**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| ROBERT YOUNG, | * | Civil Docket Number: |
| | * | |
| Plaintiff, | * | |
| | * | JUDGE: |
| v. | * | |
| | * | |
| JAMES LEBLANC, SECRETARY OF | * | MAGISTRATE: |
| DEPARTMENT OF PUBLIC SAFETY AND | * | |
| CORRECTIONS; SETH SMITH, CHIEF OF | * | |
| OPERATIONS, DEPARTMENT OF PUBLIC | * | |
| SAFETY AND CORRECTIONS; SHERIFF | * | |
| TONY MANCUSO, SHERIFF OF | * | |
| CALCASIEU PARISH; SHERIFF TONEY | * | |
| EDWARDS, SHERIFF OF CATAHOULA | * | |
| PARISH; WARDEN ERIC STOTT; FORMER | * | |
| WARDEN PAT BOOK; CPSO SGT. BEASON; | * | |
| CPSO SGT. PRINCE; CPSO SGT. GUTHRIE; | * | |
| CPSO DEP. SANCHEZ; CPSO DEP. MARGIE | * | |
| PRICE; UNKNOWN CPSO DEPS. JANE AND | * | |
| JOHN DOES, | * | |

Defendants.

**COMPLAINT**

## I.    INTRODUCTION

1.    Like many sheriff-owned, rural correctional centers, Catahoula Correctional Center ("CCC") is responsible for safely holding both sentenced and pre-trial prisoners from around the state. There are two entities responsible for ensuring the safety of people held in custody at CCC: the Louisiana Department of Public Safety and Corrections (hereinafter DPSC, and named as JAMES LEBLANC, Secretary of DPSC, and SETH SMITH, Chief of Operations of DPSC), and Sheriff TONEY EDWARDS (Sheriff of Catahoula Parish). Each of these Defendants have allowed dangerous conditions of confinement to develop and persist at CCC. On information and belief, each of these entities is aware that CCC has no functional classification system, investigative

oversight, or staff supervision in place. On further information and belief, each of these entities is aware that these conditions allow the threat of serious injury to inmates from rampant violence to go unchecked. As a direct result of these conditions, the Plaintiff was stabbed and scalded with a boiling liquid. His attackers were people who should not even have been housed on the same unit with him. As a result of this preventable assault and battery, the Plaintiff suffered serious injuries for which compensation is due.

## II. JURISDICTION

2.    This action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law, pursuant to 28 U.S.C. § 1367.

3.    Venue is proper in the Middle District of Louisiana under 28 U.S.C. § 1391(b)(2) because Defendants JAMES LEBLANC and SETH SMITH are domiciled in this District and DPSC operations are based in this District.

## III. PARTIES

### PLAINTIFF

4.    **ROBERT YOUNG** is a citizen of the full age of majority of the State of Louisiana and is currently domiciled in Westlake, Louisiana.

### DEFENDANTS

5.    **JAMES LEBLANC**, in his individual and official capacities as Secretary of DPSC, is an adult citizen of the State of Louisiana and domiciled in the Middle District of Louisiana. At all times described herein, he was Secretary of DPSC, and, as such, was responsible for making, altering, amending, and promulgating rules and regulations necessary for the

2

administration of the functions of DPSC, as well as for organizing, planning, supervising, directing, administering, and executing programs vested in DPSC. Further, **LEBLANC** is responsible for setting goals and priorities for strategic plans periodically developed by DPSC. **LEBLANC** is a signatory to the Basic Jail Guidelines (the "Guidelines")—which purport to mandate minimum conditions of confinement at non-DPSC facilities housing DPSC inmates— and is responsible for oversight, review, revision, and promulgation of the Guidelines. **LEBLANC**'s major focus since at least 2016 has been on ensuring that people in his custody, including those people held in local jails, are in "good shape" before they return to their local communities. He is responsible for all actions of DPSC and its staff. He was and is the direct superior to the Chief of Operations for DPSC, with whom he has regular meetings and correspondence. He was and is a final policy maker. He is liable directly and as a supervisor for the actions complained of herein.

