Transcript of the Testimony of

# JAMES LEBLANC

April 17, 2025

ROBERT YOUNG v. JAMES LEBLANC

AMERSON WHITE
COURT REPORTING · EST.2000

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT YOUNG,<br>Plaintiff, | CIVIL DOCKET NO.<br>23-681-SDD-RLB |
| VERSUS | JUDGE:<br>SHELLY D. DICK |
| JAMES LEBLANC, ET AL,<br>Defendants. | MAGISTRATE:<br>RICHARD L. BOURGEOIS |

VIDEOCONFERENCE DEPOSITION OF JAMES LEBLANC, taken via Zoom, in the above-entitled cause on the 17th of April, 2025, commencing at 9:09 a.m.

REPORTED BY: CHERIE' E. WHITE
CCR (LA), CSR (TX), CSR (MS), RPR
CERTIFIED COURT REPORTER

APPEARANCES:

ATTORNEYS REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
4400 South Carrollton Avenue
New Orleans, Louisiana 70119
Phone: 504.620.2259 |Fax: 504.208.3133

(BY: Emily Washington, Esquire)
E-mail: emily.washington@macarthurjustice.org

CO-COUNSEL REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

LAW OFFICE OF STEPHEN J. HAEDICKE
1040 Saint Ferdinand Street
New Orleans, Louisiana 70117
Phone: 504.291.6999 |Fax: 504.291.6998

(BY: Stephen J. Haedicke, Esquire)
E-mail: stephen@haedickelaw.com
(Not present)

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, CATAHOULA PARISH SHERIFF'S OFFICE:

FROSCH, RODRIGUE, ARCURI, L.L.C.
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Phone: 504.592.4600 |Fax: 504.592.4641

(BY: Ronald "Shane" Bryant, Esquire)
E-mail: sbryant@fralawfirm.com

ATTORNEYS REPRESENTING THE DEFENDANT, CALCASIEU PARISH SHERIFF:

MUDD, BRUCHHAUS & KEATING, LLC
422 E. College Street, Suite B
Lake Charles, Louisiana 70605
Phone: 337.562.2327 |Fax: 337.562.2391

(BY: Lenzi C. Hebert, Esquire)
E-mail: lhebert@mbklaw.net

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, JAMES LEBLANC AND MR. SMITH:

FRILOT, LLC
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Phone: 504.599.8016 |Fax: 504.599.8116

(BY: A. J. Krouse, Esquire)
E-mail: ajkrouse@frilot.com

ALSO PRESENT:
Elizabeth Cumming, Esq.

E X A M I N A T I O N  I N D E X

BY: PAGE

Ms. Washington 7

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically NOT waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

CHERIE E. WHITE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath.

JAMES LEBLANC,

after having first been duly sworn by the above-mentioned Court Reporter did testify as follows:

EXAMINATION BY MS. WASHINGTON:

Q. Good morning, Secretary.
A. Good morning.
Q. My name is Emily Washington. We have spoken before. I'm one of the attorneys representing the plaintiff in this matter whose name is Robert Young, and I'll be taking your deposition this morning.

MS. WASHINGTON:
This deposition is being taken pursuant to the Federal Rules of Civil Procedure, and it's my understanding that there's no objection to this deposition being conducted by a Zoom or to the oath having just been administered remotely.

BY MS. WASHINGTON:

Q. So, Secretary Leblanc, what is your understanding of what this lawsuit is about?
A. A complaint filed by I believe Young about the conditions at the local level basically in general terms.

Q. Thank you. And have you seen the complaint or the lawsuit in this matter?
A. I have.
Q. When is the -- well, let me ask, when was the first time you saw it?
A. Last week when I met with all the attorneys.
Q. Okay. Great. So during the deposition today, I may use the acronyms DOC or DPSC to refer to the Louisiana Department of Public Safety and Corrections. You'll understand what I am referring to if I use those terms?
A. Yes, ma'am, I will.
Q. Okay. And you just sort of referenced it, but I may use the term "state facility" or "state-operated facility" or "DPSC facility" during the deposition today; and by that, I'll mean those correctional facilities that the department operates itself and uses to hold sentenced prisons. Does that make sense?
A. Yes.
Q. And then I may also use the terms "local facility" or "local jail" during the deposition today; and by that, I'll mean those facilities which hold DPSC sentenced prisoners

but which are not operated by the state itself. Does that work?

A. Yes.

Q. Okay. Now, I'm aware that you have a lot of deposition experience, so I'll try to move through this introductory portion quickly.

I took your deposition in May of last year in another matter concerning the holding of sentenced prisoners in local facilities. That was Murray versus LeBlanc. Since that deposition, have you been deposed in any other cases?

