Transcript of the Testimony of

# GARY WESTCOTT

April 15, 2025

ROBERT YOUNG v. JAMES LEBLANC

AMERSON ◦ WHITE
COURT REPORTING · EST.2000

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT YOUNG, Plaintiff, | CIVIL DOCKET NO. 23-681-SDD-RLB |
| VERSUS | JUDGE: SHELLY D. DICK |
| JAMES LEBLANC, ET AL, Defendants. | MAGISTRATE: RICHARD L. BOURGEOIS |

VIDEOCONFERENCE DEPOSITION OF GARY WESTCOTT, taken via Zoom, in the above-entitled cause on the 15th of April, 2025, commencing at 10:07 a.m.

REPORTED BY: CHERIE' E. WHITE
CCR (LA), CSR (TX), CSR (MS), RPR
CERTIFIED COURT REPORTER

APPEARANCES:

ATTORNEYS REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
4400 South Carrollton Avenue
New Orleans, Louisiana 70119
Phone: 504.620.2259 |Fax: 504.208.3133

(BY: Emily Washington, Esquire)
E-mail: emily.washington@macarthurjustice.org

CO-COUNSEL REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

LAW OFFICE OF STEPHEN J. HAEDICKE
1040 Saint Ferdinand Street
New Orleans, Louisiana 70117
Phone: 504.291.6999 |Fax: 504.291.6998

(BY: Stephen J. Haedicke, Esquire)
E-mail: stephen@haedickelaw.com
(Not present)

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, CATAHOULA PARISH SHERIFF'S OFFICE:

FROSCH, RODRIGUE, ARCURI, L.L.C.
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Phone: 504.592.4600 |Fax: 504.592.4641

(BY: Ronald "Shane" Bryant, Esquire)
E-mail: sbryant@fralawfirm.com

ATTORNEYS REPRESENTING THE DEFENDANT, CALCASIEU PARISH SHERIFF:

MUDD, BRUCHHAUS & KEATING, LLC
422 E. College Street, Suite B
Lake Charles, Louisiana 70605
Phone: 337.562.2327 |Fax: 337.562.2391

(BY: Lenzi C. Hebert, Esquire)
E-mail: lhebert@mbklaw.net

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, JAMES LEBLANC AND MR. SMITH:

FRILOT, LLC
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Phone: 504.599.8016 |Fax: 504.599.8116

(BY: A. J. Krouse, Esquire)
E-mail: ajkrouse@frilot.com

ALSO PRESENT:
Elizabeth Cumming, Esq.

E X A M I N A T I O N  I N D E X


| BY: | PAGE |
|---|---|
| Ms. Washington | 7 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 54 | Department of Public Safety & Corrections, Correction Services, 5 Year Strategic Plan, Fiscal Year 2023-2024 to 2027-2028 | 52 |
| Exhibit 55 | BJG Single Month Activity Report Rollup, April 2024 | 106 |

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically NOT waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

CHERIE E. WHITE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath.

GARY WESTCOTT,
after having first been duly sworn by the above-mentioned Court Reporter did testify as follows:

EXAMINATION BY MS. WASHINGTON:

Q. Okay. Good morning. This deposition is being taken pursuant to the Federal Rules of Civil Procedure, and it's my understanding that there's no objection to this deposition being conducted by Zoom or to the oath having just been administered remotely.

Secretary, like I said, my name is I'm Emily Washington. I'm one of the attorneys representing the plaintiff, Robert Young, in this matter, and I'll be taking your deposition today.

Would you please state and spell your full name for the record?

A. It's Gary, G-A-R-Y, Westcott, W-E-S-T-C-O-T-T.

Q. And during the deposition today, I may be using the acronyms DPSC or DOC to refer to the Louisiana Department of Public Safety and Corrections. You'll understand what I'm referring to if I use those acronyms?

A. Yes, ma'am.

Q. Okay. Perfect. And I may also use the term "state facility" or the "operated facility" or "DPSC facility." And by that, I will mean those correctional facilities that DPSC operates itself and uses to hold state-sentenced prisoners. Will you understand what I mean?
A. Yes, ma'am.
Q. Okay. Perfect. And, additionally, I will be using the terms "local facility" or "local jail" during the deposition today; and by this, I mean those facilities which hold DPSC sentenced prisoners but are not operated by the state itself. Is that agreeable?
A. Yes, ma'am.
Q. Okay. Have you had your deposition taken before?
A. Yes, ma'am.
Q. Okay. How many times?
A. Twice.
Q. Okay. Can you tell me a little bit about those two occasions, when and what the general matter was?
A. The last one was last month, and it was involving the execution process protocol.
Q. Uh-huh (affirmatively).

A. And that was my only one as -- as secretary, and then I did a deposition maybe in 1990, early 1990s involving a lawsuit of a probationer suing the department for -- she said that her time was -- her -- the filing of the motion was -- was too late because of a leap year so she said I was a day late filing my paperwork because of a leap year and it was dismissed.

Q. Okay.

A. So it was a long time ago.

Q. Sounds good. Thank you. I would like to just briefly go over some sort of ground rules or mutual expectations for the deposition today so that we are on the same page.

We have Cherie' here as our court reporter. She's taking down everything we say, so it's just important that you speak up and give nice, verbal, audible answers so that we can have a good transcript at the end of this. Does that make sense?

A. Yes, ma'am.

Q. Okay. And you understand that the oath that you just took is the same oath that you would take as if you were testifying in court to tell the truth?

A. Yes, ma'am.

Q. We are interested in finding out everything that you know that's relevant to this lawsuit, so I'm just looking for a full and complete answers to my questions today. So if at any point during the deposition you remember something that would have been responsive to a question that I posed earlier, can you please let me know that so that we can go ahead and supplement your response on the record?

A. I sure will.

Q. Okay. And by the same token. If at any point you realize that you misspoke or you said something incorrectly and there's a correction that you need to make to your answer, please let me know that so that we can get the correct testimony on the record as well, okay?

A. Understood.

Q. If at any point I ask you a question that you don't understand for whatever reason, please let me know that and I will attempt to clarify it or rephrase my question for you. Sound good?

A. Yes, ma'am.

Q. You are welcome to take a break at

any point today. All I ask is that if I have posed on question to you that you go ahead and answer that question and then we'll go off the record. Does that make sense?

A. Sure does.

Q. Is there any reason, whether that's medication, stress, any kind of hardship that would interfere with you understanding and truthfully answering my questions today?

A. No, ma'am.

Q. Great. And what is your understanding of what this lawsuit is related to?

A. It's related to a pretrial inmate I believe that was being held at Catahoula Parish jail, and I think he was in an altercation with a DOC inmate that caused some injury. Again, it -- it happened -- I wasn't even with the department when it happened, so that's my recollection of what's going on so far.

Q. Okay. Thank you. And did you take any steps to prepare for this deposition?

A. Did I take any steps?

Q. Yeah. Did you do anything to prepare?

A. Yeah. I met with Mr. A. J. Krouse

and Jonathan Vining on Zoom just to prep for it.

Q. Okay. Did you review any documents or other materials in preparation for the deposition today?

A. I reviewed the Basic Jail Guidelines on a couple of guidelines that pertained to a couple of the questions that was sent to me by e-mail. I'm not sure who sent it.

Q. Do you recall either which guidelines they were or what the general topics of those guidelines were?

A. The question was whether pretrial inmates can be housed with DOC inmates at the local level, so we looked up that -- we looked for that, which I knew -- which I knew was not in there already being a previous warden at a parish jail.

Q. And we'll get to that, but are you referring to your time at Iberia?

A. Yes, ma'am.

Q. Okay. Any other -- any other guidelines that you took a look at during your preparation?

A. No, ma'am.

Q. Okay. And any other documents in

general that you reviewed?
A. No, ma'am.
Q. Have you seen the -- the complaint, the lawsuit that was filed in this case?
A. I would say it was probably e-mailed to me; but have I looked at it, probably not.
Q. Okay. And I know that Jonathan is present in the room there with you. I can still see his left arm. Is there anyone else there?
A. No, ma'am. It's just us two.
Q. Okay. Thanks. And Chief Seth Smith was deposed yesterday in this case. Have you spoken to Chief Smith about his deposition?
A. Yes.
Q. Okay. What did you-all discuss?
A. He came meet with me after pertaining to a different subject, nothing to do with this case, and he just told me he got out a lot quicker than he thought he would, so he was able to -- he was able to meet with me.
Q. Okay. Did you-all discuss any of the substance of the deposition?
A. No, ma'am, not really.
Q. Okay. There were also depositions of various DPSC employee personnel taken in a

case called Murray versus LeBlanc, which was related to assaults on three men at the Madison Parish Correctional facilities. Are you familiar with that litigation at all?
A. I'm familiar with it, but -- yes.
Q. How did you become familiar with it?
A. When I became secretary, they -- they -- they went over -- well, actually when I was deputy secretary, Jonathan Vining would review the pending lawsuits we had at secretary management meetings, so I remember that case coming up. And then when I became secretary, they basically ultimately all fell into my lap, so that's about all I know. I don't know the details of it.
Q. Okay. Have you reviewed any transcripts from depositions taken in the Murray matter?
A. No, ma'am.
Q. Okay. Have you spoken with any DPSC employee who was deposed in the Murray matter with regards --
A. Yeah. No.
Q. -- to that deposition?
A. I was going to say, I probably spoke

-- no, absolutely not, no.
Q. Okay. Today we are going to be talking about the Catahoula Correctional Center, which is where the assault took place. Have you ever been to that facility? I'm sorry. I didn't hear you.
A. No, ma'am. No.
Q. All right. Thank you. I want to go through your education and work history just mostly try to get a little bit of a background and timeline.
Could you walk me through your educational history starting with high school?
A. I graduated from St. Martinville High School in 1985 and then I graduated from the University of Southwestern Louisiana in December of 1990 with a degree in general studies concentrating on behavioral science.
Q. Okay. Anything else?
A. United States Army Quartermaster School. I was in the National Guard, so I completed that course. That was the reason for the five-year college, took a year off.
Q. Okay. How long were you in the National Guard?

A. Six years, 1987 to 1993.

Q. And what did you do during your time with the National Guard?

A. I was a supply clerk, slash, armor, unit armor, so I handled all the firearms, the weapons, all the supplies for the -- for the -- the unit; and then when I got activated, I was in an excess position, so I was assigned to The Fifth Entry Division regular Army out of Fort Polk; and then from there, the sergeant major of the Second Armor Division assigned me as his driver, so I went to Fort Hood, Texas for four months as the command sergeant major's driver; and when I got back, I returned to the unit armor and then I got out shortly after that.

Q. Okay. Great. Thank you for that. Any other schooling that we haven't discussed?

A. I mean, I completed the police academy in 2000, the POST -- POST council -- POST certified officer in 2000. No further -- no further, nothing further.

