# Transcript of the Testimony of

# **Seth Smith**

February 23, 2024

Murray v. LeBlanc

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CIVIL DOCKET NUMBER: 21-cv-592-SDD-RLB
JUDGE: JOHN W. DEGRAVELLES
MAGISTRATE: RICHARD L. BOURGEOIS

JAMES MURRAY, LATAVIUS PASCHAL, ANTONE HENDERSON,
PLAINTIFFS
VERSUS
JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL, DEFENDANTS

VOLUME II

Videoconference Deposition of SETH H. SMITH, JR., 6712 Dees Road, Jackson, Louisiana 70748, taken remotely, on Thursday, February 23, 2024, commencing at 9:03 AM.

APPEARANCES:

RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER
Attorneys at Law
BY: ELIZABETH CUMMING, Esquire
BY: EMILY WASHINGTON, Esquire
4400 S. Carrollton Avenue
New Orleans, Louisiana 70119

ATTORNEYS FOR JAMES MURRAY, LATAVIUS PASCHAL, AND ANTONE HENDERSON

APPEARANCES (CONTINUED):

PROVOSTY, SADLER & DELAUNAY, APC
Attorneys at Law
BY: JOHN D. RYLAND, Esquire
934 Third Street
Suite 800
Alexandria, Louisiana 71315-3530

ATTORNEYS FOR LASALLE MANAGEMENT AND MADISON PARISH SHERIFF

HAMMONDS, SILLS, ADKINS, GUICE, NOAH & PERKINS, LLP
Attorneys at Law
BY: WAYNE T. STEWART, Esquire
2431 S. Acadian Thruway
Suite 600
Baton Rouge, Louisiana 70808

ATTORNEYS FOR LEBLANC AND SMITH

LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS
Attorneys at Law
BY: JONATHAN R. VINING, Esquire
504 Mayflower Street
Baton Rouge, Louisiana 70802

ATTORNEYS FOR LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS

ALSO PRESENT:
Secretary LeBlanc

REPORTED BY:

LORIE M. HOYT
Certified Court Reporter
Registered Professional Reporter

JAMES MURRAY, LATAVIUS PASCHAL, ANTONE HENDERSON, PLAINTIFFS VS. JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL, DEFENDANTS
Deposition of SETH H. SMITH, JR.
Taken on February 23, 2024

EXHIBIT INDEX

| | |
|---|---|
| Exhibit 3 - | Notice of Deposition |
| Exhibit 4 - | Headquarter organizational chart |
| Exhibit 5 - | Louisiana Department of Public Safety & Corrections Monthly Activity Report for MCC dated May 2020 Bates MCC MAR 49 - 51 |
| Exhibit 6 - | Louisiana Department of Public Safety & Corrections Single Month Activity Report for the Northeast Region dated May 2020 |
| Exhibit 7 - | Basic Jail Guidelines Quarterly Summary Report Northeast Region April - June 2020 |
| Exhibit 8 - | Zoom invitation dated 2/2/21 with attached e-mail dated 1/4/21 to Seth Smith and Derek Ellis from Gary Gremillion |
| Exhibit 9 - | Strategies for Monitoring Disciplinary Activities in Local Facilities |
| Exhibit 10- | Louisiana Department of Corrections Department Regulation No. B-02-017 Classification, Sentencing and Service Functions |
| Exhibit 11- | Louisiana DPS&C Basic Jail Guidelines Checklist Bates ESI - JAMES MURRAY 190 - 196 |
| Exhibit 12- | Madison and Southern Correction Center Policy on Offender Classification and Trustee Assignment Bates MCC P1 |
| Exhibit 13- | Letter dated 9/12/22 to Sammie Byrd from James LeBlanc with attachments |
| Exhibit 14- | List of inmates from Madison who were sent out for medical care Bates MTS 2021M 1 -7 |

EXHIBIT INDEX (CONTINUED):

Exhibit 15- Critical Incident list
Bates CIML (2020) 16 - 20
Exhibit 16- BJG Monitoring Report for Madison
dated 2019

EXAMINATION INDEX

Page
Ms. Cumming........................6

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

LORIE M. HOYT, Registered Professional Reporter, and Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath to the witness.

SETH H. SMITH, JR.,

after having been first duly sworn by the above-mentioned court reporter, did testify as follows:

EXAMINATION BY MS. CUMMING:

Q. Good morning, Mr. Smith. So, this is a continuation of the deposition that started on January 25th, 2024. You're still under oath. It's the same oath that you took last time. So, it's very important that you tell us the whole truth to the best of your ability.

Is there any reason, hardship, medication, illness, sleep deprivation, or any other reason that you would not be able to understand and fully and accurately answer any questions I put to you today?

A. I'm going to answer the same way I did last time. I'm still fighting migraines. Now, they are much improved. And I anticipate going all the way through this today, I hope, but I am still fighting them. I'm still having them daily, but they are not as intense, but they are daily. So, just in all fairness, letting you know that that could happen. Short of that, no, I'm good.

Q. Okay. Great. Thank you.
So, we -- I want to also go back. We sent some topics to your attorney to have the department designate representatives who are best qualified to speak on certain topics. So, I want to go ahead and introduce what will be called Exhibit 3.
(Exhibit 3 to be marked for identification.)
BY MS. CUMMING:
Q. So, it's three pages. The only part that I'm going to ask you to take a look at is down here where we list the various topics that we were asking for a representative on, and you have been designated as the representative to speak on drafting, editing, revisions to the classification system and its offender population management system basic jail guidelines provisions.
You have also been designated to testify on the development of the basic jail guidelines auditing and recertification processes, and you have been designated to testify on development and implementation of Schedule B disciplinary procedures, hearings, and reporting from local facilities.

And reporting from local facilities, we clarified was -- included underlying documentation, attachments, narratives received from a DPSC representative holding sentenced people, including disciplinary reports, unusual occurrence reports, injuries, and contraband.

Are you able to offer testimony on those topics today?

A. Being a broad level, I'm sure I can, yes.

Q. Okay. So, the other thing that has happened since we were last talking is your attorneys sent an org chart. So, I want to go through that just to make sure that I understand how it aligns with what you had previously talked about in terms of who was over you and who was working under you, and all that stuff.

A. Okay.

Q. So, this will be Exhibit 4.

(Exhibit 4 to be marked for identification.)

BY MS. CUMMING:

Q. And I will load this up. It's a little difficult. Can you see that?

A. Yeah. I'm going to stand up and get a little bit closer.

Q. Sure.
A. Okay. I can see it now.
Q. All right. So, does this reflect the organization that's the department at the headquarters level?
A. I'm looking for me. Yes. That's -- let's see. That's how it was previously. I think it just changed slightly.
Q. Okay. When did that change happen?
A. Well, Malcolm Myer is no longer with us. I can start with that.
Q. Okay.
A. And it happened two weeks ago. I don't know. It's been in the last few weeks.
Q. Okay. But that position still exists, correct?
A. That position still exists. That looks correct.
Q. Okay. And so, this reflects that you report directly to the secretary, correct?
A. Correct.
Q. Okay. And all of these people sort of listed here report directly to the secretary; is that right?
A. That would be correct.

Q. Okay. And then, underneath where it says, you know, "Confidential assistant, secretary's office - adult services," and then it's got Seth Smith, that's you, correct?
A. Correct.
Q. And then it's got a number 24. Do you know what that number 24 represents?
A. No, ma'am.
Q. Okay. I'm going to ask, do you think it's possible that it could represent the number of people who report to you?
A. I feel like I'm more than 24. There may be 24 directly. I'm not sure what that 24 means.
Q. Okay. Okay. And then here, it has office of the undersecretary, and then it talks about Thomas Bickham. Do you know what are Thomas Bickham's responsibilities?
A. I can tell you primarily for the financial side. His primary function is over the financial side and over prison enterprises.
Q. Okay. And how does that overlap with your work as a confidential assistant in adult services?
A. How does Thomas overlap with me? I mean, basically, everything we do that requires

funding ultimately comes under him as well as any of the prison enterprise jobs that we have at the state-level facilities would be the primary two ways I see it would overlap.
Q. Okay. So, if you were working on something and you need money to get the project going, then you would reach out to the Undersecretary Bickham, correct?
A. That's one way. I could reach out to him. I may reach out to someone in his office, or it may be a conversation I have with the secretary to bring up down the road whenever he's present. I mean, it could go a few different ways.
Q. Okay. Is there -- who all on this chart has a role related to adult prisons?
A. Well, you know, I can say almost everybody at different levels. I mean, you want me to go through them one by one? How would you like me to do this?
Q. Yes. Go through them one by one. That would be great.
A. Okay. Well, the nurse consultant, WAE, Leslie Schmidt, you know, she helps perform audits and things of that nature at the state

facility, so that overlaps there.

Debbie Bennett, not so much.

Tanisha Matthews, she's involved in training at all the facilities, so there's overlap there.

The deputy secretary, not so much. EAPs, things of that nature come out of that office when there's a critical incident, things like that, so there could be some overlap there, but typically, it's not, not in the day-to-day operations.

I discussed Bickham already.

So, if you go to Bobby Lee -- well, I'm sorry. That title that he's got there, probation and parole director, he's no longer in that position. He's now in an assistant secretary position. So, I looked at the name, not title. I think -- yeah. And that probation and parole director, which is vacant right now, that position, though, there's still some pending off, so to speak between the people that are discharging, so that position would still have some dealings with it.

Natalie LaBorde, executive counsel. She's

also over pre-class, which has to do with time computation, so there's a lot of hand-in-hand stuff there.

And Angela Whittaker is the executive management advisor, mainly when it comes to statistics and things of that nature. You know, there's some overlap where we reach out to her for assistance.

So, you know, most everybody on there, there could be some overlap.

Q. Okay. And for the position, that deputy assistant secretary position that I understand Bobby Lee is now in, can you tell me a little bit more about what that position is?

A. Okay. So, the assistant secretary, not deputy secretary, not deputy assistant. He's an assistant secretary, as I appreciate it. And that position is over the office of reentry, which also includes education and religion, and probably some other stuff I'm not sure of.

Q. Okay. And when did Bobby Lee go into that role?

A. I'm not sure. The new governor -- that's a governor's appointee. It's been a few weeks ago. Maybe a month ago.

Q. Okay. And do you know who is coming in -- I know that the P&P director is still vacant. Is there, like, an interim, or anything like that?
A. Not to my knowledge. There could be. I don't deal with them at that level daily, so I'm not sure.
Q. And then, when you were talking about the deputy secretary, you believe it was Malcolm Myer, you said that that office would issue EAPs after a critical incident; is that correct?
A. Well, I really -- EAP may be the wrong word. I know they do critical incident stress debriefing, and I think that responsibility may have been moved from that position now, but previously, that's one of the roles that fell under that position.
Q. Okay. And what would -- what sorts of things would count as a critical incident in that context?
A. Well, I mean, if there is an employee or inmate suicide, we could perhaps offer CISD, CISM. Anytime there's a traumatic event, you know, even an officer getting killed in a car

wreck on the way home. That's happened. Things of that nature.
Q. Okay. And so, just so I understand, EAP, tell me what that stands for.
A. That's an employee assistance program. And again, I think I misspoke. I'm not going to say that that fell under him. I really was thinking CISD, CISM, which is critical incident stress management, critical incident stress debriefing.
Q. Okay.
A. Two that previously fell under the deputy secretary's office.
Q. Okay. And those are things that are offered to employees after something happens; is that correct?
A. Correct.
Q. Okay. So, this isn't -- this doesn't touch on inmates, or this is --
A. I'm not going to say that it doesn't. I think there are cases where they can be offered, but again, that's outside of my umbrella, so I'm not speaking with a hundred percent certainty.
Q. Okay. All right. All right. And then you had talked about Leslie Schmidt doing the

auditing for the prisons, and I think we had touched on this last time, but I just want to confirm, those are for the main DOC state-run facilities that she does auditing; is that correct?
A. I mean, we technically could use her anywhere, but typically, no. Typically, I -- I can't -- I can't recall using her anywhere other than the state facilities, but she's a consultant to the secretary. So, with his permission, we utilize her expertise wherever needed.
Q. Okay. Do you recall ever using her expertise related to audits or reviews of local facilities?
A. Not off the cuff, no, ma'am.
Q. Does anybody on this chart have any overlap or anything to do specifically with, you know, reviewing, monitoring auditing performance at local facilities?
A. No, ma'am.
Q. Okay. We -- when we broke last time, we were talking about the basic jail guidelines and the amendment process. And so, I kind of -- I just want to go back. I don't want to retread all of that again, but I do want to go back

and just follow up and confirm a couple of things.

So, I'm going to go to what was previously marked and what we'll keep referring to as Exhibit 2. This is the reg. It's dated July 2022. And then, just going down to page 2 of the exhibit, this is dated July 31, 2022.

Have you had an opportunity to confirm that that is the most recent basic jail guideline?

A. No, ma'am. I believe it to be the most recent, but I didn't confirm that.

Q. Okay. And then we had also looked at Exhibit 1, which I'll show you now. Exhibit 1, this page 1, has basic jail guidelines, and then it's dated 2019 with a review date of October 1, 2019.

Do you know, between 2019 and 2022, were there any revisions of and re-issuances of the whole basic jail guideline packet?

A. I can't -- I can't recall, you know, that far back as to whether or not there was. I'm sure there was some amendments. There may or may not have been one. I would have to go through a database to find out.

Q. Okay. And those -- the database that you would go through to find out, what database is that?
A. You know, maybe I misspoke. I probably would ask the BJG coordinator to let me know. I'm sure there's a track of changes in the database, but I wouldn't be the one going through it.
Q. Okay. And the amendments that would have come out between 2019 and 2020, assuming there wasn't a re-issuance of the guidelines as a whole, those would have been distributed by e-mail, I believe that was your previous testimony?
A. Typically, yes, ma'am.
Q. Okay. Do you know when the next revision is anticipated?
A. Oh, I don't know when it's anticipated. I can tell you we're constantly working on revisions, and I don't know when there would be a full one. I mean, I can tell you it's in revision now. We're making changes as we speak.
Q. What changes are you working on?
A. Well, the most recent one would be reporting

requirements at the local level of non-U.S. citizens. I know that's in the works as we speak.

Q. So, that would be, like, ICE detainees?

A. Not necessarily ICE detainees. I think those are already reported. Just if it's a pretrial or a postconviction. If somebody is being held at the local jail, we have an interest in knowing whether or not they're a U.S. citizen.

Q. Okay. So, you're working on that. Any other?

A. I'm sure there's other ones, but off the cuff, no, ma'am, I can't just pull one out of there. Not this second.

Q. Okay. That citizenship reporting, when did that start? When did y'all start working on that?

A. Last week or so.

Q. Okay. So, going back to Exhibit 2, I'm going to scroll down to the classification. All right. So, this is page 20 of Exhibit 2. This is the classification system.

We talked last time about sort of the verbiage differences between 2019 and 2022. It sounded like, and correct me if I'm getting this wrong, but it sounded like it was mostly

kind of, like, a stylistic change to make the provision read a little bit better.
Do you know when this provision was first developed?
A. No, ma'am.
Q. Do you know who first developed this provision?
A. No, ma'am.
Q. All right. Do you know when the last substantive change to this provision was made?
A. No, ma'am.
Q. Do you know who would know those things?
A. I think it would take someone looking at the historical documentation to find that answer. And who that would be, I mean, it could be anybody with access to that.
I mean, it's something that, you know, Megan could get the answer for us or, you know, I mean, several people probably could get the answer, but as far as to have it off the top of their head, I don't think anybody is going to remember something that detailed.
Q. Okay. So, the historical documentation. What kind of documentation are you talking about?
A. Pulling previous BJGs and seeing when it was

developed, and when it changed, or if it changed.
Q. Okay. Where would you pull the previous BJGs from?
A. I would ask the BJG coordinator. I honestly don't know, but I know they keep historical documentations.
Q. So, you don't know where previous BJGs were, and you don't know where someone would look to sort of trace through the origin of a provision?
A. No, ma'am. I typically ask somebody, and it happens. To tell you where exactly they go to look, I'm sure it's in a filing cabinet somewhere.
Q. Have you or has anyone ever asked to look at, you know, where this provision came from?
A. I can tell you --
MR. STEWART:
Objection as to form. You can answer.
THE WITNESS:
I can tell you I never have. I can't tell you if somebody else has or hasn't, but I haven't.

BY MS. CUMMING:
Q. Okay. And do -- you've been designated as the person to talk about this provision on behalf of the department. So, do you know? Has anybody in the department ever asked?
A. I just said I can't tell you if somebody else ever asked. I don't know if they have or have not.
Q. All right. And I'm sorry. I know you testified to this last time, but if you could just remind me, when did you come into your current position?
A. December of 2014.
Q. Okay. And so, in time, in your, you know, not quite ten years, you don't recall a substantive revision to this classification provision; is that correct?
A. No.
Q. Okay. All right. So, you've also been designated as the department representative on reporting from local facilities. So, I'm asking you questions both in that capacity and in your capacity as a defendant witness.
Who at the Department of Corrections receives notice of incidents that happen at,

like, main facilities, main state-run prisons?
A. I mean, there's a host of us that do. There's a category reporting system that includes multiple people on the e-mail. I can't tell you exactly who all gets them, but I know I get -- I know I get them.
Q. Okay.
A. I know the secretary gets them. I mean, there's other people that do.
Q. Okay. And so, that would include deaths?
A. Correct.
Q. What about hospitalizations; do you get notification of that?
A. It would depend on the hospitalization. At some, you would. Not all.
Q. Okay. What sorts of factors determine whether or not you get notice of the hospitalization?
A. It could be an unexpected, secondary to an event.
Q. Okay. So, you tell me if this is right. If you have a 70-year-old who has metastatic cancer, and he's admitted to the hospital, you would not necessarily get notification of that, but if you have someone who has a -- is stabbed and has to be admitted to the the

hospital, you would get notification of that?
A. That's correct.
Q. Okay. What about if -- you know, so going back to our example of the person who is stabbed, but they just go to the emergency room. They're just routed to the hospital, but they're not admitted. Would you get notification of that?
A. Yes, ma'am.
Q. Okay. And how would you get those notifications?
A. Again, through the category reporting system. Sometimes I get a phone call from the warden, depending upon the significance, but at least I get an e-mail.
Q. Okay. And just so I understand the category reporting system, on your end, the receiving end, that looks like an e-mail; is that right?
A. That's correct.
Q. Okay. And the category reporting system, can you tell me how that works sort of on the other end, the sending end?
A. Okay. I can tell you that we have a duty officer at all times, and the duty officer is contacted by either the institution or Hunt

Control Center, and then they, in turn, key in the e-mail and send it out.

Now, ultimately, the institution will do a more in-depth category reporting the following day or something with more detail, but initially, the duty officer lets us know that the incident occurred, and then a true Cat A, B, C, whatever notification will come from the unit to that e-mail address.

Q. And so, by "category reporting," what does that mean? What does that term designate?

A. It's your -- ask me that question again.

Q. Sure. I'm just trying to understand. Category reporting. Like, what's the category? Why is it called that?

A. Well, because, okay, inside this, you're going to have Category A and Category B are your two main ones that actually require pretty prompt reporting, and there are certain events that will fall under each one.

Like, a Category A is going to be your more egregious or your more significant event, such as, you know, a murder, a suicide, an escape, things like that that require, you know, an immediate deal. So, those are going

to be a Category A or a Category B, and they're going to be more things, like, you know, a medical, death, or things of that nature.
Q. Okay. Is there a written policy sort of defining what's Category A, what's Category B, what the process is for reporting and timelines?
A. Yes, there is.
Q. Do you know what that policy reg number is?
A. Oh, I knew you were going to ask that. Yeah. I mean, it's funny. We changed our numbering system. And I know the old number. I don't know the new one.
Q. Okay. What's the old number?
A. C-05-01.
Q. Okay. And when did that change?
A. Oh, it's changed way too long for me not to know the number. It's been several years.
Q. Okay.
A. Historically, that's what it always was.
Q. Okay. All right. So, did it change, like, in 2020, or 2021, or after that?
A. I would be guessing. I'm not sure.
Q. Okay. So, for -- so, you would get

notification -- through that system, you would get notification of deaths, you would get notification of unexpected hospitalizations, including both admissions to the hospital and, you know, just going to the emergency room for treatment. Would you get notification of assaults?
A. It would depend upon the complexity of it. It's possible that I could. It's also possible that I could not.
Q. Okay.
A. I mean, it's a large system with a large number of people, and there are assaults that occur that don't really rise to that level.
Q. Okay. What are the criteria for reporting an assault versus not?
A. I would have to read the regulation to tell you specifically what the criteria is. I don't know that an assault in its own right rises to the level of a Category A or a Category B; however, an assault that results in, you know, a death, that results in a significant injury, those would.
So, it's not the assault. It's the outcome of the assault that makes it

reportable, as to the best of my recollection.
Q. Okay. All right. That's helpful. Thank you.
So -- and significant injury, I just want to make sure we're on the same page with that. How that is defined?
A. I would have to pull the reg again to see it, but again, to the best of my recollection, I believe a significant injury is one that requires any -- requires a healing time or puts you out of -- I'm having a hard time with my words. I know what I'm trying to say.
It's basically one that takes, like, six weeks or more, I believe is what it reads, but again, I would have to read that to quote that exact timeline, but it's tied to the recovery time.
Q. Got it. Okay. That's helpful. Thank you.
But what about sexual assaults; would that be reported through this category reporting?
A. Well, there's a PREA mechanism for that, but also, we would be notified.
Q. Okay. So, there's sort of two different mechanisms; one is through a separate special PREA mechanism, and then --
A. Well, you know, I --

Q. Uh-huh (affirmative response).
A. -- know that we get notified, and we make sure that the PREA coordinator handles that. So, you know, is it two separate ones, or is it one and we bifurcate and spin it off, I'm really not sure, but I just know that that one goes two different directions. I mean, we get notified, but so does the PREA person.
Q. Okay. Do you get notified through that same system, that category reporting system?
A. Do I get -- of a sexual assault?
Q. Yes.
A. Yes. Yes.
Q. Okay. All right. And what are UORs?
A. Unusual occurrence reports.
Q. Okay. And what would be included in an unusual occurrence report?
A. Unusual activities. I mean, it could be any number of things, but anything that occurs that's outside of the norm, well, within reason, would be put on a UOR within the state facilities.
Q. Okay.
A. I mean, it would be -- I mean, almost any instance we've named thus far could definitely

be put in the unusual occurrence.
Q. And do you get notice of UORs from the state facilities?
A. Okay. There's a large volume of UORs done every day at every facility. So, no, we don't just get notified of every UOR. Now, we do get notified -- again, this is kind of going back to the categories deal. We know a UOR is being generated at those events.
Q. When you get the notification of the events we've been talking about, deaths, hospitalizations, assaults, sexual assaults, do you also receive a copy of the UOR?
A. Not necessarily. We could. But we definitely can ask for it.
Q. And how are the UORs kept at the main facilities?
A. An electronic database.
Q. What's that database called?
A. Oh, don't get me lying. I'm not your best IT person.
Q. Okay.
A. I know it's in there. Now, whether it's -- what the name of the database is, I'm not sure.

Q. Okay. And the electronic database, is that something that people at headquarters are also able to access?
A. Yes. I recently ensured that our investigative division has access to all the units.
Q. Okay.
A. And we had previously, but I mean, you know, there was one or two that we had a little issue with that we made sure, but yes, we do. To answer your question, we do.
Q. And what about people at other facilities? So, if someone is at DCI, and they're curious about a UOR that happened at Angola, would they be able to access it?
A. I would think not, but I would defer that to someone in IT to answer because I'm not a hundred percent sure of that, but I would think not.
Q. Okay. And the database, how is that -- is that searchable by -- well, how is that -- how do you pull up certain UORs?
A. You know, I've never personally sat down and pulled up UORs. Again, I typically ask somebody, I need such and such, and they give

it to me. So, I can't answer that.
Q. All right. So -- and for the state facilities, the main camps, you talked about this category reporting, but I just want to make sure I understand. I know it goes through a duty officer, but at the state facility, who is responsible for making those reports?
A. The warden typically has a designee. It could be different people at each institution, but the warden has a designee at each institution.
Q. Okay. And is there a designee, like, for each shift, or is it, you know, one person gets called at all hours and has to do this?
A. Well, the paperwork -- see, we're talking two different things. One is when an incident occurs, someone will notify the duty officer, and that takes care of part of the reporting requirements. But a formal category submission, the formal report doesn't -- isn't done at all hours. So, it's probably going to be the same person Monday through Friday to do the written part that comes into the e-mail later.
Q. Okay. And for that -- that's helpful. Thank

you.
So, for that initial report, that, you know, first contact with the duty officer before the formal paper -- all the formal paperwork gets done, whose responsibility is that?
A. I mean, it's going to be the warden or designee, as far as the initial report. And I'm not sure -- there's two things here. I'm not sure which one you're asking about. One is the unit is going to call the duty officer, and then two, the duty officer is going to send us an e-mail summarizing what was said.
So the duty officer is going to do the actual e-mail, but the actual contact will be taken by the warden or designee. It depends on the incident and how high it rises.
Q. Okay.
A. They -- typically, they call me directly, and that meets their requirements. I say it meets their requirements. It actually doesn't. It tells them, even if they contact me, they still have to contact the duty officer to make sure we have the right documentation.
Q. Okay. And when you say "they," that's the

warden or designee?
A. Well, when I was saying "they," I was referring to the institution as "they," but yes, it would be the warden or designee. And again, it depends on what it is because if it's something that's at that level, you know, a murder, an escape, you know, some of these serious Category As, typically, the warden is going to be called before me, and the institution obviously is going to bring him in, and then he should call me directly at that level.
Q. Okay. All right. Okay. So, let's talk about something, like, a slight step down, where, let's say, there's been an assault and someone has had to go to the hospital with a pretty serious possibly life-threatening injury. They're not dead. They may not die. But, you know, you don't know what the recovery is going to be. Would that result in a call to the duty officer?
A. Oh, it definitely would result to a call to the duty officer.
Q. Okay. And who would be --
A. It may not occur within -- it may not be

immediate. It may be within 24 hours.
Q. And who would be responsible for making that call to the duty officer in a case like that?
A. Well, ultimately, it still would be the warden or designee.
Q. Okay.
A. You know, that's how that would go down.
Q. Okay. All right. Thank you.
And so, moving now from, you know, the main facilities to the local facilities that hold, you know, DOC people. Who at DOC receives notification of incidents that happen at local facilities?
A. Typically, I believe it's the Hunt Control Center. They call the Hunt Control Center, and then the Hunt Control Center notifies our duty officer.
Q. And what sorts of things get reported?
A. Well, you know, a lot of things get reported. The big ones are the ones that jump out, you know, in my mind. They're, you know, the ones that I get phone calls on are going to be escapes, the murders, the suicides, things of that nature.
The reg spells out specifically what all

gets reported, and I would have to see that in front of me to give you an exact answer.

