# Transcript of the Testimony of

# **Megan Wintz Kent**

February 15, 2024

Murray v. LeBlanc

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CIVIL DOCKET NUMBER: 21-cv-592-SDD-RLB
JUDGE: JOHN W. DEGRAVELLES
MAGISTRATE: RICHARD L. BOURGEOIS

JAMES MURRAY, LATAVIUS PASCHAL, ANTONE HENDERSON,
PLAINTIFFS
VERSUS
JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL, DEFENDANTS

Videoconference Deposition of MEGAN WINTZ KENT, 6122 Beachgrove Lane, St. Francisville, Louisiana 70775, taken remotely, on Thursday, February 15, 2024, commencing at 11:03 AM.

APPEARANCES:

RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER
Attorneys at Law
BY: ELIZABETH CUMMING, Esquire
BY: EMILY WASHINGTON, Esquire
4400 S. Carrollton Avenue
New Orleans, Louisiana 70119
ATTORNEYS FOR JAMES MURRAY, LATAVIUS PASCHAL, AND ANTONE HENDERSON

APPEARANCES (CONTINUED):

PROVOSTY, SADLER & DELAUNAY, APC
Attorneys at Law
BY: JOHN D. RYLAND, Esquire
934 Third Street
Suite 800
Alexandria, Louisiana 71315-3530

ATTORNEYS FOR LASALLE MANAGEMENT AND MADISON PARISH SHERIFF

HAMMONDS, SILLS, ADKINS, GUICE, NOAH & PERKINS, LLP
Attorneys at Law
BY: WAYNE T. STEWART, Esquire
2431 S. Acadian Thruway
Suite 600
Baton Rouge, Louisiana 70808

ATTORNEYS FOR LEBLANC AND SMITH

LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS
Attorneys at Law
BY: JONATHAN R. VINING, Esquire
504 Mayflower Street
Baton Rouge, Louisiana 70802

ATTORNEYS FOR LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS

REPORTED BY:
LORIE M. HOYT
Certified Court Reporter
Registered Professional Reporter

JAMES MURRAY, LATAVIUS PASCHAL, ANTONE HENDERSON, PLAINTIFFS VS. JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL, DEFENDANTS
Deposition of MEGAN WINTZ KENT
Taken on February 15, 2024

EXHIBIT INDEX

| | |
|---|---|
| Exhibit 1 - | Notice of Rule 30(b)(6) Deposition of Megan Wintz Kent |
| Exhibit 2 - | Basic Jail Guidelines dated 7/31/22 |
| Exhibit 3 - | Basic Jail Guidelines dated 4/25/19 |
| Exhibit 4 - | LA DOC Corrections Services Department Regulation No. B-02-017 dated 9/22/17 regarding Classification, Sentencing and Service Functions |
| Exhibit 5 - | Louisiana DPS&C Basic Jail Guidelines Checklist Bates ESI - JAMES MURRAY 190 - 196 |
| Exhibit 6 - | Madison Correctional Center and Southern Correctional Center Institutional Policy No. 200-A16 on offender classification and trustee assignment Bates MCC P1 |
| Exhibit 7 - | Louisiana DPS&C Corrections Services Monthly Activity Report for Madison Parish Correctional Center dated May 2020 Bates MCC MAR 49 - 51 |
| Exhibit 8 - | Louisiana DPS&C Correction Services BJG Single Month Activity Report Rollup dated May 2020 |
| Exhibit 9 - | Basic Jail Guidelines Quarterly Summary Report April - June 2020 Northeast Region |
| Exhibit 10- | Letter dated 9/12/22 regarding Basic Jail Guidelines Monitoring Report for Madison Parish Correctional Center with attached certificate and BJG Recertification Report |
| Exhibit 11 - | BJG Monitoring Report for Madison Correctional Center dated 10/10/19 |

# EXAMINATION INDEX

Page

Ms. Cumming........................6

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

LORIE M. HOYT, Registered Professional Reporter, and Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath to the witness.

MEGAN WINTZ KENT,
after having been first duly sworn by the above-mentioned court reporter, did testify as follows:

EXAMINATION BY MS. CUMMING:

Q. Good morning. My name is Elizabeth Cumming. I represent the plaintiffs in this action.
We're taking your deposition pursuant to the federal rules of civil procedure. There is no objection to the use of Zoom for this deposition or to the court reporter being remote.
At the end of the deposition, the court reporter is going to ask you about reading and signing, so you can talk with your attorneys in the room about that.
Could you please introduce yourself for the record?
A. I'm Megan Wintz Kent.
Q. And could you provide your address and phone number?
A. My address is 6122 Beachgrove, St. Francisville, Louisiana 70775. My phone number is (225) 241-1402.
Q. Thank you.

Do you have any previous deposition experience?
A. No, ma'am.
Q. Okay. So, I'd like to just go over a couple of ground rules with you, just so we're on the same page.
We've got the court reporter here who is taking down everything that we say, so it's really important for you to go ahead and speak up so that she can get down your answers.
If I -- I'll probably ask you some yes or no questions, so it's really important to answer those verbally rather than shaking your head or saying uh-huh (affirmative response) or uh-uh (negative response). I'm going to try and get my question out, and then if you can wait until I finish the question, even if you know where I'm going with it, and then answer, just so that it's clear on the transcript you knew what I was asking and that your answer is responsive to what I was asking.
You've taken an oath. It's the same oath that you would take as if you were testifying in a court of law, so it's important that you

give us full, accurate, truthful testimony. We're interested in finding out everything that you know related to this case. So, we're looking for full and complete answers.

If, at some point, you need to clarify or supplement an answer, that's completely fine. Even if we've moved on to a different topic or a different question, you can always -- if something jogs your memory, just say, Oh, I want to go back. I know I said this earlier, but also this, or actually, that was wrong.

I am going to be asking you a series of questions today. I promise you, at some point, I will ask a bad question that's either unclear or has too many parts in it, or, you know, it's not a good question for whatever reason. If that -- not if. When that happens, just ask me to clarify, and I'll do my best to kind of rephrase it in a better way to make it make more sense. If I do ask you a question, and you answer it, I'm going to assume that you understood the question.

You are welcome to take breaks. I try to remember to offer a break every hour, but as everybody sitting on this deposition knows, at

this point, I'm really bad at that. So, if we've been going for a while, and you want to take a break, let me know. The only thing that I ask is that if I've asked you a question, you go ahead and answer whatever question is on the table before, you know, we take that break.

During breaks you can speak with your attorneys who, I believe, are in the room with you. I may ask when we come back if you spoke with them.

Is there anyone else -- I see Wayne is in the room. Who else is in the room with you?

MR. VINING:

Hi. Jonathan Vining. I'm the general counsel for DOC.

MS. CUMMING:

And anybody else?

MR. STEWART:

No.

BY MS. CUMMING:

Q. Okay. Is there any reason, any medication, sleep deprivation, or any other hardship that would interfere with understanding my question and providing complete and truthful answers

today?
A. No, ma'am.
Q. And what is your understanding of why we're here today?
A. Questions about my BJG role.
Q. Okay. And you understand that you're here today as a witness; you are not named as a party, correct?
A. Yes, ma'am.
Q. Okay. You have also been designated as a witness under Federal Rule of Civil Procedure 30(b)(6), which means that you've been designated as the person who can speak to certain topics, not just from your own personal knowledge, but also on behalf of DPSC.
So, I want to show you Exhibit 1, which is the 30(b)(6) notice we sent.
(Exhibit 1 to be marked for identification.)
BY MS. CUMMING:
Q. Can you see that on the screen?
A. Yes, ma'am.
Q. Okay. And I'll just take you to the top so you can see. It's captioned. It's a 30(b)(6) notice. And then these bullet points here are

the topic areas that we requested.
And so, you have been designated as the person who can speak to the editing and revisions to the classification system and offender population management system provisions of the basic jail guidelines from January 2018 to present; the development of reporting forms and recordkeeping for the auditing and recertification processes of the basic jail guidelines; staff, compensation, training, and oversight of basic jail guidelines team leaders and members; and reporting from local facilities, which we clarified to counsel as identifying all reporting from local facilities, including underlying documentation, attachments, narratives received by a DPSC representative from local facilities holding sentenced people.
Are you able to provide full and complete testimony on these topics today?
A. I can try.
Q. Are there any topics or parts of any of these topics that you feel you would not be able to provide full testimony today?

A. No, ma'am.
Q. Have you seen these topics before?
A. Yes, ma'am.
Q. Okay. On what occasion?
A. To determine who these were for or who could talk about these a couple weeks ago.
Q. Okay. All right. And I want to clarify that most of the -- we'll be talking about DPSC practice, but we'll also be talking about the facilities at Madison. Have you -- Tallulah, specifically. Have you -- have you -- have you ever been to any of the facilities at Madison?
A. No, ma'am.
Q. Okay. Have you ever participated in any audits of any of the local facilities?
A. Yes, ma'am.
Q. Okay. I'll come back to that later.
What did you do to prepare for your deposition today?
A. Not much.
Q. Did you review any documents?
A. No, ma'am.
Q. Did you speak with anybody?
A. About 30 minutes before this, just to kind of

guide me and just tell me what to expect since I've never done this before. I spoke to Wayne.
Q. Okay. You spoke to Wayne. Anybody else?
A. No, ma'am.
Q. Okay.
A. Well, I may have asked -- I talked to my supervisors, just for guidance, but not anything specifically.
Q. Okay. Who are your supervisors?
A. Duane Cambre is my immediate supervisor, and Chief Smith is my big boss.
Q. Okay. So, you spoke to both of them; is that correct?
A. Yes, ma'am.
Q. Okay. So, going back to Madison, to the extent that we're talking about the facilities at Tallulah, I'm going to be talking about MCC and SCC, also known as Building 3 and Building 4. Is that your understanding?
A. I'm not sure.
Q. Okay. And I may at some point slip into referring to them all collectively as MPCC. If I start using acronyms that you don't know or that don't make sense, stop me, and I'll

clarify.
A. Okay. What -- I don't know -- I don't -- what is the MCC?
Q. Madison Correctional Center, which is --
A. Oh, okay, yes.
Q. Yeah. But I think the other naming convention is referring to all of that collection of buildings as MPCC.
A. Okay.
Q. I'll try to stay away from the acronyms, but if I slip up, just ask me to clarify.
So, I want to start with just kind of running through your background and education. Can you tell me where you went to high school and when you finished?
A. I went to high school in St. Gabriel at East Iberville, and I finished in 1995. I graduated there.
Q. I'm sorry?
A. I graduated there.
Q. Okay. Thank you.
And after you graduated from high school, did you have any other schooling?
A. I did. I went to a community college in Mississippi, Southwest Community College, and

then I transferred to Southeastern.
Q. Okay. And what did you study at Southwest?
A. I started in nursing.
Q. Did you get a degree?
A. No, ma'am.
Q. And then, when you transferred to Southeastern, what did you study?
A. Business.
Q. Did you graduate?
A. No, ma'am.
Q. Okay. How many credits did you get at Southeastern?
A. I'm not sure.
Q. And after Southeastern, any other schooling?
A. No, ma'am.
Q. Any other pro -- any professional licenses, or certifications, or anything like that?
A. No, ma'am.
Q. All right. So, other than St. Gabriel, Southwestern, and Southeastern, any other education that we haven't covered?
A. No, ma'am.
Q. Okay. So, I want to move into your employment history. Can you run me through your employment from the age of 20 on?

A. 20 on?
Q. Yes, ma'am.
A. During college, I had numerous jobs. I worked part-time at a local hardware store. I worked at a formal wear store. I worked for GEO Heat Exchangers. I worked for a retina specialist. And then, in 2004, I started at Dixon Correctional.
Q. Okay. And at DCI, what position did you start with?
A. I started as a clerical position. Secretary for the maintenance department.
Q. Okay. And how long did you hold that job?
A. Maybe a year.
Q. And what did you go into after that?
A. Clerical assistant for the deputy warden.
Q. How long did you hold that job?
A. I'm not sure.
Q. Okay. And that's the deputy warden at DCI; is that right?
A. Yes, ma'am.
Q. And what were your responsibilities as the clerical assistant to the deputy warden?
A. All the ARPs came through that office, so I coded those and submitted them to the correct

departments. All the court orders came through that office, so I made sure that any court hearings were scheduled, and just general office procedure.
Q. And for the record, ARPs or A-R-Ps are grievances; is that right?
A. Correct.
Q. Okay. And you don't recall how long you held that position; is that right?
A. No, ma'am, I don't.
Q. Okay. What did you -- what position did you move into after that?
A. The purchasing manager at Dixon Correctional.
Q. And what were your responsibilities as purchasing manager?
A. I supervised the canteens, the warehouse, and I was over all purchasing for the facility.
Q. And the canteens, is that -- well, let me ask. What do you mean when you say "canteens"?
A. It's like a store for the inmates.
Q. So, were your responsibilities more on making sure that, you know, you were ordering from the wholesalers so that people could, you know, place their orders for shampoo, honey buns, whatever they wanted from the canteen,

or were you also responsible for making sure that inmate orders were being filled?
A. More so making sure that the canteens were stocked.
Q. And, roughly, how long were you doing that; do you know?
A. I can't remember.
Q. Okay. And after purchasing at DCI, what did you move into next?
A. I became the executive management officer. So, I was the ACA manager for DCI.
Q. And what were your responsibilities in that role?
A. I made sure that DCI was -- stayed up to -- followed all the department regs, that we were in compliance with ACA, and in compliance with the department regs. I did the CFI reporting for the facility, and then just special projects to the warden.
Q. The CFI reporting, what is that?
A. That's monthly reporting that the facilities have to report to headquarters.
Q. And what sorts of things are included in that monthly reporting?
A. Each department has things that they would

submit to the executive management officer. Things for medical, things from the records office, security had things that they had to report. Specifically, I can't think off the top of my head right now.
Q. Okay. And for the ACA, what is that?
A. American Correctional Association.
Q. And that is a body -- it's like a voluntary certification for prisons and jails; is that right?
A. I don't know that it's voluntary.
Q. Okay. So, can you walk me through what the -- what the process was for, you know, what you were doing with the ACA?
A. So, annually, we -- well, every three years, we were ACA accredited. So, we were annually audited by headquarters, and we just had to make sure that, you know, we were maintaining our documentation to show that we were doing the practices that ACA called for us to do.
Q. When you say you were annually -- sorry. Were you adding something?
A. No, ma'am.
Q. Oh. So, when you say that you were annually audited by headquarters, that's, like, DPSC

headquarters in Baton Rouge; is that right?
A. Yes, ma'am.
Q. What did that annual audit consist of?
A. ACA managers from the other state facilities, security from other state facilities, a team that they built at headquarters, like education, reentry, someone from the records office. And they would come in, and it may take a day or two for them to go through the facility.
Q. Okay. And just to clarify, DCI is a state facility, meaning that it is a -- people sometimes refer to them colloquially as main camps, but it's a state prison that is also run by the DPSC; is that correct?
A. Yes, ma'am.
Q. All right. And that's different from, you know, what people call outcamps or the local facilities that are owned by sheriffs' offices; is that right?
A. Yes, ma'am.
Q. Okay. All right. So, when you talk about people coming from other state prisons, you're talking about other prisons in Louisiana, so Angola, Wade, the places that are run by DPSC;

is that correct?
A. Correct.
Q. Okay. And so, there's a group of people that headquarters puts together from other state prisons that goes in and does the annual audit; is that right?
A. Partially. Some -- some people do come from headquarters, as well as other state facilities.
Q. Okay. All right. Thank you.
So, when people are coming in to do this annual audit of a state facility, what all are they looking at?
A. They are actually going in the facility and looking at the practices. They're looking at the fire extinguishers. They're looking at tool counts. They're looking at lights. They're looking at going in the kitchen and looking at meals. They're looking at -- they are going in dorms and looking at dorms. They're going to our education department and looking there.
And then they're also going through files, the actual ACA files, but then also comb through medical files, or record files, or

classification files. And then they may interview staff. They may interview inmates.
Q. When they're going through files during these annual audits, are they -- are they going to where the files are normally stored and just pulling out random files, just to look and see how things are being kept, or are specific files being pulled for the auditors and set aside for them?
A. Yeah. It's usually random files that they pull.
Q. Okay. And how much notice is given to, you know, a state prison facility before the audit happens?
A. There's a schedule that goes out usually at the beginning of the year.
Q. Have you ever participated as an auditor for other state prison audits?
A. Yes, ma'am.
Q. Okay. What facilities have you audited?
A. All of them but David Wade.
Q. And over what period -- or let me ask this: Are you still serving as an auditor for any of the state prisons?
A. No, ma'am.

