Transcript of the Testimony of

# SERGEANT DAVID GUTHRIE

November 21, 2024

ROBERT YOUNG v. JAMES LEBLANC, ET AL

AMERSON WHITE
COURT REPORTING · EST.2000

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT YOUNG,<br>Plaintiff, | CIVIL DOCKET NO.<br>23-681-SDD-RLB |
| VERSUS | JUDGE:<br>SHELLY D. DICK |
| JAMES LEBLANC, ET AL,<br>Defendants. | MAGISTRATE:<br>RICHARD L. BOURGEOIS |

VIDEOCONFERENCE DEPOSITION OF SERGEANT DAVID GUTHRIE, 807 Highway 915, Sicily Island, Louisiana 71368, taken via Zoom, in the above-entitled cause on the 21st of November, 2024, commencing at 2:13 p.m.

REPORTED BY: CHERIE' E. WHITE
CCR (LA), CSR (TX), CSR (MS), RPR
CERTIFIED COURT REPORTER

APPEARANCES:

ATTORNEYS REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
4400 South Carrollton Avenue
New Orleans, Louisiana 70119
Phone: 504.620.2259 |Fax: 504.208.3133

(BY: Jack Stephens, Esquire)
E-mail: jack.stephens@macarthurjustice.org

CO-COUNSEL REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

LAW OFFICE OF STEPHEN J. HAEDICKE
1040 Saint Ferdinand Street
New Orleans, Louisiana 70117
Phone: 504.291.6999 |Fax: 504.291.6998

(BY: Stephen J. Haedicke, Esquire)
E-mail: stephen@haedickelaw.com

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, CATAHOULA PARISH SHERIFF'S OFFICE:

FROSCH, RODRIGUE, ARCURI, L.L.C.
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Phone: 504.592.4600 |Fax: 504.592.4641

(BY: Ronald "Shane" Bryant, Esquire)
E-mail: sbryant@fralawfirm.com

ATTORNEYS REPRESENTING THE DEFENDANT, CALCASIEU PARISH SHERIFF:

MUDD, BRUCHHAUS & KEATING, LLC
422 E. College Street, Suite B
Lake Charles, Louisiana 70605
Phone: 337.562.2327 |Fax: 337.562.2391

(BY: Lenzi C. Hebert, Esquire)
E-mail: lhebert@mbklaw.net

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, JAMES LEBLANC AND MR. SMITH:

FRILOT, LLC
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Phone: 504.599.8016 |Fax: 504.599.8116

(BY: Allen J. Krouse Esquire)
E-mail: akrouse@frilot.com

ALSO PRESENT:
Suzanne Risey, Esq.

E X A M I N A T I O N   I N D E X


| BY: | PAGE |
|---|---|
| Mr. Stephens | 7 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Personnel File from CCC | 15 |

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically NOT waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

CHERIE E. WHITE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath.

SERGEANT DAVID GUTHRIE,
807 HIGHWAY 915, SICILY ISLAND, LOUISIANA 71368,
after having first been duly sworn by the above-mentioned Court Reporter did testify as follows:

MR. STEPHENS:
Hey, Mr. Guthrie. My name is Jack Stephens. I'm going to start with some stipulations. This deposition is being taken pursuant to the Federal Rules of Civil Procedure. There are no objections to the use of Zoom nor to the court reporter being remote, and reading and signing are not waived. At the end of the deposition, your attorney, Mr. Bryant, will let you know more about your opportunity to read the transcripts and sign off, if you so choose. We will get there at the end.

EXAMINATION BY MR. STEPHENS:

Q. All right. Let's get started. Can you please introduce yourself for the record?
A. Sergeant David Guthrie.
Q. And can you please provide your address and phone number?

A. 807 Highway 915, Sicily Island, Louisiana. Cell phone number, (318) 439-4252.

Q. Do you have any previous deposition experience?

A. No.

Q. Have you ever been a party to a lawsuit before?

A. No, sir.

Q. Okay. I'm going to go over some ground rules just so this all goes smoothly.

First, as you can see, Cherie' is here with us today, our court reporter. She's going to be typing everything that you say and that I say. Please give clear, spoken answers rather than nodding your head or shaking your head or saying uh-uh (negatively) or no -- or, you know, any sort of unclear answers. Say yes, no.

It's -- it's hard on Zoom sometimes, but please let me finish my questions before you start answering and I'll let you finish your answers before I ask my next question. Does that make sense?

A. Yep.

Q. And the oath you just took at the

top of this Zoom is the same one that you would take in court, so that requires you to tell the whole truth. You understand?

A. Yes.

Q. And generally speaking, we are interested in finding out everything you know that's relevant to this lawsuit. We are looking for full and complete answers. If at any point during the deposition you realize that you omitted a detail or remember something that you didn't previously remember, feel free to interject and tell me that and we can revisit.

Importantly, I will ask a bad question, I'll be convoluted or otherwise confusing. If that's the case, just ask me to rephrase my question and I'll try to be more clear. You good with that?

A. Okay. Yes.

Q. And we are going to do our best to take breaks on the hour, but sometimes it's easy to lose track of time, so I might -- so if you need a break, just speak up. All ask is that you finish answering the last question before we do our break. Is that good?

A. Okay.

Q. And during those breaks -- actually, strike that. Never mind.

Where are you right now to take this deposition?

A. I'm sitting in my vehicle so my kids won't bug me.

Q. Okay. And that's outside your home?

A. Yes, I'm at home.

Q. Is anyone else in the car with you?

A. It's just me.

Q. Are you on any medications, sleep deprived or experiencing any other hardships that will interfere with your ability to understand my questions or provide clear and truthful answers today?

A. No, I'm not on any meds.

Q. And no to the sleep deprivation or other interferences as well?

A. No to everything.

Q. Thank you. What is your understanding of why we are here today?

A. I'm not real sure. No one's gave me any info.

Q. And what did you do to prepare for this deposition?

A. I found out about this today.
Q. Okay. Did you review any documents?
A. No, sir.
Q. And do you have anything with you in the car, documents?
A. No, sir.
Q. Okay. Last thing before we get done, I'm going to be asking predominantly questions about '21, 2021 and 2022. I'll try to remind you as we move through, but just keep that in mind.
A. Okay.
Q. And -- oh, I lied. Last thing, we are going to be talking about Catahoula Correctional Center --
A. Yes.
Q. -- otherwise known as CCC. Is that what you call it?
A. Yes.
Q. Great. Okay. So we are going to start by going through some personal background. Where did you go to high school?
A. Winnsboro High School.
Q. And did you graduate?
A. Yes.

Q. Okay. When would that have been?
A. 2004.
Q. And after high school, did you go to college or pursue any other education?
A. Technical college in Nashville Auto Diesel College.
Q. And when did you finish that program?
A. '06 --
Q. Any other --
A. -- I believe --
Q. Sorry. Say that again.
A. I believe 2006 is when I finished that.
Q. Okay. After that, did you pursue any additional education that we haven't covered?
A. No.
Q. And have you received any professional licenses or certifications since then?
A. No.
Q. Thank you. Okay. Can you run me through your employment history from the age of 18 to the current day? You can start after your education, if that makes sense.

A. You talking about from when I graduated high school to now?
Q. Yes, sir.
A. Chase Feed Mill; I've worked at U-Haul in Nashville, Tennessee. I don't remember how long that was. I've repossessed vehicles, worked as a mechanic for USA Truck Repair. I've done shutdowns for Brett Construction. Oh. Louisiana Research Station Sweet Potato Plant, and CPL, rebuilding natural gas compressors, which would be the one I had before working at the prison.
Q. Okay. And when did you start working at CCC?
A. July 31st, 2019.
Q. Who was operating the facility when you began working at CCC?
A. I'm trying to remember his last name. I don't remember who the warden's name was.
Q. Was -- was the facility --
A. Warden Ford. Warden Ford.
Q. Warden Ford.
A. Yes.
Q. Was the facility under the control

of the sheriff's office or a contractor, some other type of entity at the time?

A. Sheriff's office.

Q. Sheriff's office?

A. Yes, sir.

Q. Are you familiar with LaSalle Corrections?

A. Yes.

Q. Tell me about that.

A. What -- you asked me if I'm familiar with them. I've heard of them, yes.

Q. Have they been involved at CCC during your time working there?

A. We were with -- the sheriff's office has always been in it. I don't remember if LaSalle was part of it when I started or not.

Q. Okay. I'm going to mark an exhibit and I'm going to share my screen with you.

(Sharing screen).

BY MR. STEPHENS:

Q. Can you see that?

A. Yes.

MR. STEPHENS:

Okay. I'm going to scroll this a little bit, and we are going to mark this

as Exhibit 14.
(Exhibit 14 to be marked.)
THE WITNESS:
Uh-huh (affirmatively).
BY MR. STEPHENS:
Q. And this is your personnel file from CCC. We are on page 24 of the document Bates stamped CPSO 0246.
A. Okay.
Q. See right here (indicated) where it says "reason for termination, facility under new management"?
A. Can I make this bigger on my screen?
Q. I can make it bigger for you.
A. I got it.
Q. How about that, is that -- is that good?
A. Yes. Now, what were you asking?
Q. Right here, it says "facility under new management," it's dated April 30th, 2021.
A. Okay.
Q. Do you have any recollection of this transition?
A. This is saying I was terminated in 2021?

Q. You continued working. My sense is that there was -- well, strike that.
That's what it says. Have you been terminated while you've been working at CCC?
A. No.
Q. Do you have a sense of what happened on April 30th, 2021?
A. No. I don't remember anything on April 30th, 2021.
Q. Do you remember any sort of pay raise, pay deduction around that time?
A. It might have been when we lost ICE and went to -- we went from ICE detainees to regular salary.
Q. Okay. Do you have any memory of CCC coming under new management around this time?
A. I mean, we have always been the same management. I don't -- no, sir.
Q. Okay. Have you been employed by any other companies while working at CCC?
A. No.
Q. What is your employment relationship with the Catahoula Parish Sheriff's Office?
A. What do you mean?
Q. Do you work for CCC or do you work

for the Catahoula Parish Sheriff's Office?
A. Well, that's kind of not the way to say because I work for Catahoula Corrections, but we are -- we're with the sheriff's office.
Q. Okay.
A. So yes and no.
Q. What position did you start with when you went to work --
A. Officer.
Q. Thank you. And thereafter, have you been promoted?
A. Yes, sir.
Q. Do you remember when you received your first promotion?
A. No, I do not.
Q. Do you remember what position you were promoted to?
A. Sergeant.
Q. Were you promoted subsequently to another position after you were promoted to sergeant?
A. Yes, sir. I've been a lieutenant also.
Q. Do you remember when you were promoted to lieutenant?

