Transcript of the Testimony of

# SGT WILLIAM BEASON

November 13, 2024

ROBERT YOUNG v. JAMES LEBLANC, ET AL

AMERSON WHITE
COURT REPORTING · EST.2000

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT YOUNG,<br>Plaintiff, | CIVIL DOCKET NO.<br>23-681-SDD-RLB |
| VERSUS | JUDGE:<br>SHELLY D. DICK |
| JAMES LEBLANC, ET AL,<br>Defendants. | MAGISTRATE:<br>RICHARD L. BOURGEOIS |

VIDEOCONFERENCE DEPOSITION OF SERGEANT WILLIAM BEASON, 499 Old Columbia Road, Harrisonburg, Louisiana 71340, taken via Zoom, in the above-entitled cause on the 13th of November, 2024, commencing at 9:20 a.m.

REPORTED BY: CHERIE' E. WHITE
CCR (LA), CSR (TX), CSR (MS), RPR
CERTIFIED COURT REPORTER

APPEARANCES:

ATTORNEYS REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
4400 South Carrollton Avenue
New Orleans, Louisiana 70119
Phone: 504.620.2259 |Fax: 504.208.3133

(BY: Elizabeth Cumming, Esquire)
E-mail: elizabeth.cumming@macarthurjustice.org

CO-COUNSEL REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

LAW OFFICE OF STEPHEN J. HAEDICKE
1040 Saint Ferdinand Street
New Orleans, Louisiana 70117
Phone: 504.291.6999 |Fax: 504.291.6998

(BY: Stephen J. Haedicke, Esquire)
E-mail: stephen@haedickelaw.com

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, CATAHOULA PARISH SHERIFF'S OFFICE:

FROSCH, RODRIGUE, ARCURI, L.L.C.
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Phone: 504.592.4600 |Fax: 504.592.4641

(BY: Ronald "Shane" Bryant, Esquire)
E-mail: sbryant@fralawfirm.com

ATTORNEYS REPRESENTING THE DEFENDANT, CALCASIEU PARISH SHERIFF:

MUDD, BRUCHHAUS & KEATING, LLC
422 E. College Street, Suite B
Lake Charles, Louisiana 70605
Phone: 337.562.2327 |Fax: 337.562.2391

(BY: Lenzi C. Hebert, Esquire)
E-mail: lhebert@mbklaw.net

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, JAMES LEBLANC AND MR. SMITH:

FRILOT, LLC
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Phone: 504.599.8016 |Fax: 504.599.8116

(BY: Allen J. Krouse Esquire)
E-mail: akrouse@frilot.com

E X A M I N A T I O N  I N D E X


| BY: | PAGE |
|---|---|
| Ms. Cumming | 8 |
| Mr. Krouse | 238 |
| Ms. Lenzi | 243 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | CCC Diagram | 17 |
| Exhibit 2 | Employment File (Redacted) | 72 |
| Exhibit 3 | Organizational Chart | 113 |
| Exhibit 4 | CCC Policy and Procedures Policy No. II-A-006 | 130 |
| Exhibit 5 | CCC Transfer Sheet, Robert Young | 154 |
| Exhibit 6 | CCC Policy and Procedures Classification System, BJG II-A-012 | 157 |
| Exhibit 7 | CCC Policy Procedure Manual | 182 |
| Exhibit 8 | CPSO Policy & Procedure Manual | 188 |

E X H I B I T S (CONTINUED)


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 9 | 8/8/22 to 8/9/22 Control 3 Logbook Sheet | 222 |
| Exhibit 10 | CCC Activity Sheet, Robert Young | 229 |

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically NOT waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

CHERIE E. WHITE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath.

DEPUTY WILLIAM BEASON,

499 OLD COLUMBIA ROAD, HARRISONBURG, LOUISIANA 71340, after having first been duly sworn by the above-mentioned court reporter, did testify as follows:

MS. CUMMING:

We are taking this deposition pursuant to the Rules of Federal Procedure. There's no objection to the use of Zoom for this deposition or to the court reporter being remote. A little bit later on after we finish, we will -- we'll get into reading and signing and -- and you can talk about that with your attorney. My name is Elizabeth Cumming. I represent the plaintiff in this matter.

EXAMINATION BY MS. CUMMING:

Q. Could you please introduce yourself for the record?

A. Deputy William Beason, Catahoula Parish Sheriff's Office.

Q. Okay. And can you state your address and phone number?

A. 214 Book Road, Jonesville, Louisiana 71343. Phone number is going to be 318-657-9230.

Q. Thank you. And do you have any previous deposition experience?
A. No, ma'am. This is the first one.
Q. Okay. All right. And don't worry. I'll -- I'll go over some ground rules. We will -- we'll get through it together. Have you ever been a party to a lawsuit before?
A. No, ma'am.
Q. Okay. So never been a defendant or a plaintiff before?
A. No, ma'am.
Q. Okay. So I want to go over just a couple of ground rules just to make sure that we are all on the same page and so you know kind of what's going on and what to expect.
We have the court reporter here, Ms. White. She is taking down everything that you and I say, so it's really important that when I ask you a question, you answer verbally with a yes or a no rather than shaking your head or saying uh-uh (negatively) or uh-huh (affirmatively).
A. Yes, ma'am.
Q. When I ask a question, try and let me get the whole question out, even though you

may know exactly where I'm going.
A. Right.
Q. It's important to just get a clear transcript so that it's really clear that you knew what I was asking and that you were responding to what I -- to what I asked. So it will feel like a conversation, but it's -- it's -- and I'll try and remind you, but it's useful to remember like this is being taken down for a transcript.
A. Yes, ma'am.
Q. You've taken an oath. It's the same oath that you would take as if you were testifying in a court, so it's really important that you give us, you know, full and accurate answers. We are really interested in finding out everything that you know related to this lawsuit.
So if you need to go back and supplement or correct an answer because something else jogs your memory, that's completely fine. We can go back. If you -- if you don't remember, I don't know or I don't remember is a fine answer; but if at some point you do remember something, something jogs your memory, then -- then we can go back.

I'm going to be asking you a series of questions. At some point, I promise you I will ask you a bad question that's unclear or has too many parts to it. Your lawyer is usually pretty good about objecting to those sorts of questions, but if for some reason he -- he doesn't or the question is unclear to you for some reason, just let me know and I'll go back and I'll do the best I can to clarify it.

A. Yes, ma'am.

Q. I want to make sure that you understand what I'm asking; but if -- if I ask you a question and you answer, I'll assume that -- that you understood what I was -- what I was asking.

You are welcome to take breaks. I am supposed to and I try to offer a break once every hour. I'm -- I'm really bad at it. I lose track of time, so if we have been going for a while and you need a break, just let me know and we will -- we'll take a break. The only thing that I ask is if I've asked you a question, you go ahead and answer the question that's on the table.

A. Yes, ma'am.

Q. During breaks, you can speak with your attorney. I may ask when we come back if you spoke with your attorney during that time and, you know, like you -- you can look at things. I'll -- I may ask if there's anything in the room with you or, you know, if you -- if you looked at anything. Right now, where are you?
A. I am in the conference room at the Catahoula Parish Sheriff's Office main building.
Q. Okay. And is there anyone else in the room with you?
A. No, ma'am.
Q. Okay. And is there any medications, sleep deprivation, any other illness, any other hardship that would interfere with your ability to understand my questions and provide complete and truthful testimony today?
A. No medication. Maybe the lack of sleep because I worked last night and had two hours of sleep, but I'm going to do the best I can.
Q. Okay. All right. Understood. Well, we will try not to keep you here too, too long. And what is your understanding as to why we are here today?

A. Was advised that I -- well, a gentleman by the name of, if I can think of it, Robert Young --

Q. Uh-huh (affirmatively).

A. -- that is suing I guess the prison and I'm part of the -- one of the ones that was apparently there, so --

Q. And what did you do to prepare for this deposition today?

A. Tried to find any report or anything that I could on it. Other than that, I have not seen any reports or kind of just going off the -- the brain of what I can try to remember of it.

Q. And I'm not asking for the content of the communication, but just, you know, did you speak with your attorney in advance of today?

A. Yes, ma'am.

Q. And I think you said that you had tried to find reports. Were there any documents that you -- that you reviewed in advance of today?

A. No, ma'am, besides the -- the lawsuit, the serve papers.

Q. Okay. The -- the complaint itself?

A. Yes, ma'am.

Q. Okay. All right. All right. So I'm going to be asking primarily about the time period between 2021 and 2024. There may be -- so like right now, there may be times when I -- I don't -- I don't think -- well, there may be times when I am asking about what happened before. If you don't know what happened before 2021, that's fine.

A. Yes, ma'am.

Q. I'll try and -- and if the time period is unclear, I'll -- I'll try and remind you. And then I want to go through and just clarify the facilities that we are talking about today. We are talking about what I understand to be called the Catahoula Correctional Center or CCC; is that correct?

A. Yes, ma'am.

Q. Okay. And that's what you refer to it as?

A. Yes, ma'am.

Q. Okay. How many buildings does CCC have?

A. One main building that has most of the dorms and cells, chow hall, offices. You have another building which is considered the

island, which holds I and J. You have a maintenance building and multiple storage buildings.

Q. Okay. And you said the island holds I and J; is that right?

A. Two -- two dorms, yes, ma'am.

Q. Okay. So Dorm I and Dorm J?

A. Yes, ma'am.

Q. Got it. Okay. All right. And how many -- and the -- the main building, is that referred to by a special name or anything like that?

A. Not really.

Q. Okay. Just main building or CCC?

A. Yes, ma'am.

Q. Okay. And then the island, I -- I take it it's referred to as "the island"?

A. Yes, ma'am.

Q. Okay. All right. And how many dorms total in the main building and the island?

A. Let's see. You have Dorm A, B, C, D, E, F, G, I, J, so it would be a total of 9 dorms and 10 -- 15 cells.

Q. Fifteen cells. The cells are one-man, two-man?

A. Depending. There are two, which is the main hall because we have regular cells and then we have maximum cells, which is now turned into juvenile cells; but the main cells, they have two cells that are suicide and have -- and have one bed to them that would be -- which back then was Cell 2 and Cell 5, but they have now made it to Cell 3 and Cell 4.
Q. Okay.
A. Cell 1, 2, 5, 6, 7, 8, 9 and 10 can house two people, which are two racks in each cell --
Q. Okay.
A. -- or bunks.
Q. Got it. And you -- when you were sort of listing off the dorms, you referred to them by letter A, B, C, D, E, F, G. Are -- are they referred to in any other way?
A. No, ma'am. Unless you go by alphabetical military code, like alpha, delta, you know, all them.
Q. Got it. Okay. Yeah. The -- the nato alphabet designations, got it.
MS. CUMMING:
Okay. I want to show you what we

will mark as Exhibit 1. I'm going to share my screen. This is a diagram, it looks like a fire escape diagram.

(Exhibit 1 markged and viewed.)

BY MS. CUMMING:

Q. So I'm actually going to go down to two because I think that's a slightly more complete -- so can you walk me through what -- so on page 2, and this is a Bates No. CPSO_0009. Can you walk me through like what we are seeing here?

A. Okay. So directly along the left, which would be the main office and the chow hall.

Q. On along -- along where A and C are?

A. More to the left.

Q. More to the left?

A. Yes, ma'am.

Q. Okay.

A. That would be the main offices and chow hall. If you go between A and C, that would be the main door, which we can -- we call the Coke machines because there are Coke machines right there. That is practically your only way to get up towards the front or out to the building, unless you go back to the back

sallyport. You have two doors on every dorm: One outside door, which is the hallway; and one inside door, which is inside the interlock to go into the dorms. You have alpha and bravo, which if you see the kind of, I guess, shaped like that (indicated) between the dorms, that would be considered --

Q. (Indicated.)

A. Yes, ma'am. That is control -- go ahead.

Q. Sorry. Just for the record, you held your hands in sort of like an angled shape to -- to refer to this pentagon shape that's --

A. Yes.

Q. -- between the A and B and close to the corridor, correct?

A. Yes, ma'am.

Q. Okay. All right. I'm sorry. Continue.

A. For alpha and bravo dorms, that is considered Control 1. That is also the, I guess what you could call, headquarters for the control rooms. That's where we receive all the phone calls that come from outside, unless it's daytime, then we have people from the front that

will be able to answer. That's where all communications go.

Transportation, she is the main logbook for the whole facility. Transportation will communicate with her if they are leaving, coming, going. She also keeps log of who's leaving the compound, how many times they are leaving with inmates. She handles -- she's the main control room over Control Rooms 2, 3 and 4:00 --

Q. Okay.

A. -- which is also the lieutenant's office as well. It's going to be in the upper left-hand corners where the -- of that pentagon-shaped room is the lieutenant's office.

Q. The upper left-hand corner?

A. Yes.

Q. Okay. So does it -- does it -- sort of like next to the -- the interlocked area for Dorm A, correct?

A. Yes, ma'am.

Q. Okay. And the interlocked area is indicated by two doors; one to the hall and one to the dorm, right?

A. Yes, ma'am.

Q. Okay. All right. So this (indicated) where the arrows are, this is sort of like a main corridor; is that correct?
A. It's a main hallway we refer to as A-B hallway.
Q. Okay.
A. Control 2 controls charlie and delta dorms. If I'm not mistaken, in 2022, charlie dorm would actually be our trustee dorm.
Q. Okay.
A. And that's where we house our kitchen workers, floor men, maintenance, your work release where they are able to go outside of the compound and go out and work and then come back. That is where they housed all them is charlie dorm --
Q. Okay.
A. -- at this time. They switched it around now, but --
Q. In 2022 when Mr. Young was there, correct?
A. Yes, ma'am.
Q. All right.
A. The -- in between the dorms, you see a bunch of walls and kind of lines to it. That

is -- inside the dorm would be considered the shower, the toilets, the sinks, the urinals. In between those are -- in between the dorms, it's considered a pipe chase.

Q. (Indicated.)

A. Yes, ma'am. That's what we call a pipe chase for getting in there for if they have a water leak or if hot water's not working, stuff -- stuff of that nature. There are also I believe, if I'm not mistaken, ducts inside for ventilation.

Q. So -- and just for the record, the -- the shower area that you're talking about is sort of at the back of the dorm on the other side of where the -- the control room, that diagonal shape is. There's sort of an open rectangle, that's the shower area, correct?

A. Yes, ma'am.

Q. Okay. All right. This -- these two -- it looks like two doors that are coming off of the back of each of these dorms, A, B, C and D. Where do those doors go?

A. They are the back doors to the dorms. They are also fire escape doors. They are also doors used -- because they don't have it

marked in the map, they are also back doors to open to go to yard to where if they need to use the restroom or go inside and cool off, we leave the door open for them to come in and out. Like I said, there's no markings of the vents, but those are secured areas for yard time.

Q. Got it. Okay. And then the -- these (indicated) looks like double doors. Does -- well, let me ask you. What is -- what is this (indicated) area, this sort of rectangle off the back of Dorms C and D with the -- looks like double doors?

A. That is the double doors, the entrance to the pipe chase to get inside to work on them.

Q. Okay. Great. How many -- how many people are in A, B, C and D?

A. If I'm not mistaken, A-Dorm and D-Dorm actually hold I believe it's 106. Charlie and alpha -- charlie and bravo hold a hundred -- it's either 102 or 104.

Q. Each?

A. Yes, ma'am.

Q. Okay.

A. I want to say it's 104.

Q. Okay. It looks like -- so I'm looking on -- well, let me look at -- at Dorm A, I see the interlock area and then it looks like there are two rectangle shapes that have doors going into them. What -- what are these?

A. So those right there to -- right there in front of Dorm A, the rectangular shape looks -- appears to be rooms, that is Cell 1 and Cell 2, which actually was Cell 3 at the time.

Q. Okay.

A. So it would be Cell 1 and Cell 3. On the C-Dorm side, the first one to your left is actually an office. I -- I cannot recall what it is or what it was at the time. Actually, no. I -- I apologize. That was actually the chaplain's office when I was there back in 2022. I believe it's something else now, but it is an office.

If you go to on C-Dorm side or charlie side the rectangular to the right closer to Control 2, that is -- at the time was Cell 2. That is one of our suicide cells. It also has a window from Control 2 looking inside and has cameras inside Cell 2.

Delta side, that's going to be

cell -- I believe it's 4 and 6 is what it was at the time. They have changed it to now 5 and 6. Bravo side, the left side is actually a suicide cell. It is also connected to Control 1 window and camera. At the time, it was Cell 5. It is now Cell 4. That would be the interlock -- that -- the rectangular to the right of bravo is actually a storage chemical closet. We house or store like, you know, our big, I guess you could say, shop fans, chemicals, floor buffing equipment, stuff of that nature for putting in dorms, like urinal tablets, brooms, trash bags, soap, just kind of everything that -- that they will need to either clean the facility or put into the dorms for them to clean them.

Q. Okay. All right. And then -- well, let me -- let me ask about the doors in this (indicated) part of the building, this A, B, C, D part of the building.

A. Yes, ma'am.

Q. The lead door to -- to get into that A-B hallway, does that -- how does that open?

A. By key.

Q. Is key the only way to open it?

A. GM key, yes, ma'am.

Q. All right.
A. That's actually kind of reference to almost kind of like a -- to a key to unlock the house. It's basically a key that can get you through gates, it can get you into the building, kind of like all the offices. If they use the GM key, I'm trying to think of the technical term to use.
Q. Almost like a -- like a master?
A. Yes, ma'am, a master key.
Q. Okay. All right. And who all carries -- carries a GM key?
A. Essentially, basically all office personnel; captains, sergeants, lieutenants, maintenance, medical, booking; almost everybody, except for like your new officers, if they are not running sergeant keys or helping with pill call.
Q. Okay. So new deputies may not have the GM key, but it sounds like everybody else, including deputies who are -- who are doing some tasks associated with pill call, would -- would have a GM key; is that correct?
A. Yes, ma'am.
Q. Okay. And then for the dorms, let's

start with the hall door. How does that door open?

A. They have different keys. They are not your standard household key, master key. It's hard to explain, but I want to kind of use it as a reference as a kind of looks like a skeleton key. It's a big key. It's got a bunch of teeth on it, hard to miss.

Q. Okay.

A. And since you brought that up, there are two types of keys. To the inside doors, which is from the hallway to the -- into the dorm, they take a different kind of key, which is basically -- basically what we consider an inner key because you can only use them on the inside of the facility. You cannot use them to go outside. Pretty much you can't use them to go outside.

Q. Okay.

A. Now -- go ahead.

Q. So you are talking about the key that goes from the hallway into the interlock, that's -- it's a key that can only be used for doors inside the secure perimeter of the facility, correct?

A. Yes, ma'am.
Q. Okay. Is it the same key that opens the interlock, from the hallway to the interlock as for the door from the interlock onto the dorm itself?
A. Yes, ma'am. Both doors on -- coming inside from the hallway to the interlock and the interlock into the dorm take the same key.
Q. Okay. All right. And A and C, for example, those each have their own key; is that correct?
A. Negative. No, ma'am. Sorry.
Q. Right. No. Negative is fine. That's -- that's clear. That's good.
A. All dorms take the same key --
Q. Got it.
A. -- if it's -- if it's going inside -- if it's an internal door or interior door. If it's an external door, they take a different key.
So if I go in -- if I go in -- and use an example -- alpha dorm, I will be able to go into charlie dorm, delta dorm, bravo dorm, echo dorm, fox dorm, gulf, I-Dorm, J-Dorm. I can also use that same key to go inside the cells to

be able to -- to go into the cells.
Q. Got it. Okay. All right. That's really helpful that -- okay. Good. So -- so we are talking about two keys basically: One key is to get inside, let's call it, that main door, so you are getting inside, what? I don't know. If I say secure perimeter, does that make sense?
A. Yes, ma'am.
Q. Okay. So to get inside the secure perimeter at the facility, and then you got another key that opens every single door inside the facility once you're inside the secure perimeter; is that right?
A. Yes, ma'am.
Q. Okay. Great. And that goes for -- I mean, we will -- we will get into E, F and G, which are further down, but all of these doors on the inside, they are all opened by that one key, correct?
A. Yes, ma'am. Yes, ma'am.
Q. Got it. Okay. Thank you. And who all carries that internal key?
A. The internal dorm, slash, cell key, Controls 1, 2, 3 and 4 have those said keys. Your sergeants and lieutenants have those keys.

Your captains, major, assistant wardens and wardens also have those keys. There are a select few -- maintenance have -- has those keys. If I'm not mistaken, medical might have those keys. I could be wrong. I'm not sure.

Q. Got it. Okay. Okay. Thank you. And so all of these doors are key operated. Is there anything in the control room, is there any button operation for any of the doors that you're aware of?

A. No, ma'am, there is not. It's all manual.

Q. Got it. And so you were referencing Control 1, 2, 3 and 4:00. Control 1 is between A and B. Where is Control 2?

A. Control 2 is located at the front side of charlie and delta.

Q. Okay. So it's the -- it's sort of right directly across the hall from Control 1?

A. Yes, ma'am.

Q. All right. The door to get into Control 1 and 2, is that -- how is that door operated?

A. Automatic. And it's also an inner key.

Q. Okay. All right. And when you say "automatic," what do you mean by that?
A. Manual. I'm sorry.
Q. Okay. So that's -- that's the same inner key?
A. Yes, ma'am.
Q. Okay. Are those doors kept locked?
A. Yes, ma'am. They are supposed to be kept locked.
Q. Okay. The policy is to keep them locked?
A. Yes, ma'am.
Q. Okay. All right. And then moving down through, we are going past B and it looks like there are -- it looks like there's sort of a square here (indicated) with four different doors. What's that?
A. So if you looked, we have -- there's two doors: One in that little rectangular, there's one to your left and to your right. Those are both doors to close and secure those hallways for basically maintaining and securing. Like sometimes we have to run the dorms out to the chow hall, so to keep them from going down to another cell or going down the hallway, we

nine -- nine times out of ten tend to just shut the door and lock the door to keep them from trying to go down that way.

The ones that will be -- looking at the diagram -- which will be up and down --

Q. Uh-huh (affirmatively).

A. -- those are exterior doors. They go to the outside. The top side goes to charlie and delta yard. It doesn't show it on the bottom side, but at the bottom of E-Dorm, between E-Dorm and bravo, there's actually a gate that you have to get through, but that is kind of a secured -- I guess you would call it a walk. I don't know the technical term for it, but the upper and lower doors of that particular area take an exterior key, which is different from the interior key. So if you do not have an exterior key, you cannot go out those doors.

Q. Got it.

A. That's practically everything in that. In terminology, we call it the breezeway, breezeway doors.

Q. Breezeway doors. Great. Okay.

A. Yes, ma'am.

Q. And every place they have -- they

have different terms for everything, so I'm --
A. Terminology is hard to get.
Q. -- just trying to make sure I get the -- I'm trying to learn the language.
A. Yes, ma'am.
Q. All right. So all right, but the breezeway doors. So once we get past the breezeway doors, just looking at across the hall from what I take to be Dorm E, it looks like there's something with a bunch of squares in it. What is that?
A. So that is what we call the laundry room. It houses your -- actually houses three driers and three washers, but it -- it's showing -- I believe I count eight; one, two, three, four, five, six, seven, eight, yes. There is only actually six in there. Basically, all the laundry that comes from any dorm or any cell goes to there to be washed and dried and placed back into the dorm.
If you look inside that rectangular or rectangle, to the right is actually a back room. That is where they store towels, I'm sorry, blankets, sheets, different types of jumpers, whether it's orange, blue, white, red,

red and orange stripes, that all the different colors determine the type of job they are doing. Any extras we house back there for either new intake or new workers that come and get put into the trustee dorm. That way they will have uniforms to work in.

Q. And then moving along the hall past the laundry room, what is this (indicated) next area that's that square?

A. I'm trying to pull up my photographic memory here. I believe that's what we consider the ice room. We have an ice machine in there. There's also a -- I want to say a ventilation unit. That's also where we store the hall man's carts, extra coolers, brooms, all various different types of brooms, whether you got your little household sweeper, your push broom, scrubbers, hand brushes, wet floor signs; and I want to say that's about it in that room.