6.     **SETH SMITH**, in his individual and official capacities as Chief of Operations for DPSC, is an adult citizen of the State of Louisiana and domiciled in the Middle District of Louisiana. At all times described herein, he was Chief of Operations at DPSC, and, as such, was responsible for making, altering, amending, and promulgating rules and regulations necessary for the administration of the functions of DPSC, as well as for organizing, planning, supervising, directing, administering, and executing programs vested in DPSC. He is responsible for actions of DPSC and its staff relating to incident management, state and local operations, internal affairs / crisis management, offender assignment and transfers, employee training, pre-classification and records, audits, sheriffs' billing, and the Guidelines, *inter alia*. According to Department Regulation JO-1, **SMITH** is responsible for ensuring appropriate policies and procedures are in place to comply with the provisions of the Guidelines. He is directly responsible for monitoring

3

the Guidelines process of local facilities and is responsible for overseeing audits of those facilities. **SMITH** also directly receives monthly reports of all local jail activities, including unusual occurrences, deaths, major disturbances, and serious injuries. **SMITH** regularly reports directly to **LEBLANC**. **LEBLANC** and **SMITH** meet, email, and otherwise communicate regularly to discuss any problems related to the aspects of DPSC's functions under **SMITH**'s supervision. He was and is a final policy maker. He is liable directly and as a supervisor for the actions complained of herein.

7. Sheriff **TONY MANCUSO**, in his official and individual capacities as Sheriff of Calcasieu Parish Sheriff's Office, is an adult an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, he was Sheriff of Calcasieu Parish, and as such, was responsible for the secure holding of Calcasieu Parish prisoners. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

8. Sheriff **TONEY EDWARDS**, in his official and individual capacities as Sheriff of Catahoula Parish Sheriff's Office ("CPSO"), is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, he was Sheriff of Catahoula Parish, and as such, was responsible for the management and operation of CCC. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

9. **WARDEN ERIC STOTT**, in his individual and official capacities as the current Warden of CCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. On information and belief, Defendant STOTT was either Warden or Assistant Warden of CCC at the time of the events described herein, and, as such, was responsible for the

4

hiring, training, supervision, discipline, and control of the deputies under his command. He was responsible for all actions of the staff at CCC. At all times described herein, he was an employee of Defendant SHERIFF EDWARDS.  He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

10.    **FORMER WARDEN PAT BOOK,** in his individual capacity as the former Warden of CCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. On information and belief, if Defendant STOTT was not Warden at CCC at the time of the events described herein, then Defendant BOOK was the Warden at CCC during the relevant time, and in any event it appears that BOOK was the Warden at CCC in the months and years leading up to the attack on Plaintiff, such that his actions and inactions contributed to the unconstitutional conditions at CCC. During the time he was Warden at CCC, BOOK was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command. He was responsible for all actions of the staff at CCC while he was Warden, and he was a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

11.    **CPSO SGT. BEASON**, **CPSO SGT. PRINCE**, and **CPSO SGT. GUTHRIE**, in their individual capacities as correctional officers at CCC, are adult citizens of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, these Defendants were employed by Defendant **SHERIFF EDWARDS** as ranking correctional officers at CCC. As such, they were responsible for the supervision, discipline, and control of correctional officers under their command and maintaining the care, custody, and control of individuals in the custody of CCC. They are liable both directly and vicariously for the actions complained of herein.

5

12.     **CPSO DEP. SANCHEZ, CPSO DEP. MARGIE PRICE**, and **UNKNOWN CPSO DEPS. JANE AND JOHN DOES**, in their individual capacities as correctional officers and / or classification specialists at CCC, are adult citizens of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, these Defendants were employed as correctional officers at CCC. As such, they were responsible for maintaining the care, custody, and control of individuals in the custody of CCC. They are liable directly for the actions complained of herein.

## IV.     FACTUAL ALLEGATIONS

### A. Louisiana's "outcamp" system of incarceration

13.     In 1996, as a means of resolving the capacity limitations in state-operated facilities, DPSC entered a formal partnership with Louisiana Sheriffs to hold DPSC-sentenced prisoners in facilities owned and operated by Sheriffs and private entities. These non-DPSC facilities are supposed to operate in accordance with Guidelines developed by both DPSC and the Louisiana Sheriff's Association. The Guidelines are meant to assure that this "outcamp" system does not jeopardize the fundamental rights of DPSC prisoners housed in non-DPSC facilities. The Guidelines have undergone periodic updates and revisions (the most recent being on October 1, 2019) and are signed by JAMES LEBLANC and the Executive Director of the Louisiana Sheriff's Association.

14.     According to Department Regulation JO-1, the Guidelines "represent a consensus of professional opinion and management experience and are considered the minimum conditions necessary to ensure the safe, efficient, effective and legal operation of a jail facility." LEBLANC has pledged that if local facilities are not complying with the Guidelines, his practice is to send

6

someone "to sit down with the sheriff and his warden to talk about how we're going to fix [the facility]. So it's one of those deals where we try to help them get where they need to be."