A. I don't believe, no.

Q. Okay. So we went over it last year, but I just want to briefly review some mutual expectations for the deposition today so we are on the same page.

We have Chérie here as our court reporter. She's going to be taking down everything that we say, so it's just important for you to speak up and provide verbal audible answers so that we can have a clean transcript at the end of it here.

The oath that you just took is the same oath you would take as if you were

testifying in court. You understand that?
A. Yes.
Q. Okay. And I'm just looking for full and complete answers to my questions today, so if at any point in time during the deposition you remember something that would have been responsive to a prior question that I asked, can you let me know that so that we can go ahead and supplement your testimony on the record?
A. Yes.
Q. And if at any point in time you realize that you made a mistake or you misspoke or you just need to correct a prior answer, please let me know that so that we can get your correct testimony on the record as well, okay?
A. Okay.
Q. Great. It is very likely that I will ask you a question today that you don't understand or is confusing, it's just a bad question. Please let me know that so that I can attempt to clarify or rephrase my question for you, okay?
A. Okay.
Q. I don't think that we are going to be here terribly long this morning, but you are

welcome to take a break any time that you need one. All I ask is if I've posed a question to you, that you go ahead and answer that question and then we can go off the record and take that break. Does that work?

A. That's fine. Thank you.

Q. Okay. Is there any reason, whether that's medication, stress, any kind of hardship that would interfere with you understanding and truthfully answering my questions today?

A. No.

Q. I know you mentioned meeting with your attorneys last week, and I don't want to know the -- the content of anything that was discussed, but did you prepare for this deposition today?

A. That was the only -- we met on that and went through the complaint and talked a little bit about that. That was about the extent of it.

Q. Okay. Great. Other than the complaint, are there any other documents or records that you reviewed in preparation for the deposition today?

A. No, ma'am.

Q. And do you have any documents or other reference material with you that you might be referring to during the deposition?

A. I have the complaint in front of me. And I don't have any -- I circled a couple of things here and there just out of curiosity. Other than that, I don't -- that's it.

Q. I'm sorry. I think you cut out a little bit. You said you had the complaint in front of you and what else?

A. Yeah. I had the complaint basically, no notes or anything. I maybe underlined something here or there. That was it.

Q. Okay. Thank you. Other than your counsel, have you spoken with anyone else about your deposition today?

A. No, ma'am.

Q. Okay. We have deposed a couple other DPSC employees in this matter. We spoke with Chief Smith on Monday in this case.

Have you spoken to Chief Smith about his deposition in this matter?

A. No, ma'am.

Q. And we spoke with Secretary Westcott on Tuesday.

Have you spoken with Secretary Westcott about his deposition in this matter?
A. I have not.
Q. Where are you located for this deposition?
A. I'm at home. I'm in my Tiger room at home, if you want to see that Tiger behind me right upstairs right over my head.
Q. I can see the orange a little bit. That's great.
A. Yeah. I have a -- quite a bit of memorandum bill I can here in my upstairs little manhole, if you will.
Q. That looks like a great collection on the wall.
A. Yeah.
Q. Is anyone else present there with you? I don't see anyone.
A. No, ma'am. I'm by myself.
Q. All right. And I think, as you know, in addition to the deposition that I took of you in the Murray matter that I referenced earlier last year, there were various other depositions of DPSC personnel in Murray.
Have you reviewed any of the

transcripts from the depositions taken in that matter?

A. Probably my own would be the only one.

Q. Okay.

A. I haven't -- haven't reviewed anybody else's.

Q. Okay. Do you recall having seen your -- your deposition transcript from Murray?

A. I -- you know, I know I read it --

Q. Okay.

A. -- and I made a couple of notes on it to make a few changes on the transcription, but other than that, yeah, I mean, I do remember reading it.

Q. Okay. And so that would have been pretty close in time to when that deposition was taken?

A. Yeah. Right.

Q. Have you seen it since that time?

A. No.

Q. And have you spoken with any DPSC employee that was deposed in -- in Murray? And, I mean with regard to their depositions in that matter.

A. Not that I can remember, no.
Q. Okay. Okay. Today, we may talk a little bit or I may reference the Catahoula Correctional Center. That's the local facility where the assault that's at the center of this lawsuit occurred. Have you ever been to that facility?
A. I don't think so. You know, I've made some rounds at different local facilities and I'm not sure that's one of them, to be honest with you.
Q. Okay. No. That's helpful. Thank you.
So we went pretty exhaustively through your education and work history when we spoke last year, so I just want to ask you about some updates.
Are there any new educational opportunities that you've pursued since we spoke last May?
A. No, ma'am.
Q. Okay. What about any new or renewed professional licenses or certifications?
A. Not that I'm aware of.
Q. And at the time that we spoke last