Q. Okay. And we talked about your military experience with the National Guard. Any other military experience that we haven't covered?

A. No, ma'am.

Q. Okay. And we talked about the quartermaster school and POST. Are there any other professional licenses or certifications that you've obtained?

A. I was a defensive tactics instructor for over 20 years. I was certified in that in PPCT.

Q. Uh-huh (affirmatively).

A. I can't recall any other certifications.

Q. Okay. That's useful. And in terms of being the defensive tactic instructor, with what academy were you providing instruction?

A. Probation and parole. Probation and parole has its own academy and I was one of the three main instructors. There was only three instructors allowed to teach the academy cadets, and I was one of the three.

Q. Okay. Were there courses other than defensive tactics that you taught as part of that?

A. Building entry. It was -- it was all related to -- to tactical situations.

Q. Okay.

A. I didn't teach anything else besides -- besides that.
Q. Okay.
A. And I was also certified for three years in SSGT, which is -- I don't even know what it -- something ground tactics. I forget what it stands for, but that was another -- besides PPCT. We did that for three years, but that was it.
Q. It's another defensive tactic course?
A. It's another -- it's another -- it's another system, right --
Q. Okay.
A. -- that we were using briefly, but it was too expensive, so the state cancelled it.
Q. Got it. Okay.
A. It dealt more with ground fighting.
Q. Okay. And then in terms of your work history, you are currently secretary for DPSC, correct?
A. Yes, ma'am.
Q. And you've been in that position since August of last year?
A. August 29th, yes, ma'am.
Q. And you were appointed by Governor

Landry?
A. Yes, ma'am.
Q. And this was after the resignation of Secretary LeBlanc from that position?
A. He didn't -- he didn't resign. He -- I guess the governor replaced him with me, and he's currently the warden at Elayn Hunt Correctional Center on leave right now.
Q. Right. Okay. When were you first employed with DPSC?
A. October 25th, 1991.
Q. And what was your first position with the department?
A. Probation and Patrol, Officer 1. I don't even know what we called it that back then, but that's what it is now currently.
Q. Okay. And it's my understanding that you retired from the department in 2020; is that correct?
A. Yes, ma'am.
Q. Okay.
A. June 5th, 2020.
Q. And when did you return to DPSC?
A. On February 12th, 2024 as the deputy secretary.

Q. And you've now been with the department continuously since your return in February of last year; is that right?
A. Yes, ma'am.
Q. And we are going to talk about your time with Iberia in just a minute, but other than your employment with the Department of Corrections and Iberia Parish Sheriff's Office, have you worked for any other law enforcement or corrections agencies during your career?
A. I was -- I mean, it's not law enforcement, but I was the city probation officer in the Mayor's Court of St. Martinville, Louisiana for 22 years. I did that part-time, so city probation officer would be my title I guess.
Q. Okay. And what years was that between?
A. I don't know offhand, but I know I was let go during COVID; so that was probably 2019, so I probably started in 1997, if I'm doing my math correct.
Q. Okay.
A. Somewhere around there, late '90s until COVID.
Q. Okay. That makes sense. Thank you.

WESTCOTT, GARY 4/15/2025


And so let's -- starting in October of 1991 when you began as a Probation and Patrol Officer 1 with the department, can you walk me through the positions that you held with the department from that time until your original retirement in June of 2020, just including any promotions or changes in job titles and the rough timeframe that you were in each position?

A. It's definitely a rough time period.

Q. That's fine.

A. Okay. So in 2000 -- so 1991, I was an officer; in 2000, I was promoted to a specialist, which basically I supervised violent offenders case load. About three years after that, I was still a specialist, but then I was assigned to the sex offender specialist case load, which I continued to do all the way up until 2014. No. I'm sorry. 2011. 2011, I became a supervisor, and I was a supervisor for a little over three and a half years.

In 2014, I was the district manager of New Iberia District, which basically was the ones that run the -- they ran that office. I only did that for six months before I was promoted to regional administrator in 2015,

January of 2015, and I stayed in that position as regional administrator running all the offices from Lake Charles to New Orleans. I had seven offices under my -- my command.

Q. Uh-huh (affirmatively).

A. And I did that until I retired in June of 2020.

Q. Okay. Great. That's really helpful. And just to make sure I understand, all of those positions were with probation and parole within the department?

A. Correct.

Q. And so when you returned to the department as the deputy secretary in February of last year, how did you come to take on that position?

A. Several years of conversation with the governor about problems with probation and parole that I saw that one of the things he wanted to do, he thought about taking probation and parole out of Department of Public Safety and Corrections and putting them on their own or putting them underneath another agency; and I basically told him he didn't have to do that because the deputy secretary position typically

oversaw probation and parole, so if I would be put in that position, I could basically control probation and parole and wouldn't have to worry what the secretary or how they --

I mean, to put it simply, probation and parole has felt like a stepchild for Department of Corrections for many years because of the previous secretaries; and we know we are a small portion of DOC, so we know that's kind of -- I guess it's still not right, but I -- I understand to a certain degree.

So by the governor putting me in that position, he basically told Secretary LeBlanc that all probation and parole matters would fall under my command. And that's what I wanted to do. I didn't -- I wanted to stay in that position, to be honest with you.

Q. Okay.

A. But that's how it came about, discussions with the governor.

Q. Understood. And so let me ask you this. I assume when you are referring to the governor, you are talking about Governor Landry?

A. Yes, ma'am.

Q. Okay. And did these, I guess,

conversations about problems with the management of probation and parole, to just sort of summarize what you said, did that start before he was elected governor?

A. When I started in 1991, I lived with Jeff Landry. We lived together for almost two and a half years, so he saw -- he saw what I went through and the struggles I went through and we remained friends throughout those years; and so yeah, these discussions have been ongoing for probably 25 years.

Q. Okay. So this included the time when he was attorney general prior to his gubernatorial election?

A. He was in college when we started talking about this.

Q. Okay. Okay. And so in terms of the deputy secretary position, is that one that the governor appointed you to?

A. Yes, ma'am.

Q. Okay. And what were your main job responsibilities when you were the deputy secretary for the department?

A. The major responsibility was overseeing all probation and parole operations.

Q. Okay.
A. I also was over internal auditing, but I -- that was a dual supervision between the secretary and the deputy secretary, so we both kind of split that. I was in charge of the official record custodian for the department and oversaw any litter programs we had with the facilities and the canteen operations. But I will tell you, every one of those were very minor compared to -- I mean, probation and parole probably took up 90 percent and the rest were about 10 percent.
Q. Okay. That's helpful. Thank you.
And when you say "internal auditing," what you were mentioning was split between you and the secretary, what exactly does that involve?
A. So we have -- there was two people in our internal auditors that review any issues that we have with anything -- anything involving the department.
For instance, one of the first things when I got here, they were doing an internal audit of the Union Parish work release facility that had money missing from the -- the

inmates, so we did an audit on that. They did an auditing on the P card, purchasing card that we had. So anything within the department that -- that we feel has an issue or a red flag, they do an internal audit on it --

Q. Okay.

A. -- and they report it to both -- both me and the secretary on those findings.

Q. Okay. And the oversight of probation and parole, is that a responsibility that has always fallen under the deputy secretary or that was a change when you entered the position?

A. I want to -- I want to say it changed way back like maybe in the mid '90s or late '90s when Genie Powers became -- she was our probation and parole director.

Q. Uh-huh (affirmatively).

A. And she was -- and she was named deputy secretary I believe under James -- Jimmy LeBlanc, not Stalder, and they put her over that position, in that position over probation and parole.

And then when Malcolm Myers, the guy that was there before me came in and knew nothing

about probation and parole, the secretary re-arranged the duties, so he was -- probation and parole was taken away from him and the director of probation and parole at that time just reported directly to the secretary.

And that is how it is again. Now, that I'm in the secretary position, the -- the deputy secretary is not over probation and parole, so it changes depending on the secretary.

Q. Okay. And it also sounds like it changes depending on --

A. Qualifications.

Q. Well, the expertise, correct --

A. Correct.

Q. -- of the person --

A. Right.

Q. -- as deputy secretary?

A. Absolutely.

Q. Okay. Understood. And so when you were deputy secretary, who were you reporting to?

A. Secretary LeBlanc.

Q. Okay. And generally speaking, what positions reported to you as deputy secretary?

A. So I had the internal auditor reported to me; the probation and parole

director; I had an administrative assistant under me, and then -- it's called SOAP, Sex Offender Assessment Panel. There was a couple of people under -- in that area that reported to me; and I think that's it.

Q. All right. Great. Thank you.

A. Yeah.

Q. And in terms of your retirement from the department back in June of 2020, what was the reason for your retirement at that time?

A. I -- I completed 28.9 years. I wasn't doing drop because I got promoted late. It would -- financially, it wouldn't have been good for me, so I -- I was ready to go at any time and then the -- Sheriff Romero in Iberia Parish was running for -- for sheriff. He approached me and asked me, if he won, would I be willing to go work for him.

I actually told him and three of -- of his opponents the same thing. I told them all that I wouldn't -- all four of them offered me a job. I told them I wouldn't politic for any of them because I was civil service, so I said I -- in a year and a half, contact me. So when Sheriff Romero won, he contacted me and offered

me a job and -- and it was pretty much take it now or -- or don't take it, so it was -- I retired for three weeks; I started July 1st with the sheriff's office.

Q. Okay. And so were you still employed by the department at the time that the newly elected Sheriff Romero contacted you about working at Iberia?