Q. Okay. And the reg, is that the same -- I know the number has changed, but what the -- the C-05 reg, does that also govern reporting for local facilities?

A. That's correct.

Q. Okay. So it's deaths, unexpected hospitalizations, assaults that might result in death or unexpected hospitalization, sexual assaults, all of that would be reported from the local facility to the Hunt Control Center to the duty officer; is that right?

A. If they reach the level, yes. Noting what I said earlier, yes.

Q. Okay. So, it's the same -- I guess what I'm trying to make sure I understand is it's basically -- it's the same reporting parameters for both the main prisons and the local facilities?

A. There are some differences, and off the cuff, I'm not going to tell you what they are. Again, I would have to have the reg in front of me, but the reg breaks it out. State institutions categories. It breaks out the

local level. It breaks out TWP. Three separate divisions.
Q. Okay.
A. But they're basically very similar.
Q. Okay. All right. And these -- and you would receive these notices as well through that same category reporting process?
A. Yes.
Q. Okay. And at the local facilities, who is responsible for notifying the Hunt Control Center to get that category reporting process started?
A. I would have to pull the BJG to see, but I mean, it's the warden or designee at all facilities, as I appreciate it.
Q. So, this duty officer that you've been referring to, that would be -- I think it shows up on the e-mails as, like, the DOC HQ OAS duty officer; is that -- does that sound right?
A. That sounds correct.
Q. Okay. And HQ is headquarters?
A. Correct.
Q. And OAS is office of adult services?
A. Correct.

Q. Okay. And the duty officer, is that, like, one person, or is it a rotating position with shifts? How does that work?
A. Well, it rotates. Typically, one week rotations.
Q. And the duty officer has another job?
A. Yes. They all do.
Q. Okay. Where does the -- where do duty officers get drawn from? What are they doing otherwise?
A. Well, basically, it's almost everybody that's under my umbrella is put in that rotation. I say almost everybody. But, I mean, we've got the investigators that work under me that are part of it. We have the medical staff that works under me is part of it. We have some executive management officers. We have the deputy assistant secretary, the TWP people. I mean, basically, it's the whole broad spectrum of staff that have been trained to carry the duty phone, per se, and handle that.
Q. Do they have, like, a list of questions or kind of, like, a checklist to make sure that they get all of the information that they need to get when that call comes in?

A. They have a specialized training that's conducted, I want to say, annually where all that is gone over. Now, as far as do they have a checklist, I know there's a cheat sheet out there, but is it in everybody's hand and is it formal, that much, I can't tell you.
Q. Okay.
A. But I know it's gone over in training.
Q. Okay. Who does that annual training?
A. Well, I think Diana McCool recently oversaw a class here a few weeks ago.
Q. Okay.
A. She's one of our head trainers, and she -- there may be some other trainers that do it as well. I'm not sure.
Q. Okay. And it's McCool, M-C-C-O-O-L?
A. Correct.
Q. And does she have, like, a curriculum, PowerPoint, agenda, anything like that for this training?
A. I know there is a training outline. Whether or not there's a PowerPoint, I'm not -- I'm not certain.
Q. Okay. There's a training outline?
A. Correct.

Q. Okay. Did she develop the training outline, or did someone else?
A. I'm going to say it predated her, so I would say she did not do it. She may have had some influence in the current one.
Q. Okay. How long has she been doing the trainings?
A. Oh, I don't know. She's been at headquarters a few years, but I mean, I know we were doing this before she came to headquarters. And it used to be more of an OAS or department of -- or division of prison operations function.
We recently centralized our training and have, you know, trainers involved in all the aspects, where previously we were a little more compartmentalized and would have conducted it ourself, but now, they have a role in it, but it definitely predates bringing in McCool.
Q. Got you.
Okay. So, if it's something that's coming from the duty officer, you are on that distribution list; is that -- that's correct?
A. Correct.
Q. Okay. And the Hunt Control Center, so that

e-mail is -- I just want to make sure I understand. So, the local facilities report incidents that they're required to report under that -- what we'll just call the C-05 policy. I know it's got a different name -- number now. They report that to the control center at Hunt, and then the control center at Hunt has the responsibility of reaching out to the duty officer. The con -- who all is at the control center at Hunt?

A. Typically, there's going to be a minimum of two officers.

Q. And is that their primary job to be at that control center?

A. Yes.

Q. And do they receive any kind of training, or do they have, like, a checklist, or anything like that about relevant information that they need to make sure that they gather when someone from the local facility calls with the report?

A. I can't speak for today, but when I was employed there, they had a checklist on a clipboard in the control center.

Q. Okay. Do you know where that checklist came

from?
A. It predated me, so I'm not sure.
Q. Okay. So if it happens that while the -- when the duty -- when the Hunt Control Center, you know, reaches out to the duty officer, and the duty officer sees, okay, so there's some information that I know we're going to need because, you know, duty officers have this annual training, how do they -- how do they -- well, let me ask this first: Do they -- do they follow up to try and get that information before, you know, sending out the notification?
A. I'm not following your question.
Q. So the duty officer gets annual training and knows what sorts of pieces of information they need to include and report out about any of the incidents that might happen at local facilities under the C-05 policy; is that correct?
A. Correct.
Q. Okay. And so, they're receiving that information from the Hunt Control Center officers; is that correct?
A. Yes.

Q. Okay. And so, if the Hunt Control Center provides information to the duty officer that's incomplete, for whatever reason, how does -- does the duty officer try and get the missing information before sending out the notification or the report to everybody?
A. That would depend on how substantial the information would be. I mean, there's instances where they do. There's instances where they don't.
You know, I've had duty officers call me and say, This is what we have. This is what I have. You know, what do we need to do? If it's not substantial, it's something that might wait until the next day and get the basic guidelines team leader to do. If it's something substantial, either Hunt Control Center will reach back out to them, or the duty officer can.
Q. Okay.
A. I've seen it go both ways.
Q. Okay. All right. So that was going to be my question. If it's something substantial, the duty officer will then ask Hunt, and then Hunt will turn around and ask the local facility;

is that how it goes?
A. It could go that way. There's nothing that precludes the duty officer from reaching out directly, though, as well. I have seen it happen both ways.
Q. Okay.
A. Ideally, Hunt should get complete information, and Hunt should reach back out, in my opinion, but as long as we get it, in the moment, that's what's important.
Q. Okay. Okay. And so, what would be -- what would be substantial information that would require the duty officer or Hunt to reach back out to the local facility to get more information?
A. That's a very broad question. I mean, it could be something as simple as they didn't get the guy's name. Believe it or not, you know, things like that have happened. It could be something as simple as, you know, we have a -- he's hurt real bad. Okay. What's that mean? Do we have a diagnosis? We may not have one at that time. You know, it might be that's all we have. But things of that nature.

And again, you know, if it's something like that, it may be something we're not going to get the same day, and it may be that this is the best information we have at that time. And in that case, you know, it's one of those cases where it does wait until the next day if we have the basic jail guideline team leader reach out to give us more details.

I mean, sometimes in the middle of an incident, you know, you have to accept the information we have available at that point. So, I'm not saying to accept incomplete information, but sometimes you accept what's available.

Q. Okay. So, if -- let's take the "hurt real bad" example. So, someone from a local facility calls Hunt Control Center, says, James Dean is here. He was stabbed. He's hurt real bad. We don't know the extent of his injuries. Hunt then reaches out to the duty officer. Does that notification still go out with just a note that, you know, We don't know extent of the injuries yet?

A. Yes. I would hope that it does, and I would hope that it goes out with, you know, just

like you said, We don't know the extent of the injuries. More to follow.
Q. Okay. All right. So, sort of the function of this notification process is to let you know that something is going on and that even when it's an evolving situation, you don't necessarily have all the information, it's also maybe something to follow up on; is that fair?
A. That's fair to say.
Q. So the checklist that you knew that they had at Hunt back when you were working there, do you recall what sorts of things were on it?
A. Well, you know, it's nothing that I used, but I know, you know, it had institution, it had name, it had who actually called and getting their phone number. Just basic information, but you know, I know it existed. I probably have read it, but I can't tell you verbatim or even close to what was on it.
Q. Okay. And the annual training, do you know what sort of information the duty officers are told to try and collect?
A. I haven't sat through an entire training, so I can't tell you exactly what all they're

trained to collect, but again -- again -- "but again" twice. That's fun. They're going to get the obvious who, whats, whens, wheres, and hows, you know.

We don't want somebody to call with half information or somebody sending out a report that, you know, John Doe at institution such and such fell, you know, and that's where it stops, you know. What was the outcome? What are we doing now? Was he hospitalized? Has he been looked at? So, they do get trained to ask those questions.

Q. Okay. So, when these notifications come in -- so, I know you said you get them in your e-mail, and then it -- but it also goes out to a distribution list. So, there are multiple people in the department who receive these notifications; is that correct?

A. Correct.

Q. All right. And I know that you don't know everybody who receives these notifications. Can you think of other specific people who you know for certain do?

A. I know the secretary and I get them. Outside of that, I'm speculating.

Q. Okay. Is there sort of, like, an e-mail group or a list serve that, you know, the duty officers just sort of types in, all right, I'm going to send this to, you know --
A. Correct.
Q. Okay. What is that -- what is that e-mail group called?
A. I'd have to look on my phone to tell you, but it's going to be, like, a duty officer notification, or something along those things.
Q. Okay. So, when you get those reports, do you do anything with them to, like, you know, put them in a specific place, compile them, anything?
A. Each one is handled individually, in my opinion. I think, you know, some we follow up on immediately. Some we don't. Some we send to medical to have them look into. Some we send to the BJG team leaders. Some we may send a team to audit. I mean, there is no "this is what we do."
You know, I think that's a very individualized response to a very individualized report. I mean, some of them are notifications, and that's what they are.

They're notifying what happened. And there may not need to be anything that's done. So, those are, again, very individualized.

Q. Okay. Who decides what to do? Like, what the response should be to a notification?

A. I think that could be myself and/or the secretary. I mean, there's some that are dictated in the reg. Like, if there's a suicide, we're going to do certain things, if there's a murder.

There are some things that are just very obvious, but other ones there is, like I said, some discretion and individuality with the circumstance.

Q. When you say that for some the response is dictated in the reg, which reg is that?

A. Well, I know there's a reg on suicide, in particular, that spells out what's done.

Q. Okay. All right. For the -- what sorts of incidents do you have discretion to determine how you want to respond or not?

A. Well, I think we have discretion on all of them to some degree. I mean, even regulated, the secretary can have his say. But, you know, I'll just give an instance where, you

know, if there's a fight with significant injury, or if there's an escape, or if there's whatever, you know, sometimes we may have the duty officer -- not the duty officer -- I'm sorry -- the basic jail guideline team leader reach out to the facility and get a more thorough report as to what happened.

And if it's satisfactory that there was an anomaly or that it was handled appropriately, it may go no further, or it can go as far as us sending an audit team in, and anything in between.

Q. Okay. So, if you were to ask the team leader, the basic jail guidelines team leader, to reach out to the facility to get a more thorough report, what would you expect that process to look like?

A. Typically, that person reaches out to his contact there, the warden, typically, and then he asks for more details in what we would have in an initial report, you know, maybe what the precipitating factors were, maybe what the outcome was, if there was any changes because of this, things of that nature. And then, typically, we get an e-mail back stating, you

know, I checked into this incident, and this is what I found.
Q. Okay. So, when the team leader reaches out, are they doing it by phone or e-mail?
A. You know, I'm not saying it couldn't be done both ways, but I would say, more often than not, it's by phone. Sometimes it's face to face. Sometimes they drive out. It could be any of them. It could be a question via e-mail. It depends on what the question is.
Q. Okay. And then the way you get the information back is typically by e-mail from the team leader; is that correct?
A. Yes. Now, typically, it would go through Meg. That's the BJG coordinator. Usually, I kick it down to her and ask her to have the BJG team leader follow up on X, Y, Z, whatever it may be. And then she initiates that process with the team leader, and then it comes back that way. And then either she forwards it to me, or she prints it. And it comes down, and we discuss it at a later date once everything is done.
Q. Okay. So the team leader is not necessarily e-mailing you; the team leader may e-mail back

Ms. Kent?
A. That's probably more often than not. I'm not saying I have never sent something directly to the team leader and bypassed her. I'm not saying they've never sent me something directly as well, but I try to use the chain of command and use Meg, Ms. Kent, and her position, to kind of oversee and coordinate that. I think it keeps it cleaner and easier to go back and find if we try to be consistent with what we do.
And again, I'm not going to tell you I've always done that. I'm sure if I look through, there may be a time or two along the way that -- or also, there's an instance where maybe she's out of town or is not readily available. So, it's happened.
Q. Okay. So, Ms. Kent, I believe she started in 2022. So, prior to that, who would you reach out to to have them look into something or coordinate with a team leader?
A. Two things. I'm leaving out Duane Cambre, who is the deputy assistant secretary, who is actually Meg's supervisor and works directly for me, so I may reach out to him as well. A

lot of times, I do go directly to Meg, though, just because she's over it.

But prior to Ms. Kent, it would have been Ms. Stewart, Markisha Stewart, was in that position for a brief period of time. I'm not sure, but she wasn't there a long time. I know that. And then Angela Tozan prior to her, and Angela was in the position when I got here. So, that would be the only three that have been holding that spot during my tenure here.

Q. Okay. And I believe we had gotten previous testimony that said that Ms. Tozan had been out on medical leave maybe or she was out for a period of time. Do you know, roughly, how long that was?

A. You know, that's been so long ago, and I hate to guess. It was a significant amount of time, but I would be pulling it out of the air. That's been, you know, years ago. And then, was she out the entire time; she came in and out some? You know, I would be pulling -- I would be grasping to give you a timeline.

Q. Where would that timeline be kept? How would we be able to determine that timeline?

A. I'm assuming payroll through HR would have that. And while she was down, I would have been reaching out to the deputy assistant secretary.
Q. And who would that have been?
A. You know, I know when she very first -- when I very first got it here, it would have been James Bush, but during her time that she was absent for an extended period of time, I'm not sure who the deputy assistant secretary would have been. It would not have been Duane Cambre, I do not believe. That position we've had several people in throughout the course of my career.
Q. Okay. Okay. So, if Ms. Kent hadn't -- wasn't there, for whatever reason, you might reach out to Duane Cambre, or you might reach out directly to the team leader to get some follow-up. So, that's sort of the one level of possible response. And then if that was not -- if you felt like that wasn't enough response, what would sort of the next step up of kind of dealing with a notification of an incident be at a local facility?
A. I'm confused. Are you saying that the

response I got back wasn't sufficient, or are you saying -- I'm confused as to what your question is.
Q. Yeah. You're right to be confused. So, yeah. Let's start with if the response that you got back wasn't sufficient. What would you do then?
A. I, most likely, would reach out to whoever I reached out to the first time and point out what's insufficient about them and ask them to go back to the well, you know.
Q. Okay.
A. Just because you failed to provide -- if I'm asking you what color shirt somebody had on, and you come back, and you fail to mention that, to me, that's an insufficient answer, and I'm not just going to go a different path. I'm going to go back and say, Do it again. Here's where you dropped the ball, and point out where the problem is.
So, you know, it depends on, again, what the insufficiency is. If it's something that they should have been able to get, then I get them to go back and do it. Otherwise, you know, what you allow is what will continue.

Q. Okay. And then if -- when you get back sort of all of the information that you have requested, do you -- what do you do with it?
A. I mean, it depends on if it's a satisfactory answer to the question. You know, there is no "what do you do with it." It could be read it and say, Oh, well. This is what happened, and this is what -- this is prison. You know, there's things that happen. Or if it's something that you need to send a team in. There's a whole gamut of what can happen, and there's not a cut and dry what will happen.
Q. Okay. So, in terms of the what can happen, that gamut, can you walk me through sort of, like, the lowest level of response to the highest level of response?
A. Okay. Well, the lowest level of response, in my opinion, would be we get a report back that states what happened. We're satisfied that it's an accurate report. And then, you know, there's no factors that necessarily require any further attention, and that's a wrap. That's on one end.
On the other end, is, you know, we get a report in that provides more questions, quite

honestly. You know, you get a report in that makes you wonder how did this happen, and the answer they gave -- I'll have an example of an escape. That's probably an easy one to give.

We get an example of an escape. We have an offender escapes from wherever. And, you know, let's say the count had cleared the last four times, but we find out that, in fact, he had been missing for a day before they realized it. You know, we're going to send a team in to go over and review their count practices, and go back and review and see what happened, see why the count cleared, you know.

Obviously, you have somebody pencil whipping it. And if it cleared over multiple shifts, multiple people. And then make sure that that's -- you know, we find out what the root cause was and that it's addressed. So that's kind of the spectrum, as I see it (indicated).

Q. Got it.

Okay. So, on the one hand, it's sort of, like, you -- the -- so, the lowest level is you may ask for more information. You get back that additional information. You're

satisfied. Case closed. You're sort of -- that's all right. Everybody is moving on.

The next level up is if the report raises more questions, then you might send in a team to review whatever is going on at the facility in that particular area; is that fair?

A. Well, I think the lowest level would be to be satisfied with the initial report and there's no further questions. So, I will say that. On the other end, I agree with what you're saying that, you know, we send a team in. And then it can still go further based upon the unit's response to our findings, you know. There's still a possibility of cranking up even further, but that would be an additional step.

Q. Okay. The team that you would send in, who would be included in that?

A. Typically, it would be the basic jail guidelines team leader and whoever they deem necessary depending upon the incident. You know, it may be just that person. They may bring someone from classification with them. They may bring somebody from medical with them.

You know, now, I send the colonel from headquarters on all escapes. They're going to do all escapes, period. So -- and they may or may not include the team leader. So that would be a little different, but again, that would be individualized. It could be just the team leader.

Q. And so, in -- does the team leader decide or do you decide, okay, this report raises more questions; we need to send someone to actually go to the facility and look a little closer at whatever is going on? Is that your call?

A. Well, that could actually come from three different places, as I see it. The team leader has definitely called me, and I can't give you an exact time, but I've had team leaders call, and say, Hey, Boss, this doesn't look good. I'd like to -- so, I mean, he's suggesting it.

But as far as being whose call it is, you know, I'm also, at the other end of the spectrum, I've had the secretary send me an e-mail and say, Send somebody in. So, you know, typically, it would be myself or the secretary that would make the call.

Now, the team leader definitely has the authority to reach out and suggest it. And if they suggest it, I can't imagine we would say no.
Q. Okay. All right. So, there are a couple of different ways that someone could go in in response to an incident or a report?
A. Absolutely.
Q. Okay. All right. So, someone goes in, the team leader, colonel from headquarters, whoever, reviews, takes a closer look. And so then, what's the -- how do you ramp up from there?
A. What do you mean how do we "ramp up from there"?
Q. So, you said that there are a couple of ways to kind of ratchet up the response. So, can you walk me through those?
A. Okay. What I'm saying is is it depends on institution's response to our recommendations. Okay. Let's just use, again, the incidence of an escape. If we send a team leader in or the colonel from headquarters now, and they make recommendations, there's an expectation that those recommendations are going to be

followed.

Now, if we have somebody stonewall and say, We're not doing it, then there's other things that can be done. And we've never had that happen, you know, with an escape.

So, there are -- there can be some teeth behind this if we need it to be. Typically, the institution is going to comply with what we suggest or what we tell them to do. But that's what I mean. It's not just an information gathering. At some point, you know, we make suggestions, recommendations, or mandates. Are they operating within the BJG, first and foremost. They may or may not have been. If they aren't, we're pointing out deficiencies and making sure they have a plan to take corrective action.

Q. Okay.

A. But not all -- but not all incidents, you know, fall outside of that. Plenty of incidents fall within it. Again, you know, you're operating a prison, and you do have unusual occurrences regardless of how well you do things.

Q. So -- all right. So, going -- I think that --

this is very helpful. So, to go back to -- so, there's -- someone goes to the facility, takes a look at things, and then the recommendations, or mandates, or, you know, whatever action the facility needs to take, who develops that?
A. Typically, it would be the team leader, if it's something related to the basic jail guidelines. In the more recent past, if it's dealing with an escape particularly, it would be the colonel over apprehensions.
Q. Okay. And does the team leader or does the colonel, do they consult with anybody else at headquarters in developing recommendations?
A. It depends on the situation. If it's something that's directly dealing with the BJG, there's no reason to. It's in writing. It's telling them how to help them get into compliance with where they are.
I'm not going to tell you that they haven't called me and said, Hey, Boss, what about this, what about that? It's something that may be on the fringe, you know. I'm thinking of a -- and I can't remember all the details of recent -- I say "recent" -- an

escape within last year, year and a half. They wanted to talk to someone about changing some practices about, you know, how they count inmates. And, you know, there was some consultation with me on that one.

But for the most part, these people, you know, this is what they do. You know, I trust them to come up with these recommendations.

Q. Okay. And so, after the team leader, or the colonel, or, you know, whatever team has gone in and has come up with the recommendations, are those recommendations written down someplace?

A. Yeah. They're going to be written down. A lot of times it may be, like, a BJG walk-through, and then we'll send it to the unit in writing. Other times, you know, it may be something that while they're there, you know, if it's a security issue, for instance, or if it's a major issue, for instance, we're not going to wait, come back here, draw everything out, send something in writing, and have the bureaucracy kill, you know, seven to ten days on something that needs to be fixed.

You know, while they're there, they'll

say, you know, You need to do this, and they verbally agree to do it, then we have it in the report. This was addressed, verbally done. And then we'll do a follow-up to ensure that, you know, it actually took place.

And depending upon the egregiousness of it, depending upon the severity, you know, it could be with their next routine follow-up, or it could be a follow-up that we schedule based on the incident. So, it can go in a lot of different directions.

Q. Okay. So, the recommendations may come out of -- I mean, there may be recommendations that come out of whatever that visit is that are conveyed verbally to the local facility, but then they might be documented after the fact; is that fair?
A. That's one way it can go.
Q. Okay. And so, when they're documented after the fact, they were docu -- well, let me back up and ask this: After a visit that happens in response to an incident, how does that get documented?
A. Typically, the BJG team leader does a document stating why they went, what they did, and what

the conclusion was. And if it's satisfactory, it may just go in the file, or it could, you know, go further up. And, you know, based off of the decision tree, you know, which way do we go here? It could be, if we followed up, this is what we did, and we didn't find anything. In that case, it would just go to the file. You know, we may say that the recommendations were done, and they agreed to them, and we're going to follow up with our next scheduled BJG.
Q. So, when BJG team leader, or in the case of an escape, the colonel, they go out, and they do a visit in response to an incident, that document or that report that the team leader does, does that have a special name? Is it a form? What is that?
A. I don't know that it has a special name. Now, the colonel has a template he uses on escapes, but it's not a designated form. And the other one would typically be a BJG, you know, follow-up or walk-through.
Q. Okay. All right.
MR. STEWART:
Elizabeth, we've been going about

75 minutes. Did you want to take a brief break?

MS. CUMMING:

Sure. I mean, you're calling the shots here, Chief Smith. So, are you okay? Do you want to take a break?

THE WITNESS:

I think I would appreciate one.

MS. CUMMING:

Sure. Let's do it then.

MR. STEWART:

You want to meet back at 25 after?

MS. CUMMING:

Yep.

MR. STEWART:

All right. Thank y'all.

(Recess taken.)

BY MS. CUMMING:

Q. Okay. So, we were talking about the BJG team leader, the colonel, whoever, whatever team goes back to the facility, and you said there wasn't necessarily a particular form, but it would maybe be called something, like, a walk-through is how the team going back to the facility would kind of document what they saw;

is that right?
A. I would have to go and pull the file and see if there's a standard terminology they use because, you know, I see so many papers every day. That one doesn't jump out at me. But yeah, it would be a 30-day -- or it would be a follow-up, a post-incident follow-up. It could be a number of titles, I guess.
Q. Okay.
A. But it would be in the file.
Q. Okay. And so, in that, it would say, like, what the incident was, what they were looking at, what the recommendations were if there were any, kind of what they did to look into it; is that correct?
A. Partially. It could say follow-up per the incident reported on such and such date. It may not break down exactly what the incident is because that's already reported, but it could be a response to the incident, yes.
Q. Okay. So, it might give the date. Is there -- do incidents have, like, you know, incident numbers or anything like that to make them identifiable?
A. Not to my knowledge, no, ma'am.