Q. Okay. Over what period of time would you go and do audits in the state prisons?
A. I did that as -- in my role as the executive management officer at DCI.
Q. Okay. Roughly, how long was that?
A. Maybe from 2017 up till two years ago.
Q. So, around 2022 maybe?
A. Yes.
Q. So, in that time, roughly, how many audits of state prisons do you think you did?
A. I'm not sure.
Q. More than five?
A. Yes.
Q. Okay. More than ten?
A. I can't be certain.
Q. Okay. So, when you would go to a facility in your role as an auditor, can you walk me through sort of generally what you would do, what your practice was?
A. My role was to check the ACA files. And in the ACA files, I would make sure that they had the correct department regs, and that their policy's met what the department regs stated, and that the practice was the correct practice.

Q. And roughly -- you said it was like a team of people. Roughly, how many people would go on these audits?
A. Maybe 15 to 20. Maybe more.
Q. So, it was a lot of people, and each person sort of had their job, their role, the specific things that they were tasked with checking; is that correct?
A. Correct.
Q. And how long would you be at a facility doing the audit?
A. A day for me.
Q. Okay. Were other team members there for longer?
A. They could be.
Q. Okay. So, what were the -- so, I know your responsibility was on the ACA files. What were the other areas of responsibility?
A. Education, medical, security, business office, human resource.
Q. Okay. And for security, was there one person who was in charge of that, or were there multiple people?
A. There were multiple people.
Q. Okay. Were there sort of subdivisions of

security?
A. I would say so, yes.
Q. Okay. What were some of those sub areas?
A. So, I guess you would have some that did maybe, like, the perimeter fencing, and you had some that did the kitchen area, and then maybe you had some that did the inside of the facility, or maybe tool check.
Q. Okay. And then, for medical, were there multiple people?
A. Yes.
Q. Okay. Who would be responsible for the medical piece?
A. DOC headquarters had a team that they would send.
Q. Okay. Were they doctors, nurses, you know, hospital administrators, anything like that?
A. Nurses.
Q. Okay. And on the security side, who was kind of responsible for that? Were they COs in other facilities, wardens, sergeants? What level are we talking about?
A. It was always usually a colonel that headed that up, and then it would be lower-line staff. I don't know the ranks of those.

Q. And how were people selected for these audit teams?
A. I think it just kind of went with whatever their position was.
Q. Could you volunteer? So, you know, if you are a colonel or, I mean, say you're even line staff, but you were interested in this audit, could you volunteer to go perform this function?
A. No.
Q. So, you were -- you would definitely be selected, not that you were raising your hand to do it; is that right?
A. Correct.
Q. All right. And who was responsible for selecting the teams?
A. It went with the position. So, I guess whenever you were hired -- whoever hired you for that position selected you.
Q. Okay. So, whatever colonel at DCI knew that he or she was definitely going to be an auditor when they were hired into that job; is that right?
A. Yeah. He just -- that was part of the job.
Q. Okay. All right. So, you held that executive

management assistant position until 2022; is that right?
A. Correct.
Q. Okay. Did you receive any training either before you stepped into that position or while you held that position?
A. I trained for about two months with the guy that was retiring.
Q. Who was that?
A. Buddy Stutzman.
Q. And what did that training consist of?
A. Just on-the-job training.
Q. Did you do any audits with him during that time?
A. I did not.
Q. Okay. Did you receive any kind of training specific to being an auditor, you know, what to look for, things to sort of keep in mind as you're looking through information, anything like that?
A. I went on several audits as on-the-job training.
Q. And was there someone who was sort of responsible for kind of showing you what to do during those audits?

A. I guess I was following the lead of the other auditors there.
Q. Do you recall --
A. That was my first time, so they were just showing me what to do, and I was just working closely with them.
Q. Do you recall who those other auditors were?
A. Joli Darbonne is one of them, and Lisa Saia.
Q. Could you spell Lisa's last name, please?
A. I think it's S-A-I-S-A (sic).
Q. Thank you. It's not a spelling test. I just want to make sure.
A. I'm not certain that's right, but I think it's correct.
Q. Okay. And there -- what were their positions when they weren't auditors?
A. Joli was an ACA auditor at LSP and had been for many years, and Lisa worked at headquarters at our central office. She was, I guess, like the regional ACA person for the department.
Q. All right. So, in 2022, what did you move -- what was your next position?
A. I transferred to headquarters as the -- I'm an executive management officer and also a BJG

administrator.
Q. Okay. So, can you run me through what your responsibilities are as -- in your current position?
A. So, currently, there are 10 or 11 team leaders that audit about 93 local-level jails. They report back to me after they audit. We try to make sure that the local level follows the basic jail guidelines. I -- once they report back, I compile their reports and submit them to the chief of operations. Once he signs off, then it goes to the secretary. I review monthly reporting that the local levels submit.
Q. So, it's -- tell me if I'm getting this wrong. It sounds like -- so, you've got a title of executive management officer, and you also have a title as the basic jail guidelines administrator; is that right?
A. Right.
Q. Okay. Are those two things kind of like -- is that all one title, or is it sort of two?
A. The position is an executive management officer, and I guess my title is BJG administrator.

Q. Okay. So, how many other executive management officers are there?
A. In that area, none.
Q. Okay. Headquarters, is that sort of like a -- I mean, to sort of borrow a military term -- is that like a rank almost?
A. It's our central office.
Q. Okay. All right. And so, not talking specifically about the basic jail guidelines, but just executive management officers, how many others are there?
A. I'm not sure.
Q. Okay. But your specific responsibility is as a basic jail guideline administrator; is that right?
A. Correct.
Q. All right. And you are the only one with that responsibility; is that right?
A. Yes, ma'am.
Q. Got it. Thank you.
Okay. So, running through your responsibilities there, you receive reports from the 10 or 11 team leaders, you compile reports and submit them to Chief Smith.
How do you submit those reports?

A. Meaning --
Q. Do you --
A. -- how do I get them to Chief?
Q. Yeah.
A. I print them out, and once I feel like -- I go through the reports, and I make sure that, you know, that there aren't anything that needs to be questioned that, you know, the auditors have looked at, and basically, the BJG team leaders are going out auditing these facilities, so I'm making sure that they haven't missed anything. So, once I compile that and make sure everything is okay, I print it out.
When I think it's ready for Chief, I type up a letter, I send it to him for his signature. He reviews it. I print it out and send it to him.
Q. Okay. Like, through, like, interoffice mail or something like that?
A. Yes, ma'am.
Q. Okay. Got it.
Okay. So, when you were -- we'll come back to this in more detail, but let me ask this now: When you are kind of reviewing

these audits, are you looking at anything else to sort of compare, or are you just kind of looking through the audit report just to make sure all of the questions have something put down as a response?
A. I'm looking at the guidelines, you know. And I have a -- you know, there's a form that they use, a template. So, I'm making sure that they are meeting the guidelines, or sometimes they may miss something, so, you know, I have to get more information, or sometimes we need clarification on something.
Q. Okay. So, if you're looking at the guideline -- other than the guideline, are you looking at -- and the report -- are you looking at anything else?
A. Yes. From time to time I have to look through the monthly report just to double-check, make sure numbers are right.
Q. Okay. Anything else?
A. Not that I can think of at the moment.
Q. And then the monthly reporting. You were talking about reviewing the monthly reporting. Can you tell me what you do for that review?
A. So, the local levels enter in their

information monthly. The team leaders review it and approve it. And then I go in after they approve it and double-check it for anything that's -- looks wonky.
Q. And how do you go through and double-check it?
A. There's really no sign-off or anything for me. I just pull up each one individually, each facility individually.
Q. Are you comparing to something else? Are you looking at other documents?
A. Well, I'm comparing to their previous month's reports.
Q. So, what are you looking for when you're comparing?
A. I'm looking at their numbers. Like, if their -- I don't know. Like, if their contraband numbers are way off, or if they've gone up, or if their operational capacities don't look right. I'm just reviewing it to see if anything sticks out.
Q. Are you looking at any other kind of underlying information to confirm the numbers?
A. Probably, but I can't think of what it would be at the moment.
Q. So, when you came into this position, did you

receive -- did you receive any instruction on, you know, what your job responsibilities were?
A. Yeah. Sure.
Q. Who provided that instruction?
A. My supervisor.
Q. Would that be Duane Cambre?
A. Yes.
Q. Did Mr. Cambre or anybody else ever provide you information, not just on what your responsibilities were, but sort of how to go about performing them?
A. I don't recall.
Q. Other than Mr. Cambre, did you ever get any kind of -- did anybody else describe what your responsibilities were or, you know, offer any kind of, you know, template for how to go about them?
A. Markisha Stewart was in that position before I was, and so she and I worked together.
Q. How long did you and Markisha Stewart work together?
A. Maybe, like, two weeks.
Q. Do you know how long Ms. Stewart had been in that position?
A. No, ma'am. I'm not sure.

Q. Have there been any -- I don't know -- improvements to process in that you've developed in your time in this position, you know, related to reviewing the monthly reports, or the audits, or anything like that?
A. I think so.
Q. Can you tell me about them?
A. I feel like the guidelines have been revised. They flow better. The reports have been organized better. I think there's more communication with the team leaders.
Q. So, the reports are organized better. Can you tell me sort of --
A. Just the structure of the reports. They're -- I think it's just they were a little dated, and I feel like they have just been organized a little bit better.
Q. So, when you were talking about the -- you are talking about, like, the actual reports and the reporting forms themselves; is that right?
A. The templates, yes. The templates that they use.
Q. Okay.
A. And also, the monthly reporting template that's used. That's been revised to flow

better and everything is organized better on it to where the guidelines are actually in order. The information flows in order.
Q. And you said there's more communication with the team leaders. So, are you the person that's communicating with the team leaders?
A. Yes.
Q. And what sorts of instances would you communicate with the team leaders?
A. I try to keep them in the loop with any pertinent information by e-mails, but we also have two meetings a year at two separate conferences. And then any time that it's needed, we'll have Zoom meetings, but mainly it's e-mails.
Q. And the two conferences, that's, like, the team leaders physically come and all get together?
A. Yes.
Q. Where does that happen?
A. In Lake Charles.
Q. And you said that happens twice a year?
A. Yes.
Q. When, roughly?
A. One is in the spring, and one is in the fall.

Q. And what all is reviewed at those conferences?
A. Usually, anything that's new with the guidelines. We review that. Any problem areas that we're having with the facilities. We review that. And then it's also a time that we just open the floor for them to talk about any issues they may have.
Q. Is it mandatory? Do all team leaders have to attend?
A. It's not mandatory, but they're encouraged to attend.
Q. How well attended is it usually?
A. The one in the spring is pretty well attended. It's the jail conference, so they try to attend that one. The one in the fall, it's if they can get away from their jobs.
Q. Are there any -- how long have these conferences been going on?
A. I'm not sure.
Q. Were they happening before you started in your current position?
A. Yes, ma'am.
Q. Are there any kind of agendas, or meeting minutes, or anything like that?
A. Probably agendas and a sign-in sheet.

Q. And where are those kept?
A. In my office.
Q. Digitally or on paper?
A. Both.
Q. Other than -- are there any kind of, like, presentation materials, PowerPoints, anything like that?
A. Yes.
Q. Okay. And are there any kind of -- is there any sort of, like, curricula, or anything like that? Are there any kind of classes or continuing education component to these conferences?
A. I'm not certain about the continuing education, but we have a program for one of them, and I would think, yes.
MS. CUMMING:
Wayne, I'll send you an e-mail about it, but we'll request the agendas, sign-in sheets, and any kind of presentation materials as responsive to some of our discovery requests.
MR. STEWART:
Okay.
BY MS. CUMMING:

Q. Okay. So, how frequently would you say that you e-mail the team leaders?
A. I'm not certain. I would say several times a week. Probably more than that. It just depends on what's going on how frequently.
Q. Okay. And what sorts of -- let me ask this: Are you e-mailing the team leaders as a group, or are you reaching out to certain specific team leaders?
A. Both.
Q. Okay. When you reach out to a specific team leader, what sorts of things would you reach out about?
A. If I have questions on any of their reporting, if they haven't submitted something, or if they're behind on -- like, if one of their facilities hasn't sent in their numbers, their counts for the week. I may get a request from the secretary or the chief's office. Usually, the chief's office, I would get a request needing more information on a UOR, or maybe they have gotten information from -- I don't know -- for instance, maybe they got an e-mail of some sort, or something happened at a local jail that they're needing us to investigate

just to follow up on.
Q. And UOR is unusual occurrence report; is that right?
A. Yes, ma'am.
Q. And the chief's office, that's Chief Smith; is that correct?
A. Yes, ma'am.
Q. Okay. So, if you are requested to investigate something, what steps would you take to do that?
A. Usually, I would take that e-mail -- it's usually an e-mail request. I would take that and forward it to whichever the team leader the jail falls under and ask them to follow up on it, and then submit a report to me.
Q. And what would you expect the report to include?
A. A copy of the UOR, a copy of the disciplinary report, and a letter from them with their findings.
Q. What steps do you expect the team leader to take to investigate something?
A. It just depends on how significant the incident is. Sometimes, you know, they have to actually physically go out to the facility.