A. Should have been sometime in 2022, but I don't know exactly.

Q. Okay. All right. I just unshared my screen, but I'm going to share it again.

A. Okay.

Q. And we are going to be looking at the same -- it's the same document. It's also your personnel file.

(Sharing screen)

THE WITNESS:

Uh-huh (affirmatively).

BY MR. STEPHENS:

Q. We are on page 22 of the document. Right here (indicated), it says new job title sergeant.

A. Uh-huh (affirmatively), yes, sir.

Q. Effective date November 7th, 2021. Is this the date of your first promotion?

A. Yes.

Q. Do you have any reason to believe that that date is inaccurate?

A. No, sir. I just didn't keep up with it. I was just glad to get the promotion.

Q. Got it. I'm going to scroll up. Similar question, August 28th, 2022, you were

promoted from sergeant to lieutenant. Do you have any reason to believe that that date is inaccurate?

A. That's around the right time, yes, sir.

Q. Okay. Have you ever been demoted while working at CCC?

A. Yes.

Q. Do you remember when that was?

A. I don't remember the exact date, no, sir.

Q. What happened, why were you demoted?

A. They didn't think I was doing a good -- performing well as the lieutenant on the shift that I had to take over.

Q. Prior to the demotion, did you receive any verbal warnings from your supervisor?

A. No, sir.

Q. Any written warnings from your supervisor?

A. No.

Q. Were you placed on a performance improvement plan prior to that demotion?

A. No, sir.

Q. Were there specific aspects of your

performance that they cited when they demoted you?

A. They said I wasn't being a -- a good leader and I didn't argue with them. I was -- I honestly just didn't want the position anymore at that point.

Q. Why didn't you want the position?

A. I didn't care for the shift I was running.

Q. Were you on the dayshift or the nightshift?

A. At that point, I was on nightshift.

Q. And did you dislike your fellow staff on that shift, did you just not like working the nightshift; was there a particular --

A. Just conflicts with the fellow employees.

Q. Conflicts with the federal employees?

A. Fellow, fellow employees.

Q. Oh. Fellow employees. Sorry. What shift was it?

A. I believe that would have been D-team at the time.

Q. Thank you. During your time at CCC,

have you ever been transferred to another facility?
A. No.
Q. Okay. Have you ever received any sort of rule violation report or otherwise been found guilty of misconduct while working at CCC?
A. No, sir, not that I'm aware of.
Q. Okay. I'm going to pull up the same document, Exhibit 14 as previously marked.
Can you see that or -- sorry.
A. Not yet.
Q. Now, can you see it?
(Sharing screen.)
THE WITNESS:
Yep.
BY MR. STEPHENS:
Q. Okay. This is page 49 of Exhibit 14. At the top of the page, it says Catahoula Parish Correctional Center Employee Rule Violation Report. It has your name at the top and your title.
A. Yes.
Q. It's dated May 1st, 2023.
A. Uh-huh (affirmatively).
Q. Do you need time to read the

document or does this refresh your recollection?
A. Yes, sir, I remember this now.
Q. Can you tell me about what happened?
A. Well, that's -- as stated there, I went to grab the gentleman by his jumper and I missed.
Q. And it says here you were suspended for three days without pay?
A. Yes.
Q. That's accurate?
A. Yes, sir.
Q. Was that suspension served right away or was there a delay between the disposition and you serving the suspension?
A. I believe it was right away.
Q. Okay. And right here it says "Sergeant Guthrie has been counselled on the negative decision that he made."
A. Yes.
Q. Do you recall who did that counselling with you?
A. No, sir.
Q. Do you recall what that counselling was comprised of; what they told you?
A. I did an online anger management

class, but I'm not sure if it was for this or something else, sir.
Q. Was it around the same time that you received this rule violation report?
A. I believe so.
Q. Okay. And it says here you were counselled on the proper use of force?
A. Yes.
Q. Who did that counselling?
A. I'm trying to remember, sir. I talked to several people at the prison. I just can't remember who did what, sir.
Q. Okay. Who was your supervisor at the time?
A. In '23?
Q. Yes, sir.
A. Should have been Lieutenant Fortune.
Q. Okay. You mentioned you were on D-team before you were demoted?
A. Right.
Q. Is that correct?
A. Yes, sir.
Q. What other shifts or teams have you worked well at CCC?
A. I've been on B-team, I was

lieutenant on C-team, delta team, and now I'm working on A-team, so all the shifts.
Q. And when you office -- do you remember what team you were on?
A. I didn't hear the question.
Q. When you were a sergeant, do you remember which team you served on?
A. I've been a sergeant on all the shifts, sir.
Q. Okay.
A. Well, I believe I have, anyway. I'm pretty sure I have. The only one I may not have been a sergeant on would be C-team because I was a lieutenant.
Q. All right. I'm going to jump back to the rule violation really quickly.
A. Yes.
Q. You mentioned taking an anger management course.
A. Uh-huh (affirmatively).
Q. Was that an online course?
A. Yes.
Q. Were you required to pay for it?
A. Yes.
Q. Personally?

A. I don't remember who it was. Yes, I just took this to do it. I wasn't recommended -- made to do it, I just went ahead and took it.
Q. So you received the rule violation and then subsequently you elected to take this anger management course; is that correct?
A. Yes.
Q. Do you remember where you took it?
A. I did it online, sir. I don't remember where I took it.
Q. Okay. And lastly on the violation, when that process was -- was happening, were you interviewed after the incident took place before there was a suspension?
A. Was I spoken to, yes, sir.
Q. And did they ask you what happened, what your thoughts were, stuff like that?
A. Yes.
Q. Do you know if they interviewed anybody else as a part of that investigation?
A. I'm not sure.
Q. Okay. Do you remember who you spoke to specifically in relation to that violation, who would have been counselling you?
A. Well, I mean, whenever I was given

the violation, I was spoken to by the wardens and assistant warden, if that's what we are talking about.

Q. Yep.

A. That's who I spoke with, sir.

Q. Anyone else?

A. And the -- the major also.

Q. Do you remember the names of those folks?

A. It would have been Warden Stott; Major Wascom; and my assistant warden at the time, I do believe was Wiley, Warden Wiley, I do believe.

Q. Okay. When you started working at CCC in 2019, what training did you receive?

A. We took the classes that they required us to do for the ICE detainees.

Q. And did you take those before you started working --

A. Yes.

Q. -- as an officer?

A. Right. Yes, sir.

Q. Were those classroom courses?

A. We had -- we set in -- the shift I was on, we all reported to a room and we did

classes, yes, sir.
Q. Were you required to take any tests as a part of that training process?
A. Yes.
Q. Was the ICE training the only training that was conducted before you started working at the facility?
A. Yes. Everything else was done at the prison after I was hired, yes, sir.
Q. Do you remember who offered that training, who ran the course?
A. No, sir. No, sir, I don't remember.
Q. Okay. Let me go back to your personnel file really fast. We are on page 42 of your personnel file, Exhibit 14. It says here, this is from the ICE specialized training. I think that's who you were referring to; is that correct?
A. Yes. Yes, sir.
Q. It says here Jay Buseck?
A. Yes. It was someone who came in and taught it to us, but I couldn't remember his name.
Q. Were they an employee of CCC or were they coming from outside the facility?

A. Outside the facility.
Q. Thank you. Jumping to page 34 in Exhibit 14. It says Deborah McClure up here. Was she also brought in from the outside to run this training?
A. Yes.
Q. And on this training, specifically this is from 2020 while after you started working at the facility?
A. Yes.
Q. Do you recall this training and how it may have been different from the initial one?
A. I recall it, but it was just a touch up on the original one basically.
Q. Were you required to do this training annually or at a certain interval?
A. I believe it was annually --
Q. Okay.
A. -- because we had to take classes every year at the prison also.
Q. Tell me about those classes.
A. Well, there's your mandatory like sexual harassment and just touch base on your -- what -- how to handle yourself at work, you know, how to talk to people and that.

Q. Are there other subjects covered in these trainings other than sexual harassment?
A. Yes. We have to go on and do our certifications every year so we can get the TASER certifications and that.
Q. You do that annually?
A. Yes, sir.
Q. Okay. Are all CCC employees or officers, rather, required to do those trainings?
A. Yes, sir.
Q. And how do they communicate when you are supposed to do those trainings?
A. Well, we normally get a memo sent to us and it's set on the board at work and it tells you when you're going. This year it hasn't happened again yet, but it's in the works.
Q. Okay. When you said they sent a memo, is it via e-mail, is it dropped in a box at work?
A. They put it on a bulletin board at work for us.
Q. Okay. So they place it on a bulletin for everyone to see, it's not individualized; is that correct?
A. Right.

Q. Where in the facility is that board?
A. When you walk in, there's a time clock. There's a cork board there.
Q. Okay. Have you received any training related to investigations?
A. No, sir.
Q. Have you received any training related to interviewing witnesses?
A. No, sir.
Q. Have you received any training related to document retention?
A. Document retention? What do you mean?
Q. In an administrative sense when you are filling out reports, any -- any -- any paperwork, are there any trainings as to how to file that paperwork, where to put it, how to make sure that it stays organized, things like that? Have you done any training along those lines?
A. No, sir.
Q. Have you ever received any training related to retaining video?
A. No.
Q. If I were to say in-service training, are you familiar with that term?

A. Yes.
Q. What does it mean to you?
A. Basically training on the job.
Q. And when you say "training on the job," do you mean courses taken after you've already been employed at CCC?
A. Yes. And also shadowing senior officers, learning what they are doing, shadowing them to get an idea of how the job's done.
Q. And -- and when do you do that sort of shadowing?
A. It would be when you first hire on, sir.
Q. Did you do that shadowing before, after or during the fellow training that you mentioned earlier?
A. During.
Q. So you're taking the classroom trainings and then when you are not in the classroom you are in the facility working, shadowing a senior employee; is that correct?
A. Yes. Like your lieutenant or your sergeant.
Q. Okay. Can you -- do you remember how long you did that sort of in-service

training?

A. I do not remember how long, sir.

Q. Have you yourself helped to guide someone along when they are a new employee?

A. Yes.

Q. And can you tell me about that process?

A. Well, you just walking around and you want them to treat inmates or offenders a certain way. They can't just talk to these people any way. You got to treat them like human beings and you got to make sure they know this because some people just watch TV and don't know any better.

Q. I mean, you --

A. You got to make sure they are -- you got to make sure they're wrapped up for count and you count them and you do it correctly, just things like that.