Q. Is that door kept locked?

A. It is actually. Unless we are running chow, it is actually left open. There's no type of -- large quantity of chemicals left inside. Normally, any time it's in there, it's in a spray bottle and it's ready to go for any

type use, whether there's a spill on the floor, you know, types of that nature just to get it cleaned up. But, like I said, it does get shut when we run chow, just due to the fact that nobody can go in there and get a weapon. That is also used with the GM key --

Q. Okay.

A. -- or master key. Sorry.

Q. No. If you call it the GM key, that's what I'll call it too. That -- yeah. Like I said, I'm -- I'm learning your language, so --

So -- and then moving past the -- the ice room, what -- what is this (indicated) area?

A. That is an actual -- actually an employee bathroom. At one time, it did have showers in there. They no longer have a shower in there, but it is an employee bathroom that's got a toilet, a urinal and a sink inside; and then that's also used with the GM key.

Q. So if you are in Control 1 and you need to use the bathroom, you come down to this bathroom that's across the hall from E and F; is that correct?

A. Yes, ma'am. Unless you go up to the main office like at nighttime. Daytime, it's a lot more easier because you have more traffic up front like as far as, you know, office personnel, wardens, assistant wardens; but nighttime, you have to be assisted with a -- a supervisor, which is either a lieutenant or a sergeant when you go up there to use the restroom. But the majority of the time, they do go down to that bathroom just so we don't have to take somebody off the hall to escort them up there.
Q. Got it. Okay. And then next to the bathroom, what's this area (indicated)?
A. Now, it would be the captain of transportation's office. I'm trying to think of what it was then. That was -- that was the old Zoom court; that kind of make sense, office where any type of Zoom meetings, court proceedings over Zoom would take place. If not, they were taken into the GP room. I'll get to that part here shortly because we are making our way that way.
Q. Okay. Well, is that -- is that the next -- I'm going to ask you about the next room.
A. No, ma'am. That is not the GP room.

That is -- actually at the time was the chief of security's office, slash, captain's office. That is now considered booking office. That also takes a master key.

Q. Okay. So that's that key. That's the -- the key that gets you in and out of the secure perimeter, right?

A. The GM key, yes, ma'am.

Q. Got it. Okay. All right.

A. So both going a ways.

Q. Got it. Yeah. So -- and you said it's booking now, correct?

A. Yes, ma'am.

Q. Do you recall when that switched over?

A. No, ma'am. Because it happened after I had left in '23. At the beginning of June until, I want to say, just here recently is when I found out that they moved offices.

Q. Okay. Got it. All right. And then -- and we will get into some of your background in a little bit too. I just wanted to run through this so that we were, you know, talking from a common -- a common layout.

All right. And then this control

room between E and F, what is -- is that -- what control room is that?

A. That would be Control 3. She also has a little bit more responsibility. I'm not sure if it would be more than either Control 1 or Control 2. She has, I'm going to go with, supervision over dorms echo, fox trot and gulf.

Q. All right. And we will also get into a little bit more of the control room responsibilities in a little bit. So you said echo, fox trot and then gulf is over here (indicated) it looks like -- well, we will -- we will get to that in a second.

A. Yes, ma'am.

Q. I wanted to also just sort of run through these rooms on the other side of the hallway sort of above E and F. What -- what are these?

A. Yes, ma'am. Starting from your left on echo dorm, that is Cell 7. The one on the right side is Cell 8; fox trot, left side, is Cell 9; right side is Cell 10. No kind of -- kind of suicide cells or anything. They are just normal cells.

Q. And then there is a door, it looks

like it goes out to -- towards this (indicated) other part where G is. What key does that door take?
A. GM key.
Q. Okay.
A. The halls between E and F, we call it E-F hallway. When you pass through the doors you were just pointing at, which is the right side of fox trot side, that is when you enter that area. That's what we call the booking area.
Q. All right. All right.
A. Booking -- booking and medical.
Q. Booking and medical?
A. Yes, ma'am.
Q. Okay. And these doors sort of up and -- up and down on either side of that -- that door going out of the E-F hallway, where do those lead?
A. So the upper part of the hallway will lead you out to charlie and delta yard, still inside the fence that is securing the yard. The bottom side is actually what we call the booking breezeway. It's kind of a long hallway that leads to the outside. It doesn't show it, but right in the long fox trot, the right side of

the dorm, at the very end by the door on the bottom side, there is actually a fence that runs straight down --

Q. Okay.

A. -- and it ends just right past the -- if you are looking on the right side of that long room, there's that door that comes out. It just comes out maybe, I want to say, six feet from that door and it is closed off with a gate.

Q. I see. Okay.

A. And that is our -- that is actually our way for booking down from that long hallway. It takes you straight to the maintenance department and also it is our entry and exit, walking entry and exit to the back sallyport, which is where we either receive inmates coming in or send inmates out.

Q. Okay. And so the -- the back sallyport, does that appear on this diagram?

A. No, ma'am, it does not.

Q. Okay. So the -- would the back sallyport be sort of down below the bottom edge of the page?

A. Yes, ma'am.

Q. Okay. And can you walk me through

what these (indicated) rooms are sort of? You know, after you walk after the E-F hallway, what are these rooms on the -- sort of up at the top edge?

A. Okay. Starting with the exterior door that goes to the charlie and delta side, that's going to be the left side of the rectangles, that right there is a -- what we would like to call the booking bathroom. That is also an in -- inmate bathroom. That's where we also do work release drug test. That is where we do cell showers, so it is a full functioning shower/bathroom.

That is also where we go into, because there is a door to it, one of the officers, sergeants or lieutenants will go in there with said inmate and do a full strip search, whether it's work release, new intake, you know, things of that nature of -- to make sure that kind of a private room to go into to get away from the females, to not expose anything in front of the females.

Q. And when you say "females," you are talking female staff, correct?

A. Yes, ma'am. Sorry.

Q. Well, I just wanted to make sure -- do you-all hold any female prisoners?
A. No, ma'am. They did at one time, but I -- since 2021, they have not housed females.
Q. Got it. Okay. Okay. So that's this area. Now, and when you say the cell showers, that means everybody in all of these cells lining A-B hallway, E-F hallway, they all come down here to these showers --
A. Yes, ma'am.
Q. -- across -- away from G?
A. Yes, ma'am. Not all at once. We go cell by cell. We walk them down from the cell down to the shower, let them shower, escort them back and then so on and so on until all the cells have been showered.
Q. All right. And then across the hall from the showers and bathroom, the booking bathroom, what -- what are these (indicated) areas?
A. Okay. So the bottom side of the hallway, the left side would be medical records. That's where they hold all the records for new intake, released intake. They do store some,

say, medicines and sharps in there. That is a secured room. That is also a GM key. Inside that square, the bottom left side, if you see that door, that is also connected to the medical records room. They do have files back there as well. The right side is not connected to that room.

Q. So -- okay. So the right side, you can't access it through medical records room, correct?

A. No, ma'am.

Q. How do you access that area?

A. So the -- the next room to the right, that is -- at the time when I was there from when I started until I left, that was actually booking, slash, transportation's office --

Q. And how --

A. -- that --

Q. How is that accessed; how do you -- how do you get into that area?

A. So there's another -- the medical records room, the door on the left -- right side of that room, there's also a door on the left side of the booking, slash, transportation room.

If you can see that and you can walk down and it will go into another bathroom, which is another employee bathroom.

Q. I see. Okay. So the transportation room, is that this (indicated) area that's got sort of like the two long rectangles in it?

A. Now, that, I have never seen two rectangle desks inside there. At that time, they had three desks, one in the top right-hand corner kind of diagonal. That was the transportation side; and the bottom side, there was two desks that was the booking side.

Q. Got it. Okay. All right. Thank you.

A. So as far as -- as far as those, I have no idea what those are.

Q. Okay. All right. And then it looks like there's a door -- so this (indicated) is the booking area and it looks like there is another door. Does this get -- sort of continue into the booking area or is this another area?

A. That is the area of max. That is where we hold our maximum security, which now is -- which is when -- back in 2022, 2021 to 2023, that's where we housed our max prisoners or

maximum security inmates. Now they have juveniles back there.

Q. Got it. What bathroom is used for the people who are held back here, juveniles or the max?

A. Well, see the bathrooms, inside each cell has a -- I guess what you could call a two-in-one. It has a makeshift sink and toilet inside each cell, so they are able to use the restroom inside the cells. When we did have max, we did pull them one at a time, pulled them out for the shower right next to the exterior door booking breezeway bathroom there.

Q. Okay. Got it. And then going down to -- so I see G is --

A. That's right.

Q. -- over here (indicated). This is a dorm, correct?

A. Yes, ma'am.

Q. All right.

A. Well, before we start there, we actually missed one, two, three rooms.

Q. Yeah.

A. So if you go -- if you go up to the booking breezeway, if you go up just a little bit

more?

Q. (Complied.)

A. Okay. Now go directly to the right.

Q. (Complied.)

A. There you go. Right there is medical. That is where the nurses, LPNs, RNs, medications are stored. The door to the right is actually a, I guess you could say, overstocked storage for medications. It also -- it has a restroom inside of there for medical staff. Both doors are GM keys.

If you go to the booking transportation office?

Q. (Complied.)

A. Yes, ma'am. Okay. There's a door to the bottom right of that office. That is a connection from the booking medical hallway that will -- if you go through booking and transportation, that is actually our commissary office to where they store, you know, clothes, like toothbrush, toothpaste, everything they can order off commissary; snacks, food. If you want it, they probably got it. That also connects to the outside, which is the G-Dorm, what we like to call G-Dorm, slash, commissary yard.

Q. Uh-huh (affirmatively).
A. That was when I first started there. I don't remember the transition when they moved it, but that was the yard for G-Dorm, which was the trustees at the time when I did start. They had took -- I cannot recall when they did the transfer, but they switched gulf and started putting them in charlie because they started getting more work and more workers, so they had to have bigger rooms.
Q. How many people can fit into -- into gulf?
A. Sixty four.
Q. And the room that is next to gulf, what is this (indicated), this --
A. Okay. That is -- that is our GP room. If you actually go to booking medical breezeway again and come out, there's actually a door. A little bit more.
Q. Uh-huh (affirmatively). (Complied.)
A. Right there. There's a door that leads to the general purpose room, I guess I could say, is what we use the term for GP room, and it is a small hallway that leads to the G-Dorm.

Q. Okay. What is the general purpose room used for?
A. That's where we have new intakes come in. Practically, we hold new intake property in there until they are able to go through and be put into one of the shipping containers to be stored. That way nobody has access to it, except for basically -- I know they had GM keys, so almost anybody -- no. I take that back. It was a master key, an actual like, you know, master lock -- brain's dead. Basically, a master lock lock that goes on the shipping containers to keep anybody out, so only a select few have those keys. I believe it would be lieutenants and above, if I'm not mistaken. I believe one of the sergeant keys might have it. But they do church in there, religion purposes. I don't know if you know Ramadan, Muslim prayer call in there. They have -- also, it's not showing on the diagram, but the right-hand side of the general purpose top side, they built --
Q. (Indicated.)
A. Yes, ma'am. They built, I guess you would call it, makeshift storage rooms.
Q. Uh-huh (affirmatively).

A. Keep blankets, mats, toilet paper, what we like to call intake bags where they already have pre-made where they got spoons, soap, toothbrush, basically everything they need when they start out at CCC. They have added on more since I had left.

They have a -- a property, I guess you could say, lieutenant, sergeant. I can't remember what her status is. They had the chaplain's office in there. I want to say that's about it.

Down at the bottom side, right side, those two big rooms right there, the bottom side is actually turned into showers. The one right above that is actually a storage room. They -- they were both bathrooms at one time. I'm not sure if the top room works anymore, but I know the bottom one does. As far as that weird L-shaped looking thing against the wall --

Q. Uh-huh (affirmatively).

A. -- back inside the room --

Q. Oh, I see. This thing (indicated).

A. -- up -- that's actually a door.

Q. Oh.

A. If you go on the right side of the

room and then go right above those two --

Q. (Complied.)

A. Yes, ma'am. Right there are cabinets. They do have locks on them. They also stored -- I'm trying to recall. I believe -- I believe that's it, inside the GP room.

Q. Okay. And just so I make sure I understand, G is -- the control room for G is between E and F; is that correct?

A. Yes, ma'am. Control 3.

Q. Okay. And so anybody who's going in and out of G, that gets logged in the Control 3 logbook?

A. Yes, ma'am.

Q. Is there a sight line between Control 3 and G?

A. No, ma'am, there's not. The only thing that we have is cameras.

Q. Okay. All right. That's -- that was going to be my next question is let's -- let's take the 2022 time period first. In 2022, were there cameras in this facility?

A. Yes, ma'am.

Q. Okay. Where were the cameras located?

A. I'm trying to think. I know for sure one -- they are -- right on the main entrance of G-Dorm coming in from the hallway --
Q. Uh-huh (affirmatively).
A. -- there was a --
Q. Oh, around here (indicated) --
A. Yes, ma'am.
Q. -- where that door is?
A. Yes, ma'am. There's a camera up in that corner facing towards the dorm, so facing out that way (indicated), yes, ma'am. If I'm not mistaken, almost where the G is, there was I believe another camera that was facing towards that door, which you had benches there, a TV there, kind of almost like metal picnic tables between the door and the showers. And if I'm not mistaken, there was a camera I want to say just a little bit down and to the right of G. You -- up a little bit more.
Q. (Complied.)
A. Right there. If you go a little left?
Q. (Complied.)
A. About -- about in that area, there's another camera I know that pointed back towards

the door like down at the bottom, the exterior door.

Q. Okay. So down towards here (indicated)?

A. Yes, ma'am.

Q. Okay.

A. As any other cameras, I cannot recall because they kind of all try to run together and I'm not going to say that there was a camera here, here and here and not for certain. I know those three cameras are there. As far as any other ones, I cannot recall.

Q. Okay. So for cameras on E-Dorm, can you recall any cameras on E-Dorm?

A. There is one I want to say about right where your cursor is that points towards the bottom side of the dorm, which is what we can refer to as the back of the dorm.

Q. Uh-huh (affirmatively).

A. I'm trying to think if I can remember any other in E-Dorm. I know there's -- if -- I'm pretty certain at the bottom side of E-Dorm by the exterior door, there is a camera that points straight back up towards the front side of the dorm.

Q. Uh-huh (affirmatively). Okay.
A. As far as that, I -- I can't recall any other placements on that dorm.
Q. Okay.
A. I'm not saying there wasn't, I just can't recall it.
Q. Yeah. No. That's -- that's fine. And the feeds for those cameras, where do they go; do you know?
A. Well, there's multiple feeds. The main feed would go into control three, but if you have, let's say -- try to use my words here -- authorization or access to the cameras. Like IT, they have full access to all the cameras in the front main office; I know the warden and the assistant wardens have main access; lieutenant had main access, which would be in Control 1; and then I know the captain's office, they had access.
Q. And do you know would -- would camera footage be preserved or saved in any way?
A. I cannot answer that question because I have no idea.
Q. Okay. All right.
A. I -- I -- I don't know any of how

far it goes back or if they are saved on an internal drive. I -- I have no idea.

Q. Okay. Yeah. No. That's -- that's fine. I just thought I'd ask.

A. In -- in short terms, I don't know.

Q. Okay. We have been going for a little bit, about an hour, and I'm about to sort of switch topics. We are going to get into a little bit of your background, so do you want to take a little break just to kind of, you know, get some caffeine and reset a little bit and --

A. That would be great because it's a little bit chilly in here and I would love to go grab my jacket.

MS. CUMMING:

Yes. All right. Go for it. We will -- we will call it five minutes.

(A short recess was taken.)

MS. CUMMING:

Okay. We will go back on at 10:31.

BY MS. CUMMING:

Q. So I want to switch gears a little bit and -- and kind of get into some of your background starting with your education. Can you tell me where you went to high school and when

you finished?
A. White Oak High School, actually located in Texas. Highest education or highest grade of education was 12, and I did receive my high school diploma in 2013. I believe it was either May or June.
Q. All right.
A. I cannot recall exactly which month it was.
Q. That's -- yeah. But you're -- you're doing better than me. I barely remember back a month ago, so -- okay. So 2013, White Oak in Texas. Where in Texas?
A. Northeast Texas, kind of north to northeast, probably about 30 minutes from Tyler.
Q. Okay. And then after high school, any schooling?
A. No, ma'am. No college, no nothing.
Q. All right. Any professional like, you know, vocational training courses, anything like that?
A. Besides, I mean, like your normal job site like first aid, CPR things, nothing out of the -- nothing out of that range.
Q. And any professional licenses or

certifications?
A. Besides a POST certified deputy, which I got back in -- or actually the beginning of this year.
Q. I'm going to follow up on that in a second, but other --
A. Yes, ma'am.
Q. -- other than that, nothing --
A. No.
Q. -- nothing else?
A. No, ma'am.
Q. All right. And can you run me through your employment history from, you know, the age of 18 on briefly?
A. Age 16 through I believe it was 18, I worked at a grocery store as a bagger, slash, sacker cashier. After that, I went to I believe it was Complete Pipe, oilfield. I know I did like basically kind of like oil technician, worked at an oil exchange place.
Q. How long was -- was that for?
A. To be honest, I can't even remember. It's so long ago. I worked at Premium Pumping Services, which is also oilfield. Both Complete Pipe and Premium I did go travel to west Texas.

I was a waiter, slash, maintenance, slash, everything at Circle M Crawfish stand in Big Sandy, Texas. I believe I worked at a sand plant called U.S. Silica in Tyler, Texas. I did move to Iowa; to be specific, Fort Dodge, Iowa, worked for TNT Crane & Rigging. I want to say that was about a year and a half.

Q. What were you doing there?

A. I was a crane rigger. Most jobs we was working on wind turbine plants or, I'm sorry, not plants, farms.

After that job, I moved to Arkansas, worked for the City of Bentonville, basically landscape department mowing, weedeating. Worked for a -- I'm trying to think of the technical term for it. Worked as a repairman on electronics. I've worked in a -- like I guess you could say condiment factory. We made jellies, sauces, pepper jellies, all that. I worked as a kind of -- kind of like a security guard basically for events.

Q. Who was that with?

A. Basically -- it was actually my boss at the House of Webster, which was the condiment, I guess you could say, factory, producer in

Springdale, Arkansas. We did basically concerts; pat downs, all that, make sure nobody was fighting, getting drunk, you know, typical hey, let's just have a good time, but don't do anything stupid kind of thing. I believe I then come back to Texas, worked for the City of Big Sandy. I worked at a -- kind of like a, how can I say, a family-owned like feed store. They sold gates, pipe, sewer drainage, basically anything you needed for a farm.

Q. When you were working for Big Sandy, the City of Big Sandy, what were you doing then?

A. Pretty much everything maintenance. Landscaping, lawn care, sewer, water meters, like a water main busted, we -- we went out and fixed it. Your typical small town city departments, they basically do everything. I have -- I was actually living in Texas, but working in Louisiana for Gilchrist road construction --

Q. Uh-huh (affirmatively).

A. -- traveled inside of Louisiana. And then I come over here in August of -- as a matter of fact, I can tell you exactly on that, August 16th, 2021, and worked for Catahoula Correctional Center.

Q. Wait. When you started with Catahoula Correctional Center, were you -- were you hired by the sheriff's office or by some other company?
A. I was hired by -- well, it is the sheriff's office. The sheriff's office owns it. I was hired up there, sent down here to do -- to get sworn in and back up there to finish all my application and everything and I was put right to work.
Q. Okay. When you say "hired up there," hired up where?
A. At the correctional center.
Q. Got it. Okay. All right.
A. And that's actually God that brought me over here.
Q. In -- in what form? Tell me -- tell me how that worked.
A. Well, see, when I was working for the family-owned feed store, going through a lot, lost my girlfriend at the time, really -- I was in a really dark place at that time. I was a very big churchgoer. I turned my life over to God, started asking him for help, you know, point me to the way of where you want me to go, help me

find something better, you know, everything, find a new job, which I never told anybody, except for him.

I believe it was August 14th I had come over for my grandma's 75th birthday party -- and which is now -- at the time, it was Lieutenant Justin Spinks. He is now captain. Related to him by marriage. I believe I would be a third cousin to him I guess. I don't know how all that works.

He was there and I know he's a very big church person, and he basically told me, hey, you know, I need to talk to you in private. I said okay. I walked outside. We -- he started telling me that, hey, I hear that you've been looking for a job. I said what? He said I hear you've been looking for another job and that's when it clicked. I was like I don't care what it is, I don't care what it pays, I want it and I want it now; and ever since then, I was up at Catahoula corrections.

Q. Okay. So you said Justin Spinks?

A. Yes, ma'am.

Q. Okay. Your cousin. I -- I understand. My -- my people are from north

Louisiana. I also have many, many cousins of varying degrees, so I get it.

So Justin. And the last name, is that spelled S-P-I-N-X?

A. No. K-S.

Q. K-S. Got it.

A. Spinks.

Q. Spinks. Okay. And so he -- he was a local worker for Catahoula?

A. Pretty much.

Q. Okay. I got you. And he was working with the sheriff's office at the time?

A. He was working -- he's actually the lieutenant for transportation.

Q. Okay. All right. Okay. So two days later you -- you went down and you applied?

A. On Monday morning.

Q. On Monday morning to apply to work at CCC, correct?

A. Yes, ma'am.

Q. Okay. I got you.

A. And I've actually had two more jobs on top of that, this being one of them.

Q. Oh, two more jobs. And I'm sorry. When you say "this," what -- what is your current

job now?
A. Oh. Deputy -- the road deputy at Catahoula Sheriff's Office.
Q. So you're out of CCC, but you are still working for the -- the sheriff's office, correct?
A. I do a little bit of both. On my days off, if they need me, they will call us and I'll go up there and help out. Pretty much by the sheriff if you want overtime, you are more than welcome to go up there and work.
Q. So almost like a reserve deputy to come in and -- and backfill positions, if need be?
A. Yes, ma'am.
Q. Okay. All right. When did you -- when did you become a road deputy?
A. You want me to go with the other job and kind of work my way towards that?
Q. Sure. Yeah.
A. Okay. So I was working there for just a little over a year. I believe it was either September or November. I was working with Catahoula corrections and I was also working for Harrisonburg Police Department, so I did both

jobs, no days off. I did that for either September or November until -- of '22 until beginning of June of '23. I then left CCC and did full-time at which -- I mean, I was already full-time, but main job then become Harrisonburg Police Department. I did that for a few months and was hired on September 1st of 2023 with the Catahoula sheriff's office. I was then doing both, Harrisonburg Police Department and Catahoula Sheriff's Office until January -- I believe it was January 28th of 2024 when Catahoula Sheriff's Office sent me to the academy and I had to give up Harrisonburg Police Department.

Q. All right. So you've been full-time with CPSO as a road deputy since January of 2024, correct?

A. September 1st of '23.

Q. Oh, right. Okay. And then you became exclusively with CPSO starting in January 2024; is that right?

A. Yes, ma'am.

Q. Okay. Got it. All right. So just going back to August 2021, at that time, was LaSalle corrections operating the facility or was

the sheriff's office operating the facility?

A. It was not LaSalle at that time. I want to say I think it was early 2021 is when they switched from LaSalle to Catahoula, if I'm not mistaken, but it was before I came.

Q. Okay. All right. So you never worked under LaSalle?

A. No, ma'am.

Q. Got it. Okay. And the time that you were at CCC, there was no other company or organization other than the sheriff's office that was operating CCC; is that right?

A. That's correct.

Q. Okay. So when you were hired by CPSO, were you -- were you -- how were you hired, as like a full-time, part-time, salary to hourly; how did that work?

A. I want to say it was before September 1st. I think it was sometime in October that I was a part-time deputy. I was coming to be a reserve deputy, but I ended up becoming part-time and I was full-time September 1st.