15.     A quarter century after this agreement was first formalized, DPSC facilities had capacity for 15,565 people while non-DPSC facilities had capacity for 15,247 people. In other words, nearly half the capacity for housing Louisiana's sentenced population is in non-DPSC facilities.

16.     On information and belief, Sheriff TONEY EDWARDS entered a contract with DPSC to house sentenced prisoners in one or more of Catahoula Parish's correctional facilities, including CCC.

**B.  The Plaintiff is arrested and transferred to CCC as a pretrial inmate.**

17.     The Plaintiff is a resident of Calcasieu Parish, Louisiana.  Because of damage during Hurricane Laura in 2020, people arrested for criminal offenses in Calcasieu are not held for trial at the Calcasieu Parish Jail.  Instead, they are sent to a variety of different facilities across the state, including CCC.

18.     In April 2022, the Plaintiff was arrested and booked in Calcasieu Parish on non-violent charges.  He was transferred to CCC on April 19, 2022.  At all relevant times during his incarceration at CCC, the Plaintiff was a pretrial detainee rather than a convicted inmate.

19.     The Plaintiff would remain at CCC until he was brutally attacked by violent DPSC inmates with whom he should not have been housed because of their different legal status. These inmates were placed in the facility pursuant to the "outcamp" policies and practices of the Sheriff and DPSC Defendants LEBLANC and SMITH.  As described below, the Plaintiff's attack was part of a pattern of pervasive violence at CCC resulting from the policies and practices of LEBLANC, SMITH, SHERIFF MANCUSO and SHERIFF EDWARDS.

7

**C. The DPSC Defendants and SHERIFF EDWARDS fail to provide constitutional conditions of confinement at CCC.**

20.     On information and belief, the contract to house DPSC prisoners at CCC requires the facility to be operated in compliance with DPSC's Guidelines. Further, the Prisoner Housing Agreement initially entered in October 2020 and renewed in 2022 between SHERIFF MANCUSO and WARDEN BOOK, which provided for "the secure housing of Calcasieu Parish prisoners" until the Calcasieu detention facilities were repaired was conditioned on the requirement that the "Housing Agency must meet the minimum standards as outlined in the LSA/DOC Basic Jail Guidelines or satisfy the American Correctional Association Standards. In addition, Housing Agency must comply with all applicable federal, state, or local laws and regulations."

21.     Guideline II-A-012 requires a classification system that includes a written policy and procedure providing for a written classification plan. Housing assignments are to consider age, gender, legal status, custody needs, special problems and needs, and behaviors. Further, classification must be done by an objective process that identifies appropriate custody and appropriate housing assignment and identifies the prisoner's interest and eligibility to participate in programs. The Guidelines identify housing records and classification records as appropriate documentation to demonstrate adherence to this guideline.

22.     Guideline II-A-003 requires sufficient staff to perform functions relating to the security, custody, and supervision of prisoners at all times. The Guidelines state that adherence to the guideline can be demonstrated through records of staff deployment, facility logs, and records showing an annual review and analysis of the staffing plan.

23.     Guideline II-A-008 requires records to accompany a prisoner at the time the prisoner is transferred to a local or DPSC facility. Those records include but are not limited to records of classification actions and reports of disciplinary actions, grievances, incidents, or crimes

committed while in custody. The Guidelines state adherence to this guideline can be demonstrated through reports and completed forms.

24.     Although Sheriff EDWARDS and his supervisors, including Defendants STOTT and BOOK, had an obligation to develop and implement a classification system to assess risk and efficiently manage the pre-trial detainee and sentenced-prisoner population, on information and belief, these Defendants failed to meet even the minimum standards set by the Guidelines. Among other failings, it is believed these Defendants intermingled pre-trial detainees with sentenced prisoners, failed to follow their own written classification policies, failed to appropriately or adequately classify people based on information available at intake, and failed to regularly review classification status of all individuals in their custody.

25.     Further, on information and belief, Defendants EDWARDS, STOTT, and BOOK failed to hire sufficient, qualified staff, and failed to adequately monitor and train correctional officers working in prisoner housing areas at CCC. As a result, staff improperly supervised inmates and failed to document and investigate acts of violence amongst inmates, which allowed preventable harm to come to prisoners and detainees due to lack of supervision and lack of re-classification procedures in response to violence.

26.     On information and belief, as a result of these patterns and practices, CCC had no proper classification plan and inmates were assigned to housing units based on available beds without regard to custodial status, disciplinary history, known enemies, or any other consideration included in classification plans. Although the Guidelines clearly require consideration of legal status in classifying people, CCC, as operated by SHERIFF EDWARDS, failed in this most basic of classification measures.