year in May of 2024, you were secretary of DPSC, correct?
A. Correct.
Q. And you remained in that position until late August of last year?
A. Correct.
Q. And you are currently still employed by the department?
A. I am.
Q. And what is your current position?
A. Warden of Hunt Correctional Center.
Q. Okay. Are there any other positions that you've held between when you were secretary for the department and this position as warden at Hunt?
A. No.
Q. And it's my understanding that you are currently out on leave; is that right?
A. Yes, ma'am.
Q. Okay. When did you go out on leave?
A. In late August.
Q. Okay. And do you have an estimate of when your -- your leave will end or when you'll be back from leave?
A. No. Actually, I -- I spent

yesterday morning with my doctor and going through that. I'm still waiting for -- I'm going through the Veterans Administration on some evaluations of issues that I'm dealing with. I haven't gotten the results of that, so I'm kind of waiting on that, so I don't know at this point --

Q. Okay. That's helpful?

A. -- when it will end.

Q. Okay. So I want to talk a little bit about your work as secretary since the last time I talked to you, so May of last year until you left the position at the end of August. Does that make sense?

A. I'm sorry. Say -- ask that again. I'm --

Q. Yeah. I'm going to ask you -- I want to ask you a few questions about your work as secretary for the department.

A. Okay.

Q. We talked a lot about that in May of last year, so I don't want to rehash the stuff --

A. Okay. Yeah.

Q. -- we were talking about --

A. That's fine.

Q. -- but I just want to talk about the window kind of between May and August of last year. Does that make sense?
A. Okay. Yeah.
Q. Okay. Thinking about that time period, can you tell me about sort of your, I don't know, major or central like tasks or initiatives that took up, say, the majority of your time during that window?
A. Well, you know, that's hard to -- to -- to pinpoint I guess to some extent. I -- as most of you know, I'm always looking ahead and working on different -- different things. I'm not sure what I could tell you between those dates exactly what -- probably some of the aftermath, if you will, of the criminal justice reform efforts. I say "reform," the criminal justice legislative hearing that they had, so trying to -- to adjust our regulations and things like that accordingly is probably what I was most focused on at the time. I don't remember exactly when the session ended, but it would have been in June at some point I think.
Q. Right. I don't remember either, but that sounds right to me too.

A. Yeah.
Q. Okay. That makes sense.
And so we talked last May about some of your kind of areas of responsibility and authority as secretary.
During that time period, and I mean May to -- May through August of last year, were there any changes to your responsibilities or authority as secretary?
A. No, ma'am, not -- no.
Q. Okay. And just to drill down on that a little bit, you continued to be responsible for promulgating policies and regulations for the department?
A. Yes, ma'am. Correct.
Q. You referenced some adjustments following the legislative session. Were there any policy or regulation changes that you recall during that period?
A. Not that I recall, but I'm sure there was. I mean, there were statutes that were changed and it would have had a reflection on -- any regulations that referenced those statutes would have had to been changed; so I don't know the specifics of that just right off, but I'm

sure there were some changes that were made.
Q. Okay. But it sounds generally that you're saying that those would have been ones that were dictated by the results of the legislative session?
A. Correct.
Q. Okay. And just in terms of your responsibilities and authority during that time period, am I correct that you continued to be responsible for setting goals and priorities for the department?
A. Yes, ma'am. Correct.
Q. Okay. I want to show you one document. I think this is the only document that you don't have in front of you that we are going to look at today. Give me one second.
(Sharing screen.)
BY MS. WASHINGTON:
Q. Let me know if you see something up there on your screen. I'll zoom in on it and we will go through a little bit of it, but I just want to make sure you can actually see what I'm sharing with you.
A. I got it. Five-year strategic plan --

Q. Yeah.
A. -- '22 to '27.
Q. Correct.
A. '23 to '27. Excuse me.
Q. So this is a document that we have previously marked as Exhibit 54 in this matter; and, as you said, it's a five-year strategic plan. It has a submission date of July of 2022 with the -- the kind of fiscal year span of '23-'24 to '27-'28. Do you see that there?
A. I do.
Q. And do you recognize this document?
A. I do.
Q. Okay. What is it?
A. It's five-year strategic plan that we submit.
Q. And were you involved in the development of this plan?
A. Our undersecretary usually takes the lead on the plan. I'm sure at some point in time through that process that I had an opportunity to review it more than prepare it in that sense, but -- you know, again, I probably had some comments here and there on the plan, I'm sure. I usually do.