A. Yes.

Q. Okay. And so what position were you hired into with the Iberia Parish Sheriff's Office?

A. I was the warden and special projects major. I was a major.

Q. And what -- what all was involved with being the special projects major? I think I get the warden part.

A. Yeah. Special projects was over the -- the fleet section and the -- the trustees that went out into the -- and did special projects with the -- with litter crews and construction and grass crews; so any time there was a festival or event and they needed trustees, that fell under the special projects. So everything would have to be -- go through the -- I think it was a

sergeant in that area and then approved by me.
Q. Okay.
A. So basically oversaw that and coordinated it.
Q. And when did you start with Iberia Parish?
A. July 1st, 2020.
Q. And in terms of your role as warden, is there just one detention facility in Iberia Parish?
A. Yeah.
Q. Okay. I've seen it referred to as both the Iberia Parish jail and also the Iberia Correctional Center. Is that one and the same?
A. It's one and the same, right. Yeah. I think one of them sounded fancier. We called it Iberia Parish jail.
Q. Okay. That is the one I see the most.
A. Yeah.
Q. So it's what I was going to use, but then I confused myself.
A. I think -- yeah. I think a warden came in and wanted to change it to the Iberia Parish Correctional Facility, so it's under both

of them.
Q. Okay.
A. They did have a work release, but it -- it's been closed for several years.
Q. Okay. Was that operational when you were the warden?
A. No, ma'am.
Q. Okay. And during the time that you were warden in Iberia, what populations or statuses were being held in the jail? And by that, I mean, a pretrial, DOC sentenced, etc.?
A. Yeah. So we had pretrial, DOC, we had city contracts with New Iberia Police Department and Abbeville Police Department, which was outside of Iberia Parish.
Q. Uh-huh (affirmatively).
A. And then when I got in there, we started working with the U.S. Marshals to get a Fed -- to contract to hold Fed, which is we did probably within the first six months that I was there. The Feds didn't touch Iberia Parish jail for about eight years prior to me getting in there, so --
Q. Yeah. I have some questions for you about that in a minute, but --

A. Yeah. Okay. Uh-huh (affirmatively).
Q. Were -- was the facility holding pretrial for any other parishes at that time?
A. I mean, yes. We -- we swap with the different wardens if we have behavioral issues or enemy lists or conflicts for whatever reason, and it could be many reasons. We would swap with each other or we would hold and charge them the -- the DOC rate just for if we didn't a swap an inmate with them.
Q. Right. Okay. That makes sense. I mean, what about ICE, did you-all have a contract to be holding ICE detainees?
A. No. No. I didn't do ICE or Bureau of Prisons, only U.S. Marshals.
Q. Okay. Okay. And approximately how many people were being held in the Iberia Parish jail during your tenure there?
A. It varied. Because when I first took over, it was COVID time so we were probably in the low three hundreds, 315, and maximum probably was 415 when I left.
Q. Okay.
A. It was always in between there.

Q. Okay.
A. 350 was a pretty steady number.
Q. And prior to this position, had you had any experience working in a correctional facility?
A. No, ma'am.
Q. Okay. Do you have any understanding of why Sheriff Romero and I guess the other sheriff candidates were interested in having you come to run the facility?
A. Honestly, when I first talked to the sheriffs, it was never about being the warden nor did I want to be the warden. It was always you going to come work for me. I honestly wanted to work part-time because I'm also a volleyball coach.
Q. Got it.
A. And I wanted to -- I wanted to coach volleyball and work part-time for the sheriff's office. And I actually asked to be either in the training department because of my defensive tactics background and -- or to be in the sex offender unit, basically a sex offender compliance officer because of my expertise and background in that and they had other plans.

Q. Okay. Got it.
A. There was never a discussion. Just so we are clear, there was never a discussion about me being the warden until after he won.
Q. I mean, when was that sprung on you?
A. So it had to be early 2020. I think the election was late 2019 and I probably didn't speak to him for a month or two. It was probably January or February of 2020.
Q. Okay. And at that time, he told you that what he needed was for you to come in as warden and the special projects major?
A. He -- he basically said that the jail was going to make or break him and, because of the past problems with that facility, he wanted somebody with my -- my leadership skills and my common sense and he trusted me to go in there and help him run that facility.
Q. Okay.
A. So that -- that was the reason.
Q. Okay. Was there a warden who was in place over the facility at the time that you came in? Like did you replace somebody?
A. Yeah. He was a postmaster for 30 years and then he became -- he was a friend of

the previous sheriff.
Q. Uh-huh (affirmatively).
A. And he ran the fleet section, had no law enforcement experience at all; and then during COVID, the sheriff asked him to be the warden until he replaced him and he never did. He left him in there for two years, no law enforcement experience at all.
Q. Okay. And you sort of hinted at this a little bit, but generally, what was the state of the Iberia Parish Sheriff's Office and the jail at the time that you came in as warden?
A. When I basically took over Iberia Parish jail, the inmates ran the facility because the correctional officers were scared of a lawsuit or going to prison because nine of their former deputies went to federal prison for civil rights violations. I will tell you that when I took over there was probably only about if I had to guess five or six. There wasn't many. There were less than ten employees that were in that jail when all that occurred, but the ones that were left there pretty much scared everybody into -- into thinking it was going to happen again, that the FBI would come knocking on their door.

So we had to basically go in there and change the whole culture of that facility and the officers and regain control of that jail, so --

And it -- actually, I mean, it really helped being it was COVID and there was a restricted number of inmates in there and -- and there was a lot of restrictions on what they could do and what they couldn't do; and the excuse of COVID was really helpful at the time, to be honest with you.

Q. Yeah. Understood. Okay. And I'm assuming that you were aware of this history at the time that you were hired at Iberia?

A. Yeah. I worked in -- I worked as a -- in that area, so of course, I knew it. I mean, I wasn't first-hand knowledge, but, I mean, we all heard the stories of what happened. I've never seen the videos or -- or anything that occurred. I never went to any of the -- the trials or the court hearings, but we all heard what happened.

Q. Okay. And I think you told me, but when exactly did you leave the agency, the Iberia Parish Sheriff's Office?

A. I left on February 10th because I

started here February 12th, so --
Q. Okay.
A. It was either 10th or the 11th, whatever -- I think they might have put my official end date the 11th.
Q. February of last year?
A. Yes, ma'am. I'm sorry. February of 2024.
Q. Perfect. And what was your reason for leaving the sheriff's office at that time?
A. The governor's appointment to deputy secretary.
Q. Have you been -- I know you talked generally about the decades that you talked to Governor Landry about probation and parole, but specifically in terms of the appointment to deputy secretary, how far in advance of the appointment were you-all in -- in serious talks about you taking on that position?
A. I will tell you that DOC was one of the last departments that he announced.
Q. Uh-huh (affirmatively).
A. And, I mean, it was even after the new year, so -- I mean, the election was in October. Even after the new year, I had no idea

what I was doing.

Q. All right.

A. I knew that we talked about this position, but I wasn't sure what he was going to do; and I think a lot of that had to do with -- the delay is because he wanted me to be the secretary and I did not want to be the secretary.

He asked me to find somebody to be the secretary and -- and then I understand it was an agreement to keep LeBlanc for a year, so honestly, I started February 12th. I think the conversation was mid January that we finalized it. I mean, I had an idea that what I was going to do, but it wasn't official.

Q. No. That's helpful. Thank you.

A. Uh-huh (affirmatively).

Q. Did you think about finding the governor a different secretary?

A. I actually did. I found him one and they got activated and went to Poland for nine months, so that changed the plans.

Q. And who is that? I know who it is from some other context, but I'm just blanking on it now. Who --

A. It's Bobby -- Bobby "Jamie" Lee.

Q. Right. Okay. Yeah.
A. He was the director of probation and parole.
Q. Okay.
A. So we just switched. He's going to be the executive secretary upon his return.
Q. Okay. And right now, am I correct that Derek Ellis like came out of retirement to be in that position temporarily?
A. I brought -- I brought Derek Ellis back on an interim basis until Jamie -- I call him "Jamie." I think his official name is Bobby, but when Jamie Lee gets back, and that will probably be July 1.
Q. Okay. Of this year?
A. But yes, Derek is in there.
Q. Okay. So a couple months?
A. Uh-huh (affirmatively).
Q. Okay. That makes sense. Thank you. That's useful.
So when you were appointed as secretary, were you given any orientation, for lack of a better word, to the position and its responsibilities?
A. What I -- like I said, so as a

regional, regional administrator for probation and parole, I sat at the table for five years and watched Secretary LeBlanc and I saw how he operated and what he did.

When I became deputy secretary, I had very little conversation with him. We met a few times. Never did he do any type of succession discussion with me. He was -- I think he was holding on hoping that he could stay in that position.

Q. Okay.

A. So honestly, the only orientation, I guess you could say, is when I met with the staff, the -- the director leaders underneath me; and I basically told them that I wasn't going to micromanage them, I wasn't going to be in the weeds of everything, that I wanted them to run their specific areas and we would work together. It would be more of a team than an "I."

And they basically all told me how -- how they operated and how they would like to operate and what we think would be best for the department moving forward and get us out of that stagnant position we were in for so many years; so that's the orientation, just the discussion

with my -- but I was -- there was no orientation training or succession from Mr. LeBlanc.

Q. Okay. Let me break down a little bit of that. Did you have any discussions with Governor Landry at the time that you became secretary about any goals or expectations he had for the position?

A. I guess Governor -- I mean, Governor Landry and Secretary LeBlanc never saw eye to eye on many things, and he basically told me when I first met with him that he -- that he made a promise to keep him for a year and I had a year to change my mind; and then I told him that I would -- we would talk later or whatever.

But I did know the governor's visions and he basically brought Mr. LeBlanc in with Jamie and myself and he said that -- you know, that we had a bunch of changes in the crime laws; there was going to be many changes in the policies and procedures; and that basically Mr. LeBlanc needed to work with me and Jamie Lee and for us all to make this -- make the changes work; and if there was any problems, that he would replace Mr. LeBlanc.

Q. Okay.

A. And that's basically the -- I mean, that's the discussions I had with him. I mean, I will tell you that I spoke to the governor probably every other day during this -- my six months as deputy secretary, and I think Secretary LeBlanc spoke to him twice, so he basically -- you could say I was the secretary just not getting paid for it, not being named. I was doing everything -- Jeff was -- the governor was coming to me for everything with the department --

Q. Okay.

A. -- to put it simply.

Q. Okay. And I guess through those discussions that you were having with the governor even when you were titled, I guess, as deputy secretary --

A. Uh-huh (affirmatively).

Q. -- what was your understanding of, I guess, changes either in terms of laws or just policies or procedures for the department that the new administration, Governor Landry, was hoping to pursue?

A. Well, I mean, basically he -- he had a victims first attitude, that we were going to

make sure the victims were getting taken care.
Most of the changes actually occurred with probation and parole not really within the -- the prison system. We're going to see changes in the prison system with the truth in sentencing and the changes in good time and no parole, but we haven't really seen that yet.
Q. Uh-huh (affirmatively).
A. But most of the changes were going to be with probation, that he wanted to basically try to take -- take advantage of the people on probation, the first and second offenders and really work with them and spend most of our time with them to prevent them from being third and fourth and fifth offenders and not see that revolving door that we were seeing in the parolees, so a lot of emphasis was put on probation and parole and not really with the institutions, to be honest with you --
Q. Okay.
A. -- with my discussions at least.
Q. And that's what I asked you about, so thank you.
A. Uh-huh (affirmatively).
Q. That's useful.

A. Yeah.
Q. And in terms of meeting with the leadership in the department that reported to you when you started in the position, we'll talk through this a little bit more, but what positions are you referring to in terms of the direct leaders?
A. So deputy secretary.
Q. Uh-huh (affirmatively).
A. And I guess that's Derek Ellis currently; the undersecretary, Thomas Bickham; chief of operations, Seth Smith; the assistant secretary at that time was Jamie Lee, but he was -- once he left for Poland, Renee Delouche took his place. Executive counsel at that time was Natalie Laborde, but Jonathan has since taken her place --
Q. Right.
A. -- Jonathan Vining.
Q. Right.
A. Okay. Then the general counsel was Jonathan Vining, but now that's Adrienne Aucoin, so there's been some changes since. Am I missing somebody? I know I'm missing somebody.
Prison enterprises, Misty Stagg, the

prisons enterprises director; Francis Abbott, who is the executive director over the probation -- over the pardon board and committee on parole. Even though they report to the governor, Francis is still -- they are still under my deal.