Q. Okay. All right. So, it might just say, like, you know, follow-up to whatever happened on January 30th, 2023 or something like that?
A. Correct.
Q. Okay. All right. And if there are recommendations that are made, those recommendations would be included in that form. Would they -- do you get copies of those reports?
A. Yes.
Q. Okay. How are they provided to you?
A. One of two ways. Either I get an e-mail, and my secretary or administrative assistant prints them off and puts them in my inbox, or sometimes, if I reach out to Ms. Kent and have her reach out to the team leaders, sometimes they respond directly to her. And in that case, she usually prints one out and either puts it in my inbox, or she'll walk down and have a discussion with me, depending upon how she may feel about it.
Q. Okay. And when you say "put in your inbox," that's, like, a physical inbox for paper for you to look at it?
A. Correct.

Q. Okay. All right. But someone is getting it by e-mail; either you are getting it to your e-mail, and your assistant is printing it out, or Ms. Kent is getting it by e-mail; is that right?
A. Correct.
Q. All right. And when your assistant gets e-mail, that's to your e-mail address; she's just the one accessing it; is that right?
A. That's correct.
Q. Okay. So if there is a set of recommendations, and it says that, you know, the facility verbally agreed to the set of recommendations, what happens next?
A. Again, there is no clear-cut what happens next. It depends. You know, it could be if it's something that was minor, and it was a minor recommendation that they agreed to adopt, and we have no reason to think they didn't, it could be that we're just going to see them at the next audit. Or it could be something that we're going to follow up in 30 days and make sure they adopted whatever practice it is we're recommending. So, it can be anywhere in between those two.

Q. Okay. In the follow -- in the report that has the recommendations, will it also say sort of what the plan is? Like, oh, you know, we're going to let this go until the next regularly-scheduled audit, or we're going to follow up in 30 days?
A. Almost every BJG report, regardless of what causes it, whether it be an annual, whether it be the big one, whether it be -- you know, all of them typically state when the next follow-up is going to be. It may be just say follow up with the next routine, you know. It may not give a date when it's going to be, but all of them have some kind of conclusion as to when we're going to see them again.
Q. Uh-huh (affirmative response). Okay. So, in terms of you have a bunch of local facilities, if you've got a couple of different follow-up timelines, so, for example, you know, there are 17 facilities in a region, you know, one is on a regular annual audit schedule, another has, you know, a 30-day follow-up that needs to happen, who is kind of keeping track of, you know, these various follow-up auditing schedules?

A. I would put that on the team leader in concert with the coordinator, being Ms. Kent.
Q. Okay. And do you know how they kind of keep track of that?
A. No, ma'am.
Q. All right. So, what happens if something has happened? There's been a visit. There have been recommendations for something serious. In the 30-day follow-up, the facility is still not abiding by the recommendations for whatever reason. What is sort of the next elevation?
A. Well, again, without having specifics, it's hard to tell you that it automatically goes one direction or another. It depends on what the possibilities are if it's not corrected.
I can tell you it could be as simple as another 30-day follow-up with them being -- or maybe a two-week follow-up. It could be, you know, send me pictures and progress notes, or it could be something as significant as, you know, moving of inmates. So, I mean, it's -- there is -- there's a -- that's a very vague question that has a very large number of possibilities, I guess, is the best way I can

answer that.
Q. Yeah. And I'm just trying to get an overview of sort of what the range of possibilities are. So my understanding of the possibilities, like, what actions are available to you and to the department are, on the lower end, another 30-day follow-up to see if they're able to implement the recommendations. Maybe the next step up from that would be that you request a little bit more information, you get some pictures, you become a little bit more involved; is that fair?
A. That's one possibility.
Q. Okay. And then, on the highest end, that the department moves its sentenced people out of the facility; is that right?
A. That's the largest move I could anticipate making, yes.
Q. Okay. All right. So let's start with the biggest one. Has that -- and so, you've been there for just shy of ten years. In your time there, has that ever happened?
A. Yes.
Q. All right. What facility?

A. I'm going to be grasping to tell you which one. It's been -- well, it was during COVID. And we didn't move them all. We moved a portion of them.
Q. Okay. Do you remember which region?
A. You know, I'm going to say this is going to be Avoyelles Parish Prison.
Q. Okay.
A. It just hit me.
Q. Got it.
And you said it was during COVID. So, sometime in the last four years?
A. Correct.
Q. Do you remember --
A. The early part of COVID.
Q. Okay. So, like, maybe 2020?
A. '19 or '20 would be my guess.
Q. Okay.
A. That's a guess.
Q. Okay. Just so I -- the last four years are fuzzy for me, as I'm sure for all of us, but I think March 2020 was when the lockdown started, so my COVID clock starts around then.
A. Okay.
Q. All right. So, that Avoyelles Parish Prison,

you said that you moved a portion; is that correct?
A. Correct.
Q. Okay. So, can you -- let me ask this: How did that process start?
A. I don't recall exactly how it started. I do not.
Q. What sorts of issues were -- was Avoyelles Parish Prison dealing with?
A. Hot water or lack thereof.
Q. Okay. All right. And do you recall how you first received the reports that Avoyelles didn't have hot water?
A. No, ma'am. I don't remember how I received that.
Q. Okay. And how -- what steps did the department take prior to moving people?
A. Ma'am, the only thing I remember, truthfully, is that we had that incident with the lack of hot water. I know that there was a meeting with the facility, the wardens, the sheriffs. And then there was a failure to remedy the situation in an acceptable time frame, and then that was what was done.
Now, as far as the steps that were taken

along the way, again, we're talking four years ago, and this, in my opinion, was of an urgent matter, so I don't know who went, who saw, who did what. I'm just -- I'll stop you before we go into that because I do not remember.
Q. Okay.
A. But I physically went there myself, so I remember -- that's how I remember this instance. But when you ask is there a time where we had moved inmates, that's the one that jumps to my mind.
Q. Okay. All right. So -- and you were involved in that meeting with the facility officials, and the sheriff, and all of that; is that right?
A. Correct.
Q. Okay. All right. So -- and you said it was only a portion. Do you know sort of, roughly, what percentage?
A. Roughly, half.
Q. And where did those people go that you moved?
A. I'm sure they went to other parish facilities. I don't recall specifics.
Q. Other than Avoyelles and the hot water issues that precipitated that, can you recall moving

people out of a facility for any other reason?

A. I cannot recall moving any others out. I can recall not allowing any additional ones to go until things have been remedied. Now, I have done that a few times. But I'm really thinking more along the lines of transitional work programs, which are still local-level facilities. That's the only other. But it wasn't moving people out. That's the only thing close to that.

And I want to add, the reason I only moved a portion out, because just thinking through this -- this -- what I just said could look bad. I only moved half of them. Why did I move half? They had enough hot water to be sufficient for half their population. They had hot water heaters go down. They had hot water, just not enough with population they had.

So, I do want, you know, to make sure you understand. I didn't arbitrarily say, Y'all get hot water, and y'all don't. So, we wanted to make sure they had hot water and hygiene, proper hygiene, especially during the high COVID.

Q. Right. Yeah. That's helpful. And that was going to be part of my follow-up, so I'm glad you clarified. Thank you.
A. I didn't know if you were going to or not. I wanted to clarify.
Q. Okay. Good.
So, in terms of the facilities where you said, No, we're not going to send more to you, do you recall which facilities those were?
A. No, ma'am. I don't. It's been here and there throughout the years, and all of them had minor issues that were remedied quickly, and it started back. So, off the cuff, I can't -- I can't tell you which ones.
Q. Okay. So, that might be sort of an intermediate step. Before actually moving people out, you might say, All right, we're not going to send you any more inmates?
A. Correct.
Q. Okay.
A. I can think of one. Winn Parish, whenever it was being run as a local-level facility when CCA was still in Louisiana. We stopped sending them inmates for a period of time as well. That's the only time I can think of

stopping sending to a facility.
Q. Okay. Do you recall roughly when that was?
A. No, ma'am. It probably would have been -- now, I say I don't remember. I'm going to give you a roughly. But it was shortly after being in this position. 2015, maybe 2016, somewhere in that area.
Q. And Winn is now ICE detention, correct?
A. Correct. And then it wasn't with that management team whenever we did this.
Q. Okay. Winn is currently LaSalle-operated; is that correct?
A. Correct. It was CCA back in the day.
Q. I remember well.
Okay. All right. Did -- before LaSalle started operating it, before it switched over to ICE detention, did Winn ever get back to the point of being able to -- the department sending people there?
A. I believe CCA withdrew before. We may have started back. We may not have. I'm not a hundred percent certain, but Winn ultimately withdrew -- I mean, Winn. I'm sorry. CCA ultimately withdrew.
Q. Okay. So, not under CCA management?

A. I'm not going to say we didn't start sending some back. I really don't recall. That's been, you know, almost ten years ago. It's been at least eight. But I know we stopped sending them additional ones for a time. I do know that.
Q. Do you know, is that in response to any particular issue or incident?
A. Like, during that time, there was a lot of issues with CCA. I can't tie it to any one specific one.
Q. Okay. What sorts of issues were you -- was CCA dealing with?
A. I'd have to go back and pull the reports to give you specifics. I just know, in general, they were having issues running the prison.
Q. So, for CCA -- so, for Avoyelles, it sounded like it was, like, a physical plant issue; there were hot water issues?
A. Yes.
Q. For CCA, was it physical plant issues, or was it a question of inmate, staff safety issues?
A. It was operational. I mean, we was dealing with incidents, but now, I can't recall off the top of my head if it was contraband, if it

was assaults, or if it was a combina -- I mean, all that we have in prison. I just know they were having difficulty running the prison there.

At some point in time, we stopped sending them inmates to let their camp reduce to give them an opportunity to get a little better control. I don't recall any facts.

Q. Okay. Do you recall, were there any kind of recommendations, performance improvement plans, root cause analysis, and corrective action plans, anything like that that the department provided to CCA?

A. I was early in my career in this position. I don't doubt some of that occurred, but to tell you I recall, that would be, again, just me making it up.

Q. Okay. So this process that we've been talking about, how frequently, roughly, and let's -- I don't know -- let's take, like, over a two-year time period, how frequently would it happen that a team leader or a colonel from headquarters would have to go in and kind of review what was going on in a facility in response to incidents?

A. That's a tricky one to answer. The colonel now goes to all facilities where an escape occurs. So that's dictated by escapes. It's not dictated on a timeline. And I can't tell you off the cuff how often that occurs, you know. It may happen three times one month, not happen again for six. So, that's not an easy one to answer.

The BJG teams leaders, again, it's response to incidents, and to just to pull a number out the air, I mean, it happens, you know, every month or two, I guess, but again, I could go pull my e-mails and find out I'm completely wrong in that answer. So, I'm not comfortable pulling a number.

Q. Okay. Yeah. That's fine.

So, I guess the other question is does anybody kind of track it to see, Oh, all right, we've had, you know, three times in January of 2023 we had, you know, BJG team leaders in these regions had to go to X number of facilities? Is there any kind of tracking like that?

A. If it is, I'm not aware of it. Meg possibly could be doing something, you know. I don't

know. I'm not aware of a formal process for that.
Q. Okay. All right. But if someone did want to track it, the way that -- like, the information, you know, sort of, like, the base data that you would be looking at would be in your e-mails?
A. Yes.
Q. Okay. And then, in terms of recommendations, performance improvement plans, corrective action plans, is there a particular term that's used consistently by team leaders or by the colonel who is, you know, responding to escapes when they make recommendations to a facility?
A. I'm not aware of a specific term. I said earlier, the colonel works off a template, and he does have a spot for recommendations or further actions. He's got his broken down that way. I'm not aware of the terminology that's being used consistently.
Q. Okay. All right. So -- and I just want to make sure. So the department has the power, the ability, or the authority -- tell me what word works best for you -- to send people into

local facilities, to, you know, look at what's going on, both as part of the annual audits, but also if, you know, something comes up and there's some questions about what's happening in the local facility; is that correct?
A. Correct.
Q. And the department has the ability and the authority to make recommendations or corrective action plans to fix, you know, operational issues, you know, physical plant issues, you know, whatever at local facilities; is that correct?
A. Correct.
Q. And the department has the authority to either stop sending people to a local facility or to withdraw people from a local facility if those recommendations are not being followed; is that correct?
A. Correct.
Q. Okay. And you, in your role as kind of the director of operations, you have authority to make all of those things happen or to direct those things; is that correct?
A. I would say it's partially correct. I would never do it without consultation with the

secretary, but yes, I would confer with him before taking any measure at that level.
Q. Okay. Does the department pay for hospitalizations of people in local facilities?
A. I believe we pay for everything, other than primary care, so yes.
Q. Okay. So, if someone is a -- a DOC inmate is in a local facility, and they -- I think DOC inmates are supposed to get an annual physical; is that right?
A. I don't necessarily believe that's accurate. I think over a certain age they might.
Q. Oh, okay. Fair enough. Yeah. I was just trying to think of an example of, you know, routine primary care that would be provided. That would be the responsibility of the local facility, right?
A. If someone is on blood pressure meds, that's a primary care function, if they're at a local-level facility, you know, those type things, when I say "primary care." You know, we don't take care of everything. Primary care, they're responsible for.
Q. Okay. All right. And so, what happens if

someone who is hypertensive has a crisis? You know, let's say, they have a stroke, and then they require emergency care. Does the department pay for that?
A. It's my understanding we do, yes.
Q. Okay.
A. I think --
Q. I'm sorry. Say again.
A. I think we pay for all hospitalizations; however, if they're in the hospital 24 hours or more, then Medicaid can kick in.
Q. Okay. 24 hours or more, even if they aren't admitted to the hospital?
A. No, no, no. Only an admission is what I understand. And again, someone in medical may answer that better than I, but that's my understanding. After 24 hours inpatient, they're eligible for Medicaid.
Q. Okay. That's helpful.
So, if someone comes into the emergency room, for whatever reason, they're in the emergency room for longer than 24 hours, the hospital isn't ready to admit them for whatever reason, that would not necessarily result in -- that would still be a department

expense; it would be before Medicaid would kick in; is that right?
A. My understanding, they have to be inpatient, meaning admitted for 24 hours. Anything outside of that, Medicaid doesn't -- they do not qualify.
Q. Okay. All right. And so, that then becomes the department's responsibility, correct?
A. Correct.
Q. Okay. All right. So, if someone is in a fight in a local facility, they get stabbed, they have to go to the emergency room to be stabilized, that is something that the department pays for?
A. That's my understanding. Yes, ma'am.
Q. Okay. What about for pretrial people? So, a pretrial person, local facility, gets stabbed. They go to the hospital to be stabilized. Does the department pay for that?
A. I'm not a hundred percent certain. I believe the answer to be yes.
Q. Okay. All right. So, if a local facility is holding sentenced people, and they're also holding people from outside of their parish -- and I understand there's, you know, Title 15,

Section 700 also has all sorts of provisions, so I'm trying to get outside of that.

So, a local facility holds sentenced people and holds people from outside of the parish, pretrial. A pretrial person from outside of the parish gets stabbed, has to go to the hospital to be stabilized. The Department of Corrections, in your understanding, would pay for that?

A. Yes, ma'am.

Q. Okay. So, does the department get notification of hospitalizations that they -- let me rephrase that -- get notifications of routes to the hospital? So, admission or no admission, just someone going to the hospital from local facilities?

A. Someone in medical may, but to my knowledge, no, just a routine trip to the hospital -- or I say "routine" -- a trip to the hospital with a pretrial, in particular, I mean, there's no reason that we would be notified. It's the incident, if it were a DOC offender, that would necessarily start the notification because, I mean, you know, you can go to the hospital for any number of things.

Q. Okay. So, if it's a DO --
A. Now --
Q. I'm sorry. Go ahead.
A. I said now medical may have a different answer, but that's how I appreciate it.
Q. Okay. So, when we were talking about, you know, local facility reporting in which you get notification of if a DOC person is in a local facility, they get stabbed, they have to go to the hospital, you don't know -- no one knows at that point what the injuries are, you know, part of that evolving process, you would get notification of that, correct?
A. The incident would drive the notification, correct.
Q. Okay. But if it's a pretrial person in a local facility, they get stabbed, they have to go to the hospital, you would not necessarily get notification of that through that duty officer category reporting system; is that correct?
A. That's correct. We would not.
Q. Okay. All right. But the department pays for hospitalization for both sentenced and pretrial people who are having to go to the

hospital for, you know, emergency care; is that correct?
A. Again, that's how I understand it to be, yes.
Q. Okay. And so, at some point, the department does get some kind of notification because someone is going to want them to pay money for that hospital bill; is that right?
A. I don't know how that process works. I know that whenever the Charity Hospital Systems closed, we got budgeted money for inmate healthcare, and then if I remember correctly, we did have to start providing for the non-DOCs as well out of that budget.
I can't even swear to you it's still that way today, you know. That's -- when you're talking pretrial, my knowledge is slim to none, and I just know we do not -- my office isn't notified about any of that.
Q. Okay. So, that hospital billing, there's no one in your office that is involved in -- let me back up. Let me start with for DOC people for hospital billing. Is there anybody in your office involved with that?
A. Yes. And again, I'm not saying that there's not somebody involved in the pretrial, but my

office itself is not. I'm not aware of it.
Q. Okay. Who is involved with the DOC hospital billing procedure in your office?
A. Well, Tracy -- Tracy. Stacye Rodriguez is the nursing -- I don't know actually what her title is -- chief nursing officer for the State of Louisiana DOC. And under her umbrella, she deals with inpatient stays. She deals with the scheduling, billing, all that kind of stuff. She's got a division under her that would be involved in that.
Now, whether or not they're involved in pretrials, I don't know. I've never even thought about that.
Q. Okay. So, she would be the person that would know, okay, like, you know, this is the bill that we are getting from, you know, Madison Parish every month for hospitalizations; is that correct?
A. I mean, if there's anybody that would know, that's who I would suggest.
Q. Okay. All right. Is there -- are there any meetings, discussions, anything like that involving you or that you are aware of that kind of look at, you know, levels of spending

on hospitalizations in local facilities?
A. No, ma'am.
Q. Do you know how that billing goes? Does the hospital bill directly to the Department of Corrections, or does the local facility pay, and then the Department of Corrections reimburses?
A. I'm not aware.
Q. Would Stacye Rodriguez be the person that would be able to answer that question?
A. I -- that would be the person I would ask. Now, whether or not she can answer it, I'm not sure. There may be a billing -- it depends on how the billing is routed, you know. If, in fact, it comes through her, and we knew that, right, sure. If it's something where they just submit invoices to the billing office, then not, but I don't really know about pretrials, and their hospitalizations, and how they're billed, or reimbursed.
Q. Okay. You had mentioned that Undersecretary Bickham did sort of the more financial side of things for the department. Would -- does Bickham do any kind of reconciliation of the annual budget, make sure that, like, you know,

what has been allocated by the legislature is sort of meeting the needs, anything like that?
A. I can't tell you what his job exactly entails. You know, I'm speculating.
Q. Do you participate in any kind of meetings or anything like that where, you know, the department is looking at the annual budget, looking at, you know, legislative allocations, putting together proposals for the next session, anything like that?
A. We have our monthly meetings. The budget always comes up. It's always discussed at some level. But as far as in the weeds at that level, typically, no.
Q. When the budget comes up at the monthly meetings, what do you all discuss?
A. Usually, it's a report out from Undersecretary Bickham stating, you know, where we are, where we're going, potential -- potential money coming to us, or potential money being taken away. It's something at 30,000 feet for all the wardens, as well as the management team, to be aware of.
Q. Okay. Does Undersecretary Bickham, you know, provide any kind of indication of, all right,

we might be looking at a shortfall, we might -- you know, this money earmarked for this area, you know, we've been spending faster than we expected, anything like that?
A. Sure. That's happened.
Q. And do you recall, has there ever been a shortfall or sort of, like, you know, faster than expected expenditure on things, like, you know, hospital billing or medical care for local facilities?
A. You know, I can't tell you specifically. I know that throughout the years we constantly struggle with budgets and have to get -- I'm drawing a blank on the word I'm looking for -- but when it happened to -- to struggle to meet our budget given, but as far as specifics about hospitalizations or specifics as to where they are, I'm not going to say they may not be mentioned, but I don't recall at that level.
Q. Okay. Let me show you what's going to be Exhibit 5.
(Exhibit 5 to be marked for identification.)
BY MS. CUMMING:
Q. Can you see that?

A. I can.
Q. I can blow it up, too, if you need me to.
A. I can see it.
Q. So the first question is does this document look familiar to you? It's three pages. So I'm going to scroll through it. Have you seen this before, not this particular document, but the form?
A. Yeah, I've seen the form.
Q. Okay. And what is this?
A. It's a monthly activity report.
Q. Okay. And how is this generated?
A. You know, I know that the -- the -- I'm assuming the parish actually generates it, but I know it's reviewed by the BJG team leader.
Q. Right. And it has up there, it says, "Reviewed and approved by Tyrone Mays." That's the BJG team leader for the northeast region, correct?
A. Correct.
Q. When the BJG team leader reviews this, what is your understanding of what that review and approval is, what that means?
A. That it's accurate.
Q. Okay. What is your expectation of what the

BJG team leader is doing to ensure that the report is accurate?
A. Well, I mean, he's familiar with the facility. He's familiar with any incidents that have occurred. You know, there's no way you're going to know if somebody is reporting to you specifically something that's a hundred percent accurate or not, but if he were to look up and see that, you know, the number of days over were, you know, 15, and he knows that not to be true, to make a phone call.
Q. Okay. How would he know that not to be true?
A. Well, if he's been over that region all that time, and he knows what their census is, you know. I mean, I'm not saying he necessarily would, but if historically they never have been, it's worth making a follow-up call.
Q. Okay. And do you know who compiles this document?
A. You know, I don't.
Q. Okay. So your understanding of what the team leader is doing is not necessarily compiling the document, but just sort of confirming that it's accurate, right?
A. I mean, it says, "Reviewed and approved by,"

so I'm assuming that's what he's doing, reviewing and approving it.
Q. Okay. All right. Do you know, does -- are the BJG team leaders expected to or is it your expectation that they would look at any other documents, reports to take any steps to kind of go through and confirm the accuracy of this report?
A. You know, there's mandated reports within the basic jail guidelines that tell the facility what they're required to do. So, you know, in my opinion, this would be something that would be looked at, and again, if there's any obvious anomalies or abnormalities, to reach out to the facility to find out if it's accurate.
Q. So what would an obvious anomaly be?
A. Okay. The number of offenders on the last day of the month, if all of a sudden it said 1288, well, you know the facility can't handle 1288. And, you know, human error occurs, and people do hit the wrong keys. So, it would be things of that nature that I would expect them to -- that they would notice right off the bat.
Q. Okay. So, looking at things that might be

typos or something like that?
A. Yeah. That would be something. Now, I mean, in addition to that, if you see a spike in something, it's worth looking into. The piece of paper is important, but I mean, as far as them looking at it and approving it, it's not saying "I approve of this or that." It's "I approve of this is an accurate representation of what's occurring."
Q. Okay. So, help me unpack that a little bit. So, they're not -- they're not vouching that it's a hundred percent accurate; they're just vouching that it looks all right?
MR. STEWART:
Objection as to form.
THE WITNESS:
Ma'am, I don't know where we're getting twisted here. There's no way short of going in there and hand counting 288 offenders or 268, whatever it is, that that's how many are there. So, there's no way I expect them to do that.
BY MS. CUMMING:
Q. Okay. So, I mean, I guess, you know, we can

look at also escapes, assaults, there's transportation, there's, you know, grievances, sexual assault allegations. There are a couple of different categories here. Deaths, contraband.

Do you know, is there anything else that the BJG team leader is looking at to confirm that the facility isn't underreporting the number of assaults with serious injury or underreporting, you know, the contraband identified?

A. Not to my knowledge, but I would have to go through the BJG and see what their mandatory reports are to answer that question. That's a very complex process, complex document, and off the cuff, you know, I'm not aware of any, no.

Q. Okay. All right. Do you ever receive this document?

A. You know, I've seen it in some of the basic jail guideline reports, but as far as monthly we would get it, no.

Q. Okay. Is this accessible to you monthly? If you wanted to get it, could you?

A. Yeah, I can get my hands on anything if I want

to.
Q. Okay. And how would you go about getting it if you wanted it?
A. I would ask either Meg, or Faith, who is my assistant, or Duane Cambre.
Q. Okay. And do you know how this document is stored?
A. No, I do not.
Q. Okay. All right. Do you know who else reviews these reports at the department level?
A. I don't know that they are necessarily reviewed at the department level. Again, I would have to see what the BJG spells out verbatim, but I know that, you know, they -- no. I'm going to leave the answer to that. So, I don't anything beyond that.
Q. Okay. So, I want to go to 6. I can blow this up. This is nine pages. I'm just going to scroll there. Does this document look familiar to you?
MR. STEWART:
Which, Elizabeth, of the exhibits is it numbered?
MS. CUMMING:
This is Exhibit 6.