Other times, it may be just, you know, a simple phone call.
Q. Okay. So, what sorts of incidents would require actually going out to the facility?
A. If it's a significant injury, or a death, or maybe a suicide, you know, they would want to go out for that, or an escape.
Q. And what would you expect them to do when they get out to the facility? What are they looking into?
A. They're just looking into the steps that -- I guess they're looking into what the facility did, you know. They're just following up on -- depending on what the incident was. Like, if it was a suicide, I mean, we have a mental health director that probably would be the first one to contact the facility, but sometimes our team leaders get the information first. So, maybe they would go in and try to review the cameras, or if it was a fight, maybe they would go in and see what steps the facility took, you know, to help break it up or, like, I guess, like, to gather all the information of what steps the facility has taken to get the situation under control.

Q. In the letter that you get from the team leader, does the team leader kind of outline what steps they took to look into something?
A. No, they don't usually outline what they've done.
Q. So, when they're providing their findings, do they provide kind of what they're basing their findings on?
A. Yes.
Q. Okay. What sorts of things did they provide?
A. They -- they -- who they spoke to at the facility, you know, what offenders may be involved. I'm drawing a blank at the moment.
Q. So, when you receive that, are you receiving that by e-mail?
A. Yes.
Q. Okay. And it's by e-mail from the team leader; is that right?
A. Yes.
Q. Okay. What is your e-mail address?
A. megan.wintz@la.gov.
Q. And it's W-E-N-T-Z?
A. W-I-N-T-Z.
Q. @la.gov?
A. Yes, ma'am.

Q. And Megan is with the G -- or with an H, or no H?
A. No H.
Q. Thank you.
Okay. Prior to you coming into this position, if Chief Smith or anybody else wanted an investigation into an unusual occurrence report or anything else at a local facility, who would have sent that to the team leaders?
A. Markisha.
Q. Okay. Do you happen to know what Markisha Stewart's e-mail address was?
A. markisha.stewart@la.gov.
Q. Thank you.
So, you said earlier your direct supervisor is Duane Cambre. How frequently do you communicate with him?
A. On a daily basis.
Q. Okay. And what form does that communication take?
A. His office is right across the hall from me, so I see him pretty regularly.
Q. Okay. And what about with Chief Smith; how frequently do you communicate with him?

A. A couple of times a week.
Q. And what form does that communication take?
A. In person.
Q. Is that, like, part of formal meetings, or you're seeing each other in the hall? How does that work?
A. Both.
Q. And what sorts of things would you talk with Seth Smith about?
A. If I have a question on maybe a BJG report, or if I need guidance on -- I don't know -- something that I'm working on. Like, as far as maybe trying to get some -- an increase for one of my employees. Just -- or guidance on how to respond to -- I don't know -- a request from the jail.
Q. And what sorts of requests do you get from jail?
A. I get all sorts of requests, but sometimes they're wanting to up their medical co-pays, or they're wanting to increase their capacity, or they're wanting to decrease their capacity, or they're wanting to open a TWP.
Q. TWP is?
A. Transitional work program.

Q. Thank you. Okay.
A. Or sometimes their team leader may get a request that a small jail wants to start holding DOC offenders. Of course, I would have to talk to Chief about that.
Q. Okay. So, is it Chief Smith who is the person that, you know, can approve or deny a local jail to hold sentenced people; is that right?
A. Yes, ma'am.
Q. And do you know what information he reviews or asks for when he's deciding whether or not sentenced people can be held at a local facility?
A. We would have to send a team leader in to make sure that the facility is capable of housing inmates. We would have to see a fire marshal report, a DHH report, and then the team leader would just send their findings back to us.
Q. Did they look at policies or anything like that?
A. I don't know -- I don't think at the beginning, no.
Q. All right. Do you have any, like, standing meetings, you know, weekly, or biweekly, or monthly, you know, where you know you're

always going to see either Duane Cambre, or Seth Smith, or both of them?
A. I have a monthly with Duane.
Q. And what is that -- what is sort of the agenda?
A. A monthly staff meeting.
Q. And what all do you cover in that monthly staff meeting?
A. Duane usually goes over whatever he's -- whatever topics were discussed in the secretary's management meeting. It's always different.
Q. And any standing meetings that Seth Smith participates in?
A. Not that I participate in with, no.
MS. CUMMING:
We've been going about an hour, so I am going to try and do what I am very bad at doing, which is offer a break. How are you feeling?
THE WITNESS:
Okay.
MS. CUMMING:
All right.
MR. STEWART:

Do you need a break?
THE WITNESS:
Oh, yeah. I can have a break.
MS. CUMMING:
Okay. All right. All right. We'll take five minutes, if that works.
THE WITNESS:
Okay.
MR. STEWART:
Okay.
(Recess taken.)
(Mr. Vining exited the videoconference deposition.)
BY MS. CUMMING:
Q. So, just to make sure I understand, what would you say -- what percentage of your time is spent on, you know, the basic jail guidelines and, you know, like, the auditing process and all, like, sort of dealing with the local facilities?
A. Probably 65 to 70 percent.
Q. And the remaining, you know, roughly 30 percent that remains, what are you doing?
A. Just little -- maybe a special project or -- I don't know. Maybe that percentage should be

higher.
Q. Okay. So, the majority of your time you would say, right?
A. Right.
Q. So, if you wanted to, sort of thinking about it now, what would you put your rough percentage at?
A. About 85 percent.
Q. So, you're familiar with the basic jail guidelines?
A. Somewhat. I think so.
Q. What is your understanding of why the basic jail guidelines exist?
A. For safety and security of our DOC offenders or inmates that are housed in the local level.
Q. Okay. And do you agree -- well, let me show you what we're going to mark as Exhibit 2.
(Exhibit 2 to be marked for identification.)
BY MS. CUMMING:
Q. Do you see that?
A. Yes, ma'am.
Q. Okay. Does this document look familiar to you?
A. Yes, ma'am.
Q. All right. It's a 60-page exhibit. I can --

I'm happy to scroll through all 60 pages, but I'm just showing you pages 1 and 2, which is dated July 31st, 2022, and then the forward on page 3, and then the table of contents.
This is sort of the written form of the basic jail guidelines, correct?
A. Correct.
Q. And then, just looking at the forward, looking at the -- let's see. I think it's the second full paragraph, that last line, "The BJG were designed to assure that the fundamental constitutional rights of DPS&C offenders housed in local jails would not be jeopardized by such housing arrangements," correct?
A. Correct.
Q. So, you agree, the purpose of the basic jail guidelines is to assure that local facilities don't jeopardize the constitutional rights of sentenced people housed there?
A. Correct.
Q. Okay. So -- and the basic jail guidelines, they represent the department's understanding of the minimum that is necessary to hold people in a constitutional setting; is that right?

A. Yes, ma'am.
Q. Okay. So, like we went over at the beginning of the deposition, you've been designated as the representative on behalf of the department related to topics on the editing and revision of the basic jail guidelines.
So, on that line, who is -- well, let me ask this: Do you know who is responsible for drafting the basic jail guidelines?
A. That, I'm assuming, would come from -- I'm not certain.
Q. All right. But on the questions of editing and revising, what is the process for revising the basic jail guidelines currently?
A. My role is, you know, if there's -- usually, it's brought to my attention that there's something that needs to be revised, or if a department reg is changed, and there's something in the guidelines that reflects, you know, that's the -- the department reg has something to do with the BJG guidelines, then I need to make sure that is updated, or as things evolve, you know, from time to time, there's -- we -- the decision is made to just update the guidelines.

Q. So, who usually brings to your attention that there needs to be some sort of revision?
A. It would be Chief Smith. Occasionally, maybe the secretary, which is Secretary LeBlanc.
Q. And how would they -- would they -- who all would they inform that a revision needs to be made?
A. Probably me.
Q. And prior to you -- so, you've been here since 2022. Prior to you, who would they have informed; do you know?
A. It could have been Markisha, or prior to her, it would have been Angela Tozan.
Q. So, the person in your position is the person who is -- who receives a notification that there needs to be some revision in the basic jail guidelines; is that right?
A. Correct.
Q. And so, you said you would get -- you would get notice from Chief Smith or sometimes Secretary LeBlanc. Is there anybody else who can kind of initiate a revision in the basic jail guidelines?
A. Yeah. I mean, like, if the medical department has -- you know, with laws, laws change, so

the medical department may have things that they need to have revised. The reentry department may change their procedures, so they may need to have things updated. Or education may change the way they do things, so their portion may need to be revised.

So, they would possibly notify me, but it would not get updated just because they're notifying me. You know, they would have to go through -- you know, I'd have to get approval before we would actually make those changes.

Q. And who approves -- let me ask this: If someone -- so, someone from the education or the reentry department notifies you of some change, before you begin the revision process, who would you reach out to to approve starting that revision?

A. Chief Smith.

Q. Okay. Does Chief Smith have to approve, like, the, you know, Okay, we need a revision here; we're going to go ahead and start this process?

A. He has to sign off on it, like from me, but he doesn't -- he actually goes up further to the secretary.

Q. Okay. So, ultimately, it's the secretary's responsibility to revise -- to make revisions; is that right?
A. To approve them, yes.
Q. Okay. So, going back to, let's say, it's someone from reentry. Reentry changes something. You tell Chief Smith, Look, I got notice from reentry. They changed something. I think we need to make a revision. Chief Smith and the secretary say, Okay. Yes. Let's go ahead. They approve the revision.
How does that revision actually happen? Like, who does the work of actually drafting the language and all of that?
A. So, if it would just be, like, for one guideline that we were making a revision on, we would do an amendment to that guideline or to the guidelines. I -- usually, whatever the department reentry would send, you know, they would pretty much take the guideline out of the BJ -- out of the current BJG and word it how they would want it. I would draft the amendment letter, then I would get it signed off by the secretary, and that's how we would notify the local level.

Q. Okay. So, when reentry reaches out to you, they're usually reaching out with a proposed amendment. You then pass that proposed amendment on to Chief Smith and/or the secretary. The secretary approves that amendment. And then tell me how it gets out to the local level.
A. By me via e-mail.
Q. Okay. And who are you e-mailing?
A. I send it to the team leaders, and they forward it to each of their facilities.
Q. So, in the course of a year, let's say, how frequently would there be amendments to the provisions?
A. Maybe three or four times a year.
Q. Okay. Now, that's an the amendment to the provisions. The basic jail guidelines will also get revised and sort of reissued as a whole every so often; is that right?
A. Yes, ma'am.
Q. Okay. Is there any kind of a regular schedule for that revision and kind of reissuing?
A. I believe with our new system, it is on an annual review.
Q. Okay. What new system?

A. PowerDMS.
Q. And what is PowerDMS?
A. It's all of our department regs are in the system. It's how they are reviewed annually. It's just the new system that we've gone to. I say "new." It's been a couple of years.
Q. So, is there a person who is responsible for going in and looking at the basic jail guidelines and doing a full revision?
A. Yes.
Q. Okay. Who is that person?
A. Me.
Q. Okay. And so, walk me through what that process looks like.
A. Well, throughout the year, if there are things that come up, I may make notes in my hard copy that I have on my desk. And then, when it's time to do a big revision, you know, I have all of those notes. I take all those amendments that may have come up throughout the year, and I make sure that those get added in. And then I may double-check, you know, any, throughout the year, any department regs that have been revised, and make sure that, you know, if there's something pertaining to

Wintz Kent, Megan 2/15/2024


that in the BJG, make sure that those get updated as well.
Q. Okay. So, amendments from different departments, departmental regs that may have changed. Is there anything else that would trigger a review or changing a provision?
A. I can't think of it right now.
Q. How long has the -- do you -- let me ask this: So, you said annually there is a review of the basic jail guidelines. Does the review always result in kind of a full revision and reissuing of the basic jail guidelines every year?
A. So, I've been in this position two years. And there was one that came out in 2021, and then there was one that came out in 2022, so yes, I would say so.
Q. Okay. So, this -- we're still on Exhibit 2, and this one is dated July 31st, 2022, correct?
A. Correct.
Q. So, this is the one that came out in 2022, right?
A. Right.
Q. Did this come out while you were in your

current position?
A. Yes.
Q. Okay. I want to go to Exhibit 3.
(Exhibit 3 to be marked for identification.)
BY MS. CUMMING:
Q. This is also the basic jail guidelines. It's 61 pages. I'm not going to show you all 61 pages, unless you really want to look at them?
A. No. That's okay.
Q. Okay. But this is -- on the first page, this one says, "April 25, 2019. Reviewed as of: October 1, 2019." Do you see that?
A. Yes.
Q. Okay. So, your testimony is that there is a basic jail guideline that was issued between 2019 and 2022; is that correct?
A. I actually think I misspoke, and I think it came out after 2022.
Q. Okay. All right. I just wanted to clarify. It's not gotcha. It's just clarification. So, thank you. That's helpful.
Okay. So, there is, what, maybe a 2023 basic jail guideline?
A. I would have to double-check.

Q. Okay. So --
A. I'm thinking of the one that I'm actually working on at the moment.
Q. I got you.
A. I have to double-check, yes.
Q. Okay. All right. The one that you're working on currently, has that actually, you know, been issued as the latest round?
A. No, ma'am. It's in draft stage.
Q. Okay. And do you know, were there any versions between 2019 and 2022?
A. I don't believe so, but I would have to double-check.
Q. Okay. If you find any, you can just let Wayne know?
MS. CUMMING:
Wayne, we'll have a request for that, if it exists.
THE WITNESS:
Yes, ma'am.
BY MS. CUMMING:
Q. Okay. So, prior to you coming into the position, was there any kind of schedule for updating the basic jail guidelines?
A. Not that I'm aware of.

Q. Okay. And do you know -- well, let me ask this: Prior to you coming into your current position -- let me back up and ask this: Right now, is there anything in particular that will trigger an update of the basic jail guidelines?
A. Nothing in particular that will trigger it, but I already have one that I'm working on, a draft that I'm working on.
Q. Okay. And that's part of what is now kind of, like, an annual process; is that right?
A. Yes.
Q. Okay. And prior to this annual process that you engage in, was there anything that would trigger an update to the basic jail guidelines?
A. I'm not certain.
Q. Okay. Would the person who would know that, would that be a person who held your position previously?
A. Yes, ma'am. I think so.
Q. Currently, can an observed deficit or a problem that you or that anybody else is seeing in the local facilities, can that trigger an update of the basic jail

guidelines?
MR. STEWART:
Objection as to form.
BY MS. CUMMING:
Q. You can answer.
A. I didn't understand the question.
Q. Sure. If there is an observed problem or some kind of a deficit, can that trigger an update of the basic jail guidelines?
A. I'm not certain.
Q. Okay. Do you know, has there ever been an update of the basic jail guideline that has happened because there has been some sort of a problem that was identified?
A. I have no knowledge of that.
Q. Okay. And so, to the best of your knowledge, this 2022, we're back on Exhibit 2, this 2022 version of the basic jail guidelines, that's the most recent operating version of the basic jail guidelines; is that right?
A. I think so, but I would have to double-check.
Q. Okay. And do you know what prompted the revision from the 2019 basic jail guidelines to this 2022 update?
A. I don't know.