Q. You said when some -- some people are watching TV. You are referring to officers in that sentence?

A. I mean, like there's certain people that don't have a clue of how a facility works. They just know what they seen on movies, and you

got to really make sure that they understand how it is.

Q. Will you bring every employee along in that shadowing process for the same amount of time or is it different depending on the employee?

A. It depends on the employee.

Q. What are some of the factors?

A. Well, sometimes they quit before they get to finish their training, but most of the time they shadow someone for about a month.

Q. And why are people quitting before they finish the training generally?

A. They don't -- don't like the hours.

Q. Okay. We talked earlier about your promotions. So when you are promoted from officer to sergeants, did you apply for that promotion, or what was the process?

A. I -- I applied for it or asked for it and it came available and they promoted me.

Q. Who did you ask?

A. The warden at the time.

Q. Did you write to the warden or did you ask him in person?

A. I did both.

Q. What -- what form did that writing take; did you send an e-mail, letter?
A. Just -- just typed out a -- a request and sent it to him, to his box at work, typed it out and printed it.
Q. And when you say "typed out a request," is -- is there a specific platform on your computer at CCC that allows you to do that or you just used the work --
A. Not at -- at that time, it was just a document.
Q. Okay. Were you required to take any sort of exam when you were promoted to sergeant?
A. No, sir.
Q. Did you receive any extra training once you became a sergeant?
A. No.
Q. And when you were promoted to lieutenant, what was the process there; did they reply to your request?
A. They approached me and asked me if I was interested and I said yes.
Q. And did you become a lieutenant immediately after they were -- approached you?
A. It took pretty immediately, yes,

like a day or so.
Q. Okay. Was that based on your performance as a sergeant or was there some other operational reasons for the promotion?
A. Well, the lieutenant on that shift had had to have emergency surgery, or he was having cancer issues and I do well as a -- so I fit the need for the lieutenant at the time.
Q. Say more about that. What -- what do you mean by "fit the need"?
A. I was a senior officer, I had been there longer than most people that were there and I had more experience.
Q. Okay. And when you became a lieutenant, did you receive any extra training as to what that position entailed?
A. No, sir.
Q. For both promotions to sergeant and to lieutenant, did you shadow a sergeant or a lieutenant as a part of that promotional process?
A. Well, I had already shadowed the lieutenants before I made the lieutenant's job, if that makes any sense. I had already done it.
Q. Okay. You started off as an officer; is that correct?

A. Yes.
Q. When you first started as an officer, what was your assignment?
A. When I first started, I was just a floor officer and I helped run chow and count dorms and all that stuff. And then after a month or so, I got -- I had to run a control room.
Q. Do you remember why you got moved to the control room?
A. Because the person we had running the control room at the time was doing a poor job of it.
Q. Do you remember how they were doing a poor job?
A. They weren't able to keep up with the count in that dorm.
Q. Okay. We will -- we'll talk about the count later.
Do you remember who you reported to when you became an officer?
A. Sir?
Q. Do you remember in the chain of command who you reported to directly when you were an officer?
A. You spoke to your sergeants.

Q. Do you remember who the sergeants were at the time?
A. It would have been lieutenant -- I mean, Sergeant Billy Kerry or Sergeant Brady or Radcliff.
Q. Okay. And when you became a lieutenant --
A. Yes.
Q. -- how did your responsibilities change?
A. How did they change?
Q. Yes.
A. You're -- you're responsible for every member of your team. If they mess up, it's on you because well, you didn't show them how to do it correctly. You got to make sure they are all trained, capable to do the task.
Q. And to train them you would have them shadow you for a month, as you said earlier; is that correct?
A. Yes.
Q. Were there any other processes you used to train your subordinates as a lieutenant?
A. No.
Q. And I apologize. This is a little

bit out of order, but when you went from officer to sergeant --

A. Uh-huh (affirmatively).

Q. -- your responsibilities changed then?

A. Yes.

Q. How did they change?

A. Well, as a sergeant, you are -- you're responsible for letting your officers in and out of dorms, making sure the counts are being done properly and just security of the facility.

THE WITNESS:

Can I let this dog in my house real quick so I don't have to hear him bark?

MR. STEPHENS:

Yes, sir. We will go off the record for five minutes. Okay.

THE WITNESS:

It won't be that long.

MR. STEPHENS:

We are going off the record. It's 2:46 p.m.

(A short recess was taken.)

BY MR. STEPHENS:

Q. Okay. When you became a sergeant, do you remember the lieutenant or lieutenants above you that you reported to?
A. Joseph Prince was my first lieutenant. You need any more after that?
Q. Yes, please.
A. Well, since it's been -- it was Joseph Prince was my lieutenant at first, Lieutenant Dante Fortune, Lieutenant Mitchell. There's been several lieutenants, sir.
Q. Thank you.
A. Oh. Dan Oxley also.
Q. Is that O-X-L-E-Y?
A. I believe so.
MR. STEPHENS:
Okay. I'm going to share my screen again with you.
(Sharing screen.)
THE WITNESS:
Uh-huh (affirmatively).
BY MR. STEPHENS:
Q. You see that?
A. Yes.
Q. Okay. I'm going to scroll up really fast. This was previously marked Exhibit 3.

Here's the title page (indicated).
A. Yes.
Q. You see right here (indicated) it says "policy number"?
A. Yes.
Q. Have you -- are you familiar with this policy number; have you seen it before?
A. Yes.
Q. When would you have seen it?
A. I've -- I've -- I've seen it, but I can't name an exact time of when I seen it.
Q. Do you have a packet of policies and procedures that applied to CCC staff?
A. Yes, but I do not know where I have located -- I put it.
Q. But you still have that today?
A. Yes.
Q. Approximately how long is it? When you look at the stack, is it an inch; three inches; is it -- is it a big document?
A. About an inch.
Q. Okay. Okay. I'm going to jump down to page 6 of Exhibit 3. See right here (indicated), it says Shift -- Shift Supervisor?
A. Yes.

Q. Were you ever a shift supervisor?
A. Well, a sergeant is considered a shift supervisor.
Q. Okay. And if -- have you seen this particular page of the document before?
A. Yes.
Q. When would you have seen it?
A. When I read through the document the first time, sir.
Q. And did you read through it the first time when you started working at CCC?
A. Yes.
Q. Did you return to the document when you got any of your promotions?
A. I've read it a couple of times, but I don't remember how many.
Q. Zooming out a little bit, this is part of a larger policy and procedure handbook; is that correct?
A. Yes. It's the -- the employee handbook, rule book, whichever way you want to call it.
Q. And is there a copy available for reference other than your personal copy somewhere at the facility?

A. Yes.
Q. Where is it located?
A. There should be one in Control 1 and there's multiple copies at the facility, sir.
Q. Is there a copy in each control?
A. I believe so.
Q. Okay. And was that the case in 2022?
A. I don't know. I don't believe so.
Q. So at some point since 2022, they have made available referenced copies of the policies -- policies -- policies and procedures; is that correct?
A. Yes.
Q. Do you remember when those got rolled out to the various locations you've referenced?
A. No, sir, I do not remember.
Q. Okay. All right. Do you need a minute to read through these or are you familiar?
A. I'm familiar.
Q. Does this accurately reflect your responsibilities as a sergeant or shift supervisor?
A. Yes.

Q. Is there anything not included in this list that you would do as a shift supervisor?
A. No, sir. That's -- that's everything.
Q. Okay. In 2021, how many staff were assigned to each shift at CCC?
A. 2022? Should have been --
Q. 2021.
A. '21?
Q. Yes, sir.
A. It should have been 12 people.
Q. So 12 staff members for a given shift, that would be considered fully staffed; is that correct?
A. No. Fully staffed is 14 people per shift.
Q. And was 12 the average staffing level at the time?
A. Yes.
Q. Okay. During 2021, did you ever have less than 12 people working a shift?
A. It's hard to say. I don't quite really remember, sir.
Q. Okay. How about 2022, how many

staff were assigned to each shift?
A. Ten to 12 people, sir, is normally what it averages out to be.
Q. And can you break down how many of each rank there are in that group of 12; so, for example, how many sergeants, how many lieutenants, how many officers?
A. Okay. You have two sergeants, one lieutenant and the rest are officers.
Q. Okay.
A. You have your Control 1 Room operators, your kitchen security and the rest is just officers. Excuse me.
Q. You kind of just hinted at it, but where are all these staff located during a shift?
A. Okay. You have your four control room operators that's four officers; Control 1, 2, 3 and 4, a kitchen security. You have your two sergeants, lieutenant and whatever else is leftover, just floor officers.
Q. Within that group, are there officers that are assigned to specific dorms in the facility?
A. No, sir. Well -- no, sir.
Q. So there isn't a given officer

that's responsible for A-Dorm, B-Dorm, etc.; is that correct?

A. Correct.

Q. Do they roam? What does that look like?

A. Well, we -- it depends on -- you do 30-minute checks. You randomly just say unannounced rounds in a dorm, checking, like that. You keep up with your cell checks.

Q. How often are those dorm checks?

A. Every 30 minutes, if we can manage it.

Q. And the staff members conducting those checks, would they walk onto the dorm?

A. Into the dorm?

Q. Into the dorm, yes.

A. Yes.

Q. And -- and what would they do once they got inside?

A. Well, you physically -- you walk around, you make sure everybody's physically well, you talk to them, because you are supposed to, and make sure everybody's fine and you walk out.

Q. You mentioned a couple times that 12

is the typical number of staff members on a given shift. Is there a form in the facility that lists all of the required positions for a given shift?
A. What do you -- acquired -- required positions?
Q. Is there a -- a form in your handbook or otherwise that says, for example, for dayshift we need one sergeant, two lieutenants, etc. Is there any form that would have that information?
A. No, sir.
Q. Okay.
A. No, not that I know.
Q. And when those staff members arrived for their shifts, is there a sign-in sheet that they sign when they arrive?
A. We have our time sheets that we sign. You clock in and then you go write down your time when you got there on your time sheet.
Q. Okay. When you were a lieutenant and a shift was beginning, how would you know if you were short staffed?
A. We would have a meeting out front every day, a shift meeting and you go over and

see who all is there. You get to work -- you're supposed to be there -- you go to work at 5:00. You show up at 4:30 to see if you are going to have any short staff or not.

Q. What else would you discuss during that meeting?

A. Any memos that have been updated, any changes in policy, who's going to run what control room.

Q. Did anyone document the contents of those meetings?

A. No. Shift meetings, no, sir.

Q. If you happened to be late for your shift and you showed up at 4:45, for example, was there a way to get caught up on what was discussed during that meeting?