Q. Of '21?

A. I'm sorry. I got confused. Say

that again for me.
Q. Yeah. And I think I'm confused, so let's -- let's start in August '21. How --
A. Yes, ma'am.
Q. How were you hired, as full-time or part-time?
A. I was hired as full-time.
Q. Okay. And when did that change?
A. I know where it happened. You said CPSO and it was -- we still call it CCC up there.
Q. Oh.
A. So that's where I got confused at.
Q. All right. I will -- I will try and do that.
A. You're good. You're good.
Q. Yeah. All right. So when you were hired at CCC, you were hired full-time?
A. Yes, ma'am.
Q. Did you -- did that ever change in the time that you were working for CCC?
A. No, ma'am. I was strictly full-time.
Q. Okay. All right. And that was August 2021 until June '23; is that right?
A. Yes, ma'am.

Q. Okay. All right. What positions did you hold at CCC starting in August 2021?
A. August 2021, I was an officer, did basic starting out floorhand. Approximately three months in I believe, I then became acting sergeant.
Q. Do you know when that became official?
A. The actual sergeant became official exactly six months after my hire date, so I believe that would be February.
Q. Uh-huh (affirmatively). And then after sergeant?
A. I made lieutenant.
Q. Okay. Do you recall roughly when you made lieutenant?
A. I know it was after August 22nd of 2022. I don't recall the actual date. I know it was between August -- the end of August, and if I'm not mistaken, the beginning part of January of 2023, so rough estimate of -- I can't remember exactly what date it was, but I know it was between August and January.
Q. Okay. And were -- have you ever been demoted while working at CCC?

A. Yes, ma'am.

Q. Okay. Tell me about that, please.

A. I was demoted as lieutenant. I was -- I did have access to the major's office. One night I was in there with my sergeant, Jeremy Dudley, was inside the major's office doing reports. I had a new hire that was there from another shift and was uncertain of how to spell his name. Was looking for a roster list to -- with his name on it to spell his name or her name. I can't remember exactly if it was a he or a she. When walking over to the captain's desk, I noticed a piece of paper that was turned over and one of those you -- if you know what the paper looks like, you can tell what it is.

Well, I knew it was a roster sheet. So I had grabbed it off of the captain's desk, flipped it over. On that paper was showing that I was demoted and switched to another shift and my sergeant had then became lieutenant. At that time, if I'm not mistaken, was Captain Jeremy Wiley. They were actually currently down in I believe Baton Rouge or New Orleans on a conference. I then contacted lieutenant -- no. I'm sorry -- Captain France at the time and

called in concerned of said list that I had found. He advised me that there was nothing wrong that he knew of. We had went off shift, like our days off. I had come back and found out that my sergeant had then took them papers or took that paper, took it up front, made copies, put copies in -- I'm sorry. Allegedly he had took that paper is what I was being told, that copies were made, put in other boxes, being shown around and I was therefore put to blame. But I was not the one to blame because I never did that.

There was only three people that knew about it at that current time, which four if you count Captain Jeremy Wiley because he was the one that made the list; myself, Lieutenant Beason at the time; Captain Joseph Prince at the time; and Sergeant Jeremy Dudley at that time.

At that time, Captain Prince was not there. It was me and my sergeant was the only two that knew about it, and I'm very honest and trustworthy when it comes to my job because I don't want to lose my job because I love my job. I love what I do. I -- I myself knew I did not do it, so that only left one person that could

have done it. I was then pulled in the office and told I had malfeasance of office. I was then demoted to sergeant and then switched to another shift and he then become -- Sergeant Dudley then -- Jeremy Dudley then become lieutenant of that shift.

Q. So I want to make sure I understand. You saw a roster list that reflected that you were being demoted from lieutenant to sergeant, correct?

A. Yes.

Q. And someone copied that roster list and put it into people's mailboxes; is that correct?

A. It's -- essentially, it's mailboxes for like medical, transportation, their boxes for work for paperwork.

Q. Okay. Yeah. So like at work like a cubby hole or like a --

A. Yes, ma'am.

Q. -- or a digital. Okay. Got it. And when you returned to work after two days off, you were demoted from lieutenant to sergeant because these copies had been placed in people's mailboxes; is that right?

A. Yes, ma'am.

Q. Okay. So help -- help me understand a little bit just to sort of back up to the roster list and Captain Wiley. Do you know or was there any reason that you could think of that Captain Wiley would have made up a roster list indicating that you were demoted from lieutenant to sergeant in the first place?

A. I have no indications of why. To be honest, I don't know.

Q. Okay. I guess the thing I'm -- I'm getting a little bit hung up on is it sounds like you -- you got into trouble for making a copy of a list, but the -- but the list already had your demotion on it. And so I'm -- I'm trying to figure out if there was something that was preceding the list that -- that you can think of.

A. No, ma'am. I showed up; I did my job. I actually did more than other shifts would do. I -- I don't know -- as far as I know, that was the only thing that I did to get demoted.

Q. Okay. All right.

A. I have no other reasoning or knowing of any other reasoning for me to get demoted.

Q. Okay. They -- they didn't tell you

anything?
A. No.
Q. Okay. When you -- when you contacted Captain Price about the list that you had found --
A. Captain Prince.
Q. Prince. I'm sorry. Yes. When you contacted captain Prince about this list, did he -- help me out again with -- with what he told you or what he said.
A. I called Captain Prince via cell phone, my personal cell phone; and in calls of concernment about the list when I asked him if he knows of anything that I've done wrong or something that I'm not knowing about, he advised me that nothing that he knows about has happened. Everything I've been doing, I've been doing like I'm supposed to and was unsure of why I was being demoted.
Q. Do you know did Captain Prince ever talk to Captain Wiley?
A. If he did, I have no knowledgement (sic) of it.
Q. When you came back to work and --
Well, let me -- let me ask this:

When you came back to work, who told you that copies of the list had been distributed to other people?
A. At the time, Warden Eric Stott.
Q. Okay. And -- and who informed you -- well, when you say malfeasance in office, was that like a disciplinary write-up; how did that -- how did that -- what did that look like?
A. The disciplinary write-up, it was -- I'm trying to think. It was a disciplinary write-up. Apparently the malfeasance of office was due to I guess code of rank structure.
Q. Code of rank structure --
A. Also --
Q. -- help me out with that.
A. It's apparently going below my rank and notifying people of said changes on list or roster, which apparently is, I guess, a code of malfeasance of office.
Q. Did anybody write that up and -- you know, like did you have any opportunity to appeal it or, you know, anything like that? Was there a hearing?
A. Except for the conversation inside the warden -- inside of Warden Eric Stott's

office, there was no kind of hearing, no nothing. Basically, it's, hey, either you take the demotion or you're gone.

Q. Okay. And do you recall when that was?

A. I do not recall.

Q. Okay.

MS. CUMMING:

I'll show what you we are going to mark as Exhibit 2. It's a portion of your personnel file and I just want to see if this is something that looks familiar to you. All right. Just so you see, so employee status change information for CCC under Sheriff Edwards and Warden Stott.

(Exhibit 2 marked and viewed.)

BY MS. CUMMING:

Q. And this is for you, correct?

A. Yes, ma'am.

Q. And then it's got -- it has you as an officer on B team, but -- I mean, I can show it to you if you want, but I think you knew you were a lieutenant before this starting in January of 2023, according to this paperwork and then this is a demotion, slash, changed shifts. It

has you going down to 15.25 an hour and it's effective on April 9th, 2023. Does that sound right?

A. I'm going to go with yes, because I don't recall; and I know the day that I got demoted, I was told I was going to sergeant back on dayshift, which was the C team.

Q. Okay. All right. And then is this your signature here on April 14th, 2023?

A. Yes, ma'am.

Q. All right. And do you know whose signature this is on the 13th?

A. That looks to be Amber Robinson.

Q. And who is she?

A. She -- I believe at the time she may have been working in the office as -- yeah, that's what I'm seeing. Amber Robinson, I believe she took the role of HR, if I'm not mistaken.

Q. And then whose signature is this under warden; do you know?

A. Eric Stott.

Q. Okay. So it looks like they all signed it on the 13th, you signed it on the 14th. Do you recall signing this?

A. Yes, ma'am.
Q. Okay. What do you recall about signing this?
A. I believe they had signed it the day before to have it ready for when I -- actually, no. I got called in for the meeting, then sent back home to be prepared to come back on days; and I believe they signed it on the 13th, and when I came back, they -- I signed it on the 14th, if I'm not mistaken.
Q. Okay. All right. Okay. Okay. Other than this demotion in April 2023, did you ever have any occasions when you had any discipline or anything like that?
A. No, ma'am. No, ma'am, not that I recall.
Q. Do you recall ever receiving any written warning from a supervisor?
A. Not that I recall.
Q. Do you recall ever receiving, you know, what would be called like a final warning from a supervisor?
A. No, ma'am.
Q. Okay. And have you ever been placed in a performance improvement plan?

A. I'm pretty sure I -- I know what you're meaning, but can you elaborate on that for me?
Q. Sure. It's sort of like a --
A. I try to --
Q. Yeah. Yeah. So I think it's sort of like -- if for some reason your supervisors don't think that you are doing everything that you should be doing for the job, they come up with some benchmarks and goals. They sit down and they say, you know, we would like to see you do these things, we are going to check in with you. It's usually written down some place. Do -- do you recall anything like that ever?
A. No, ma'am. Because I could tell you I pretty much exceeded every expectation they thought I was going to have. A lot of people didn't think I was going to last two weeks in it, but I was one of those that stuck to my job, I did what needed to be done, and went above and beyond.
Q. So -- and -- and you were promoted from sergeant to lieutenant.
A. Yes, ma'am.
Q. Those promotions, how did they work?

Did you -- well, let me ask this: Did you ever ask for them?

A. No, ma'am.

Q. Okay. Did you ever -- did you have to take any tests to -- to move from officer to sergeant or sergeant to lieutenant?

A. No, ma'am.

Q. Okay. All right. And then when you left in June of 2023; do you recall how you quit, how you left?

A. Yes, ma'am, I do, very, very distinctly.

Q. Okay. Tell me about it, please.

A. I'm trying to think of exact dates. I want to say about a month to a month and a half before my resignation, I had lost a -- it's my stepbrother, but I consider him as a brother. He had CP, which is cerebral palsy, had to be watched 24/7 if he wasn't sleeping, couldn't operate on his own, you know, the whole nine yards.

Found out he was in the hospital with pneumonia. I'm sorry. No. That was -- that was wrong. Found out he had went to the hospital due to being deathly sick, found out he

had Stage 4 lung and liver cancer. They then put him in a hospice home and he ended up catching pneumonia; and then of that year, mother's day, which was also his mother, which is my stepmother's birthday was on the same day, and he passed that Monday morning, if I'm not mistaken. First time actually losing like a brother to me.

Essentially, took two weeks off from CCC being back in Texas to, you know, go visit him, then him passing away. I was actually about to head out that Sunday night and had called in due to the doctor giving us possible not much time left, and found out he -- that when I woke up, that he had passed away that morning. I then called CCC and advised them that I would not able to come in due to the death in the family.

When I come back, I had approximately worked for about a month straight after all that, didn't cope, didn't talk to nobody while it was really getting to me. The almost two years that I was there, I had never took a vacation, was always getting called in, came in when I was called in, practically just working robot because I never stopped working. I had took vacation to -- to try to cope and deal

with it. I took vacation from the prison, was still working Harrisonburg Police Department at the time. Juneteenth, I don't know if you are familiar with that.

Q. (Indicated.)

A. Okay. Normally happens on the weekend. I think it was the 14th and the 15th or the 15th and 16th. I can't remember the exact days, but it was Friday and Saturday night. My boss, Lyndell Atkins, the chief of Harrisonburg, advised me that I was to help the sheriff's office in any type of way. While I was out on the road helping, at the time Captain Chad Littleton had called me, while I was on vacation and working another job, to come in and work. The first time I have ever said no to coming in to work due to me being on vacation and trying to deal with my emotions, so I didn't go up there and take my emotions out on somebody else, try to do it the responsible way. It got back to I believe at the time was Assistant Warden Wiley, yes, ma'am.

Then following week, Major Dennis Wascom had tried to reach out to me to get me to come up there. I did not receive that text

until later that night. I believe it was a Wednesday. That following Wednesday, we had a mandatory sergeant-lieutenant meeting. Since I was a sergeant, I still showed up to the meeting; and as soon as the meeting was over, I was pulled into the assistant warden's office, was then, I guess you could say, getting a butt chewing, cussed out because I didn't show up.

At the time, Assistant Warden Eric Stott had come in there and essentially tried to fire me. He then told me that he should have fired me back or before I went back to Texas, which the reason I had to go back to Texas was a family medical emergency. And essentially kind of drew the line for me because they were the ones that told me that family's everything, you know, family matters most, especially the two years that -- almost two years that I had put in of doing nothing but busting my butt and going above and beyond for them. I then finished my vacation, and the day that I was to come back, I then turned in my shirts and my resignation, and that is when I went to Harrisonburg full-time or continued Harrisonburg and went full-time.

Q. Okay. I see. I'm sorry for your

loss. That's -- that's hard.
A. Thank you. It's -- I've gotten over it because I got a motorcycle and kind of going through the troubles. I had laid it over, and ever since then, I've been more free from the burden of losing him, so I'm doing a lot better.
Q. Good. Okay. All right. So going back to when you first started at CCC, what training did you receive?
A. Basically on-the-job training.
Q. Now, you mentioned that you had got POST certified. When was that?
A. It wasn't until the beginning months of January -- or of 2024.
Q. Okay. And that was when you started with CPSO full-time exclusively; is that right?
A. Yes, ma'am.
Q. Okay. As a -- as a road deputy, I should say?
A. Yes, ma'am.
Q. Okay. All right. So you never got the correctional officer POST training; is that correct?
A. That is correct.
Q. Okay.

A. I never did.
Q. All right. Did you receive any training specific to working in the corrections environment?
A. The only kind of certificates I received during that time was chemical agent, which was pepper spray; projectile launcher, which was for the pepper ball gun; and TASER certification.
Q. Okay. And those were -- do you recall roughly when you got those?
A. I mean, I do not recall, but if you give me a second, I'm sure I can find out because I have them in my phone of when I got them.
Q. Oh, sure. I -- and I don't even think we need that. I think in your personnel file the dates I have are April 2023, April 14th, 2023; does that sound right?
A. That sounds about right.
Q. Okay. All right. And do you recall who offered those trainings?
A. That was Concordia Sheriff's Office. I don't know his rank, but instructor Chris Goad.
Q. Okay.
A. G-O-A-D.

Q. G-O-A-D. Got it.
A. Yes, ma'am.
Q. And do -- do you recall did you go up to Concordia for that or did the instructor come down to you-all?
A. We went to Concordia, to the Concordia training facility on Highway 15.
Q. Okay. So other than this sort of weapons training, there was no classroom training. What -- what about -- what about rollcall training, did -- was there ever any kind of like, I don't know, instruction given in advance of rollcall?
A. In the training, we had to do it onsite.
Q. How to do what?
A. Rollcall.
Q. Oh, okay.
A. Oh, what -- what we call bed book -- bed books.
Q. Got it. So you were actually doing the counts on the dorm and -- and checking to see who's there; is that right?
A. Yes, ma'am.
Q. Okay. All right. What about when

you first show up to work, and all of the deputies and sergeants and lieutenants and everybody is there before a shift, was there ever any kind of like talk or did anybody ever kind of go over correction basics with you-all?
A. When we are first hired, yes. As far as coming in for a shift, we always have a shift meeting of new memos, anything that possibly might be coming in, like new intake or possible releases or any kind of useful information of what happened the shift prior to us coming on.
Q. Okay. So that's mostly about things that are -- I mean, not like, you know, correctional basics, it's stuff that was happening in the previous shifts, stuff that you need to know about to do your job in the next shift; is that right?
A. Yes, ma'am.
Q. Okay. All right. And then when you said when you first come on, I -- I don't know. Do you-all use the term "recruit" for the new hires or not so much?
A. The new hires, yes, ma'am.
Q. Okay.

A. That's what I was referring to.
Q. Okay. All right. So when you are a recruit, you are brand new?
A. A rookie.
Q. What?
A. A rookie.
Q. A rookie, right. You're a -- you're a rookie. You come in, you're brand new, you show up, everybody is milling around before the shift. What -- is there anything that would get covered then?
A. There is a training lieutenant, which if he's not there, we -- they shadow either a sergeant or a lieutenant --
Q. Okay.
A. -- until they kind of get the basic understanding or we feel like they understand what they had to do and no longer need a baby-sitter.
Q. All right. So the training lieutenant, what -- what --
Well, let me ask this: Who was that person?
A. At the time, I cannot recall, but -- at the time, I can't recall who the training

lieutenant was.
Q. Okay. What about in 2022, do you know who the training lieutenant was?
A. That's what I'm referring to --
Q. Oh, okay.
A. -- as I can't recall.
Q. Okay. I got you. And so then -- oh. A new recruit or rookie would come in and they would shadow a sergeant or a lieutenant for a while; is that right?
A. Yes, ma'am.
Q. All right. Roughly, how long would they be shadowing the sergeant or lieutenant?
A. It honestly depends on the person. The majority of people kind of catch on pretty quick or already have experience in it. We have very few that do come in and has no prior experience, can't catch on very quick, so we have to spend more time with them to try to help them understand and help them progress towards their career. The majority of the people that come in have either had prior experience at CCC or prior experience to law enforcement or corrections. Typically, those types of people that come from a background of it normally don't have to go as

long as the fresh off the street not knowing what they are doing.

Q. So let's take someone who has a background in corrections. Are we talking like a week of shadows or a shift and then, you know, they are on their way and ready to start working?

A. If they haven't worked at CCC, it would definitely be longer than a week.

Q. Okay.

A. Or approximately about a week to make sure they kind of have the understanding. As far as somebody that's already worked there, normally, we don't have to shadow because they already kind of know how everything's ran.

Q. Okay.

A. It just, like I said, it just depends on what type of experience they have, what kind of knowledge they have or, you know, how quickly they kind of, you know, progress with the training, how much they retain of the training. It just all depends.

Q. And when you say "the training," you are talking about the -- the shadowing; is that right?

A. Yes, ma'am.

Q. Okay. All right. Is there like a -- a report or anything that in writing from this -- from the sergeant to the lieutenant that says I've -- I've seen rookie John Doe do his job and he's -- he's ready to go out and -- and work independently or is it just they get assigned and that's it?

A. As far as I know, I know it was done with me, there was kind of an evaluation that was done. Unfortunately, everybody I had either, A, couldn't hold up to the standards of the job, you know, whether they were scared or didn't want to work there. All the ones that I had received had prior training, prior experience, had either worked there before or background.

Q. Okay. And you say the ones that you had done. These were the people that you were supervising, they were shadowing you?

A. As -- as lieutenant or a sergeant, yes, ma'am.

Q. Got it. Okay. And so for the people -- the people who -- when you say there was an evaluation done, what -- what did that evaluation look like?

A. Basically, hand you a packet of --

I'm trying to think. Basically, rules, regulations, how well to retain knowledge, what kind of training you've had as far as like on-site training, like key training, radio training. I guess it would be kind of like time training, you know, making sure you stay on schedule. I mean, there's multiple types of training. I can't recall all of them.

Q. And these multiple types of training, they are exclusively being provided by the sergeant or the lieutenant that the -- that the rookie is shadowing; is that right?

A. Yes, ma'am.

Q. Okay. When you became a sergeant or a lieutenant, did you get any training on how to teach people these things?

A. I received training from multiple people; and the training that I retained, I retained it very well and learned from it and even actually got better than what they expected. So I was -- I was told to train them the way I would want them to work, basically, you know, everything that I know that I was taught and trained.

Q. Okay. When you -- so -- so who was

telling you that? Who was explaining that to you?

A. Chief -- chief of security, which is a/k/a Major Dennis Wascom, Eric Stott, warden; which no. Actually, he was -- I've had them both where he was assistant warden and warden telling me that. I've had the prior warden, Pat Book, tell me that.

Q. And --

A. And --

Q. Go ahead.

A. I was just going to say I had a few other people, but they wasn't as high ranked because they know how I work. Like at the time, Joseph Prince, he told me that. I -- actually, starting lieutenant, Dan Oxley, he told me that. That's just because I -- I'm very good at what I do. Let's just say that.

Q. Okay. So -- and the chief of security, the major, you said it was Dennis Wascom; is that right?

A. W-A-S-C-O-M.

Q. You anticipated me. Okay. But so in terms of -- in terms of training for new hires, a new hire gets paired with a sergeant or

a lieutenant and that sergeant or lieutenant is the sole person who is responsible for giving that new hire the information they need to do the job, and that sergeant or lieutenant is the person who's -- in their sole discretion determines when somebody is ready to start working on their own; is that right?

A. Sergeant, no. It's strictly the lieutenant because he is the supervisor of the shift. The sergeant basically takes him around and shows him the way to do things, simply for the mere fact of the lieutenant has a numerous amount of responsibilities; reports, video footage, handling the security of the facility; just everything and it's hard for them to learn more about the officer position with the lieutenant because we are always being called to run here, run in there, and it's a little harder for the lieutenant, so normally it's the sergeant.

Now, if we're out on -- if the lieutenants aren't busy, then we will get out with the new hires. We'll try to work with them, see what they know, what they have learned and try to evaluate from there.

Q. Okay. So it's the sergeant that's doing the sort of the knitty gritty of showing the day to day --

A. Yes, ma'am.

Q. -- how the facility operates, what the job is to the -- to the rookie; is that right?

A. Yes, ma'am.

Q. Okay. And then who is it that is responsible for determining when the rookie is ready to work -- work on his own?

A. The lieutenant.

Q. The lieutenant. Okay. And how does the lieutenant make that determination?

A. When the -- I can sense that he is more comfortable with doing things on his own, the officer understands that, hey, you know, I've got to do this, this and this as far as like pulling coolers, laundry, cell showers, basically make sure he knows his job duties. Now, this -- go ahead.

Q. Well, I was just going to ask and -- and how do you -- how do you get that sense? How do you determine that?

A. Like determine -- like that's when

we kind of shadow them or watch them to see how they do their job, and if they can successfully do it without asking questions or without hesitation, then we know that they fully understand of, hey, this is their job, they know what they are doing, pretty much along those lines.

Q. Okay. So there's like a trial run at some point where you -- you tell the -- the new hire all right, let -- go work a shift, we are going to watch you, see how you do?

A. Pretty much.

Q. Okay. I got you. All right. Now, in terms of what the sergeants are explaining, you know, the knitty gritty of the day to day, is there any kind of, I don't know, curriculum? Is there anything that, you know, helps the sergeants kind of keep track of everything that they need to explain to a new hire?

A. Essentially, everything that the sergeants essentially do is I would say the same thing as an officer. They just have a little bit more responsibility, like they carry keys, perimeter checks. They -- the sergeants kind of have experience enough to make calls, and if the

lieutenant has to see fit that okay, well, I trust you in your call, make that call or no, you can't make that call because of these reasonings and we explain it to them and tell them, hey, you can't do it like that, so we will have to do it like this. And I'll try to explain to them, hey, this is what you're trying to do and I'll show them the all possible outcomes of what can happen, which, I mean, everything you do has a bad possible outcome. It's just you got to see fit of which one is the least threatening or the lowest point of any kind of, I guess, intensity, like trying to make -- trying to make less argument or anything as possible.

Q. Okay. Okay. It sounds like -- and we will get into sort of what the responsibilities are of the sergeants and lieutenants in -- in a little bit, but I just want to make sure I understand.