**D. The improper classification policies and staff and supervision deficiencies result in excessive violence at CCC.**

27.     On information and belief, the policies and practices described above have resulted in excessive levels of violence amongst inmates at CCC.  Some of the reported instances of violence include:

    a.  In October 2018, Kevin Percle, a pretrial detainee from Lafourche Parish, was transferred to CCC.  Shortly after he arrived, Percle was involved in an altercation with another inmate and suffered a blow to the head. Because of a lack of supervision, no CCC staff were aware of the altercation. Percle was then transferred back to Lafourche Parish, where he was found unconscious in his cell on November 12, 2018.  He died shortly afterwards. An autopsy revealed the cause of death to be homicide from blunt force trauma to the brain.

    b.  In March 2021, Christopher Hasty claims that a DOC inmate attacked him in E-Dorm at CCC.  Mr. Hasty asserts the DOC inmate stabbed him in the foot during the attack.  Mr. Hasty was taken off the dorm, but a few days later the same DOC inmate who attacked him was placed in the same cell with him and attacked him again.  Mr. Hasty filed a pro se complaint about the incidents in this Court under docket number 21-cv-3685, but the complaint was dismissed without prejudice based on Mr. Hasty's failure to update his address with the Court.

    c.  On June 10, 2021, Larry Smith, an inmate at CCC, was attacked and stabbed by one or more other inmates.  Mr. Smith suffered a penetrating injury from his mouth into his sinuses which resulted in his death.

    d.  In September 2021, Huey Vallaire was being housed at CCC.  On September 21, he claims to have been attacked by 20 other inmates for no known reason.

He was injured in his eye, scalp, and ribs. He was placed in an isolation cell and given minimal medical attention. Eventually, he was transferred to Elayn Hunt Correctional Center, where he received X-rays revealing fractured ribs. Mr. Vallaire filed a pro se complaint regarding the incident in this Court under docket number 22-cv-0814. However, the suit was dismissed after Mr. Vallaire failed to respond to an order from the Court to provide additional information regarding his claim.

e. In January 2022, Dalton Jaquillard was an inmate on J-Dorm at CCC. He claims to have asked staff to take him off the dorm because of threats from other inmates, but staff refused to move him. Then, on January 7th, he claims to have been severely beaten by five other inmates on J-Dorm at CCC. Although he again tried to get security staff to take him off the dorm for his safety, they would not do so until two days after the attack. Although he was initially denied medical attention, he was eventually routed to the hospital on January 10, 2022, where he received a CT scan that showed the right side of his face was severely fractured and required surgery. Mr. Jaquillard filed a complaint in this Court alleging these facts under docket number 22-5755. Although claims against some defendants were dismissed, claims against other defendants remain pending.

f. On November 10, 2022, Montrell Rogers, an inmate at CCC who had just been transferred from East Carroll Parish, was reportedly stabbed to death by as many as eight other inmates. According to news reports, Mr. Rogers had told

11

staff that he would be killed if he were placed on the dorm with the other inmates, but he was ignored.

28. On information and belief, these incidents are just a small fraction of the daily or near daily violence that occurs amongst inmates housed at CCC.

29. Defendant SHERIFF EDWARDS and his employees, including Defendants STOTT and BOOK, ignored these prior incidents of violence, severe injury, and death, and took no action to appropriately classify and house people in their custody to prevent further acts of violence. On information and belief, they also did not require appropriate in-service training or re-training of correctional officers who were known to have engaged in misconduct in failing to appropriately document, report, investigate, or otherwise respond to violence and threats of violence on housing units. On further information and belief, they refused to terminate, suspend, discipline, warn, or in any way punish and / or re-train correctional officers and rank for incidents involving failures to remain on post, failing to adequately carry out duties, failing to report, and failing to investigate, thereby failing to adequately discourage further constitutional violations by their correctional officers, including Defendant correctional officers in this case.

30. Sheriff EDWARDS, STOTT, and BOOK knew, must have known, and should have known that conditions of confinement at CCC were constitutionally inadequate because of the risks of serious harm posed to all prisoners by the extreme levels of violence. Sheriff EDWARDS knew, must have known, or should have known of the serious risk of harm posed by the conditions at CCC.

**E. Despite awareness of unconstitutional conditions at CCC, LEBLANC and SMITH fail to enforce basic Guidelines to address the problems and SHERIFF MANCUSO continued to pay CCC to hold Calcasieu prisoners.**

31.     Guideline VII-B-008 requires non-DPSC facilities, including CCC, to submit a monthly report of activities to Defendant SETH SMITH as Chief of Operations. These monthly reports must include unusual occurrences, deaths, altercations, injuries requiring routes to hospitals, and any other activities required under departmental regulation C-005-001. These monthly reports are used to compile Guidelines Quarterly Summary Reports.