Q. And by undersecretary, that would have been Undersecretary Bickham?
A. Correct.
Q. Okay. All right. Great. I want to look specifically at page 33 and 34 of this document, which is a 40-page PDF. And there's a discussion at this point in the -- the plan about the housing of state prisoners in local facilities; is that correct?
A. Yes. It's a little small, but I think --
Q. Yeah. I'm zooming in.
A. Okay. All right.
Q. Here we go.
A. All right. Thanks.
Q. Like this whole -- this sort of section that says --
A. Yeah. Got you.
Q. -- Local Housing of State Adult Offenders?
A. Go ahead.
Q. And I know when I talked to you last year, we I think talked about the prior five-year plan. And I guess before we go on, let me actually ask you that.

The prior five-year plan was submitted I believe in late 2019 and obviously extended I believe from 2020 to 2025. Do you have an understanding or appreciation as to why there was a new five-year plan entered in I guess 2022; and by that, I mean, like before kind of the expiration, for lack of a better word, of the prior five-year plan?
A. No, I don't, but I could guess maybe -- I think this is submitted through the Division of Administration and it may have been at the request from the division to submit an updated plan.
Q. Okay.
A. That would be my best guess and why we did it.
Q. Okay. And what is the Division of Administration, that's within the department?
A. No, no. That's -- that's actually under the governor's office, if you will, but it's the Commissioner of Administration --
Q. Okay.
A. -- which is -- does the budget process, does all the things that this ties into with the budget plan and -- so they are -- they

are -- they are who we submit everything through and then they submit it to the legislature.

Q. Okay. Okay. That makes sense. Thank you.

Okay. So looking back at this document, this first objective about using local facilities as an effective alternative to state correctional facilities, we talked about that objective when we spoke last year since that was included in the prior plan as well. Do you remember that?

A. Yes.

Q. Okay.

A. I remember we talked about it.

Q. Okay. So I -- what I want to ask about is objective I guess -- I don't know if that's I or 1.2, which is on the next page here, 34. It's under the same section, and it says "Decreased instances of local populations being housed in state facilities during evacuation events." Do you see that?

A. Yes.

Q. Okay. I will represent to you that this objective was not included in the prior five-year strategic plan that we were just

referencing.

Do you have an understanding as to why this objective was developed?

A. Again, I'm speculating to some extent here, but to get more organized. You know, our state beds are a premium obviously that we don't have the accommodations to house, you know, a big evacuation --

Q. Uh-huh (affirmatively).

A. -- and we have vacant beds at the local level and I'm sure that's the reasoning behind doing this and -- and getting more organized, and the local jails have a plan to -- to transport their population to another local jail where beds are accessible. I'm pretty sure that was the reason behind that.

Q. Okay. And were you involved in discussions about this objective or at least about this concept that became this objective?

A. Oh, I'm sure I was, yes. I mean, between Chief Smith and myself and his staff, I'm sure -- and the sheriffs were involved in discussions.

Q. In looking at the strategies that are listed there, the first one says yearly

review and training for local partners at LSA jail conference. Do you see that?

A. I do.

Q. And what's your understanding of what this is referring to?

A. Well, the sheriffs have their jail conference every year and -- and we provide usually three or four, five spots in the training part of their conference; and that's what that reference is, to incorporate that, this particular type in the -- in the training.

Q. Okay. And when you say up to five spots, do you mean for presentations by the department to --

A. Yeah.

Q. -- the sheriffs conference?

A. Correct, different subject matters. And I'm guessing. It's usually four or five. It may have narrowed down some here in the last year or two, but they give us a good portion of their training to -- to use, which we appreciate.

Q. Okay. That makes sense. And do you know if that has been occurring, this review and training at the conferences having to do with housing for evacuation events?

A. I'm not -- I'm not sure about that.
Q. Who from the department usually attends the conference and provides the training?
A. Chief Smith and his staff. It could come from different -- different parts, but if it's medical issues, some of the medical staff may go. It just depends on the subject matter, so it -- it moves around a little bit depending on what we think are -- are good topics for training --
Q. All right.
A. -- you know, to help obviously the sheriffs with their local population.
Q. Do you know if it would be either Chief Smith or people who fall under his kind of chain of command who would be presenting the training on -- on this topic?
A. Yeah. It could be him, but it's mostly people that work, you know, with him.
Q. Right.
A. It might even be a little bit outside of his responsibility in some areas. Medical, I guess medical does report through Chief Smith --
Q. Right.

A. -- so, yeah, pretty much Chief Smith.

Q. Thanks. And in terms of that second strategy, "Encourage local facilities to utilize the partnership agreements," do you see that there?

A. I do.

Q. What -- what is this referencing in terms of partnership agreements?

A. You know, that's a good question. I would assume that's -- that's the Basic Jail Guidelines. I mean, that -- it's -- you know, I don't know. The reference partnership agreement is a little bit different, but that's probably what it refers to.

Q. Okay. And earlier you had at least mentioned in describing this like objective, the idea of local facilities having a plan for what other local facility they would evacuate to; is that correct?