Q. Okay.

A. I don't think I'm missing anybody. I hope not.

Q. Okay. Great. Well, if you did and someone pops into your head, just let me know, but that's useful. Thank you.

And so as DPSC, you are responsible for all of the operations of the department?

A. Yes, ma'am.

Q. Okay. And that includes promulgating policies and regulations of the department?

A. Yes, ma'am.

Q. And you referenced the Basic Jail Guidelines earlier. What is your understanding of what the Basic Jail Guidelines are?

A. Basic Jail Guidelines are put in place for the -- the local jails or the parish jails that hold DOC inmates, that they follow certain guidelines and restrictions and to make

sure that the inmates are -- the care and custody is -- is done properly and consistently amongst all the parish jails.

Q. Okay. And when did you first become, I guess, aware of or familiar with the guidelines?

A. July 2020 when I started with the -- with Iberia Parish Sheriff's Office.

Q. Okay. And it's my understanding that the DPSC secretary is the signatory to those guidelines at least in terms of the department; is that right?

A. The approval. Yeah, I approve it, correct.

Q. And so as secretary, do you have responsibilities for promulgating, I guess, the new or updated additions of the Basic Jail Guidelines?

A. The Basic Jail Guidelines is handled by somebody within my department, then looked at by -- by chief of operations, then it comes to me for final approval.

Q. Okay.

A. I've had very little input in the short time I've been here about any changes with

it. I have -- actually, I could say with certainty I've had zero recommendations on changes to be made. I have approved some changes since I've been in the position; but, again, I rely on my -- my chief of operations that's been doing this a long time, that he's giving me good advice and -- and, again, as a warden for three and a half years, I've dealt with Basic Jail Guidelines pretty much, you know, in audits every -- every year I was there, so I was -- I was good with it.

Q. Okay. And so in terms of the chief of operations, that's Seth Smith who you are referencing?

A. Yes, ma'am.

Q. And you also referred to somebody else who is in your department, I think falls under the supervision of Chief Smith. And is that -- is that Megan Kent who --

A. Megan.

Q. -- acts as the BJG --

A. Megan Kent.

Q. -- administrator?

A. Yes, ma'am.

Q. Okay.

A. Yep. Yes.
Q. And in terms of the changes that have been recommended to you during your tenure as secretary, do you recall what those changes were or what the general subject matter of them was?
A. No, ma'am, I don't.
Q. Okay. It's my understanding that the guidelines that were put out in November of 2023 are still the most recent iteration of the guidelines. Is that your understanding?
A. I -- I really don't know for a hundred percent certainty, but it -- that sounds right. I know they are updating the guidelines --
Q. Okay.
A. -- and they are -- I think they constantly update them, to be honest with you, so -- I don't know if there's -- what I'm saying is I don't know if there's any specific changes to 20 -- since 2023 that I'm -- but --
Q. Do you have a sense of when the next full publication of the guidelines will be?
A. We had a meeting last week and I know my chief said that they are close to getting

it done, so I'm not sure when we are -- I think we were looking at -- we had an audit from the LCIW, the new -- new facility and there was some stuff that maybe we had to look at to change in there; so we were getting our responses back to them, so I think we are waiting on completion of that too to finalize it.

Q. Okay.

A. But, again, that -- that falls under Chief Smith, so --

Q. Okay. No. That's helpful. Thank you.

And so in terms of your role and responsibility as secretary, it's my understanding that you're responsible for all individuals that are sentenced to the legal custody of the department; is that right?

A. Yes, ma'am.

Q. Okay. And that would include individuals that are held both in state operated facilities and the local facilities?

A. Correct.

Q. And is it part of your responsibility as secretary to determine whether to hold DPSC sentenced individuals in local

facilities? And, I mean, that as a general practice.

A. Can you rephrase it?

Q. Sure. And I guess just keep this in mind. I'm asking about this as a general practice of the department.

A. Uh-huh (affirmatively).

Q. Is it your responsibility or do you have the authority as secretary to determine whether the department holds sentenced individuals in local facilities?

A. I -- I mean, I would guess it's my final approval. I would say it's a necessity. I mean, there's no way we can house 29,000 people in our eight state institutions. So there's a definite need for it, and not only local jails, but private facilities too. So, I mean, I don't make the decision, but I guess I am the final approver that it is needed.

Q. Okay. And when you say you "don't make the decision," what exactly do you mean by that?

A. I mean, I don't make the decision on who goes -- what inmate goes to what facility and where they stay at. I mean, we do have a

practice of, you know, the local jails keep their inmates unless they have behavioral issues, medical issues, mental health issues or they have a -- a long amount of time that they don't need to be held. My department makes decisions on work release and re-entry.

And so, again, I have people underneath me that make all these decisions on where these inmates should be at, but I guess the ultimate responsibility falls under me; but on a day-to-day basis, I'm not making those decisions is what I'm saying.

Q. Right. I understand.

A. Okay.

Q. I'm going to show you a document on my screen. Let me know if you can just see the document to begin with.

A. Yes, ma'am, I see it.

MS. WASHINGTON:

Okay. I am going to go ahead and mark this as Exhibit 54 to the depositions in this matter.

This is a 40-page PDF, and this is the cover of it. You'll see that it says Department of Public Safety and

Corrections, Correction Services and
5 Year Strategic Plan from Fiscal Year
2023-2024 to 2027-2028 with a submission
date of July 2022.

(Exhibit 54 to be marked.)

BY MS. WASHINGTON:

Q. Do you see that right there on the screen?

A. Yes, ma'am, I see it.

Q. Okay. Do you recognize this document? And I'm happy to flip through it, but just I'm showing you the cover right now.

MR. KROUSE:

Emily, before you go any further, this is A. J. Krouse. Can you identify the Bates number, if it is Bates numbered?

MS. WASHINGTON:

It's not -- it's not Bates numbered. It's just publicly available.

MR. KROUSE:

Okay. That's fine. I just wanted to know that, and how many pages is it?

MS. WASHINGTON:

It's 40, and I'm happy to send it around as a -- a marked exhibit after we

finish today --
MR. KROUSE:
That would be great.
MS. WASHINGTON:
-- send you a copy.
MR. KROUSE:
Thank you.
MS. WASHINGTON:
Sure. No problem.
BY MS. WASHINGTON:
Q. Sorry, secretary, so back to you.
Do you recognize this document, at least just from the cover page here?
A. Yes, I recognize it.
Q. Okay. And what is it or what is your understanding of what this document is or how it's used?
A. It's the five-year strategic plan for the department on what the department plans to do in the future, what it looks at.
I mean, I've had -- I got absolutely no input on this form. I actually saw it when I was on the transition team still working for the sheriff's office. That's the only time I've actually seen it. I haven't looked at it one

time since I became secretary.
Q. Okay. Is it your understanding that as secretary for the department that you have authority for setting goals and priorities for the department?
A. Yes, ma'am.
Q. Okay. And your reference to the transition team, am I correct in assuming that you're referring to the governor's transition team?
A. Yes, ma'am. I was on the DOC transition team and the juvenile justice transition team.
Q. Okay. How did you become part of the transition team?
A. The governor asked me to be on it. I don't know.
Q. Okay. I don't know how these things work.
A. Yeah. Yeah. He wanted my expertise on -- on corrections and --
Q. Okay.
A. -- so, yeah.
Q. And in terms of this particular strategic plan, was this already in place at the

time that you were serving on the transition team?
A. I -- I have no idea. I don't know when it -- I have no idea when it took place. I wasn't with the department.
Q. Okay. Let me ask this. When -- when was the transition team meeting? That might help, given that this is dated.
A. That had to be in November and December of '23 --
Q. Okay. Okay.
A. -- right after -- shortly after he won.
Q. Okay. That's what I figured. And in terms of your -- you said you -- you saw this during your work with the transition team.
Do you recall the -- I don't know -- context in which the five-year strategic plan was brought up or discussed?
A. There was two parts of the transition team. One of them actually went out to the departments and met with the -- the current leaders.
Q. Uh-huh (affirmatively).
A. That's the group I was on. I wasn't

at UL where they did -- made the final decisions. I went out to the offices, and I do remember Mr. LeBlanc and his team at that time put on a presentation of the department for -- for the team. And I was the only one on the team that had DOC experience. Nobody else knew anything about DOC, and he went over that strategic plan with us.

Q. Okay.

A. That's basically all I remember on it.

Q. Okay. No. That's helpful.

Do you recall where -- physically where this presentation took place?

A. It took place at our headquarters in the PEC room in Building 10 --

Q. Okay.

A. -- in this office that I'm in right now.

Q. Okay. And who all was --

A. Not this office. Excuse me.

Q. Who was present for that presentation?

A. We had I think around 12 members of the transition team. I don't know all of them by

name.
Q. No. That's fine.
A. Secretary LeBlanc was there; his assistant, Angela Whittaker; Undersecretary Bickham; Chief of Operations Smith; Natalie Laborde. The deputy secretary and the assistant secretary were not there, and those actually were the only two that we replaced.
Q. Okay.
A. So it might have been a reason they weren't there.
Q. Okay. Understood.
A. And the probation and parole, who was actually Jamie Lee at the time.
Q. Okay. Okay. And so I know you said that you haven't taken a look at this since you've been back with the department.
Is it your understanding that you could authorize changes to the strategic plan if you felt they were needed?
A. Well, I'm sure they are going to be needed. That's why I haven't really looked at it, because with the crime session that came about, there's a lot of stuff in there that probably won't be taking place in there anymore.

It will be a little bit different with doing away with parole, so I'm assuming that we are going to have to do another one of those. I just haven't had an opportunity to do so yet, and I honestly don't know if I have to wait until 2027-2028 or if I could do it earlier. I honestly don't know that answer.
Q. Okay.
A. But there will be changes made to it.
Q. Okay.
A. That's why I haven't looked at it.
Q. Okay. Yeah. That was going to be my next question, if you have a sense of when work will start on the next or new five-year strategic plan?
A. Yeah. I would have to get with my -- with my executive council on that, and that would probably be after the session.
Q. Okay.
A. So we probably won't be doing anything until after then.
Q. Okay. And you mean after the legislative session?
A. Legislative session, yes, ma'am.