MR. STEWART:
Thank you.
MS. CUMMING:
Uh-huh (affirmative response).
THE WITNESS:
Sure.
(Exhibit 6 to be marked for identification.)
BY MS. CUMMING:
Q. What is this document?
A. It's a monthly activity report.
Q. Okay. Do you know who compiles this?
A. You know, off the cuff, I do not. I don't know if it automatically does or if it does -- getting into IT stuff is -- I just know what I get.
Q. Okay. Do you get this report?
A. Not routinely, no.
Q. Okay. Do you know who does receive this report?
A. I would -- I would -- I would say Meg Kent. Megan Kent.
Q. Okay. Do you know sort of where this information is drawn from?
A. The team leaders over the institutions. I'm not sure what the requirements are for

inputting that.
Q. Okay. Do you know, are any steps taken to confirm that the information reported in this report is accurate?
A. Well, again, I go back to what I said. You know, I don't know, short of going there and doing it all yourself, how anybody can confirm it. You know, at some point, you have to trust those that are responsible for doing it are inputting correct data.
Q. So, do you know, are there any steps taken to sort of spot check these?
A. I mean, whenever we do our reports, whenever we do our -- I say our reports -- whenever we do our audits, I think that's our opportunity to find out if there's something that's outside of this.
But as far as day in and day out, short of going in and doing it yourself, I mean, you have to trust the people are giving you correct information. If not, you know, we're just going to chase our tail all day every day.
Q. Okay. And do you know, do you or does anybody at the department level look at any other

reports from facilities to confirm that this information is accurate?
A. Ma'am, I rely on my team leaders to let me know that things are coming in accurately. Actually, I rely on Meg, but the team leaders are ultimately the ones that are tasked with ensuring that they're getting proper documentation.
Now, as far as how they confirm that, you know, again, it's through audits. It's not through -- you know, did they really have seven items of contraband or 59 items of contraband? Without you going and hand pulling each and every UOR or each and every piece of documentation, and even then, how do you ensure the documentation was done? So I think you're asking me something that there is no simple answer for.
Q. Okay. Do you know, what is the purpose of these reports?
A. Well, I think it gives us an opportunity to prepare, and track, and see what's going on at that level.
Q. Okay. So who undertakes the, you know, comparing and tracking?

A. Well, I would hope that the BJG team leaders would keep up with their regions and see what's trending, as well as the BJG coordinator.
Q. Okay. So -- and when you say "trending," that means, like, you know, if there's a spike or a dip. You know, what would you expect would happen if someone noticed that?
A. It depends on how significant it is. It also depends upon whether or not it can be easily explained. You know, we may send a large shakedown team into any facility in the state, and then we see a spike that month in contraband, well, of course, we do. It's not that the contraband went up. It's because we found it. You know, we send a hundred officers in and five dogs in. So, you know, it depends.
Q. Okay. I want to show you Exhibit 7.
(Exhibit 7 to be marked for identification.)
BY MS. CUMMING:
Q. And this is a quarterly summary report. Do you see that?
A. I can.
Q. Okay. Does this -- it's five pages. I'll

just scroll through to give you the shape of it. Does this document look familiar to you?
A. It does.
Q. What is this document?
A. Quarterly summary report.
Q. Okay. And do you know where this information is drawn from?
A. The BJG team leaders ultimately compile that from, I guess, from the monthly ones. I'd have to go -- I don't know exactly where they get it.
Q. Okay. And do you know who developed this report?
A. I do not.
Q. Okay. Do you know how long this reporting form has been in place?
A. I believe it predates me. So, I believe it was here when I got here.
Q. Okay. And have there been changes to this form?
A. I'm sure there have over the years.
Q. Do you know, is it still in use?
A. I believe it's no longer in use.
Q. Okay. Do you know when it stopped being in use?

A. I'm going to say when Angela Tozan went out.
Q. Okay. Do you know why that changed?
A. Well, I can tell you that predating her going out, there was discussions that go as far back as when Deputy Secretary -- I'm sorry -- Deputy Assistant Secretary James Bush was here, as to, you know, whether we were gathering information just to gather it. Because we were already doing the monthly. We already were doing the other stuff. So, you know, that was the conversations.
Q. Okay. So, do you receive this report?
A. I have, yes.
Q. Okay. Do you receive it -- or when it was still in effect, did --
A. Yeah, I received it.
Q. Okay. So, just regularly as part of the quarterly?
A. Correct.
Q. Okay. But you don't regularly receive the monthly; is that right?
A. Correct.
Q. Okay. Down here, I'm looking on page 1, at the bottom of 1 and the start of page 2, where it's got escapes, and then it's also got

assaults, and it has sort of a brief little narrative.
A. Uh-huh (affirmative response).
Q. So, you know, like, on page 2, it's got Caldwell, Madison. It's got a couple where it's describing, you know, physical altercations, giving the name, giving that there was a hospital route, you know, what happened, criminal charges.
Is there -- where else would this information be contained now that the quarterly summary report is no longer happening?
A. Well, to me, that's redundant information. We were getting it already with reporting. And we were addressing it already there. So, I mean, it would be in the file in the institution or the parish.
Q. Okay. So, this example of Madison Parish with the fight between Michael LeBlanc and Lamar Green, you would have gotten a report of that through that category reporting process?
A. You know, I would hope so. You know, I'm a little concerned about it being a pretrial offender. I would have to go back and pull it

and see.
Q. Pull and see what?
A. I'd have to go back and pull the e-mails from that time period and see what's in there.
Q. Okay. So -- but your understanding is this -- these narratives from the -- that were in the quarterly summary report, those would have been in the e-mails that you were getting from the duty officer who was being notified by the local facility is what your understanding would be?
A. Correct. But I have a little bit of an issue with that one because it's -- I would have to go back and read the BJG. Okay? But, like I said earlier, it's the result. In other words, the fact that the significant injury, and the significant injury occurred to a pretrial, which I'm not sure requires reporting because of that. I'm a little gray. I'm a little -- I need to -- I'd have to research that just a tad bit.
Q. Okay. But it also looks like both of them went to the hospital --
A. Correct.
Q. -- for treatment? So, the DOC was also -- the

DOC person was also hurt, it seems like?
A. Correct. I see it.
Q. So -- and then, I mean, even going down to the next one where you've got Mr. Martin and Mr. Jefferson, they're both DOC. They both -- or it looks like just Mr. Martin was sent to the hospital. You would have gotten notification of that, correct?
A. Correct.
Q. All right. Okay. And so, the reason that these quarterly summary reports stopped is because they're -- the information is in other places that could be accessed by you or whoever else got this report; is that correct?
A. Correct.
Q. All right. When you received this report, when it was still happening, how would you receive this report?
A. It's been so long ago. I don't know if I received it via e-mail or if I had a hard copy. I can tell you -- well, truthfully, I would have a hard copy sitting in my inbox.
Now, Ms. Dufour may have printed it off and put it there, or it may have been hand delivered by the BJG coordinator at the time.

Q. Okay. All right. So, I want to go through and just make sure I understand. So, this first table where it says, you know, facility, operational capacity, it's got the numbers of DOC, non-DOC, vacant beds, where is this information drawn from?
A. I mean, you can get it numerous places, but the most obvious would be what we call the CFACILITY. It's a report that's done that shows all that.
Q. So, the CFACILITY, what is that?
A. It's a breakdown of all local-level facilities, and it breaks down their capacity and what they are currently housing. It has all those numbers and additional numbers.
Q. Okay. And is that, like, a database, a report? What is it?
A. It's, like, a spreadsheet that's sent out. It's a report that's sent out.
Q. And who is responsible for sending that out?
A. Colette Boies.
Q. And who all does she send it to?
A. Again, I know I get it. I would have to go back and pull the e-mail to see exactly who all gets it.

Q. And how often does she send that out?
A. Weekly.
Q. Okay. All right. So, you're getting this information, and is it broken down by region, or how is it broken down?
A. It's broken down by region.
Q. Okay. All right. So, it would have northeast region, and then it would have all of these facilities that are listed here on page 1, correct?
A. Correct. It breaks it down even further. It breaks it down by region, and then by parish, and gives a tally for each, and, like I said, gives additional information above and beyond that document.
Q. Okay. What additional information?
A. Well, it may break down male and female, which that one doesn't. It will break down, you know, if they have any offenders outside of what's there. DOC, non-DOC. Outside of that non-DOC, it may break down further as to whether or not they're housing any federal offenders.
Within the number of DOC, it breaks it down further as if -- if they have any TWP or

transitional work program offenders. So, it just -- those are tallies that can be broken down further.
Q. Okay. All right. All right. So, this information you get weekly. So, the CFACILITY report. So, you don't need that in the quarterly report, correct?
A. Correct.
Q. All right. And Schedule B reports, what is that?
A. Those are going to be write-ups.
Q. Okay. And is that all write-ups, including -- I mean, I know, that some write-ups go to sort of, like, a central kind of DOC disciplinary board, but other write-ups stay at the facility. Would that be all write-ups or only the ones that kind of go up to DOC?
A. Only the ones that go to DOC.
Q. Okay. And where is this information other than the quarterly report?
A. Off the cuff, I couldn't tell you. I know I could get it, but I couldn't tell you where it's kept.
Q. Okay. This number that represents the write-ups that go up to that DOC -- I think --

I think at Madison they call it high court; is that right?
A. That would be, yes.
Q. Okay. So this number of write-ups that go to high court, do you know, is there any place that provides a breakdown of, you know, how many are coming from which facility, the types of write-ups, anything like that?
A. Off the cuff, no, ma'am. Don't know.
Q. Okay. All right. And so, you're getting this number in the -- or you were getting this number in the quarterly report, but you don't know where you would get this number if, you know, not in this report; is that right?
A. Yes, ma'am.
Q. Okay. All right. Transfers to DPS&C custody. What does this sort of section mean?
A. That's showing ones that came from the local level and came to us.
Q. Okay. So, coming from the jail?
A. Correct.
Q. All right. And they're people who were pretrial who got sentenced who have moved into DOC custody; is that right?
A. That's one possibility.

Q. Okay. What are the other possibilities?
A. Okay. As I appreciate what you said, people that were pretrial that became DOC and came to us. You can have someone who is already DOC and been DOC for years, but still didn't meet one of these reasons; therefore, transferred to us.
Q. Okay. So, when DPS -- DPS&C custody, is that referring, like, moving from a local facility to a state-run facility?
A. That's how I appreciate that.
Q. Okay. So, when it says "medical 129," there are 129 people who were either DOC for years or, you know, were pretrial and became DOC, but have serious medical needs that were being held in the local facility, but had to be moved into a DOC-run facility; is that right?
A. Correct.
Q. Okay. All right. For court, what -- well, let me ask this: The 16 that were moved for administrative, what's that mean?
A. Again, that's kind of a catch-all, whatever else. You know, we may get a request to bring one in that doesn't necessarily meet medical, or mental health, or that we requested. You

know, as far as that goes, it could be something like, you know, a representative could ask us, you know, Can you move offender so-and-so into a state facility? So, you know, it could be any number of reasons.
Q. Okay. How do those requests get made?
A. Those could be all over the place, you know. There is no set way. You know, I literally could run into a state rep, or senator, or whoever else and them just say, Hey, you know, I wish you could bring so-and-so in. And if we have a spot, we can. There's nothing saying we can't. So, they could come in like that.
Q. Okay. So, if a rep, you know, comes to you and says, you know, My cousin's once removed sister-in-law is in an outcamp, and it would be really great if she could go someplace else, you're able to get that done if there is a spot at the someplace else?
A. If it's vetted and makes sense.
Q. Okay. Who does the vetting?
A. Well, typically, my -- depending on who -- depending on who gets the request. But if it comes to my office, typically, my assistant

will pull a master prison record, and we'll see. You know, once we pull the master prison record, we may find out this person only has 30 more days. It doesn't make sense at this point. Okay? So, it has to make sense.

You know, we always can bring people in. There's always going to be vacant beds as people discharge. So, there's going to be all that that comes into it.

Another one that says administrative, though, could be one that comes across my desk for whatever reason, and I just notice that this person has been bounced around a lot, you know. That's something we could just say, Well, this guy has been bounced around eight facilities in the last 10 months. Let's bring him in. So, we're really not bringing him in -- I guess it could be a DOC request, though, at that point. Yeah. I may be talking over my next one on that one.

Q. Okay. All right. So administrative is --
A. A catchall.
Q. -- a catchall? In other words, it's for whatever the reason the person is coming in; is that fair?

A. Correct.
Q. All right. Court. What does that mean?
A. Well, sometimes the courts will request that he come to DOC facilities for various reasons. You know, it may be in their documents. Now, I don't believe that the court can order it, per se. I think that's an illegal sentence, but they -- they definitely -- we take their recommendations in.
Q. Okay. So can the court specify, you know, I'm sentencing this person to X number of years hard labor DOC time, you know, whatever form that takes? Can the court say, like, in a state-run prison?
A. I mean, I guess they can, but it doesn't mean we have to follow it.
Q. Okay.
A. No. It's more on the lines of they say, you know, they want the guy to receive mental health treatment, or they want the guy to receive a vocational programming. They make these things that are more or less recommendations. And then we see it, and if we can honor it, we will.
Q. Okay. All right. And the DOC request, I

think you were starting to talk on. What does that mean?
A. Yeah. I can tell you that those would be ones that I request for whatever reason, or the secretary requests for whatever reason, or, you know, the DOC requests for whatever reason. I can't -- and it could be a lot of different reasons. But I go back to it could be something as simple as I'm reviewing an incident and see somebody has been bounced around a little bit. You know, you just kind of question, what's that about? So, you bring them in. It's nothing that says we have to. It's something we might.
It also could be that, you know, a warden hears that a trustee that he had previously has re-offended, and, you know, he may know the guy is a skilled electrician or a skilled carpenter, and the institutional needs. There's a lot of reasons that DOC could request one.
Q. Okay. So, DOC -- who at DOC has the authority to make that request?
A. I think anybody can make it. Now, as far as it getting approved, almost all of them are

going to be approved by me or Secretary LeBlanc.
Q. Okay.
A. I mean, if a warden wants a particular person at his facility, it's going to come through me. Another one, a DOC request, it could be, especially a larger number, is, you know, we have one institution that provides work crews for the capitol region, and they will go out to the local level and screen people to bring in. And even those, though, they come in requests through my office, and we approve it.
Q. Okay. All right. So, for -- let's go back to the administrative. It sounds like -- so, the DOC requests. It sounds like, if it's someone within DOC, then they can ask for it. You or the secretary will look at it and will approve it. For administrative, it sounds like it could be requests that are coming from outside the department, so a representative, you know.
Family members. Can they request that, you know, like, a loved one be moved closer to home or something like that?
A. We get requests from all sorts of places. So, absolutely they can. Now, it doesn't mean

it's necessarily going to be done, but I'm not going to say it hasn't been done.
Q. Okay. But would that come under administrative?
A. Again, that's where I would assume it would go.
Q. So, where does all of this -- and let me ask this: Do you have to sign off on those sort of administrative moves to -- to --
A. If there's a certain -- a request to come in and stay, typically, yes, that would be me that would sign off on that.
Q. Got it.
Okay. So, this information that we've been talking about, the transfers to DPS&C custody, where is that?
A. Medical tracks theirs. Mental health tracks theirs. I'm not sure about the other ones. But, you know, sometimes you collect data and realize you're collecting data you're not doing anything with, and I think that's a lot of this, so.
Q. Okay. So, no one is doing anything with these transfers to DPS&C custody; is that what you're saying?

A. I'm saying, you know, it may spell out that this is how many we got this way, and I'm not saying we're not tracking it in other places now, but what decisions are being made with the data?
Q. Okay. So, it's this is being tracked, but it's not being tracked in any kind of centralized way now that the quarterly summary report isn't being done; is that right?
A. I'm -- I'm saying that it's not. I'm saying I do know where it is if it is.
Q. Okay.
A. We get a lot of reports in a lot of different places. And, you know, I'm not going to say it's not buried somewhere I'm not thinking of at this moment.
Q. Okay. And then, down here where we were talking about escapes and assaults, we're on page 1, and page 2, and page 3, that has these sort of little brief narratives of, you know, assaults, and escapes, and things like that. Where -- I just want to make sure I understand.
Now that this is not being compiled into the quarterly summary report, where -- are you

still receiving this information?
A. Yeah. In my mind, that's redundant information we're already getting when an incident occurs.
Q. Okay. So, these are incident reports, basically?
A. Basically.
Q. All right. And are they being compiled, tracked, anything like that?
A. I mean, they're being tracked on a case-by-case basis as they occur. They're being addressed then. So, I don't understand the question, I guess.
Q. So, I guess, I'm -- so, I understand that when you get one in you may respond to what is particular in that incident. And so, you're sort of dealing with each one as they come in.
I guess the question I have is here you're sort of seeing this is what happened over the quarter. You're getting everything kind of put together for one sort of chunk of time. Is there any way that you are kind of looking a little bit more globally at the incidents to see, All right, Madison was having a really, really hard time with assaults in, you know,

this quarter or this six months; maybe we should look and see what's going on with that? Is anybody kind of trying to look and see if there are patterns or trends in the incident reports?
A. Well, I'll go back to the boots on the ground with the BJG team leaders. You know, that's part of their job, in my opinion, is to -- that's why we have multiple ones and not one, and that's why they do what they do.
Now, I rely on them to keep us posted on that. They should be identifying trends before a report is generated anyway, saying, Hey, we're having issues over here, or this is happening a little too frequently.
Q. Okay. All right. So -- and the BJG team leaders, do they -- are they on that distribution list from the duty officer?
A. You know, I'm not sure. I'd have to go back and pull that e-mail. Like I said earlier, I'm not sure exactly who all gets it. I know I do.
Q. Okay. So, I guess my question is do the BJG team leaders get incident reports?
A. I'm going to have to go back and figure out

exactly how, but the answer is yes. I mean, we want them to get them. We want them to look into them.
Q. Okay. But as you sit here today, you can't say certainly that the BJG team leaders get incident reports from local facilities?
A. Not in an e-mail. I mean, I'd go -- I'm sorry. No, I can't today.
Q. Okay. So this transportation for DOC discharges, we're on page 3, transportation for DOC discharges, number of DOC discharged with ID, that's releases?
A. Correct.
Q. All right. And so, all of this information and -- and releases because the time has been served, correct?
A. Correct.
Q. All right. And so, where is this information kept?
A. I can't tell you today.
Q. Okay. So, outside of the quarterly summary report, you don't know where this information is --
A. No, ma'am.
Q. Okay. GED program. Do you know, is this

information about what is being offered at each facility in terms of GED?
A. Yes, ma'am.
Q. All right. Do you know where this information is kept outside of the quarterly summary report?
A. Education tracks that.
Q. Okay. Do you receive any kind of reporting about that outside of this quarterly summary report?
A. No, ma'am.
Q. All right. And then the substance abuse program, do you know where that information is kept?
A. I believe reentry tracks that, but off the cuff, no, I can't tell you with a hundred percent certainty.
Q. Okay. And outside of the quarterly summary report, do you receive this information?
A. No, ma'am.
Q. All right. And then the other CTRP, what does that mean?
A. Oh, other CTRP. Those are other programs that are non-GED, non-substance abuse that actually give additional good time or certified

treatment rehabilitation program, whatever that acronym stands for. You can get up to another 360 days off your sentence by participating.
Q. All right. So, those are, like, the anger management, parenting classes, like that?
A. Correct.
Q. All right. And where is this information kept?
A. Again, that's going to be in the office of reentry.
Q. Okay. And outside of the quarterly summary report, do you receive this information?
A. No.
Q. All right. And tell me if I asked this already, and I'm just losing the plot, but the DOC discharge information that we were talking up here sort of early on page 3, outside of the quarterly summary report -- I think you testified that you weren't sure where it was kept -- outside of the quarterly summary report, where do you re -- do you receive that information regularly?
A. I can't say that I do.
Q. Do you know who does receive that information

regularly?
A. No, ma'am.
Q. All right. Okay. On to page 4, job skills. Where is that information kept?
A. Again, the office of reentry is the one that does that.
Q. Okay. And do you receive this information outside of the quarterly summary reports?
A. No, ma'am.
Q. Grievances. Where -- how is that information compiled?
A. We have the ARP division that works under the deputy assistant secretary that tracks the grievances.
Q. Okay. And they track the grievances for local facilities?
A. Correct.
Q. Okay. How do they track the grievances for local facilities?
A. Well, the ones that reach our level, I'll have to spell out which ones they are. So, the ones that involve taking of good time and things of that nature come to us.
Q. Okay. All right. So, this grievances, the total accepted/total rejected, this is only

for grievances that get to the DOC level, correct?
A. I'm not a hundred percent certain on that. I would have to go back and ask one of the ARP people as to where that number comes from.
Q. Okay. What sorts of grievances -- so, I know good time. You just said. What other sorts of grievances reach the DOC level?
A. That's the ones that jump out at me are the ones that actually involve good time.
Q. Okay. Would grievances, you know, requesting transfer, reporting safety concerns, anything like that, reach the DOC level?
A. I would have to pull the regulation and read it verbatim to sit here and tell you this. I can tell you that, you know, whether it's reported here or not, as far as what they are, you know, I haven't seen any of them, unless it's something that goes through the ARP process that makes it to headquarters and it appears to be something that we know we need to do corrective action on.
Q. Okay. So, that information, sort of the underlying information is kept at that ARP division; is that right?

A. Correct.
Q. Okay. Who is over there? Who is responsible for that?
A. Swantje Hoffmann is, I think, her last name.
Q. Could you spell the first name, please?
A. I can attempt. I think it's S-W-A -- hang on. S-W-A-N-T-J-E.
Q. Okay.
A. I could be off.
Q. And outside of the quarterly summary report, do you receive this information on grievances?
A. No, ma'am.
Q. All right. What is a L-A-R-N-A?
A. LARNA. That's a Louisiana risk needs assessment.
Q. Okay. What does that mean?
A. It's a tool that we used to use that was a risk needs assessment. I mean, it took certain factors, such as age, criminological stuff, and we come up with a risk score.
Q. Okay. And what was that risk score used for?
A. You know, that's a good question. I can tell you that there's certain regulations that require for if you have certain crimes to go to work release, or this, that, and the other,

and some sex offender-type panels that the LARNA score is used for.

LARNA is a term that we no longer use. It's a tool we no longer use. But it's in various regulations at that time that would have quoted where you needed a LARNA and where you didn't.

Q. Okay. So, what is the tool that's used now?

A. TIGER.

Q. And how long have you been using TIGER?

A. Well, that's a difficult question because the two overlapped for a period of time. You used TIGER as well as LARNA. I can tell you TIGER was in its inception when I came to work at headquarters nine years ago. I don't know what day we pulled the trigger on getting away from the LARNA and just doing the TIGER. And the TIGER tool is still being modified as we speak.

I mean, it's not -- it's a, I say, a fluid tool. It's a tool that's -- it has a real good indicator of need; however, it is a very complex tool with a lot of questions to the point of being burdensome.

So, the office of reentry has worked on

that tool, and I think are still doing modifications as we speak.
Q. Okay. All right. Was it ever just exclusively LARNA, or the entire time that you have been in your role, your current role, has there always sort of been this transition from LARNA to TIGER and these sort of dual things happening?
A. No. TIGER was being developed whenever I took this role, so. And I don't know at what point -- and then it was a pilot, and then it was, you know, move forward. And then they coexisted, and then it was phased -- LARNA was phased out, as I appreciate it. So, I can't give you a date.
Q. Okay. Like, a rough time period? So, you know, was it LARNA was phased out pretty much by 2020, like four years ago, or anything like that?
A. LARNA and TIGER, for that matter, are things that really are more of a reentry tool, and I -- my assistance, or usage of it, or usage of any numbers has been very limited. So, I would be guessing.
Q. Okay. All right. Drug testing. Do you know

where this information is kept?
A. I know that we're going to have that with our BJG audits. It's going to be in the audit.
Q. Outside of this quarterly summary report, do you receive information about drug testing?
A. I receive the audit reports whenever they audit the facilities, and drug testing is a part of that.
Q. Okay. So, you would be getting it as part of the annual audit or the three-year certification; is that right?
A. Correct.
Q. Okay. All right. And then, search and seizure, down here on page 4 going to page 5, where is this information kept?
A. That's also part of the audit.
Q. And outside of the audit -- well, let me ask this: For search and seizure and for drug testing, this information, it's being compiled by the facility, correct?
A. Correct.
Q. All right. In the course of the audit, is the team leader or, you know, anybody who is conducting the audit, are they, you know, doing checks to confirm the accuracy of either

the drug testing numbers or the search and seizure numbers?
A. I would have to speak with them directly to find out how they are certain that that's the correct number. I can't tell you off the cuff how they do that.
Q. Okay. So, the search and seizure information, outside of the quarterly summary report, how do you get that?
A. I don't.
Q. You don't receive search and seizure information?
A. I personally do not, correct.
Q. Do you have any way of accessing search and seizure information?
A. I mean, I'm sure if I asked someone to present it I can get it, but it's nothing that I look at on a monthly basis by any means.
Q. Okay. But I mean, outside of a monthly basis. So, you know --
A. Any regularity.
Q. Quarterly, semiannually, annually, do you get it?
A. I look at -- I look at it whenever I get the audits is whenever I look at that.

Q. Okay. So, this information --
A. If I had a need --
Q. I'm sorry. Go ahead.
A. If I had a need to or a want to, I'm sure I can access it, but that's the time that I look at it is then.
Q. Okay. All right. And then, deaths. How do you get information about deaths?
A. We get those through our notifications as they occur.
Q. Okay. And then, offender transport. It's got scheduled medical, medical emergency, funeral trips, etcetera. Scheduled medical, what does that mean?
A. I can only make an assumption, but I think it's an easy one to make. You know, people have follow-up trips. They have specialty clinics. They have things of that nature. So yeah, they schedule a trip. You know, you -- I know at the local level they're not going to be getting chemo, but at the state level, if somebody is on chemotherapy, you know, we know they're going to have scheduled trips. This could be the primary care trips. We know they have issues, and they have to go for a

follow-up.
Q. Okay. And then, medical emergency. What was your understanding of that?
A. Exactly what it says, a medical emergency. You know, somebody has to go to the emergency room, or it's a trip that wasn't scheduled.
Q. Okay. So, would you expect notification of medical emergency trips under the category reporting?
A. Not necessarily. You know, you can have medical emergencies that don't rise to -- you can have medical emergencies that aren't, in fact, emergencies. You can have people that are having chest pain. They go to the hospital, and it's ruled to be, you know, a gastric issue. They, you know, give them some Tums and move on. So, not necessarily.
Q. Okay. Other than the quarterly summary -- well, let me ask this: Do you know how this information is tracked?
A. No, I don't. It's self-reporting.
Q. Okay. So, it's self-reporting from the facilities. Who are they reporting to?
A. Oh, I mean, in this case, to the BJG team leader.