Q. Okay. In a move to -- you said that now that you all are using PowerDMS, you are reviewing the basic jail guidelines annually. Did anybody instruct you to do that?
A. No, not necessarily.
Q. What prompted you to start doing that review annually?
A. Because of the amendments that we had that were out and department regs, just it had gotten to a point where I had lots of notes, and it was just time to make an update.
Q. Okay. And then you sent that update to Chief Smith and to Secretary LeBlanc; is that right?
A. No. It's still in draft form.
Q. I'm sorry. The -- I'm talking about 2022, the current one?
A. Yes. Correct.
Q. Okay. And they approved it; is that right?
A. Yes.
Q. Okay. In the process of approval, do you know what all they looked at?
A. I would assume -- I'm thinking they looked at the entire guidelines.
Q. Did they ask for any -- did they ask for any meetings, or phone calls, or conversation?

Did they have any questions about it?
A. I don't remember.
Q. Okay. You said the next revision of the basic jail guidelines is in draft form; is that right?
A. Yes, ma'am.
Q. Okay. What are the next steps to -- before that gets finalized?
A. It's still a work in progress, so I have work to do on it.
Q. Okay. So, that's not at the stage of Chief Smith and Secretary LeBlanc looking at it?
A. No, ma'am. It's still at my desk. It's still at my level.
Q. Okay. Who else is working on that with you?
A. Medical has a portion that they're looking at that they're working on.
Q. Who from medical is working on that?
A. Stacye Rodriguez.
Q. And what is her role?
A. She's the chief nursing director.
Q. Is she there at headquarters with you?
A. Yes, ma'am.
Q. Anybody else helping you with it?
A. No, ma'am, not at this point.

Q. Okay. Is there a point at which other people will become involved?
A. At some point, it will make its way to our policy. They'll review it. Our policy department.
Q. Is that before or after it goes to Chief Smith and Secretary LeBlanc?
A. It goes to them before.
Q. Okay. And do you know what the policy department is doing with it?
A. I don't know what the word is they use, but maybe they're just scrubbing it, checking it for legal, legalities. I'm not really certain.
Q. Okay.
A. And I just remembered that there is a November 2023 guideline that's out.
Q. Okay. Thank you.
Is it, like, a full revision?
A. Yes.
Q. Okay. So, just like Exhibit 2, you know, roughly 60 pages, 61 pages, all of the provisions?
A. Correct.
Q. Okay. All right.

MS. CUMMING:
Wayne, we're going to request that one.
MR. STEWART:
Okay.
BY MS. CUMMING:
Q. All right. I want to move into some of the more specifics. Let me ask you, generally, what is your understanding of what a classification system is in a prison?
A. Well, I never worked in classification, but I mean, it's a level of housing, a level of security, a level of mental health.
Q. And do you know why it's important?
A. Yeah, for the safety of the offenders.
Q. Okay. And so, kind of going back to your time at a state-run prison, does the department have a classification system for people?
A. Yes.
Q. Okay. And do you know what some of the considerations are for that classification system?
A. I don't remember.
Q. Okay. I'm going to show you what we're going to mark as Exhibit 4. It's 13 pages. I can

scroll through and show you, but there are just a couple of different areas I want to ask you about.

(Exhibit 4 to be marked for identification.)

BY MS. CUMMING:

Q. Have you seen this document before?

A. Yes.

Q. Okay. When have you seen this document before?

A. When I worked at Dixon Correctional. I've seen it in the ACA file. And I updated policy, so I'm assuming that I -- I mean, I updated the policy before. Not -- I updated it because I was directed by the classification officer as to what changes were needed.

Q. And this is at Dixon, correct?

A. Correct.

Q. So, this is part of what goes into the ACA file to show that you all have a classification system at Dixon; is that right?

A. Correct.

Q. And then you make revisions to it based on what the classification officer is telling you; is that right?

A. Correct.
Q. Okay. All right. And this says that the -- it's the pol -- it's "To state the policy relative to objective risk assessment guidelines/criteria for institutional security level and offender custody level assignments for all offenders."
And then it's specifying -- let's see. Where am I? Let me make sure I'm not lost. So, that there are specific criteria for headquarters staff and security staff for objective risk management and assessment.
And then down here, on page 2, it talks about the -- it talks about an offender classification plan, and it says, "The plan shall specify the objectives of the classification system and methods for achieving them and provide a monitoring and evaluation process to determine whether the objectives are being met."
Do you see where I am?
A. Yes.
Q. Was that -- well, let me ask you this: What does that mean, in your understanding?
A. Which part? The --

Q. That "The plan shall specify the objectives of the classification system and the methods for achieving them and provide a monitoring and evaluation process to determine whether the objectives are being met."
A. I'm not certain.
Q. Okay. Do you know who would be responsible for that monitoring and evaluation process to make sure that the objectives of the plan are being met?
A. Are we talking about at the state level? This would be, like, the classification director.
Q. Okay. So, at Dixon, you had a classification director, and that's who would be sort of taking on that role?
A. Yes.
Q. Okay. And then down here, it talks about -- I'm on the second paragraph of this kind of subset 5. Still on page 2. It talks about statistical risk categories. Do you know what statistical risk categories are?
A. I think so. I'm not very familiar with the classification area, but I mean, I think I know what that means.
Q. Okay. What's your understanding of it?

A. I would think, like, trustee level, like, medium, minimum, maybe mental health. That's what I'm thinking, but I could be off.
Q. Okay. So, you said that there was someone at DCI who would be sort of responsible for, you know, implementing this plan. Is there anybody at the state level that's looking at this for state prisons?
A. I'm sorry. Repeat that.
Q. Sure. So, you said that, at Dixon, the classification officer was the person in your understanding who would be kind of evaluating and monitoring the classification process to make sure that the objectives of the classification system were being met.
Is there anybody at the state level that is looking at that question for, you know, state prisons, generally?
A. So, we're talking about -- both of these are state facilities. So, you're talking about both state facilities?
Q. Yes. All state.
A. I'm not certain. I'm not certain that I understand the question.
Q. Okay. Yeah. I -- I just wanted to -- I think

it's all right. Yeah. Never mind.
All right. So, down here, in "Definitions," it talks about "Initial Classification" and "Reclassification." Do you see where I am?
A. Uh-huh (affirmative response).
Q. Do you know what is the point of initial classification?
A. Yeah. To -- I mean, like, when they first come in, you initially classify them to see where they need to be housed, or maybe for their mental health status.
Q. And then reclassification. Do you know what the point of that is?
A. Yes.
Q. What is your understanding of what the point of that?
A. This is, like, if they are -- maybe if they have a disciplinary write-up, and they had to be moved to maybe a disciplinary dorm. And then after they served their time in the disciplinary dorm, maybe they're reclassed after that, or maybe they could be reclassed for an education program, or they could be reclassed for a job change.

Q. Okay. And then going down to page 3, it talks about general classification procedures. And I'm looking at A. It says, "The primary objective of the facility's classification plan shall be to maximize stability within the facility by assuring proper offender custody and work assignments."
What is your understanding of that "maximize stability" raising?
A. My understanding is to make sure that inmates are housed properly or assigned, maybe that they're, you know, screened. If they are not -- if they're -- you know, if they shouldn't be a trustee, that, you know, that they're screened so they don't become trustees.
Q. And you said earlier that part of the reason that classification is important is, you know, to keep inmates safe. Is this maybe another way of saying that as well?
A. Yeah.
Q. Okay. So, maximizing stability is also kind of maximizing keeping people safe; is that fair?
A. Yes.
Q. Do all the department, you know, the state-run

prisons, have to abide by this policy?
A. Yes.
Q. Okay. And do you know, how does the department ensure that this policy is being followed?
A. Well, they -- there's classification procedures. I mean, I can't be a hundred percent certain on that answer.
Q. Okay. Classification is included as one of the areas that the, you know, the team of auditors would audit, you know, and 15 or 20 people would come and check on how a state-run facility was operating; is that right?
A. Correct.
Q. Okay. And so, was there a specific auditor that was assigned to classification?
A. I don't recall a specific one, no.
Q. Okay. But whenever -- when the team of people went to a place, was there one person on that team that was primarily tasked with looking at classification?
A. Yes.
Q. Do you remember, on the teams that you participated in, do you remember who that person was?

A. I believe it was Duane Cambre.
Q. So, this has been a policy that we've been looking at. I'll go back up to page 1. Oh, I'm sorry. This is a department regulation.
So, when you were talking about change, you know, looking at the basic jail guidelines for revisions, is part of what you were looking at to make sure that the basic jail guideline aligns with, you know, department regulations like this?
A. Yes.
Q. Okay. So, do you know, do local facilities have to follow a similar policy related to classification?
A. There is a classification section in the BJG guidelines. I don't know that it's specific to that, but there is a classification guideline.
Q. Okay. We can go -- so, going back to Exhibit 2 -- let me stop sharing for a second. All right. We're on page 20 of Exhibit 2. Can you see that?
A. Yes.
Q. All right. So, I want to just scroll down. This is Revision II-A-012. It says,

"Classification System (Revised)." And then down here, it's got comment: None. Protocol, documentation, and then spilling over to page 21, it's got documentation.

So, this is the provision in the basic jail guideline that deals with classification; is that correct?

A. Correct.

Q. Okay. Is there any other provision in the basic jail guideline that deals with classification?

A. I would have to thumb through it to look, but I'm not certain.

Q. Actually, let me show you the table of contents. That might -- can you see that? We're on page 4 of Exhibit 2.

A. Yes.

Q. Okay. Let me know when you want me to scroll down, but if you want to just take a quick look through the table of contents and see if that jogs your memory about any other provision.

A. Okay. You can go down. Is there more to that, or is that all?

Q. I think that's it. And then just into the

index, which I can show you that, too, if that's helpful.
A. Maybe.
Q. Okay.
A. And so, what am I looking for?
Q. Anything -- so, we were just looking at the provision that says it is the classification provision, but if there is any other provision that you can think of that touches on classification?
A. Okay.
Q. And see if any of these titles sort of jog your memory about that.
A. Yeah. I don't think so. I think it's all going to be in that one area.
Q. Okay. All right. So, we're down here.
A. II-A-14.
Q. II-A-14?
A. Yeah. There may be something there.
Q. Separation in classification. I see. And this is dealing mainly with gender, right?
A. Correct.
Q. Male and female offenders. Okay. All right. So, that's on page 21 of Exhibit 2.
Any other place you can think of?

A. No, not offhand.
Q. Okay. So, going back to page 20, looking at this II-A-12 classification system, do you know who developed this classification provision?
A. No, ma'am, I don't.
Q. Do you know when it was first included in the basic jail guidelines?
A. No, ma'am.
Q. Do you know who would know who developed this classification provision?
A. I don't know.
Q. And what is the purpose of this provision?
A. For assignment, housing assignment for the inmates.
Q. And it's also -- it looks like it's requiring, like, a classification plan and an objective classification system; is that all correct?
A. Yeah.
Q. Okay.
A. That's correct.
Q. Okay. And it has to include appropriate level of custody, appropriate housing assignment, and interest and eligibility to participate in programs, right?

A. Yes.
Q. Okay. Down here, where it's got comment, and it has none, what is that section used for?
A. Normally, that would have -- like, when the facility is building a file, like their BJG file, to show their documentation, we would have a sample of -- you know, it would be a comment of some type of documentation that they could put there. I think that's what that's for.
Q. So, like, the facility would include the comments or --
A. No. We should have. If there were a comment to be put there, DOC would put that there.
Q. Okay. And that comment would be something along the lines of examples of stuff to include in that BJG file?
A. Yes.
Q. Okay. And then protocol. What is that?
A. Protocol is a copy of their policy or procedure. Like, their classification plan, offender handbook.
Q. Is the classification plan -- what -- what would you expect to see in a classification plan?

A. Well, some of the things that are listed there.
Q. Is it different from the policy and procedure?
A. It would be whatever the facility would have, you know. It would be their policy, and it doesn't necessarily have to follow the department's reg.
Q. Okay. So, I mean, it's got written policy and procedure. So, that would be one thing that would be included in the BJG file, right?
A. Correct.
Q. And it's got classification forms and formats. So, those would be the sorts of forms that are used in the classification process, correct?
A. Correct.
Q. And it's got offender handbook, which I think is self-explanatory. Offender orientation materials. So, you know, that would be anything that the person is handed, right?
A. Right.
Q. And then there is classification plan. So, it is a separate thing that's listed. Do you know what that thing is supposed to be?
A. I don't know. No, I don't know the answer to that.

Q. And then documentation. What is that? What is that supposed to be?
A. That's the one I thought the comments should have been. So, I'm not certain what the comments -- I would have to see another one that had comments on it.
Q. But documentation would be what?
A. What should be in the files. A sample of what should be in the files.
Q. Okay. All right. So, offender housing records and offender classification records, right?
A. Right.
Q. Okay. For the classification.
Does it -- do you know when -- we'll get to that later. We'll come back to that.
Okay. All right. And I don't know -- I don't -- I can't recall seeing one that had a comment. So, I'm just scrolling through to see if there's an example. Oh, all right. So, we're on pages 23 to 24 of the exhibit, and this is II-B-002, use of restraints, and the comment is about, you know, restraint devices.
Does that help kind of jog your memory

about what the comment field is for?
A. Yeah. I mean, it looks like it's just notes about the section, about the guideline. You know, if there's anything that needs to be spelled out. Like, what something means. Like, a definition. I'm not certain why there's not anything there.
Q. Okay. But, just generally, that comment field is used if there is some sort of clarification that might be helpful, but not necessarily part of the official provision that's included there; is that right?
A. Yes.
Q. Okay. All right. So, do you know -- we're back on page 20 of Exhibit 2. Do you know when this was last revised?
A. I am not certain.
Q. Okay. So, I will just represent to you that there was a revision between 2019 and 2022 of this provision, and I'm going to show you -- Exhibit 2 is the 2022 version of the basic jail guidelines. We're going to go to Exhibit 3, which is the 2019 version.
A. Okay.
Q. We're on pages 18 through 19 of Exhibit 3.

Can you see that?
A. Yes.
Q. All right. So, this indicates, "Written policy, procedure, and practice provide for a written offender classification plan that includes custody required and assignment to appropriate housing. Offender management and housing assignment considers age, gender, legal status, custody needs, special problems and needs, and behavior. All offenders are classified using an objective classification process."
Rather than making you, like, spot the five differences and all those fun games for kids, I'll just tell you. What I saw in comparing these two provisions is right here in this kind of third or -- sorry -- second sentence right in the middle. It looks like it just was rephrased. I'll show you 2022, again, so you can compare.
A. Yeah. I think they changed the verbiage on behavioral issues on there, yeah.
Q. Yeah, looking back at it.
Do you know, how did that change come about?