A. Yes, sir. You just get up with the lieutenant and he informs you.

Q. Okay. We have been talking about the unannounced dorm visits, for lack of a better term.

When the officers would go into a dorm and talk to the detainees, the prisoners, would they record what they found in any way?

A. What -- what do you mean "record,"

sir?
Q. Would they write down anything that they discussed or witnessed, observed while they were doing that check?
A. If something had went wrong, yes, sir, there would be -- be a report or something done on it, yes.
Q. And would that be recorded anywhere else; is there -- we will get to it, but would it go to control? Would it go anywhere else in the facility?
A. The write-up -- if you did have to do a report, it goes in the security box.
Q. Where is the security box?
A. In admin.
Q. Before I share my screen again, were the shift staff assignments written down anywhere so that staff members knew what shift they were working and what they would be assigned to work during that shift?
A. Yeah. You talking about your shift assignment like they -- when you get hired, they tell you what shift you are going to be on. That's posted.
Q. And that --

A. Sir?
Q. Just thinking. What happens if that assignment changes?
A. I don't understand your -- what you mean.
Q. I'll rephrase. When you show up to work, how do you know what post you are assigned to?
A. Well, during the meeting, like say I might would swap out officers in the chow hall running chow just so they don't have to do the same thing every day, if that's what we're talking about, discussing during in your meeting, shift meeting.
Q. Is that written down anywhere?
A. No, sir.
Q. Okay. I'm pulling up what was previously marked as Exhibit 4. It's just one page.
(Sharing screen.)
BY MR. STEPHENS:
Q. See here (indicated), it says Staff Log? Have you seen this document?
A. That's in our shift packet.
Q. That's in your shift packet?

A. I believe you are talking about the -- the second sheet on the shift packet.
Q. Tell me more about the second sheet on the shift packet.
A. Well, it's the names of the officers that's working in -- you know, it's security and this job title and this job title.
Q. And where is that shift packet located?
A. In admin, but I don't --
Q. Do you have access to it?
A. Yes.
Q. How do you get a copy of it or get the shift packet itself?
A. Well, each shift has its own copy of the shift packet. Every morning before you come down the hall, you bring your shift packet with you.
Q. What else is contained in that shift packet?
A. Well, it's the cover sheet that says Catahoula Corrections and who the warden is; and that's your fence inspection and laundry room inspection, all that stuff was done; dorm inspections; fire and safety.

Q. Okay.
A. Your count sheets go in it -- with it at the end of the day.
Q. And when you include your count sheets in the shift packet, where do you place it at the end of your shift?
A. In the security box.
Q. And the security box is in admin; is that correct?
A. Yes, sir.
Q. Got it. Okay. Let's jump to this document. As I mentioned, it's been previously marked Exhibit 4.
A. Okay.
Q. So this is a logbook policy. Have you seen this document before?
A. I don't believe so.
Q. Okay. Do you need a second to read it?
A. (Complied.) Okay.
Q. Where is this log that's referenced in this policy located?
A. That would be the control room's logbook.
Q. Okay. And is there -- sorry.

A. Go ahead. Each control has its own logbook, and Control 1 that keeps up with what's in her dorms or their dorms plus all the movement over the whole facility.

Q. Was that the practice in 2021?

A. That's been the practice since I've been there, sir.

Q. And it's still the practice today; is that correct?

A. Yes, sir. Yes.

Q. Are there separate logs for unusual occurrences that happened on the facility?

A. No.

Q. What about if a prison or detainee switches dorms, is that recorded in that same log or is it a different log?

A. It's recorded in that log -- it's recorded in what -- every control room -- if he moved from C-Dorm to D-Dorm, it would just be wrote in Control 2 and Control 1's book. Because Control 2 is over C and D and Control 1 keeps up with the movement for the whole facility.

Q. Got it.

A. But it's -- it's noted, yes.

Q. Do you remember who the control

center officers were in 2021?
A. No. I mean, it depends on what shift.
Q. On your shift.
A. 2021, I believe I was on D team. I don't know if any of them still work there. I don't remember, sir.
Q. Okay. Do you remember who the control officers were during your shift in 2022?
A. Ms. Jean was Control 2. I think she's the only one that stayed the same.
Q. You said Ms. Jean; is that correct?
A. Ms. Jones, yes.
Q. Jones. What's Ms. Jones' full name?
A. Jean Jones.
Q. Jean Jones. Okay. Which control does she work?
A. Two, two.
Q. Does the log keep track of when staff members enter and exit a dorm?
A. Yes.
Q. So, for example, if -- if a staff member walks on the E-Dorm, that would be recorded in the corresponding control; is that correct?

A. Yes.
Q. Is that information relayed to Control 1 as well?
A. Well, they announce it over the radio, yes.
Q. And does everyone get that radio call or only specific individuals?
A. Everybody.
Q. Are unusual occurrences tracked in the control logs?
A. I don't understand "unusual occurrence."
Q. Yeah. When there are incidents that are out of the ordinary, for example, a fight?
A. Yes. Those are always logged in the control room book, yes, sir.
Q. Any other -- I'll just be specific. What about if there's an overdose in the dorm, would that be entered in the logbook?
A. You buffered real hard right there. I don't know what you said.
Q. Yeah. I'll repeat my question. If there's an overdose on the dorm, would that be tracked in the logbook?
A. It would be tracked in the logbook

that there was a med -- medical something in the dorm, yes.

Q. Would it just say medical or would t be more specific?

A. It would say medical Code 3 or like that, yes.

Q. What's included in the category of medical Code 3?

A. It could be anything from, you know, he slipped and cut his leg on the drawer or fell down, anything like that; nonresponsive.

Q. Okay. If contraband is located on a dorm, would that be tracked in the logbooks?

A. Yes. If we find it, yes.

Q. Anything else that would get included in the logbooks that happens on the dorms?

A. Whenever you go in and out the count; when a Code 3 happens; whenever it's all -- Code 4, it's good; when they get medical, you call and let them know that medical cleared them.

Q. If a fight occurred, would that be logged anywhere else besides the logbooks?

A. No. It would be in the control rooms that it happened.

Q. Okay. Let me just jump back up in this document.
A. Okay.
Q. This final paragraph says "Prior to the end of each shift, the shift supervisor on duty will prepare a written summary."
When you were a shift supervisor, did you prepare those written summaries at the end of your shifts?
A. If it was needed.
Q. When would it be needed?
A. I -- I never had to do a written summary to the warden.
Q. Have any of your colleagues had to complete those written summaries; and, if so, in -- in what context?
A. I'm not sure, sir.
Q. Okay. If there were a Code 3 on a dorm during the beginning of your shift, would that be required to be written up in a shift summary at the end of your shift?
A. It would be done in the report, yes, sir, a UOR, and then it would be a write-up done about it.
Q. Okay. So just to be clear, you

would write a URR -- UOR, but you wouldn't necessarily also write a written summary of your shift packet duties; is that correct?

A. Well, you do a -- whenever there is a fight, you do the unusual occurrence and a write-up on the whole -- I can't remember the name of the sheet, but there's another sheet you fill out for it.

Q. Okay. You brought up unusual occurrence forms that you fill out in those times. What are those for?

A. What is a UOR for?

Q. Yes, sir.

A. It -- it could be as simple as you found a lighter on the hall or the laundry room caught on fire and you had to do a write-up because the lint backed up in it. I mean, it's just --

Q. Anything else?

A. It could be for laundry missing. It's just --

Q. And you said there's a UOR and then a write-up; is that correct?

A. Yes.

Q. Are those different forms?

A. Yes.
Q. Do you know if the write-up form has a title?
A. I can't remember what it's called.
Q. Okay. We will return to UORs in a little bit. So just to be clear, this document talks about written summaries, but to your recollection, you didn't prepare those written summaries at the end of your shifts and send them to the warden; is that correct?
A. Right.
Q. Do you remember if -- when you were a sergeant, for example, if your lieutenant was completing those written summaries at any point?
A. No, sir, not that I remember.
Q. Okay.
MR. STEPHENS:
We have been going for about an hour, do you need a break? How are you doing?
THE WITNESS:
I'm fine.
MR. STEPHENS:
You're good?
THE WITNESS:

Yep.

MR. STEPHENS:

Anyone else? Are we good? Okay.

BY MR. STEPHENS:

Q. Okay. When a new inmate arrives at CCC, what is the intake process? Can you walk me through the protocol?

A. Well, they come in, you -- they get strip searched; you do a drug test on them just because; you go through their property; give them a list of the stuff they can and can't have, you know, you can't have red or blue; and they get it back to them and they are issued a mat and their blanket and hygiene that CCC provides; and they get their property and they get issued a dorm to go to and you would escort them to the dorm.

Q. Where is that strip search conducted once they get to the facility?

A. GP room.

Q. And is it just like in the middle of the GP room? Is there any specific location within that room where the strip searches are conducted?

A. It's in the GP room. It's just that room.

Q. And is that just one officer with the new intake or other folks involved in that process?
A. There's four to five officers in there, if not more.
Q. Okay. And then you mentioned a drug test. Can you tell me about how that happens?
A. Well -- well, your sergeant or a lieutenant is issued -- they give them a drug test and they go in the bathroom and they do the test and you read it in front of them.
Q. And if they fail the drug test, what happens?
A. It's -- it's wrote down that they failed it and we tell the warden or the major and them that's on shift and they get put in a cell.
Q. You said it's written down. Where is it written down?
A. On the drug -- we have drug tests like papers that say --
Q. Okay.
A. -- that they failed the test. It's a --
Q. I'm sorry. Can you repeat the end of what you just said?

A. Well, it's a piece of paper saying new intake and it's drug screens and all this; and on that paper, you write down pass or fail.
Q. Got it. And if they fail, how long are they placed in a cell?
A. It's normally just for 12 hours, like temporarily just right then until you figure out what dorm you want to place them in, or it just varies.
Q. And does that information, the results of the drug tests, does that effect what dorm they get assigned to after they get to the facility?
A. No.
Q. No. Do you follow up subsequently in any regard with regards to the drug testing?
A. Yes.
Q. When would that happen?
A. It's whenever they ask us to. It just varies.
Q. And is that only for new intakes that fail upon entry or is that everyone?
A. Every -- we could do random drug screens just whenever, I guess how you say that.
Q. Do you have a sense of how often you

were conducting those screens?
A. Once a month.
Q. Okay. So post-intake, depending on the results, if someone failed, where would you record the results of that drug test?
A. Well, I give the paper to the lieutenant, then it goes to the nurse's desk; and after that, I'm not real sure of where it goes, sir.
Q. And you said "paper" there. I understand at intake, there's a box, but subsequently, what paper are you referring to?
A. The one -- the one for the drug screen. Each -- each inmate has one with their name wrote on it, it's got their DOC number and that, and you check -- when you do the drug screen, they have to sign that they did it, you know.
Q. Right. And those go to the nurse after results?
A. Yeah.
Q. Do you know what happens on that paper after it gets to the nurse?
A. I know they file it and put it up, sir.