There's not like a checklist or -- or something to help keep the sergeants who are responsible for telling the -- the rookies, the new hires what to do? There's -- there's not any kind of like guidelines like that? The sergeant is just supposed to know what to -- what to tell

the new hires; is that right?
A. You popped up. Sorry.
Q. Okay.
A. There is a checklist. There's a post orders for sergeants, officers and lieutenants in Control 1 that basically tells them their job duties, essentially, everything that needs to be taken care of through either day, nightshift. We also have a shift packet that we get every -- every day we come on shift or before we come down the hall that basically has all the job duties, like 30-minute cell checks, fence inspection, laundry room inspection. There's multiple inspection lists inside that packet, which kind of help everybody steer of what we need to do, what we need to get done, what needs to be checked.
Q. Okay. All right. All right. Okay. So when you first started, how long -- how long were you shadowing someone?
A. I would say probably about a week or two, I'd say. It's been so long since I done it. I know it wasn't long and I was -- I think it was approximately about three months into it that I was already acting sergeant.

Q. Okay.
A. So I would say it -- it wasn't very long.
Q. Did you ever receive any training -- now I'm talking about at CCC before -- before you did the -- the POST academy for CPSO. Did you ever receive any training related to investigations?
A. The only kind of training I received was basically onsite investigation training.
Q. Okay. Tell me about that.
A. I was taught by multiple people. Can I go with last names or do I need to say titles and full names?
Q. Well, whatever you remember.
A. Okay.
Q. Yeah. How things are.
A. Well, I know there's -- I know there's one that I haven't said, and that's Lieutenant Dante Fortune. Lieutenant Fortune, Lieutenant Oxley, Major -- Mr. Wascom. A. W. Stott, Captain Trevor Mitchell, Captain Patti Scott, Warden Pat Book. Basically, it's everybody comes together to try to help you out and, hey, do you know how to do this or, hey, do

you know how to do that almost every time something happens and, you know, yes or no and I've been tested a few times to see, hey, do you know what you're doing. I said, well, I can show you better than I can tell you.

Q. So when you say "when something happens," what do you mean by that?

A. Like as far as a fight happens or cell phone is caught on camera, contraband, just anything out of the ordinary as far as contraband or fighting.

Q. Okay. And so it sounds like there's not -- you didn't have any formal training where anybody explained to you how to do an investigation, but all of these lieutenants and the majors and the assistant wardens, they all would sort of tell you what needed to be done; is that right?

A. A little bit of both. Like they would explain to me, hey, look, if you go on this camera -- like if you get on a camera, you want to look for, you know, odd things. You always want to look for the people that's not running to the situation. You want to look for the one who sits being sneaky trying to hide from the

cameras, that sort of thing.
Q. Uh-huh (affirmatively).
A. I don't know the approximate account, but I can't tell you how many drugs, shanks, phones, fights that I've investigated and recovered the contraband, so it's definitely not hard if you know what you are looking for.
Q. Uh-huh (affirmatively). Okay. When -- when you are doing an investigation, does that get -- you know, the steps that you take, does that get written down some place?
A. So any kind of like code three, code three medical, which a code three is a fight or disturbance inside the dorm, a code three medical has to deal with anything medically as far as like seizures, pain or anything like that.
Anything serious, they will call a code three medical, but the smaller things, they will be like okay, well, hey, I have got this person that's having chest pains, like they will call us over the radio or call Control 1 and they will advise us, hey, if they are having chest pains back there, can you send somebody back there to go check them out.
Q. When you say "they," who's "they"?

A. Like our control rooms.
Q. Oh, okay.
A. Will notify like, hey, M8 is complaining of chest pain in such dorm, can you go pull them out and check them out.
Q. Okay. So -- so say there's a code three, is there an investigation that's done into, you know, what happens?
A. Yes. So -- so the first thing we do is we go inside the dorm to make sure nobody is unconscious, stabbed, bleeding, essentially check on everybody first. If there is, we will take care of that situation at hand, get them out the dorm, get them to medical, whatever we got to do with them. If it's just a fight, we will get him out the dorm with his property. That way nothing else happens until an investigation can get started.
As soon as that's done, I'll go in to -- well, either me, sergeant, or my sergeant, either me or my sergeant or me as a sergeant, my lieutenant, someone with, I guess you could say, rank, sergeant or lieutenant would go into the control room, if not both of us. We would then play back the cameras and start an investigation,

try to -- try to go a little further than when it happened to try to see what started it, what caused it and then see the initial action of the reason why we was called.

When we do that, we then get facial recognition to recognize them when we go back into the dorm to pull them out. We will grab them and their property, we will then put them in a cell under disciplinary code, whatever the code might be, and then we will do a report on it with the time, what happened, what was seen on cameras and then it will be turned -- that report will be turned in to chief -- or security box, which is either captain or majors or captains or major, to be further reviewed and then they will hold disciplinary board court.

Q. When you say the captain and the major will -- will review that report, what -- what are they reviewing for; do you know?

A. Any time they have a situation that goes on, it's basically, hey, this is what happened, I pulled this person out with such and such concerns. I then placed them into a cell or sent them to the hospital due to their concerns, which we have on call either captain, major or we

will call medical staff to advise them of the situation and what we should do. And they will normally -- like if it's something I can tell like okay, there's a lot of blood, he's got to go out, then I won't have to worry about calling medical. I will call whoever's on call, hey, I've got this happening right now, I've got to get this guy out. That all gets put in a report.

So basically, it's kind of a -- what I like to call it, a second look. So initially, I'm the first look. I see the situation, I see what happened, I pull them out, lock them up, I do a report on it. They then get the report when they come in the next morning at 7:00, 8:00 o'clock, whenever they arrive; and they will get the report, they will review the report, then they will go on the cameras, review the cameras. If everything matches up, make sure everything's right, they may see something else that I didn't see. It just depends on the situation. And they will either pull that other person out and charge him with the rule violation or they will just go ahead and clear it due to the fact of I didn't miss anything, everything looks crisp and to the T and they will proceed with the disciplinary

board.
Q. Okay. And it sounds like that process, you sort of learn that on the job as well; is that correct?
A. Yes, ma'am. Part of the investigations that I've learned from well-known fellow veteran corrections officers that's been there for a while, know what they are doing.
Q. Okay. Do you ever -- have you ever received -- and I'm talking about sort of beyond on the job, the on-the-job training that you've been talking about, but like, you know, formal classroom training or anything like that on interviewing witnesses?
A. Yes and no. I've been brought in to sit with disciplinary board to see how things are ran. I've been brought in to see how questioning an inmate is done. I try not to get into that type of stuff because it's just one of those I'm not -- I'm not the person that's doing the DB court, so I don't have to worry about that. As far as like if something was to happen, as far as a weapon, okay, do you know what type of weapon was used, do you know who hit you, like that, the small detailed stuff I'm okay with, but as far as

getting into a big investigation, you know, doing a whole interrogation, slash, questioning, I tend not to.

Q. So who -- who is responsible for that?

A. Captains and major, or anybody above him that wants to get involved --

Q. Okay.

A. -- as far as your assistant warden and warden.

Q. And so it sounds -- sounds like -- and tell me if I'm wrong -- it sounds like the interviews are more part of the DB process than the investigation process; is that right?

A. That sounds correct, yes, ma'am. Initially, if something was to happen, we lock them up. The only one that can really release them is disciplinary board. So tend to we just leave it to them to figure out if they are going to go back to that dorm or if they are going to get released the next day or, you know, everything in that nature.

Q. Okay. And when you say "lock them up," you are -- you are talking about putting them in a lockdown cell; is that correct?

A. Yes, ma'am. My apologies.
Q. No, no, no. I -- that's -- I want to make sure I'm understanding. Okay. So -- and you've talked about reviewing video.
Did -- have you gotten any instruction or training on how to retain video if there's an incident?
A. As far as going back and looking at the camera footage, yes, ma'am. As far as like a serious situation, as far as like they call it like criminal charges are going to be pressed where he -- where the inmate gets brought down, gets rebooked and go in front of a judge due to some criminal activity that they have done as far as trying to burn it and put it on a hard drive, no, ma'am. That is strictly left to our IT personnel --
Q. Okay.
A. -- or technical technician supporters, however you want to call it.
Q. Okay. Who -- who is the person that decides whether or not to save video?
A. That would be captain or majors or captains or major.
Q. And do you know when they make that

decision in relation to an incident?
A. Normally, it's the first thing the next morning if something was to happen. If they don't -- if it's not serious enough to where somebody has to go out to the hospital, sometimes they may come up there and get the footage then. It just depends on the type of concerns, seriousness and charges that are involved in that situation.
Q. So -- and if someone does go out to the hospital, is that the sort of situation where you would expect video to be saved?
A. I would -- I don't know because it just depends on the certain situation. And I'm not the person that -- like I said, does that type of stuff, so I -- I couldn't tell you.
Q. Your lawyer was very happy with that answer.
A. I seen you smiling. I was like he's -- he's over there whew.
I seriously don't know on that part. It -- it -- it's on them because we have people that go to the hospital all the time and it just depends on the situation.
Q. Okay. All right. We have talked

about sergeants' and lieutenants' exams and you -- you did not take exams for either of those positions, correct?
A. As far as I know, I have never took any exams. I've only done in the field, I guess you could call, exams. So I --
Q. Tell me about those.
A. Basically being watched over as I complete my job.
Q. Okay. All right. And then if I say in-service training, are you familiar with that?
A. I would presume that you're meaning on duty?
Q. So like training that -- that happens, you know, while after your initial onboarding period. Do you ever have any kind of like classroom training or anything like that after you started work?
A. Besides the -- I do recall a pill call training to go over the medical cart for passing pills, insulin, all that. As far as any other in-service training, unless it was kind of like a hands-on training, as far as during the job, the only thing I can think of is types of training of as far as like getting called to

sergeant, lieutenant meetings, hey, they are changing this to this or we don't like how this is going, so we are going to change it to this to see if it will help.

Q. Uh-huh (affirmatively). Okay. Okay. All right. The pill call training, do you recall who -- who gave that?

A. At the time, that was my lieutenant when I first started, Dan Oxley. He was the one that trained me on the pill call and then I had to watch a video over it and I believe I had to take a test over it.

Q. Okay. All right. Anything else you can think of where you either had to watch a video or take a test?

A. At this time, not that I recall.

Q. Okay. All right. We have been going for --

A. About an hour and a half.

Q. An hour and a half.

A. Two minutes shy of an hour and a half.

Q. Okay. Do you want -- do you want to take a quick break or you good to keep going?

A. Maybe run to the restroom real quick

and that should be good.

MS. CUMMING:

All right. We will -- we will do five minutes again.

MR. BRYANT:

You guys mind, can we do ten this time?

MS. CUMMING:

Yeah, yeah.

MR. BRYANT:

Real quick. Appreciate it.

MS. CUMMING:

Yeah.

(A short recess was taken.)

MS. CUMMING:

All right. We are back on 12:10.

BY MS. CUMMING:

Q. So I want to run through, let's -- let's take when you were a sergeant --

A. Yes, ma'am.

Q. -- starting then. Can you walk me through what all your responsibilities were at CCC as a sergeant?

A. Normally, any time I was running sergeant, I know I had to do pill call due to the

fact of I was very sufficient for time and also knowing what kind of medications to give out, what not to give out, who took insulins; to make sure all officers was doing their duties as far as cell showers and a lot of cleanups, control room cleanups; making sure the hall workers were doing their jobs as far as keeping the halls clean; anything that was, I guess you could say, building up like as far as dust or trash or anything like that, make sure it was cleaned and picked up; counts, basically any type of reports that my lieutenant couldn't take care of because he was unable to make it due to reports or having to be a supervisor.

Q. Okay.

A. Fence inspections; making sure paperwork was lined out; making sure -- checking any types of logs, like logbooks in control rooms; 30-minute cell logs, making sure those were all completed, filled out; make sure everything was added up in the logbook as far as counts or times going in and out; chow; making rounds.

Q. When you say "making rounds," what do you mean by that?

A. As far as like going through dorms, checking on inmates, making sure there's no, I guess I could say, illegal activity as far as contraband or fighting, those type of nature, make sure nobody's injured.

Q. How -- I'm sorry. Go ahead.

A. Anything basically medically. I was dealing a lot with medical, training with the nurses up there showing me what to look for, the signs to look for to see what's going on with them; and if I didn't have a question, I'd call them, hey, look, I've got BP of this, rate of this, he's complaining of this and this, what do you think. And if I didn't have a -- if I didn't have an answer, I found out whether it was through a lieutenant, a captain, a major, anything we had a question about, we always found a solution.

Q. Uh-huh (affirmatively). Okay. And how frequently were you expected to -- to go onto the dorms?

A. I want to say it was -- as far as rounds, basically any chance we got, go in to make rounds. We would have to go in there, check, see if they have got water, get laundry,

get trash.

Q. Was there a certain -- so in the course of a shift, were you expected to go onto each dorm at least like one time every 30 minutes, once every hour, once every 15 minutes, anything like that?

A. Not -- as far as going into the dorms expectedly. We had counts. I'm trying to recall the counts. I know we had count time as soon as we came on, which was 5:00 o'clock. I believe it was 5:00 o'clock, 8:00 o'clock, 10:00 o'clock, 12:00 o'clock and 3:00 o'clock for counts.

Rounds, it was more of, if we got the chance to go in there, if we didn't have other duties or other specific tasks from a captain or a major of getting things done to like property, property was another one; booking; new intake come in from the sheriff's office or new intake came in after everybody left, we were to do intake drug tests.

Once again, property, making sure they had everything when they come in, if they were accessible to have it as far as like deodorant, shampoo, all that, laundry bags.

Q. Okay.
A. I'm trying to think of more. I know at the time we had trash runs, which either had to be done by a sergeant or lieutenant with the kitchen staff or the kitchen trustees. After third chow, we would take out all the garbage to the dumpster outside of the facility, make sure there was no drugs being gotten, essentially supervising them as they go out, take the trash, dump it, come back in.
Q. Uh-huh (affirmatively). Okay. And when you were a sergeant, who would report to you?
A. I was head sergeant; so if we had another sergeant, that sergeant reported to me and anybody as far as the officers below myself.
Q. Okay. And then who did you report to as sergeant?
A. I reported to the lieutenant.
Q. Okay. Did you have a lieutenant that you worked with pretty consistently?
A. I mean, I worked all the time, so I worked with Lieutenant Dante Fortune, Lieutenant Dan Oxley, Lieutenant Joseph Prince. Say the other one was Lieutenant Will Harris, but he

wasn't there for long.

Q. All right.

A. Essentially, if they was the lieutenant, I was always there too basically going in and helping and making -- working extra shifts to help them out; because when I first started, they was always shorthanded and I would always call in and work.

Q. And when -- and when you were working as a lieutenant, what sorts of responsibilities did you have?

A. Essentially, the same duties, a little bit more, which as sergeant, we did have to do some reports. As a lieutenant, you have to go over all the paperwork, you have to verify movements.

If let's say you move one out of the A-Dorm into Cell 3, make sure it got moved in the system, make sure the reports are good if you didn't do them. As like let's say a sergeant did it, I'd have to overdo that, make sure that everything's correct on it, turn it in; check all logbooks, make sure they are correct. Basically, the -- I guess the guardian of the castle.

Q. So when you were a sergeant, would

you be considered a shift supervisor?

A. Yes and no. I would be a supervisor to everybody below me due to the fact of the way it's normally and supposed to be ran is the sergeants are supposed to run the shift as far as making sure the officers get everything that they are supposed to get done, making sure we get chow, church, anything that needs to be done, laundry, coolers, making sure everything gets completed, any kind of cleanups, essentially oversight, overseeing but also helping with -- helping the officers with the duties and making sure everything got done completely and correctly.

MS. CUMMING:

Okay. So I want to show you Exhibit 3. And I can scroll up, but this is a -- I'll just represent to you this is an organizational chart.

(Exhibit 3 marked and viewed.)

BY MS. CUMMING:

Q. On page 6 right now, which is Bates CPSO_00006. Does this -- and -- and I can scroll you to the top if you want to see that, but does this document look familiar to you?

A. Yes, ma'am.
Q. Okay. When have you seen this document before?
A. If I'm not mistaken, that's in our sergeant protocol packet that we go in, we have to read, sign every day. I actually see a few of them that we as sergeants don't actually do --
Q. Well, tell me which ones --
A. -- but sometimes.
Q. That was going to be my next question is which of these do you do as a sergeant and which is as a lieutenant?
A. I guess, as I say, subsection D, as in delta, normally that is for the lieutenant.
Q. So that's "Supervising all count procedures during his tour of duty." And the count procedures, that's referring to the prisoner count, correct?
A. Any time we count the facility, the lieutenant has to go over it, unless the lieutenant is not there, then the sergeant has to do it; but 90 percent of the time, it was -- or 99 percent of the time, it was always the lieutenant. So I mean, that would be a yes and a no right there. Subsection gulf is kind of a

both situation. Normally, it would pertain to the lieutenant, but given circumstances, we would have to then sometimes do that, okay.

Q. And -- and G, that's "Reviewing and investigation of unusual occurrence reports and disciplinary reports." So if the lieutenant was there, the lieutenant would do that; if the sergeant -- if there was no lieutenant, then the sergeant would be responsible, correct?

A. Yes and no. Everything you said, but if, let's say, the lieutenant is on another investigation or in the middle of something else, then we would have to take over and make sure it's done. He would then come back behind us and double check to make sure it was correct, everything that we put in the report was correct.

Q. And so -- and the investigation, that's sort of the -- the video review and --

A. Yes, ma'am.

Q. -- pulling people out that may have been involved and putting them into lockdown, that -- that's what that's referring to; is that right?

A. Yes, ma'am.

Q. Okay. All right.

A. And the last one I see is subsection K, "Sergeants are not allowed to directly contact the captain." That is the lieutenant, unless authorized by the lieutenant to call a captain or higher rank, or if the lieutenant is not there, then we become acting lieutenant and then we would have solely purpose to contact the captain without authorization because then we would be considered the lieutenant at that time.

Q. Got it. Okay. All right. Okay. All right. Thank you. That's -- that's helpful.

So I want to -- I want to move on to staffing. Can you walk me through at each shift at CCC how many staff were assigned?

A. That's a trick question. No. I'm just kidding.

Q. Let's -- let's start with an ideal world that's fully staffed and everybody has showed up for their -- for their job.

A. Fully staffed would be 14 people.

Q. Okay. And how does that break down rank wise?

A. Well, as far as your rank wise, every shift has a sergeant or, sorry, every shift has a lieutenant and two sergeants; and that is

mandatory on each shift if you have everybody.
At the time, it would be -- you would have a kitchen security, you would have four control room operators, and everything after that would just be an officer on the floor.
Q. Okay. So we are talking perfect world, fully staffed, three rank: One lieutenant, two sergeants, one kitchen sergeant, four control room operators, so that's eight people and then there would be -- the remainder would be officers; is that correct?
A. Right.
Q. Okay. And where would those remaining officers be?
A. Be on the floor anywhere making sure all the duties got done.
Q. Now, when you say "on the floor," are you talking about -- or were there officers who were assigned to stay in dorms or were there officers kind of --
A. No. Roaming, I guess you could call it. They were never set to any specific job. Basically, they're -- any task at hand, they would us help us making sure they had all the other duties taken care of, if you're lucky.

Q. All right. So let's talk about when you're unlucky.
A. And, again, the non-perfect world.
Q. Uh-huh (affirmatively).
A. Just pray you have everything that's filled up as far as your control rooms, kitchen, security and hoping at least you got three people on the floor.
Q. Okay. All right. So in a perfect world, you would have six, but more frequently you would have three; is that right?
A. Yes.
Q. Okay. In terms of like the -- the posts for each shift, not just the people who are showing up, but the -- but the actual like job assignments, what was the -- what was the first thing that would have to get filled, and it didn't matter if it was, you know, a five star general, that that person, if he was the only person that showed up, was going to do that post?
A. If I was the lieutenant and I had at least one person show up, he would go as a sergeant or acting sergeant if he wasn't a sergeant.
Q. Okay. So you have to have a

lieutenant, you have to have an acting sergeant. After that, what is your -- what is your next mandatory post?

A. Well, there would be another acting sergeant.

Q. Okay.

A. Because normally, we run with two sergeants, so three sets of keys on the compound at night, but if it's not kitchen security or control rooms, they was to be on the floor to help with count. There's -- there's not really any specific duties after lieutenant and sergeant. It's just officer and it's basically get done anything we can get done.

Q. All right. So if you have a bad night and only five people show up to work, how is that staffing being allocated?

A. Can you -- can you elaborate as to five people, like just five people showing up for shift?

Q. Yep.

A. Well, I would definitely be making phone calls to the captain or calling -- trying to call people from the other shift in.

Q. Okay.

A. And if I can't get nobody, then I would call whoever's on call and explain, hey, I've got, myself included, five people that showed up, I don't have enough people --

Q. Okay.

A. -- and they would then call -- start calling people in.

Q. Okay. All right.

A. Or I've seen it happen to where they will show up until people have showed up, or people have stayed over from the dayshift to help us at least get done with chow or at least until people showed up.

Q. Okay. And so none -- no one is specifically assigned to a dorm post? No one is assigned to Dorm A, they stay in Dorm A for their entire shift; is that right?

A. That is correct. That -- since I have been there, nobody has been assigned just to one dorm.

Q. Okay. And we were talking a little bit about sort of the lieutenant and the sergeant's role, which is just sort of do rounds whenever it's possible and then, you know, also do the count.

For the roaming officers, is there an expectation -- well, more than an expectation. Did they have a responsibility to walk onto the dorms like a certain number of times every hour or, you know, every 15 minutes?

A. The same with it was never -- now, there's -- the only thing that there is an actual -- two main rounds was cells and max every 30 minutes. As far as them having any type of rounds or expectations every 15, 30 minutes, besides cells and max, no.

Q. Okay.

A. Their only tasks were to basically if the sergeant or lieutenant asked them to do something to go do it, to help out. Let's say, if they have got a task of their own they have finished before the other person, another officer finishes theirs and there's nothing left to do, well, we expect them to go help them to finish their job to where they can get done quicker. As far as specifics, no, there's no specifics.

Q. Okay. So how does -- I'm trying to figure out a good way to ask this, so this may come out clumsy and I may try to clarify it if it does.

A. Take your time.
Q. So if you were -- if you -- it's -- let's say, it's -- D shift is scheduled to be working. Is there a roster -- I think you -- you had talked earlier about a staff roster. Is there a roster of who all is supposed to be on D shift in showing up to work for that evening?
A. Yes.
Q. There is?
A. Yes.
Q. Okay. It's D shift?
A. Yes.
Q. Okay. So how is that created -- well, tell me about that.
A. I know it's by either captains or major or anybody up higher. As far as wardens and assistant warden, they determine who goes to what shift. If they don't show up without calling, it would be a no-call, no-show, then they would have to talk to the warden or assistant warden of why they didn't show up.
And as far as if somebody didn't show up, they would call them, what's the reason you're not coming in, why didn't you call in, they are shorthanded. And if they still can't

come in, then they will proceed to call people from the other shift to come in.

Q. All right. And so at the beginning of the shift, there is -- I'm -- I'm just going to sort of walk through what it sounds like happens and tell -- tell me where -- where I'm getting it wrong.

At the beginning of the shift, it sounds like there is a list of everybody on that, let's say, D team who should be reporting to work that night, correct?

A. Yes, ma'am.

Q. Okay. And so is there like a -- a role, a staff rollcall for everybody to sort of just say that they are here and does that get marked down on the roster?

A. There's -- it's one of those we know who we work with and we know who's supposed to be there.

When I was a lieutenant, every time I would get there, I would call Control 1 and verify if there's any call-ins for my shift. If there was a call-in, I would try to either, A, if I had enough floor officers, try to work somebody into that position. Of course, I would ask them,

hey, do you want to work control room tonight.
If I have a lot of things going on -- and this is my perspective. If I have a lot of things that are going on, have to be done, as far as like shakedowns, cell movements, church, if I got all that going on, I'm more than likely going to try to call somebody in that works the control room versus putting an officer in there due to the fact of more manpower on the floor and instead of taking one out or off the floor and putting them into a control room.
Q. Okay. And here I'm asking about the sort of how things get written down. So if you show -- you show up as the lieutenant, you call Control 1, you ask if there have been any call-ins -- and just to make sure we are on the same page, call-ins are people who have called in to say they are not coming to work --
A. Yes, ma'am.
Q. -- for whatever reason?
A. Yes, ma'am.
Q. So see who has called in to say they are not coming in to work, do you write down or does anybody write down, okay, deputy John Doe is not coming in to work?