32.     SMITH regularly reports directly to LEBLANC. LEBLANC and SMITH meet, email, and otherwise communicate regularly to discuss any problems related to the aspects of DPSC's functions under SMITH's supervision.

33.     On information and belief, these reports will show that SMITH and LEBLANC were aware that CCC housed DPSC and non-DPSC individuals together and were aware that this practice resulted in violence, and they were further aware that deaths, serious injuries, and hospital routes were regularly occurring because of the level of violence at CCC.  For example, the previously described incidents and other suspected incidents of violence should have been documented in the reports sent to SMITH and LEBLANC.

34.     Non-DPSC facilities, including CCC, are required to submit statements of compliance with the Guidelines annually, which must include proposed expansions, available rehabilitative programs, and a summary of reentry initiatives. The only external validation or evidence that must accompany these statements of compliance are Fire Marshal and Health Inspection reports.

35.     CCC was required to notify the Calcasieu Parish Sheriff's Office and SHERIFF MANCUSO immediately of any medical emergency including injury. Even where reports of injuries and medical emergencies revealed unconstitutional conditions and deviations from the

13

Guidelines' standards, MANCUSO willfully turned a blind eye and continued to allow Calcasieu prisoners to be detained at CCC.

36. Even where the policies and incident reports of non-DPSC facilities' plainly reveal unconstitutional conditions and deviations from the Guidelines' standards, SMITH and LEBLANC have willfully turned a blind eye and refused to direct audits that would meaningfully examine non-DPSC facilities' implementation of the Guidelines.

37. MANCUSO, SMITH and LEBLANC each ignored the serious risk of harm and actual harm befalling people at CCC.

38. Further, Sheriff MANCUSO, Secretary LEBLANC and Chief of Operations SMITH chose to continue to contract with Sheriff EDWARDS to house sentenced DPSC prisoners at CCC despite the dangerous conditions there. Defendant LEBLANC has authority to determine whether to house DPSC prisoners at local facilities based on the facilities' adherence to the Guidelines.

39. Sheriff MANCUSO has authority to determine whether to house Calcasieu prisoners at CCC, based on the facilities' performance of the Prisoner Housing Agreement, including adherence to the Guidelines.

40. LEBLANC directly appointed SMITH, and SMITH directly reports to LEBLANC. All information available to SMITH regarding CCC's inadequate classification policy and reported assaults was also available to LEBLANC.

41. According to DPSC, "[t]he Secretary sets the tone for and leads the agency. The Secretary is responsible for development and promulgation of policy, the proper functioning and control of programs, initiating and monitoring legislative issues affecting the agency, and broad oversight of institutions, probation and parole services and other major program activities."

14

42.     LEBLANC sets the tone by developing strategic plans for DPSC. His 2019 strategic plan listed as an objective effectively using local facilities as an alternative to state correctional facilities. To meet this strategic goal, LEBLANC intended both to ensure that local jails complied with the Guidelines, and to increase the use of reception centers to assist with appropriate housing assignments. In 2019, LEBLANC was aware that local jails needed to comply with the Guidelines. He was also aware that DPSC needed to ensure that local jails were using appropriate classification practices and procedures if DPSC was to continue housing people in such "outcamp" facilities.

43.     Under LEBLANC's direction as Secretary, in 2019, DPSC spent $155 million on "outcamp" operations. In 2020, DPSC expended $173 million on such operations, almost a quarter of DPSC's total budget.

44.     Further, LEBLANC and SMITH have authority to review files and other necessary information to determine if local facilities are complying with the Guidelines. The reports of assaults and deaths, the clear presence of weapons and other contraband, and the clear lack of classification system at CCC resulting in a pattern of injuries put SMITH and LEBLANC on notice of the dangerous and unconstitutional conditions at CCC. On information and belief, the Guidelines Quarterly Summary Reports from CCC showed that DPSC and non-DPSC prisoners were in contact with each other and that violence was resulting from that contact. However, LEBLANC failed to take action to address this blatant problem.

45.     Despite the significant expenditures DPSC makes on local facilities, neither SMITH nor LEBLANC took steps to look beyond self-serving reports from CCC regarding compliance with the Guidelines and the adequacy of the conditions of confinement at CCC.