A. Uh-huh (affirmatively). That's correct.

Q. Does --

A. And whenever they are going to, does that facility have a plan to accept, so both

ends.

Q. Right. Does the department require each local facility to have an evacuation plan?

A. If they fall below I-20, I would think that's probably more a Seth question than mine, but I'm assuming that most of them are required to have a plan, yes, below I-20, you know, in the hurricane --

Q. Right.

A. Yeah. And some others may have it too. I'm not sure, to be honest with you, who all has them, but that would be the minimum.

Q. Okay. And I know when we spoke last year, we had some conversation about sort of the -- the general practice that the department has of holding, you know, roughly 50 percent of the sentenced population in the local facilities. Do you recall discussing that?

A. Yes.

Q. What is your current thinking as to whether there are any problems with the department's arrangement to hold half of its sentenced prisoners in local facilities?

A. Well, I mean, I -- you know, I think -- I think the idea of having them more --

more in state facilities, we have accomplished that in a lot of regards in reducing our population because we have reduced our population considerably over the last three, four, five years, whatever it is. And that reduction, other than the closure of Camp J and a couple of other areas that needed to be closed at the main prison at Angola, the reduction has been at the local level, so that -- that I think is a good thing.

You know, they have worked with us. The sheriffs have done a great job working with us in dealing with -- with not having enough capitol funding to -- to build additional state prisons to accommodate that -- that part of our population, but it is unique in the numbers.

Q. Okay.

A. We've -- you know, and I -- you know, the reception center part of it is a real challenge and we opened Raymond Laborde as a reception center. That's helped quite a bit. We allow like DCI for trustees to work in the Baton Rouge area and do those things to process through DCI as a reception center. So we have opened the reception center part of it considerably; and before I left, that may be one

of those things in between May and August that we were looking at maybe doing some conversion of re-entry centers to reception centers where we could have more access to reception and making sure they get to where they need to be. I think that's important, so --

Q. Okay. So when you said in terms of the -- the population reduction at the local level and sort of concentrating more sentenced housing in the state facilities, you mentioned that you thought that that was a good thing. Why is that?

A. Well, I mean, I think that accessibility of programs is -- is part of -- is a big part of that and our re-entry centers have really softened that quite a bit in making that much better at the local level with however many it is now.

I think it's eight or nine re-entry centers that we have established where you process through if you're going back to that region where the re-entry center is, you process through that re-entry center with some re-entry services that are available to you for -- it could be three months, up to six months,

something like that. I'm guessing a little bit there, but at least have, you know, job hunts, do the things that you need to do in order to transition back to the communities, so that's helped a lot at the local level.

Q. If current bed space and the capital financing that you mentioned wasn't a limiting factor, do you think it would be preferable for all sentenced prisoners to be held in state-operated facilities?

A. I don't think "all" is a good word for it. I think that there is some -- some reasoning behind local jails staying in their community closer to their families, which I think is important, that family unionification (sic) part. Rather than sending somebody from south Louisiana to -- to Wade Correctional Center, you know, they might be better staying in Orleans Parish jail where you can visit, have access to whatever you need to have access to.

So there's -- you know, every state houses a certain amount of DOCs in local jails. If I'm not mistaken, I think Kentucky is probably the closest one to us at this point on percentage wise on housing in local jails. I think they end

up processing everyone through the state prison before they -- they leave. So there are -- there are some reasonings why local jails are good to have for state prisoners.

Q. Okay. And you were referencing the reception centers and opening up more of them or more capacity with the reception centers.

Can you tell me a little bit more about what role the reception centers are designed to play in the department?

A. Yeah. I mean, it's -- in my -- my simple way of putting it, it's an evaluation of mental health, medical, education; you know, and those three general things are real important in making sure that they -- they get processed in the right direction, you know, and understanding what their issues are.

Q. And am I correct that the idea of the reception centers is that each individual who is sentenced to the legal custody of the Department of Corrections goes through such a reception center so that they are evaluated in this way and then housed accordingly?

A. Yes.

Q. All right. I'm going to stop

sharing my screen. And in showing you this exhibit, I remembered that I did not circulate a copy of this exhibit earlier this week to opposing counsel, which I apologize for; but we will actually do it after today's deposition.

Okay. I want to ask you about a few operations or practices of the department and whether there were any changes that occurred during the same time period that we have been talking about of May through August of 2024.

So we were talking about the holding of state-sentenced prisoners in local facilities. I'm correct that the department continued doing so during that time period?

A. Yes.

Q. And was that at the same rate or around the same rate as when we spoke in May of 2024?

A. I would -- I'm assuming it is. I don't recollect any differences that would have changed things.

Q. Okay. And am I correct that the -- the Basic Jail Guidelines which you referenced earlier and we have talked about before, that those continue to be the mechanism by which the

department provided guidance for the operations of local facilities?