I'm sorry.
Q. No. That's helpful. Thank you. Okay.
So we have talked a little bit about the holding of state-sentenced prisoners in local facilities. Currently, what is your understanding of the, I guess, rough percentages of how many sentenced prisoners are held in state operated versus local facilities?
A. Probably have a little -- a little over 50 percent are in local facilities at this time currently as of this week.
Q. Okay.
A. It's about 50/50 right now.
Q. Okay. And just how do you keep track of that or like how did you know the answer to my question?
A. We have a census report that comes out pretty often. I don't know if it's -- it seems like it's more than weekly. I get so many e-mails, I can't keep up, but we get it at least weekly. We get the update of each facility and the openings they have and -- within the state, and then there's a separate form that's for the parish that shows their beds, their operational

capacity, how much they are holding; so yeah, they're -- those reports are turned in weekly.
Q. Okay. And you mentioned e-mail. Is this -- are these reports sent to you electronically?
A. Yes.
Q. Okay. And we have heard in the past of a report that's roughly referred to as the C Facility Report. Have you heard that term?
A. Yes.
Q. Okay.
A. Uh-huh (affirmatively).
Q. Are these the C Facility Reports --
A. Yes.
Q. -- that you are referring to?
A. Yeah. Yeah. Yeah. I think C stands for census, but I really don't know.
Q. C Facility is good enough.
A. Yeah. Because I think the C Facility Report comes out maybe monthly --
Q. Okay.
A. -- but the census comes out weekly maybe. I'm --
Q. Okay. Do you also receive the C Facility Reports then monthly?

A. Yes, I do. Yes. Yeah.
Q. And it's my understanding that those reports, the C Facility Reports, have a similar breakdown like you are talking about where they list out the state-operated facilities, the local facilities and then give numbers in terms of open beds and what numbers of various populations -- pretrial, DOC, etc. -- are in each facility for that period of time --
A. Yes, ma'am.
Q. -- is that right?
A. Yes, ma'am.
Q. Okay. Okay. And you talked about the holding of sentenced prisons in local facilities being necessary given the bed space of the state-operated facilities; is that right?
A. Yes, ma'am.
Q. Okay. If bed space wasn't a limiting factor in the state-operated facilities, do you as secretary think it would be preferable for all sentenced prisoners to be held in state-operated facilities?
MR. KROUSE:
Objection to the form of the question. Calls for speculation.

BY MS. WASHINGTON:
Q. You can answer.
A. Okay. Yes. It would financially benefit us to hold them in our -- in our facilities also.
Q. Okay. And when you say "yes," is that just based on the financial benefit or are there other reasons that you think that that would be preferable?
A. Well, depending on the -- the inmate. I mean, if we have programs available, if they are eligible for programming that we have that some of the smaller facilities don't have, it would benefit us. We've actually double bunked some of our facilities to increase the number of beds just recently, so --
Q. Okay.
A. And our beds are full. Our beds are -- every bed that we have available for a DOC inmate is full with the understanding that we do have some open because of, you know, there might be infirmary beds or disciplinary beds or, you know, segmented housing or something, but all the beds that could be full by DOC-MH, we keep full.
Q. Okay. And in terms of the double

bunking of some of the state facilities, which facilities are those that you are referring to?

A. I did that at Rayborn Correctional Center and Raymond Laborde Correctional Center, just two.

Q. And in -- in putting that double bunking in place, do you know roughly how many additional beds the department created at those facilities?

A. It was approximately a hundred in each one, somewhere -- maybe 90 something in each one. We just did the outer walls, so we didn't have to -- for safety reasons. It wasn't a lot, but it did help a little bit. 200 is 200, you know.

Q. It is. I mean, what was the thinking or the rationale behind that -- that expansion at those facilities?

A. Those two facilities are well staffed. We don't have staffing issues there. They are probably two of the best behaved prisons we have, and it was -- we had the ability to do it just because mainly I would say staffing was probably the main reason.

Q. Okay. And in terms of who the

department then placed into those additional beds, did you move sentenced prisoners from local facilities or was it just movement inside of the state-operated facilities?

A. I -- again, I don't know the exact answer. I do know that all prisoners have to go to our reception center, one of our two reception centers; so I'm sure they were taken from the reception center based on -- on needs and whatever other qualifications they have, but I have no idea a hundred percent where they came from.

Q. Okay. Is that a question that Chief Smith would be better able to answer?

A. Probably so.

Q. Okay.

A. Yeah. He -- again, he oversees the prison operations, but I don't know if he -- if he's making those decisions. That's more of the reception centers.

Q. Okay. That makes sense.

And in terms of the financial benefit to the state that you mentioned about holding all the sentenced prisoners in state-operated facilities, what did you mean by

that? What would the financial benefit be?
A. Well, we are paying each per day $26.39 for each DOC inmate that's housed at a local level; whereas, if we hold them in our facility, because of the overhead and everything already incurred and the -- the inmates we have already, it would be probably closer to $10 a day, so we -- we would see a savings or the state would see a savings if we could keep them.
Q. Okay. I'm sure that there are other job duties and responsibilities as secretary that we haven't discussed, but in terms of how you think about the position, what do you consider to be your biggest responsibilities or what you spend the majority of your time on?
A. Well, I mean, the prison population is the biggest thing we have. I mean, it's -- again, I don't want to sound like a hypocrite because I said probation and parole was the -- the reason why I came back, but, you know, we -- basically my job was to put the right people in the right place.
I've -- I've changed all three leaders at the -- probation and parole director and the two deputy directors are all brand new.

The -- I mean, we have changed our executive counsel over here, we've changed our general counsel, we've changed our deputy secretary, our assistant secretary, so a lot of changes in leadership.

I mean, my main goal is to put the right people in the right place to -- to help run this as a team. I have a priority of officer safety and taking care of the well-being of our staff. I think that was put on the side for many years over here and it was more about the inmates than the -- than our staff, and I feel if I'm putting an emphasis on -- on staff wellness and their well-being and making them want to come to work and work at a successful -- at a place that they enjoy working at, have pride in, and I think in turn that will help with the -- the way they treat the inmates and -- and, you know, have a mutual respect.

Programming, when I came in, I will tell you there was a lot of wasteful programming going on. There was a lot of programs and great ideas that were started and then the next new idea would come up and they would leave that on the side and go into another one.

So I came in with the attitude of eliminate and enhance. We are going to eliminate programs and -- and policies and practices that weren't working and we were going to enhance on the ones that were working. So we are doing a lot of that right now, looking at staffing, how we could -- especially with this hiring freeze, it doesn't help, but how we could get the most use out of our staff, again, eliminating positions or -- or duplicating -- giving people more jobs or less jobs, whatever it needs just to make sure it's running the most efficiently and -- so that's --

I mean, I will tell you that the changes in the death penalty have really taken up a lot of my time, which, again, I didn't foresee that, didn't even think about that; but that's -- took up a lot of our time recently, the crime session, the new session. Meeting with vendors, which is not my favorite thing to do, doing a lot of that; going to events, so it's -- yeah, it's a lot. It's --

Q. Okay. Thank you. I appreciate that.

And I know we went through some of

this already, but in terms of the leadership positions that report directly to you, which of those have had changes in personnel since you took over?

I know that Chief Smith is still where Chief Smith was. I know that undersecretary Bickham is still where he was, but I think most of the other positions have changed.

Can you just walk me through that? I know we have kind of gone through some of it.

A. Right.

Q. I just want to have a nice list for myself.

A. So the assistant secretary was -- when we came in under Governor Landry was appointed and confirmed Bobby Lee. Bobby Lee went on military leave and Renee Delouche was put in his position, and she will be -- she will be confirmed this session and stay as the assistant secretary. Derek Ellis was brought on to replace me as the deputy secretary in an interim basis, and Bobby Lee will probably be confirmed next time because he's not coming back until after session.

Q. Uh-huh (affirmatively).

A. So Derek Ellis with be confirmed as the deputy secretary for a couple of months, Natalie Laborde was replaced by Jonathan Vining as my executive counsel, Adrienne Aucoin replaced Jonathan Vining as my general counsel, and I think everybody else is in their same positions. Yes.
Q. And in terms of probation and parole --
A. Oh, yeah. I'm sorry.
Q. -- I know that you made leadership changes there --
A. Yeah.
Q. -- but who was the director that -- I guess what changes were made?
A. Yeah. I'm sorry. Yeah. I'm sorry. I did skip that.
Q. That's okay.
A. So Bobby Lee was the director of probation and parole; and when he was appointed assistant secretary, he retired from probation and parole and we moved Cory Acosta as the probation and parole director.
Q. Okay. And when did that occur, after you became secretary?

A. No. That -- actually, while I was deputy secretary.
Q. Okay.
A. It was getting -- it was in February when I came back --
Q. Okay.
A. -- February or March. It was very quick because Bobby Lee was moved out of that position.
Q. Okay. And Mr. Acosta has stayed in that position since you've become secretary?
A. Yes. That's a classified position, yes.
Q. Okay. Okay.
A. And then the two deputy secretaries underneath him have changed too. I mean, that's -- they report to Cory. They don't report to me, but --
Q. Okay. And I know that there's other deputy assistant secretary -- I don't remember if assistant or secretary goes first in those titles, but that fall under some of these other positions, specifically thinking under Chief Smith. Have the personnel in those positions stayed the same?

A. Yes. Dwayne Cambre is the assistant deputy secretary underneath Seth Smith.
Q. Okay.
A. Yeah. We have an Andrea Buttross is under the assistant secretary, and we have -- I don't even know her name. Cheria Spears is under the executive counsel. She's an ADA compliance. She's an assistant -- they are all assistant deputy secretaries.
Q. All right.
A. And then I have a vacant on -- underneath me.
Q. Okay. Great. That's really helpful. Thank you.
All right. So it's my understanding that in Louisiana after a person is criminally sentenced on state charges, they enter the legal custody of a DOC; is that correct?
A. Yes, ma'am.
Q. And we've talked about the Basic Jail Guidelines for those local facilities that hold sentenced prisoners, and that's my understanding that those local facilities are reviewed or audited for compliance with the guidelines; is that right?

A. Yes, ma'am.
Q. Okay. And so during your time as warden at the Iberia Parish jail, I think you mentioned that that facility was audited by the department for compliance with the guidelines; was that right?
A. Yes. Three times while I was there.
Q. Okay. Do you recall which years those were?
A. It was '21, '22 and '23.
Q. Okay.
A. Every -- every three years -- and I don't know which year that was, but every three years they do a major audit, a really, you know, full audit; and then the other years are just reviewing the folders, making sure that everything is done right, the policies.
Q. Right. It's my understanding that there is an annual audit for what the guidelines call the mandatory guidelines; is that your understanding?
A. Yes, uh-huh (affirmatively), yes.
Q. Okay. And then every three years, there's a recertification that is supposed to assess compliance with all of the provisions; is

that correct?
A. So I had -- I had one of those, one of the three-year audits and the other two were just annual audits.
Q. Okay. Are you familiar with the term "BJG team leader"?
A. Yes.
Q. And what is your understanding of the who the team leaders are?
A. They are the ones that go to the facilities and conduct the audits, review the folders. They communicate with the -- the local jail staff; and any issues that come up, we would -- when I was the warden, we would contact them if we had a suicide attempt with a DOC inmate or anything major involving the DOC inmate or questions with DOC inmates dealing with the guidelines, we would contact them.
Q. Okay.
A. So --
Q. And do you recall who the team leader was for the Iberia facility?
A. It's Lieutenant Stinson. I think Carmisha might have been her first name, but Stinson was her last name.