Q. Okay. Outside of this quarterly summary report, do you know or do you have access to this information? Do you receive this?
A. Not quarterly. I believe it's buried in the annual audits as well.
Q. Okay.
MR. STEWART:
Elizabeth, we're at almost an hour and a half since the last break, and I think people might need a little something to eat as well as another break. And then we have about another, perhaps, two and a half hours for him, in timing, two and a half, maybe three at the outside, and then we should be coming to closure on him.
MS. CUMMING:
Yeah. I think that's fine. I mean, I know that, Lorie, you have the time from the previous, so yeah, but I think that's fine.
THE REPORTER:
(Nodded head affirmatively.)
MS. CUMMING:
How much time do you -- I mean, I'm

happy to take a break now. How much time do you all want?

(Discussion off the record.)

MR. STEWART:

You want to meet back at 12:30?

MS. CUMMING:

Yep. That's perfect.

MR. STEWART:

Okay. Thank you.

MS. CUMMING:

All right. Thanks.

(Recess taken.)

BY MS. CUMMING:

Q. So, I want to turn now to -- I'm going to show you Exhibit 8.

(Exhibit 8 to be marked for identification.)

BY MS. CUMMING:

Q. And so, this is -- it's sort of an e-mail printout. I will say, just the way that it was produced, it was produced as, like, an Outlook form. I want to say that when I made it into a pdf, my name appeared up here on top this line, so I modified this pdf to take out my name, but other than that, it is, you know, as it's produced. So, I just wanted to

clarify that on the record.
But this is -- it looks like it's a Zoom invitation. In the e-mail, it says to "Review reports from Gary Gremillion." It's for February '21. And then below, it has an e-mail from Gary Gremillion from January 4th, 2021.
A. Uh-huh (affirmative response).
Q. So my first question is who's Gary Gremillion?
A. Well, can I finish reading the e-mail first?
Q. Sure. And tell me if you need me to scroll, or blow up, or anything.
A. Okay. Now, you asked who was Gary Gremillion?
Q. Yes.
A. Okay. Gary, at that time, would have been a WAE, if I'm not mistaken, which is a part-time employee, but he retired as a deputy warden, if I'm not mistaken, with the state.
Q. Okay. So, just so I understand the timeline, he was a deputy -- where -- what facility was he deputy warden?
A. Raymond Laborde, which would have been Avoyelles Correctional Center at that time.
Q. Okay. And when did he retire as deputy warden from Avoyelles?

A. Oh, I can't tell you. It's been a while.
Q. Okay. And then after that is when he was working part-time with the state?
A. Correct.
Q. And you said it was a WAE; is that right?
A. Yes.
Q. Okay. What's that stand for?
A. Oh, you know, I believe it means when actually employed, meaning they get paid for when they work, and they don't get any leave or any compensation, but an HR person may tell me that I have an incorrect idea of that.
Q. Okay. That's fine. I was just curious.
So, that WAE arrangement, is that, like, a contractor? How does that work?
A. No. It's, like, a part-time employee. It's not a contract. It's a part-time -- you know, we have a fair amount of people that retire from DOC that we may offer a WAE position to come back and assist us in certain areas. They can't earn but a certain amount of money in order to keep their retirement, so it's a part-time job.
Q. Okay. And is there, like, a job description or anything like that for these WAE positions?

A. Well, each -- you can have a WAE position in medical. You can have one in administration. You can -- there's not any WAE job description. There probably is in one HR tied to that position that he's actually in, but there's a not a universal one.
Q. Okay. Yeah. And that was my question. So, when Mr. Gremillion comes in for this WAE work, is there someplace where sort of the ambit of his responsibilities are defined?
A. I would have to pull his HR file to answer that. There should be something, though.
Q. Okay. What would that be called?
A. What would what be called?
Q. The description of what he's doing.
A. I mean, that's an HR question. I don't know the actual title for it.
Q. Okay. All right. But there should be some document that describes it?
A. Yeah.
Q. Okay.
A. There has to be something tying his position.
Q. Okay. All right. And as far as you recall, what -- what was he brought in to do?
A. You know, I mean, he worked at Raymond

Laborde, and I think most of his functions were at Raymond Laborde dealing with Raymond Laborde. Now, exactly what else he did, I don't know. I know he did do some things with TWP and did some things at the local level, but specifics, I don't know.
Q. TWP. I want to make sure I understand what that means.
A. Transitional work program.
Q. Okay. And so, that's work release?
A. That's -- yes.
Q. Colloquially.
All right. So, he did some stuff with work release, and then you think he may have done some stuff with the local facilities, but you're not entirely sure what?
A. There's so many people that do so many things. I can't recall exactly what Gary did.
Q. Okay. So, here, what it looks like -- I'm just looking at this e-mail that you read. And down here, it's got just, I guess, his signature?
A. Uh-huh (affirmative response).
Q. But he's got a December summary or a summary of his work from December, and he's looking at

CAJUN and Oracle records. Tell me what CAJUN is.

A. CAJUN is a database. It tracks basic information.

Q. What kind of basic information?

A. That's where, like, the master prison record is. It will have movements. It will have date of birth. It will have quite a bit of stuff in there. I don't really use CAJUN, per se. I get things printed off of CAJUN for me. So, I don't know exactly what all it has the capacity for. I use it primarily for master prison records.

Q. Okay. And then, for DOC people, correct?

A. Correct.

Q. Okay. And then, Oracle records. What's that referring to?

A. Now, I mean, I'm the worst person in the world when it comes to IT, but Oracle records, as I understand it, it's going to be a database, again, because that's going to be where they scan hard files that become, like, a pdf.

So, I guess, as I read that, I spent most of my time reviewing CAJUN and Oracle records, records that you get within the databases.

Q. Okay. And so, as part of his function in that WAE position is he had access to CAJUN and Oracle? Like, he had a login?
A. Well, apparently, yes. I mean, I couldn't have told you had you asked me that.
Q. Okay. And then he's looking at people in RAP DCs. What's that mean?
A. That's going to be Rapides Detention Center.
Q. Okay. And so, that would be a local facility?
A. Correct.
Q. All right. And then he's got some comments and some suggestions to mitigate some of the issues facing them with a strategies memo that he sent for November and an addendum. We'll go through the strategies memo in a second.
A. Okay.
Q. Yep. And then, he says, "I will continue to perform these classification/disciplinary reviews as I go through the rosters of DOC offenders in local jails following the order used in the monthly CFACILITY report."
So, the CFACILITY report, that's the same report that you were talking about earlier that's got the breakdown of each facility, number of beds, DOC, pretrial, all that stuff,

right?
A. Correct.
Q. Okay. So, the classification and disciplinary reviews, do you know -- do you know what he was doing for that?
A. Well, I'm assuming -- I really don't know verbatim -- that he's looking in Oracle, which would have some of the classification stuff. If nothing else, it would have the basic information, like, to go to TWP, what their offense is, you know, whether or not they're eligible based upon their offense, their earliest release date, and then whatever come back records may or may not be there. So, you can at least weed out ones that you know are not eligible.
Q. Okay. So, do you know who directed him to do this review?
A. In all honestly, I do not.
Q. All right. And then, do you know why he's focusing on Rapides?
A. Do I know what?
Q. Do you know why he's focusing on Rapides?
A. No, ma'am. I do not.
Q. All right. He sent this e-mail to you and

then to Derek Ellis. Who is Derek Ellis?
A. Derek Ellis is the former deputy director of probation and parole who has since retired. At that date, I can assume he was working in the deputy assistant secretary's job, which would fall under my office.
Q. Okay. And then it's got the Secretary LeBlanc, and then who is Joli Darbonne?
A. Joli Darbonne, and again, I'm not sure at that point in time where she worked, but she probably worked in the TWP division here at headquarters.
Q. Okay. And then, Marcus Myers?
A. That would have been Gremillion's immediate supervisor or the warden at the facility he was working out of. I don't know. He may have had somebody else directly above him.
Q. Okay. So, do you know why it is that he's sort of sending this to you and to Mr. Ellis, but then he's CC'ing those three other people?
A. You know, I don't recall what's going to be attached to this. I may then have an idea. But I can tell you that based on who it is, I would assume it's transitional work related with Joli's name being involved, and then

Marcus, because that is the warden at the facility at which he works, and Secretary LeBlanc because that's Secretary LeBlanc.
Q. Okay. All right. So -- but you don't recall directing Gremillion to do any of this review?
A. No.
Q. All right. Do you know who at DPSC did ask Mr. Gremillion to do this review?
MR. STEWART:
Objection as to form. You can answer.
THE WITNESS:
No. I don't recall.
BY MS. CUMMING:
Q. Would this have been something, in that WAE position, would this have been something that he could just undertake himself without being directed by anybody?
A. I would not -- I would have to see what his WAE duties were when he started it. I can tell you that, you know, I don't know what his scope was there at Avoyelles. So, I can't answer that.
Q. Okay.
A. I didn't hire him, and he didn't work for me.

You know, that's really all I can tell you.
Q. Okay. I'm going to go to Exhibit 9.
(Exhibit 9 to be marked for identification.)
BY MS. CUMMING:
Q. It's one page. Just sort of looking at it at first glance, does this look familiar? Is this a document that you've seen before? And I'll scroll through so you can have a chance to read it.
A. Yeah. Stop there. You know, I feel like I've seen it, yeah. This was in the height of COVID, and there was so many moving parts, but I've seen this before or --
Q. Okay.
A. -- some form of this.
Q. Okay. So -- and this, I'll just tell you, this was attached to that e-mail --
A. Okay.
Q. -- that we were just looking at. So, even though it's not got his name on it, because it was attached, do you know if this is from Mr. Gremillion?
A. I believe it to be.
Q. Okay. And my understanding -- sorry. My understanding of this document that this is

the strategies document that he was referring to in that e-mail. Do you have any reason or knowledge that would say otherwise?
A. None.
Q. Okay. So, you recall seeing this at some point. Is this helping to jog your memory about what sort of review Mr. Gremillion was doing relating to disciplinary and classification?
A. You know, I recall him looking at TWP offenders, screening people for TWP on occasion, and -- now, I'm speculating as to how he came up with this, but I re -- you know, I have vague recollections of a conversation, a Zoom meeting or something, where he had some concerns at the local level with Rapides and what they were referring and not referring, but I -- the specifics, I don't -- I -- are not coming to me.
Q. Okay. Do you know why he had concerns about Rapides?
A. Well, I can go back to what he was saying right here. What he was saying he would like to do. Establish -- that must be referred to regional court, you know, on and on and on.

I'm speculating. You know, this is -- I'm going off memory, and my memory is not honing in on this document. I have a vague recollection of it at best.
Q. Okay. So -- and the -- and the referrals that you're talking about, help me out there. What do you mean by that?
A. Regional court. Referral to a regional court.
Q. Okay.
A. I do recall at some point him saying something, and I don't know if this is it, but it appears it could be, that he had issues with Rapides and who they were and weren't referring to regional court.
Q. Okay.
A. Like, you know, referred more to regional court is what's coming to mind.
Q. Okay.
A. And this document, that tracks it close with that.
Q. Okay. And so, it looks like part of -- I mean, he starts it off at the top couching it out beyond just Rapides. He's talking about, "As the population of DOC offenders in local jails continues to decrease, facilities may be

prone to be more tolerant of offender misbehavior in terms of how they are disciplined."
Do you know what that means?
A. I think that's his opinion. That's all.
Q. Okay. I guess I'm trying to just unpack what that opinion is. What's your -- what's your understanding of what his opinion is?
A. I think only he can give you his opinion. I mean, "facilities may be prone." I read it just exactly how he wrote it.
Q. Okay. So, I guess I'm -- I'm trying to understand what -- what is he talking about when he says "more tolerant of offender misbehavior"? That they're less likely to be referred, that they're less likely to be disciplined at all, that they won't be written up? What -- what -- what do you -- what is your understanding?
A. How they are disciplined. "Especially true of facilities which use DOC to support public operations, including TW" -- I mean, I'm taking it exactly how it's written. I'm not sure what -- what you're asking me to clarify.
Q. I'm just asking what your understanding of,

like, this "more tolerant of offender misbehavior" -- do you --
A. I put up with more today than I did yesterday.
Q. I'm sorry. Say that again.
A. I put up with more today than I did yesterday. I'm more tolerant.
Q. Okay. And so, I'm trying to understand a little bit more of, you know, what that actually means. Does that mean that you -- no one is doing shakedowns and you walk onto a housing unit and it's filled with smoke because everybody is smoking drugs? Does it mean that even when you do a shakedown and find a bunch of drugs, you're not writing people up? Does it mean that you're writing people up, but you're not sending it to regional court? What is your understanding of it means?
MR. STEWART:
Objection as to form, and it's asked and answered. You can go ahead.
THE WITNESS:
I can't tell you what he means by this. I can answer this two different ways, though. One, you know, there was

a time in my career where if an inmate was caught masturbating, he caught a Rule 21 violation regardless. Okay? We have become more tolerant with that. If he's doing it in the privacy of a shower or his bed, and it's not -- it's not a disrespectful act, we're more tolerant of that. So, you know, tolerance can be good or bad.

You know, it could be that we used to -- you could get rid of anybody for any reason because we know what -- we're getting another one to fill the bed. Now, it could mean that. It also could mean that somebody that used to -- I don't know -- cross the line with -- I don't know -- verbally, or physically, or whatever else, that maybe they're not referring them, but I -- I can't tell you what he meant, you know. I can interpret that any number of ways.

BY MS. CUMMING:

Q. Okay. And then here, this line, "It is critical to the department's mission that offender disciplinary infractions be

consistent, appropriate, and properly documented to support future classification decisions as well as the department's overall mission."

What is your understanding of how disciplinary documentation would support future classification decisions?

A. I definitely see where disciplinary infractions help consider future classification decisions, such as, if you have somebody that is not -- but, you know, again, this goes both ways, too. But if you have somebody who is not giving write-ups that they should give. You know, if you have somebody that's caught with contraband. They get caught with a shank. And if somebody is not writing that up, they are wrong. And we need to know that down the road if we were to go to make this guy a trustee, if we were to bring them in for the Baton Rouge crew, if we were to send him to TWP. But, you know, I think that's spelled out in the basic jail guidelines that requires that already. So, I think this is a subjective opinion of his.

Q. Okay. So -- and then he provides, "As such,

the following strategies must be considered," and then he goes into some bullet point strategies. So, we'll go through these. I mean, I guess -- well, yeah. Let's just go through them.
A. Okay.
Q. So, the first strategy, do you recall reviewing this?
A. Again, I recall having a conversation maybe Zoom. I recall having a meeting on this at some point, but the actual decisions, none, you know. It goes back to a lot of this sounds really good. And I'm not necessarily arguing with it. A lot of it is already spelled out in the BJG.
And also, you do have some latitude that we're not going to take away, you know. When you say "contraband," there's some exceptions. Either we do it or -- either it's mandatory or it's not. You know, they have to have discretion with that. Contraband can be a bag a potato chips, you know.
I understand all positive drug tests. I understand intoxication, but again, defiance, that's a big window. It goes back to, like I

said, about masturbation. You know, there's some things that it may meet the rule violation, but does it elevate to needing the type of resources at that level.
Q. Okay. So, I guess to unpack a little bit, what he's suggesting here is to come up with criteria for everything that has to be without discretion referred to the regional court.
Is your -- is your understanding that that already exists, or is that this is -- this -- what he's proposing is sort of an expansion on that current criteria?
A. My memories of this exact meeting and discussion are hazy at best. So, I can't tell you exactly what his intentions were. I personally believe that anything like this that we need to do needs to be incorporated into the basic jail guidelines, which we are always in a revision cycle. There's always a place to add something.
So, I can't tell you if a decision was or wasn't made. I would have to go sit down with the file, and go through it, and read it line by line. You know, we're a very, I won't say regulation heavy, but we have regulations all

over on everything. And to sit here and know verbatim what each one of them says, that's why we have a database. So, I can't answer that.
Q. Okay. So, you can't recall if any of these were picked up and incorporated into the basic jail guidelines?
A. Correct.
Q. If -- if any of these decisions or any of these strategies were picked up and incorporated into the basic jail guidelines, that would be documented in -- you're referring to a database. I want to make sure I understand. What database would that be?
A. I'm talking about a regulation database. You know, we have -- all of that is available in databases. You can pull regulations. You can pull the basic jail guidelines. You can pull all of that and then do word searches and things of that nature. But I don't recall, and maybe it will come to me, but I don't recall what, if any, action was a result of this.
Q. Were there any notes, or minutes, or anything like that related to the meeting where this

was discussed?
A. I highly doubt I took any, but I'm not going to say there weren't. I don't remember who the invitation list included. I do remember it being Derek Ellis. No. That was on the e-mail. The Zoom link was James Ray Wesley, myself, and LeBlanc, I think.
Q. Here. I'll go back to the Zoom link.
A. I can tell you it's -- let's see. If they were any taken, it would be by Angela Whittaker.
Q. Angela Whittaker, okay.
A. Yeah. If there were, and I'm not going to say that there were.
Q. If Angela Whittaker had taken notes, would she have distributed them after the meeting? Would she have e-mailed them or anything like that?
A. It's possible. I'm not sure.
Q. Do you --
A. Action items. I'm not sure.
Q. All right. Going back to Exhibit 9, in this first strategy, he says, you know, "should be discussed with the BJG coordinator." Who's that BJG coordinator?

A. I would take it that he means the BJG coordinator for the region in which it occurred.
Q. And --
A. No. And I'm not -- I said that wrong. I was thinking team leader. That says "coordinator." So, that would be, at the present time, Megan. I don't know who it would have been at that time.
Q. Okay. All right. But that's -- it's not referring to a team leader. It is referring, in your understanding -- like, BJG coordinator would be referring to the person at the department level; is that right?
A. That's how I use that terminology, correct.
Q. Okay. All right. We touched on this a bit. I'm looking now at Strategy 2. We touched on this a bit when we were talking about transfers to DPSC custody, but I just want to make sure I understand.
Prior to 2020, do you -- who had authority to decide that someone was not appropriate to be housed at a local facility?
A. Okay. That could go any number of ways. First of all, the local-level facility

themselves could say this guy no longer needs to be here for medical, mental health, and/or disciplinary reasons. So, it could be from there. It could come from our BJG team leaders. It could come from regional court. I mean, there's a lot of places where it could come from.
Q. Okay. But those are people who can originate the -- a move from a local facility. Do they -- does -- do they have the authority to decide without asking anybody else, Okay, this person needs to not be housed in a local facility; they need to go to a state-run facility?
A. I can't tell you as of that exact date, but typically, if it is a medical, then it gets sent to our chief nursing officer who reviews it and makes that decision. Technically, she asks me, and I'm involved in that loop, but if it's medical, and she says it's coming in, I'm not going to tell her it's not.
The same thing for mental health. If it's a BJG team leader or someone like that, there's going to be an e-mail to my office requesting it, and then we'll approve it or

deny it.
Q. Okay.
A. I honestly can't recall a BJG team leader doing one in the recent past, but it could have happened. Disciplinary court, though, sometimes that would happen, and they would even hold them there. So, that has happened.
Q. Okay. And disciplinary court is the same thing; it will come into you as an e-mail, and you can approve it or deny it?
A. I'm not sure that I ever approved or denied those. I don't know if there's a mechanism for that or if they just keep them. Because if they -- if they -- let me say this: If they recommended, the answer is going to be yes every time, if, in fact, I have to approve those. I can't recall one that ever it wasn't approved.
Q. Okay. And do you know, are there written directives for the, you know, the disciplinary person or the BJG coordinator on, you know, when someone should be moved out of a local facility and moved into DOC?
A. I would have to read the transfer section. I feel like there is, but specifics, I'm not

certain on.
Q. Okay. And the transfer section in the -- in what?
A. Well, both in the BJG and in the department regs.
Q. Okay. And do you know, roughly, what number in the department regs?
A. No clue.
Q. Okay.
A. The database is searchable, and I will just key in transfer, and it will give me a list of regs that would be applicable.
Q. Okay. All right. So, what criteria is considered to determine if someone is not appropriate for a local facility?
A. If their medical needs exceed the medical capabilities of the facility. If the cost medically exceeds, you know, their per diem, you know. The same thing with mental health. And then, security-wise, if they're a constant behavior problem or something that they feel like they can't handle. You know, at the end of the day, these are DOC offenders. The local level is housing them. If they call and say this guy is a behavior issue, and I can't

handle him, then we take them.
Q. Okay.
A. Now, the other ones that are kind of automatic would be, like, an escape. If you escape, I'm bringing you in. That's a no-brainer. I may have to leave you there for a period time while they book and charge you with your new offense, but outside of that, we're going to take those in.
Q. Okay. So, for people who are, you know, presenting behavioral problems to the local facilities, you're talking about the local facility reaches out, then you, DOC, will consider taking them.
What about someone from the department who all might be looking at behavioral issues and saying, Okay, that person might need to come in; they're not eligible to be in the local facility?
A. I think there's two places that comes from. One is regional court. Whenever they see their offenses at regional court, whoever is housing or whoever is holding court definitely has the ability to say, This guy, I feel, exceeds their capabilities at the local level.

But usually, the local level asks, though, if they're really having issues.

But the other one would be through the incident reports that we get, you know, through the duty notifications. When we see certain things -- that's just like how we see the escapes, you know. We see somebody escape from Caddo, and they were captured, you know, two hours later. Without fail, that person is going to be brought in the following Monday unless there's a booking or some reason the sheriff or local authorities need to keep him.

So by the same token, we could see an incident that rises to the level that we decide to bring him in, but typically, you know, I said escapes are the ones that jump to mind.

Q. Okay. So, just sort of talking about, you know, behavioral stuff, are there particular criteria that are considered when looking at someone's behavioral history to say, All right, they really should be moved out of the local facility?

A. Again, I typically would rely on the local-level facility to generate that request

unless it's, like I said, a significant incident that the secretary or myself feels warrants bringing them in. I mean, I know that happens from time to time.

There's an incident that the secretary will say, Hey, bring this one in when you can, or I'll say to the transfer section to bring this guy in with their next load. But as far as, you know, criteria, per se, there's too much gray there, you know. It's not all assaults are going to land you in. It's not -- I mean, all escapes pretty much are. Whether that's spelled out or not, that's our practice.

But aside from that, you know, I can't tell you that it's as sample as -- I mean, at the end of the day, these are inmates that are serving time because they can't live and play well in society, and they don't always live and play well in the prison. It's not just as easy as we just bring them in because they misbehave.

Q. Okay. And moving down to this third strategy, it's got, "RC chairpersons should be encouraged to use custody changes to medium

when appropriate."
Do you know, RC chairperson, what that is?
A. Regional court.
Q. Okay. And then during this time period, who -- who is responsible for determining custody level?
A. I'm confused. Who is responsible for the custody on who?
Q. So, for people in local facilities coming into local facilities, it looks like -- well, let me ask this: For people coming into local facilities who are at local facilities, who is responsible for determining their custody level?
A. That facility is going to designate someone. I don't know who it's going to be from facility to facility.
Q. Okay. So, the local facility is in charge for determining custody level, but here, it looks like, did the reg -- does the regional chairperson also have a role in determining custody level for sentenced people?
A. They could.
Q. Okay. In what circumstances?
A. Well, like, he's trying to encourage them

whenever they come in on something to do a custody-level change. I mean, they can do it for any rule violation that reaches the level of coming to regional court. They could.

Q. The regional chairperson could?

A. Yes.

Q. Okay. And how would that work?

A. How would that work? They would come to court, and the sanctions would be, you know, loss of good time, 90 days, change -- custody level changed to a medium or a maximum, for that matter, and, you know, also, canteen, or whatever sanctions may be. That could be a sanction.

Q. And does that -- that gets communicated back to the local facility?

A. Yes.

Q. How does that get communicated back to the local facility?

A. You know, I'm not on the receiving end of that, nor have I ever been, but I'm trying to think through this. The actual write-up has the disposition. I can only assume that that goes back to the regional -- or the local-level facility.