A. Not a hundred percent.
Q. Do you know who changed that wording?
A. I think medical did, but I'm not a hundred percent on that.
Q. Okay. Do you know why that change was made?
A. I think because it was -- maybe it just flowed better, or it was the right -- no. I would have to look back at notes. I don't have the right answer.
Q. When you say "look back at notes," what sorts of notes would you be looking at?
A. If I had notes on that from my draft or notes from why that was changed.
Q. Do you know, were there any kind of discussions around this guideline and this change?
A. No, I don't.
Q. Would there have been any documentation of the discussion around this change?
A. I'm not certain.
Q. I want to go to Exhibit 5.
(Exhibit 5 to be marked for identification.)
BY MS. CUMMING:
Q. So, this is what's called a checklist, and there's a Bates number on here that I'll give

you. It's Bates ESI - JAMES MURRAY 190. It's 7 pages. Have you seen this document before?
A. Yes.
Q. Okay. When have you seen this document?
A. It's a file checklist that goes in a -- I mean, I've seen it on audits. I've seen them when I update them, yeah.
Q. So, like, when you update this form; is that right?
A. Yes.
Q. Okay. Have you updated the form for II-A-008, the offender population management system?
A. Yes.
Q. Okay. When is the last time you updated that?
A. I'm not certain, but I would say, I think, the November revision I made some updates to it.
Q. Do you remember what those updates were?
A. No, I don't.
Q. Prior to that -- and when you say "November," you're talking November 2023, correct?
A. Correct.
Q. And prior to November 2023, had you updated that provision at all?
A. Yes.
Q. When was the --

A. It would have been after the July 2022 update.
Q. After the July 2022?
A. This would have been a -- I would have revised those after the BJG revision for the 2022. The one that came out that summer.
Q. I see. So, if there's a BJG revision to a provision, then you, as soon as that new guideline goes into effect, you go back and you revise the checklist; is that right?
A. Correct.
Q. Okay. All right. But you don't revise the checklist at the same time you're doing the revisions to the guidelines; you wait until after the new guidelines have gone into effect; is that right?
A. Yes. That's right.
Q. All right. And I am not sure that these are dated, so do you know where the date would be on these checklists?
A. I don't know that they are dated. They may be dated in a folder on my computer, but I don't think I have dates there.
Q. Okay. So, you know, if you're not looking at your computer, if you're just someone at one of the outcamps who has this form, you can't

see what version this is; is that right?
A. Right.
Q. So, we're down on page 4 of Exhibit 5, which is II-A-012, the classification system. And so, does this form -- can you tell me -- let me ask this: Do you know when it was originally developed?
A. No, ma'am, I do not.
Q. Okay. And I think you made reference to it being in a folder. How -- are you talking about, like, the folders that the local facilities keep?
A. I'm sorry.
Q. Is that right?
A. I don't understand.
Q. Sure. Let me back way up. What is this form used for?
A. That is for their final checklist. So, when an auditor goes -- when one of the team leaders go in to audit their facility, not only are they walking around the facility to check their procedures, they're also looking at their files. So, that would be on one side of the file, and the documentation would be on another side of the file.

Q. Okay. And the documentation, that includes written policy, procedure, classification forms, offender handbook, orientation materials, classification plan, offender housing records, and offender classification records; is that right?
A. Yes.
Q. Okay. The offender housing records, would they be in the file as well?
A. I'm not certain. It should be.
Q. Okay. I guess, let me clarify what I'm asking. Do you know, are the offender housing records that the auditor or the team leader would be looking at for this provision, would they be going to sort of where those housing records are kept in the normal course of business, or is there, you know, is there a sample of housing records that are pulled by the local facilities?
A. There should be a sample in the file, in their BJG file.
Q. Okay. And that sample, it's not just, like, a blank form; it's an actual, like, sample of a real housing record for John Doe; is that right?

A. Correct. Yes.
Q. Okay. Do you know how many samples the local facilities are supposed to pull?
A. They should have three years.
Q. And how many samples for each year?
A. One would suffice.
Q. Okay. And who developed that process?
A. I have no idea.
Q. Okay. So, that's been a process since you came in; is that right?
A. Yes, ma'am.
Q. All right. And so, my understanding, tell me if I'm getting it wrong, is there is an audit every year of the local facility, but then there's a recertification visit every three years; is that right?
A. Yes, ma'am.
Q. Okay. Is this checklist used as part of the annual audit?
A. It's only used at the facility. Like, that never makes its way to headquarters.
Q. Okay. All right. And when it's in use in the facility, is it only used for that every-three-year visit, or is it used for the annual visit; do you know?

A. It's used for all of them.
Q. Okay. If, for whatever reason, so COVID, or, you know, some other reason, there isn't a visit, does this form still get completed?
A. No. If there's not a visit, it doesn't get completed.
Q. And do you know when -- I'm sorry. Go ahead.
So, do you know when, in relation to the visit, this form would be -- and I'm looking now specifically at that self evaluation section -- do you know when the self-evaluation section would be completed?
A. No, ma'am.
Q. Okay.
A. That would be on the facility.
Q. Okay. So, you, at headquarters, never see this document; is that right?
A. Right.
Q. Okay.
A. It's just a guide through the facility, and it's for the monitors.
Q. Okay. And so, the -- but the expectation is the monitors are reviewing the facility policy; is that right?
A. Right.

Q. Okay. Do you ever request or have you ever had sent to you a local facility policy?
A. Yeah, from time to time we get their emergency policies or plans.
Q. And is that something that you asked for or something that the facility will send to you to ask for sign-off?
A. Sometimes you have to ask for it, and sometimes they send it.
Q. I want to show you Exhibit 6. Madison Correctional Center and Southern Correctional Center. This is the offender classification and trustee assignment.
(Exhibit 6 to be marked for identification.)
BY MS. CUMMING:
Q. Have you seen this policy before?
A. No, ma'am.
Q. Okay.
MR. STEWART:
Elizabeth, it's about 1:30. Could we take another break?
MS. CUMMING:
Sure. Good timing. Five minutes; is that all right?
MR. STEWART:

Six minutes?
MS. CUMMING:
Sure.
MR. STEWART:
Okay. Thank you.
MS. CUMMING:
Okay.
(Recess taken.)
BY MS. CUMMING:
Q. So, I wanted to move into incident reporting. Like we talked about at the beginning, you've been designated as the representative for the department about reporting from local facilities, including underlying documentation, attachments, narratives, etcetera.
MS. CUMMING:
Lorie, I'm sorry. Tell me if you need me to slow down.
THE REPORTER:
(Indicated.)
THE WITNESS:
It's okay.
BY MS. CUMMING:
Q. So, before we get into the local facilities, I

wanted to kind of go back to your experience at Dixon and the main prison facilities.
So, who at the department would receive notice of incidents at main facilities?
A. What do you mean; who would receive them?
Q. So, you know, if there was a death at Dixon, would someone at headquarters receive notification of that?
A. Yes.
Q. Okay.
A. Well, the duty officer would be notified, and then there was an e-mail group that had to be notified. Like, a Cat A or a Cat B notification that would have to go out.
Q. I'm sorry. You said Cat A or Cat B?
A. Yes. Category A or Category B.
Q. All right. What's a Cat A?
A. It would be an offender death that's, I guess, like a homicide or -- not -- not a medical death. Not something that's, like, a cancer patient. It would be, like, a stabbing, or a Cat A would also be an escape, or, I think, a fire, a suicide.
Q. All right. And what about Cat B?
A. Cat B would be, like, a medical-type death, an

injury with a significant -- an incident with a significant injury.
Q. And what --
A. An arrest-type thing.
Q. And what is a significant injury?
A. A significant injury is classified as being out for -- it's either six or nine weeks. Like, not able to work for six or nine weeks.
Q. Okay. So, it's not just being sent to the hospital; it's longer than that?
A. Yes. Correct.
Q. So, something that results in, you know, almost, like, a longer-term disability?
A. Yes.
Q. Okay. And so, all of that would go out to, like, an e-mail group?
A. Right.
Q. Okay. Who all was included in that e-mail group?
A. I am not a hundred percent on that.
Q. Do you recall, did the group have, like, a list serve name or something like that?
A. I don't know. I don't -- what's a list serve name? I'm not certain what that is.
Q. So, like, if you're in Outlook, and you've

created, you know, a group of people that you would call it, you know, death notification list or something like that?

A. Yeah. So, that's what that was. I mean, it would -- it was an e-mail group for Category A, and then there was so many people attached to that e-mail group, yes.

Q. Okay. But you don't recall who all was attached to that e-mail group?

A. No. I mean, I know some of the names, but I don't know who all is attached to it.

Q. Okay. But were there people at headquarters who were attached to it?

A. Yes.

Q. Okay. And do you recall what sort of that e-mail group was called?

A. I'm sorry. Say that again.

Q. Do you recall what that e-mail group was called?

A. I think it was, like, Cat A notification or Cat B notification. It was something simple like that.

Q. Okay.

A. Since we've moved to Outlook, the e-mail has actually changed. So, I don't -- I'm -- I'd

have to look it up to see what the e-mail is.
Q. Okay. When did that move to Outlook happen?
A. For DCI, it might have been around COVID time. I think different parts of the state came on board at different times, so I don't know when it came on here at headquarters.
Q. And so that would have been, roughly, 2020 for DCI; is that right?
A. Yeah. I think so. I think that's correct.
Q. Okay. And prior to Outlook, what was the system?
A. We had Lotus Notes.
Q. Okay. So, what about -- again, still talking about, like, you know, trying to recall back to when you were at DCI, was anybody at headquarters notified for hospitalizations?
A. I'm not certain.
Q. Okay. What about --
A. Yeah. I don't know. For just regular hospital, I don't know.
Q. Okay. What about assaults?
A. I mean, we had to report it, but depending on the significance of it, it may have just gone on the monthly reporting. If it was something with significant injuries, then yes, that was

reported.
Q. And the monthly reporting, did that include deaths?
A. Yes.
Q. Did it include hospitalizations?
A. Yes.
Q. And it included assaults?
A. Yes.
Q. Did it include sexual assaults?
A. Yes.
Q. Did it include contraband?
A. Yes, ma'am.
Q. Anything else?
A. It included ARPs. It included DB appeals. It included court trips, hospital trips, any little community projects, all sorts of things.
Q. And who at the department would receive those monthly reports?
A. It -- I guess, each individual, like, department would get a copy of it. It would roll up. And then, I guess, like, chief's office, secretary's office. I think all upper management. Like, leadership would get copies of it, as well as each facility warden would

have a copy.
Q. So, the facility warden would have the copy for their facility, right?
A. Yes. And they would have it -- once it rolled up, they would get -- so they could see what was happening at other facilities. They would have access to other facilities as well, so they could compare.
Q. Okay. So, the warden --
A. They had --
Q. I'm sorry. Go ahead.
A. You know, they had hard copies, but they could also pull it up in the system.
Q. Got it.
Okay. So, the warden at Angola could pull up DCI's monthly report in, like, some kind of an online system?
A. Yes.
Q. What was that system?
A. It was a C-05 reporting in Lotus Notes.
Q. And is it, like, a cloud-based system on the Internet that you can access from any computer, or is it, like, a database where you, you know, would only access it through a specific portal?

A. I think it's a database that you would just access through -- I really don't know the answer to that. Yeah. I don't know.
Q. Okay. All right. Is that still -- is that still how monthly reporting for the state facilities is kept?
A. Yes.
Q. Okay. So, that's still through Lotus Notes; is that right?
A. Yes.
Q. Okay. So, if you wanted to go look at, you know, what was happening at Dixon or look at Dixon's monthly reports, would you have to go sit down at a specific machine that's, you know, loaded up with the ability to access this database?
A. If I still had access, I could look at it through my computer. Now, I don't know if I still have access or not.
Q. Okay. Got it.
Okay. And so now, for incidents at local facilities, what sorts of things do local facilities have to tell the department about?
A. Escapes, deaths, assaults with significant injuries, any sort of, like, I guess, fires,

or riots, or those sort of things.
Q. Okay. And significant injuries. What does that mean for local facilities?
A. It would be the same. You know, anything with a significant injury. Like, I guess, like, if somebody got stabbed and was going to be out for a significant amount of time, or if they had to have some major surgery, or any unusual occurrence, you know, that the warden of the facility felt necessary that needed to be reported, then they should report.
Q. Okay. And what form -- well, let me ask this: Does the department get notified about hospitalizations?
A. Our medical department does, yes.
Q. Who at medical receives that notification?
A. I'm not certain.
Q. Do you know how they receive that notification?
A. I don't really know the answer to that, no.
Q. Outside of medical, is there anybody else in the department that receives notification of hospitalizations?
A. I don't know. Yeah. I'm uncertain.
Q. What about assaults?

A. Not just your -- I mean, that gets reported on a monthly basis, just your average assault, your offender-on-offender fight. That gets reported monthly.
Q. And sexual assaults?
A. That gets reported to our PREA coordinator.
Q. Who is the PREA coordinator?
A. Joel Odom.
Q. Is Joel Odom at headquarters or someplace else?
A. He's at headquarters.
Q. Is he responsibile -- is he the PREA coordinator for all of the state facilities?
A. Yes.
Q. Okay. Does his responsibility also extend to the local facilities?
A. Yes.
Q. So, for reporting that happens outside of that monthly report, the escapes, something with significant injuries, fires, riots, unusual occurrence reports, how does that reporting happen?
A. The local level reports to the Hunt -- Elayn Hunt control center. They, in turn, report it to the duty officer, and the duty officer

notifies Chief Smith.
Q. How does the duty officer notify Chief Smith?
A. I guess depending on the incident. By e-mail -- I mean, by telephone call.
Q. Okay. And what information is included -- when you say the local facility or the local level reaches out, do you know who from the local level is reaching out?
A. I don't know. I mean, it should be the warden or the facility administrator, but I don't know that it's always that person.
Q. But it's someone at the facility, not, like, the team leaders that would do that?
A. Right. It's somebody from the local level from their facility.
Q. Okay. And what information are they supposed to include when they are reporting something?
A. Offender name, DOC number, date of birth, depending on what the incident is, if it's an escape, you know, we need to know if they have any victims, or maybe last known address. We have a list of things that are required for them to report.
Q. Where is that list?
A. In my office.