Q. Okay. Okay. This was previously marked Exhibit 5.
(Sharing screen.)
BY MR. STEPHENS:
Q. We are on page 1 right now.
A. Okay.
Q. And don't worry about the specifics of who this is. We are just worried about the general form of this form. Are you familiar with this document?
A. Yes.
Q. What is it in your understanding?
A. I would call it a booking sheet.
Q. How is this booking sheet completed?
A. Well, I don't understand your question.
Q. So, for example, there's a number of -- what would be an example?
A. Oh, I understand now.
Q. Yeah. When you -- go ahead.
A. When they come to the facility, they go into booking and they talk to our booking captain now and she takes the picture and makes their ID. That's where all this is done.
Q. See this time right here

(indicated), 14:53?
A. No.
Q. Can you see my cursor?
A. No, sir. Oh, I do now.
Q. Yep.
A. It's blinked.
Q. Yep. Right there (indicated)?
A. I got you.
Q. Yep. It says 14:53. Do you know what that time refers to?
A. The time they were booked into the facility when they got there.
Q. Got it. And then follow my cursor. Right here (indicated), it says Class, MED?
A. Medium, yes.
Q. Do you know how that determination is made?
A. That information comes -- comes with them. It's already on their sheets from the other facility.
Q. And this is medium security; is that correct?
A. Yes.
Q. How does that determination matter? Once they have -- once they have got it, how does

that effect where they are housed?
A. It doesn't.
Q. So this information comes with them?
A. Yes.
Q. And it doesn't effect their housing assignment thereafter; is that correct?
A. Correct.
Q. Okay. Zooming out a little bit, what does classification mean in the corrections context to your understanding?
A. Well, like medium, like that, sir?
Q. Yes, sir.
A. That's just medium security. I don't know exactly how you want me to explain this.
Q. Whatever the word means to you based on your experience?
A. Well -- well, generally, your medium class are -- they are not your -- what's the right word here? They are normally in there for theft or something like that. It's not your -- we don't really get many high. It's just normally medium to low security.
Q. Okay. So you are talking about medium and low specifically. I think what I'm

trying to ask you about is something more general about classification.

Do you have a sense of why classification is important in the corrections context?

A. Yes.

Q. And why is it important?

A. Well, I mean, you don't want -- it's important so you can make sure you have them in the correct dorms; but, like I said, our facility only really has medium.

Q. Okay. And why is it important to have them in the correct dorms?

A. Well, you don't want a low with -- if we had a max dorm, if we had that, you wouldn't want to mistakenly put a medium in there with a dorm full of max inmates. It's just you wouldn't want that.

Q. Why wouldn't you want that?

A. Back up. That's a -- poor judgment mostly. It's just not how you should do that.

Q. Why is that -- why is it poor judgment?

A. It shouldn't happen.

Q. Why shouldn't it happen?

A. Because max inmates belong with max inmates and medium belong with medium.
Q. I understand. But is there -- what are the consequences of placing a medium with a max, for example, which would lead to it being poor judgment?
A. Well, there's not really a consequence because it doesn't happen. We don't have the max inmate, so, I mean, if we do, they are normally just there temporarily at the jail.
Q. Hypothetically -- hypothetically if you did -- I'm just trying to understand why it would be poor judgment to have this mixing in a classification scheme just to be a little more specific, so I'll try again. And I'm going to drop it.
A. Okay.
Q. Who was the classification officer when -- in 2021?
A. I don't remember.
Q. Who is the classification officer now?
A. Ms. Margie.
Q. Ms. Margie?
A. Ms. Price.

Q. Was there a classification officer in 2021?
A. I believe so. It should be -- should have been -- I'm not sure if it's changed. See, we have had a lot of changes at the facility. I'm not sure who it would have been.
Q. Okay. Was there a classification officer in 2022?
A. Yes.
Q. And there is one currently; is that correct?
A. Yes, sir.
Q. In your understanding, what does a classification officer do?
A. In my understanding?
Q. Yeah.
A. Well, they just sort through who is basically your medium, low and high offenders, short and simple of it.
Q. How do they do that?
A. That same sheet you were just looking at, they go through there and they decide who's what when they come in, sir.
Q. Earlier you referenced a booking captain. Who was that?

A. Ms. Margie Price.
Q. Got it. Can you see this document?
(Sharing screen.)
BY MR. STEPHENS:
Q. I just shared my screen.
A. Yes.
Q. This was previously marked Exhibit 6. It's one page. Have you seen this document before?
A. I have to blow it up to read it.
Q. I can do that for you.
A. I got it.
Q. Oh, you got it?
A. I got it to work. Okay.
Q. Okay. You -- have you seen this document before? You have not; is that correct?
A. I've glanced -- I've glanced at it, but it's not one I've read.
Q. And where was this document located when you had -- are you -- my apologies. Are you saying you glanced at it just now or previously while you've been working at CCC?
A. I've seen it before, but I couldn't tell you where.
Q. Okay.

A. But it's there.
Q. Down here (indicated), this document's dated 2023.
A. Uh-huh (affirmatively).
Q. Was there a policy like this one on classification in 2021?
A. Yes.
Q. Was there a policy like this in 2022?
A. Yes.
Q. Can you see my cursor?
A. Yes.
Q. It says Classification Specialist right here (indicated). Do you see that?
A. Yes.
Q. Who is the classification specialist; is that the same as Ms. Price or is that a different person?
A. I believe it is, but I'm not 100 percent, plus that's not -- I'm not in that department. And I'm not trying to say anything, but I just don't know who it is exactly, sir.
Q. Is anyone in that -- who is in that department, I should say?
A. Well, if it's -- if it is in

booking, it would be either for Ms. Price or Ms. Quwanisha Powell.

Q. Can you spell Quwanisha?

A. No, sir, not -- not the slightest.

Q. Fair enough. Is Powell P-O-W-E-L-L?

A. Yes.

Q. Got it. Thank you. Do you know how long she's worked at CCC?

A. About a year and a half, I believe.

Q. Do you know her title?

A. Sergeant.

Q. Sergeant. What shift does she work?

A. She's a Monday through Friday person. She's days.

Q. Days. Okay. Thank you. When you say department, not your department, for example, what do you mean by that?

A. I mean, I don't -- I don't do booking, so I couldn't tell you exactly who does that. And I'm not trying to -- mislead, I just don't know.

Q. Are there certain dorms that only house certain categories of inmates?

A. I'm sorry. I yawned. I didn't hear the first of that.

Q. That's all right. Are there certain dorms in the facility that only house certain categories of inmates?
A. Yes.
Q. Can you tell me --
A. We have -- well, we have a dorm that's mostly for our locals and pretrials right this second because we normally don't have pretrials.
Q. Which dorm is that?
A. G-Dorm.
Q. G-Dorm. Is there a chart or a document that states which type of person can go on which -- which dorm?
A. I'm going to say no. I'm -- I'm not sure I understood what you meant so I'm going to say no.
Q. Are there any -- I'll try again. Are there any written guidelines, policies, procedures that tell you sergeant, lieutenant, whatever your position is at the time, which inmates can live on which dorm?
A. No.
Q. And backing up a little bit. You mentioned that there are pretrials in G-Dorm; is

that correct?
A. Right.
Q. Are those pretrial detainees from Catahoula Parish?
A. Yes. We are holding them -- the sheriff's office sends them to us for us to hold --
Q. Okay.
A. -- because -- well, we are still considered a parish jail to a small -- you know, we hold the local parish inmates.
Q. Okay. Does that dorm hold pretrial detainees from other parishes as well?
A. To my knowledge, I don't believe we have any pretrial inmates from other parishes. We don't generally do that, no.
Q. Okay. Do you conduct any checks to see if a certain inmate can live with the other inmates on a given dorm?
A. What do you mean, sir?
Q. I'll return to that. If -- if I say "keep separate" or "enemy list," does that mean anything to you?
A. Well, we don't have a list for that, but generally they are telling you the truth that

they have an issue with people in a dorm.

Q. Okay. And if someone told you they had an issue with someone in a dorm, would that get recorded?

A. Yes. They would get recorded being moved from a dorm-to-dorm.

Q. Would the reason why they wanted to be moved or the person with whom they had a conflict, would that be included in documentation of the move?

A. Yes.

Q. Where would that documentation be?

A. Well, all the information would be in the Control 1 logs.

Q. Okay. So you're saying that if someone requests a move because of a conflict with another prisoner, the move itself would be placed in a logbook --

A. Yes.

Q. -- as well as the reason for the move; is that correct?

A. Well, the reason for the move would be done on -- on like -- if they are requesting PC, you give them a form to fill out and they get -- they tell you the reason. But you are --

you go ahead and pull them, then you don't wait for them to fill the paper out. That's ridiculous.

Q. Okay. I'll ask you about that PC form later.

A. Okay. Oh, that -- I'm sorry. That's a recent thing. That was not in '21. That's like the last year. Sorry about that.

Q. No worries. Thank you. You mentioned that the moves will get put in the Control 1 logbook?

A. Yes.

Q. Do you know what PTS is?

A. Yes.

Q. Would the move also get logged in PTS?

A. Well, when they get moved from dorm to dorm?

Q. Yes.

A. Yes.

Q. Would the reason for the move also be entered into PTS?

A. No.

Q. And you mentioned that, you know, someone could come to you and request a move.

Where does that type of request typically happen?
A. Where does it happen?
Q. Yes.
A. They come to you when you are making your rounds or when they are going to chow, on the yard. Anywhere, it can happen anywhere.
Q. And do you record those conversations in any way or do you just --
A. No. I don't record them, no, unless it's -- no. They don't get recorded because I don't have any means of doing it on me at the time.
Q. Okay. But later you don't write it down once you do have the materials to do so?
A. What, if someone asked to be moved?
Q. Yes, sir.
A. Normally, I just move them. That's when it would happen.
Q. Okay. Are people moved from dorm to dorm -- from dorm to dorm based on behavioral issues?
A. Well, behavioral issues, so you mean like if they had a fight? I don't understand.
Q. Yeah. If they --
A. If they have -- if they had a fight,

they get put in a cell. We don't -- they don't get to go to a dorm immediately, no, sir. They got to go to a cell and wait to be brought to, as we call it, low court.