A. Yes, ma'am.
Q. Okay.
A. There's a -- go ahead.
Q. I was just going to ask where does that get written down?
A. So every shift has a shift packet basically going over the procedures, the to-do list. There is a specific page for who your lieutenant is, who your dorm sergeant is, your block sergeant is. I'm trying to go down the whole list. I think there's administration, office, segregation, administration, segregation, kitchen security, medical, and then not sure if that's everything, but then it skips to, let's say, Control 1. And then you have two slots for I guess you could say alpha, bravo, one of those, like if you've got the extra people as far as officers, that's where we would start putting them. And it's basically kind of a rollcall sheet, okay, this is all who's here, this is what they are doing, this is their positions for that night.

At the bottom, it has call-ins, so I can put so and so called in sick or so and so called in hospital, you know, whatever the reason

it may be, if there's not a lot of them.
Below that would be notes. I can then also notate that I called in so and so or anything I need to add into the shift, into the notes to let them know, hey, this is, you know, kind of what's going on. I tried to call so and so personally, no answer, you know, anything I need to put in there. And then at the bottom is where your lieutenant will sign, hey, this is everything that has been done.
Q. Okay.
A. Or let's say, the notes part, so and so officer come in at 11:00 or 12:00 o'clock at night to help with shift.
Q. What is that document called?
A. I'm uncertain of the document title just because it's been so long since I've done it, but -- I'm going to stick with I don't know, but I do know it is in the shift packet that everybody has.
Q. Okay. So it's in the shift packet and you can't -- and if you can remember sort of like what you would kind of all refer to it as, even if that's not like the official title.
A. It's basically a roster or job

assignment list.

Q. Right.

A. I believe that's probably what it is, but I'm not a hundred percent sure.

Q. Right. Okay. Different -- that's another one of those different facilities. They all call it -- I've heard probably 20 different names for exactly that document, so --

A. Right.

Q. It's always good to know what people are calling it so we are on the same page. Okay. And then after the shift is --

Well, let me ask this: What else is included in that shift packet?

A. I want to recall that I was saying something about it earlier. It's got the job assignment, it's got a cover page of basically the -- the duties, whether it's dayshift or nightshift. It's got a fence inspection, unusual occurrence report for it, it's got a laundry room inspection unusual occurrence report. It's got multiple checklists. It kind of has like a maintenance report. It's kind of a checklist, and if you have some kind of problem with something, you can add it in on there. 30-minute

cell checks.
Q. So is that shift packet, is that sort of like printed out on like paper and something that the lieutenant carries throughout the shift or fills in throughout the shift?
A. Yes, ma'am. It's actually something we have to have every shift. So if you don't have that turned in, I don't know what can happen because I've never went without doing a shift packet, but I know it is mandatory to do.
Q. And when you say "turned it in," so at the end -- let's say you've done your full shift, you've completed the shift packet, what happens to it next?
A. Well, if no reports, drug tests -- let's just say I do have reports, drug tests. Those will get added in, the drug test and the reports, whether it's unusual occurrence reports or disciplinary reports, along with the said numerous amount of count sheets, depending on how many times we count that night, will go into that packet. That packet will then be placed together. They like it in a certain order, but, you know, if you don't put it in that certain order, it's not a big deal. That will be either

stapled or paper clipped. At the end of shift, you'll take it up and -- to the administration -- administrative office to the cubbies and it will be placed into security for chief of security or captain to grab every morning.

Q. And do you know what the chief of security or captain does with the shift packets after that?

A. Well, I do know that they do go through them to verify that everything's correct on it, make sure there's no kind of maintenance needed, anything out of the ordinary. As far as after that's taken care of, I have no idea where it goes.

Q. Okay.

A. So I will have to answer I don't know on that one.

Q. Okay. All right. The last time you touch it, you're putting it into the cubby of the major and chief of security; is that right?

A. Yes and no. Yes, if everything is clear; no, if there's a mess up on it to where we got to fix it, which we may just see that one piece of paper that we messed up, hey, need you to fix it and then we turn it back in to them.

Q. Okay. Got it. Thank you. So we have been talking about control rooms and I -- let me -- let me start with -- and you've been talking about the logbooks.

MS. CUMMING:

Let me just go ahead and show you what we are going to mark as Exhibit 4 so we are on the same page.

(Exhibit 4 marked and viewed.)

BY MS. CUMMING:

Q. All right. Can you see that?

A. Yes, ma'am.

Q. Okay. So just scrolling up, it's only a page. Does this look familiar to you?

A. Yes, ma'am.

Q. Okay. When have you seen this document before?

A. I cannot recall where I seen it from, but it looks very familiar.

Q. Okay. And this one's dated June 20, 2023, so it's around the time I think you were leaving, but do you recall seeing another version or a similar version that looked kind of like this during your time, you know, before you left CCC?

A. I have seen something similar to this. I'm trying to think of when I can -- I can't recall -- I don't know if it's due to everything being in here, basically everything that I've learned of there and if it's something I have seen.

Q. Oh, okay. Yeah. That's fine. Well, then I guess let me just ask this: Does this look consistent with what your understanding is a logbook policy and practice was at CCC?

A. Yes, ma'am.

Q. Okay. Great. And so we have been talking about the control center officer who will maintain a permanent written log. Now, there are four control rooms; is that right?

A. Yes, ma'am.

Q. Does each of those control rooms have a logbook that the officer is responsible for?

A. For the control room officer, yes, ma'am.

Q. Okay. And for --

A. Actually had two.

Q. They have two logbooks?

A. Now. I'm sorry. Let me rephrase

that. They have two now. We had a different system for bed books, but they found out it was easier for them to use logbooks for the bed books.

Q. Okay. So when you say "bed books," what's that mean?

A. Essentially, roster call. We going to each dorm, this person's in this bunk, this person's in this bunk, okay, well, this person moved from this dorm to that dorm.

And essentially back then, we had it in our computer system. Well, started having glitches and I guess they quit going in the system in case the system messed up that they would write them in the books. They would write it and confirm, okay, this person's here and not in this dorm.

Q. Okay. So something like that would reflect movements on and off of dorms, like a --

A. Yes, ma'am.

Q. Okay.

A. But that was -- that was brought in after I had left.

Q. Okay. All right. So currently, there are two logs in 2022; and 2023 until you

left, those movements would be recorded in the computer, you said?
A. Yes, ma'am.
Q. All right. Do you know what the name of the system was that was being used to -- to log those?
A. PTS.
Q. Okay.
A. I only know it as PTS. I don't know the -- the acronyms it stands for. I know it's something solutions, but as far as what it's actually called, I don't know.
Q. It's -- it's all good. You're -- I'm -- I'm familiar with PTS, so I won't --
A. Oh, okay.
Q. -- I won't probe too much into that.
So when you say the movements will be put into PTS, did the people in -- did the correctional or the -- the control room officers, did they have sort of like a computer terminal that had PTS on it so that they could log directly or how did that work?
A. The only person that could do that was Control 1. Controls 2, 3 and 4 did not have computer systems to do that with.

Q. Okay.
A. The only system they had was the TV with the security cameras on it --
Q. Okay.
A. -- or monitors, however you want to call it. I call them TVs because they are basically TVs.
Q. So if someone was moving off of, let's say, charlie dorm, which is overseen by Control 2, and moving onto Dorm E, which is overseen by Control 3, how would that movement get conveyed to Control Room 1?
A. Control 1, 2 and 3 would have the logs of it. Essentially, I -- the way it goes is if I take a person out, okay, that would be one time out of charlie going into echo. Control 2 would show the one where it left, so it would take down the count in Control 2 and out of charlie is count down one. Echo's, or Control 3, would show that one time out of charlie going into echo with one count going up on her current count.
And control -- and she would show her new count for that dorm in both control rooms. Control 1 would have both. She would

have one time out of charlie and then the new -- well, one time out of charlie into echo she would have, and all three logbooks should have the name. One time out of charlie into echo, so and so, new count for charlie is this, new count in echo is this, and that's what Control 1 would have.

Q. And so that would be in Control 1's like physical written logbook, correct?

A. Yes, ma'am.

Q. Okay. And before the -- the current, you know, two logbook system, that would get logged into just the main logbook; is that right?

A. The new system, it would be logged in both due to the fact of that person moved out of that dorm, so they would get removed from whatever bunk they were in.

Q. Okay. So I'm asking about before the new system, so when that --

A. Oh, I'm sorry.

Q. That's okay. When there was only one logbook, would Control Room 1 physically write into that one logbook, John Doe moved from charlie to echo and new count for charlie, new

count for echo; is that right?
A. That is correct. They are supposed to be writing that in there.
Q. Okay. And Control Room 1 would also enter that information into the PTS, correct, under the old system?
A. They should, yes.
Q. All right. Currently under the new system, there's a log only for movement and a log for other things; is that right?
A. The -- so there's a logbook for movement and then there's a logbook for bed books, which is basically where each person is in this rack or this person's in this rack.
Q. All right.
A. Just stating where they are at.
Q. Okay. All right. And so that's -- that gets even more detailed beyond just sort of movement from one dorm to another. It's also like a specific rack where that person is assigned?
A. It -- it don't have where they moved from one dorm to another. That would be main logbook, but that one specifically says, hey, they are supposed to be in this bunk.

Q. Okay. All right. Okay. Okay. So talking about in 2022, this -- I just want to make sure I understand the sorts of things that were covered by the logbook.

So it's movement from one dorm to another in Control 1 and then I'm -- I'm looking at the policies. So it's a permanent written log which continuously documents personnel on duty, and so that would be staff who were working that shift; is that right?

A. Anybody that's doing the type of movement or counts, anybody that calls in, anybody that has to leave the facility, transporting an inmate, fence inspection, laundry room inspection, any kind of the inspection parts, their name would be put into it. Any type of counting, their name would be put, hey, they counted this dorm, such and such counted this dorm.

Q. And then for offender population, what -- what would be included, what would be logged for that?

A. That would -- well, that's bus counts. I'm trying to think because that's kind of throwing me off. Offender population and bus

counts.

Q. In your mind, the -- the way you would think about it is that the offender population and counts would be sort of similar, documenting similar information; is that --

A. I would say yes, offender population basically. Well, that's -- offender population is admissions and releases.

Q. Uh-huh (affirmatively).

A. Basically, I would have to go with the release of John Doe now brings the population down to this number. Is that -- is that kind of what you are getting at?

Q. Okay. Yeah. I'm asking. It's an honest question, so yeah.

A. If I -- if I had to guess, that's probably what it is.

Q. Okay.

A. It's kind of throwing me off a little bit with the offender population admissions and releases and bus counts. So it's like now I'm wondering if it's the same thing, if it's not, so I'm going to go with that.

Q. Okay. I'll -- I'll trust you. I think the other thing too is you know how this is

working in practice and so that's sort of where I'm trying to understand how the policy on my end is working in practice.
A. Yes, ma'am.
Q. So -- and then the "Entry and exit of all visitors." Visitors, what is that referring to?
A. So if we have like preachers, if we have probation and parole, any kind of actual certified maintenance people as far as like plumbing, AC work, duct work, any kind of outside contractors that we have to bring into the facility.
Q. Okay.
A. We actually have a specific logbook that stays upfront to log, okay, such and such with such and such company coming at this time, left at this time.
Q. So there's a logbook up at the front where you have to sign in and out if you aren't an employee of CCC.
A. Yes, ma'am.
Q. And then -- but then also -- and does the control officer also log in anybody who's coming into the facility?

A. Yes.
Q. And that's in that main Control 1 logbook?
A. Both. They -- they should be in both.
Q. The logbook that's up at the front and the Control 1 logbook?
A. Yes, ma'am.
Q. Okay. All right. And then shift activities, is that things like med pass or pill call, showers, if you're on the cells, trash collection, things like that?
A. Cell movements, yes, ma'am.
Q. Okay.
A. All -- everything like that.
Q. Would that also reflect any time an officer goes onto or off of a dorm?
A. That is included as well, like pulling coolers out -- in and out, laundry in and out.
Q. What about rounds, would that be included?
A. Rounds would be included as well.
Q. And -- and tell -- tell me if this is wrong, but Control 1 would -- is supposed to

document any times, you know, someone from CCC goes onto any of the dorms, like including Dorm E or Dorm F; but Control 3 would -- would specifically document if someone came onto E or F, but wouldn't necessarily document if someone came onto A or B; is that right?

A. Control 1 is different. Unless they are called with it or called -- like the control room calls -- let's say, Control 3 calls Control 1, says, hey, you know, such and such went into this dorm to make rounds or count, then she will name off who went in there, what time they went in there.

As far as making rounds, unless -- if I'm not mistaken, unless it's like a group deal to where we call it out, then she necessarily might not write it down because she wasn't called and advised of it.

Q. Okay.

A. It's -- it's like how can I make a report of or make an arrest of somebody I didn't see doing this and I have no proof of it.

Q. Uh-huh (affirmatively). Okay. So is the policy -- well, not the -- is the practice, is it supposed to be that every time

someone comes in or out of any of the dorms, the -- the control officer of that dorm is supposed to call Control 1?

A. As far as the practices as they are supposed to log everything down in Control 3, yes. As far as Control 1, like I said, it just depends on the situation. Like Control 3 doesn't have to call Control 1 up, hey, such and such pulling water coolers and laundry out or someone's making rounds. Like that's for their dorm specifically, unless it's like a group round count, then if it's everybody and we call it, then it's Control 1 and whatever control room we are going into or dorm we are going into.

Q. Okay.

A. So --

Q. Is there any place where it's written down like when it is that the person in Control 3 is supposed to call Control 1 versus, you know, like what Control 3 can just log down in their logbook and they don't have to call Control 1?

A. I don't recall, as in I don't remember if there is one. As far as I know, there should be. Like I said, I don't remember.

I know most of it is kind of training-on-hand purposes, like they know what's important to call and what's not important to call. Like any type of movement is important, any kind of medical, code three or code three or code three medical is important. Chow is important, if they don't hear us.

Like, let's say, we are feeding on the island or Dorms I, J and Control 1 doesn't hear us, then they'll have to call and relay that. Any time there's kind of a situation of like illegal, you know, fighting or contraband, if we -- if they can't reach us on the radio, then they will call Control 1 because Control 1 has a higher -- higher-powered radio that will pretty much reach anywhere you need it. It can actually go down to the sheriff's office.

Q. Okay. All right. And moving in to I think the -- the last one of these things I want to ask you about is just the unusual occurrences. What -- what all is included in that?

A. As far as I'm going to go with my best guess of unusual occurrences, I'm going to go with someone calling in sick, so and so called

and reported someone having a cell phone, go along those natures. Like something that don't normally happen as far as on the compound, or I'm going to say with a package that's thrown over, so and so found such and such package in so and so yard.

Q. What about fights or assaults?

A. Definitely.

Q. Okay. Let's see. Overdoses, does that --

A. Any -- any type of -- that actually makes sense now because I was sitting here reading it. Any type of code threes, code three medicals, anything like that; overdoses, fights, stabbings, anything is supposed to be called and logged code three, fight, which nine times out of ten, they are going to put fight instead of stabbing.

Q. So if --

A. And they will call us back there and we will come running.

Q. Okay. So you say "called" and "logged." So is that logged in the --

A. The --

Q. -- Control 1 or both the Control 1

and, you know, if it happened in Control 3?
A. It should work -- it should be on both actually. When, let's say, Control 3 sees a fight going on in F-Dorm, she's to immediately call over the radio code three -- code three fight, F-Dorm, to have all -- all officers available to respond as quickly as possible; and then she is to contact Control 1 or he or she is to contact Control 1 to verify that she heard it and then Control 1 is to log it in her book.
Q. Got it. Okay. Just do you recall who the control center officers were in 2022?
A. From the ones that I know that have been called, the only one I can think of would be Alondra Sanchez, which is Control 1 operator. Because the three other names, Lieutenant Joseph Prince; Sergeant Guthrie -- I can't never remember his first name -- and Alondra Sanchez all worked on the same shift.
Q. Okay.
A. But as far as anybody else, it's -- I cannot recall.
Q. Okay. All right. So you -- when you were talking about your sergeants' responsibilities earlier -- well, and when we say

responsibilities, you did mention the logbooks. Walk me through like was anyone checking to make sure that the logbooks were being accurately maintained?

A. Really, our biggest thing is making sure that their counts are straight, like any type of movement is logged down. Normally, it's supposed to be, you know, oversight and overseeing of the logbooks to make sure everything is written down. I know there's a lot of times that stuff may not get written down just because of the situation that's going on at hand, but normally they are pretty good about getting everything wrote down.

I know when it comes to situations as fights, everything going on, myself or the lieutenants, the sergeants, we are all trying to scatter to make sure everything's code four, which means everything is good, doing an investigation, making sure everybody's gotten out, any medical attention is seen, taken down and seen or evaluated. If not, try to get everything that they can to call medical to advise them, hey, this is what we have got going on.

Q. Okay. So --
A. I want to say --
Q. -- would there be a time in the shift when you would go and -- and, you know, check through a logbook and initial or do anything like that just to sort of make sure that things were being filled out?
A. Essentially after every count, we try to just to make sure, try to keep up with everything. It's not always that chance we get to because we have got so much stuff going on.
It's -- I've -- I've been there for two years and I know there's been numerous of policy changes of this or that, and I just know it's -- it's hard to keep up with everything, so I'm trying to do everything I can remember. I want to say yes, but I'm not a hundred percent certain that everything is to make sure. I know counts is a very big -- counts and movement is a very big thing.
Q. Uh-huh (affirmatively), yeah. Well, and -- and just to clarify, what I'm asking about is like what you recall doing in your two years. So, you know, the -- the details of the policies may -- may be changing, but -- but what you --

A. Right.
Q. -- recall doing is really all I'm asking about.
A. Right.
Q. So, you know, you're -- you're answering that, so that's good.
Okay. So -- so going back to the -- as I say that, going back to this policy, it says, "Other entries as directed." Do you recall -- now, again, like I'm not asking about what the policy says. I'm just asking about like what you recall doing as, you know, part of the day-to-day practice.
Do you recall were there any sorts of things that you can ever remember, you yourself or -- or another sergeant or lieutenant, directing a control officer to include?
A. The only thing I can think of is -- and "other entries as directed," it could possibly be delivery trucks as far as food for the kitchen, IWF. I know a lot of times I think it's -- I want to say it's chloroform, but I don't think it's chloroform. It's a company that distributes detergent --
Q. Oh, right.

A. -- for our washers, and nine times out of ten, they are carrying detergent, so we will have them pull in the backside of the port to unload. Basically, I think it's any traffic inside -- in and out of either the kitchen sallyport or back sallyport --

Q. Okay.

A. -- as far as transportation drivers, any contractors.

Q. Got it. That's helpful. Yeah. I got you. And then down here (indicated), it -- it talks about at the end of each shift, the shift supervisor on duty will prepare a written summary of the shift activities. Do you recall doing that?

A. If everything, which was very rare, went smoothly to where we had no kind of disturbance, no unusual occurrence, we were not obligated to write a shift packet or a shift summary; and normally, that would let them know hey nothing went wrong last night.

Now, as far as if something did go happen -- did go wrong in the non-perfect world, we would have all the reports that went with it, summaries of what happened during the night.

Q. And was there like a specific form that was used for that shift summary --
A. If --
Q. -- or was it just sort of written?
A. If it was -- sorry.
Q. No. That's okay.
A. If it was, it would be on an unusual occurrence report, typically the same thing we write on all the time. Normally, I don't see it on just a blank piece of paper, but, you know, everybody does things differently.
Q. And would that shift summary, that -- that unusual occurrence report, would that be completed by hand or would that be written up on a computer?
A. Written up on a computer and signed by the lieutenant with signature --
Q. Okay. Was the --
A. -- at the bottom and then signed right above it just stating, hey, I signed and completed this.
Q. Okay. All right. And the lieutenant was usually the person who was responsible for doing the shift summary?
A. Yes, ma'am.

Q. Okay. I got you. All right.
A. Sometimes it could be both, sergeant and lieutenant.
Q. Okay. And when it's written on the computer, what -- where is the computer where that -- that's usually completed?
A. Lieutenant is normally Control 1. If they are on a -- let's say, a report, something was to happen, normally we go to booking and try to do our reports on it, if we are a sergeant trying to get our reports done at the same time.
Q. And would like a draft or a version of those shift summaries be saved on the computer or would you just print it out and not worry about saving it?
A. Well, I can't speak for everybody else, but nine -- 99.9 percent of the time, I saved mine and made a copy. Unfortunately, once I left, all mine got deleted off the computer, so I have nothing from back then to go look.
Q. Do you -- do you know why it was that all yours got deleted off the computer?
A. No longer up there.
Q. Okay.

A. And that was the same shift that another lieutenant took over; and apparently I just had too much stuff in there, so they had deleted it since I was no longer up there.

Q. Got it. And then that shift report or shift summary, would that be given to the chief of security the same way the shift packet or as part of the shift packet, you know, put into the -- the cubby?

A. Yes.

Q. Okay. And do you know how the chief of security would transit that packet or that shift summary to the warden?

A. The only thing I could think of is a meeting. I -- I honestly don't know.

Q. And those summaries were being prepared in 2022, to the best of your recollection, correct?

A. Yes.

Q. Okay.

A. I do know that since 2021 until '23, actually here recently, they still have basically the same system of that shift packet.

Q. Okay. All right. Finally, move off of that one. So I want to shift gears to talking

about intake and classification. Okay. Are you doing okay? Do you need a break?
A. I'm good for right now.
Q. Okay. Great. So can you just walk me through what happens when someone comes into CCC from another -- and "someone," I'm -- I'm talking about a prisoner or detainee comes into CCC from another facility.
A. From another facility, nine times out of ten, if it's not a last minute thing, booking will already have majority of their information in to where normally all we have to do is take pictures.
There are some cases where we have to go through and enter information into the system, if we have to get emergency contacts, ask them if they are allergic to any drugs or food allergies or any kind of allergies --
Q. Who's --
A. -- things of that nature.
Q. I'm sorry.
A. Go ahead.
Q. Go ahead.
A. I was saying stuff of that nature. I mean, it's -- normally, nine times out of ten,

it's already completed. All we got to go in and put in there is emergency contact, allergies and picture.

MS. CUMMING:

Okay. So I'll show you an example. This is going to be Exhibit 5.

(Exhibit 5 marked and viewed.)

BY MS. CUMMING:

Q. So just taking Mr. Young's as an example. So have you seen a document like this before?

A. More than I want to recall.

Q. Okay. All right. So this is -- tell me if I'm wrong, but this is a booking sheet; is that correct?

A. I'm pretty -- I want to say yes. That would -- yes, because I see Margie Price, and yes.

Q. Okay. Who's Margie Price?

A. At the time, she was Lieutenant Margie Price. She was head of booking --

Q. Okay.

A. -- booking and releasing.

Q. And do you know what all she was responsible for as the head of booking?

A. I know for sure booking all the new intakes in, making sure that if we had releases, the paperwork was ready, the property was ready for when they were released, and keeping up with facility count --

Q. Okay.

A. -- like stating who left the facility, what date, what time, where they went.

Q. All right. And so the information that you were talking about that a lot of this sort of being -- would already be filled in for a transfer, so that's the stuff like the address and date of birth, all of that stuff?

A. That would -- I'm looking. Most -- more than likely, yes. Like your booking date, what time you was booked in, your arrest time, normally, it would be the arresting agency. The cell assignment.

Q. So the cell assignment, do you -- do you know -- that says D38. What -- what does that mean?

A. That's delta dorm, 38.

Q. Okay. And 38 refers to?

A. Bunk No. 38.

Q. Okay. All right. And so D is a --

it's an open flat, not a cell tier; is that right?