46.     This problem extends beyond CCC to a range of local jail facilities. In 2019, non-DPSC facilities in Madison, Ouachita, Franklin, and Tensas parishes all reported at least five

serious altercations and assaults involving DPSC and non-DPSC individuals on the same housing units. Despite these reports of violence arising from co-housing DPSC and non-DPSC individuals together, annual compliance reports for these facilities found them in compliance with the Guidelines, including for classification and offender management systems.

47.     Defendants SMITH and LEBLANC's failures to ensure adequate classification and staffing at facilities like CCC housing DPSC prisoners pose credible ongoing threats of harm to Plaintiff.

48.     It was and is the policy and / or custom of Defendants LEBLANC and SMITH to inadequately monitor, audit, review, and supervise local jail facilities, including CCC, thereby failing to ensure that prisoners were not subjected to unconstitutional conditions and / or unreasonable risks of harm.  They also failed to adequately discourage further constitutional violations at "outcamp" facilities holding DPSC prisoners and created a risk of harm to both sentenced prisoners and pretrial detainees held in these facilities.

49.     It was and is the policy and / or custom of Defendant MANCUSO to inadequately monitor, audit, review, and supervise local jail facilities, including CCC, which have been entrusted with safely holding Calcasieu prisoners, thereby failing to ensure that Calcasieu prisoners were not subjected to unconstitutional conditions and / or unreasonable risks of harm. He also failed to adequately discourage further constitutional violations at agencies holding Calcasieu prisoners and created a risk of harm to both sentenced prisoners and pretrial detainees held in these facilities.

**F. The Plaintiff becomes another victim of the unconstitutional patterns and practices at CCC.**

50.     On August 8, 2022, Plaintiff Robert Young became another victim of the rampant violence and unconstitutional conditions at CCC.  On that date, Mr. Young was housed on E-Dorm

16

at CCC. E-Dorm has approximately 66 beds and housed a mixture of pretrial detainees and convicted DPSC prisoners.

51.    Mr. Young witnessed numerous fights amongst prisoners during his time on E-Dorm.  Often, these fights occurred between detainees and DPSC inmates because detainees were engaged in fighting their cases in various ways (e.g., meeting with lawyers, going to court, etc.). The pretrial detainees' coming and going and conversations about their cases could aggravate the DPSC inmates, who were simply trying to do their time.

52.    There was very little staff supervision on E-Dorm such that guards rarely intervened in the fights and there were rarely any consequences imposed on inmates.

53.    On information and belief, Defendants **CPSO SGT. BEASON**, **CPSO SGT. PRINCE**, **CPSO SGT. GUTHRIE, CPSO DEP. SANCHEZ, CPSO DEP. MARGIE PRICE**, and **UNKNOWN CPSO DEPS. JANE AND JOHN DOES** were on-duty at CCC on August 8, 2022.  On further information and belief, one or more of these Defendants had caused the Plaintiff to be housed on a dorm in which pretrial detainees and DPSC prisoners were intermingled. Additionally, on information and belief, each of these Defendants was aware that the Plaintiff was housed on a dorm that intermingled pretrial detainees and convicted prisoners.

54.    These CCC Defendants individually and collectively had a responsibility to maintain security and provide protection to inmates at CCC, including the Plaintiff. However, these Defendants failed in that duty, both by failing to supervise the dorms (including E-Dorm) and by knowingly co-mingling pretrial inmates like the Plaintiff with DPSC inmates like his attackers.

55.    On August 8, 2022, the Plaintiff was trying to exercise while on E-Dorm. Suddenly, he was attacked by two DPSC inmates who stabbed him in the back five times.  The

17

inmates then poured scalding hot liquid on the Plaintiff's face, resulting in first and second degree burns and injuries to his eye.

56.     The Plaintiff managed to escape his attackers and tried to signal for help from guards.  However, he could not get any staff attention, either because no one was monitoring what was occurring in the tier or because none of the CCC Defendants were willing to come to the Plaintiff's aid.

57.     After he tried to shower some of the blood from his wounds, two other inmates tried to attack the Plaintiff. The Plaintiff managed to escape these inmates and again attempted to signal for help.  This time, an unknown officer removed him from the dorm.

58.     The Plaintiff was then transferred to the hospital where he received treatment for his stab wounds and burns to his face and eye.

59.     Shortly after the attack, the Plaintiff pleaded guilty and received a sentence that required him to be transferred to a work release facility.

## V.     CAUSES OF ACTION

### COUNT ONE

### VIOLATION OF THE U.S. CONSITUTION, EIGHTH AND FOURTEENTH AMENDMENTS

### (Against All Individual Capacity Defendants)

60.     Defendants, acting individually and together, under color of law, acted to violate Plaintiffs' right to due process and equal protection of the laws as protected by the Fourteenth Amendment and (to the extent applicable) the Eighth Amendment of the United States Constitution, all in violation of 42 U.S.C. § 1983.