A. Yes, ma'am.

Q. And I don't believe any new addition of the guidelines came out during that time. Is that your recollection?

A. I don't believe, but I -- you know, again, I'm probably not the right person to answer that question, but I don't think there was.

Q. Okay. We heard some testimony that the November 2023 edition is still the operating edition like as we sit here today, so I just wanted to make sure that you didn't have any other understanding?

A. No.

Q. Okay. And I know we've talked before that there's some possibility of there being like an individual amendment to one guideline that might come out sort of in the interim period between full editions being produced. Do you remember that?

A. I can't say that I remember that, but --

Q. Okay. Does that ever happen, I

guess? So let's -- let's say that, you know, November 2023 is the last time of full edition that the guidelines came out. We are sitting here in April of 2025. Were there or was it possible for there to be amendments to individual guidelines during that time period?

A. Oh, yeah. There could be and we -- maybe I think, if I remember right, Seth may have put out -- you know, or maybe I put out a -- you know, a letter, if you will, to -- to --

Q. Right. Like a supplement?

A. Yeah. Right.

Q. Okay. Do you recall any such like letters or supplements having to do with individual guidelines during that time period?

A. No, ma'am. I don't -- I don't -- I can't guarantee you there wasn't, but I don't remember any.

Q. Okay. That's perfect.

And in terms of the guidelines and the auditing or review process, am I correct that during this May through August period of last year the department continued to use team leaders to audit or review the local facilities?

A. Yes.

Q. Okay. And those team leaders were -- also continued to be responsible for various reporting of -- of incidents and events at the local facility to the department headquarters?

A. Correct.

Q. And did you and other members of your leadership team -- I'm thinking specifically about Chief Smith and other people who work under him -- did you-all continue to receive reports of incidents that occurred at local facilities during this 2024 time period?

A. I'm assuming we did.

Q. Okay. Okay. I want to move on to ask you a little bit about the end of your time as secretary and some changes in the -- the leadership team last year.

So I'll represent to you that most of the news reports that I saw described your departure from the position of secretary as a resignation and indicated that you had provided the governor with a letter to that effect I think also citing some of your health concerns; is that correct?

A. Correct.

Q. Okay. Would you personally describe your departure from the position of secretary as a resignation?
A. As a resignation from secretary, yes.
Q. Okay. So Governor Landry took office in January of last year; is that right?
A. Yes.
Q. Okay. And after he became governor, I believe you were reappointed as secretary?
A. Yes.
Q. Okay. That had occurred --
A. I don't know if reappointed is the right word for it. I was kept.
Q. Okay.
A. I didn't -- I didn't go through the confirmation process. I had -- I had another year to -- to be confirmed.
Q. Okay. Tell me a little bit more about that. I know that -- I mean, obviously you were in that position for a -- a very long time through other, you know, administrations, so how exactly is that supposed to work?
A. That's a good question. I'm not probably the person to answer that.

Q. Okay.
A. But it was all -- you know, the attorneys, everybody agreed that it was okay to do it that way.
Q. Okay. So let me ask you this. Like when -- when Governor Edwards came into office, were you -- was there like a re-appointment or re-confirmation process?
A. Yes, there was.
Q. Okay.
A. Actually, I mean, when he got re-elected, I mean, you go through that process.
Q. Yeah. That was going to be my question.
A. Yeah.
Q. So like when he was re-elected, what happened --
A. Yeah.
Q. -- to the current position?
A. The same thing with Bobby Jindal, Governor Jindal, I had to do it twice.
Q. Okay. Okay. And does that -- what is the right term for that?
A. Confirmation, yeah. I mean --
Q. Okay.

A. I mean, getting confirmed is the term for what you go through and you're appointed.
Q. Okay.
A. But you can get appointed temporarily --
Q. Got it.
A. -- until you get confirmed.
Q. Okay.
A. And they had -- we had that discussion and that I could go up until the next session after, you know, his January of whatever. What is that, '23 I guess?
Q. '24.
A. '24.
Q. Uh-huh (affirmatively).
A. To the next session of '24.
Q. Without confirmation?
A. Right.
Q. Okay. Okay. So let me ask you this. What was your understanding at the time that Governor Landry took office in terms of how long you would continue to serve as the department secretary?
A. My goal was to stay until LCIW where

I was born, I'm from there, I graduated from high school in St. Gabriel --

Q. Uh-huh (affirmatively).

A. -- and started my career there 50 something years ago, and I wanted to be part of it until, you know, when it was -- when it was dedicated. I just wanted to be there for that as secretary, but unfortunately, my health wouldn't allow it and it was -- you know, caused me to resign actually.