Q. And remind me. Which region is Iberia in for the Basic Jail Guidelines, if you recall?
A. I don't recall.
Q. Okay.
A. I don't know why I'm thinking 3, but I don't know for sure.
Q. They use geographic terms --
A. Yeah.
Q. -- that seem to make some sort of sense, but not always.
A. Yeah.
Q. No. I was just wondering. I can look it up.
A. Yeah. I've seen it -- I've seen it before, but I can't recall which one it is.
Q. Okay.
A. I don't know why 3 is sticking out.
Q. Okay. That's fine. And so as the warden at the Iberia Parish jail, did you have responsibilities related to these guideline audits?
A. Yes. I had a compliance officer that -- that handled all the folders and obtained all the information and, you know, gathered

everything and then brought it to me for my approval, and I signed off on that; so yes, I was ultimately responsible.

Q. Okay. And so in terms of Lieutenant Stinson as the team leader for the Iberia Parish jail audits, are you -- are you aware or do you know what her regular full-time employment with the department is?

A. If I remember correctly, I thought she was in training, but I -- I'm not -- I'm not a hundred percent, but I thought she was in the training area as a lieutenant.

Q. Okay.

A. And she did the last two. We did -- I did have somebody, a Holiday, and I don't remember her first name, but the first audit I ever did was her last name was Holiday and then she left our department and Carmisha took her place.

Q. Okay. And walk me through what the actual audits -- and let's talk just about the annual audits, the two annual audits that you had. Walk me through what that looked like on at the Iberia facility on the day of the audit.

A. They would get there early in the

morning. They would -- we would have an office set up for them with all the files; and I'm guessing there was like 113, whatever the -- however many guidelines there were, there was 113 folders. And they sat in the office and went through every one of them, so that took several hours. If they had any questions, they would call us in or they would call my compliance officer at the time because he's the one that organized them.

Again, I don't think they had any problems while I was there, but that took probably, like I said, most of the morning. And then once we finished that, we went over the folders, if there was anything to review, and then we did a walkthrough of the whole facility. The main areas, they would check all the housing areas; they would speak to inmates. I'm not sure how many, but there was -- they would speak to different inmates. They would speak to DOC inmates; I think they would even speak to pretrial. They would go check our -- our inventory at our kitchen, they would make sure all the knives, everything was safe, properly -- everything was labeled; tool shed; I mean, the

fleet. They -- they did a walkthrough of the complete facility.

Q. Okay.

A. She was a very -- she was very thorough.

Q. And you are referring to Lieutenant Stinson?

A. Lieutenant Stinson, she was very thorough.

Q. And would she come to the facility by herself?

A. I think one time she came with somebody else. It might have been the first time. I don't recall who, but I do remember the second time she came by herself, so --

Q. Okay.

A. And the Holiday came by herself when she came.

Q. Okay. And approximately how long would that audit last?

A. Probably started at 9:00 a.m. and finished at 2:00 and she worked through lunch.

Q. Okay.

A. So yeah, she -- five hours.

Q. Great. That's helpful. Thank you.

As secretary of the Department of Corrections, do you receive the annual audits of the local facilities?

A. I do.

Q. How do you receive the audits? I mean, like had they hard copy; are they electronic; how do they come to you?

A. It's a hard copy that's placed in my office for my review and signature, and then basically I sign off the -- the letter that's prepared by, I would assume, Megan Kent that's going to be sent out to the sheriffs. I sign just to say that they have successfully completed their audit or guidelines and, if there's any issues, they are addressed in there.

Q. Okay. And in terms of your review of the annual audits, what -- what do you do when you receive the hard copies?

A. Basically just go through them. I mean, some of them are very small because there are not a -- not a lot of DOC inmates on them. Some of them are very thorough, they are bigger, so I spend a little bit more time on them, but I just look to make sure that -- I look at typically the number of inmates, DOC inmates they

have and to see, but I honestly verbally I hear more of what's going on at the facilities than I do through these reports, so --

Q. What do you mean by that?

A. I mean, if there's issues at prisons, we usually -- it usually goes through chief and chief lets us know about it before.

I mean, for instance, before I started, they were having problems at Tangipahoa Parish prison. They were like -- you know, they had some issues over there that the chief went over there and looked at and handled and told them that hey, these things needed to be corrected. So a lot of that we get, you know, Chief Smith and Dwayne Cambre, the assistant deputy secretary, worked very closely with the wardens.

And -- and Chief Smith, I mean, actually does -- goes and does spot checks at the prisons and goes meet with the sheriffs, so I usually find out good or bad what's going on before the reports even come out.

Q. Understood. Okay. Okay. And do you also receive the three-year audits, the recertifications as secretary?

A. Yes. And I -- usually those -- and I -- I've also probably seen a couple of those, but those also come with a certificate that I have to sign --

Q. Okay.

A. -- so that's how I can tell that those are the three-year ones.

Q. Okay. I mean, in terms of the process, do you get a hard copy of those as well?

A. I do.

Q. Okay. And in terms of where the hard copy is coming from, is that coming from Chief Smith or Megan Kent? Like what's the transit after you?

A. Yeah. I would think everything goes through chief for approval first and then it comes -- so it goes through the chain of command, then comes to me. And technically everything I sign, they have to keep a hard copy of, so we keep hard copies in our -- in our office. I have no idea -- no idea where, but somewhere in this building, every piece of paper I've signed is -- is stored, which is crazy.

Q. Okay. And in terms of the process that you go through with the recertifications, is

it the -- the same as what you described to me for the annual audits, looking through them, looking at the number of DOC inmates and signing off?

A. Yes.

Q. Okay. When you first started as secretary, did you review any past audits of local facilities?

A. No, ma'am.

Q. Okay. So you've only looked at the ones that have come across your desk since starting last year?

A. Correct.

Q. Do you have an estimate of how many -- how many facility audits you've looked at since you started?

A. A rough estimate, 20.

Q. Okay.

A. Twenty, I guess. I don't know, that's been -- I really don't know. I have no idea. I sign so much papers.

Q. Okay. Let me ask you this. Are most of the ones that you've seen annual audits or have you -- annual audits or the three-year certifications?

A. Mostly annual.
Q. Okay.
A. Yeah. I've only signed a couple that I can recall with the certificate.
Q. Okay. Got it.
A. And that's transitional work programs too, so I may be -- I may be adding both of those together because I get both of them. If you got a TWP, I sign one; the jail, I sign one; so altogether, probably 20, 30, somewhere in that neighborhood.
Q. Okay. I'm going to sort of change to another topic. We've been going for about an hour and a half, so I just wanted to offer you a break if you want one or need one?
A. I'm good.
Q. Okay.
A. I could continue.
Q. Great. I want to ask you a little bit about communication with the leadership team members that report to you, and so we have talked about -- we have talked about Chief Smith a good amount.
How often do you have any form of contact with Chief Smith?

A. I probably talk to Chief Smith more than anybody on my team. Probably daily, sometimes multiple times within a day, mainly on phone -- phone calls; meeting in person, probably two or three times a week. But I -- I do speak to chief because, again, out of my 5,000 employees, 4,300 fall underneath him, you know, underneath the correction side; and then Cory Acosta with probation and parole is probably the second most.

Q. Okay. And you referenced communicating with Chief Smith by phone and also in person.

Are there other forms of contact like e-mail or texts or anything like that that you use with Chief Smith?

A. Yeah. Yeah. I don't know. We e-mail on certain things. I'll forward him -- I forward him certain things I get from -- well, I forward a lot of things to him: Complaints from family members for him to look into and then he forwards it to the wardens; surveys from associations that want to know what we are doing here in Louisiana; if I get a transfer request from a legislator or for a family member, I

forward it to him. So I -- everything I pretty much forward to him and through e-mail when it comes to that kind of stuff, and I basically leave him as the final authority on that. I sign off on what he agrees with.

Q. Okay. And we talked about some of the changes in -- in personnel and some of the positions.

When you first became secretary, did you conduct any kind of an evaluation of the individuals who were in these leadership positions that would be reporting directly to you?

A. Yeah. I mean, through the transition, we -- you know, we got to know them; but personally, honestly, I was gone three and a half years.

Q. Uh-huh (affirmatively).

A. But I have many friends in the department and I kind of was still in touch with what was going on. I knew the two people that were going to be replaced. Whether I came here or not, that was my recommendation on the transition teams to the governor, that those two people needed to be replaced, the assistant

secretary and the deputy secretary.

I recommended to the governor that the other ones stay in place because they were doing a really good job, meaning Chief Smith and Undersecretary Bickham and Misty Stagg and Francis Abbott, so my evaluation, a lot was my personal knowledge of them.

Again, like I told you, I sat on the secretary management team for five years as the probation and parole regional administrator. I saw first hand what a couple of them did and didn't do --

Q. Uh-huh (affirmatively).

A. -- and I always said if I had an opportunity to get rid of them or move them, I would.

Q. Okay.

A. And that's --

Q. It seems like you did some evaluation and assessment --

A. Yeah.

Q. -- prior to becoming secretary.

A. Yes. Yeah. I -- they just weren't taken out because we wanted somebody else in there.

Q. Okay. Okay.

A. And I really felt -- just, I mean, to be honest with you, coming in as secretary, this is an extremely difficult job. It is an extremely -- I don't know how one person could do this job, it is so much involved; and I wanted people with experience, but I wanted the right people with experience, so I did put a lot of thought into who I kept and who I didn't keep.

Q. Okay. That makes sense.

You mentioned the secretary's management team that you sat on when you were with probation and parole. Tell me a little bit more about what that is.

A. So every month, Secretary LeBlanc had secretary management meetings --

Q. Uh-huh (affirmatively).

A. -- with the secretary management team. We would come to headquarters. There was probably all the wardens, all his -- his staff, the three probation and parole regionals, the probation and parole director. We all sat at the main table and then in the audience or in the crowd there was probably another 50 or 60 people, like the assistants and the -- and this went on

every month. It was about a five-hour meeting that would spend about two minutes on probation and parole, so I felt it was a waste for me to drive over there and go to that meeting. But, again, I got to hear -- all the wardens went over their issues at their facilities; good, bad, ugly; prison enterprises; probation and parole; I mean, pardon board; executive counsel; I got to hear about all the legislation pending, so Secretary LeBlanc did a really good job keeping everybody informed of what was going on throughout the whole department.