Now, the issue is is once they're back there, you know, what obligation do they have to honor the custody change. I feel like they will, and it may be in the BJG that they do, but off the cuff, I don't know where that's at.
Q. Okay. Is there, like, part of the audit process or any -- is there any kind of part of the -- is there any way that the team leader or anybody from the department goes and looks to see if the local facility is honoring those custody-level changes that are coming back from regional court?
A. Not to my knowledge. They review their classification plan, and so long as that's correct and it's going correct, I don't know -- I don't know how they would audit that short of going through all the disciplinary.
Q. Okay.
A. I'm not saying it doesn't happen, but I'm not aware of it.
Q. Okay. What custody levels are available to sentenced people at local facilities? Like, how many levels are there?
A. Well, I think there could be three. I'm not

saying all facilities use three, but there could be three. You can have a minimum, a max, and a medium.
Q. Okay. And is it possible for a local facility to hold someone who has that maximum custody level?
A. Some facilities could.
Q. Okay. Which facilities are able to hold max?
A. In my mind, anybody that's in a cell meets the criteria to be a maximum-security offender. Now, we're not talking about something based upon their sentence. We're talking something based upon their behavior. So, whenever I say that, that's what I'm referring to it.
Q. Okay. So, you're thinking -- you're not thinking about, you know, classification that may be looking at sentence; you're thinking about classification based on institutional behavior; that that's part of what helps determines custody level; is that right?
A. Correct. Because even, like, within Angola, which is a maximum-security facility, we have max, minimum, and medium. So, you know, you can have all that. It's not all about the sentence. And I don't think in this purpose

where it's talking about this it's about that, you know. I think it's talking about their conduct and whether there are -- it's saying put the guy back to a medium at least.
Q. Okay.
A. So, he's not eligible to be a trustee. He's not eligible to work on the road crews. He's not eligible to do certain things. That's how I read that.
Q. Okay. All right. So, institutional behavior becomes a way of determining how -- how someone should be held. I mean, what -- the custody level is sort of --
A. Correct.
Q. -- what access they have to privileges, to programs, and where they are housed, correct?
A. Not necessarily access to programs. It could. But it's more about a housing and what level of supervision they receive.
Q. Okay. All right. And then, going down here to this strategy where it starts with "Require local facilities to maintain statistics on Schedule B disciplinary infractions," do you know, in 2020 or 2021, what statistics were local facilities maintaining on disciplinary

actions?
A. I'm not sure.
Q. Okay. Currently, do you know what statistics they maintain?
A. No, I'm not sure.
Q. All right. Do you know, was this recommendation implemented?
A. No. I don't recall if any of this was implemented.
Q. Okay. I just -- I'm noticing here, Mr. Gremillion is saying, "BJG coordinators should be required to review the disciplinary processes as part of any facility visit."
Is it possible that he's using BJG coordinators as team leaders?
A. You know, it is very possible. In that case, it is definitely not meaning what I use as a coordinator, so. In that context, the BJG coordinators. There's not. There's one. Coordinator.
Q. Uh-huh (affirmative response).
A. So, it's very possible that he is meaning team leader.
Q. Okay. All right. And do you know, the -- do the team leaders, do they look at the

disciplinary process as part of facility visits?

A. I don't know how deep they look at the disciplinary process. I know that it is looked at on some level because I know they look at making sure that they have, which is kind of disciplinary, but kind of not, they look at restoration of good time, ensuring that there's a policy on that, and it's posted. So, you know, I know it's looked at on some level, but as far as in the weeds how deep, I'm not sure.

Q. Okay. And then he's talking about the "reviews of internal disciplinary court 'result sheets' as well as individual reports as appropriate."

The result sheets, do you know what he's talking about there?

A. You know, no. I can't tell you that I know for sure. I think I know, but I'm not certain. There's a -- I'm trying to think of the -- the -- the words we call it. It's a -- like, a conduct history report that's just, like, a one-pager that shows, I think, on this date they got this rule violation, and this

was the outcome, but it doesn't dive off deep into the specifics of it.

You have to go back and pull the write-up to get into the specifics, but usually, there's a conduct sheet that you spell it all out to where you can go quickly and say, Okay, this guy has only had five write-ups in the last five years, and none of these are significant write-ups. We don't have to go any further.

Well, the next one you may look at, he has seven, but one of them is a higher write-up. And we have to go pull to find what the -- the actual content is, but that con -- that result sheet is, I think he's calling it, would be a good spot to -- to get a quick opinion as to whether somebody definitely is eligible for certain things or definitely ineligible. And then there's the other group that require deeper review if that makes sense.

Q. Okay. The result -- or that conduct sheet that you're talking about, where is that found?

A. You know, it's an institution. They have a basic file. I never went and pulled a file at

an institution at the local level, so I'm not a hundred percent certain.
Q. Okay. But that's not something that would be in CAJUN?
A. No. Uh-uh (negative response).
Q. So -- and then here, he's -- he's -- this next recommendation is requiring that disciplinary reports and supporting documentation be scanned into Oracle. That's the, you know, database that accepts pdf documents. Do you know, does that happen?
A. I'm sorry. Do I know what?
Q. The disciplinary reports and supporting documentation, do you know, are those being scanned into Oracle?
A. I can't tell you with a hundred percent certainty.
Q. Where would they be kept if not in Oracle?
A. In the offender record.
Q. Okay. And is that paper?
A. If it's not in Oracle, yes, it would be paper.
Q. Okay.
A. And even if it's in Oracle, there's a paper floating somewhere.
Q. Where is the paper kept?

A. Again, it would be in the offender file.
Q. And where is the offender file kept?
A. I would guess they have the file at the local level. I know we don't have it here, so yeah.
Q. Okay. So, you have James Dean. He's DOC. He's got multiple disciplinary reports and supporting documentation. It's all on paper. And he happens to be held in Madison. That paper file is going to be with him at Madison; is that right?
A. That's an assumption on my part. I haven't physically went and pulled one, so -- but I would think that would be reasonable to assume.
Q. Okay. If someone from the department wanted to go and look at all of the disciplinary reports and documentation related to James Dean, would they have to -- and it wasn't scanned into Oracle, where would they go?
A. I would need to talk to a BJG -- now, they got me saying coordinator -- team leader that actually does this because hopefully they would know where to access that better than I.
Q. Okay.
A. I can't answer that with a hundred percent

certainty. I'm guessing at best, so.
Q. Okay. All right. Does anybody at the department level review disciplinary reports?
A. I'm sitting here thinking through it. I don't know who it would be if it is. So, I'm going to say not without cause.
Q. Okay. What sort of cause would there be?
A. Well, if somebody files an ARP. You know, they have an administrative process to get us to go back, and then also, we have an appeal process.
Q. Okay. So, if someone files an appeal, does someone review the -- the disciplinary report and supporting documentation?
A. I would have to pull the reg and see what it says at the local level, but I know there's a field process and our process. So someone has to review it, yes. But I know, just like the ARPs are only going to be the ones that takes certain rights, I don't know exactly what the fields state in the BJG.
Q. So, I guess I'm trying to understand this: So, for certain write-ups, you're going to the regional court. The regional court is the Department of Corrections-run court. It's --

it's -- there -- there is someone who is a state-run facility who is running that regional court; is that correct?
A. That's correct.
Q. Okay. And so, when that regional court happens, what are they looking at?
A. They're looking at the facts around the case. You know, there's a --
Q. And are --
A. Go ahead.
Q. I'm sorry. Go ahead.
A. I said they have a write-up and whatever evidence is presented for them to hear. That's what they're looking at.
Q. So, if you've got someone who's written up for, you know, contraband and intoxication, say, what evidence, what supporting documentation, what are they -- what is that regional coordinator looking at?
A. I mean, it could be a picture of whatever it was. It may be nothing more than the write-up itself. You know, if there was somebody that was sent out to a hospital, it's a possibility you could have that attached, or at least showing the trip in and out, not necessarily

the medical data. There's various things that it could be.
Q. Okay. How does the regional coordinator receive whatever information is being submitted?
A. I know back in the day, you know, whenever they came to the regional court, the transporting officers transported the documents with them. Now, you know, I worked in the field. That's been ten years ago. I'm not sure if they get it that way still or if it's electronically sent. I'm not sure.
Q. Okay. And so, the regional court, whoever is doing that -- well, let me ask this: That documentation that's submitted with the write-up, who puts that together?
A. The sending unit.
Q. Okay. So, someone at Madison gets written up for contraband and for intoxication. Madison is putting together whatever packet of supporting documentation there is to support that charge; is that right?
A. If there is supporting documentation, yes.
Q. Okay. And then that is getting sent to the regional court, which -- now, tell me if I'm

wrong, but my understanding is that's at Wade, right?
A. I believe that to be true.
Q. Okay. And so, someone is sitting at Wade who is -- works for the department, part of that state-run system, is getting whatever supporting documentation Madison has put together. And they are looking at it, and then making a determination after some sort of process; is that correct?
A. Correct.
Q. All right. And so, after that determination is made, does the regional court keep the underlying documentation that they used in order to, you know, make whatever disposition they were going to make?
A. I can't tell you with a hundred percent certainty if the documentation stays there, or goes back, or if a copy is made. That's down in the weeds of a level I can't answer.
Q. Okay. Does -- for someone who is coming from a local facility, are they transported to regional court, like, physically?
A. I know pre-COVID they were. I know we did some Zoom at one time. And I would have to go

pull and see exactly how we're doing it today, but yes.
Q. Pre-COVID, who did that transport?
A. The local level.
Q. Okay. And the local level would bring whatever documentation?
A. Correct.
Q. Okay. So -- but if there -- so, after that regional court happens, after that disposition is made, if there is no appeal, if there is no grievance, is there any kind of -- I don't know -- auditing, review, any kind of sampling, procedure, or anything like that to sort of look at how the disciplinary process, that regional court disciplinary process is functioning?
A. Not to my knowledge.
Q. Who has access to Oracle?
A. Oh, I have no idea.
Q. Do you know what the purpose would be of, you know, scanning in the disciplinary reports and supporting documentation into Oracle?
A. Again, for classification purposes. Whenever we go to make people TWP eligible, when we go to make people trustee eligible, when we go to

make things -- decisions dealing with their custody, it gives us a place to get some more information.

Q. Okay. I want to turn now to the auditing. We've been -- and you've been designated as department representative in this area. So, I mean, just to start at the 30,000-foot level, the local facilities, are they subject to auditing?

A. Yes.

Q. All right. And what different types of auditing are they subject to?

A. The annual and the recert are the two main ones.

Q. How frequently does the recert happen?

A. I believe every three years.

Q. What's the difference between the annual and the recert?

A. Well, the recert is a more in-depth going through the standards. It's got more intense documentation, more intense level of an audit.

Q. All right. What's the purpose of the audits?

A. The purpose is to ensure they are compliant or attempting to be compliant with the basic jail guidelines, and where we find them to be

noncompliant or partially compliant, to help them get to full compliance.
Q. And who's responsible for the audits?
A. Who's responsible for the audits? Well, that's a broad question. You could say the department is responsible, but the basic jail guideline team leader heads up the audit, and then ultimately presents that.
Q. Presents it to who?
A. The basic jail guidelines coordinator.
Q. Okay. And then who gets it from there?
A. Well, the coordinator typically goes through it and flags areas, too, and highlights certain areas of importance, and then, typically, it would come to me. And then I would go through it, and then I would send it to Secretary LeBlanc.
And then at that point -- oh, and also when the coordinator sends it to me, it has a cover letter at that time attached to the local government, whether it be the sheriff's office, or police department, or whatever municipality, board they may answer to, that after he reviews it, if he's satisfied, he signs it and sends back to them.

Q. So, when you get it -- and the BJG coordinator is -- that's Ms. Kent, correct?
A. Correct.
Q. All right. And so, what is Ms. Kent reviewing the audits for before she sends it to you?
A. Accuracy and anything that jumps out at her, you know, because it's a large volume document, and there's a lot of them. And it makes my life easier to have it -- basically, any extremes, I guess. Any theories of concern, you know. You may scan through it or read through it at a rapid pace, but then you see a flag, oh, let's find out what this is all about.
So, it's really just to make sure, to highlight certain areas is how I appreciate what she's doing. And she does extremely good and extremely bad things. I say she does extremely good and bad things. That came out wrong. She will highlight someone who is doing above and beyond as well as someone who we may find an issue. So, it's not all negative what she does with her highlights and her flags.
Q. Okay. How does she highlight? I mean, is it,

like, physically with a highlighter, Hey, look at this?
A. I have seen a highlighter, but typically, it's sticky notes off to the side with maybe a handwritten, you know, a concern or an attaboy.
Q. Okay. When you say that she's reviewing for accuracy, do you know, you know, what else she is looking at to sort of confirm the accuracy of the audit?
A. When I say "accuracy," again, there's no way for me to know that somebody counted 422 people, but what we do know is it wasn't 4,222. So it's more egregious typos, mistakes, errors that she's able to look for. As far as reconciliation of the data, there's no way.
Q. And then when you get it -- well, let me ask this: What -- can you give me some examples of deficiencies that she has sort of flagged or noted for you?
A. Okay. I can tell you, you know, some of the ones is it may have that a particular facility is not as clean as they think it should be. It could be a particular facility didn't have

an inventory on their spoons in their kitchen. It could be -- I mean, any number of things like that. It could be that they actually were over their operational capacity for three days. Anything like that.

It's any standard that's -- that they're in violation or they were in violation or -- and again, these are standards. There's a lot of standards. You can be in violation of a standard and be running a good facility, but there are some standards that probably, you know, are a little more important than others.

And you'll see some that are listed as mandatory standards. And when it's mandatory, it's not mandatory saying you must meet standard. It's mandatory that we must audit this standard every year. Okay? This one has to be. So, sometimes people get lost in that. But any -- it can be any number of things. Those are a couple of quick examples that I know I've seen. And we like to remedy on the spot.

Q. Remedy on the spot. So, you know, if someone hasn't inventoried their spoons, how is that --

A. When I say they haven't inventoried it, they are not on inventory. So, of course, they haven't, but that's what the problem is. The remedy on the spot is they get out their engraver, and they engrave these four-slotted spoons 1, 2, 3, 4 and add them to the inventory, and now, their own inventory would have to be tracked.

Q. Uh-huh (affirmative response).

A. Things like that. And other things you can't remedy immediate.

Q. Okay. And on the flip side, what are the positive things that she's noted?

A. Again, someone's facility is, you know, is immaculate. It's extra clean. It's -- you know, there are some that definitely are newer. And an old, ancient building, I don't care how much you clean it, it still looks like an old building. So, some of the newer ones may -- and you can have a new one that's filthy, you know. Just because it's new doesn't mean that it's clean. But cleanliness is one thing that stands out. Inmates say something about the -- you know, all the beds were in perfect order and mattresses were in

perfect order and, you know, just things that were done that are typically above and beyond what we normally see day in and day out. So, you know, it could be any number of things.
Q. Okay.
A. They may have a key procedure. I know one facility at one time went to, like, almost, like, a vending machine-type key system that made it a lot easier to track, and that's something that was highlighted. You know, we might want to look at this for other facilities or at least dive off into it. Best practices.
Q. So what are the facilities that kind of stand out to you as getting flagged by Ms. Kent as having some issues?
A. Look, almost all facilities get flagged as having some issues. Very few come through unscathed that everything is perfect. So, you know, I don't know. Almost all of them are going to have something. You know, it's an operation.
Q. Are there any that stand out to you as, you know, facilities that sort of consistently seem to have more problems than others?

A. Sure. Avoyelles has had it's fair share of it. And look, I feel bad throwing out some names because there may be some other ones that are worse. But the ones that jump out at me may be the ones that I've seen most recently, too. But Avoyelles and Tangipahoa are two that jump out.
Q. And what about on the flip side, the facilities that sort of, you know, tend to have more of the positive flags?
A. Well, again, you know, any of them. You can have a facility that has a lot of negative flags that still has positive ones, but the only one that jumps out at me right off the cuff, and that's going to be Bossier. Bossier has got a really, nice neat, new fac -- I say new. It may be 20 years old, but in our world, that's new. They run a very, very tight ship up there. So, that jumps out to me, but also, I toured it recently, so that might be why. It might not even be because she flagged it. But there's other ones as well. Lafourche. Lafourche is in the same boat. They've got a very nice facility.
Q. Okay. All right. And so, though, when you

get these reports, these audits, after Ms. Kent has gone through it, what are you doing with them?

A. Reviewing them before I send them to the secretary. I mean, quite honestly, it's more of a review and pass-through to him. At this point, what's been found has been found, and I can think of -- I'm trying to think if I can think of any time I've kicked one back. I can't say that I can.

I may have asked a few more questions about a specific here or there, but nothing is jumping out at me. For the most part, I read them and send them to LeBlanc, and then -- now, he may have questions when it hits his desk that get kicked back to me.

Q. What sorts of questions does he have?

A. Well, I can tell you, and this is just, again, something that came up recently. We had a facility -- and I don't remember which one. It may come to me -- that there was, like, one month that the contraband was less. All that, we're going to have a sheet that gives the monthly activities since our last audit. And two things that we track. And, you know, I

thought about this, and I may have even misanswered earlier with the quarterly, where it is, but I know in the yearly that we're going to have the substance abuse and contraband reports. And I just know, here recently, there was one that got kicked back to me that, again, let's just say every month they were averaging 30, 35 incidents of contraband, and boom, there was one month that we were, like, you know, 140.

And that goes back to what I said earlier about sending in a shakedown team that, you know, went in there and thoroughly shook down from one end to the other, a hundred officers at once with multiple dogs. And, you know, it's just a whole lot harder to -- if we send a team of -- if the institution itself sends a team of five people to go shake down, word gets out they're shaking down, things get flushed, things get hidden, things get -- you know, we can hit it at a level that they can't. So, that explains that.

So, you know, he'll call me or kick it back. Hey, what's this about? And I go back and say, Well, I sent a -- I -- I send a

shakedown team typically three times a month somewhere, and local levels are included in that, and I don't keep him updated as to where I send them. I mean, that's just -- that's just part of our routine. So, I'll know that and he won't.

There may be another. Assaults, you know, that's also in that report. If there's something that jumps out at him there, you know, he may ask me for further information. And typically, when he does, I've already got it. It's typically going to be, you know, What's this deal where there were seven in May? Well, I can go back and pull them and show him where they were and show him that he already knew about them.

Now, the flip side to that is is he could say to me, What's the deal with seven in May? And we go back and look and seven weren't reported, and that's a whole 'nother issue. And I can't recall that happening in the recent past, but it's like anything else. If you have humans, there's human error. And it has happened where somebody underreported. So, you know, those are the things that we

catch at that level.
Q. Okay. When this --
A. I'm going to jump back in because I'm going to correct myself. I said that, you know, I can't recall kicking one back, but I have kicked one back, and it was -- it wasn't real recent, but it's on that same note. Let's just say that I got a notification last month of a significant incident at Avoyelles, or Tangi, or wherever it may be. And then I look and think I've got the audit, and then I know that they had one last month, and it's not there. And I have kicked one back, and then we corrected it.
Q. Okay. So, if you see that there's an obvious discrepancy in incident reports or something like that?
A. Sure.
Q. Okay. When the secretary is reaching out to you to ask questions to, you know, follow up on these audits, what form does that take?
A. You know, that could take multiple forms. It could be a simple phone call saying, Hey, what's the deal here? And then I verbally tell him over the phone, and he's good with it

if it's something I'm able to. Most of the time I'm going to say he handwrites on the report and kicks it back to me. And I'm not sure if it's e-mail and my assistant prints it off or if it's hard copied and sent to me. I just know I get a hard copy, which Faith goes through my e-mails and prints things like that. So, it would be one or the other.

But he'll write, and look into, and advise, and have something circled, or a sticky note. So, you know, a phone call, an e-mail, or perhaps, just sending a hard copy.

Q. Okay.

A. Now, the other thing that would come from that, too, is, you know, he may call me over as well and have a consultation on deciding whether or not the plan and the cover letter that Meg prepares is sufficient. Sometimes we modify that. I can't say that I've ever modified one at my desk.

Now, Meg may come and consult with me before she writes the letter, so. And things would be of -- let's just go back to we had a tool count issue. You know, we may say we're going to come back in 30 days to verify that's

been corrected. If that's the only issue, it may be a targeted issue just at that or a count issue, something of significance. And her question may be, Do you think the secretary is going to want to do this at 30-day or 60-day intervals, things like that.
Q. Uh-huh (affirmative response).
A. And then he may call me for the same reason.
Q. Okay. All right. How many auditing teams are there?
A. You know, I knew you were going to ask me that, and I don't have the answer. I can see the map, but I can't -- I can see the -- I can't tell you how many.
Q. All right. Is it one for each region?
A. Yes, it's one for each region.
Q. Okay. And how many people are for each team?
A. Well, you're going to have a team leader, and then that person can assemble the team he needs as he goes. You know, there's no set number, as I appreciate it.
You know, we're trying to get them to include medical, especially at the larger facilities, but we haven't mandated it at this time. And, you know, again, if you're going

into a facility that you knew you had an issue with medical, you may want to bring medical with you. If you had an issue with any of the other disciplines, you know, you may want to bring that person with you.

The BJG team leader may or may not be a security person. It could be someone who does not have a security background. And in that case, they typically are going to bring a security person with them, so.

Q. So, it's really entirely up to the team leader? There's not a requirement?

A. I would read the BJG guidelines before I would go out and just go it's entirely up to him, but that's the one person that's consistent. It's not a set team.

Q. Okay. All right. But it's at the discretion of the team leader; is that right?

A. Again, I'd have to read the current one to make sure that I'm not contradicting it, but I know that that person is responsible for assembling whatever team they decide is necessary, and if it is regulated, they were going to follow that.

There was talk about adding a component

for medical, and I do not believe it's been added at this point, but there's talk of adding one for facilities that house over a certain number of inmates, but I don't believe that's been implemented yet.
Q. Okay. All right.
A. If it has been, then that's going to be there.
Q. Okay.
A. But we still encourage them to.
Q. Okay. I don't think that there's anything in the guidelines that tells the team leader, just to tell you that. So, if -- assuming that most of us are remembering correctly that there's nothing in the guidelines telling the team leader who has to be on the team, then it's the team leader's discretion; is that right?
A. Well, I can agree with that. But where I'm coming from is I've seen so many drafts of things we've talked about doing that sometimes I have to go back and pull the BJG and remember the language we put there because we definitely were talking about mandating a few certain team members on some of the larger facilities. So, you know, that's why I'm

getting a little cloudy in my own memory there what we enacted and what we didn't.

Q. Sure. And so, you were talking about medical. You were talking about security. Are there other specific areas that would be cov -- that you have talked about mandating for that team leader?

A. Well, medical is the one that jumps out at me. Other ones as needed. Again, if we have somebody whose background was not security, which Megan, for instance. She used to be a team leader back in the day. And I'm not going to say she has never worked in security, but if she does -- if she did, I don't remember it. She's always been in an administrative role. And there's been other people like that.

So, again, you know, they can go through and do standards, and they can audit, and they can do -- it's no different than a correctional officer can, in fact, see if they're meeting their criteria in areas outside of security in custody.

But, you know, the most important thing to know is what you don't know. And sometimes

they'll bring people to augment or supplement the team for that. But medical is the one that jumps out to me.
Q. Okay. All right. And is there any reason why the composition of the team will -- you know, I know that you've said you talked about doing that. Is there any reason that that hasn't been done or that hasn't been incorporated?
A. Absolutely. The reason we did -- and I know you're going to ask me why, I'm sure. The reason why is we've been in the middle of a nursing shortage during COVID. There's so many traveling nurses. We've had to contract and bring people in to meet our own needs.
So, while we think it would be best practice or a better practice to incorporate that, we did not mandate it for that reason. It's a matter of -- it's a staffing issue. How do we take somebody out of a patient care area and put them on an audit team, you know. It's priorities. But I know we are moving in that direction.
Q. Okay. So, the general responsibilities of the team leader, I think we've touched on them, but I just want to make sure I understand.

It's to conduct these audits. It's to do -- you know, to check over the monthly reporting from the facilities. What else?
A. You know, I see it as -- let's just take Rapides, who we mentioned them earlier. If Rapides has a BJG team leader, anything that occurs with Rapides, the BJG team leader is typically my go-to person. You know, even if we get a complaint via social media, you know, a lot of times we will refer that to the BJG team leader for investigation, or to gather intelligence on, or if there's, like you said, reporting to to verify the accuracy in reporting. Post incident, if we have an incident, the BJG team leader has been the go-to person for that as well.
Basically, anything that occurs outside of normal, daily activities, that's our point person because they have an established contact and an established respect with the institution. It's almost like a liaison in addition to the auditing capacity.
(Mr. Vining exits the deposition.)
BY MS. CUMMING:
Q. Okay. And how much time do you expect those

responsibilities to take up?
A. How much do I expect them to take up? That's an as-needed thing. I hope it doesn't take up a lot outside of their audit and their report. Now, is that always the case, no. I can tell you that it has grown over the years.
I think our expectations of them has risen, and for that reason, there's things in the works to hopefully take some of that off of them down the road, but that's where we are today.
Q. Well -- so, currently, let's say, you know, we'll take the northeast region and all of the facilities in the northeast region. So, there's the annual auditing, and then whatever reporting requirements, all of that. I mean, in an average year, roughly, how much time? Like, what percentage of their work time would you expect to be taken up with team leader duties?
A. Just to say they worked 2,080 hours a year and how much it's tied to that, I mean, if they're just doing 10 parishes, you know, you can figure that's 10 8-hour days just on the annual reports. Then you can figure the time

to do the documentation, and that's going to be another -- I don't know. I mean, I don't know.

Some of them are faster than others. So, it's hard to give you an exact time frame on that or even a good guess, in all honesty, because then you throw in if there's complaints, if there's issues, if there's incidents.

Sometimes they just pick up the phone and make a phone call, and we feel like we're good. Other times, we send them in, you know. So, it's not as easy as to just tell you a percent or a number of hours.