Q. Is it -- well, let me ask you this: Is it called anything?
A. It's actually just kind of, like, for the duty officer training, I guess, so we know what we need to report. So we have all the information to give to the secretary and the chief. So, like, all the -- so they have all the information that they need. Then there's really no blank spaces. They don't have to guess at anything.
Q. Is that list sent out to the local facilities?
A. No.
Q. Okay. So, is there any kind of instruction or list that the local facilities have so they know what information you need?
A. It's the duty officer's responsibility to reach out to the local level and gather all that information.
Q. Okay. And how does that contact happen?
A. So, once the control center, the Hunt control center, contacts the duty officer, if more information is needed, at that point, then the duty officer calls whoever from the local level. You know, they should have their name and number. They'll reach out to that person

and get more information from them.
Q. Okay. So, it's --
A. It's a phone call that's made.
Q. Okay. All right. And then when the duty officer gets all of the information on their checklist from the local level, how does the information get conveyed to Chief Smith and Secretary LeBlanc?
A. There is an e-mail group that -- there is a duty notification e-mail that that goes to. So, everybody gets it, all of that information, for whatever incident it may be.
Q. Is there usually sort of, like, an underlying narrative that's coming from the local level, so, they're not just saying, you know, so and so DOC number, date of birth, escaped from the facility, but they're providing a little context about where they escaped from, and when, and how?
A. Yeah. They usually give a background of whatever happened.
Q. Okay.
A. Yeah.
Q. Who all is on that duty notification e-mail?
A. I don't know who all is on it. I know Chief

Smith is on it. Secretary LeBlanc is on it. Stacye Rodriguez is on it. Duane Cambre is on it. Outside of that, I don't know. I know there's other people, but I'm not certain who they are.
Q. Are you on it?
A. No, ma'am.
Q. Okay. Does the department pay for hospitalization or medical care for people in the local facilities?
A. I'm not certain. I'm not certain.
Q. Okay. Other than the monthly reporting, do you get any notification of hospitalizations?
A. No, ma'am.
Q. So, outside of the monthly reporting, but sort of thinking about the escapes, significant injuries, fires, riots, other unusual occurrences, do you ever get notification of those sorts of things?
A. Only if I request additional information about an issue. I don't get any notification up front before anybody else, no.
Q. Okay. When would you ask for additional information?
A. If the chief's office gets one of those

reports, and they need more information.
Like, if the duty officer submitted something to the notification group, then chief's office may have more questions about it. So, they might want a full report, so I get with the BJG team leader for them to get a full report, and then that would be submitted to me.
Q. The full report would?
A. Correct.
Q. But otherwise, you weren't getting, like, narrative reports or anything like that about any of these issues?
A. No.
Q. Okay.
A. No, ma'am.
Q. Okay. I'm going to go to Exhibit 7.
(Exhibit 7 to be marked for identification.)
BY MS. CUMMING:
Q. Can you see this document?
A. A little bit.
Q. All right. I can blow it up a little bit.
Does that help?
A. Yes.
Q. Okay. Have you seen this document before?
A. Yes.

Q. All right. Does this -- when have you seen this document before?
A. Well, not specifically this one, but I mean, I know what this is. I've seen them.
Q. Okay. And this document is from May 2020. So, this would have been before you took on your current position, right?
A. Correct.
Q. Okay. But this -- and you're answering the question I was needing to ask, which is this type of document. So, what is this type of document?
A. That's an activity -- a monthly activity report.
Q. Okay. And where does this come from?
A. From Lotus Notes. Well, for me, Lotus Notes. It's a web-based thing for the local level.
Q. Okay. And so, you aren't the one that's filling in -- there's, you know, a bunch of columns on one side and a bunch of numbers on the other. You aren't the one that's filling in these numbers; is that right?
A. No, ma'am.
Q. Okay. Do you know who is?
A. The local level.

Q. Okay. And when you say "the local level," do you know, like, so for Madison Parish, do you know who that would be?
A. I do not know.
Q. Okay. But it would be someone at that facility, correct?
A. Correct.
Q. Okay. It's not the team leader that's completing it, right?
A. No, ma'am. They approve them, but they do not enter the information.
Q. Okay. So, when you say that the team leader -- and I see here, it says, "Reviewed and approved by Tyrone Mays." Tyrone Mays is the northeast team leader, correct?
A. Correct.
Q. So, when you say that the team leader approves this document, this monthly activity report, do you know what the team leader does to do that?
A. They go through and look at those numbers and make sure that nothing looks out of place. I mean, all they can do is go through there and look to make sure that everything is entered.
Q. So, they're going through to just sort of make

sure that all the fields have something; is that right?
A. Right. And make sure that nothing sticks out.
Q. Okay. So, when you say "nothing sticks out," what sort of thing do you mean?
A. I don't know. Like, for instance, if they have 20 deaths on there, that wouldn't be right. So then, he would know to contact them and say, Hey, this number isn't right; can you double-check it? Like, if something just looks off, he needs to reach out to the facility before he approves it and have them double-check it.
Q. So, something that might look like a typo or something like that?
A. Correct.
Q. Okay. Do you know, are the team leaders looking at any other kind of underlying documents, or reports, or anything like that to sort of check and make sure that these numbers are lining up with the information that they've gotten?
A. Not that I'm aware of.
Q. Okay. Is this document, like, e-mailed to you directly, or do you have to log in to Lotus

Notes to access it?
A. Yeah, I have to log in to Lotus Notes to access it.
Q. Okay. How frequently do you log in to Lotus to access the monthly activity reports?
A. Not enough.
Q. Okay. Do you have any responsibility related to the monthly activity reports?
A. I mean, besides I should be double-checking, I guess, behind the team leaders. I mean, I don't review and approve them, but I should be a second pair of eyes looking at them.
Q. Okay. And so, when you are a second set of eyes looking at them, is there anything that you are, like, comparing them to or trying to check them against?
A. I compare them to the previous month's reports.
Q. But you're not trying to compare them to any kind of underlying documentation to make sure that they're accurate; is that right?
A. Well, with their monitoring reports that I get, I use that, and I'll go back and reference those sometimes to see if those are right. Like, what they're reporting on the

monitoring reports, sometimes I question, in my mind, I'm questioning a number, and I'll go back and look to see if they reported that for the month. So -- and that would be the only time I would do that.
Q. Okay. So, if you have the monitoring report, you're basically making sure that they added correctly, right?
A. Yeah. Right.
Q. All right. Do you forward these monthly activity reports to anybody?
A. No, ma'am.
Q. Who else has access to these monthly activity reports through Lotus?
A. They get rolled up monthly to where all of the facilities are, like, compiled together, so where you could see them side by side. So, the secretary, the chief, I would assume Duane. I'm not certain -- I'm not certain who all has access to it.
Q. Okay. All right. So, that rollup -- let's go to -- let's see if I can get there. This is going to be Exhibit 8. Well, I just lost it. Hold on one second. Sorry. On the Lotus Notes -- all right. So, this is Exhibit 8.

(Exhibit 8 to be marked for identification.)
BY MS. CUMMING:
Q. So, it's called the single month activity report. It's from May 2020. So, I know this is before your time, but just as an example. It's 9 pages. Is this the rollup report that you were talking about?
A. Yes.
Q. Okay. All right. So, going back to the Lotus Notes, is there a way to see kind of who is logged in to the system and looked at what?
A. I don't know.
Q. But those monthly activity reports that come from the facility, those are all stored there, and you have access to them, right?
A. Yes, ma'am.
Q. Okay. But you would have to actually affirmatively go in and, like, pull a monthly activity report to look at it; is that right?
A. Right.
Q. So, in the course of, you know, let's say a month -- well, let's say over the course of three months, how often are you going in to look at the monthly reports?
A. Well, this is a process that I started -- I

don't know -- maybe in November. So, I have a checklist that I started. And once I go through them -- once I get notification that the rollup is done, then I'll go and -- that gives me indication that all of the team leaders have done what they needed to do. So, I'll just go back and look through them, and then I'll check off as I go.
Q. Okay. And when you say you'll go back through --
A. It's on the back burner of the things that I do.
Q. I'm sorry. Say again?
A. That's on the back burner of the things that I do.
Q. Okay. I got you.
All right. So -- and I want to make sure I understand. When you say that you are going through the monthly reports, are you going through the rollup, or are you going through the monthly activity reports coming from the facility?
A. I go through the ones that come from the facility.
Q. Got it.

Okay. And you're basically comparing to that rollup; is that right?
A. Not really. I'm just reviewing the monthly one.
Q. Got it. Okay. Great.
And this rollup, this Exhibit 8 that we're looking at now, do you know who creates this?
A. Colette Boies.
Q. Okay.
A. But as far as creating it, I think it's just a click of a button.
Q. So, it's, like, a report that can get generated?
A. Yes, ma'am.
Q. Does this get generated by Lotus Notes?
A. Yes, ma'am.
Q. Does this monthly, this rollup, does that get sent out to anybody?
A. I don't know.
Q. Do you --
A. I think we get notification that it's done, but as far as that actually being e-mailed, I don't know.
Q. Okay. How do you get the notification that it's done?

A. From Colette.
Q. Okay. And how does she send that notification out?
A. She sends an e-mail.
Q. Okay. And who all does she send that e-mail to?
A. I am not sure.
Q. Is it a bunch of people or just you?
A. No. It's others, but I don't really know who is on that e-mail.
Q. Okay. And so, when you get that notification from Colette, you know that all of the monthly activity reports have been submitted; is that right?
A. Yes.
Q. Okay. Perfect.
And then if you're able to get to it that month, that's when you go in and will take a quick look; is that right?
A. Right.
Q. And what is Colette's role?
A. I don't know her official title, but she's -- she does the CFACILITY reporting, and she has something to do with the C-05 reporting, which this form is pretty much part of the C-05, but

this is just the local level side of it.
Q. Okay. And C-05, that's the department regulation about kind of incident reporting; is that right?
A. That's in there, but it's also local reporting from the state facilities.
Q. Okay. All right. And who does she work for?
A. Joli Darbonne. She works for the division of prison operations.
Q. Got it.
And the division of prison -- who is the head of that? Is that -- well, who is that?
A. Chief Smith.
Q. Okay. All right. So, it's Colette, Joli Darbonne, Chief Smith; is that the ranking?
A. Colette, Joli, Duane, Chief.
Q. Got it. Okay. Thank you.
A. Sure.
Q. Okay. So, do you spend any time looking at this single month activity report?
A. Only when necessary. Not very often.
Q. Okay. When would it be necessary?
A. Like, if I needed to see -- I guess, if I needed to compare maybe a couple of facilities that are in one area, maybe in one parish. I

don't look at this report that often.
Q. And do you direct anyone to confirm that the reported information is accurate?
A. No.
Q. Okay. And do you look at any other reports from the facilities to confirm that the information is accurate?
A. No.
Q. Okay. I want to go to Exhibit 9.
(Exhibit 9 to be marked for identification.)
BY MS. CUMMING:
Q. Now, again, this is going to be before your time. So, I'm asking about the general form. This is the basic jail guidelines quarterly summary report for April to June 2020 for the northeast region.
Does this document look familiar to you?
A. It does, but that's no longer being done.
Q. Okay. When did this -- well, let me ask this: Do you know who developed this form?
A. No, ma'am.
Q. Okay. Was this form being used when you started in your current position?
A. No, ma'am.
Q. It was not?

A. No, ma'am.
Q. Do you know when it stopped being used?
A. I don't.
Q. Okay. So, these narratives here, I'm looking at the bottom of page 1 and going to page 2, where it says, "assaults with significant injury," and it's got, like, little kind of narratives about, you know, what happened, do you know where those come from?
A. Those come off the monthly report. So, like, if we went in Lotus Notes to the May 2020 monthly report, that information should be at the bottom of that May report.
Q. Okay. So here, we're on page 2 of Exhibit 9, and looking at Madison Parish, it says, "Offender Michael LeBlanc had a physical altercation with Pretrial Offender Lamar Green." Stab wounds, hospital route, criminal charges, etcetera. And then going back to Exhibit 7, the monthly report, I see in the comments where it sort of talks about some of the injuries, but it doesn't appear to have the same kind of information.
A. Does it -- I can't really see that. Does it list any of those assaults?

Q. It looks like it lists the assault, but it doesn't include all of the information that was included in the quarterly report.
A. So, those reports were submitted -- the quarterly reports were submitted to the secretary, and I'm sure he wanted more information, which is why it goes into a little more detail on the other report.
Q. Okay. So, the quarterly report that's Exhibit 9 that we were just looking at is submitted to the secretary, right?
A. Yes, it was.
Q. Okay. And so, you're saying that the secretary may have requested more information?
A. Yes.
Q. All right. So, my question is still this is the main monthly report. This is -- it's a bunch of numbers, and then the only comments are down here. I can blow it up more, if you would like. And then this is the quarterly report where it discusses the fight between Michael LeBlanc and Pretrial Offender Lamar Green, which appears to be different than the information that's provided in the monthly report.

Do you know where this narrative comes from in the quarterly report?
A. It would have to come from the facility. Warden Mays would have had to request more information from the facility on that.
Q. Okay. And then this -- you're saying this quarterly report would go up to the secretary; is that right?
A. Yes, ma'am.
Q. Okay. Do you know why they stopped doing these quarterly reports?
A. I remember a discussion about it, but I'm not a hundred percent why they stopped doing them.
Q. Okay. Who was involved in that discussion?
A. Me and Chief Smith.
Q. Do you know when that discussion was?
A. I think they were already stopped before I came here, and then we discussed -- it had to be right, you know, right whenever I first started working here in early 2022.
Q. Is the information contained in these quarterly reports, is that collected anywhere else?
A. Only in the monthly reports.
Q. Okay. So, the narrative information in these

quarterly reports, if it's not in the monthly reports, it's not being collected anywhere else; is that right?

MR. STEWART:

Objection as to form.

BY MS. CUMMING:

Q. You can answer, if you know.

A. I'm not certain.

Q. So, going back to the top here, where it's talking about the -- it's sort of, like, a grid of operational capacity, do you know where these numbers come from?