Q. Low court. Is there another name for low court?

A. DB board.

Q. Okay. Thank you. And -- and so if someone is in a fight, they get moved to a cell?

A. Yes.

Q. And let's say that they are on alpha dorm and then they get in a fight, they get moved to a cell. After that, would the fight effect which dorm they go to once they are released from that cell?

A. It depends. Sometimes they just were acting up, I guess. If they are opposite the person they had the fight with, they don't get to go back in the -- we keep them separated as much as we can, if that's what you're asking.

Q. And to the degree that you keep them separated, do you talk to those people about which dorms they may go to or do you just send them to a dorm?

A. We give them a choice.

Q. And how do you decide which dorms to choose between?
A. Well, we normally go by the population that's in the dorm and what beds are available. Like when we are doing a cell movement, you come up to them and ask them what dorm and they normally just want to go to one where their friends are; but if it's full, they can't go to there.
Q. Okay. Are there any other factors that decides capacity that effects which dorm they go to?
A. Well, if they had issues with the -- say they got, for lack of a better term, a group they -- that we have to keep instigating stuff with, we don't want them together because that's just asking for trouble later on.
Q. Is there a way to -- do you write down which groups are where and -- and --
A. No, sir. I don't have to write it down.
Q. You don't have to write it down because you just -- you just know; is that -- is that correct?
A. Yes, sir.

Q. How do you relay that information to your colleagues?
A. We tell each other during our shift meetings every day what's going on, what happened here.
Q. Okay. And if a new hire comes in, how do you update them on this type of information with regards to the groups in certain dorms?
A. Well, your new hire isn't allowed to move people from dorm to dorm. It's a sergeant or above doing it, if that's what we are talking about, because the new hire doesn't -- isn't allowed to do that.
Q. Okay. So if -- if someone during chow comes up to -- comes up to an officer and requests a move --
A. Yes.
Q. -- what does that officer do with that information?
A. Send it -- brings it to a sergeant or a lieutenant or a captain.
Q. Any of those three or is there a sequence?
A. You go through your low sergeants

and lieutenants and then a lieutenant goes to where it needs to go from him higher up, which would be a captain.

Q. Who approves those moves ultimately in the chain of command?

A. The lieutenant, but it can be overruled by the captain.

Q. And why might the captain overrule a lieutenant?

A. I mean, I'm just -- it's possible. Normally, he doesn't.

Q. Other than groups on given dorms that might effect where you place someone when they request a transfer or have to be transferred after an altercation, are there other variables that you are thinking about when someone requests a move?

A. No. It's generally that, and I won't -- say we do have a faith based on we try to put, for lack of a better term, our ailing older gentlemen that have like walkers, we get those sometimes and they go there, but it's kind of that way. But then that has to be approved too.

Q. And you've got a similar process,

are those -- is that approved up the chain just like you described?

A. Right. Yes, sir.

Q. Okay. What dorm is that?

A. Right now, it would be J-Dorm.

Q. Thank you. Can you tell me more about when you say "group," what do you mean by that?

A. Well, for lack of a better term, normally when these guys come to a facility, they meet up with people they done time with in their parish and clique -- I'm digging here, but I can't remember a word better for the court, but the -- besides just saying their buddies, you know.

Q. Are there certain groups that are more common than others in the facility?

A. No. It's just --

Q. Is there a geographic component?

A. No. It's just -- no. They -- they have known each other for years and sometimes they just get on each other's nerves and you don't want that to happen. That's just -- I don't have any better option but boss man.

Q. Got it.

A. My phone will need to charge in a little bit.
Q. We will take a break here in a second and you can pop that phone on a charger.
Have you heard of the Basic Jail Guidelines?
A. Yeah. The BJGs?
Q. What are they?
A. That's what -- yeah.
Q. What are they?
A. I'd have to read through them again. I haven't read them thoroughly yet, sir.
Q. Did someone request that you read them thoroughly?
A. No. I have them. I just haven't read them. We got them. I --
Q. When did you get -- when did you get them?
A. Shoot. I can't remember how long ago it was. I haven't read them in a long time is what I'm saying. I haven't done it again, so I can't quote anything from it.
Q. Okay. Do you know what there purpose is?
A. To make sure you apply -- go by the

standards set by DOC is what I would say.
Q. This was previously exhibit -- previously marked Exhibit 7. We are on the first page.
(Sharing screen.)
BY MR. STEPHENS:
Q. We were kind of just talking about it, but have you seen this document before; is it familiar to you?
A. Yes.
Q. Have you seen this provision that I'm highlighting right now?
A. Excuse me. Yes.
Q. When did you see it?
A. Well, when I read the guidelines, but I can't give you a date because it's been a long time.
Q. Would that -- would it have been around the time you were hired to work at CCC?
A. Yes.
Q. So in 2019?
A. Yes.
Q. Got it. I just highlighted the Objective Classification Process.
A. Yes.

Q. Do you know what that means?
A. We basically discussed that, but yes.
Q. And -- and what does it mean?
A. Well, make -- make sure they are in with the same level of security as the rest of them; make sure they are in there with the same level of security as they are basically.
Q. Okay. Do you know if anyone at CCC has regular access to all of these regulations that are included in this document?
A. Yes.
Q. Who would -- who would that be?
A. Ms. Wanda Phillips.
Q. Do you know Ms. Phillips' title?
A. Lieutenant.
Q. Okay. Do you know when Ms. Phillips began working at CCC?
A. Not exactly. I think she was working there before I started, sir.
Q. Okay. And does she have a specific role with regard to these regulations or different access to those regulations?
A. I know she's to keep up with them, but she's the one that's doing the -- the

guidelines.
Q. When you say "doing the guidelines," what -- what do you mean?
A. If anything changes, she's the one keeping up with the prison guidelines, you know, the changes to it.
Q. Got it. If a guideline changes, will -- will Ms. Phillips notify employees?
A. She'll -- yes. She will notify the warden and update the guidelines, print it up that we have, and we normally have a meeting about it or something.
Q. Do you remember the last time that you had one of those meetings?
A. We have a meeting once a month. Now, I can't tell you the last time this was talked or not, because we have them once a month.
Q. What -- what are those -- do those meetings have a name?
A. Just a staff meeting, sir.
Q. Just a -- just -- you -- you-all refer to it as a staff meeting; is that correct?
A. May -- yes.
Q. And at those staff meetings, is someone writing things down, taking notes?

A. Yes.
Q. Who would that be?
A. Normally, it's the assistant warden that's taking a note.
Q. Who is the assistant warden?
A. Warden Allen.
Q. And have these meetings occurred since you've been at CCC?
A. Yes.
Q. Have you always had staff meetings? Okay. Has the assistant warden always been responsible for taking notes during these staff meetings?
A. No. He's -- it's not his responsibility. He just takes note.
Q. Okay. Do you know what he does with those notes?
A. No, sir.
Q. Okay. Thanks. After Ms. Phillips or -- or someone else at those meetings relays updates to the guidelines, are those updates posted anywhere in the facility?
A. Yes. In -- in the control rooms.
Q. And are they pinned up or are they in a packet, what -- what form do they take?

A. In a packet, I would say, stapled together.
Q. Okay. When you were working control, did you reference those guidelines?
A. Yes.
Q. Do you remember why?
A. They were there.
Q. Okay.
A. I'm sorry for that answer, but that's --
Q. Oh, no worries. Do you -- backing up a little bit. Who attends these monthly staff meetings?
A. Well, it's for all employees that aren't working on shift at the time. They have the meeting and you're working. You don't -- you don't go to it, but it's for all employees.
Q. And when do they typically occur? During -- like during the day, when do they occur?
A. 2:00 o'clock to sometimes 4:00.
Q. Is it always between 2:00 and 4:00?
A. Yes.
Q. Okay. Prior to the meeting, do you receive an agenda as to what would be discussed

during the meeting?
A. No.
Q. Is there an agenda passed out before the meeting starts once you get there?
A. No. You -- we go, we sign we were at the meeting and then they tell you what it's about during the meeting.
Q. You said you sign-in to the meeting; is that correct?
A. Right. You sign that you were there.
MR. STEPHENS:
Okay. All right. We have been going for nearly two hours.
THE WITNESS:
Uh-huh (affirmatively).
MR. STEPHENS:
So how about we take a five-minute break and then -- five-minute break, Shane?
MR. BRYANT:
Please.
MR. STEPHENS:
Yeah. So about 4:02 we will pop back on the record.

THE WITNESS:
Do what?
MR. STEPHENS:
About 4:02 we will get back on the record, okay?
MR. BRYANT:
Yeah. We are -- we are going to take a ten-minute break.
THE WITNESS:
All right.
(A short recess was taken.)
BY MR. STEPHENS:
Q. All right. Mr. Guthrie, you ready?
A. Yes, sir.
Q. I'm going to shift gears a little bit. You mentioned it a few times, but was conducting count a part of your responsibilities?
A. Yes, sir.
Q. How many times do you conduct a count per shift?
A. Six.
Q. And can you walk me through the procedure for conducting count?
A. Well, we call out count time and then you go in the dorm and tell them to rack up.

They all get seated, not moving, and you go in and do a head count and you come and turn your counts in.

Q. And who do you turn your counts in to?

A. The control room operator.

Q. And is that just a number that you turn in to the control room operator?

A. Yes.

Q. And then what does the control room operator do with that number?

A. They write it down in their book and they -- when it's done, they tell Control 1 to turn their count in.

Q. And when you say they "write it down in their book," is that the logbook in the control room?

A. The logbook, yes.

Q. Do they record that number anywhere else?

A. Yes. They have a count meeting in the control room.

Q. Okay. What do they compare that number with when they get it?

A. I -- I don't understand your

question. What do they compare their number with the count?

Q. Do you -- exactly.

A. Well, they have a number -- each time when you come in, you have your -- what's in your dorm wrote down on your count sheet and how many steady counts you have on that sheet and you keep up with that as it changes through the day, say they go to court or this or that.

Q. Okay. Does that --

MS. HEBERT:

Hey, guys. Sorry to interrupt, I apologize. I have to go and so I just want to reserve Calcasieu Parish Sheriff's rights here. I'm so sorry to interrupt. I just didn't want to leave without saying that for the record. But thank you-all so much.

MR. STEPHENS:

Lenzi, are you -- Lenzi, are you available at 9:00 a.m. tomorrow for the last bit of the depo?