A. It's a big open dorm with, if I'm not mistaken, that would be 106 bed dorm.

Q. Okay. All right. And then it says, class, M-E-D. Do you know what this means?

A. I'm going to go with it's a classification of -- normally, it's either max, medium or minimal, if I'm not mistaken.

Q. Do you know how this determination of -- of medium -- I -- I read it the same way, so I read that as medium. Do you know how that determination of medium is -- is made?

A. I do not.

Q. Okay. Do you know who's responsible for making that determination?

A. To be honest, I do not.

Q. What is your understanding of classification as a concept in corrections?

A. My thoughts on it would be maximum, pretty much life. If you got life, you are a maximum. Medium, possibly a couple of assault charges, depending on your rap sheet or your criminal history; and minimum, I would say you're very, very low crime rate people.

Q. What's the -- what's the importance or -- or why bother with classification in corrections?

A. So you -- I mean, I -- if I had to take a guess, it would be to keep maximum away from medium or minimum or medium away from minimum and maximum; and same thing with minimum, keep them away from medium and maximum.

Q. And why is that? Why would that be important?

A. Due to the fact of you get nonviolent people versus -- around violent people.

Q. So you want to keep nonviolent people away from violent people is the -- the main thing; is that right, in your understanding?

A. Yes, ma'am.

MS. CUMMING:

Okay. So I want to go to Exhibit 6, yet another policy, but hopefully we won't spend quite so long on this one.

(Exhibit 6 marked and viewed.)

BY MS. CUMMING:

Q. All right. So this is Policy II-A-012 and it's called Classification System.

There's also a reference to BJG II-A-012, which I'll -- I'll ask you some questions about that in a second.

But have you seen -- I'll just scroll through. It's one page. I know this one is dated June 2023, but I'm just going to ask you about the format. Does this look familiar to you?

A. Offhand, does not look familiar, but I'm trying to scan through it to see if I see any.

Q. Sure. And take -- take your time if you want to read through it and tell me when to scroll down if you want to read it.

A. I made it to four, but I -- I can't recall seeing anything like this.

Q. This is not -- it's not ringing any bells for you?

A. I don't -- I don't recall. Like I don't -- I don't know if I've seen this or not before.

Q. Okay.

A. I may have; I may not have. I'm not -- I can't remember.

Q. Okay. Yeah. No. That's -- that's

fine. I'll -- I'll just ask. Do you recall seeing any policy on classification back in like 2022; do you have any recollection of that?

A. I see a little something in here --

Q. Okay.

A. -- but, you know, behavior -- no. You're good. I can remember -- about the behavioral or kind of any mental status and stuff like that.

Now, if we have something like that come in, we know, hey, he's seriously got something wrong with him, let's not put him in a dorm, we will put him in a cell by hisself, or any kind of like somebody comes in talking suicidal thoughts, then we will have to put him in a suicidal cell, follow suicide protocol.

But as far as us determining whether he's medium, maximum, minimum, I -- I couldn't tell you who's -- who's over that, how to do that because it's they come in, they are medium. That's -- unless they get brought in and they are maximum, then when we are notified that they are maximum, okay, well, then he goes back to maximum security.

Q. Okay. So -- and when you say "goes

back to maximum security," you are talking about that area that's sort of on the -- sort of the far side of the building, like near where Dorm G is; is that right?

A. Yes, ma'am.

Q. Okay. There was a reference to classification specialist. Do you know who that person is or was?

A. I could not tell you. I -- I don't know.

Q. Okay. Do you recall -- well, I'm going back to 2021 and 2022. Do you recall was there anything like a -- some places call it like a housing matrix, other places call it a housing plan. You know, like different places call it different things, but where they say only certain types of prisoners can go into these dorms. Do you recall was there ever anything like that at CCC?

A. Back when I did started in 2021, 2022, there was a bunch of gang rivalry going on with EBR and Calcasieu.

Q. Okay. So what -- what were you-all doing about -- about that?

A. Not mixing the two.

Q. Okay. All right. I figured, but I wanted you to be the one to say it. All right. So --

A. Is that another whew moment?

Q. Right. So you knew that people from -- now, was it -- how -- how were you going about the not mixing? How were you -- can you walk me through sort of like what the -- what the practice was?

A. Like we had multiple dorms that had EBR, we had multiple dorms that had Calcasieu. I believe during the time we had the dorm that had Terrebonne in it. We had a dorm with locals. It was just trying to make sure they went into dorms where they were, you know, closer to home.

Like Calcasieu, okay, well, you got Calcasieu people in here and not going to EBR dorm. There's been many of times to where a lot of people say they can't go in Calcasieu and they are from Calcasieu. I say, well, I can't put you in an EBR dorm. Oh, I can go in an EBR dorm, I know several people over here. And if that's what they say, you can't tell them no, we are not going to put them in there because we don't know if they are lying, telling the truth. Normally,

we try to keep them apart, but it's one of the nine times out of ten they don't want to go to a cell.

Q. Okay. So it sounded like there was a period of time in 2021 when it was like a -- almost like a geographic classification system that there was an EBR dorm, a Calcasieu dorm, a Terrebonne dorm, a Catahoula dorm; is that -- is that right?

A. Pretty much.

Q. Okay. But that there were times when someone was going to go into a Calcasieu dorm, they were from Calcasieu and they said -- I mean, did they say specifically I have -- I have enemies in there or there are specific people I know who are going to hurt me, or they just say I -- I don't feel safe around those Calcasieu people?

A. I've heard all three of those I don't know how many times.

Q. Okay. All right.

A. It -- a majority of them like to say I just can't live in there just because they don't want to go in that dorm. Now, they never really tell us the reason, but we try to do what

we can do to, how can I say it, make it more comfortable for them. And a lot of times, they don't want to go into a cell and wait until the next morning and wait until a captain or major gets there and they can talk to them and see -- see where they can put them.

Q. Okay. So -- well, let me back up. So the -- the times when -- your example -- the Calcasieu person doesn't want to go in the Calcasieu dorm and they say you can put me on the EBR dorm, was there any like paperwork, like a voluntary statement or a waiver or anything like that that -- that they would fill out that you can recall?

A. Not that I remember.

Q. Okay. And would there -- well, and let me ask this: The -- the dorm assignment, so someone comes in -- and again, I'm talking about this 2021 time period. Someone comes in. Who would be the person who says, okay, you're from Calcasieu, I'm going to assign you to this dorm. Do you know who was responsible for that?

A. I don't recall exactly who was over the assignments. I don't know if it was captain, major, booking. I -- I don't know.

Q. Okay.
A. That was above my pay grade. All we got was a list with the dorm locations on it beside their names and where they are put is where they go.
Q. Okay. Would -- that dorm location list, do you know how that was generated?
A. I have no idea.
Q. Okay. Was it like a --
A. They don't --
Q. -- computer software?
A. Yes. They have a list of all the names on it with the dorms wrote out by the side.
Q. Got it. Okay. So that might have come from the -- the PTS?
A. It normally, if I'm not mistaken, comes through e-mail, a list of everybody who's coming or they get just a list of names and date of births and they will go in there and I guess manually create one.
Q. And you say "they." Who -- who is "they"?
A. Whoever does it. I -- like I said, I don't know who does it.
Q. Okay. All right. All right. The

invisible hand.
A. Yes. We will go with that.
Q. All right. Okay. So you were talking about sort of a -- it sounds like a kind of a geographic classification system in 2021. Do you know how long that lasted? Did that last into 2022?
A. I know it lasted into 2022. I don't recall when it kind of -- like I don't even know now if it's come to a complete stop or when it changed. That, I couldn't tell you.
Q. Okay. All right. And do you recall, you know, D-Dorm was the Calcasieu dorm, C-Dorm was the -- was the EBR dorm; do you remember the specifics of that?
A. I don't recall.
Q. Okay. You talked about the captain or -- so if someone was -- was going to go into the Calcasieu dorm and -- and refused, you talked about they would have to wait for the captain or the major to come -- come in and decide where that person would go; is that right?
A. Well, they would have to wait until they come in and talk to them and explain to them why they can't go in the dorm or, you know, any

type of reason they couldn't go on the dorm.
If they didn't -- if they just didn't want to go on the dorm, that was strictly up to captain and majors to conversate with them about it. As far as where they assigned them, I have no idea. It's just one of those if they say they can't live in there or they say they can't go to another dorm, nine times out of ten, they get put in the cells until the next morning until one of them get there and then they can try to figure out something more suitable than a cell.
Q. Okay. Is there like a keep separate list or an enemies list that's maintained?
A. Not to my knowledge.
Q. And other than the kind of the geographic system you were talking about, is there any other check to -- to see if, you know, people can live on a dorm with each other?
A. Explain that to me again.
Q. So it sounds like there's sort of this geographic division. But I'm wondering if there's any other process when you're -- when you're putting together a dorm or when you are putting someone on a dorm, is there any other process that -- that was used at CCC to -- to see

if, you know, it was a group of people that would -- that would live together without killing each other?

A. As far as a list, not -- not to my knowledge.

Q. So primarily, it -- it sounds like - and tell me if I'm getting it wrong. It sounds like if you were putting someone on a dorm, it was their job to say I can't live on this dorm either because I have -- you know, generally, I can't live on this dorm or, you know, I can't live on this dorm because James Dean is on there and James Dean wants to kill me?

A. As far as -- like I said, as far as a list, I -- I've done a lot of intakes and I've never seen a list that gets shown to them who's in that dorm.

Q. So they --

A. So nine times out of ten, they will go -- they will get put into the dorm. If they don't say okay, well, I can't live in that dorm, even though they have never been in the dorm, they will go into the dorm and it could be anywhere from literally 30 seconds to 12 hours later and they finally realize, oh, so and so's

in this dorm, I can't live in this dorm.
Q. Okay. And so when that happens, what -- how does someone move?
A. They have to go up to the key and notify them that they need to check out.
Q. Okay.
A. And normally when they mean check out, basically stating they can't live in there and they need to get moved out as quick as possible.
Q. Okay. Now, when you say --
A. That's when we will come in --
Q. I'm sorry. Say again.
A. I was saying that that's when we will come in there, pull them into the interlock, talk to them, see what's going on and figure out what we can do for the time being, if they can live in another dorm, if they are okay with going to a cell until in the morning, then we will figure out what we can do to get them out of whatever danger they think they are in.
Q. Okay. And so when you say "the key," you're talking about that like control room?
A. Yeah. Yeah. I'm sorry. It's

the -- it's the -- what we call a flap. It basically allows them to come up, knock, they drop the key flap, you know, if they need ARP, a sick call, any kind of, you know, like kind of paperwork, they can give it and, you know, communicate with the control operator, be like hey, I can't live in here, I need to get moved out or we need water or, you know, just anything that they need or whatever, they will contact controls and then the controls will contact us.

Q. Okay. And so if -- if someone comes up to the flap, says I need to get out of here, I can't live on this dorm, does that get documented in -- where does that get documented?

A. I want to say that's just when they -- I want to say that's just when they moved him out of the dorm into another dorm or into a cell.

Q. Okay. Does that get written down in a logbook?

A. When they get moved, yes.

Q. Okay.

A. Now, as far as if they check out, I'm not certain. It has -- it's been a minute since I've actually gotten the detail on that.

But I cannot recall if -- so I know some people will go the extra mile and do it, some won't. So it's one of those I don't know if it's policy, I don't know if they do it, if they don't do it, so it's just depending on the person.

Q. Okay. So if someone comes up to the key, says I need to leave out of here, and I think you said that the control officer will radio for the lieutenant or the sergeant; is that right?

A. Just anybody available to at least come get him out of the dorm and put him in the interlock until me or the lieutenant or me or the sergeant gets there --

Q. Okay.

A. -- to figure out what's -- what's going on.

Q. Okay. And who is it that decides if someone is actually going to like leave off the tier or either go into a cell or go into another dorm?

A. At that point, it's -- it's a -- it's a 50/50, depending if we have got cells or not or depending if we have got room in that dorm or not. It depends on if they decide they want

to go to another cell or another dorm, if our cells are really full and we can't put them in a cell, we have to put them in a dorm. It's just scenario as it comes.

Q. Okay. So in the scenario of someone said I can't live on D-Dorm, they come to the flap, they are taken out into the interlock by an officer, the lieutenant or sergeant comes, is talking to the person, the person's saying I'm not going back on D-Dorm, your cells are full, what -- what happens?

A. Normally, we tell them what room we got in the dorms, what -- I guess how you put it -- geological classification to see who's where; and then between those two, if they decide to go to a cell, they go to a cell or they can attempt to try to do one of the dorms just because the fact they don't want to go into a cell, but if they try to go into that cell or into that dorm and can't live in there and I've got no more room, the only place I can put them is in a cell.

Q. Okay. All right. But if your cells are full, what happens?

A. It's one of those if the cells are

full and he can't live nowhere, I have to put him in a cell.

Q. Okay. So you --

A. So it's --

Q. -- you move someone else out of the cell?

A. We try to, if we can, which normally we will try to make a phone call, hey, can we move so and so and so and so out of this cell, we have got a problem with another one can't live. If it's very serious, we try to get it to where we can accommodate for them.

Sometimes it's -- I can literally vouch that times it gets tough to where you don't stop moving all night because you have stuff going on all night long, and it's kind of hard to stop and make the time to call and try to get a can I move these people.

What we try to do is we will make basically a summary report over it, a UOR on it to be like, hey, so and so checked out of such dorm, we tried to accommodate, put them in such and such dorm, he still couldn't live. Even though cells were packed and due to us having basically a high volume, which is a lot of things

going on, we had to stick him in the cell on the floor with his mat to get by until in the morning until we could figure out what was going on or what could be done.

Q. Okay. And when you say you "try to call, but sometimes you can't," but who -- who is it that you are supposed to try to call in those circumstances?

A. Whoever's on call.

Q. And --

A. It would -- it would be either a captain or a major.

Q. Got it. Okay. And it's the captain or the major that gives you permission to clear someone off of a cell to make room for someone else; is that right?

A. Yes.

Q. Okay.

A. The reason being is because we can't -- we can't go into a cell -- let's say -- let's say Lieutenant Prince, Joseph Prince locked up three people, he put them in them cells. I come on shift the next night after he did, I can't take those three people and move them out without the consent of someone higher than the

both of us, especially if we have a -- a bad situation that, hey, I need the cell, this is the only cell I can move or it gets to the point that where we are so busy we can't even make the phone call.

Q. Okay. But you don't have to -- tell me -- tell me if this is wrong. You don't have to call the captain or the major to move someone into another dorm; is that correct?

A. Correct. If they -- if they check PC or check out, then we are able to try to accommodate them from either going to -- either into another dorm or, if all else fails, go into another cell.

Q. Okay. So I know we have talked a little bit about count. Just sort of starting at the beginning of the shift, of a -- of a normal shift, is there a -- a list -- it sounds like there's a computer-generated list of people who are coming in and what their assignments are going to be. Is there a list of everybody who is in the facility and what dorm they are in that you get a -- like, you know, at the beginning of your shift?

A. Are you talking about like for

inmates or for --

Q. For inmates, yeah.

A. There's no actual kind of list. The only list we have when we do, which back then, we would do bed books every weekend, so that would determine who's in the facility, who's not in the facility.

Q. Okay. So every weekend on like a Saturday or a Sunday, you would do --

A. Normally, Friday night, Saturday night and Sunday night.

Q. You would do everybody who is in the facility and what dorm they are in; is that right?

A. Yes.

Q. Okay. But then during the week, there would be no current list of everybody in the facility and what dorm they are in; is that correct?

A. See, there's -- it's always in the computer, but there's so much movement, so much activities going on, so many in and out that it's basically to verify that, okay, we have got these people in this dorm, these people in this dorm, counts match up, counts match up, all that,

just -- just I guess a safety net.
Q. Okay. So the -- so the bed books are a safety net to check that what's in the computer is accurate; is that right?
A. Yes. And, if not, we get them moved.
Q. You get who moved?
A. Like get them moved from whatever dorm they are showing to be in but actually in and get them moved in the computer, because, like I said, it does get hectic up there. Sometimes it never happens to where you can get every little thing done. You might forget one person from moving him in a cell to a dorm, you know. I'm not going to say it's all a perfect world to where we can get everything down and go through and sugar coat it.
Q. Okay. So sometimes a movement won't get into the computer, into the PTS; is that right?
A. Normally, until it's about the weekend when everything's calm, cooled down and we actually have the time where we are not going out for court or doing all the extra things for the next day.

Q. Okay. So during the week, let's say it's a Wednesday, how -- how are you doing counts?
A. We are still doing counts, I know of as -- as soon as shift change comes on. Normally, it's one person from the dayshift, one person from the nightshift that goes in the same dorm, counts the same dorm, makes sure they get the same number.
Q. Okay. So you've got two people who are counting to make sure that they are getting the same number. I guess my question is if it's not just a question of like, you know, the right number of people, but the right people, John Doe, James Dean, Marilyn Manson are all supposed to be on Dorm C, what list -- like do you have a list that you're able to sort of check and make sure that like those people are where they are supposed to be?
A. Oh, okay. Yeah. There is a -- in the system, a place where you can go in and print everything by location stating their names, what dorm they are in and what bunk they are.
Now, there is a lot of times where they get moved all the time and switching dorms

or going to cells because they got disciplinary actions. And they will try to make sure all that's done, but you might miss one or two here that don't get moved in the system, but they are still at the facility.

Q. Okay. So I guess I'm -- I'm still trying to understand like when you are doing count, all you're doing is just counting and coming up with the -- the number of who -- who -- of people who are in Dorm C, for example; is that right?

A. Yes, ma'am.

Q. But you aren't necessarily looking at names to make sure that the right names are in Dorm C; is that correct?

A. When it comes to just regular counting, no. We just go -- we -- we count bodies. When it comes to rollcall, we will actually get all the IDs out, show some kind of proof of identification to prove that, hey, I'm this person, I'm in this rack.

Q. Okay. And how often do you do rollcall?

A. That was every weekend.

Q. Every weekend. Okay. I got it.

And that's when you would -- you would check and you would come up with your dorm census; is that right?

A. Yes. And then we will go into the computer. Control 1 is actually the one that's supposed to do it. Nine times out of the ten, it gets -- you have busy nights to where she can't get everything done, so normally I try to go in on the lieutenant's computer and help her fix everything to where by Monday morning everything's straight to where everybody's in their known bed locations and go from there.

Q. Okay. Got it. All right. Like if you've got people being moved around during a shift, that's supposed to get logged into the computer, it doesn't always until the weekend is the time that you-all take to make sure that all of the movements that happen throughout the week are being captured; is that right?

A. Yes, ma'am.

Q. Okay. And if someone is taken off the tier for medical transport, where does that get documented?

A. So let's go, for instance, delta dorm. They would stay in -- they would still be

on the count as far as, okay, I have a hundred people that's supposed to be in this dorm, but now I have 99 because I have one that's out for medical en route to the hospital. So they will be stuck as a sick out to hospital, both Control 2 and Control 1, until that person does return --

Q. Okay.

A. -- or doesn't return and goes to a different facility, taken off our hands.

Q. Okay. Is there any other log where just medical transports are being documented?

A. Not that I'm aware of. Anything that goes in and out per transportation, whether it's medical, courts, things -- transportation to where they are leaving or coming is all done by our transportation.

Q. So that's --

A. So normally is done by Control 1.

Q. Control 1. Okay. So does Control 1 have a separate transport log or everything is in that one main logbook?

A. Everything is in that one main logbook and you also have -- if I'm not mistaken, it should be like control two, one time out of

delta for booking or hospital or one sick out to the hospital, such and such name, one sick out.

Q. Got it. Okay.

THE WITNESS:

Is there any way we could possibly take a restroom break?

MS. CUMMING:

Sure. Yep.

(A short recess was taken.)

MS. CUMMING:

We are back on at 2:19 p.m.

BY MS. CUMMING:

Q. So -- and I just also wanted to just close the loop on something. When someone is moved off of a dorm because they say they can't live on it for whatever reason, the -- and they are moved either onto a cell or onto another dorm, is -- is there anybody from classification who gets notified about that that you can -- that you know about or recall?

A. Not that I'm aware of.

Q. Okay. And you were not sure like if there was a classification officer who that classification officer would be; is that right?

A. That's correct.

Q. Okay. Okay. I wanted to just go back a little bit to the Basic Jail Guidelines that were referenced up at the top of the policy. Just in general, have you heard of the Basic Jail Guidelines?

A. I'm pretty sure they come in the packet, our new hire packet.

Q. Okay. And do you know what they are?

A. Not off the top of my head, I don't.

Q. Okay. Just sort of like, you know, what they are for, what the point of them is?

A. Maintaining security -- you done hit me with a tough one.

Q. And if you don't know, that's also fine. That's a -- that's a fine answer.

A. Maintaining security, maintaining safety for the inmates. I mean, right now that's all I can think of.

MS. CUMMING:

Okay. I want to show you I think what's going to be Exhibit 7.

(Exhibit 7 marked and viewed.)

BY MS. CUMMING:

Q. So -- and I can show you sort of the

cover page of this, if that's helpful, but just sort of looking at this one page, 20, it says Classification System Revised and then it's got -- it lists some departmental regulations. Have you seen this before?

A. If -- if I have, I don't recall.

Q. Okay. I want to go up to page -- the cover page of this. This is the -- I'll just tell you this is the basically jail guidelines. Do you recall seeing this cover page before?

A. Is that -- does that have rules and regulations in it?

Q. Yeah. I can sort of scroll through. There's this forward, and then this table of contents. If there's something that catches your eye that you want to read, tell me to stop and I'm happy to stop.

And then this is sort of a listing all of the various, yeah, regulations I think; then intro and then here (indicated) we get into the specific guidelines themselves. Any of this ringing a bell? Does any of this look familiar to you?

A. I'm not recalling, but --

Q. Okay. That's fine. It's -- if it's

not, then that's fine. All right. So we were talking about people going into the cells and lockdown. What -- what does lockdown mean?
A. You have your protective custody, which we call PCs, people that aren't able to live in any of the dorms. You have your what I -- I call mental patients. They can't be put in the dorm due to their mental status. You have disciplinary, you have max.
Well, before they had gotten juveniles, I believe we had one or two juveniles that come in, but only sergeants and lieutenants could enter the cell, and I believe they were in actually I believe the suicide cells have cameras on them, suicide cells or suicidal inmates.
Q. Uh-huh (affirmatively).
A. That's all that I can remember.
Q. Okay.
A. I think that's a majority of them, like the reason why they are in a cell.
Q. Okay. Got it. And for -- okay. And for people who are in the cells on lockdown, do they have restrictions in commissary, phone time, access to television, anything like that?
A. No access to television, unless they

get with the captain or major and notify us about it. There's no phones in the cells. Disciplinary I believe is the only one that gets commissary taken away after they go to the -- the disciplinary board. As far as anybody else, not that I'm aware of.
Q. Okay. So --
A. Or any kind of rap sheets.
Q. Okay. So the primary distinction between people who are on PC and people who are on disciplinary are -- is that people who are on disciplinary don't have access to commissary, people who are on PC do; is that right?
A. Yes.
Q. Okay. All right.
A. Unless there's some kind of other stipulations for major or captains that we are not aware of.
Q. Okay. What about yard time, did people in the cells get access to the yard?
A. No. The only people that got access to the yard is now -- was max and now juveniles, because we no longer have an actual -- max is now the -- still considered max, like we just call it max because that's what we have known it as for

the longest, but now it's shared with juveniles and they do get yard time.

Q. Okay. All right. But the people who are in the cells on the hallway, they don't get yard time, correct?

A. No.

Q. All right.

A. No.

Q. What about shower time, how -- when is that done?

A. Anywhere between three or four days a week.

Q. Okay. And phone access, does anybody in the cells get access to a phone?

A. Not inside the cells. Like I said, that was one of those if we get a call from -- or either a call or in-person from captain or major stating, hey, I need you to pull this one out to make a phone call, that's when we would be able to pull out and make phone calls.