61.    At all times described herein, Defendants, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the constitutional rights and safety of Plaintiff.

62.    The Defendants' failures, as described above, were a moving force in the substantial risk of harm and unconstitutional conditions of confinement leading to Plaintiff's injuries.

63.    Defendants' violated Plaintiff's clearly established rights of which reasonable persons in Defendants' position knew or should have known.

64.    Defendants' conduct was intentional and willful, and in reckless disregard for the Plaintiff's constitutional rights.

## COUNT TWO

### VIOLATION OF THE U.S. CONSTITUTION, FOURTEENTH AND EIGHTH AMENDMENTS

**(Against Sheriff EDWARDS, MANCUSO, in his individual and official capacity, and against LEBLANC and SMITH in their individual and official capacities)**

65.    Plaintiffs repeat and re-allege each and every allegation of the complaint.

66.    Defendants EDWARDS, MANCUSO, LEBLANC and SMITH, acting individually and together, under color of law and in the course and scope of their employment, acted to violate Plaintiffs' rights to due process of law protected under the Fourteenth Amendment (and 42 U.S.C. § 1983) and right to be free from cruel and unusual punishment under the Eighth Amendment (and 42 U.S.C. § 1983).

67.    The misconduct described above was caused by the policies, practices, and customs of Defendants EDWARDS, MANCUSO, LEBLANC and SMITH.

68.   These Defendants knew of the extreme levels of violence at CCC, the lack of proper classification, the lack of investigation and response to known drivers of violence, and the chronic understaffing, but nevertheless continued to operate the facility with minimal adjustments, including continuing to house sentenced DPSC prisoners in the facility, allowing an intolerable risk of harm to come to those held in custody at CCC, including Plaintiff.

69.   Defendants knew of the failure of individuals at CCC to perform crucial duties, including failures to properly implement a classification plan, failures of correctional officers under their supervision to respond appropriately to imminent risks of harm, and failures to investigate and discipline with respect to incidents of harm.

70.   As final policymakers, these Defendants, acting individually and collectively, engaged in, established, condoned, ratified, and encouraged customs, policies, usages, practices, patterns, and procedures that they knew would and did directly and proximately create conditions of confinement that failed to mitigate serious risks of harm to people in custody at CCC, including Plaintiff, thereby violating his constitutional rights protected under the Fourteenth and Eighth Amendment.

71.   Further, these Defendants failed to establish and maintain policies to mitigate known and / or obvious serious risks of harm, and these Defendants knew or should have known that such failures would deprive people in their custody, including Plaintiff, of his constitutional rights under the Fourteenth and Eighth Amendments.

72.   Defendants were aware that the policies, procedures, practices, customs, and usages they established and those they failed to establish would result in violations of constitutional rights.

73.   The did so by engaging in, establishing, condoning, ratifying, and encouraging policies, customs, usages, practices, patterns, and procedures that they knew would and did directly

and proximately create conditions of confinement that failed to mitigate serious risks of harm to people in their custody, including Plaintiff, thereby violating his constitutional rights protected under the Fourteenth and Eighth Amendments.

74.     These policies and practices specifically include Defendants' practice of failing to adequately classify detainees or develop and implement an adequate classification plan, failing to ensure adequate investigation into critical incidents, failing to implement corrective action plans to address known substantial risks of harm, failing to ensure deputies were observing housing units, failing to investigate incidents of harm, failing to provide appropriate training and supervision of staff, and failing to ensure adequate staffing.   These policies created unconstitutional conditions of confinement that allowed known and substantial risks of serious injury to go unmitigated.

75.     Further, these policies and practices include MANCUSO, SMITH and LEBLANC's practice of ignoring reports that essential requirements of the Guidelines had not been implemented, ignoring obvious and ongoing dangerous conditions created by the failure to enforce the Guidelines' requirements, failing to engage in oversight of CCC sufficient to prevent violations of constitutional rights, and failing to respond to obvious violations of the constitutional rights of people held at CCC.

76.     These actions, and failures to act, were a moving force in the substantial risk of harm and unconstitutional conditions of confinement leading to Plaintiff's harms.

77.     Defendant EDWARDS was aware of the need to supervise, train, investigate, and discipline his subordinates to mitigate unreasonable risks of harm to people in Defendants' custody.

78.    Despite this knowledge, Defendant EDWARDS failed to train, supervise, or discipline individuals who engaged in behaviors that contributed to unconstitutional conditions at CCC. This failure to train and supervise was a moving force behind the harm experienced by Plaintiff, in violation of his Eighth and Fourteenth Amendment rights.