Q. How far is LCIW from being complete? I thought it was pretty close.

A. It's close. It was -- so that would have been -- you know, my projections were sometime in June or July of this year --

Q. Okay.

A. -- was what I was looking at.

Q. Okay. And is the facility itself still on track for that?

A. You know, I don't know. I assume it is.

Q. Okay. Did you have any conversations with Governor Landry at the start of his term, so early 2024 regarding his expectations for your work as the department

secretary?

A. I'm sure I did. You know, I -- I mean, I know I had conversations with him and he had a good handle on -- on where I was with things and -- and he talked about some of the changes that he was interested in doing.

Q. What do you recall about those discussions in terms of any changes that he was interested in?

A. I -- you know, it was -- that's really too long ago for me to remember exactly what was talked about. I'd be purely speculating on trying to tell you what that conversation was about.

Q. Okay. After Governor Landry took office, how often were you in contact with him?

A. We had -- we had a few cabinet meetings, so, you know, three or four different times probably. By phone, maybe a few more than that. You know, you talk to his staff quite a bit, you know, his governor staff. That's who I had most of the conversations with.

Q. Okay. Does he have a particular portion or subset of his staff that is sort of like assigned to corrections or the department?

A. I assume he still does, yes. He had -- he had -- he had staff assigned to different areas like, you know, corrections and public safety, you know, state police, fire marshal, wildlife and fisheries, the enforcement type staff in one section, so yeah.
Q. And in terms of the cabinet meetings, those are attended by the various department heads?
A. Yes. His was -- his was a little different in that he segmented the department heads into kind of what you're -- you know, to like public safety, corrections --
Q. Uh-huh (affirmatively).
A. -- fire marshal, those type of -- you know, which was good. I mean, you got -- you got more time to -- to talk between each other and with each other rather than the whole cabinet being there, so I thought that -- that was a good move.
Q. Got it. That makes sense. Okay.
And maybe you have already answered this, but, to your knowledge, were there any changes in the department, the Department of Corrections' priorities or goals that the

governor set after he took office?
A. Not that I'm aware of, no.
Q. And what about in terms of policies and practices, to your knowledge, were there any changes in the department's policies or practices that the governor wanted you to pursue?
A. No, ma'am, not that I remember, no.
Q. Did you have any agreements with Governor Landry about the direction of the department after he took office?
A. No, ma'am.
Q. What about in terms of any of the executive or legislative initiatives that Governor Landry was pursuing in terms of criminal justice, did you have any disagreements with the governor over those? And I'm thinking ones that would specifically impact the -- the Department of Corrections.
A. No, ma'am.
Q. So it's my understanding that in February of last year, Gary Westcott was appointed as deputy secretary of the department; is that right?
A. Correct.
Q. Okay. And that's -- that's an

appointment by Governor Landry?
A. It is. Well, actually, that's a good question. I'm not sure I can answer that. I think I have to end up writing a letter to -- to -- to confirm him I believe, if I'm not mistaken, him and state police both I think is the way that's done.
Q. Okay.
A. It's been that way forever.
Q. Okay.
A. I mean, that's the way it works.
Q. So did you have any role, I guess, in the selection of Secretary Westcott for appointment to the deputy secretary position?
A. No, ma'am.
Q. Am I correct that Malcolm Myers had been the deputy secretary before Westcott entered the position?
A. Correct.
Q. Okay. And Mr. Myers was terminated?
A. Correct. I guess terminated is the right word for it.
Q. Okay. Well, whose decision was it to --
A. Well, to not get reappointed, I

guess it's the governor's decision.
Q. Okay. And Secretary Westcott was reporting directly to you while he was in the deputy secretary position?
A. Correct.
Q. And so that would be -- he was one of your direct reports from February of last year until you left the secretary position at the end of August?
A. Correct.
Q. What were Secretary Westcott's responsibilities while he was deputy secretary under you?
A. Probation and parole, internal audit, I think policy. I think policy and things like that, if I'm not mistaken. I'm sure there were some other things there that I'm just not pulling up right now, but --
Q. It sounds like from our --
A. He had -- he had that experience, probation and parole experience. That's where he came from.
Q. Right.
A. That's where he retired from.
Q. Right.

A. So it was reporting to me and I just moved it under him directly, which was a good move for him.
Q. Yeah. In our conversation with him, he said that -- I think he estimated that something like 90 percent of his time was spent with the probation and parole part of his job. Does that --
A. That's what I remember.
Q. -- comport with your memory?
A. Yes.
Q. Okay. And so Westcott was appointed as secretary after you left the position?
A. Correct.
Q. Okay. Did you have any role in his appointment to that position?
A. No, I didn't.
Q. Did you have any discussions with Governor Landry either about Westcott's performance as deputy secretary or what you thought about him being appointed secretary?
A. I don't think I did, but I think that was the right choice, I mean, from my standpoint that -- you know, he had a little bit more -- you know, on my end on the things that he

wasn't responsible for, but that was going to kind of be my objective in January of this year to when I did end up retiring, that I would spend some time with him on the things that I had responsibility for that he was not familiar with --

Q. All right.

A. -- so that would help, but it didn't work out that way.

Q. Yeah. That was actually sort of my next question. Were you involved in any kind of like orientation to the position and its responsibilities for Secretary Westcott?