Q. Right.

A. So I will tell you that it was overkill and I changed it to quarterly meetings since I got here. Those meetings were a bit much. We also have leadership meetings with the -- with the close -- the -- those group that I told you about.

Q. Yeah.

A. We have those every other month, so we -- you know, so we are still meeting. I think he did leadership and secretary management meetings every month, but I was not part of the leadership team. The probation and parole

director only was.

Q. Right. Okay. And so the management meetings are still happening. Do they have the same list of invitees I guess, for lack of a better term, under your --

A. I changed the -- the table a little bit. Like the regional, for instance, the regionals for probation and parole I don't feel need to come --

Q. Okay.

A. -- because a meeting -- my meetings are an hour and a half compared to four or five hours. I don't feel there's a need for somebody to drive from Shreveport, get a hotel in Baton Rouge to stay for a meeting for five minutes, so I cut a lot of those. We added Zoom so they could Zoom in if they want.

Q. Okay.

A. So the meetings are probably a little bit smaller and quicker. Not probably, they are. But the right personnel are there. And then when they are at headquarters, anybody's invited to come in the crowd, they could come.

Q. Okay.

A. So but it's usually just extend

today leadership and second level leadership.

Q. Okay. And you said that you are now doing them quarterly. When did you make that change?

A. The day I came in. No. Shortly after that, yeah.

Q. Okay.

A. Once August 29th I came in, honestly I think I had one within two weeks that was scheduled or three weeks of me getting the secretary position. So I didn't change it, I kept it, and then I told them beginning this year in January we would change to quarterly.

Q. Okay. And so have you already had your first one for the year?

A. (Nodded head affirmatively.) And I have one Thursday, my next one.

Q. Okay. Got it. And so then the leadership team, for the leadership team meetings, I know you said you had moved those to every other month; is that right?

A. Correct.

Q. Okay. When did you make that change?

A. The same thing, in January.

Q. Okay.
A. I --
Q. Go ahead.
A. I was just going to say, Secretary LeBlanc kind of -- everything was done in his office over here. I walk around and I meet with them more. Like I'm always in their office. I'm always walking around. I believe in connecting with my employees and my staff, so I don't need to sit here and have a meeting to go over my stuff. So I basically -- I have a lot of informal meetings, I will say, the seven-minute meeting daily or every other day, I meet with them, I check on them, make sure they are doing okay, so -- so we are not having formal meetings, but we are meeting, so --
Q. I understand. Chief Smith told us yesterday that you are a fan of the office pop-in, and I think he meant that in a nice way, so --
A. Right. Yeah, uh-huh (affirmatively).
Q. Okay. And in terms of the actual leadership meetings, the ones that are every other month, that leadership team are your direct

reports that we have talked about; is that right?
A. Correct. Right.
Q. Is there anybody else who attends or is invited to that meeting?
A. The -- I didn't -- I didn't list our communications director --
Q. Okay.
A. -- who we just hired yesterday, so we lost one. The previous one left to go work at another agency --
Q. Okay.
A. -- so we didn't have one for a while, but they are invited also. Sometimes, depending on the issue, like HR director might be involved. Again, the -- Secretary LeBlanc's leadership team expanded to the second, sometimes even third level, whereas mine's much smaller. It's my smaller group of 10 to 12.
Q. All right.
A. The nursing director --
Q. Uh-huh (affirmatively).
A. -- Stacy Rodriguez is involved, sometimes Dr. Lavaspere is involved in that group too. I neglected to say them earlier. I mean, they don't fall under my command. They are under

Chief Smith --
Q. Right.
A. -- but they do come to the leadership meetings.
Q. Okay.
A. Erin St. Pierre, another attorney. And I'm not sure of her exact -- deputy general counsel maybe. She comes too. So it's a much smaller group. It's a group of probably 12 to 15 --
Q. Okay.
A. -- instead of 25 to 30 like he used to have.
Q. Okay. Do other people that fall under Chief Smith -- and I'm thinking about like Dwayne Cambre or Megan Kent that we have talked about -- do they attend either the leadership team meeting or the management meeting?
A. I know they attend the management meetings. They have in the past. Dwayne Cambre only comes to the leadership meeting if chief can't make it.
Q. Okay.
A. Sometimes chief is out, so Dwayne will come in his place. That's what usually

happens. The deputy assistant secretaries come when -- when their supervisors can't make it.

Q. Understood. Okay. It sounded to me like the management meetings were sort of a report out from all of the various departments across -- well, I guess subdepartments across the Department of Corrections. Is that still true?

A. Yeah. It's networking and reporting, correct.

Q. Okay. And in terms of your leadership team meetings, what -- how do you use those meetings or what do you envision their purpose to be?

A. Well, again, a lot of the -- it's reporting again and connecting and -- and networking with each other, because I handled the internal problems and the issues or disciplinary that are more serious I handle individually with them.

Q. Right.

A. And then when we meet as a team, it's more reporting so everybody's on the same page what's going on. Some of our issues effect both like, for instance, our assistant secretary dealing with re-entry deals with chief Smith with

those in the prison population. So, again, I want to make sure they are on the same page, so there's a lot of communication that goes on there. So each -- each team leader, each leader gets to bring up their section and issues going on, goals, good, the good things going on, if there's any bad issues we got to discuss and we go around the table discussing that. Everybody gets their turn. Like I said, it's quick again. It's not a -- we are going to fix problems there. We need to get to work so we don't stay in meetings long, so it's about an hour and a half to two hours at the most.

Q. Okay. That makes sense. And I know you're familiar with Megan Kent. We have talked about her a couple times this morning. Do you have any direct contact with Ms. Kent?

A. I mean, passing her in the hall every now and then. That's about it. But I don't -- no, not really. I go through -- I go through chief.

Q. Okay.

A. I know who she is.

Q. No, I understand. That's really what I was wondering.

A. Yeah. I'm joking. I got a lot of people over here, so --

Q. I'm sure. Okay. And does -- does Megan Kent report directly to Chief Smith in terms of her basic jail guideline responsibilities?

A. I am not a hundred percent, but I think she reports to Dwayne Cambre first.

Q. Okay.

A. I would think that's her immediate supervisor, and then I think she goes through -- and I say she might even have somebody in between Dwayne canal re and her. I'm not exactly sure of that.

Q. Okay.

A. But I know she doesn't report directly to chief.

Q. Okay.

THE WITNESS:

Would it be possible if I could -- we could take a small break? I got to use the restroom.

MS. WASHINGTON:

Definitely. It is 11:45. Let's go off the record for I'll say five minutes,

but you're not being timed, whenever you are back.

THE WITNESS:

That's perfect. Yeah, five minutes is perfect.

MS. WASHINGTON:

All right. Thanks.

(A short recess was taken.)

BY MS. WASHINGTON:

Q. Okay. Let's go ahead and go back on the record.

I had been asking you a little bit in terms of some of your direct reports, and you had mentioned Undersecretary Bickham before. And am I correct that that is one of the positions that reports directly to you as secretary?

A. Yes, ma'am.

Q. Okay. How often are you in contact with Undersecretary Bickham?

A. Probably more like once a week.

Q. Okay.

A. It will be more now because of the budget and the legislative session coming out, but the last couple of months, I mean, I haven't really been involved with him besides preparing

for the budget and having meetings at the capitol for -- with appropriations and stuff, so probably once a week.

Q. Okay. Great. And you may scream at me or for revisiting a couple of questions, but I want to make sure that I understand just a couple of things about the change in positions when you came back to the department.

So I know you said that there were two individuals. I believe they were in the position of the assistant secretary and the deputy secretary that you basically knew before coming back to the department. You did not want to be in those positions; is that correct?

A. During the transition, correct.

Q. And who were those two individuals?

A. Rhett Covington was the assistant secretary, who already held a position as deputy secretary of probation and parole, so he was -- he still had a position to fall back to. He was detailed from the deputy director of probation and parole to the assistant secretary. So when he lost his position, just like LeBlanc went back to the warden, he went back to probation and parole as the deputy director. And then Malcolm

Myers who was just an appointee who had no -- no affiliation with the department went to the house.
Q. And what position was Malcolm Myers in?
A. Deputy secretary.
Q. Okay. And so just so I understand the timeline, when you came in as deputy secretary, who had been in that position immediately before you?
A. Malcolm Myers.
Q. Okay. So that's when he was removed?
A. He was removed and I came in, correct.
Q. Got it. And how long had -- to your knowledge, had he been in that position?
A. I'm guessing eight years, six to eight years I guess.
Q. Okay. He was in that position during at least some of the time that you were sitting on LeBlanc's management meetings and I guess during your time at Iberia; is that right?
A. Yes, he was, my whole time at Iberia and while I was on the secretary management,

maybe not the whole time, but -- so that's why I was thinking it's got to -- it's probably not eight years, but somewhere around there.

Q. Okay. No. That's helpful.

And in terms of Rhett Covington, was he the assistant secretary when you came in as deputy secretary?

A. No. We replaced him.

Q. Okay.

A. It all happened at the same time.

Q. Okay.

A. He went back to probation and parole.

Q. Okay. And that lines up with when you rejoined the department in February of last year?

A. Yes. Jamie Lee took his place.

Q. Okay. Thank you. I finally think I have it straight.

A. Okay. Yeah.

Q. Thank you for indulging me.

A. That's fine.

Q. I want to talk to you just briefly about incident reporting both in terms of events that happened at the DPSC-operated facilities and

also at the local facilities. So I want to start with talking about the -- the state, the department run facilities.

Do you receive notification of incidents from the state facilities?

A. Yes.

Q. Okay. And, if I remember correctly, and tell me if this is not how it works, incidents are categorized by importance or severity into categories A, B and C; is that still true?

A. Yes, ma'am.

Q. Okay. What types of incidents fall under category A?

A. I really -- I really don't know. I can't answer that. I don't know for sure, for certain which ones.

Q. Okay. Do you receive notifications of incidents in all of those categories, A, B and C?

A. I don't think so.

Q. Okay. Do you know which categories you receive notifications for?

A. If category -- if category A is the worst, I receive the worst. Any type of inmate

injury; any type of use of force by the officers; any type of employee arrest, whether inside the facility or outside, off duty or on duty; any significant events such as a fire in a cell or something like that, I get those.

I don't get the -- the minimum. I'm sure there's some reports that they do often, unusual occurrence reports or incident reports that I -- I don't see, but I just get -- I just get the main -- I apologize, but I think it's category A, but I'm not a hundred percent.

Q. Okay. No. That makes sense.

The list that you just gave me, those are the types of incident reports that you do receive from the state facilities?

A. Yeah.

Q. Okay. And how do you receive the notification of those incidents?

A. E-mail from the facility either by the warden or a designee.

Q. So let's say there is a significant event, like a fire at Angola, you receive notification of that by e-mail from leadership at Angela?