Q. Okay. But you, as the director of operations, you have expecta -- you have an idea of what these team leaders are supposed to be doing to fulfill their responsibility as team leader. You have an idea of how much time some of that takes. And I understand that some of that is going to be dependent on how many incidents there are and how many complaints, but roughly, your expectation as the ultimate director of operations for these people, what is your expectation of how much of -- like,

you know, what percentage of their job responsibilities are going to be dedicated to this?
A. My expectation is they get the job done whatever the time frame requires, you know. Again, I can't give you a -- I expect if they're going to audit, that's an 8-hour day right there. So, the number of facilities they have times eight. Then you have to figure the documentation, and I would give another two to four hours for that per institution.
And then the incidents are going to be based on how they occur, and I can't tell you how many incidents I expect there to be, you know. The number has grown over the years. I can say that. I mean, the demands on them have gone up. So, I mean, it shouldn't be more than 10 percent of their overall job duties. I can't imagine it being more than that.
But, you know, in some cases, it could be less, and in some cases, it could be more in special circumstance, but that's really me pulling a number out of the air, you know. I

expect their warden to reach out to me if it's interfering with their other jobs with -- interferes with their full-time job.
Q. Okay. All right. That kind of gets into the other question. The team leaders, they have full-time jobs doing something else; is that correct?
A. That's correct.
Q. Okay. And it's -- Tyrone Mays, he's the team leader for the northeast region; is that correct?
A. That's correct.
Q. And he's the person who is responsible for the monitoring, the auditing, and then everything else that you've described as what the team leaders are supposed to do, correct?
A. Correct.
Q. All right. Are the team leaders paid anything additional for being a team leader?
A. Yes, ma'am.
Q. What?
A. Not enough. It's a percentage. It's a percentage of their base pay. I believe it to be 5 percent, and it was at the time in which they started this job. So, if -- like, Tyrone

Mays, he's now an assistant warden. I don't know what rank he was when he started these duties, but I can tell you, if I'm not mistaken, and I didn't look into it for this reason, but he makes $1.77 an hour is what he makes. And I can tell you on the other end of the spectrum, we have a young lady that's making about 82 -- 72 or 82 cents an hour. So, they all make somewhere between those two numbers. That's the low and the high if my memory is correct.

Q. Okay. And so, for Tyrone Mays, if he started as -- he started as team leader as -- I know he told me, and I can't remember. But let's just say he started when he was a lieutenant as team leader. He's getting paid 5 percent of his lieutenant salary as compensation for his team leader duties?

A. That's correct.

Q. Okay. Anybody else that comes on the audit as a member, are they paid?

A. No, ma'am.

Q. Okay. What is -- how are team leaders selected?

A. Typically, the warden at the facility submits

names. You know, let's just say Tyrone Mays retires tomorrow, then I'll reach out to Warden Dauzat and ask who -- I say I would reach out to her. A lot of wardens are proactive and will send me an e-mail and say, you know, Warden Mays is retiring effective such and such day. I would like to recommend captain so-and-so or major so-and-so to fill that spot. So, you know, that's how that's done.
Q. Is there an approval process?
A. Yes, ma'am.
Q. What's that process?
A. I say "approved."
Q. Okay. Do you do any interviews, background checks, looking at their prior experience, anything like that?
A. I talk to the warden who, in fact, they worked for and has a good knowledge of what the expectations are, and that's how that goes. So, no, there is not a formal interview process. And quite honestly, these aren't sought after jobs. I would like to see that changed, but right now, if we have someone who has a reasonable amount of time in the

department, reasonable rank, and has the desire, you know, I'm of the opinion we give them a shot and see if they're able to do it.

Q. Do they get any training, or orientation, or anything like that?

A. You know, there is a training. We do an annual basic jail guidelines training at one of our conferences. Now, as far as the initial, I will send people with them, and they'll do some OJT, but as far as actual training itself, I haven't -- I haven't looked at the curriculum, or if I have, it's been quite some time.

Q. All right. The annual BJG training that you're talking about, that's the Lake Charles conference?

A. That's usually where it occurs, yes.

Q. Okay. And there is a curriculum for that, correct?

A. Yeah. I would have to defer that to Meg. I'd have to go back and look. I would hope that there's a curriculum, yes.

MS. CUMMING:

Wayne, I've sent you some e-mails about this, but I'm just going to

reiterate our request for that. Those documents.

BY MS. CUMMING:

Q. So, for -- so, that's the team leaders. For the members, so anybody that the team leader wants to take with them, is there any kind of approval process for that?

A. No, ma'am, not to my knowledge. I mean, the -- the -- I can tell you, it goes back years ago. I actually was on a team on occasion, and it was basically the team leader requesting from the warden at the facility, Can I take you? Because obviously, whoever is on the team has a job, as we've discussed, and that's going to be the one day they're not on the job and they're not on leave. So, typically, the warden or designee at the facility approves it.

And I can tell you that on the ones I did, there was no formal training. It was "here are the standards," and, you know, "this is in your area of expertise."

Q. Who does the northeast regional -- well, Mr. Mays -- or Warden Mays. Who does Warden Mays report to in his capacity as team leader?

A. In his capacity as team leader?
Q. Yes.
A. Okay. Then he's going to report in that capacity to Megan Kent.
Q. Okay. Does he ever report to you?
A. I'm not going to tell you that we haven't had a conversation, but not routinely.
Q. Okay. Have you ever gone on an audit with Warden Mays?
A. No, not to my recollection.
Q. And in terms of the audits, they're done by the team leader at least and maybe whoever else the team leader wants to bring, but they go on-site, correct?
A. Yes.
Q. All right. Do they -- how much advanced notice do they provide to the facility before they -- before they go on-site?
A. I'm not certain.
Q. Do you know, do they request documents to review in advance of going on-site?
A. Again, I'm not certain of that either.
Q. Do they review documents on-site?
A. Yeah, they definitely do on-site.
Q. Okay. Do you know what documents they review

on-site?
A. I know they're going to review the fire marshal's deal. I know they're going to review DHH. The basic jail guidelines spell it out, you know, as to everything they look at, so I can't tell you all the documents, but I know those are being reviewed.
Q. Okay.
MR. STEWART:
Elizabeth, we're at about an hour and half past our last break. Can we take a brief break for the restroom?
MS. CUMMING:
Sure.
And maybe, Lorie, while we're on the break, could we just --- could we get a total hour count when we come back?
THE REPORTER:
(Nodded head affirmatively.)
MR. STEWART:
Come back at about a quarter after?
MS. CUMMING:
Sure. Yeah. That works.
(Recess taken.)
BY MS. CUMMING:

Q. So, I want to -- in terms of, like, what is actually being audited, so you said the mandatory provisions, the provisions in the basic jail guidelines that are noted as mandatory, in parenthesis, those are the ones that have to be audited annually; that's correct?
A. Correct.
Q. Okay. Is there anything else that has to be included in that annual audit?
A. They have to check the fire marshal and the department of health. Other than that, nothing comes to mind.
Q. Okay. And then for the every -- all of the other provisions that are not marked as mandatory, how frequently are they audited?
A. I believe the big audit, the third-year recert, they are going to be done, and it doesn't mean not done at the annual. They're just not mandatory.
Q. Okay. And so, if they happen to be done at the annual, is that noted in the annual audit?
A. It should be, yes.
Q. What sorts of reasons would there be to include non-mandatory provisions in the annual

audit?
A. Well, the two jump out to me is, one, if you have a facility that you knew had an issue with one of the non-mandatories before, you may want to verify that they, in fact, did either fix it or maintain the fix that we had instituted.
The other one would be if there was an issue that had occurred over the last audit cycle and, you know -- you know, maybe we had an incident we had to respond to, and because of that, they want to check one to make sure that they're in compliance.
Q. Okay.
(Discussion off the record.)
BY MS. CUMMING:
Q. Okay. Are you aware, have auditors ever -- either at the facility or away from the facility, has a team leader ever asked to get documentation or information from a local facility, and they weren't able to get it?
A. Not to my knowledge. I'm trying to think if that's ever happened to my knowledge. I -- I can't remember if it's occurred.
Q. Okay. I want to switch gears a little bit and

talk about -- we've touched on classification a little bit, but I just want to talk a little bit more generally on it.

Does the -- well, let me ask this: What is your understanding of what a classification system is?

A. Oh, that's a very broad question again. Classification is not my background, nor have I spent a lot of time in classification, but classification, in theory, as I see it, is a way of looking at the whole picture of an individual to determine where they should be for the safety of the institution as well as the safety of the public, meaning that you're going to look at a combination of factors, such as how long they've been incarcerated, disciplinary record, what their charge is to determine where they can be best protected from -- or protect the public from them, as well as protecting them, I guess is the best in a nutshell. I'm grasping at those words, but that's kind of where I'm at.

Q. Okay. Yeah, no. That's helpful.

So length of incarceration, disciplinary history, charges. Would institutional

behavior sort of be included in disciplinary history?
A. That's what I -- I would include that in disciplinary history, yes.
Q. Okay. All right. And so, that is for the safety of the public, but also the safety of the person who's being classified and for the institution. Any other reasons it's important?
A. I'm sure there are, but I'm drawing a blank as to any.
Q. Okay. So, the big one is safety, everybody's safety?
A. Oh, yeah. You don't want to put an escapist out in the public. You don't want to put, you know, someone that maybe has a -- significant sex offenses. There's obvious reasons you don't want to just put just anybody out on the road crews, so to speak.
Q. Okay.
A. There's other reasons, too. That's just, I mean, one of the more obvious ones.
Q. Okay. Right. And just in terms of, like, where you're housing people, even in the facility, does classification matter in terms

of, like, who you're housing together and, you know, whether or not it's on an open flat or in cells?

A. That's -- there's two different aspects to that. One of them is not classification. One of them would be an inmate -- inmate -- sorry -- enemies. You don't want to put known enemies together, which may be a classification function, but it's not a classification system, meaning that, you know, two guys can both be minimum, two guys can both be trustee material, but those two guys -- you know, one of them may have killed the other one's sister. So, you know, that's where that comes in. It's not necessarily in the gamut of what I just said, and it doesn't reclassify either one of them, per se, as to what they are.

Now, so, as far as housing goes, as I see it, classification is more about whether they are appropriate to be in an open dorm, or whether they need to be in a cell, or a mix of that, you know. It's, like, working cell blocks where they, you know, may sleep in a cell and are allowed to do things during the

day. So, all that comes into play.
Q. Okay. All right. So, they're -- okay. Does the department have a classification system for people, and I'm talking in the, like, the main state-run facilities?
A. Absolutely.
Q. Okay. I'm going to show you what I believe is Exhibit 10.
(Exhibit 10 to be marked for identification.)
BY MS. CUMMING:
Q. And tell me if you need me to blow it up or anything like that.
A. I can see it.
Q. Okay. Great.
Is this -- have you seen this document before? I can scroll down. Tell me if there's something you want me to stop at so you can read it. And there's the end.
Have you seen that document before?
A. Yes.
Q. Okay. And what is this document?
A. It's a department reg. The numbers have been changed. It's no longer B-02-017, but it's the classification, sentencing and service functions department reg.

Q. Do you know when the numbers were changed?
A. No. As I talked earlier, I know we went to a different numbering system, but I don't recall the date, nor do I recall the date range.
Q. Okay. And this states it's the policy -- I'm going to go down to page 2. The policy is to provide for a classification plan, a written classification plan, and it says to "specify objectives of the classification system and methods for achieving them and provide a monitoring and evaluation process to determine whether the objectives are being met."
Do you know what that means?
A. Which part? What are you talking about?
Q. Well, let's start with a written offender classification plan. Do you know what that is?
A. There's a penitentiary directive at each institution that basically follows this department regulation, so that is the written plan.
Q. So, that directive. Okay. And then the objectives and methods for achieving and monitoring and evaluating the process, do you know what sorts of things would be -- you

know, how you would monitor and evaluate, you know, whether or not there are -- the plan is achieving the objectives?
A. You know, that's a -- that's a good question. I know that we do yearly audits, just like we do B -- basic jail guideline audits. We do audits from the state facilities where we audit them, and we look at the classification plan then. That doesn't stop the institution itself from doing whatever they need to monitor it, but we monitor it from headquarters at least yearly.
Q. Okay. And when those monitoring visits happen at a state facility, is there someone who is tasked with looking, you know, exactly at the classification plan?
A. Sure.
Q. All right. And so, there is an annual monitoring visit, and so that is one set of people who's responsible for monitoring and evaluating the process. Does the institu -- does the state facility have someone who's tasked with monitoring and evaluating the classification --
A. You know, the -- I'm sorry. I thought you

were through. Go ahead.
Q. That's okay. Just monitoring and evaluating the classification plan? Okay. Now, go.
A. Okay. The classification director at each facility, I would say that the responsibility would fall on that person, but I don't know about a formal tool or instrument that's being used.
Q. Okay. And then this also makes a reference to a statistical risk category. It's down here in this second paragraph of the policy. Do you know what that means?
A. "Statistical risk categories shall be used as an instrument for custody and security classification." Yeah.
Again, classification is not my strong point, by any means. I would want to insert the TIGER tool, which actually is a risk/needs responsivity tool, but I can't tell you with a hundred percent certainty that that's what that means.
Q. Okay. So -- but your -- your educated guess is that there is a statistical tool that can do risk assessment, and that's part of what this policy is calling for is, you know, kind

of thinking of an objective way of kind of evaluating and quantifying risk?
A. We do have a tool that's a risk tool --
Q. Okay.
A. -- being LARNA, and then, like I said, TIGER, currently. And we -- perhaps there's other ones out there on the market that could be bought. That's kind of how I see that, but I can't tell you that that's exactly the intent. I'm not sure.
Q. Okay. Yep. And then the definitions down here, I want to look down at initial classification. What is your understanding of the point of initial classification?
A. Well, when we process someone in, and that could be numerous ways, but let's go the most typical way. We have someone from the courts or the local level that comes in through our reception center, and they get processed through, and then it gets sent to the receiving institution "insert name here."
Whenever they receive them there, they do an initial classification. And that's where they come in, and they look at what is available to them. I mean, you can look at

things such as the age of the offender, the size and stature of the offender, the charges they have, any disciplinary that you're aware of to help make an initial classification. You know, it could be as simple as -- something as simple as, you know, if you have a young, small quote/unquote weak individual that -- you know, you have strong arms and weak arms. He still may be a medium security, but based upon where he's at, we're going to put him in a unit that's got more people like him than not, you know. That's one thing that can happen. Again, it's the first assignment when they get there.

Q. Okay. And so, part of that first assignment is you're not just looking at levels. So, it's not just, you know, you're going to put all the mediums together, and it doesn't matter, like, what all the mediums are. If you've got a 300-pound guy that is 30 years old, and he has a sex offense, and then you've got a 19-year-old who is, you know, 150 pounds soaking wet, you may not put those two people together because they are -- even though they're both classified as medium; is that

right?
A. That's, like I said, that's one thing taken into consideration. Also, you can look at their medical needs, their mental health needs. I mean, all that comes into play. It's -- in -- in my mind, initial classifications, we tend to be a little more conservative, meaning that, you know, he might meet the criteria to be a trustee. He might meet it all the way around. But before, you know, if I'm the warden at that facility, before we make them a trustee, he's going to have to be there a little while. Or even within the medium security dorms, there is higher-level ones that, you know, I hate to say they're nicer, but they just are. They're more privileged areas.
You know, if I'm not sure if someone is appropriate for a dormitory assignment upon coming to the institution, I prefer him to go to a cell block briefly. Now, preferably a working environment where they're able to get out, and they're not there extended periods of time, but that's what the initial classification is.

Q. Okay. All right. So, you're looking at -- so, I understand the trustee analysis, but the other thing that you are looking at is you are looking at, you know, conservatively trying to guess and predict who might have trouble with each other if they're living on the same unit and, you know, maybe trying to not set up that problem; is that fair?

A. Well, it's not a perfect system. You can put two bulls in the pasture, and they're still going to bump horns, you know. So -- but, again, there are some that we try to go a little above and beyond and try not to put, you know, the minnows with the sharks, so to speak.

And it's not always possible, and it's not always something you're able to see. You know, you may have a great, big, strapping, young man that's weak mentally. So, it's not a perfect system. But ideally, you know, you're going to look at the ones that we have no control over -- I say no control over -- the ones that don't change. You know, we do know this guy is this age. We do know this guy is this mental status, you know, as far as

IQ goes or mental health goes. This is what his charges were and things of that nature. The other gets a little more subjective.

But I would like to think our classification boards try to look at all of that. That's why it's a diverse board. It's not just, you know, correctional officers or classification officers. They can try to take all that into account.

Q. Okay. Oh, and that goes a little bit further down into this page. The board. So, it's a group of people with, it looks like, with a range of backgrounds. So, social services, medical/mental health, security classification. So, it's people with a bunch of specialties who are all kind of looking at this person that's coming in and thinking about, you know, what they know about how institutions work, how people are, identifying factors, and sort of taking all of that knowledge from that range of backgrounds; is that correct?

A. Yes.

Q. Okay. And so -- and reclassification, going back up to that A, and then 2, this

definition, what's the point of reclassification?

A. I'm not sure if it spells it out later in the policy. They can be reclassified for a number of reasons, and I don't know if there's a time frame where it's automatic, but they can be reclassified at their request, or at our request, or following disciplinary are just three that pop to mind.

Q. So, is there something that happens, there's some institutional behavior that, you know, adds to the information that you know about this person and how they interact with other people or how they are that goes into, you know, decisions about where they're housed and who they're housed with? Is that part of what reclassification does?

A. Yeah. It can be.

Q. Okay. And then down here on 2 and getting into page 3, this is custody levels. So, here it's talking about maximum custody, and it describes that this is appropriate when -- "based upon the need to protect the offender, other offenders, the public, staff and/or the institution," correct?

A. Correct.
Q. So part of the -- part of the thinking in assigning custody levels is trying to determine how to keep the person that you're classifying, other people who are in the facility, the public, and the staff, and the institution as a whole. It all goes to sort of keeping everybody safe; is that fair?
A. Correct. Now, a decision can be made based upon -- I mean, all that is brought into the decision making process, but when it says "based upon the need to protect the offender," okay, if you just stop right there, there's some offenders that, especially upon initial classification, we may put into maximum security for their protection and see how they transition to prison.
The other case there is someone may declare an enemy concern. You know, someone may check them self into protective custody. So in that case, you're doing it to protect that offender. But all of those -- it doesn't mean that each time we do it it's based on all that.
Now, it can be. But, you know, if we have

somebody that's a trustee that literally comes and says, "Hey, Boss, I need check PC," and they may or may not tell you why initially, and then we do an investigation to determine if it's valid, but, you know, they may have gotten to a gambling debt or a situation where they've got somebody that's trying to do them something, and they know that, and they're trying to check out.

So, sometimes it's one hundred percent about protection of the offender. Other times, you have someone who is, you know, violent, has committed violent acts, and in that case, it's for other offenders or the public. So, I just want to specify that it's not necessarily all of those every time.

Q. Okay. That's helpful.

These are some of the considerations, but safety is the paramount consideration, someone's safety?

A. Oh, absolutely.

Q. All right. And then, the general classification procedures. We're on the bottom of page 3. It's 7A. It's says, "The primary objective of the facility's

classification plan shall be to maximize the stability within the facility by assuring proper offender custody and work assignments."
Maximize stability, do you know what that means?
A. Yes. I interpret that as to, you know, having the least amount of issues as possible within a facility through the proper classification. I mean, I don't know how to word it any differently.
Q. So, the least amount of issues. That would include, you know, least number of escapes, lowest number of fights, lowest number of sexual assaults, things like that?
A. Correct.
Q. Okay. So, classification. Part of the job is to try to reduce as much as possible, you know, when people are fighting with each other, or assaulting each other, getting into any other kind of trouble; is that fair?
A. That's fair.
Q. Okay. So, do all of the main camps, the state-run prisons, have to abide by this policy?
A. Okay. Yes. When it says there that the

"warden shall establish written procedures for a unit-specific classification plan," each of them has to do that, and the classification plan which they have has to fall -- you know, this is a broad guideline. They can be more specific. They can say, you know, mediums have to be housed on unit such and such, minimum have to be housed here, where we don't tell them at this level. So, it's just getting a little -- a few more feet closer to the ground, so to speak, but they're unit-specific that has to fall underneath this umbrella.

Q. Okay. So, the wardens can say exactly how this general policy is put onto the specifics of their institution. Like, what units are being used for what, how you're evaluating people, who all is sitting on the classification board. The wardens decide how to actually implement this policy; is that fair?

A. It can be more specific than the regulation but, yes.

Q. Okay. But what the wardens are doing has to comply with the general contours of, you know,

what this regulation is requiring; is that right?
A. Their internal regulation, their internal penitentiary directive to not be in conflict with this, correct.
Q. Okay. All right. And how does the department ensure that the wardens are implementing this regulation?
A. Well, that's part of our annual audits. Whenever we audit, we pull the classification plan, and we look at certain things, but basically, all our state institutions are ACA accredited, and we use the ACA standards. And they're standards specific to classification in which they look at. And those standards, when they put together a file, it's going to have the ACA standard, the department reg, and the corresponding penitentiary directive or institutional policy.
So, that's when they audit the files. They have that, then they'll actually go see some of the practice as well. And then every three years we have the outside group that comes in and does the same thing with outsiders looking at us. So, that's how we

assure that's being done.
Q. Okay. And so, what sorts of things? So, I understand that you're looking at the regs and policy, and then you said that the audit -- the annual department auditors are looking at, like, how that happens in practice; is that correct?
A. Yes.
Q. What are they looking at for that?
A. There's a whole deal of supporting documentation with these files. Okay? So, you know -- and we can go above and beyond that and ask for more, but again, you know, when they have the reg, they have the file, I mean, the institutional policy.
It may have something, as supporting documentation, showing where, you know, Offender A was reclassified from a medium to a minimum. It may show where one has had their classification go the other way. It may have some immunity -- im -- I'm sorry. My tongue is getting tied -- initial classification boards.
The other thing, though, that will happen is they'll pull a sample of, say, you know,

Class 3 trustees, and then verify them. And maybe they'll pull, you know, 10 or 10 percent even and check them against the criteria and see if they meet that. That's one of the things that we definitely look into.

Q. Okay. So, there's sort of, like, a random sampling component of these audits where they're actually just going into the classification -- set of classification records that haven't been pulled prior to their arrival in the facility, and just say, All right, give me every fifth one on the list, and I'm going to look at these, something like that?

A. It would be something like that. The auditor that actually conducts that would have to tell me the exact method they use to pull a random sampling, but they do pull a sampling and do that periodically because I know when we find things, we make corrective action. So, I know that happens.

Q. Okay. And the outside auditors. Who are the outside people that come in and look?

A. The outside auditors are determined by the American Correctional Association. They have

trained auditors. I'm a trained auditor myself. So, you know, they pick other states that come in and look at us.
Q. When you are doing ACA audits, do you look at random record samples?
A. Yes.
Q. What's your methodology for randomizing the records you look at?
A. Well, it depends on the institution. The last one I did was very small, and I think I looked at every one because they only had seven inmates. So, you know, in that case, we actually reviewed -- I think they had seven when we got there and nine when we left or vice versa. That's the first time that I looked at one hundred percent, and I made a point of telling them that.
So, aside from that, you know, you may -- it's -- if it's not spelled out in the standard, and it may be, and I only do international audits, so my audits are a little different than what we do here, if it spells out how to do it, then you have to follow the formula given, but if not, I just ask for X number, depending on the size of the

institution, so.
Q. Okay. All right. How do you determine what number you ask for depending on the size?
A. I mean, what's reasonable with the time you have. It's not -- like I said, the standard that we do with the international prisons depending upon whether -- it's different because it's a different set of standards than what we do. So, I don't know that it really correlates. All the facilities I've done have been relatively small. It's been real easy, I mean, to say give me 5, 10, 15, which may be half the population.
Q. Okay. All right.
A. So, I don't do audits like we do here.
Q. Okay.
A. It's apples and oranges, quite frankly.
Q. Okay. All right. So, just sort of, like, generally talking about kind of, like, looking at a random sample of records, would you ever look at a single preselected record and deem that sufficient to establish that, you know, whatever policy is being implemented?
A. Absolutely not. And I can tell you, in the audits we do internally -- again, you know,

classification, I don't want to say exactly how they do it. I don't know. But I can tell you that medical will go down, and they'll have a list of -- and I think they do have a number that we make them do. We may have a number we make them do in classification as well. But they'll do, like, 20 -- 25 percent or 40 -- not 25 percent. Maybe 10 percent or 40 charts or whatever the large number is that spells out that we make them do. And they literally will ask healthcare, if it's, like, say, inpatient, say, a goal is to get 70 people in there, then if the number is 10, they'll just take a highlighter and just, here, I want these ten, and then go do it. We're not going to be predetermining records, though. I mean, of course, if you let me do that, I'm going to give you the good ones.

Q. Okay. Okay. So, the criteria -- so, this policy that we've been talking about in Exhibit 10, this kind of lays out what the criteria are for a classification policy and procedure; is that fair?

A. Yes.

Q. Okay. And then is this criteria also -- or do

the local facilities also have to follow the criteria for an appropriate classification system that's found in this reg?
A. They'll follow this -- go back to the very beginning of the reg. I want to make sure before I say something wrong.
Q. Yeah.
A. Go down. Keep going. It should be applicability. There we go. I'm making sure that it doesn't specify something I'm not aware of, and it doesn't.
So, I would be right in saying that this is not applicable to the local level. The basic jail guidelines are.
Q. Okay. And so, for the basic jail guidelines, that's the criteria that would be found in provision II-A-12? And I can go back and show it to you.
A. I would have to see that.
Q. We're going back to Exhibit 2, page 20. So, this is provision II-A-12. It says, "Classification System." And this provides -- this is in Exhibit 2. So, the 2022 basic jail guidelines. So, this is the classification system that is required of local facilities,

correct?
A. Correct.
Q. Okay. For written offender classification plan, what does that mean?
A. I'm sorry. Say that again.
Q. Written offender classification plan, do you know what that is or what that means?
A. It means one in writing.
Q. Okay. What is a classification plan?
A. A plan that spells out how you classify somebody.
Q. Okay. And it includes custody required and assignment to appropriate housing. So, custody required and assignment -- yeah. Help me unpack that. What does that mean?
A. Custody required, that would be the custody of the supervision is how I would appreciate that. Assignment to appropriate housing, meaning, again, if we're going to do a minimum versus a medium, and then assignment to appropriate housing to house that.
So, again, if you have a trustee dorm, which not everybody has, but if you do, you're not going to put somebody who's a medium in there.