A. The fire marshal reports or the DHH reports.

Q. Okay. Does anybody check to confirm that these are accurate?

A. Yes.

Q. Okay. Who checks?

A. The team leaders check that. I check that, and Colette checks it.

Q. So, how do you have access to the fire marshal's reports?

A. We get them from the facility.

Q. You get those as part of the annual audit?

A. Yes.

Q. Okay.

A. And their annual compliance statements.
Q. Okay. And then in terms of the counts of DOC people who are at these facilities, how is that generated?
A. I'm not a hundred percent, but that's a number that's approved by the chief or the secretary.
Q. So, is that the actual number of sentenced people that they are holding, or is that the number of sentenced people that they are able to hold?
A. I don't know. I don't know what this report -- if it's -- I don't know.
Q. Okay.
A. For this purpose of this report, I would say that would be the number of DOC offenders that they are holding.
Q. Okay. And do you know how that list or that number is generated?
A. They're getting it off of the monthly report.
Q. Okay. And for the monthly report, do you know how that number is generated?
A. The facility does a count of their DOC offenders.
Q. Okay. So, it's whoever -- on a given day, how ever many DOC people they are holding, that's

the number that goes on the monthly report; is that right?
A. Yeah. I think it's usually the last day of the month that they are supposed to put on that monthly report or whatever day they are reporting. I would have to look at what the report said, but yes.
Q. Okay. And non-DOC offenders, would that include people who are pretrial?
A. Yes.
Q. All right. Anybody else?
A. I don't know. I'm uncertain.
Q. Okay. Let me go back to the monthly activity report because that form is still one that you're looking at. Okay. So, we're back on Exhibit 7. Okay. Back on Exhibit 7. What are Schedule B reports? Do you see where I am?
A. Uh-huh (affirmative response). That's disciplinary reports that are -- I'd have to brush up on my disciplinary reports, but I think it's, like -- like, Rule 21s or -- offhand, I don't remember.
Q. So, there are -- so, it's disciplinary reports. Is there any step taken to confirm

that this number is accurate?
A. I'm uncertain.
Q. Okay. Does anybody at the Department of Corrections or does anybody, the team leaders or anybody like that, do they look at disciplinary records?
A. From time to time they do. Whenever, you know, it's -- if they're investigating an incident, you know, they may get a copy of the DB report.
Q. Do they look at disciplinary records as part of the regular audit process?
A. I'm not certain if they look at that in the file or not.
Q. Okay. All right. We'll move into the auditing process. So, the local facilities are subject to monitoring and auditing, correct?
A. Correct.
Q. All right. What's the purpose of these audits?
A. To ensure the safety and security of DOC offenders.
Q. And who is responsible for these monitoring or audits?

A. I guess the Department of Corrections, division of prison operations.
Q. And more specifically, like, who within that division of prison operations?
A. Me.
Q. Okay. How many monitoring teams are there?
A. Ten.
Q. And how many people are on each team?
A. Not each have a team. Some are individuals, and then some have two or three people that go with them.
Q. Okay. And it's divided up by region; is that right?
A. That's correct.
Q. So, in the northeast region, it's Tyrone Mays who is the team leader; is that correct?
A. Right.
Q. Okay. How many people does he have on his team; do you know?
A. Usually, he has one person that goes with him.
Q. Okay. And what are the responsibilities of team leader?
A. They are the go-between for headquarters and the local level. They set up their audit dates. They just -- you know, they help the

local level with anything DOC-related. They -- on their audit days, you know, they go out and just do a complete inspection of the facility, inspect the files to make sure, you know, they have the documentation. If there's ever any training that needs to be done at the facilities, they do that.
Q. So, how much time would you expect these responsibilities to take up?
A. I don't know how much time, but I know this process has evolved. So, along with their current jobs, the BJG portion of it is pretty busy.
Q. Okay. So, the team leaders are people who have other full-time jobs; is that right?
A. Correct. They each work in a state facility, and this is just -- you know, this is in addition to that.
Q. Okay. So, Tyrone Mays. Do you know what his other job is?
A. He's an assistant warden at David Wade Correctional Center.
Q. And so, would you have an estimate of how much -- like, what percentage of his working time would you expect should be taken up with

basic jail guideline team leader responsibilities?
A. I don't know. I don't know what -- I mean, I don't really have a number. I don't have a percentage.
Q. Do you ever check in with any of the team leaders or with Mr. Mays to see how much time they're spending on basic jail guideline work?
A. No, not that specifically.
Q. What about more generally?
A. I mean, we talk and e-mail pretty regular.
Q. How frequently?
A. I'd say e-mail a couple of times a week. Talk at least once a week. Maybe more. It just depends on what's going on in his region.
Q. When you're e-mailing, what are you usually e-mailing about?
A. Sometimes requesting more information on his reports. Sometimes asking for follow-ups on incidents at his facilities. Things like that.
Q. And when you talk, what are you all talking about?
A. The same thing.
Q. Are the team leaders paid anything additional

for being a team leader?
A. Yes.
Q. How much?
A. They get 5 percent optional pay.
Q. What is optional pay?
A. It's just, like, optional duties. I don't really know how to explain it. That's just what it's called. Like, an optional service.
Q. Okay. So, it's not like the pay is optional; it's that the responsibility is optional, and then they get paid the 5 percent because they're doing this optional thing; is that right?
A. Yes, I think so.
Q. But they're definitely getting the 5 percent?
A. Yes.
Q. Okay. All right. How are team leaders selected?
A. The wardens at their facilities select them.
Q. Is there an approval process for the team leaders?
A. Yes. They submit a letter to Chief, and Chief signs off on it.
Q. That's Chief Smith?
A. Yes, ma'am.

Q. Do you know what Chief Smith looks at?
A. I don't.
Q. Are there any kind of criteria or certain requirements, or experience, expectations for team leaders?
A. I think he just -- I'm not certain.
Q. So, you said Tyrone Mays is the team leader for the northeast region, and he has one other person with him. I think that person is called, like, a member; is that right?
A. Yes.
Q. Is there an approval process for members?
A. No.
Q. How are members selected?
A. The team leader -- the team leader usually picks that person. It's usually somebody in security, or maybe they'll bring somebody from the medical department. They usually bring somebody that has experience.
Q. But the team leader doesn't have to get approval for the person that they pick or anything; is that right?
A. Not from our level. They may have to on their level. Like, at their state facility.
Q. Are all of the team leaders and all of the

members, they are all working at state facilities?
A. Correct.
Q. And do the members get paid?
A. No.
Q. Okay. Are any -- have any of the team leaders, that you know of, have any of them worked at the local level?
A. Not that I'm aware of.
Q. Have any of the members worked at the local level?
A. Not that I'm aware of.
Q. And who did the team leaders report to?
A. Me.
Q. All right. So, we talked about that there is an annual audit, and then there's the every-three-year recertification. So, I guess, let's start with the annual audit, just assume that I'm asking about, and then if something is different for the three-year recertification, we can talk about that, too.
We touched on that scheduling happens, and that's part of the responsibility of the team leader. Can you tell me a little bit more about, like, when the local facility is made

aware that there's going to be an audit?
A. I'm not certain when they're made aware. I mean, I know they're given a heads-up, but as far as if it's two weeks prior or a month prior, I don't know the answer to that.
Q. And the team leader has to go on-site for an audit; is that correct?
A. Correct.
Q. Did they request anything in advance of going on-site?
A. I'm not certain.
Q. Okay. Do they request any documents or anything like that?
A. I'm not certain. I mean, the facility knows that they're going to be looking at their files. They know that they're going to have to submit a fire marshal report and a DHH report. They're going to have to submit a count for the day. Like, an offender count for the day. But as far as them actually calling to say that they need this on hand, like giving them a heads-up, I'm not certain that that happens.
Q. Okay. And when you say that they know -- they know that the -- the local facility knows that

the auditors are going to be looking at the files, are you talking about, like, the specific basic jail guideline files?
A. Yes.
Q. Okay. And so, those are the files that the facility is keeping throughout the year that have, like, the checklist on one side, and then all the supporting documentation on the other side, correct?
A. Correct.
Q. All right. Do you know, do the auditors ever go and look at the files sort of as they are maintained by the facilities? So, you know, any disciplinary files or classification files, sort of where they are kept when the facility is sort of doing normal business?
A. I would assume that they do during their walk-through of the facility, that they would just do some spot checks. I'm not there with them, so I can't be a hundred percent, but yeah.
Q. Okay.
A. I don't know a hundred percent on that.
Q. Okay. In your experience as an auditor, though, that would be part of your

expectation; is that correct?
A. Yes.
Q. Okay. Do the team leaders receive any kind of training on how to conduct an audit?
A. It's more on-the-job training.
Q. And who gives them the on-the-job training?
A. Just from years of experience.
Q. So, if you have a new team leader that's starting, how do they know what to do?
A. Well, I mean, they do get some sort of training. You know, I'll walk through, you know, I'll tell them, but they've also been at a facility, and they've gone through the ACA process, and they know how, you know, when headquarters comes in and does their audits.
The warden has picked them to be a BJG team leader. So, they possibly have been on audits already, so that's probably why they have already been chosen to be a team leader.
Q. Okay. But that's not a requirement to be a team leader?
A. No, it's not a requirement.
Q. Okay. And you said they've had some training in that you've talked to them; is that right?
A. Yeah.

Q. So, what sort of training do you give?
A. I mean, I just tell them what's expected and go through the process with them. We have --
Q. Have you -- I'm sorry. Go ahead.
A. Of course, we have -- you know, any time they have questions, they can call, but then we have our meetings twice a year that we do a little bit of training there.
Q. The training and the meetings, those are the conferences at Lake Charles; is that right?
A. Right.
Q. The training that you do there, is there any kind of lesson plan, curriculum, anything like that?
A. Just an agenda.
Q. Who develops that agenda?
A. I do. My supervisor looks at it and goes over it.
Q. That's Duane Cambre?
A. Yes.
Q. Do you have any input from anybody as you're developing it?
A. I mean, Duane. Sometimes he wants to add something.
Q. Okay. Have you done audits of local

facilities?
A. I have.
Q. Okay. When was the last time you did an audit of a local facility?
A. It's been a while. It's when I was at DCI in my EMO role. When I was the ACA person at DCI, I was a BJG team leader. So, I haven't done it since then.
Q. How long were you a BJG team leader?
A. I'm not certain.
Q. What's the region there?
A. The capitol region.
Q. Do you remember, roughly, what years?
A. I don't. Maybe '17, '18. Somewhere around there.
Q. How many facilities are in the capitol region?
A. At that time, it was four.
Q. Did you have anybody who was going with you?
A. Yes.
Q. Who all was going with you?
A. I had a security officer going with me. I had medical going with me. That might have been it. It may have just been three people.
Q. Okay. So, you, a security officer, and medical. The medical person, who was that?

A. It would have been Terry Grady.
Q. MD, nurse?
A. Nurse. He's an RN.
Q. And the security person, who is that?
A. I can't remember who it was. I don't know that it was always the same person.
Q. Okay. And so, for all four facilities, it would be three of you that would go; is that right?
A. Yes.
Q. Okay. And did each of you sort of have -- like, divide up different responsibilities?
A. We sometimes all do, like, a walk-through together, and then security would fall off and do a little deeper dive into security, and then medical would do a deeper dive into medical, and then I would hang back and go through the files.
Q. Okay. And when you say security would do a deeper dive into security, what would that include?
A. Tool checks, key checks, just cleanliness of the facility, checking the fire extinguishers. Those sort of things.
Q. Look at -- would that person be, like, looking

at files as they're kept on-site?
A. No. Probably not. They wouldn't. Not security. Medical would.
Q. Medical would be looking at medical records?
A. Yes.
Q. Okay. What else would medical look at?
A. ADDs. They look at sharps, medical, like, counts, just their procedures, look at their policies.
Q. The four facilities, do you recall what they were?
A. East Baton Rouge, West Baton Rouge. I think it was only three. Livingston. I think it was only three.
Q. Okay.
A. Yeah. I think it was those three.
Q. Do you recall, roughly, how many sentenced people were held in those places?
A. I don't remember.
Q. Okay. And so -- and you would look at the basic jail guideline files, correct?
A. Correct.
Q. All right. Would you ever go look and see, you know, like what -- I don't know -- look at logbooks or look at, you know, inmate records

to spot check, just to sort of see how they're kept normally?
A. No.
Q. Okay.
A. Security would probably look at logbooks, but as far as inmate records, no.
Q. Okay. And how many -- so, we were talking about classification. How many examples of, you know, housing records for that classification provision would you look at?
A. I don't remember.
Q. Okay. What about for, like, disciplinary provisions; would you look at any kind of disciplinary records?
A. I would, but I don't remember how many. It would be whatever they would use for their sample. Like, their documentation in their file.
Q. Okay. Is there a certain number that are required for the sample?
A. No. As long as they're showing three years of documentation.
Q. Okay. All right. So, it can be one; it doesn't necessarily need to be more than one; is that right?

A. Right.
Q. Okay. And they can go through, and they can pick which ones to show you; is that right?
A. Yes. Unless it requires certain -- unless it's something specific that the file is asking for.
Q. Okay.
A. Which that would be just on an ACA level. I can't remember.
Q. Did you ever, in the time that you were doing the local facility monitoring, did you ever find any facility not in compliance with the guidelines?
A. There were things that -- yeah. I mean, not enough to fail anybody, you know, but yeah. There would be issues.
Q. What sorts of issues did you identify?
A. Policies not being up to date or maybe their ADDs not being up to date. I can't remember specifics, but, like, something that we had talked about the previous year still hadn't been updated. I don't remember the specifics, but I remember that issue.
Q. Which facility was that?
A. East Baton Rouge.

Q. So, there were specific provisions that they were not in compliance with. What happened as a result of those findings of noncompliance?
A. Well, I'm not certain, because the team leader, me, at that time, I would submit my report to headquarters. The facility would get the final report, and they would have so many days that they would have to either get into compliance or submit a letter to chief with their corrective actions.
Q. Okay. Did you as team leader get copied on evidence of coming into compliance or the corrective action plan?
A. I don't remember. I would say I did, but that's been so long ago.
Q. So, you would find some provision that was not in compliance. The next step was they would send something to Chief Smith saying either this has been fixed. Would they have to provide evidence of what the fix was?
A. I don't remember if they had to provide evidence or if we had to go back out and reinspect.
Q. Okay.
A. Whatever the chief or secretary wanted us to

do. I can't remember.
Q. How would the chief or secretary communicate that to you?
A. In -- well, it would actually go to the facility saying that the team leader would be out in 90 days, or however, in three more months, to reinspect whatever. It would go out, a letter, to the facility.
Q. And how would you as team leader get told that? Would the facility tell you, or would you get copied?
A. The team leader would be CC'd on that.
Q. Okay. And if you had to go back out and do a reinspection, was that documented anywhere?
A. Yes.
Q. How was that documented?
A. It would be just like a reinspection and submitted to the headquarters.
Q. Was it documented on a specific reinspection form or --
A. Yes.
Q. Okay. So, there's a specific form for a reinspection; is that right?
A. You could use the same form and just state reinspection.

Q. Okay. And you would say what specific areas you were back to reinspect; is that right?
A. Yes.
Q. Did it ever happen that the facility had not fixed whatever the issue was?
A. I don't -- I don't recall.
Q. Do you know what would happen if that reinspection was not compliant?
A. I'm not sure.
Q. Was there ever a stage at which the department would feel that it had to remove people from the facility?
A. I'm not sure.
Q. In your experience, either as an auditor, or a team leader, or now, have you ever heard of or known of an occasion when the department felt it had to remove people from a facility?
A. Not that I'm aware of.
Q. And so, when you became a team leader, did you have any kind of training on how to do audits in the local facilities?
A. I was a team member before I was a team leader, and then the team leader trained me.
Q. How is that training accomplished?
A. It was just on-the-job training.