MS. HEBERT:

Oh, yes. If that's -- if we don't -- oh. That's true. Yes, perfect. So --

MR. STEPHENS:
Yep. Yeah. We're going to --
MS. HEBERT:
Thank you guys, thanks so much.
MR. STEPHENS:
Thank you.
MR. BRYANT:
Thanks, Lenzi.
BY MR. STEPHENS:
Q. Is there a -- a -- a master list of the names of every person that they are on each dorm?
A. There is a bed book, yes.
Q. Okay. What's -- what's in the bed book?
A. The -- their names and what rack they are in in the dorm.
Q. Okay. When the control operator gets the count number from the officer that conducted count, does the bed book -- do they -- do they check that number with the bed book?
A. No, sir. You don't check it with the bed book, you check it with your master sheet. Control 1 has all the dorm counts. She's over all of them, and then when she called, they

-- say Control 2 calls into Control 1 and says she has 101 people in C-Dorm and Control 1's like no, you have -- you're supposed to have this, and that's how it goes.

Q. If Control 1 notes that they have -- are supposed to have a different number, what happens next?

A. They figure out -- most of time, it's because somebody had taken someone out for whatever reason to go to the warden's office or to Catahoula court and transportation or somebody didn't inform them or they just failed to write it down, but most times it's just adding error.

Q. Okay. And you mentioned there's a count list; is that -- that correct, like a separate -- a separate document with the count numbers on it?

A. Yeah. I believe that's how I would say it, yes.

Q. Okay. At the end of your shift, where does that list go; what do you do with it?

A. That's what I called the count sheets, and it goes in with the shift packet.

Q. Okay. And do you -- you turn -- I think you said --

A. That goes to the security box.
Q. And that's located in admin, correct?
A. Yes, sir.
Q. So I understand that when you conduct count you return a number to the control operator and the subsequent chain occurs. How often do you ensure that based on the bed book that the right prisoners or detainees are in the correct dorm?
A. The bed books are done every night.
Q. Can you tell me about -- what do you do with the bed book every night?
A. They go in and make sure they are in their assigned rack and -- every night.
Q. And when you say --
A. Or every other night.
Q. I'm sorry. Did you say -- did you say every other night?
A. It's every night.
Q. Okay. And you said "they" go in. Who is "they"?
A. The nightshifts.
Q. Is that -- that's an officer, a sergeant or lieutenant?

A. Yeah. A sergeant or an officer would go in there and do them, yes, sir.
Q. And they physically bring the bed book with them?
A. They have a -- no. They don't bring the actual bed book. They have a sheet printed out and they check off the names that way.
Q. Do you know what that sheet's called?
A. No, sir.
Q. Have you -- do you -- do you print it out? Where -- where do you print it out from?
A. No, sir. I don't remember the name of it. I just call it a -- a C-Dorm bed book log.
Q. Right. When you go -- when you were doing this yourself, where do you go to print out that sheet to then go conduct your checks?
A. Census.
Q. Census?
A. Yes.
Q. Is that -- is that a software or a --
A. It's on the PTS.
Q. Okay.

A. PTS, yes.
Q. Do you know who keeps the census up to date?
A. Booking.
Q. Do you know how often they are updating the census in booking?
A. Every day.
Q. Okay. And within a day, if people are moved from one dorm to another, is that list updated?
A. Yes.
Q. And how are they notified to update the list, "they" being booking?
A. Oh. When they get moved -- it's moved in the computer when they get moved from dorm to dorm then.
Q. And is that also in census or is that somewhere else within PTS where these moves are located?
A. It's -- it's in -- it's under booking, so we could do census or booking, but it's -- I'm having a hard time explaining it, but it's -- it's --
Q. That's okay. So -- so in PTS there's buttons you click: One says booking, one

says census, there's like -- is it a drop-down? What does it look like when you go in to do that?

A. Well, you go up at the top when you're on it, it says -- you can go by booking number or this, and then you do a printout for this dorm who's in there and it gives you the list of names and everything and you print it out and it gives your -- as I called it, a bed book sheet, and you sort -- sort it by dorms and you hand it to them, the individual that's going in there to do the bed book, they update it, come back and they update the book.

Q. And that occurs during the nightshift; is that correct?

A. Yes, sir.

Q. Okay. We had previous testimony that there's something called a rollcall list. Are you familiar with that?

A. That's the -- that's the same thing I'm talking about, I do believe.

Q. So to be clear, the bed book list, the census, the rollcall list, those are all the same thing; is that correct?

A. Yes. If we are talking about when they go in the dorm and they do a rollcall, yes,

it's the same paper. I've never called it a rollcall.

Q. Okay. Have you ever updated that?

A. It's been years. I ain't been on nightshift in a while, well, since '22, I think.

Q. When you say "update" the census or the bed book list, what do you mean by "update"?

A. Well, you go in and, if they have moved beds, they normally have to come up and tell the Control 1 operator or whatever operator is in there and it gets updated in the book because they cannot move racks without telling you they are moving to get it updated.

Q. Okay. So if I'm understanding correctly, so can the prisoners or detainees move bunks themselves and then so long as they update you after; is that what you're saying?

A. They come and tell you that they want to move beds and you say yes or no.

Q. Okay. And -- and what goes into saying yes or no in that scenario?

A. Well, normally, it's just -- they are just trying to get a bottom bunk rack is all. You know, they are on a top rack, they want to go to a bottom rack and it's no issue.

Q. Okay.
A. I can see the TV better from here or something like that.
Q. Okay. When you print out the bed book list and you take it on to the tier to conduct your check, are you writing on that list as you go?
A. Yes. Putting checks by it.
Q. Okay. And -- and when you're done, where do you turn in that list, if you do?
A. Well, you take it to the control room and they update the -- it goes back to the control room and you go to the actual logbook that we call a bed book and make sure it's all the same.
Q. And when the control operator is done updating the actual physical bed book, what happens to the list that they used to update the bed book?
A. They put them in a -- it gets turned in and admin and the captain gets it the next day, I do believe, sir.
Q. Okay. Are those a part of the shift packet or are they turned in separately?
A. Separately, as far as I know.

Q. Okay. And is it put in the captain's box or is it subsequently given to the captain later?

A. Well, no. In security, the captain's told that, so he's normally the one that picks it up and takes it down to the major's office, the chief of security's office.

Q. But it's not -- the captain doesn't necessarily have their own box that you're turning that sheet into?

A. Right.

Q. Okay. You were talking earlier about someone requesting to switch bunks or alternatively if -- if someone asked you to switch tiers, and do you -- when you get a request like that, do you notify the classification officer?

A. I do not, no.

Q. And just so I can close the loop on this. The -- once the bed book is updated --

A. Uh-huh (affirmatively).

Q. -- does the census subsequently get updated as well, and -- and who does that as well?

A. Yes. It's the control room operator

normally does it.

Q. So is -- is that Control Room 1?

A. Yes.

Q. Okay. So does -- does the Control Room 1 operator update the bed book and then also update PTS when they are done?

A. Yes. If someone's been moved, yes.

Q. Okay. When you start a shift, do you get notified of any changes to the bed book or transfers that have occurred while you were gone?

A. No. You gone -- you get notified of -- I guess if they moved someone from A to D-Dorm they will let you know that, but as far as the bed books, no, sir.

Q. Okay. And jumping back a little bit. Can only Control Room 1 update PTS or the census?

A. Yes.

Q. So control room --

A. It's Control 1 and booking can do it. As far as the control rooms go, it's only Control 1.

Q. Thanks. And does Control 1 also get notified if someone changes racks or is it only

if -- well, sorry. Let me rephrase.
Does Control 1 only get notified -- apologies.
A. That's okay. I can answer your question. If someone moves a rack in -- in Control 1's dorms theirself, which would be A or B-Dorm, she knows about those. I do not believe that Control 2 -- they will call and let her know that they moved, but she doesn't get notified in person.
Q. Okay. And then once she's notified of the rack change, will she update PTS after that?
A. Yes.
Q. Okay.
A. And if she doesn't get to it on dayshift, it's -- it's handled at night.
Q. Okay. And how does the nightshift officer know to enter that change?
A. We leave the -- we normally tell them, because we normally try to have everything done for our shift before the other shift gets there because you don't want to leave them with what was your task.
Q. Right. In the event you can't

finish all your tasks, how do you notify the other shifts?

A. She does. It's in the book or wrote down on a -- on a notepad for her. Normally, there's only like one thing that has to be changed, but we are pretty good about getting it done.

Q. Okay. I just want to make sure I understand. So say we are in -- we are in D-Dorm and someone changes racks. How does that information get entered into PTS? Can you walk me through that process again?

A. Okay. He gets moved in D-Dorm from this rack or that, he comes up and let -- first of all, he tells the control room operator he's going to move and he -- that control room operator will inform Control 1 and then it gets moved in the computer.

Q. Okay. And is the control room -- is the Control Room 2 operator also noting down that change?

A. She does it on the logbook in her control room.

Q. Okay.

A. The bed book log, yes.

Q. Got it. All right. I'm going to switch gears. What does lockdown mean?
A. Lockdown?
Q. Yeah.
A. No one in or out, no one in or out of the facility.
Q. When does lockdown occur?
A. It normally occurs -- well, if they think they have a missing inmate or count's incorrect for whatever reason, you did an emergency count and everything goes on lockdown.
Q. And when those lockdowns occur, are you writing it down somewhere that it's happened?
A. It gets logged down in the control room's logbook, yes.
Q. Got it. What about when someone's sent to a cell, how do you all refer to -- to that process?
A. Say so and so out of A-Dorm to Cell 5 for a rule violation this, and that's it. It gets wrote down in the book just like that.
Q. All right. We are going to put lockdown on hold. I'm going to jump back for a second to what we were talking about with the count. You may have already talked about this

earlier, but just so I'm clear, who decides if someone can leave a tier?
A. The lieutenant mostly.
Q. You -- you said "mostly." Is there someone else?
A. If you had -- if you had one trying to check out, leave a tier, you let your lieutenant know and he handles it.
Q. Who -- and who decides where they go once they made their request?
A. Normally, they go to a cell so we can investigate with why they are wanting to leave -- leave the tier.
Q. And how do you investigate why they want to leave a tier?
A. Excuse me.
Q. What do -- what do those investigations entail typically when you put the requester in a cell?
A. You review the cameras to see if anything has happened to them.
Q. If someone asks to leave a tier when there hadn't been an incidence, do you still place them in the cell and then make your decision?