Q. Okay. So there's not like a regular phone call access. The captain or the major has to say like, you know, so and so gets a phone call today?

A. Yes, ma'am.

Q. And that's included for people who are on PC or people who -- who are in because of mental illness; is that correct?
A. Yes, ma'am.
Q. Okay. Who is the -- so when someone is placed on lockdown or placed in the cell, does anybody have to be notified of that?
A. If it's a suicidal person, medical, an on-call person has to know anything major, a major incident like a stabbing, aggravated fight, which is two or more jumping on one person. I -- I can't speak for everybody else. Normally call and at least notify them, hey, I had three or four people jump on one. I've got all three, talked to medical, he's clear to await until in the morning for them to further evaluate him because he's not in any type of distress to go out tonight; but normally it's anything major.
Q. Okay. So is there a chief of operations or chief deputy that you are of?
A. There would be a chief of security, which is the major.
Q. Got it. Okay. And who -- who was that in 2022?
A. I want to say it was Major

Dennis Wascom.
Q. Okay.
A. We did have another major when I started, but I do not recall his name.
Q. Okay. That was going to be my next question in 2021, but -- but you can't recall, correct?
A. Yes, ma'am.
MS. CUMMING:
Okay. I want to show you what I think is going to be Exhibit 7.
THE REPORTER:
Eight.
MS. CUMMING:
Exhibit 8.
(Exhibit 8 marked and viewed.)
BY MS. CUMMING:
Q. Okay. So I can show you sort of the first page of this, but I figured I'd -- I'd start with the part I'm interested in to see if this looks familiar to you. And I'll just represent to you, it's the CPSO Policy and Procedure Manual.
A. It looks very familiar. If I'm not mistaken, that was in our new hire packet, if I'm

not mistaken.
Q. Okay. And so when you were hired on at CCC, you saw this; is that correct?
A. If -- if I'm not mistaken, yes, ma'am.
Q. And it says -- it also has a reference to the CPSO jail manual, so that's distinct from -- from this policy and procedure manual, correct?
A. I mean, that's pretty spot on to up at the prison --
Q. Okay.
A. -- the jail. I can't recall if it has the jail in there or if it has the prison, but it looks familiar.
Q. Okay. So -- and that's a -- that's a good distinction. So there's a -- there's a jail and there's a prison, correct?
A. Yes, ma'am.
Q. All right. CCC is the prison; is that correct?
A. Yes, ma'am.
Q. So -- and the distinction -- I'm going to pause at this and tell me if I'm wrong. The distinction is the prison holds primarily

people who have been sentenced; is that correct?
A. No.
Q. Okay.
A. The jail really holds -- now holds trustees and there's occasion of someone that can't go up to the prison until they can find the -- the housing for them. The prison holds -- ever since COVID, they quit holding, what can I say, new -- new arrestees. They now transport them to the hill and they are held up at the hill.
Q. The hill?
A. That -- I'm sorry. The prison.
Q. For a minute --
A. That's the terminology around here. The hill is the prison.
Q. Okay. Got it. All right. No. That's good to know because I -- I'm -- I'm sure I will hear that term again.
Okay. All right. So there's the jail, that holds trustees. The jail used to hold new arrestees, it does not any longer, that those people now go up to --
A. Not -- not that I'm aware of, but that's what I've heard, that since COVID

happened, they quit holding people down there and started taking them up to the prison.

Q. Okay. So the prison holds new arrestees from Catahoula?

A. Yes, ma'am.

Q. Who else does it hold?

A. To be honest, I don't even know who they got contracts with now. Calcasieu, EBR, which I'm going off of I believe 2022. I think we had a few Livingston Parish. I think we had Terrebonne and Tangipahoa. I believe we had a few from Shreveport, Franklin, if I'm not mistaken. That's -- that's all I can think of at the moment.

Q. And those people from Calcasieu, EBR, Livingston, all these other parishes, were they -- were they people who were pretrial like waiting to be sentenced, or were they already sentenced or, you know, probation, parole violations?

A. We -- I can't tell you exactly who had probation and parole violations. I honestly want to -- I don't recall. I don't -- I don't remember if it was a mixture of both or if it was just ones that were already sentenced. I want to

say it was a mixture of both.

Q. Okay. So make sure both people who were pretrial waiting to be sentenced and people who -- who were already sentenced and serving their DPSC time?

A. Yes, ma'am.

Q. Okay. And so the CPSO jail manual, do you know if that's referring specifically to the jail where, you know, now the trustees are, but that different building that's not CCC?

A. I feel like it was in our packet, but I can't --

Q. You can't recall?

A. No, ma'am, I cannot.

Q. Okay. And it says, "The chief of operations, deputy or chief criminal deputy is notified when someone is placed on lockdown and dispositions made."

Do you -- do you know what's -- well, I guess all of this, like what -- when does -- when does the major get notified when someone's put on lockdown?

A. If it's a nonserious crime, normally, it's the first thing in the morning when they get there. If it's a very serious

crime, like aggravated fighting, stabbing, any type of bodily harm to where they possibly might be injured or having to go out to the hospital, that is when either the major or the captain will be notified, whoever is on call.

Q. Like immediately?

A. Yes. Like it says, the sergeant and lieutenant have the situation under control, they are out the dorms, that is when the lieutenant will call and notify.

Q. Okay.

A. Supposed to notify, let me say that. I notify. I don't know about everybody else. I can't speak for everybody else.

Q. Okay. And then the -- the disposition, do you know what's meant by that?

A. Basically the situation, I'm going to go with the situation and crime that took place and advising them that, hey, he was put in this cell under rule violation such and such, along with whoever else he was in -- in affiliation with to the crime, and especially if somebody is sent out.

Q. Okay. And the -- is there -- you had mentioned earlier the DB, disciplinary board,

correct?

A. Yes, ma'am.

Q. What -- what is that process?

A. I want to say it's kind of like a hearing. And then like DOC, if I'm not mistaken, it goes to high court. Basically determines their punishment for their actions, basically let them state what happened, try to see if their story is going to line up with what the video's showing.

Normally, if they are truthful, they try to, you know, cut them a little slack, not as much time; but if it's something serious, then they don't -- they try not to be as lenient. They just, hey, these are your actions, this is what's going to happen, two weeks commissary, a month commissary, a month in the hole, whatever they decide they want to do.

Q. Yeah. When you say "they," you're -- and you talked about DOC -- well, yeah. Who do you mean by "they"?

A. The captains and the majors. If it's -- if it's handled in-house or if it's taken to DOC, if it's pretrial, what -- who -- whatever the case may be, the captain and the major, if it

doesn't go to high court, will determine the -- I guess the punishment.

Q. When does something go to high court?

A. I know back then when it was something very serious -- I mean, I'm not really a part of the board. I've sat in there a couple of times with in-house. As far as the DOC or high court, I -- I really haven't been a part of that, so I couldn't tell you.

Q. I got you. Okay. Looking back up here at this -- the jail operations, it says, Operations Supervisor. "The inmates are the direct responsibility of the operations supervisor, the employees of the Catahoula Parish jail."

Is this -- is this referring to CCC or is this referring to the jail?

A. See, it says "jail," but I'm not a hundred percent certain if that's pertaining to us. If it's in the prison manual, new hire manual, I -- I can't recall exactly where I've seen it or where -- where it's in, what page it is. I -- I can't --

Q. Okay. All right. And then I just

want to ask this. Operations super -- it says, "Any incidents involving any inmate must immediately be reported to the operations supervisor who will file a report."
Do you -- do you know who this operations supervisor would be for CCC assuming this applies?
A. From the sounds of it, that sounds like the operations supervisor, which would be the actual supervisor on shift, which would be lieutenant.
Q. Okay. Lieutenant. All right.
A. If I'm not mistaken. I -- I don't know.
Q. Okay. All right. And the -- and the filing of the report, do you know if that would be verbally or in writing? How -- do you know how that was supposed to work?
A. That would be a report.
Q. In -- in writing?
A. It would be a UOR of the one layout on the computer.
Q. Got it. All right. All right. So when a UOR happens, when you're -- when you're completing that report -- and I know that you had

talked about the investigation would -- would include looking back at video -- was there any -- other than looking back at video, were -- were there any other steps taken to investigate, you know, what might have happened?

A. If there is, normally that's going to be the captain or the major. Normally, we just go by video. Anything I see in my investigation, I put in my report. Subject was hit with what was believed to be a makeshift weapon, has puncture wounds multiple times, you know, stuff like that. Subject had what was believed to be synthetic marijuana. I mean, just detailed everything I see or find.

Q. Okay. Okay. You have -- so the captain and the major would be the person that would kind of take further steps. Would the captain and the major ever, to your knowledge, talk to other prisoners who did detainees as witnesses about what happened?

A. Not to my knowledge, no. I -- I don't think so, but I'm not a hundred percent certain. I know anybody involved they will pull out and talk to, like if they got locked up or disciplinary board, got boarded out of the dorm

because the cells were so full. It just depends on the situation.

Q. Okay. But those -- those instances that you are talking about, that's primarily when -- there are people who appear to be involved based on --

A. Like it's as far as hitting them, kicking them, having any kind of not allegations, basically an accessory to the fact.

Q. Yeah. Okay. I got you.

A. Like meaning any type of involvement to the situation.

Q. Okay. I got you. And when you are doing an initial investigation, is there any kind of -- do you obtain physical evidence?

A. As far as?

Q. So if it's a stabbing, do you obtain any rags that might have been used to try and staunch the -- the flow of blood? Do you try and take photos of blood spatter? Do you try and secure the weapon?

A. Definitely try to secure the weapon. As far as pictures of blood splatter, to be honest, inmates are in there for a reason and they are going to try to cover up any tracks.

I've seen it so many times, tried to hide the situation. As far as being able to take pictures or anything, I do not have a camera and I'm definitely not the type to take photos on my phone and send them because then I could get subpoenaed for my phone.

Q. Uh-huh (affirmatively).

A. So there was --

Q. And there's no camera that the -- or that the facility provides to -- to take camera or -- or to take photos as part of an investigation?

A. If they do, the captain or the major would have them.

Q. Okay.

A. I'm trying to recall if they had anything like that or -- I don't recall. I think normally, it was just the basis off of the video footage is what they went with.

Q. Okay. Did -- did the captains, the majors or the lieutenants ever receive like a -- like a facility-issued or a sheriff-issued cell phone to use for work?

A. Not that I'm aware of. I mean, I was a lieutenant and never received a phone --

Q. Okay. All right.
A. -- so I wouldn't know.
Q. Okay. Going back to -- to physical evidence. If you were -- if you were able to secure the weapon, did you have training or instruction on how to maintain chain of custody?
A. Yes.
Q. Okay. Where did you receive that training?
A. Onsite from investigate -- I say the investigators. The major, the captains, Warden Stott. I mean, it was basically showing, hey, you received something, you put it in a bag, you mark it, the date, the time, where it was located, who you got it off of; if you didn't get it off of anybody, where did you find it; and then it would be turned into a safe inside of booking for them to recover.
Q. Where would you document all of that information about, you know, where you recovered it, circumstances like that?
A. On -- onto the bag.
Q. Okay.
A. It would be on the bag of chain of custody. Or I say the chain of custody, the

evidence bag where it has all the, I guess you would call it, blank spots to put in that information.

Q. Uh-huh (affirmatively).

A. And any type of like measurements or description of the weapon and where it was located and who it was located on would also be put in the report.

Q. All right. And that's that initial report that you do that you hand in to the major and the captains; is that right?

A. Yes, ma'am.

Q. Okay. All right. So I want to shift to shakedowns. Well, let me ask. What is a shakedown?

A. Well, what type of shakedowns are we talking about?

Q. All right. Let's break it down. What types are there?

A. There's a ground shakedown, there's a roof shakedown, there's mattress shakedowns, work release shakedowns. Basically, a shakedown is -- and, of course, also searching an inmate.

If we suspect something, either we do pat downs or strip search on the inmates, go

through their clothing, make sure they don't have anything contraband wise or any type of weapons, then we will send them to either up front with another officer to sit there with him out in the hall or away from the bunks after they have been searched, then we will shake their bunks, searching inside their mattress, their lockers for any kind of big old contraband weapons. And as far as contraband, I'm talking phones, drugs, stuff they're not supposed to have. Checking under lockers, checking anywhere there's a possibility might be hidden. My favorite one is the bunk shakedowns.

Work release shakedowns, there is a work release out in the back sallyport to when they go in -- they go in, they get strip searched to see if they have any contraband or weapons. We will also do random shakedowns on the buildings themselves to see if any drugs or anything's been hidden inside the work release building. Never actually done a roof shakedown, so I can't tell you anything on that one. That's --

Q. So is CCC, is that a tobacco free facility or is tobacco allowed there?

A. They had E-cigarettes when I was working there. After I had left, they did turn into nicotine cigarettes, I believe it's tobacco pouchs. I'm not sure if they are selling actual tobacco like snuff, but I know they sell cigarettes.

Q. Okay. All right. So cigarettes are -- are not -- at some facilities, they are like completely like tobacco free and so tobacco is contraband in other facilities. It's not -- so okay. But here it's possible to get tobacco through commissary, both cigarettes and smokeless --

A. Yes, ma'am.

Q. -- is that right?

A. Yes, ma'am.

Q. Okay. All right.

A. At the time in '22, it was not. It was a smoke free.

Q. Okay. Do you know when it changed?

A. Sometime between June of 2023 and I want to say around August of '24, somewhere between there.

Q. Okay.

A. I couldn't really tell you. I

wasn't there.

Q. Okay. Do you know why?

A. I couldn't tell you that either.

Q. Okay. All right.

A. I don't know.

Q. Okay. So thanks for that rundown of shakedowns. That all makes sense. So why are shakedowns done; why are they important?

A. To ensure the safety of other inmates, especially when it comes to drugs. There's been a lot of synthetic marijuana, a/k/a prison name mojo that is very, let's just say, not good. It makes them do really stupid things; passing out, making them turn purple, sending them into seizures, I mean, just all kinds of -- vomiting. It's -- so we try to get any kind of drugs, any kind of weapons, contraband.

I've got a -- a pretty good eye for activity like that. You know, not everybody is going to think, oh, he's playing with something on the ground that's leaving white marks. I see that. I see someone sharpening an object to make a possible weapon. I see a bunch of people gathered up around a bunk, I think it's either drugs or -- let's see, drugs or possible getting

ready for a fight. I think other people might see it, well, they are just hanging around a bunk.

I see a blanket hanging up on a bunk to where it's blocking two or three people or one person inside the bunk, well, most people say, oh, he might be sleeping or, oh, they are just doing whatever. The way I see it, possible cell phone, possible drugs, possible PREA. I mean, there's all kinds of different outcomes that you could have a person having ADD and ADHD. You think of everything.

Q. And PREA, just for the record, is Prison Rape Elimination Act. So when you say PREA, you are saying possible sexual assaults or rape, correct?

A. Yes, ma'am.

Q. Okay. Okay. So the shakedowns are important to try and get drugs and weapons. Cell phones, why is it important to get cell phones out?

A. Because that is a big communication to the outside world to get more drugs, more weapons, possible hits on officers. It's just -- it's bad. It's a -- it's a non-recorded line.

Anything is possible.
Q. The shakedowns that were happening at -- well, I'll get to that. Okay. The shakedowns that were happening at CCC, how often were they done?
A. Normally, they want us to try to get 20 to 25 a night. It also depended on how busy we were. Sometimes we weren't able to; sometimes we were able to shakedown a whole dorm. But that also depended on the manpower. If I had nine officers -- wait. Hold on. Five, six, seven, eight, nine. If I had about nine officers, it's more of a kind of touch and go situation. If I had more than ten officers, I had no problem doing shakedowns.
Q. And when you say 20 to 25 a night, you are talking about like the pat downs and the mattress shakedowns?
A. Mattress shakedowns.
Q. Okay.
A. Normally try to do five to a dorm.
Q. Okay. And was there -- how would you select which mattresses to -- to shakedown?
A. Just go at random. Sometimes if they had blankets or sheets hanging up, we would

go by that. We would go by the activity and the bunks. If there was a couple of people around the bunks, then we would shake down everybody around it and in between them bunks. It's just a pick up random. It's never like, oh, hey, we're going to hit this bunk, this bunk, this bunk. It's the same people over and over. It's always where the action or possible action might be.

Q. Okay. And how frequently were -- would you be able to do a whole dorm shakedown like in the course of a month setting?

A. I'd be able to do one every night. Not perfect world, I would probably be able to do it if I was lucky once a month. Because we had problems of officers calling in and being shorthanded, so we didn't get to do everything we needed to do at times.

Q. And then if -- if there was something that happened, so someone overdosed, there was a fight, something like that, would -- would there be a shakedown in response to that?

A. Depending if there was -- especially a weapon involved, I would definitely try to do an investigation, try to locate the weapon to see where it possibly might have went; and then if I

need the location, look for it, it's bad. I got about a 70/30 percent chance ratio. 70 percent I find it, 30 percent I don't find it, but it's one of those a report's done on it. If I don't recover it, it will be put in the report. A weapon was not recovered. Subject will stop in charlie dorm.

Q. The weapons that you're recovering, do you have sort of a rough number -- and -- and I understand it's an anecdote, but a -- like a rough percentage of how many world knives versus how many shanks you were finding?

A. I would definitely have to go with 98 percent shanks, 2 percent world knife. It was very, very rare you found a world knife.

Q. And the shanks, was there any process of examining the shank to try and identify what materials it was constructed out of?

A. That was one of my biggest things of trying to figure out where it come from. Most of the time, I knew but couldn't figure out where exactly it come from. Very detailed. I know a lot of people like to take the -- the tie wire on the fences and make that, what we call pokers out

of the shank, angle iron. I mean, it's just whatever they can get their hands on.

Q. Okay. Were there efforts to sort of harden the areas where you knew materials for shanks were likely coming from?

A. It was very hard to because working nights, normally the materials that they had normally come from outside.

Q. When you say "outside," help me out with that.

A. Like as far as on yard time.

Q. Okay. Did you report what you were finding in terms of the -- the source materials for shanks to a captain or a major or anybody?

A. Yes. And -- well, in my reports, I would explain exactly what it looks like. Never did I put in my reports identified as this coming from such and such material. It was always just the description of the weapon, and when they got it, they would understand okay, well, this looks like tie wire from the fence or this looks like a piece of strap off the gutter. So it was -- there wasn't nothing I couldn't figure out that they didn't figure out of, hey, this is this material.

Q. All right. So your understanding is, based on what you were putting in your reports, that the captains and the major who -- who were reviewing your report really could figure out what the -- what the sources of -- of what the weaponry would -- would likely be?

A. Right.

Q. Okay.

A. Right.

Q. All right. Do you know any of them, the captain or the major, did -- did they ever take any steps to try and harden the outside environment where, you know, that seemed to be a source of shank material.

A. Not that I'm aware of due to the fact of they was there for days, I was there for nights. I don't know what was done, what wasn't done. I don't know.

Q. Okay. And I -- we touched on this a little, but I just want to kind of run through. When you found something on a shakedown, drugs, weapons, cell phone, how would that be reported?

A. Well, it would be taken down to one of the -- the scan top printers and placed on the printer and scanned for -- on both sides and

turned in with the report.

Q. So the object itself would be scanned?

A. Yes, ma'am.

Q. Okay. And then you would write a report. That -- would that be on the same unusual occurrence report form?

A. It would be attached to the unusual occurrence.

Q. Okay. So the report about the --

A. Yes, ma'am.

Q. -- contraband specifically?

A. Yes. Well, the -- the involvement of the contraband to the report or if it was just contraband that I found while doing a shakedown.

Q. So yeah. Let's take that scenario. It's contraband -- you're -- you're doing your, you know, mattress shakedown a night just randomly selected. You find a cell phone and a shank and a baggy of drugs. It was really, really good that night, what -- and this is not in response to an incident, this is just part of your routine shakedown. How -- how does that get reported, like what form do you use?

A. Be the UOR form.

Q. Uh-huh (affirmatively).
A. And he would be charged with contraband as well. Basically, the same steps.
Q. Got it. Okay.
A. So I guess to answer your question from earlier, what type of camera would we use, I guess that would be our camera system would be using the scanner --
Q. Okay.
A. -- for drugs and weapons and phones as far as that fact; but as far as anything else, no.
Q. Okay. So you wouldn't take actual photos of what was recovered, you would scan it using that scanner?
A. Yes.
Q. Got it. Okay. Okay. And the item itself, what would you do with that?
A. Place it into an evidence bag. If not, it would be placed into the safe with information on it due to not having any bags would be the only time it would go into the safe without a bag.
Q. Okay.
A. But it would be signed, sealed,

delivered to the safe with all objects contained inside that was on the evidence bag and locked and secured until the major or captain recovered that said evidence, whether it was weapon, phone or drugs.

Q. Okay. So you said that the -- the expectation, the hope -- the hope was that you would do 20 to 25 mattress shakedowns or -- or pat downs in the shift, correct?

A. Yes, ma'am.

Q. All right. Who set that expectation?

A. To be honest, I don't know. I would presume either captain or major. I'm unsure.

Q. All right. How was it communicated to you?

A. I would have to go with either captain or major. I don't remember if there was a memo put out or not. I -- I can't remember.

Q. Who decides -- so -- so you're in the course of the evening. Who decides when it's time to do a shakedown?

A. Normally, it would be the lieutenant, depending on who's not busy, who's busy, how much stuff we have done, how much --

how much time we have before the next count after we finish something. It just depends.

Q. Do you recall whether there was a written policy or -- or procedure or, you know, SOP for shakedowns?

A. See, and that's my biggest thing is shakedowns, and I can't recall. I'm sure there was. I just can't recall it.

Q. Okay. Let's see. We are about to shift gears. Are you doing okay? You need a break?

A. That's up to you-all.

MS. CUMMING:

Shane?

MR. BRYANT:

I'm good.

MS. CUMMING:

All right.

THE WITNESS:

Some caffeine and some sleep would be great, you know --

MS. CUMMING:

Okay. All right.

THE WITNESS:

-- but I got this going on.

BY MS. CUMMING:
Q. We are actually in the homestretch, believe it or not, so -- so we will -- we will get you out of here and to bed.
We have -- we have been talking about fights on dorms. Have you -- have you had to respond to fights on -- on dorms at CCC?
A. Oh, yes, many; many, many, many, many.
Q. Okay. I was going to ask how frequently, but I think you've -- you've answered that. If you have an estimate of like, let's say, over a month period?
A. It's out of two to five days, I would put an average to maybe one per week.
Q. All right. So that's a fight that you -- you had to respond to as a -- as a lieutenant or as a sergeant. All right. And what about injuries, people -- people getting injured on -- on dorms, have you had to respond to -- to that?
A. I've had many injuries, many medicals.
Q. What kind?
A. The majority, stab wounds.

Q. In a -- let's say, a week, how many stab wounds are you responding to?
A. I'd probably have to go -- now, my -- my -- my week I consider is basically two weeks because I work the seven days.
Q. Uh-huh (affirmatively).
A. So it would be technically every two weeks, I would probably say once.
Q. Okay.
A. So it could be every other week.
Q. Okay.
A. I couldn't -- I can't recall because there's times it gets really heated. There's times that there's a big break, so I mean, I'd have to go off an average.
Q. Uh-huh (affirmatively).
A. I mean, that would be nice if I could just recall every time I responded to a stab wound or injury wound or --
Q. Second to stab -- stabbing, stab wounds, what's -- what's the other sort of the second most common injury that -- that you have to respond to?
A. Something broke. That's -- I mean, like a arm broke, a thumb broke, a dislocated

shoulder. I've had jaws dislocated and broke. I mean, it's just -- I ain't going to say I've seen it all, but I've seen a pretty good share.