79.    The Defendants named in this Count acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional rights of Plaintiffs by failing to mitigate known and / or obvious serious risks of harm. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the Defendants, were allowed to exist because policymakers with authority over these acts exhibited deliberate indifference to the problems, thereby effectively ratifying them.

80.    The policies, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiffs to suffer the grievous and permanent injuries and damages set forth above.

81.    These Defendants ignored the serious risk of harms they created and acted unreasonably and with deliberate indifference to Plaintiff's constitutional rights, as described above.

## COUNT THREE

### VIOLATION OF THE LOUISIANA CONSTITUTION

### (Against Defendants EDWARDS and MANCUSO)

82.    Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law," and Section Twenty prohibits cruel and unusual punishment.

83.    By reason of the same conduct that violated Plaintiff's federal constitutional rights, Defendant EDWARDS violated the Plaintiff's state constitutional rights to liberty, due process, and to be free from cruel and unusual punishment.

84.    This conduct resulted in the assaults on Plaintiff and caused the physical, emotional, and pecuniary damages as described above and below.

## COUNT FOUR

### STATE LAW CLAIM FOR
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Defendants EDWARDS and MANCUSO)

85.    Defendant EDWARDS' conduct, by, among other things, knowingly subjecting Plaintiff to unconstitutional conditions of confinement at CCC, occurred while Plaintiff was reliant on Defendant EDWARDS and his staff to ensure his safety.

86.    Plaintiff suffered severe emotional distress caused by the unconstitutional conditions at CCC and the assault that occurred against him.

87.    Defendant EDWARDS knew that severe emotional distress would be certain, or substantially certain, to result from his conduct and the conduct of his staff in failing to provide constitutional conditions of confinement at CCC.

88.    Plaintiff's status as a pretrial detainee entitled him to a greater degree of protection from these Defendants.

89.    As a result of the unlawful actions of EDWARDS and his staff, Plaintiff suffered damages including emotional distress.

90.    Defendant EDWARDS in his official capacity is liable for the acts and / or omissions of his agents and employees.

91. Defendant EDWARDS, either directly or by and through his agents, directly and proximately caused Plaintiff's severe injuries, damages and losses.

## COUNT FIVE

### NEGLIGENCE

### (Against Defendants EDWARDS and MANCUSO)

92. Defendant EDWARDS, as a jailer, had a duty to care for the safety of detainees in his custody, and protect detainees in his custody from harm.

93. Defendant EDWARDS, in his official capacity as Sheriff, is liable for the acts and / or omissions of his agents and employees.

94. Plaintiff was a detainee in the custody of Defendant EDWARDS.

95. Defendant EDWARDS breached his duty with his and his employees' acts and omissions, when they failed to classify, observe, and secure the safety of detainees. These acts and omissions created an unreasonable risk of injury to Plaintiff.

96. The risks and harms that Defendant EDWARDS caused were within the scope of protection afforded by the duties owed to Plaintiff.

97. Defendant EDWARDS knew or should have known of these risks but failed to take adequate steps to make the conditions of confinement at CCC safe.

98. Defendant EDWARDS' breach of the duty of care, through his acts and omissions and the acts and omissions of his employees, directly and proximately caused the Plaintiff's injuries.

### VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff ROBERT YOUNG prays for the following relief:

    a. Declaratory relief;

24

b.  Injunctive relief;

c.  Judgment against Defendants for Plaintiff's asserted causes of action;

d.  An order and judgment granting reasonable attorney's fees and costs incurred pursuant to 42 U.S.C. § 1988 with all legal interest;

e.  Award of compensatory damages as allowed by law;

f.  Award of punitive damages as allowed by law;

g.  All other relief as may be just and proper.

Respectfully submitted,

/s/ Elizabeth Cumming
**ELIZABETH CUMMING (**Bar Roll No. 31685), T.A.
**EMILY WASHINGTON** (Bar Roll No. 34143)
Roderick and Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
Phone: (504) 620-2259
Fax: (504) 208-3133
elizabeth.cumming@macarthurjustice.org
emily.washingting@macarthurjustice.org

-AND-

/s/ Stephen J. Haedicke
**STEPHEN J. HAEDICKE** (Bar Roll No. 30537)
Law Office of Stephen J. Haedicke
1040 Saint Ferdinand St.
New Orleans, LA 70117
(504)291-6999 Telephone
(504)291-6998 Fax
stephen@haedickelaw.com

*Attorneys for Plaintiff*

26