A. No, other than -- other than I -- you know, not -- not for the things that I just talked about.

Q. Okay.

A. But he -- you know, we had staff meetings and things like that that's -- that's good training. You know, I think that's good -- good for people to be together and working together to learn from each other.

Q. And you are referring to the -- the meetings that you would host?

A. Yeah, the leadership team meetings,

yes.

Q. Okay. Okay. Did you have any conversations with Secretary Westcott after he was appointed in terms of what he could expect from the role?

A. I don't think so, no.

Q. And it sounded like you were hoping to have the opportunity for there to be some kind of like transition plan or process in terms of some of these areas of your responsibilities following his appointment, but that didn't end up happening?

A. No. I mean, again, I -- I had some, what I consider, serious health issues that I'm still dealing with. Some I've dealt with and gotten through. It's personal, but it's things that I just couldn't -- you know, I spent my entire life in corrections and I kind of neglected my mental health and medical issues that -- that I needed to deal with; and I just -- for my family and all, it was time for me to do what I had to do, and that's what I've done.

Q. Understood.

A. I hated to do it that way, but that's just the way it was.

Q. Sometimes that's how life goes. I appreciate that.

A. Yeah. Yeah.

Q. Okay. Did you make any recommendations in terms of the department's operations or practices kind of on your way out as secretary?

A. No. I really didn't -- that wasn't on my mind, to be honest with you. I mean, I had to deal with some other stuff directly with my physical health and that was what all I was thinking about actually; and that's unusual for me, but that -- it got to that point.

So no, but, I mean, I think -- you know, we -- the strategic plan, you know, there's a lot of documentation there that -- that I'm sure that the staff that are familiar with it was able to help Gary along with some of that, so -- and, look, Seth -- Seth's good. Seth does a good job, and so he was left in good hands, Gary was, with Seth; and he knew enough about probation and parole, so that's the two biggest components of the department.

Q. Considering that -- that Chief Smith is sort of over the -- both the state owned and

the local facilities in terms of the sentenced population?

A. Correct.

Q. Okay. That makes sense.

MS. WASHINGTON:

All right. I think I am just about done with my questioning. Let me take just five minutes and go off the record so I can look at my notes and make sure I didn't miss anything, but I think we should be pretty close to wrapping up, so --

THE WITNESS:

I appreciate that. Thank you very much.

MS. WASHINGTON:

Thank you.

(A short recess was taken.)

MS. WASHINGTON:

I am ready to go back on the record, Cherie', so what I can tell Secretary LeBlanc is that I have no further questions for him, though, I really enjoyed chatting about golf at lunchtime. So I will thank you very much for your

time this morning and I hope everything goes really well with all your health stuff, so --

THE WITNESS:

Thank you.

MS. WASHINGTON:

-- I will tender you to -- I think Shane is on right now, so counsel for the Catahoula Parish Sheriff; and then Lenzi's on for the Calcasieu Parish Sheriff. Thank you.

THE WITNESS:

Thank you.

MR. BRYANT:

I have no questions for you, Secretary.

THE WITNESS:

All right. How are you doing; you doing okay?

MR. BRYANT:

I'll doing all right.

THE WITNESS:

Good. Good to see you.

MR. BRYANT:

Good to see you.

MR. KROUSE:
Lenzi?
MS. HEBERT:
Secretary, thank you for being here. I do not have any questions for you.
THE WITNESS:
All right. Thank you.
MS. WASHINGTON:
Great. Unless your counsel does, we're done.
MR. KROUSE:
A. J. Krouse. No questions. He is going to read and sign the deposition transcript. Please have a Happy Easter weekend to everybody.
THE WITNESS:
Yeah. Same here.
(The deposition was concluded at 10:11 a.m.)

LEBLANC, JAMES 4/17/2025


CORRECTION SHEET

PAGE LINE DESCRIPTION

_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________
_____ _____ _________________________________

WITNESS: JAMES LEBLANC
TAKEN ON: APRIL 17, 2025
BY: CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

WITNESS CERTIFICATE

I, JAMES LEBLANC, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

_________________ ___________________________

DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: April 17, 2025

REPORTER'S PAGE

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for the court reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; also, that any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

CHERIE' E. WHITE, CCR(LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that James LeBlanc, to whom the oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 57 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.




CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO. 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)