A. Yes.

Q. Okay. And what is your understanding as to how close in time to these incidents occurring that you are receiving the notification?

A. Most of them are within -- within 24 hours.

Q. Okay.

A. Some the same day, some the very next day.

Q. Right. That makes sense.

And, to your knowledge, who else with the department -- and I'm really envisioning in terms of your leadership team -- who else receives notification of -- notification of incidents from the state-operated facilities?

A. I know it goes through a group e-mail that I'm in. I know it doesn't come specifically to my name. It goes to a group. I'm not sure who else is in that group. I mean, I do know that Chief Smith's probably in it.

Q. Okay.

A. But with certainty, I don't know who else is in it.

Q. Does the group e-mail have like a name or -- like what is the e-mail address that

is associated with that like group list serve, if you know?

A. It does have a name. Honestly, I don't know. There's so many -- I get so many e-mails. I -- I'm sure it's something like DOC headquarters leadership or -- or --

Q. Okay.

A. But I don't remember.

Q. What is your e-mail address that you have used as secretary with the department?

A. gary.westcott@la.gov.

Q. Was that the same when you were deputy secretary?

A. Yes.

Q. Okay. Was it the same e-mail that you had back when you were with probation and parole?

A. No.

Q. Okay. Since you've been back --

A. It wasn't -- we weren't under la.gov back then.

Q. Okay.

A. It was -- it was different.

Q. Okay. So thinking now about the local facilities that hold sentenced prisoners,

do you receive notice of incidents from the local facilities?
A. The only ones I recall receiving from local facilities are escapes, and most of those happen at the TW -- transitional work programs --
Q. Uh-huh (affirmatively).
A. -- escapes and apprehensions, I get.
Q. Okay.
A. I don't get -- I don't see the significant injury or any issues.
Q. Okay. I want to show you a couple other documents to see if you recognize at least the form of them. Give me one second. Let me know if there's at least a document up on your screen. I'll definitely zoom in.
A. Yeah. Yeah. There's a document.
Q. Okay.
A. I can't -- I can't see it for sure.
Q. I'm zoom in on it.
MS. WASHINGTON:
Just for the record, this is -- has been previously marked as Exhibit 27 to the depositions in this matter. I'm going to zoom in on the top here. I will

represent that this is a 36-page PDF, and let me see if -- there are Bates numbering on this, so it starts at CPSO 1909 and it goes to CPSO 1944.

(Sharing screen.)

BY MS. WASHINGTON:

Q. Okay. So this is the -- zooming in to sort of the first page top half, there's -- it says Louisiana Department of Public Safety and Corrections Monthly Activity Report. This has a facility name location of Catahoula Correctional Center, and the month here is January of the reporting year 2022. Do you see that?

A. Yes, ma'am.

Q. Okay. I'm just going to scroll down to the bottom half of that page. There's a chart with sort of various categories and numbers associated with it. It talks about the total number of offenders, the number of DOC offenders, the operational capacity. And I am happy to flip through more of this, but my question is just whether you recognize the form of this report looking at this first page of Exhibit 27.

A. I don't believe so. I know I -- there is a similar report that I see in -- in

those audits that I was telling you about, but I don't -- I don't think it's the same thing. I don't.

Q. Okay. And I'm going to show you a couple of other documents, but you are right. There is a similar chart format that's included in the -- the audits themselves for the facilities, okay. But this particular monthly activity report for a local facility, that is not a report that you receive?

A. No. No, ma'am.

Q. Have you ever heard of these reports before, these monthly activity reports for the local facilities?

A. I knew in Iberia I had somebody that sent in that information and -- and I approved it, so yeah, I remember it from the local level, but I haven't seen it from this level.

Q. Okay. Okay. Yes. That makes sense actually. Thank you for that.

MS. WASHINGTON:

Okay. I'm going to show you a different report. This is a new exhibit that hasn't been marked before, so I'm going to mark it as Exhibit 55. It is six

pages starting at Bates number DPSC 1997 and going through DPSC 2002.

And I will represent to you and just for the record that this was excerpted from a larger PDF that was produced to us in discovery by the department. This particular excerpt is six pages, all having to do with the central region for April of 2024.

(Exhibit 55 to be marked.)

BY MS. WASHINGTON:

Q. And you can see up at the top there that it says BJG Single Month Activity Rollup or Report Rollup; do you see that?

A. Barely.

Q. I can zoom in.

A. I get you. Okay. I see it now.

Q. Okay. And my understanding is that sort of running down the left column here (indicated), there's various local facilities that are in the -- the central region.

A. Okay.

Q. You'll see there it includes the Catahoula Correctional Center that we have been talking about in that fourth row right here

(indicated.) Do you see that?

A. Yes, ma'am.

Q. Okay. And I'm happy to flip through the other pages, but you can sort of see what's represented here. It has the facilities and then again it has various counts associated, you know, with each facility in -- in the chart. Do you see that?

A. Yes, ma'am.

Q. Okay. And is this -- is this report, the form of this report familiar to you?

A. No, ma'am.

Q. Okay. Did you ever see anything that looked like this report when you were at the local level at Iberia?

A. No, ma'am.

Q. Okay.

A. Not in that form.

Q. Yep. That makes sense. Let me ask you this. Both in terms of this monthly activity report rollup and then Exhibit 27 that we just looked at, the monthly activity reports, to the extent that these are reports that the department receives from the local facilities, are they reports that you could access if you wanted to or

needed to take a look at them?
A. I'm sure.
Q. Okay. All right. Last document I think. This has been previously marked as Exhibit 49. It's an eight page PDF. It starts with the Bates number DPSC 11990 and I believe goes sequentially to DPSC 11997.

(Sharing screen.)

BY MS. WASHINGTON:

Q. So I'll zoom in here on the first page, and you'll see at the top there it says BJG Quarterly Summary Report. This talks about quarter four as April to June of 2021. It references the -- the central region and the -- the team leader and then, again, it has a chart with a list of local facilities within the central region, some information, some counts in that chart.

And then you'll see as we kind of go down, there's also this -- these narrative portions having to do with some of the -- the different incidents. Here (indicated) it's talking about escapes, assaults, etc.

And my question for you is whether or not this report, this quarterly summary report is one that's familiar to you?

A. No, ma'am, it's not.

Q. And is that true both in terms of as in your role as secretary for DPSC and also when you were warden at Iberia?

A. Correct.

Q. Okay. Thank you.

We talked before about the C Facility Reports that you thought you got on maybe a monthly basis and then other reports that you were getting at least weekly, if not more frequently that resembled the C Facility Reports but might have another term. Do you remember that?

A. The census report. That's a lot less information, yes.

Q. Correct.

A. It's just numbers.

Q. The census report. So including those, along with the reports that I just showed you, in your head, are there any reports, logs or regularly generated documents that you as secretary receive having to do with the local facilities that we haven't discussed?

A. The local -- the parish jails, the local facilities?

Q. Correct.

A. No. No, ma'am.

Q. Okay. Okay. Great. Are there any changes that you have made to incident reporting from the state-operated facilities since you became secretary?

A. I don't -- no. I mean, I -- I will say that the wardens are now following a chain of command. Before, they used to go straight to the secretary. Now, they are going to the chief of operations and he controls everything at that level. If there's anything that needs to come to my level, it comes from there; but as far as the policy, no. The policy, I don't think the policy has changed.

Q. And when you say "boards," what are you referring to?

A. Boards?

Q. Is that what you said? For the wardens. I'm sorry.

A. Wardens. I'm sorry. Sorry. I got a sinus infection. I'm working on it.

Q. Oh, no. I --

A. Yeah. The wardens -- the wardens used to call the secretary for everything. Now, they have to go through the chain of command.

Q. Understood. Okay. And that's in terms of like phone calls; is that what you're referring to?

A. You're saying incident reporting. If there's any incident that takes place, they --

they call the warden, I mean, they call the chief, they'll let them know and then they forward the paperwork in that group, but they always let the chief know --

Q. Okay.

A. -- what's going on in their facility. So that's what I meant with incident reporting. I think in the past they picked up the phone and called the secretary.

Q. Got it. Now, that makes a lot more sense now that my ears are working better.

A. Uh-huh (affirmatively). Sorry.

Q. No. I think that was on me.

And in terms of the local facilities, the parish facilities, are there any changes that you've made to incident reporting coming out of the local facilities since you've been secretary?

A. No, ma'am, not that I recall.

Q. Okay.

MS. WASHINGTON:

Okay. I would like to go off the record for just a few minutes. I think I am pretty much done with my questioning for you, Secretary. I just want to make

sure I go over my notes and haven't missed anything or need to ask you about who was the deputy assistant secretary at some time again.

THE WITNESS:

Right. That's no problem.

MS. WASHINGTON:

So if we can go off the record for just like five minutes, I'll be back and then I should be ready to -- to wrap up with you, so thank you.

(A short recess was taken.)

MS. WASHINGTON:

Okay. We can go back on the record for me to let you know that I have no further questions for you and to thank you very much for your time this morning.

I will tender you now to the counsel for the other sets of defendants in this matter, so either Shane for Catahoula or Lenzi for Calcasieu in case they have anything that they want to ask you. Thanks so much.

THE WITNESS:

Thank you.

MR. BRYANT:
I don't have any questions.
THE WITNESS:
Thank you, Shane.
MS. HEBERT:
Hi. I do not have any questions either. Thank you for your time.
THE WITNESS:
I appreciate you-all. Thank you-all. Have a good day.
MS. WASHINGTON:
All right. So unless your counsel have any questions for you, which it doesn't sound like, we are finished. And I don't know. Jonathan or A. J. or Suzanne, if you want to discuss reading and signing with the Secretary?
MR. KROUSE:
Yes, he's going to read and sign, Emily, and we would like a copy of the transcript, please, as well as the exhibits.
MS. HEBERT:
Calcasieu Parish. We will also take an electronic copy with the exhibits from

today as well.

THE REPORTER:

Thank you, Lenzi.

MR. BRYANT:

Cherie', I'll take an electronic copy too.

THE REPORTER:

Thank you, Shane.

(The deposition was concluded at 12:27 p.m.)

WESTCOTT, GARY 4/15/2025


CORRECTION SHEET

PAGE LINE DESCRIPTION

_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________

WITNESS: GARY WESTCOTT
TAKEN ON: APRIL 15, 2025
BY: CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

WITNESS CERTIFICATE

I, GARY WESTCOTT, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

_________________ ___________________________
DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: April 15, 2025

REPORTER'S PAGE

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for the court reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; also, that any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

Cherie' E. White

CHERIE' E. WHITE, CCR(LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that Gary Westcott, to whom the oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 120 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

NDTCA · Signed Electronic Transcript

Cherie' E. White

CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO. 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)