Q. Okay. And then down here where it says "Offender management and housing assignment considers age, gender," those are all self-explanatory, I think. Legal status. What does that mean?
A. You know, I was sitting here looking at that. I have no idea what legal status would be other than, you know, if they have a detainer maybe because we do -- that does come into classification if they have an active detainer.
Q. Could it be --
A. That's the only thing I can come up with there, and I don't know if that fits.
Q. Okay. Could it be, like, sentenced versus pretrial?
A. I'm not in the pretrial business. I wouldn't mandate what they do with the pretrials.
Q. Okay.
A. So, I wouldn't think it means that. I wouldn't take it to mean that.
Q. All right.
A. The jail guidelines are not applicable to those that are pretrial.
Q. Right. But in local facilities where you

might have both pretrial and sentenced people, does the department have any guideline or recommendation regarding how sentenced and pretrial people are held, you know, whether or not they're held together or separately?

A. Nowhere in the basic jail guidelines does it prohibit it. You know, we have gone on the record as to say that, you know, if possible, we would prefer them not to, but there's nothing that mandates they're separate, to my knowledge.

Q. What about custody needs? What does that mean?

A. Custody needs, again, it goes back to the custody needs of that offender. You know, you could have somebody that's wanting PC. It may or may not even be available at the local level, but they can transfer them to us. You know, you may have somebody that's acting out that needs to be put in a cell. That could mean a lot of things.

Q. And behavioral issues?

A. I think that's self-explanatory. I mean, someone that's having behavioral issues. You know, we're going to consider behavioral

issues depending on where we put them. And behavioral issues could be if this guy, you know, has a -- I hate to say it -- the guy that masturbates, you know, or this could be a guy that's a known instigator in fights. But, you know, this is where it all comes kind of to a heel.

We can have somebody with a lengthy history of behavior issues, but we don't throw them away. We don't give up on them, you know. There was a time when they might be put in a cell and let them sit forever, and I think we've determined that that causes its own unique challenges. So, you may have somebody with behavior issues, and you still put them in a dorm. You know, you still give that opportunity. At the state level, we do.

But you consider all that. That's the whole thing. It's not dictating that someone with a behavior issue goes to a cell, nor is it dictating they go to a dorm.

Q. And when we were talking about the department reg on classification, one of the things that was -- it was pretty clear that the purpose of the reg was, I think the phrasing was, to

maximize stability. So, to reduce the number of incidents to keep everybody safe. You know, whatever consideration is paramount in making the decision, safety is the thing that is sort of driving it.
Is there any reason that that, you know, maximizing stability and safety, is there any reason that that wouldn't also be sort of the purpose behind all of this classification system requirement in the basic jail guideline?
A. Sure. I think maximizing the stability is important. But now, having said that, it's real easy to say, well, let's put them all in a cell. If we put them all in a cell, we're not going to have to -- just never let them out. We're not going to have any fights. We're not going to have any issues. Also, we're going to, you know, make people worse. So, it's a delicate balance.
Q. Okay. But part of the consideration of, like, where you house people, who you house people with, and, you know, what that housing looks like, that balance is maximizing stability, which also includes reducing fights and

assaults while keeping in mind kind of that you don't want people sitting in a cell in isolation all day long; is that fair?

MR. STEWART:
Objection as to form.

THE WITNESS:
I really didn't understand the question, in all honesty.

MS. CUMMING:
Sure.

THE WITNESS:
I mean, maximizing stability, again, you know, if you really want to maximize stability, let's put them all in a cell. We'll be safe. But that's not realistic. So, I think, you know, we have an overall overarching goal of corrections, you know, and programming, and reentry, and trying to release a better product than what we get.

So, you know, that comes into -- you know, I can nitpick that verbiage to death, but you definitely should consider, you know, institutional stability while classifying inmates if

that's what you want me to say. It definitely is a consideration, but it's not the only one.

BY MS. CUMMING:

Q. Okay. So, yeah. You're also thinking about the well-being, the safety of the inmates; is that fair?

A. I'm thinking about all of that. I mean, we're not going to put a known offender out in a position where he's got an opportunity to exercise a predatory behavior, but at the same time, we're not going to lock him up in cell for the rest of his life either, the rest of his incarceration, because at some point this person is going to get out.

So, you know, if he's with us three months, three years, or 30 years, this is our opportunity to give them the opportunity to change. Are they going to embrace that opportunity? I don't know. But, you know, it's oversimplifying it, and I know it's our own regulation to say that the stability of the unit and safety is paramount. It's a strong consideration. And we don't want to do anything to knowingly rock that

boat, but at the same time, if that's our only focus, then we're looking in the wrong direction.

So, you know, I don't know if I'm answering it the way you want me to or if I'm answering the question you asked even, so I was a little lost.

Q. Okay. Yeah. Let me help clarify. That's all -- that's helpful, but let me help you clarify.

I guess I'm thinking less about lockdown and more about, so you say -- like, you know, you've got -- you have a bunch of open flats. You have a bunch of dorms. And you have a bunch of people who are medium custody, but not all medium custody people are going to get along for whatever reason.

A. Uh-huh (affirmative response).

Q. And so, as part of -- what I understood your previous testimony to be, and tell me if I misunderstood, that maximizing stability doesn't just mean locking everybody down, but it also means thinking about who doesn't get along and figuring out a way to make sure that people who don't get along, who are going to

get into fights with each other, even though they're all medium custody, they don't necessarily go onto the same dorm. Is that a consideration in maximizing stability?

A. Absolutely.

Q. Okay. And so, is there any reason that that consideration towards maximizing stability by reducing the number of fights by being strategic and thinking carefully about who doesn't get along or who is not likely to get along on an open flat and making sure that those people don't end up on the same open flat, is there any reason that that animating principle that's in the DOC reg, that that wouldn't also apply in this basic jail guideline provision on classification?

MR. STEWART:

Objection as to form.

THE WITNESS:

I don't know why it would not apply today.

BY MS. CUMMING:

Q. All right. So, okay. Let me go to what's going to be Exhibit 11.

(Exhibit 11 to be marked for identification.)

BY MS. CUMMING:
Q. So, this is titled "Basic Jail Guidelines Checklist," and I'm going to go down to the classification section, but you can sort of see generally what this is. It's got the provision. It's got comment, protocol, documentation, and then it's got some check boxes for self-evaluation and guideline.
Have you seen just this general document form before?
A. Yes.
Q. Okay. What is this?
A. I mean, it's exactly that. It's a checklist. It's a place for them to -- when I talked about building files earlier, this is, like, if you pull this part of the basic jail guideline audit, it has an opportunity for them to show how they need it and whether they think they need it or not prior to us coming in saying whether we think they need it or not.
Q. Okay. "They" being local facilities, correct?
A. "They" being what?
Q. Local facilities?
A. Yes, ma'am.

Q. Okay. And the -- so, the local facility is using this checklist. Are they completing this prior to the audit?
A. No. I've never done a local-level audit, but it would be -- this is -- mirrors what we do with ACA. So, my assumption would be absolutely they would do it. I wouldn't expect them to do it that day. I would hope that they feel like they're ready for us.
Q. Okay.
A. So, I would assume that this is being done prior to us coming, yes.
Q. Okay. Is this something that the auditors would look at?
A. Yes.
Q. Okay. Would this be kept -- I've heard reference to basic jail guideline files that are kept at the local facilities. Would this be one of the things kept in that?
A. I would hope they would keep a copy there, yes.
Q. Okay. Is there any copy that is kept by any department personnel?
A. You know, not to my knowledge. We have more of a, if my memory is correct, more of a -- we

have each one broken down on, like, a spreadsheet where it says whether they're compliant or not. I don't know that I see this actual piece of paper. So, I'm not aware of where we keep it.

Q. Okay. I think we may get to that in just a little bit, that spreadsheet. So, okay. And here, where it says "protocol," is protocol what you would expect to be in that basic jail guideline folder?

A. You know, I go back to mirroring the ACA policy. You have the standard, which is what you're looking at. That is the basic jail guideline standard. The file, in my opinion, should turn around and have exactly what's there. What's your protocol? What is your policy and procedure? And a copy of your form, formats, whatever else may help you do that. Then, the documentation showing where they actually meet it.

So, in essence, you know, you have your written policy, procedure, or whatever form your institution uses, then your supporting documentation will be where you actually used those forms or that format. So, this is how

we do it in writing, this is the forms in which we do it in, and then here's a copy of where we actually did it. This is how.

Q. Okay. All right. So, there would be a written policy and procedure, classification forms, offender handbook, offender orientation materials. This classification plan, that's going to be different from the written policy and procedure; is that correct?

A. Not necessarily.

Q. Okay. All right. And then, the documentation. So, this is offender housing records and offender classification records. And that's where you're saying that's where they will show that they are doing the things that they say that they do in their policy and procedure; that's where they show you examples of them doing it; is that right?

A. Correct.

Q. All right. How many -- how many housing records and how many classification records would you expect to see?

A. I don't -- I don't know that I have an answer for that question. How many do I expect to see? There's a stack of files that have to be

done. I mean, I'm going to see one showing they're compliant unless there's a guideline telling me to look at more. You know, they can always ask for more, but these are examples showing how they do it. Unless it creates a question to make you not believe they're doing it, I would say that's sufficient what's attached.

Now, if there's something that spells out in the report that they have to pull a certain number, then that would be different. Every standard you have is going to have a file that's going to have things of this nature attached.

Q. Okay.

A. It's a one-day audit, basically. It's not a camp in for a week and make sure they dot every I and cross every T. It's their responsibility.

Q. Okay. So, it's a one-day audit. The auditors come in. They look at the folder for classification for provision II-A-12. It's got the policy. It's got the forms. It's got the handbook. It's got all of the stuff that it says under protocol, and then it has one

example of where they have, you know, completed, you know, whatever the classification forms are.
Is that what's in the folder, to your understanding?
A. That sounds correct.
Q. All right. Are the auditors going through and pulling a random sample of classification records to make sure that that classification process is actually being done systemwide?
A. You know, I would have to find out if they have been instructed to do so. Off the cuff, I can't answer that. But again, I can tell you that there are a ton of standards that each one of them has supporting documentation, and they can't be expected to go back and do random pulls on everything the whole institution does, you know.
This is an opportunity for them to show how they do it. Like I said, we can always ask for more if we think there's a problem, but again, that's, you know, a few inches thick binder. So, I can't tell you that it doesn't require it.
Q. Okay. When the state facility audits are

done, how many days is that?
A. Typically, it's one to two days.
Q. And how many people go and do state facility audits?
A. Oh, you know, I would have to talk to my coordinator, but it's a host of people. You know, I don't know. It's five or more.
Q. Okay.
A. I send medical to do medical, mental health to do mental health, classification to do classification. It's a lot more. It is a lot beefier than the basic jail guideline audit.
Q. All right. I'm going to show you -- so, I'm going to show you Exhibit 12.
(Exhibit 12 to be marked for identification.)
BY MS. CUMMING:
Q. This is one page. I'll just tell you we have testimony that this was the Madison Parish classification policy in 2019 through 2021 when LaSalle left the facility.
Have you seen this document before?
A. I can't say that I have.
Q. Okay. So, this is the policy, the classification policy. Would this also count as a classification plan?

A. Let me read it.
Q. Tell me when you want me to scroll.
A. You can scroll now. Okay.
Q. Would that count as a classification plan under that basic jail guidelines checklist requirement for a plan?
A. My opinion, yes.
Q. Okay. I want to go to Exhibit 13.
(Exhibit 13 to be marked for identification.)
BY MS. CUMMING:
Q. So, this is the 2022 -- I think it's titled as a recertification for the basic jail guidelines, a nice little certificate for Madison, and it's got sort of a general form. This was completed by Warden Mays.
Do you know, who developed this monitoring form?
A. It predated me, I would guess. I don't know that -- we may have added or changed things throughout the years, but it was already in place.
Q. Okay. And this form or, you know, this part on the classification system, do you know who developed that?
A. Do what now? I'm sorry.

Q. Do you know who developed this classification system portion of the form?
A. No, I do not.
Q. Do you know the last time that there was any substantive revision to this portion of the classification system on the auditing form?
A. No.
Q. I'm sorry. Say again.
A. No.
Q. So, since -- in your, roughly, ten years, you cannot recall any change to the classification system portion of the auditing form?
A. Ma'am, we've made multiple changes to the document, and I can't tell you where we did or didn't do it. You know, I'm not saying we did or we didn't. That's just -- you know, that's one small piece of my job. So, no, I don't recall whether we did or didn't.
Q. Okay. I want to go down here to -- this is page 8 of the exhibit. Is this the spreadsheet that you were referencing earlier?
A. Correct.
Q. And is this done -- this is -- this is part of the every three-year recertification, correct?
A. Correct.

Q. Okay. Do -- the recertification visits, how long do you expect them to take?
A. You know, I really don't know until they -- I mean, until they can do an adequate job. I think they probably take one day and maybe take two.
Q. Okay. And the annual audits, do you know how long -- how long do you expect them to take?
A. The same.
Q. Okay.
A. It depends on the size of the facility, quite honestly. You know, a larger facility may take a little longer, but a smaller one, I mean, you may even run in and run out, you know. As long as the bases are covered, and they look at what they're required to look at.
Q. So, when you're talking about the bigger facilities, just to get a rough -- make sure we're on the same page. Like, what's the rough kind of average daily population or bed capacity you're talking about?
A. Well, let me go back to qualify this a little differently. A facility that has 50 or less offenders should not take the same amount of time as one that has 500 plus. Okay? Now,

there's everything in between. There's people that are much larger than that. But to say that it takes a day or three days to conduct one, would not be a fair assumption because the facilities themselves vary so much.
Q. Okay. And so, Madison, it's got, according to this recertification, it's got 710 DOC people, and then under local offenders, it's got 55. So, would this be a bigger jail --
A. It would be --
Q. -- or a smaller facility?
A. I thought you were through. I'm sorry. No. That would be one of the larger ones.
Q. Okay. All right. So, this would be one where you would expect at least a day?
A. Correct.
Q. Okay. All right. And local offenders, is that referring to pretrial? Do you know what that means?
A. Well, local could mean pretrial, or it could mean people that have a -- not sentenced to hard labor. It could mean that, too. So, not necessarily pretrial.
Q. Okay.
A. Just non-DOC, and they're not -- they're not

an out-of-state offender. They're not an ICE. They're not a federal. So, that -- like I said, local offenders could mean either/or, a pretrial or sentenced to parish time.

Q. Okay. Okay. In the course of an audit, do -- I'm going down here to page 4 where it has assaults, and it's got, you know, listing numbers of assaults, assaults with significant injury.

Do auditors look at investigations into assaults?

A. Do they look at investigations into assaults?

Q. (Nodded head affirmatively.)

A. Not necessarily. They could, but not all assaults result in an investigation.

Q. Okay. What about for staff deployment; what -- do you know what records of staff deployment are reviewed?

A. Okay. When you say "staff deployment," are you talking about normal staffing?

Q. Yes. So, down here in this spreadsheet there is a discussion of sufficient staff.

A. Uh-huh (affirmative response).

Q. Here. Do you know what documentation of staff deployment is being reviewed?

A. No, ma'am. I don't know off the cuff. I mean, it tells you -- it tells you there what they're supposed to look at.
Q. It just says "records of staff deployment," but you don't know what specific records?
A. No. I mean, we have, like, you know, on the state level, we have, like, what's called rob roster, and I don't know what that institution specifically called it or what they use, but now that I see it in context, staff deployment, you know, how many people were on any particular shift or whatever as they were working. A specific record they use at that facility, I'm not sure.
Q. Okay. And do you know how many days they would look back? Like, would they look at a sampling?
A. Not if it doesn't specify, no, ma'am.
Q. Do you know -- well, let me ask this: I'm going to show you Exhibit 14. Have you seen this document before?
A. Let me get up and see what it says. I'm not going to say I haven't seen it, but it's nothing I look at routinely.
Q. Okay. I'll just represent to you, it's

provided by Madison. My understanding of it, based on prior testimony, is that it's a document of inmates at Madison who were sent out for medical care.

Do you know, is this document -- and it includes sort of a brief description of, you know, what the issue is. So, swollen right-hand, laceration, burns, laceration, orbital fracture, things like that. Do you know, is this a document that the auditors might look at on-site?

A. I don't know that they would.
Q. Okay.
A. I'd have to ask medical or billing where that document even is.
Q. Okay. I'm going to show you Exhibit 15.

(Exhibit 15 to be marked for identification.)

BY MS. CUMMING:
Q. Can you see that?
A. I do.
Q. Have you ever seen this document before?
A. Not to my recollection, no.
Q. Okay. I want to show you Exhibit 16.

(Exhibit 16 to be marked for identification.)

BY MS. CUMMING:

Q. This is, I think, a monitoring report. I think it's an annual from 2019.
A. Okay.
Q. And going down to page 2 where, again, it's got, like, a listing of assaults, and then it's got, you know, October through September 2019. In February 2019, there are 45 assaults listed. Do you know why there was that jump?
A. Do I know why there was that what?
Q. So, it looks like there are 45 assaults that are listed in February 2019. There's six the months before. There's six the months after. 14, 11. In this year, I do not see anything as high as 45 in a given month. Would this -- did anybody investigate or look into why this spike occurred?
A. That was five years ago. I don't recall.
Q. Where would it be documented if anybody did look into, you know, why this spike occurred?
A. Well, there should be a file of record in the basic jail guideline folder if we did look into it.
Q. And the basic jail guideline folder, where is that?

A. We keep one on each parish. It just has their documentation. So --
Q. The --
A. -- Megan Kent would be my first guess. If not, she's who I would ask.
Q. Okay. So the department keeps a basic jail guideline folder for each parish; is that correct?
A. Yes. If I need to go pull -- let's just say I have an incident at a facility where I want to look at a facility, or I have a complaint at a facility, one of the first things I'll do is reach out to Meg and -- or reach out to Duane, whoever. It ultimately gets to Meg, whether I go through Duane or Faith to get there to ask her for the last audit because I do that periodically. And if we were to send somebody out to do a follow-up on it, it would be there as well.
Q. Okay. And so, what is contained in that folder are the audits and any follow-ups. And anything else?
A. That's all I can think of would be that. I know -- well, there's other things. I take it back. But any time there's a change, we try

to create a historical document just to, you know, again, five years later somebody asks me a question, I don't remember five years ago, but that file -- you know, maybe the occupational capacity got reduced from 800 to 500. Why did that happen? I don't know. But if I were to pull that file, it's going to have that file that the operator, the sheriff, the whoever requested that decrease because of staffing concerns, they closed down a unit, or perhaps some of the ones that are along the coast will have a hurricane. They are no longer operable, and they are working to get them back up.

So, there's other things that can be there. I try to -- I try, for this very reason to, anything of any significance, make sure it goes there.

Q. Okay. So, you don't recall if anybody investigated why it was that in February of 2019 there are 45 assaults that are reported, but if you or anybody looked into that, that would be in that basic jail guidelines parish-specific folder; is that right?

A. If we had anybody go generate a report, it

would be there.
Q. Okay.
A. Now, it's possible that, you know, we'd pick up the phone and call, and there was an explanation, but I don't know how to explain 45. So, I'm not going to say that every follow-up results in a piece of documentation, but I would think that that one would.
Q. Okay. And the basic jail guidelines folder, is that, like, on a computer, or is a physical file?
A. It's a physical file. There may be a computerized version as well, but it's a physical file that I'm talking about.
MS. CUMMING:
Okay. Wayne, I'm going to request that.
MR. STEWART:
Okay. E-mail me.
MS. CUMMING:
Yep. Okay.
MR. STEWART:
Elizabeth, just a heads-up on time, we're looking at 11, 12 minutes.
MS. CUMMING:

Yeah. We're closing in.

BY MS. CUMMING:

Q. Okay. So, you had mentioned a little while ago that you were doing some work to make that team leader position more appealing. Can you tell me a little bit about what it is that you and the department are trying to do to make that position more appealing?

A. Sure. There's two things that I'm currently working on, and I'm not saying either one of them is going to pass because both of them require people outside of the department to approve, but the first one is to change what we pay these people.

I just -- whenever I did a review, and it wasn't in response to this, it actually was in response to one of the auditors pointing out, "I'm getting 5 percent based upon what I was doing when I got here." I didn't know -- I just assumed the 5 percent went up, and that was my assumption. I verified that that was, in fact, true, and then I tried to get them all redone with their current salary.

That got shot down by civil service. And that's whenever I had a pool done to show what

they were getting paid because I really didn't know what 5 percent of their salary was. And that's how come I -- it's just happenstance. The one specific I do know is with that. That's why I know the range.

So, I had worked with Megan to come up with a -- see, with civil service, we can do a 5 percent additional pay per additional duties pretty easily. We can do it right here at headquarters. Basically, if the undersecretary is willing to sign off on it, I can get that at anytime for anybody, so it's easy.

But the volume of work they do, and the quality of work, and the expectations they do, I just feel like they deserve more than what they're being paid. So, we're working on doing a premium pay.

So, it will have to go to civil service to be approved if, in fact, the secretary and the undersecretary approve it because I haven't -- I've verbally pitched it, but I haven't given them the written proposal yet. I think it's on my desk as we speak. I think I got it this week. If not, it was last week. But I'm

going to try to up that significantly. So, that's one way is a little better financial compensation.

As I said earlier, when you asked about was there an interview process, and I said, no, there is not, I would like to make it to where people want to do this, you know. There's multiple people wanting to do it. Make it desirable, like you said. So, that's one avenue.

And the other avenue is we're growing. And this part has been approved through civil service. We just haven't been fully staffed yet. It is -- I created four new positions here at headquarters that are in internal affairs, which is primarily geared at working at the state-level facilities; however, once I get fully staffed, I'm going to regionalize them and have them assist the team leaders with some of the follow-ups where the team leaders are more involved.

My overall goal is, once I get there, is to have the team leaders really audit and primarily be an auditor. We may still use them as a liaison, but if it requires boots on

the ground, trying to send one of my guys that works at IA, and also, it's going to give them a little more consistency because, you know, instead of having however many auditors we have and however many regions we have, instead of having them, I'm going to have three majors and a lieutenant colonel that will be doing this.

So, that's kind of my long-term plan, but, you know, I can't tell you when that trigger is going to be pulled, but I believe the BJG team leaders will be greatly relieved to realize they don't have to go out in response to -- I already took the escapes. I say took them. Not necessarily. The colonel may ask the team leader to go with them. But we're doing things like that to make it more appealing, and also, I think, more consistent, and I think we'll get a better product as well.

So, that's where I'm at. And I'm not even opposed to having them go and help with the audits if we have the time with IA. Again, that would be a good consistency factor as well and have somebody that's not -- you know,

like, Tyrone Mays, and I think he does a great job, but he's been up there a long time. He's had those facilities for a time. So, it's good to bring a new set of eyes in. So, that's kind of in a nutshell.
Q. Okay.
A. Maybe I can use this to help me get that.
Q. We're here to help.
A. Oh, sure you are.
Q. I'm not -- I'm not actually kidding.
MS. CUMMING:
All right. Can we go off for, like -- I don't know -- five minutes, maybe not even? I want to just make sure, but I think we're pretty close.
MR. STEWART:
Sure.
MS. CUMMING:
All right.
(Recess taken.)
BY MS. CUMMING:
Q. Okay. So, I just want to go back, and I want to just make sure I'm understanding this sort of structure correctly. So, the department pays operators of local jails to house

sentenced, you know, prisoners who would otherwise be in DOC-run facilities; is that right?
A. Correct.
Q. Okay. And then they are paid a per diem? I think you referenced a per diem earlier, correct?
A. Correct.
Q. So, they're paid a certain amount of money each day that they hold someone who is sentenced; is that right?
A. Correct.
Q. All right. What -- how much is that, currently?
A. Oh, I knew you were going to ask me that. I don't know if it's 25.39, 26.39. Somewhere in that ballpark.
Q. Okay.
A. It's under $30 a day.
Q. Okay. And so, there is some financial benefit to local jail operators or local facility operators to hold sentenced people because they're getting paid to do that; is that correct?
A. Correct.

Q. And then, for the -- on the department side, the department -- this whole structure kind of came about, and I'm looking back at the basic jail guidelines, came about because there were capacity problems in the state-run facilities; is that right?
A. That's -- I mean, that's historically accurate. That was before my time when it started, but yes.
Q. Okay. And so, right now, the benefit to the department of this arrangement is that there is still limited space in the state-run facilities to hold state sentenced people; is that correct?
A. We don't have the capacity to house them all, correct.
Q. Okay.
MS. CUMMING:
Okay. I think that closes us out. I will tender you to -- we have the attorney for MPSO and LaSalle here, and your attorney, Wayne, who may have some questions, so I'll tender, and I may redirect depending on what they ask.
MR. RYLAND:

This is John Ryland. I have no questions.

MR. STEWART:

This is Wayne. I have no questions.

MS. CUMMING:

All right.

(The videoconference deposition concluded at 3:32 PM.)

Deposition of SETH H. SMITH, JR.
Taken on February 23, 2024

WITNESS' CERTIFICATE

I have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

SETH H. SMITH, JR.

REPORTER'S CERTIFICATE

I, LORIE M. HOYT, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that SETH H. SMITH, JR., to whom oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 270 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter. I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

LORIE M. HOYT, CCR, RPR