Q. Did you attend the conferences in Lake Charles when you were team leader?
A. Yes.
Q. Did all of the team leaders attend?
A. I'm not aware.
Q. Okay. And in your job currently, do you attend the conferences in Lake Charles?
A. Yes.
Q. When was the last conference?
A. In October of last year.
Q. Of 2023?
A. Yes.
Q. Okay. Did Tyrone Mays attend that conference?
A. I can't remember. I can't remember. They all kind of run together. I don't remember if he was at that one or the one before.
Q. When was the one before?
A. In April of 2023.
Q. All right. Was Tyrone Mays at either the conference in April 2023 or October 2023?
A. Yes. I think he was at both, but I'm not certain.
Q. Okay. So, the scheduling of audits. Is there -- let me ask this: Is there, like, a specific schedule? Like, if you had an annual

audit done in October of 2023, it has to be done sometime in the month of October 2023?
A. The team leaders try to keep it around the same time, but they make their own schedules. So, if they need to switch it around, they reach out to the facilities ahead of time to, you know, see if they can move it around. They do work with them on that.
Q. Who is responsible for keeping track and making sure that every facility gets an annual audit?
A. I guess that would be me.
Q. How do you do that?
A. Well, I mean, I have my checklist, and then I get all the reports. So, I mean, I know which ones have been inspected and which ones haven't been inspected.
Q. Do you have, like -- I don't know -- like, a tickler system, or how do you keep track of that?
A. Just my checklist.
Q. Is the checklist on your computer or something that you keep in handwriting?
A. Handwriting.
Q. Do you know, at Madison, do you know who the

team leader worked with to coordinate visits?
A. I don't know.
Q. Do you know, have you ever had an instance where a team leader requested something that the facility refused to provide?
A. I'm not aware of that.
Q. Okay. Do you know, has a team leader ever requested access to a log or some other document that the facility refused to give access to?
A. No, ma'am.
Q. In your time in your current position, have you ever learned of a facility that is in noncompliance with the basic jail guidelines?
A. I wouldn't say they -- I mean, they may be noncompliant with a guideline, but, like, as far as -- they're not -- I wouldn't say it's, like, where we failed them. So, it would be things that we work with them on, or we would go back and do a reinspection.
Q. When you say that you work with them on, who all is responsible for working with local facilities that are in noncompliance?
A. Me and the team leaders.
Q. Okay. How many facilities, in your time since

you've been in your current position, how many facilities have you had to work with to get them into compliance?
A. I'm not certain.
Q. More than five?
A. Less than ten.
Q. Okay. Do you recall --
A. It's minor things.
Q. Okay. What sorts of things?
A. Maybe -- maybe if they don't have their emergency plans approved by the fire marshal. You know, they have to get that approved from the fire marshal, and then they submit it to us. So, that's one thing that we -- I wouldn't say ding them on, but that, or they have to have five percent of their DOC population to be drug tested. Sometimes they don't meet that mark. Sometimes the cleanliness of the facility.
And we do give them time to fix the issue, you know, to get corrective actions. And then we can go back and reinspect, and then finalize the report.
Q. So, if you find an issue like that or the team leader finds an issue like that, is the report

held up until they fix it?
A. Not necessarily, no. Not always.
Q. So, there can be a final report --
A. If it's one issue, and it's minor, we don't hold it up. You know, we just encourage full compliance with this guideline. And then if it's several things, we will hold it up and do a reinspection within 30 days, or 60 days, or 90 days.
Q. Okay. So, that means there is no audit that actually is signed off on; it's held up until that recertification visit happens, right?
Let me back up. When that recertification happens, is the original report also included in that recertification?
A. No.
Q. Is there any kind of documentation that there was a visit, the facility was lacking in several areas, and so certification was held up while they fixed it?
A. No. We may note prior issues in that report, but that's it.
Q. Where do you note the prior issues?
A. At the beginning of the report.
Q. But you don't necessarily note "We've held up

certification to give the facility time to get itself fixed"?
A. No.
Q. How often does that happen?
A. What? How often does --
Q. Where you hold -- the report is not issued because they would be in noncompliance, and so they're given 30 days or however long to fix the issues?
A. It doesn't happen that often. I mean, I don't know.
Q. In your time in your current position, more than five times?
A. Less than ten.
Q. Okay. Can you think of any specific facilities where that's happened?
A. Not off the top of my head, no.
Q. Has that happened at Madison?
A. I'm not aware.
Q. I want to go to, I think, Exhibit 10.
(Exhibit 10 to be marked for identification.)
MR. STEWART:
Elizabeth, we're at about an hour and a half since we started the last, and so I was wondering. You said it would be

about an hour and a half, and I'm not holding you to it, but we're at a point of either perhaps a break or what amount of time additional if we plow through?

MS. CUMMING:

Let's do a break. I just want to get into some of the auditing forms, but we are in the homestretch. I promise.

MR. STEWART:

What -- can you give an ETA on "homestretch"? Is that 30 minutes, 45 minutes, what?

MS. CUMMING:

Probably 30.

MR. STEWART:

Okay. All right. Then a brief break. We'll start back in five or six minutes?

MS. CUMMING:

Sure.

MR. STEWART:

Thank you.

MS. CUMMING:

Uh-huh (affirmative response).

(Recess taken.)

BY MS. CUMMING:
Q. So, just going back to your time as the team leader for the capitol region, do you have a rough estimate of about how much time, you know, when you were at DCI, how much of your time was spent on that team leader role?
A. I don't know. I'm going to guess maybe 30 percent of my time. Maybe not even -- about 30 percent, yeah. I was one of the smaller regions at that time.
Q. Okay. 30 percent, you said?
A. Yeah.
Q. Okay.
A. I'm guessing.
Q. Okay. And beyond the annual audits and the recertifications we've been talking about, what else was your responsibility as team leader?
A. We also had to compile or gather the annual compliance statements. And then any time there was any request from headquarters, you know, we had to -- we were the go-between.
Q. Anything else?
A. Not that I can think of right now.
Q. Did you review the monthly activity reports

from the facilities?
A. I did do that.
Q. Okay. And when you were reviewing the monthly activity reports, what were you looking for?
A. Just looking to make sure everything was filled out correctly, looking to make sure that nothing really stuck out, like, that I could look at and see that it's definitely not entered correctly.
Q. And have you ever gone with Tyrone Mays to conduct an audit?
A. No, ma'am.
Q. So, I wanted to go to the audit form itself. This is going to be Exhibit 10.
(Exhibit 10 to be marked for identification.)
BY MS. CUMMING:
Q. This is page 3, but I'll show you the first. The first page is the letter to the sheriff from the secretary. The second page is a lovely certificate, and then the third page is the start of the certification report.
Have you seen this form before?
A. Yes.
Q. Okay. Is this the form that you were using when you were a team leader?

A. I think it was updated. It had been updated since then.
Q. Do you know when it was updated?
A. No.
Q. Do you know who is responsible for making updates to the recertification forms?
A. I am now.
Q. Who was prior to you?
A. Prior to me, it would have been Markisha.
Q. Do you know who originally developed this recertification form?
A. No, ma'am.
Q. Okay. When is the last time you did an update to the recertification form?
A. I would have to look back on my forms.
Q. Why -- what would trigger an update to the form?
A. It would tell me my revision date at the top. I've updated it since this one.
Q. Okay. And so, this one has a revision date of 7/29/2022, and it's got mwk. Those are your initials?
A. Yes.
Q. So, this is indicating that you made this revision in July of 2022, right?

Wintz Kent, Megan 2/15/2024


A. Correct.
Q. Okay. And you've done another revision since then, correct?
A. Yes.
Q. Okay. All right. Prior to this July 2022 revision, do you know when the last revision had been?
A. No, ma'am.
Q. What all was included in this revision, this July 2022 revision?
A. I don't remember. I would have to go back and compare the two.
Q. Okay. Let's see. I think it should be Exhibit 11.
(Exhibit 11 to be marked for identification.)
BY MS. CUMMING:
Q. This is the 2019 BJG monitoring report.
A. Okay. So, probably just cleaned it up a little bit, and then maybe if there were some new additional guidelines may have been added. And I would have to compare it.
Q. Okay. Is there any place where you would keep drafts or notes related to your revision of the certification forms?
A. I keep -- I have all the -- well, for what

I've done, I've kept -- like, I don't just save over those. I keep the old ones in a different folder, and then I start -- you know, I save the new one.
Q. Okay. Do you have, like, chart changes or anything like that?
A. No. Probably not.
Q. When you do an edit or a revision to one of these forms, does it have to get approved?
A. No.
Q. Okay. So, you can go through, you can edit however you see fit, and then that just becomes the new audit form; is that right?
A. Correct.
Q. Okay. When you do an edit or a revision, how do you distribute the newest version of the form?
A. I e-mail the team leaders, and I put it in our share folder.
Q. The share folder. How is that shared?
A. It's on a share drive that I share with the team leaders.
Q. Okay. What other information is in that shared folder?
A. All of our audit reports.

Q. For going back how long?
A. I'm not certain.
Q. Do you -- you send the e-mail that you let them know there's a new form. Start using this. What prompts you to revise the audit form?
A. That one was probably, assuming I revised that one, due to changes from that guideline -- from the July 2022 guidelines. But usually, if there's any changes that we make in the guidelines, then if there's anything that reflects that over here, I need to make those changes to this form (indicated).
Q. Any other reason to revise the form?
A. If there's any grammar issues, or if it needs to be cleaned up, or if I get notification from chief or secretary there's something that doesn't need to be on there. Things change over the years, so. Or if they want to add something that they want us to start inspecting.
Q. So, when is the last time there was an addition to what needed to be inspected?
A. I would have to compare the last -- the old one to this one. I don't remember offhand

what I added, what the changes were.
Q. Okay. Going down to page 5 to the classification system, do you know who developed this part of the auditing form?
MR. STEWART:
I'm sorry. Which exhibit is this?
MS. CUMMING:
This is Exhibit 10.
THE WITNESS:
No. I don't know.
BY MS. CUMMING:
Q. Okay. Have there been any changes to this provision -- the form related to this provision?
A. You mean, like, is there a new revised form?
Q. I'm explaining your time since you have come into your current role, any time that you have revised the audit form, have any of your revisions touched this classification system part?
A. I don't remember.
Q. Prior to you coming into your role, have any of the -- when is the last revision that you are aware of that dealt with this classification system?

A. I'm not certain.
Q. When you receive these audits, do you do anything to confirm anything related to the information contained in them?
A. Sometimes I'll refer -- like, I'll go back to the monthly activity report and confirm numbers there.
Q. Okay. But you never look at any of the underlying documentation to see, you know, what was the auditor looking at to see if the classification meets the DPSC criteria?
A. Not --
MR. STEWART:
Objection as to form. Use of the word "never."
BY MS. CUMMING:
Q. You can answer.
A. Not in that instance. I mean, I do look at the fire marshal reports, DHH reports. There are other things that I look at, but not that specifically, no.
Q. Okay. And then going down to page 8, this is still Exhibit 10, it looks like there's sort of a matrix, and it's got, like, the guideline, and then it has the findings.

Who developed this form?
A. I'm not certain.
Q. Okay. And then up here, it has "8/1/2022," and "mwk." Is that an indication that you revised this form in August of 2022?
A. Yes, ma'am.
Q. Do you know what your revisions touched on in this form?
A. Whatever the revisions were in the BJG manual were reflected in that form, in that spreadsheet.
Q. Okay. Is this matrix part of, or what I'm calling a matrix, this thing starting on page 8, is this part of the annual visit, or is this something that's done only every three years?
A. That's part of the recertification process, inspection.
Q. And the recertification is only done every three years; is that right?
A. Right.
Q. Okay. And so, the annual visit would not include this matrix?
A. That's right.
Q. Okay. And then this form, who all has access

to this recertification?
A. Just the form or their certification altogether?
Q. The recertification altogether.
A. The team leaders, myself, and whoever has access to the share drive.
Q. Does Chief Smith have access to the share drive?
A. I'm not aware.
Q. Does Secretary LeBlanc have access to the share drive?
A. I'm not certain.
Q. But Chief Smith and Secretary LeBlanc do have access to the recertification reports, correct?
A. I mean, they have access. If they need them, you know, I can get them for them.
Q. Do they have to request them from you?
A. They don't have to, but I don't know that they have access to the share drive.
Q. Are these reports e-mailed out anywhere?
A. They're e-mailed to the facilities, and they are CC'd to LSA, to the chief, and to the sheriffs.
Q. And the chief is Chief Smith, correct?

A. Yes.
Q. Okay. All right. Do you know who in the Louisiana Sheriffs' -- LSA means Louisiana Sheriffs' Association?
A. Yes, ma'am.
Q. Who in the LSA would receive it?
A. Mr. Mike Ranatza.
Q. Okay. So, I'm going back to page 1 of Exhibit 10. It's got Mike Ranatza for LSA; Chris Stinson, the warden; Seth Smith, the chief of operations; Jerry Goodwin, warden for Wade; and Tyrone Mays, team leader, but it looks like it's coming from Secretary LeBlanc.
Would that be the distribution list for the recertification reports?
A. Yes. That's correct.
Q. Okay.
MR. STEWART:
I'm sorry. Is this Exhibit 12?
MS. CUMMING:
10.
MR. STEWART:
10. Thank you.
MS. CUMMING:
Uh-huh (affirmative response).

Okay. We're very close, but just give me one minute to confer with my cocounsel.

(Discussion off the record.)

MS. CUMMING:

All right. So, I think we are done for now. I'm going to tender you to John, who is the lawyer for Madison -- the Madison Parish Sheriff and LaSalle, and to your lawyer to see if they have any questions, and I may have some follow-ups from that.

MR. RYLAND:

This is John Ryland. I have no questions.

MR. STEWART:

And counsel for LeBlanc and Smith. We have no questions.

MS. CUMMING:

All right. Then I have no follow-up. Thank you very much for your time today. We appreciate you being here, and your responses. You can talk with Wayne about read and sign.

MR. STEWART:

Yeah. Just hold on one second.

(Discussion off the record.)

MR. STEWART:

Yeah. Ms. Kent would like to read and sign.

MS. CUMMING:

Okay. I think that does it for us. So, thank you for your time, and hopefully, you won't have to see me again.

MR. STEWART:

Thank you. Bye-bye.

MR. RYLAND:

Bye, everybody.

MR. STEWART:

Have a good evening.

MS. CUMMING:

You, too.

(The videoconference deposition concluded at 3:45 PM.)

Deposition of MEGAN WINTZ KENT
Taken on February 15, 2024

WITNESS' CERTIFICATE

I have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

MEGAN WINTZ KENT

REPORTER'S CERTIFICATE

I, LORIE M. HOYT, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that MEGAN WINTZ KENT, to whom oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 161 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter. I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

LORIE M. HOYT, CCR, RPR