A. Yes.
Q. Okay. And then once they are moved to whichever new dorm they go to, how is that communicated?
A. When we do cell movements, we check off what dorms they are going to; and it's communicated through Control 1 through the radio and also through cell sheet, which she hangs off of everybody that's in the cell. She gets that and computes it into the computer.
Q. When you say "computes it into the computer," you mean they turns it in to PTS?
A. Well, put it into the PTS.
Q. Got it. Who decides where they go?
A. What do you mean?
Q. When someone requests to leave one dorm, who makes the ultimate decision as to which dorm they go to next?
A. It would be the captain; because if they are in the cell, the captain and the major come by and they do the cell movement, they say yes or no on that one.
Q. Okay. Just so I'm -- so I'm understanding. So someone in alpha dorm requests to move to a different dorm. They would be moved

to a cell and then the captain --
A. Yeah.
Q. -- and the major come to the cell to discuss with them why they want to leave and where they want to go; is that correct?
A. Yes. And where can you -- where -- where -- what -- where do you want to go, what dorms can you go to and --
Q. Do you know if the captain and the major talk with anyone else before they make a decision?
A. I don't know, sir.
Q. Okay. What reasons do people typically have for wanting to leave a dorm?
A. Well, some of them are just having family issues and want to be by theirself.
Q. So any -- anything else?
A. That they will -- they owe somebody commissary and don't want to pay up and check out.
Q. What about during the nightshift, if someone requests to leave a dorm, who handles those decisions during the night?
A. It would be the lieutenant.
Q. And this lieutenant can directly

decide to move someone to a different dorm once they receive a request?

A. We generally try to put them in a cell for the time being.

Q. So --

A. He can call and talk to a captain if need be to get it approved, yes.

Q. Okay. So you're saying during the night they may call the captain if the situation calls for it to get approved?

A. Yes. Yes.

Q. Okay. And just so I'm clear, can the lieutenant themselves approve a move to a new dorm during the night?

A. I don't believe so.

Q. And once dorm changes are approved, is the classification officer notified?

A. I -- it -- it -- it would be put into the PTS, so I would say yes.

Q. Do you know if the classification officer receives a notification or a note that PTS has been updated?

A. I'm not sure.

Q. Okay. If someone is taken off a dorm for medical transport, where is that

documented?

A. In the Control 1's logbook, and that can -- in the control room's book and also Control 1.

Q. Okay. Does the Control Room 1 officer enter that information somewhere else as well?

A. It's just wrote down in the logbook.

Q. It's only written -- okay. And does the process that you just outlined differ if it's a routine medical trip or if it's unscheduled or an emergency?

A. Well, I mean, I'm -- say -- say if we have to call an ambulance, it's wrote down that we called AMR and they are enroute and what time they actually get there, yes, in the cell book.

Q. And where is that information -- sorry.

A. It's in the logbook still.

Q. Is that information written down anywhere other than the logbook?

A. No.

Q. Earlier you were talking about how you do -- you-all take the census into the dorm

to conduct your check during the nightshift.
A. Yes, uh-huh (affirmatively).
Q. And that happens every night; is that correct?
A. Yes.
Q. Were you-all doing that in 2021?
A. No. It was only done on the weekends; Friday night, Saturday night and Sunday night on -- in '21.
Q. What about in 2022, were you going onto the dorm every night or what was the process?
A. It was still the Friday, Saturday and Sunday.
Q. And -- and when did the protocol change; do you remember?
A. Within the last six months.
Q. Was there a -- was there an announcement as to that protocol change? Were you-all notified in some manner?
A. We were just informed that they wanted them done nightly, so they started doing them nightly.
Q. How were you informed?
A. Through a memo, printed out handed

off at the shift meeting.

Q. Got it. And in '21 -- in 2021 and 2022, were you conducting these census checks one time per weekend or was it Friday, Saturday and Sunday?

A. Well, you would do -- we got nine dorms, so you would try to get three a night completed.

Q. Did you move through that in any given order; was it numerical or did it just depend?

A. Numerical?

Q. Sorry. Was there a set -- was there a set order that you went through the dorms to conduct those census checks during the weekend?

A. No. No. We could just start at whichever dorm we wanted to, if that's what you're asking.

Q. Yeah. And why would you start in one dorm versus another?

A. Well, you don't have to do it in alphabetical order. Just say if you were a lieutenant and you didn't want to do 106 names, you might would go to E-Dorm because it only has 66 people in it.

Q. Okay. And was that -- was the lieutenant responsible for conducting those checks during the weekend?
A. It's normally your sergeants and your officers will do it and the lieutenant can help do it. It was not required.
Q. How did you decide who was going to conduct those checks in a given weekend?
A. Well, you -- pretty easy. You just I'm going to take these, you can take these two, and whichever one of us is done first can go catch this one. It's -- I don't -- not -- we are not having to make anyone go do it. Just pick one and go get it done.
Q. Okay. All right. I'm going to jump back down. We were talking about lockdown a few minutes ago.
A. Okay.
Q. What is ad seg mean; does -- is that term familiar to you?
A. What did you say?
Q. Administrative segregation or ad seg, is that a familiar term to you?
A. I've heard it, yes.
Q. Do you use it in CCC or do you hear

it elsewhere?

A. It's happened at CCC.

Q. And when would that happen?

A. Say you -- I mean, you had one come in that you know had a conflict with, say, someone the night before. You don't want to put them in the same dorm normally or the same cell together, because normally when it's like that, they go to a cell immediately and you don't -- you can't have them together.

Q. And what would you refer to that process as normally when you would place someone in a cell because of some conflict?

A. Well, you -- how would I refer to it?

Q. Yeah.

A. Normally, it's per sheriff, per warden said this because that's what's wrote on the -- the board beside their name.

Q. When someone was put in a cell for that reason, would you have to notify up the chain of command that you -- that you have done that?

A. Well, the chain -- the -- the higher ups are the ones that are telling you they go

here, so yes.
Q. Okay. And that's the lieutenants and the sergeants; is that correct, or is that captains?
A. The majors are the ones -- the higher than the lieutenants are normally the ones who are making that decision.
Q. Okay. When you arrive for a -- a shift, how do you know who all is in each cell?
A. It's -- it's wrote down on a board in the Control 1 and we also print out the cell list, for lack of a better term.
Q. You print that out from PTS?
A. Yes. I believe it's from PTS, yes.
Q. And if someone is placed in a cell for disciplinary reasons, do they lose privileges as a part of that process?
A. Yes. They are not -- they don't get like commissary or yard.
Q. Anything else?
A. That's -- that's it.
Q. All right. How do you handle showers in those -- in those situations?
A. We bring them out cell -- one cell at a time. Normally, it's four at a time, or

have -- there's four people, you bring four of them out and you set them down on what I would call the block, for lack of a better term, and you do showers there.

Q. Okay. What about phone access?

A. There's no phone access for the cells.

Q. There's never any phone access for the cells?

A. They can request it, but there's not a phone in the cells, no.

Q. Right. What is the process for them requesting phone usage?

A. They have to write to the major and he approves it.

Q. Okay. What is protective custody?

A. What is PC? Where they fear for their life in the dorm and you put them in a cell on PC, that -- that's it.

Q. Can you walk me through how that process takes place?

A. They request it and you go by -- I can't explain it any more than what it sounds like, sir. I'm not --

Q. Okay. I think we're good.

A. Well, my wife had called and it was going off. I'm sorry.
Q. That's okay. So if someone alerts you that they are fearing for their life and they would like to be on PC, who makes the decision on whether or not they actually go to PC?
A. They -- they tell you that and you can't -- you have to get them out and talk to them. You pull them and their property and you set them on the -- on the block and the lieutenant or whoever talks to them and we decide where we can put them.
Q. Okay. And we were talking earlier about prisoners or detainees in cells for disciplinary reasons. Now, we are talking about PC.
Are inmates placed in PC afforded more privileges than the former group?
A. Do they get more privileges, no.
Q. So the process -- no matter why you are going to a cell, the process is the same once you get there; is that correct, in -- in terms of access to property, phones, showers, etc.?
A. Right. It's the same.
Q. Okay. Earlier you mentioned low

court or I think disciplinary board would be another way to refer to it; is that right?

A. Yes.

Q. Are folks placed in cells before they go up before the DB?

A. Yes.

Q. Is there a timeline between the time that they are placed in the cell before they actually go before the board? Does that have to happen within a certain time?

A. I believe it's 48 hours.

Q. Where would you find out that information?

A. BJG.

Q. Okay. Have you ever been a part of a disciplinary board process?

A. No, sir.

Q. Do you know who is typically involved in the DB process?

A. I know the ones that are in the office. It's my major and my captain, sometimes assistant warden.

Q. Does that happen during the nightshift or the dayshift?

A. Dayshift.

Q. And once the DB has made their decision, are they moved out of the cell or what happens then?
A. Even -- after the decision's made, they normally get moved out of the cell that evening on the nightshift.
Q. Is it always on the nightshift?
A. No, it's not always. It just normally is, yes.
MR. STEPHENS:
Okay. I'm going to go off -- I'm going to give myself two minutes just to talk to my colleagues to see if there's anything else, but we are in the homestretch, so I'll be back in 4:44.
THE WITNESS:
I'll be here.
MR. STEPHENS:
Okay.
(A short recess was taken.)
MR. STEPHENS:
So we have a few more chapters left of questioning, but I think it makes more sense to hold it until tomorrow considering we have 15 minutes and --

yeah. I'm good for now and we'll start-up tomorrow morning at 9:00 a.m.

MR. KROUSE:

And how long do you anticipate tomorrow morning just for scheduling?

MR. STEPHENS:

Ninety minutes.

MR. KROUSE:

Okay. Thank you.

MR. BRYANT:

David, the warden knows you have to do this in the morning, so he's -- he's going to have a place for you to do it.

THE WITNESS:

Okay. So it will be another Zoom meeting?

MR. BRYANT:

Yeah. It will be just like this, but you will be at the jail.

Jack, do you guys have a different link for tomorrow or will we be reusing the same link?

MR. STEPHENS:

We will send around a new link.

MR. BRYANT:

Okay. Oh. When you send it, could you send it like in the body of an e-mail? I had a lot of trouble trying to cut and paste the one out of that PDF last time because it was like embedded as a picture.

MR. STEPHENS:

Yep. No problem.

MR. BRYANT:

Thanks. I appreciate it.

(The deposition was concluded at 4:49 p.m.)

CORRECTION SHEET

PAGE LINE DESCRIPTION

_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________

WITNESS: SERGEANT DAVID GUTHRIE
TAKEN ON: NOVEMBER 21, 2024
BY: CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

WITNESS CERTIFICATE

I, SERGEANT DAVID GUTHRIE, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

__________________ ____________________________

DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: November 21, 2024

REPORTER'S PAGE

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for the court reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; also, that any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

Cherie' E. White

CHERIE' E. WHITE, CCR(LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that Sergeant David Guthrie, to whom the oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 124 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

NDTCA · Signed Electronic Transcript

Cherie' E. White

CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO. 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)