Q. Have there been times when a particular dorm is prone to more fights?

A. I'd say normally around the holidays is pretty much the -- the main time because tensions are high.

Q. So that's like -- and you say that's like Thanksgiving and -- and end of December, first of year?

A. Any kind of major holiday that they don't get to spend with the family; Easter, fourth of July, Valentine's day is a big one. Thanksgiving's a big one. Christmas is a big one. New year's, it's one, but it's not a big one.

Q. Okay. So tensions are high during the holidays. Is there -- I'm thinking about like, I don't know, are there ever times when you've showed up to work and you're like, you know, if I was a -- if I was a betting man, I would put good money on the fact that I'm going to get called to D-Dorm because someone's going to -- someone's going to get hurt, something's

going to happen on D-Dorm because something seems to always be popping off on D-Dorm as an example?

A. We -- we had a few dorms like that that's normally the troublemakers, but it was always different ones at different times. So it was never just this specific dorm of nothing but mess-ups in there and completely messing up all the time, it was never that. It was everywhere.

Q. Okay. So there would just be certain times when like something was going on in a dorm and they were -- there would be tension and --

A. Yeah.

Q. Okay. Did you ever kind of look into what -- what might be causing some of the tensions that were making -- that were making the dorm kind of pop off more than -- more than the others at -- at any given time?

A. Any real like really big games, like Superbowl or like any kind of playoffs and above, tensions will get high. Any major holiday or any kind of, I'd say, favorite holiday of that person, they tend to get tensions really high. But the majority of them is not being able to spend time during the holidays with their family.

Some of them can push through it; some of them can't. So, I mean, it's just a variety of them. I couldn't tell you exactly which one's more worse than the other. I can't tell you that.

Q. Okay. Do you recall were there -- were there ever like particular individuals that, you know, again you -- you show up to work and you would be like, all right, my bet is I'm going to have to deal with James Dean today because James Dean always seems to be getting into trouble. Do you -- you know, were there people like that that sort of stick out to you?

A. There were some troublemakers, like you've got your big people in the dorms, but it was never, oh, okay, well, let's see if John Doe is -- he's been at it for three days now, let's see if he's got another day or if he's going to do something again. It was never that. It was you've got your powerful people in there, basically your big shots. And it just depended on people owed him money, they didn't get their drugs or they didn't get this or they didn't get that. It just depended on the dorm if who was getting mad and who wasn't.

Q. Uh-huh (affirmatively). Okay.

A. So I mean, it was --
Q. But you -- you knew, like you knew enough about who was on each dorm and -- and kind of like the dynamics of the dorm to know, okay, like this is a powerful person, you know, like you understood the power structures in the dorm to put it badly?
A. Yes, ma'am.
Q. Okay.
A. You know your -- your messengers, deliverers, doesn't mean -- it's a perspective of watching it for so long, you kind of get used to, okay, well, he's -- he's definitely a middleman, he's definitely a boss or he's definitely a holder, whether it's holding a phone, a shank or drugs. It just -- just one of them you'll have to I'd say you have to be in there and really understand how it works to understand I guess.
Q. Okay. Do you know were there ever times when you would sort of -- you could -- you could watch, like you knew what was going on in the -- in the -- on the dorm or on the tier. Were there ever times when you could identify okay, things are -- things are starting to get tense, we should maybe start moving people

around. Did you ever do that?
A. It wouldn't really be able to move people around. It was going there, try to defuse the situation, if we are called in time, try to figure out what's going on; if there's a problem with somebody, try to get them out. The majority of the time people say, oh, that's -- that's my blood, that's my cousin, we just having some beef right now. So it's one of those we try to do what we can without trying to, you know, just start pulling people out because they are getting tense. If that was the case, we would never have an empty cell, but we try to be lenient. We try to be -- I say "we." I try to be lenient. I try to be respectful and understanding of, you know, situations, and normally, nine times out of ten, they are pretty -- pretty good about not doing anything.
Q. Uh-huh (affirmatively).
A. If I go in and talk to them, like hey, you know, what we got going on, you know, you got something bad, come see me, I'll put you in the interlock for a little bit and let you cool down, whatever I can do to help the situation to defuse it.

Q. Okay. Yeah. That's helpful. So let's -- let's talk about Robert Young. Do you -- do you recall Mr. Young?
A. Name kind of sounds familiar. Other than that, not really.
MS. CUMMING:
Okay. So -- and I'm going to go to what will be Exhibit 9, which is I think called an activity sheet.
(Exhibit 9 marked and viewed.)
BY MS. CUMMING:
Q. So tell me if this sort of looks familiar to you, not necessarily specifically to Robert, but just, you know, the -- the form of it.
A. Yes, ma'am.
Q. That looks familiar. Okay. Do you know how this is produced?
A. That's -- so let's see. Okay. So if you scroll down --
Q. Uh-huh (affirmatively).
A. -- to the bottom of the page, whichever it stops at.
Q. Like the very bottom of the thing?
A. Yes.

Q. That's -- that's the end of the document.
A. Okay. So that right there at 4/19/2022 at 14:53, also known as 2:53, subject Robert Young was booked in. He was automatically placed into D-Dorm from what I'm showing.
Q. So that's -- you're seeing that from the D56?
A. Yes, ma'am.
Q. Okay. And 56 refers to the -- the bunk number, right?
A. Yes, ma'am. Looks like he was pulled out one, two, pulled out twice for nurse evaluation basically, I guess their intake or he had sick call, whatever the case may be, nurse pulled him out and he was taken down there. 5/21/2021, it looks like he transferred bunks from D56 to D34.
Q. Do you know why that would be, why someone would move bunks within the same dorm?
A. The majority of the time, bunks, majority of them is two bunk, majority of them is three bunk. It looks like he possibly may be on top. Somebody either moved or got released and he went to a bottom bunk would -- would be my

guess. Normally, that's how a lot of them do it. They don't like top -- top bunks, so they will get a bottom bunk when it comes open.

Q. All right. And then it looks like on --

A. One, two, three, four, 7/26, next four times he was taken out for medical.

Q. Okay. And so -- and I'm trying to make sense of this series. So July 1st, 2022, it looks like he's on D34; July 26th, 2022, it looks like he's on E46; and then August 3rd, 2022, it's D34, but then to E46. Do you have any account for that?

A. My guess is he was -- I have no sense of this. That -- that don't make sense at all --

Q. Okay.

A. -- because he's not transferred until after the fact on 7/26. He's showing E46. Well, how can he go from D34 to E46 without that transfer on 8/3/22?

Q. Okay.

A. That's what I'm trying to currently figure out. And it looks like he went to LSU Monroe. I wonder if that was --

Q. I'll help you out with that. The attack that we are talking about that's the subject of the lawsuit didn't happen until the 19th of August.
A. Okay. He must have had a visit, a doctor's appointment.
Q. Okay.
A. There's --
Q. And you can't tell from -- I'm sorry. Go ahead.
A. It looks like 7/1/22, he possibly went down to the jail for something. I'm not sure. All I know is I see jail DR.
Q. Okay.
A. If I'm not mistaken, all of those numbers to the right --
Q. Uh-huh (affirmatively).
A. -- like at the top of the screen, 02511 or 01190 --
Q. At the top?
A. -- a lot of them, if I'm not mistaken, is going to be a -- if I'm not mistaken, an ID number for the person that did it.
Q. The person that actually

transferred, so --
A. That made the transfer or pulled him out.
Q. Okay. Well, here, I can --
A. I'm not completely sure.
Q. So it does have an officer listed as one of the headings, so that --
A. Okay.
Q. -- so that would track.
A. I believe that would be -- yes.
Q. Okay. Did you have one of these ID numbers to -- to enter things into PTS?
A. As a matter of fact, I still do. I'm not sure what the number is.
Q. But this would be a way to possibly track who was entering things.
A. Yes.
Q. And do you -- I -- I think I know the answer to this, but I'll ask. Do you know why he was moved from D-Dorm to E-Dorm?
A. Unless he knew somebody that was already in echo, I could not tell you exactly why he was moved from delta to echo.
Q. And both of delta and echo are both open flats, open dorms, right, they are -- they

are not celled, correct?
A. Yes, ma'am.
Q. Okay. And E46, is that a bottom or a top bunk?
A. That, I couldn't tell you.
Q. Okay. Do you know would the reason for the move from D to E be documented anywhere?
A. It should be documented in the logbooks.
Q. Okay.
A. Should be.
Q. Okay. And so that would be the log -- logbook three?
A. For control -- all three actually.
Q. All?
A. Control 1, 2 and 3.
Q. Okay. Got it. And do you know was there any classification check done prior to moving Mr. Young into E-Dorm?
A. Not that I'm aware of.
Q. Do you know who maintains this activity sheet or who generally has the responsibility for that?
A. Sergeants -- well, some sergeants. I happen to be the one that was -- as sergeant

who had accessibility, but normally it's your lieutenants and above.

Q. Okay. So normally it was lieutenants and above, but some -- some sergeants?

A. Yes.

Q. Okay. And you happened to be a sergeant who had that accessibility or access?

A. Yes, ma'am.

Q. Okay.

A. Yes, ma'am.

Q. Got it. Okay. On August 8th, 2024 -- I'm sorry. I misspoke. It was not the 19th. It was the 8th that Mr. Young was attacked. Do you recall working that day?

A. Only thing I recall is that's six days after my birthday, so I'm not completely sure.

Q. Okay.

A. I don't recall working, but obviously, I was working if I'm here.

Q. Okay. And do you recall the attack on Mr. Young?

A. I do not recall any type of attack --

Q. Okay.
A. -- on Mr. Young.
MS. CUMMING:
I'm going to show you Exhibit 10, which is the a logbook page. This is two pages and I'll show you.
(Exhibit 10 marked and viewed.)
BY MS. CUMMING:
Q. Can you see it?
A. Yes, ma'am.
Q. So this is from Control 3, so that would be that control room that's on E and F; is that right?
A. Yes, ma'am.
Q. Okay.
A. Yes, ma'am.
Q. And 8/8/2022, D Team. So this is the evening shift, correct?
A. Yes, ma'am. That would be the opposite shift I was on.
Q. Okay. What I see is I got 8/8/2022, okay, E and G, and then we go from 2:34 to 18:03, D Team. Also on 8/8/2022, it's got Officer Sanchez, Sergeant Beason, Sergeant Guthrie. This -- you are Sergeant

Beason, correct?
A. Yes, ma'am.
Q. All right. And then Officer Sanchez, is that Alondra Sanchez that you had referenced earlier?
A. Yes, ma'am. Control 1 operator.
Q. Okay. And then Sergeant Guthrie, who is that?
A. This is -- that is D Team. I can't think at this time of his first name, but he was D Team's basically what we would call master sergeant. He's the -- the head sergeant over the sergeants.
Q. Okay. So it's --
A. Let's see. Control 3. Oh, I'm trying to --
Q. Yeah.
A. -- process in my head because it -- you said Control 3, but it says Officer Sanchez, so I'm trying to figure out who was working Control 1 if she was in 3.
Q. It could -- it could be two different pages, like I only -- like right now, I only have these two pages, so I'm not sure --
A. Oh, okay.

Q. -- what logbooks they are from. I'm -- I'm just showing you what I got, so --
A. Right.
Q. -- so I don't know. This could be -- this notes on -- were on page 2 of the exhibit at 21:22, Northeast Ambulance (sic) is 1081, 10:15, one time at Trinity hospital, Robert Young, and then it's got your name I believe. What does that entry mean?
A. Well, according to that, it's showing I rode with him.
Q. Okay. So you were in the ambulance with Mr. Young according to this logbook entry?
A. According to that logbook entry, I rode with Mr. Robert Young.
Q. Okay. All right. So I want to go back up to this is the first page of the exhibit at 20:11. It says, "Inmate Robert Young, ER notified Control 3 that he had been jumped approximately 30 minutes prior. Needs medical attention now." And then looks like medical is called, "E-Dorm notified."
A. We took him out.
Q. You took him out?
A. He was taken out of E-Dorm down to

medical to be evaluated.

Q. Great. That's super helpful. Okay. So just sort of looking at kind of the couple of hours prior, it looks like it says E-Dorm to chow and then at -- that's at 18:55 and at 19:09, it's returned and locked. What does that entry mean?

A. So 18:55 shows at 6:55 E-Dorm, left E-Dorm onto E-F hall going up towards A-B hall up to the chow hall to eat for chow. The reference 19:09, which would be in regular time 7:09, the last man returned from the chow hall into E-Dorm where E-Dorm was locked and secured.

Q. Okay. Are they -- are they going up to the -- the chow hall to pick up trays and bring them back, or are they eating in that time?

A. They didn't start the bag lunches until after I left, so they would be -- they would go up to the chow hall, grab the trays, sit down in the chow hall to eat and get up, dump their trays and then go back to the dorm.

Q. Okay. And then it looks like at 19:20, there is this "Observing E, F and G dorms. All appears secure." How would that observation of E-Dorm have taken place?

A. So observing E, F and G dorms, all

secure, what that's telling me is that the operator, Officer Sanchez, was observing the cameras for E, F and G and showed that all the -- all the -- which she can go from cameras and looking into the windows for E, F and G or E and F. G she cannot. She has to go off the video camera. So when she observed E, F and G, she either looked out the windows into E and F or looked on the cameras for E and F to observe E or F, but she had to observe the cameras for G-Dorm. So it could be she looked in the dorms or she looked on the cameras.

Q. Okay. Do you -- do you know was there anybody -- so this observation does not indicate that someone was on the dorm observing. This is observation that's happening from the control room; is that correct?

A. Yes, ma'am.

Q. All right. Do you -- do you know who it was that took Mr. Young from E-Dorm to medical?

A. I'm trying to look at that time, but apparently -- oh, no. That's late -- that looks like a late entry. I'm not sure. I do not.

Q. Do you know why it took roughly four

minutes to -- to move Mr. Young from E-Dorm where he's requesting medical attention and then up to medical?

A. Normally, I'm the one that runs pill call, so I'm not sure what time pill call ended. Pill call, 8:10, so that must have meant I was still running pill call, if I was running pill call that night. Normally, 8:00 o'clock is -- I say normally -- is count time, but I don't see a count time on there.

Q. Okay.

A. I don't know if it would be further down.

Q. Let's see. I can scroll down.

A. Chow complete. Begin count 21:39. Okay. So I to G from kitchen, two from E cell. So he didn't finish chow until 21:00, so that -- that's telling me that one from E-Dorm to medical, Robert, 20:15, when we didn't finish chow until 21:00 tells me we was in the middle of pill call and running chow and had to wait to lock and secure the door from chow before we was able to go down there and pull him out.

Q. Okay. Did anybody see this fight, this -- this attack that Mr. Young reports?

A. I cannot answer for anybody else. I know for me, obviously, I didn't. I mean, I don't even remember riding in the unit -- ambulance with him.
Q. Do you know who --
A. I don't know.
Q. Okay. Do you know who called for the ambulance?
A. So more than likely it was probably Lieutenant Prince because he was the lieutenant on shift would be my guess.
Q. Do you know how he would have called; would he have, you know, cell phone --
A. The ambulance?
Q. -- land line?
A. He would probably either call medical to verify because me and him were kind of the same. I learned from the best. Nine times out of ten, we would call the nurse via cell phone and advise what we had going on; and then if we was told to get an ambulance, we would then radio to Control 1 to get an ambulance in route.
Q. Okay. And then Control 1 would call the ambulance?
A. Yes, ma'am.

Q. Okay. All right. Was there an investigation done into this fight?
A. According to what that logbook shows, it shows that I left with Mr. Robert Young. I was not able to do an investigation that I'm aware of. I do not recall. So if I was the one that went with Mr. Robert Young, I therefore was then not there to do a report for anything on it, which means the report should have been done by either Sergeant Guthrie or Lieutenant Prince.
Q. Okay. Did -- do you recall did either of them ever contact you, you know, to ask about Mr. Young's status at the hospital as they were completing a report?
A. Not that I recall.
Q. Did -- do you know or do you recall did anybody speak to other prisoners or detainees as witnesses about this attack?
A. I do not know.
Q. Do you know or do you recall what, if any, effort was taken to identify the people involved in the altercation?
A. I do not know.
Q. I believe you testified earlier that

there were cameras on E-Dorm, correct?
A. From what I recall, yes, ma'am.
Q. Did you or do you know if anybody reviewed camera footage of E-Dorm to look at what may have happened in this attack?
A. I do not recall.
Q. Did a shakedown of either mattresses, individuals on E-Dorm or the dorm itself happen after this attack?
A. I don't know.
Q. If there was a shakedown, where would that be documented?
A. If there was a shakedown, it would be -- if the control operator logged it in the book; sometimes they do, sometimes they don't; but there should be a shakedown log of the beds that was hit put in with the -- I'm sorry. A log of the bunks that was shaken down with the numbers on it who was staying in the bunk, the inmate that was in the bunk of that bed that they shook down, and it should be attached to the shift packet for that day, should be.
Q. Okay. Okay.
MS. CUMMING:
Okay. I think that's all I have for

right now. I know we don't have a huge amount of time left, but what time there is left, I'm going to reserve to hold your deposition open because we are still getting some discovery responses left. So if necessary, we might do a very, very short, short follow-up, but I -- I think that's everything that I have. I'll tender you to the attorney for Smith and LeBlanc for any questions.

THE WITNESS:

Yes, ma'am.

CROSS-EXAMINATION BY MR. KROUSE:

Q. Hey, how are you doing today? Thank you for your patience. My name is A. J. Krouse. I just have a couple of questions for you.

MR. KROUSE:

First of all, I'd like to get a copy of all of the exhibits if you could send them to me, Ms. Court Reporter, separate from the transcript since we are going to the facility on Monday the 18th.

BY MR. KROUSE:

Q. Sir, as I understand it, you were not a witness to any attack on Mr. Young?

A. Not that I recall, sir.
Q. Okay. And you don't have any knowledge of any of the investigation that was done at the time; is that correct?
A. No, sir. I am -- no, sir, I am not. Showing from the logs, it looks like I did leave the facility with Mr. Young, so therefore, any investigations or reports, because understanding of what happened to Mr. Young, he was in there more than just that night, so I was there until at least 5:00, 6:00 o'clock in the morning. So any reports that was done, any investigation that was done that night was done before I was even able to return to the facility.
Q. Did you have -- do you have any independent recollection of his condition as you took him out that night?
A. I do not remember.
Q. Okay.
A. I -- I was telling her, I don't even remember going in the ambulance with him.
Q. Right. I -- I understand that testimony. And -- and you didn't keep any notes or writings of your experience with Mr. Young?
A. If -- if I would have done a report,

it would have been on the computer, which unfortunately I explained to -- I'm sorry. I forget your name.

Q. My name is Krouse.

MS. CUMMING:

Elizabeth.

THE WITNESS:

Elizabeth. I explained to Ms. Elizabeth that any records I had, I have quite a few copies of reports that I did make copies of and store at my residence in a shoebox to hold on. Unfortunately, Mr. Young's was not in there. And everything I had of my time up at CCC that was saved on the computer, I found out that shortly after I left in June of '23, everything on that computer was deleted of mine.

BY MR. KROUSE:

Q. Okay. And how was it deleted?

A. I was told that it was just erased from -- my file was deleted off the -- off that computer with all of my files on it because apparently I had too many files.

Q. And that computer was stored at the

facility, at CCC?

A. Yes, sir. In the Control 1.

Q. Okay. And you didn't have a laptop or anything that you would have brought home to --

A. No, sir.

Q. -- to download? Okay. And who would have -- who was the IT person at CCC that would have had responsibility for maintaining those documents?

A. That would be IT, Tommy Mayo.

Q. Tommy Mayo?

A. Yes, sir.

Q. M-A-Y-O?

A. Yes, sir.

Q. Okay. Is he still there?

A. Yes, sir.

Q. Okay. And did you have any conversations with Mr. Mayo about the deletion of your files?

A. No, sir. I found out they were deleted. Once I found that out, I figured there was no chance of being able to get them back, so I never carried the conversation any further.

Q. Okay. And you don't recall any

conversations that you had with Mr. Young after this incident; is that correct?
A. That is correct.
Q. Would you even be able to recognize Mr. Young if you ran into him in a hallway?
A. I'm -- I can put faces with names, but according to me not trying -- me trying to remember of this incident and not pertaining to it, I could not tell you.
Q. And where are you currently employed right now?
A. Catahoula Parish Sheriff's Office.
Q. Okay. But you're not employed -- you're not in the correctional facility, right?
A. No, sir. I still kind -- kind of part-timely go up there and work. If we want overtime work, we are more than welcome to go up there and help out if they need help.
Q. So you work on the road for the sheriff's office in Catahoula Parish?
A. Yes, sir.
Q. Are you POST certified?
A. Yes, sir, as of I want to say May 30th, 2024.
Q. And where were you POST certified?

A. I was under the police department of -- or police academy, 94th session.

MR. KROUSE:

Okay. I think that's all the questions I have. I think we are running up on time. I too will reserve my rights, you know, if -- if necessary. It's been a rather lengthy deposition. Elizabeth, I -- I really don't have anything else at this time.

MS. CUMMING:

Okay. Lenzi, do you have anything for Calcasieu?

MS. HEBERT:

I would -- I have a couple things, but I'll also reserve our rights as well considering that discovery is still ongoing.

CROSS-EXAMINATION BY MS. HEBERT:

Q. Have you ever been employed by Calcasieu Parish Sheriff's department?

A. No, I haven't.

Q. Have you ever reported to anybody at Calcasieu Parish Sheriff's Office?

A. No, ma'am.

Q. All right. Was anyone from the Calcasieu Parish Sheriff's Office present or enforcing any policies during your employment at the correctional facility?

A. Not that I'm aware of.

Q. All right. Do you know if the cell assignments are done by Catahoula or anybody else?

A. They would be -- I believe only Catahoula.

Q. All right.

A. And anybody that has any kind of moving permissions through PTS to move them.

Q. All right. Do you know if Mr. Young was requesting to go into any certain dorm like you were discussing earlier?

A. Not that I recall.

Q. All right.

MS. HEBERT:

Okay. That's all I have for now; and, again, the sheriff's -- the Calcasieu Parish Sheriff's Office will reserve their rights. Thank you so much.

THE WITNESS:

Yes, ma'am.

MS. CUMMING:
All right.
MR. KROUSE:
Elizabeth, follow-up?
MS. CUMMING:
No follow-up for me. If you --
MR. BRYANT:
We are done.
THE WITNESS:
Thank you.
MR. BRYANT:
Now, William, you have the right to read and sign.
THE WITNESS:
Wait, wait. There we go.
MR. BRYANT:
You have the right to read and sign. We -- we are still on the record. You have the right to read and sign this what I assume is going to be a 700-page deposition. You do not have to do that. What's going to happen is the court reporter is going to type all this up. Before she finalizes that, she can mail you a copy and you get I think 30 days to

look it over and agree that it's, in fact, the things that you said and sign off on it. You do not have to do that. You can trust that the court reporter did -- did everything right. It is entirely up to you. It's a personal choice. You do whatever you want.

Would you like to read and sign it or would you like to just waive that?

THE WITNESS:

Let me go ahead and read and sign it.

MR. BRYANT:

There you go. Can you tell Madame Court Reporter where you would like to have that mailed to?

THE WITNESS:

Does she have the -- let me -- let me just -- I think it's 301 Bushley Street. Not Bushley. Hold on. I think it is 301 Bushley Street. 301 Bushley Street, Harrisonburg, Louisiana 71340.

(The deposition was concluded at 4:07 p.m.)

CORRECTION SHEET

| PAGE | LINE | DESCRIPTION |
|---|---|---|
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |
| _____ | _____ | ________________________________________ |

WITNESS: SERGEANT WILLIAM BEASON
TAKEN ON: NOVEMBER 13, 2024
BY: CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

WITNESS CERTIFICATE

I, SERGEANT WILLIAM BEASON, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

_________________ ___________________________

DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: November 13, 2024

REPORTER'S PAGE

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for the court reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; also, that any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

Cherie' E. White

CHERIE' E. WHITE, CCR(LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that Sergeant William Beason, to whom the oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 250 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

NDTCA Signed Electronic Transcript

CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO. 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)