Transcript of the Testimony of

# WARDEN CHRIS STINSON

February 1, 2024

JAMES MURRAY, ET AL v. JAMES LEBLANC, ET AL

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES MURRAY; LATAVIUS PASCHAL; ANTONE HENDERSON | CIVIL DOCKET NO. 21-cv-592-SDD-RLB |
| VERSUS | JUDGE: JOHN W. DEGRAVELLES |
| JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, et al | MAGISTRATE: RICHARD L. BOURGEOIS |

VIDEOCONFERENCE DEPOSITION OF WARDEN CHRIS STINSON, taken via Zoom, in the above-entitled cause on the 1st of February, 2024, commencing at 11:07 a.m.

REPORTED BY: CHERIE' E. WHITE
CCR (LA), CSR (TX), CSR (MS), RPR
CERTIFIED COURT REPORTER

APPEARANCES:

ATTORNEYS REPRESENTING THE PLAINTIFFS, JAMES MURRAY, LATAVIUS PASCHAL AND ANTONE HENDERSON:

RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
4400 South Carrollton Avenue
New Orleans, Louisiana 70119
Phone: 504.620.2259 |Fax: 504.208.3133

(BY: Elizabeth Cumming, Esquire)
E-mail: elizabeth.cumming@mcarthurjustice.org
(BY: Emily Washington, Esquire)
E-mail: Emily.washington@mccarthurjustice.org

ATTORNEYS REPRESENTING THE DEFENDANTS, LASALLE MANAGEMENT AND MADISON PARISH SHERIFF:

PROVOSTY, SADLER & deLAUNEY
934 Third Street, Suite 800
Alexandria, Louisiana 71315-3530
Phone: 318.767.3133 |Fax: 318.767.9588

(BY: Eli J. Meaux, Esquire)
E-mail: emeaux@provosty.com

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANT, SETH SMITH AND SECRETARY LEBLANC:

HAMMONDS, SILLS, ADKINS, GUICE,
NOAH, & PERKINS, LLP
2431 S. Acadian Thruway, Suite 600
Baton Rouge, Louisiana 70808
Phone: 225.923.3462 |Fax: 923.0315

(BY: Evan M. Alvarez, Esquire)
E-mail: ealvarez@hamsil.com

E X A M I N A T I O N I N D E X


| BY: | PAGE |
| --- | --- |
| Ms. Cumming | 8 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | MAD-EE1-7 Records | 64 |
| Exhibit 2 | MCC.LMC GROC1-11 MCC General Rules of Conduct, Effective 9.1.1 | 83 |
| Exhibit 3 | 5/28/21 Madison Parish Correctional Center, Initial Classification Board | 122 |
| Exhibit 4 | 1/1/20 Current Inmate Location List | 129 |
| Exhibit 5 | Two Donald Dorsey Madison Correctional Center Voluntary Statements, BF10 and BF11 | 146 |
| Exhibit 6 | MCC P1, MCC Classification Policy, effective 5/1/14, Signed | 150 |

E X H I B I T S (CONTINUED)



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | BJG Classification Checklists | 153 |
| Exhibit 8 | Murray JF1-39, MCC Murray Jail File (Redacted) | 163 |
| Exhibit 9 | Staffing Reports for Building 3 and Building 4, MCC and SCC | 180 |
| Exhibit 10 | Drop Sheets and Associated Documents, 148-151 Shift Drop Sheets 4-5/2021 | 188 |
| Exhibit 11 | MCC PO1-18 MCC Staff Post Orders, effective 7/1/20 | 194 |
| Exhibit 12 | Administration Segregation Log (2020) 1-4 Admin Seg Log 7, 8, 11/2020 | 218 |
| Exhibit 13 | Bates MTS 2020M 1-20 Medical Tracking Spreadsheet, 2020 Male (Redacted) | 237 |
| Exhibit 14 | LSC CIRP1-15 LSC 2.15 (6-2020) Critical Incident Reporting Policy | 241 |
| Exhibit 15 | Bates CIML (2021) 1-14 CI Monthly Logs 2021 (Redacted) | 248 |

E X H I B I T S (CONTINUED)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16 | Oct 2020 Monthly Activity Report | 252 |
| Exhibit 17 | NE Region, Q2 (Oct-Dec) 2020 (Redacted) | 259 |
| Exhibit 18 | 10/18/20 John Murray Incident | 278 |
| Exhibit 19 | 11/23/20 Incident, Document Checklist | 297 |
| Exhibit 20 | 1/28/21 Henderson Broken Hand, Madison Correctional Centers | 298 |
| Exhibit 21 | CI210120-MPM 50 Paschal Fight | 299 |
| Exhibit 22 | 2/18/21 Henderson Incident | 300 |
| Exhibit 23 | 9/15/20, Madison Correctional Centers, Employee Rule Violation Report, PF1-35 | 301 |

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically NOT waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

CHERIE E. WHITE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath.

WARDEN CHRIS STINSON, 395 WEST HAMPTON DRIVE, PINEVILLE, LOUISIANA 71360, after having first been duly sworn by the above-mentioned court reporter, did testify as follows:

MS. CUMMING:
Okay. We are here today taking this deposition pursuant to the Federal Rules of Civil Procedure. There is no objection to taking this deposition over Zoom with the court reporter being remote. And sort of at the end of the deposition, the court reporter is probably going to ask you about reading and signing, so you can talk to your attorney about, you know, whether you want to do that or waive.

EXAMINATION BY MS. CUMMING:

Q. Could you please introduce yourself for the record?

A. My name is Chris Stinson.

Q. Okay. And can you provide your address and phone number? And this would be subject to some stipulations that we had agreed to with Mr. Calvit months ago, that the address and -- and phone number would be just kept by

counsel.

A. My home address is

. My phone number is area code

Q. Thank you. And do you have any previous deposition experience?

A. Yes, ma'am.

Q. Okay. And was that as a defendant, a plaintiff, a witness?

A. Defendant.

Q. Okay. And that answers my next question. You've been a party to a lawsuit as a defendant. Any other capacity?

A. No, ma'am.

Q. Okay. So I'm sure when your deposition was taken previously, the attorney taking it went over some ground rules. I'm going to do that just to sort of make sure that we are both on the same page.

We have the court reporter here. The court reporter is taking down everything that we say, so it's really important to speak up, answer verbally. So if I ask a yes or no question, rather than saying uh-uh (negatively)

or uh-huh (affirmatively) or shaking your head, answer it yes, no and then, you know, explaining your answer as you like.

I'm going to be asking a series of questions. For the purposes of having a clean transcript, it's important for you to go ahead and let me get my question out and then you can answer; and, likewise, you know, I'll wait for you to finish your answer and then before I ask my next question. And that way it also ensures that it's clear that you know what you're answering, that you understand my question and -- and it makes for a nice, clean transcript.

All right. You've taken an oath. It's the same oath that you would take as if you're testifying in a court, so it's important that you are giving full and accurate, truthful answers. We are interested in finding out everything that you know that's relevant to this lawsuit, so we are -- we are looking for as full an answer as you can provide. If you need to supplement an answer, if, you know, you answer something and then at another line of questioning you remember something else, we can go back. You know, just -- just let me know and we can go

back. That's not a problem.

I am going to be asking you a series of questions. At some point, I will ask a bad question that's unclear or if it's got too many parts to it or, you know, it's a question that doesn't make sense, so if that -- I won't say "if." When that happens, just tell me to clarify the question and I'll -- and I'll try and go back and clarify it as -- as best as I can. If I ask a question and you do answer it, I am going to assume that -- that you understood my question.

We -- you are entitled to take breaks. I try to offer a break every hour, but I'm -- I'm really, really bad at that. So if -- if we have been going for a while and you want to take a pause, just -- just speak up. The only thing I ask is if I have a question on the table that you go ahead and answer that question.

You have your attorney, Eli Meaux, in the room with you. Is there -- in the course of the deposition, if you want to take a break and speak with your attorney, you can also do that. Again, answer the question on the table and then we can take a break. I may -- I may ask when we come back from the break if you spoke

with your attorney during that time.

Is there anyone else in the room with you?

A. No, ma'am.

Q. Okay. Is there any reason; medication, sleep deprivation, any other hardship that would interfere with your ability to understand my questions and provide full, accurate, truthful testimony today?

A. No, ma'am.

Q. Okay. And what is your understanding as to why we are here today?

A. Probably to a lawsuit filed by three former inmates in Madison Parish.

Q. And what did you do to prepare for this deposition?

A. I spoke to Mr. Meaux.

Q. Did you review any documents?

A. Yes, ma'am.

Q. Okay. What documents did you review?

A. Quite lengthy, numerous.

Q. But do you have any kind of like general categories of documents that you looked at?

A. I'm sorry. Did you say categories of documents?

Q. Yes, sir.

A. Some of the documents were Critical Incident Reports that were completed for a timeframe, and I don't remember the timeframe; and I think some were documents from the logbooks, various logbooks, forms, reports. I believe there was some medical -- some medical information also.

Q. Okay. Great. And do you have any documents with you today?

A. No, ma'am.

Q. Okay. I am just going to try and do like a blanket clarification of the facilities that we are talking about and the time period we are talking about. So we are talking about the facilities at Tallulah in Madison Parish, and my understanding is there are a couple of different buildings. I'm going to throughout the deposition refer to all of them as MPCC, or Madison Parish Correctional Center, but that -- just to let you know what my understanding is, that encompasses Southern Correctional Center, SCC, and that's -- that's also called Building 4;

is that right?

A. Sure.

Q. And then Madison Correctional Center, or MCC, that's -- that's also called Building 3; is that right?

A. Yes.

Q. Okay. And I'm going to be talking primarily about 2019 and 2021 when LaSalle was operating the facilities, so even if I slip into the present tense, I'm talking -- I'm primarily talking about when LaSalle was running things. I -- I -- there may be a couple times when I specify, you know, if, you know, what the practice was when Security Management was running things, but that's -- just assume that's -- that's the period I'm talking about.

All right. So I just want to start with some background information on you. Can you run me through your education, so starting with where you went to high school and what year you graduated all the way through any -- any schooling you had after that?

A. I graduated from Pineville High School, May 22nd, 1975. I went to college for one year. At the time, it was Northeast

Louisiana University in Monroe. It's now known as UL Monroe, University of Louisiana Monroe.

After one year, I decided to go to work, been working ever since. Started work for Department of Corrections in Baton Rouge -- I'm sorry, Angola, Louisiana State Penitentiary at Angola, January 1980. I retired from state service January -- I'm sorry, July of 2005.

I went to Iraq as a corrections advisor. I worked for a company, MPRI, that had a contract with Department of Justice as a correction -- correction advisor. Did that for two years, came back July of '07, went back into the retirement system and retired from the state service the latter part -- let's see. I'm trying to remember exactly when it was -- August of 2011.

They closed the state prison I was working at and I transferred over, went to work for probation and parole in Alexandria in that district for about seven months, I'm sorry, until March of '12.

Anyway, March of 2012, I went to work for LaSalle Management and stayed with LaSalle Management until June 1st, 2021 when

Security Management took over the prison that was in Madison Parish and I'm still employed by Security Management.

Q. Okay.

A. You asked about schools and things. Numerous, numerous instructorships, defensive tactics instructor, firearms instructor, chemical agent instructor. All this I did with -- I believe when I was with the state. Investigative courses, various -- various classes, seminars while I was with the state.

Q. Great. You -- you anticipated my next line, which was going to be for -- for work history. So I just --

A. Oh, I'm sorry.

Q. No. That's -- that's great. That's very good. So I -- I -- I appreciate that. I -- I just want to go back and kind of unpack a couple of things here. So graduated from high school '75. Year of college, would that be like '75, '76?

A. Yes, ma'am. I'm sorry.

Q. Okay. And then what were you -- you know, what were you working on in college; what were you studying?

A. Criminal justice major.
Q. Got it. Okay. And then I think you started at Angola in '80; so from '76 to '80, do you recall what you were doing?
A. Yes, ma'am. I -- let's see. From '76 until beginning of '79, I was working at a -- a retail store in Pineville, Louisiana, and then I went to the oilfield and worked in the oilfield from the middle of '79 until July of '80 for almost a year.
Q. Okay. All right. And that's -- that's one of the oilfields in like northwest Louisiana, not offshore; is that right?
A. It was offshore, yes, ma'am.
Q. Oh, you went offshore. Got it. I think that's before Haynesville came in. Got it.
Okay. Okay. So you worked offshore for a year. What was the company you worked for offshore?
A. Pool, Pool Offshore. They were located in Harvey.
Q. Thank you. Okay. And then when you stopped doing that -- why did you stop working offshore?
A. I wanted to find a job with some

benefits. That's the way my -- my daddy raised me up and my little brother. So -- so my -- my mother was a state employee, she worked for LSU system in Alexandria. Told my wife, I said I -- I'm going to see if they will hire me, they probably won't hire me, but they did and here I am.

Q. Okay. So -- so that's when you went to -- to Angola in 1980; is that right?

A. Yes, ma'am.

Q. Okay. So when you started at Angola, what was the -- what was the position you started at?

A. Correctional officer. I think the correct term at the time was CO 1, Correctional Officer 1.

Q. All right. And how long were you at that position?

A. From July 14th, 1980 until June 19 -- 1991. I transferred from LSP Angola to a prison in Pineville. At the time, it was known as Camp Beauregard Work Release Center, and at the time, it's changed several times and they closed the facility July of 2012.

Q. Okay. So did you say '91 that you

left Angola?
A. No, ma'am. '81.
Q. '81. Got it. Okay. So you were at Angola, you never held any other position other than CO 1 at Angola, right?
A. Right.
Q. Okay. And then when you went to Camp Beauregard up near closer to Pineville, you -- you transferred over there as a CO 1; is that right?
A. Yes, ma'am.
Q. Okay. And then at -- you stayed at that facility under sounds like a couple of different names all the way through the time it was closed; is that right?
A. Yes, ma'am.
Q. Okay. Can you run me through the positions that you held there?
A. Yes. I was a -- they -- they changed the title from CO 1, Correctional Officer 1, to Sergeant. I moved up from sergeant to lieutenant, was promoted to captain to major to colonel to assistant warden.
Q. Okay. So when did you move from CO 1 to sergeant?

A. Well, I didn't move. They -- they just changed the title.
Q. Okay.
A. I received my first promotion to lieutenant I believe in 1991.
Q. And did you have to apply for that, take a test, anything like that?
A. I applied. There was no test to take at the time, no, ma'am, just went in front of an interview board.
Q. Do you recall who interviewed you?
A. Yes, ma'am. One person was Preston Guilbeau. He was the chief of security. He was a major at the time. There was -- there was -- if I'm not mistaken, it was just him and the warden. That's -- that's been a little while back.
Q. That's all right.
A. It was a formal interview board is what it was.
Q. Okay. All right. And then it was my -- my rank -- my rank, memory is -- is not the best, so tell me -- tell me if I get this wrong. It was lieutenant to colonel; is that right?
A. Lieutenant to captain.

Q. Oh, lieutenant to captain. Okay. Told you I was going to get it wrong. Okay. So lieutenant to captain, when did that happen?
A. I would have to go back and look at my résumé on my computer. I want to say it was around 2000, '99 or possibly 2000, yes, ma'am.
Q. Okay.
A. Roughly.
Q. And what was the process for that?
A. The same interview board, a couple people interviewed me and there was always two or three people, several people going up for the one position, you know, for a promotion, so --
Q. And do you recall who was on that interview board?
A. I don't.
Q. And then it's captain to?
A. Major.
Q. Major. Okay. And so when did that happen?
A. In 2003, if I remember correctly, I believe it was 2003.
Q. What was that process?
A. The same, formal interview board.
Q. And do you recall who was on that

interview board?
A. I know it was the warden. I believe there was somebody out of HR, human resources I believe, if I'm not mistaken, and a security officer, but I don't remember their names.
Q. And then major to?
A. I retired as a major in July of '05 and that was when I went overseas to Iraq for two years.
Q. Okay. 2005. And when you were in Iraq, that's when you were the -- like a corrections advisor; is that right?
A. Yes, ma'am.
Q. Okay. And PRI, that's the company you were with?
A. MPRI, yes, ma'am. That's an acronym for Military Professional Resources Incorporated.
Q. Good. Okay. And what was your job title at MPRI?
A. Corrections advisor.
Q. Okay. What facilities or did you have any like specific facilities that you were tasked with kind of looking into or --
Well, let me back up. What did you do as a corrections advisor for MPRI?

A. We tried to train, mentor and advise Iraqi correction staffs in a right way of running a facility, a prison.
Q. Okay. Okay. And did you have -- how did you do that; did you have a curriculum, did you have --
A. Yes, ma'am.
Q. Okay. Who developed that curriculum?
A. It was already developed by the time I arrived in Baghdad. I don't know who developed it, but there was a written curriculum.
Q. Okay. But you don't know who -- who developed it?
A. No, ma'am.
Q. Okay. How many other corrections advisors were there?
A. Well, it depended. The first -- when I arrived in Baghdad, I was in Baghdad for about four weeks, then I was transferred to Abu Ghraib. I spent about four and a half months there. There were different numbers of people. I mean, I don't -- I think there were 14 of us in Abu Ghraib; and then I was transferred to northern Iraq, a city called Erbil, which is

actually in Kurdistan, and there were five of us on the corrections team in Kurdistan.

Q. Okay. All right. And so how long were you down in Abu Ghraib?

A. A little over four months.

Q. Okay. So that would be like the early -- earlier part of 2000? Well, I guess --

A. Latter part of 2005.

Q. Okay. And then how long were you up at Erbil?

A. I was in approximately 18 months.

Q. Okay.

A. Yes, ma'am.

Q. Okay. And so when you were at Abu Ghraib, what were you doing?

A. Same thing, supporting the corrections, Iraqi corrections staff trying to train, mentor, advise, teach.

Q. Okay. So, and what -- in what form did that take; were you like giving classes, were you kind of waiting for people to come to you? How -- how did that look?

A. A little bit. By the time I got there, honestly, there was not much teaching going on. I'm sure you remember all the bad

things that happened at Abu Ghraib. The military got out -- wanted to get out of the corrections business at Abu Ghraib, so they gave it to this company that I was working for, MPRI. And so we basically ran the prison because there wasn't any corrections staff showing up. It had a bad reputation, but by the time I got there, it was well after the fact. There were no -- the military were working inside the compound, but they weren't -- they weren't having any dealings with the Iraqi offenders, so --

Q. Okay. And Erbil, can -- can you tell me about what you were doing up at Erbil?

A. We would travel to different prisons. There were two prisons in Erbil: One was an adult male facility; the other was an adult female, slash, juvenile male; two different facilities. They don't -- at that time, they were not incarcerating juvenile females.

So we -- a couple times we received equipment we gave to the Iraqi -- the Iraqi wardens and, you know, we always had to have an interpreter with us, you know, a linguist specialist to translate and so forth, so that it was a lot of visiting.

And we traveled some other facilities outside of Erbil and I couldn't -- I'd have to go back and look at my résumé to see what kind of those places were. But anyway, that's -- that's we did, about the same thing. We did do more training and -- and advising in northern Iraq than we did in southern Iraq, so --

Q. Okay. Okay. And so when you were sort of going around and -- and doing the visiting, was that sort of to also take a look and -- and see if those facilities were, you know, applying the -- the training and the -- the standards?

A. Yes, ma'am. It was in that -- that was part of our duties, the very small tiny baby steps that, you know, they are somewhat -- they were somewhat resistant to us being there, not so much resistance, they wanted our money. They wanted taxpayer dollars. They wanted all the bells and whistles, everything; but as far as creating any change, because they -- some of the things they did weren't up to -- I'm trying to think of the term, I want to say rule of law, but that's not the correct term.

But anyway, they -- they ran their

prisons, operated their prisons much differently than in this country; made a different -- huge difference.

Q. Okay. I see. The standards that you were applying, obviously the -- the United States Constitution is not -- is not the standard.

Was there -- where was that coming from; was it coming from like a UN tribunal? How was that being set?

A. I -- I'm not sure where it came from. When -- when I mentioned the term "rule of law," that's -- I don't remember if that's right or not or the right terminology, but just -- just trying to -- trying to improve the way they operated their -- their prisons. They had -- had some huge deficiencies.

One of the things I read is the estimated Iraqi population in prison, Tuberculosis is -- tuberculosis is greater than 40 percent plus, you know, and so that's just -- so it's just they are very impoverished, you know, went through a lot; war, death, things like that, so --

Q. Uh-huh (affirmatively). Okay.

Okay. Thanks for that. That's helpful.

How did you -- how did you get connected with MPRI? How did you get into this line?

A. The Department of Corrections Association conference in Phoenix, Arizona, and me and a couple other people, and they had some headhunters there trying to hunt people. And so I grabbed one of the packets and took it home and a month later, I got to looking at it, filled it out and told my wife, I said, I don't know if I'll get hired, I don't know, but I'm going to give this a try.

And it was a lengthy process, you know, a security clearance, things like that, you know, so it took a little while; and -- and she said if that's what you want to do, said I'll -- I'll give it a shot, so that's pretty much it. It was a change of scenery to say the least.

Q. Yeah. Yeah. I imagine so. What -- why did you want to do it? Why did you apply for it?

A. Well, I've been with the state for about 25-1/2 years, about 25 years, and I don't know. My wife told me I'd -- I'd always had a

little bit of wild side in me. In my younger day, I did I guess.

Me and my wife go a long way back. We went to school together; 50 plus years. But anyway, she was very supportive, very supportive. I wouldn't have went -- I wouldn't have went if she wasn't supportive and I probably wouldn't have went if I had any children at the house. All of our children were grown, on their own, and had grand kids. So at the time, it seemed like a good idea, you know.

Q. And why -- why did you end up leaving? You were there for -- for two years. Why did you leave?

A. To go overseas?

Q. Well, so like we were -- we were just talking about sort of why you decided to -- to go overseas. Why did you leave that employment?

A. After I retired from the state, I -- I said I just want to try it; and my plan was to go for a year, so leave for one year. About four weeks after I left, Katrina hit and the warden at our facility, me and him had a talk in private, and he said if I'm still warden here in a year,

I'll hire you back. I said, well, thank you, I'll be back in a year.

Katrina hit, you know, New Orleans, everything that happened, you know, with the State of Louisiana, you know, it just -- it was a terrible time. And so he told me I wasn't -- he wasn't going to be able to hire me back after a year, so I said okay; and so I told my wife, I said, I'm going to stay for another year.

So we actually signed a contract with the company and signed another contract, and getting close entering in 2007, I think it was June or so, I called the warden or I e-mailed him and -- and re-applied, he had a job waiting for me. I told him, well, good two years is enough. I'm -- I'm ready to get back to normalcy.

Q. Okay. Got it. Thank you. That -- that makes sense.

All right. So you came back in 2007 and you went back to -- well, what was it called at that point?

A. The prison?

Q. Uh-huh (affirmatively).

A. J. Levy Dabadie Correctional Center J-L-D-C-C.

Q. All right. Formally Camp Beauregard?
A. Yes, ma'am.
Q. All right. So you went back there. What -- what position did you go back to in, I guess, August of 2007?
A. I started back with the state as a corrections captain.
Q. And then how long were you captain?
A. I believe about a year and a half, if I remember right. Yeah. I was promoted from captain to corrections major.
Q. So it would have been around 2008?
A. Yes, ma'am.
Q. Okay. And then -- and what was the process like for that promotion?
A. The same as before, the warden interviewed me. And let's see. It was the warden and a lady from human resources.
Q. Do you recall who the warden was at that time?
A. Yes, ma'am, I do. The name was T. W. Thompson, the third.
Q. Okay. And so from major, what was your next promotion?

A. Colonel.
Q. Okay. And when was that?
A. I believe it was 2009.
Q. Okay. And what did that promotion process look like?
A. Same thing.
Q. All right. And then did you have any other promotions while you were at the state facility?
A. Yes, ma'am. I was promoted from colonel to assistant warden. Now, when I was promoted to assistant warden, the warden at the time didn't have any formal interview board. It was myself and one other person interested, and we both talked to him and he chose me over the other person that was interested.
Q. Okay. Got it. And when was that?
A. Pardon?
Q. When was that?
A. Either 2009, shortly after I got promoted to colonel, or 2010. I'd have to go back and do some research.
Q. All right. Nope. That's fine. Just roughly. That's -- that's great. Okay.
All right. And then did you have

any other promotions after going into assistant warden?

A. No, ma'am.

Q. Okay. All right. And then when you went to P&P, what was your role there?

A. I was a parole officer, P&P officer, agent.

Q. How long were you working as a parole officer?

A. About seven months.

Q. Okay. What region were you working out of?

A. Alexandria district.

Q. Okay. Okay. And then -- and that was in 2012, right?

A. The latter part of 2011, August I believe from 2011 until March of 2012, approximately seven months.

Q. Okay. And why did you -- why did you become a PO?

A. Well, actually, I retired July 1st of 2011. The warden phased out seven positions at the prison. We had a warden, deputy warden and assistant warden. He phased my -- my position out, one of our maintenance men,

budgetary cutbacks. The prison's neck was on the chopping board and -- and they wound up closing the prison the next year. Everything he did delayed the inevitable one year or so. So I had a little over 30 years or right at 30 years with the state and state service and signed my retirement papers, went home and less than two weeks later, I told my wife this ain't going to work, I -- I got to do something.

So I called the district administrator with P&P in Alexandria, Jeffrey Gaspard; and he said well, come on down, fill out an application, and I did and -- and got hired. And approximately seven months later, yeah, I think, I decided to go back to work in a prison, so --

Q. Okay. And do you know -- and so you were not -- you didn't have any kind of supervisory role, you were just working as a PO when you were working with probation and parole?

A. Right.

Q. Okay. And when you decided to -- why did you decide to go back into working in corrections?

A. I got a phone call from a friend of

mine, the former warden. We have known each other for 35 years, worked together for a long time; and he had went to work for LaSalle Management and he told me a man -- there was a man by the name of Johnny Creed who had retired from state corrections and he was with LaSalle, and he said Mr. Creed would like to talk to you about a job. So I called him that evening and met the next morning and went to work for LaSalle Management.

Q. Okay. Is the former warden, who was that?

A. Keith Deville.

Q. So Keith Deville reached out to you or -- or you were talking with Keith and he was telling you about it?

A. He reached out to me.

Q. Okay. Okay. All right. Just sort of running through the promotions that you've had through the years, did you get any like training specific to the job? So like, you know, when you moved from sergeant to lieutenant or lieutenant to captain, did you get training on like, you know, how to be a captain or how to be a major or anything like that?

A. You mean like formal classroom training or something?
Q. Formal classroom training or, you know, did anybody hand you a book, anything?
A. No. No. There was no formal classroom training, no -- no books, brochures or anything. In -- in corrections, you're -- you -- you're looking -- if you are wanting to advance, then you are trying to learn everything you can from people. Some people will actually mentor you. There's some that wouldn't. It's basically -- it's going to be pretty much on-the-job training and with experience that -- that it pays off in the long run. It -- it does, or I believe so.
Q. So there's like -- yeah. Okay. So it's on-the-job training that you're getting sort of both before the promotion and a little bit after too?
A. Yes, ma'am.
Q. Okay. Got it. All right. And then you were talking about some of the -- some of the training that you have participated in as a -- and I just want to make sure I understand -- as an instructor; is that right?

A. Yes, ma'am.
Q. Okay. So you talked about defensive tactics, some investigation. What else was there?
A. Firearms, I was a firearms instructor; chemical agent instructor; defensive tactics. One of the things I went to they had at the time, State of Louisiana had, I'm -- I'm going to call it an educational program. It was called CPTP, Comprehensive Public Training Program, and it was offered not just to corrections but other state employees. And there were three different levels. Each level was a week. I completed all three of those levels.
Our prison was accredited to the American Prison Association, went through accreditation manager for one time, went to several different seminars, several out of state. Again, I'd -- I'd have to look at my résumé because I'm thinking I'm leaving out a few things, not to be boastful.
Q. No. Boast away. The -- the more -- the more information, the -- the better.
So okay. So the CPTP, when -- when did you take those -- those classes?

A. I couldn't tell you, ma'am. I'd have to look in my -- my résumé.

Q. Okay. And then the -- the ACA, when did you become like an accreditation manager?

A. In 1992. I'm sorry. 1991. Not long after I was promoted to lieutenant, the secretary of Department of Corrections wanted all of his state facilities accredited with ACA and his former prison, Wade Correction Center (sic), was the first and we were the third.

And so me and a couple other people were given an office and gave me a computer that I didn't know what to do with, never touched a computer. Anyway -- and anyway, we were successfully accredited with the ACA and then there was a reaccreditation process every three years.

Q. And so in your role as like the accreditation manager, you were --

Well, let me ask this. What -- what were you doing as an accreditation manager?

A. We were writing policies, myself and two other people, working on policies, writing policies because our prison didn't have any written -- we had a couple, but nothing that --

not nearly that needed to be done. So at the time, writing policies, gathering documentation to have proof to put into a folder to prove that you are doing it, you know, something from a report, a form or something like that. So as a -- as a -- like I say, it was a lengthy process. It took us several, several months to -- to complete it and to get audited and accredited.

Q. Okay. All right. So you were -- you were not going to places to be an auditor, you were trying to sort of work on making sure that the facility where you were could pass an audit --

A. Yes, ma'am.

Q. -- is that right?

A. Absolutely.

Q. All right. So how many of you-all were writing policies?

A. Did you say how many --

Q. Uh-huh (affirmatively).

A. -- of us?

Q. Yes.

A. Myself and another man and a woman.

Q. Okay. All right.

A. Just the three of us were.

Q. Okay. Okay. And then in terms of the documentation that you were gathering for the ACA, was it just like okay, here's the form that we use or were you also gathering kind of like specific examples of -- of how the form is used?

A. Both.

Q. Okay.

A. Real quick. You're -- you're required to have three years worth of documentation in each folder and you are up for reaccreditation every three years, so --

Q. So if you -- if you had like a -- I -- I don't have the ACA guidelines right in front of me, but so I know there's one -- I know there's one on -- on disciplinary procedures. So you're looking at the ACA guideline on disciplinary procedures, you write a policy, you have your forms.

How many examples would you have to provide of, you know, like how the disciplinary process works, like what documents -- how many examples of documentation would have to provide for each year?

A. Well, each particular folder -- and

I don't know how many folders or standards. They call them standards. I don't know how many there are now, but at the time, there were over 530, but it was -- it encompassed education, classification, security, medical, physical plant, you know, things like that.

So as far as the disciplinary process, I don't remember how many there were, but in one particular standard, there may be five different things that it talks about that you have to -- you know, and you have to go down the list and have three years worth of documentation for each of those -- those five bullets.

Q. Uh-huh (affirmatively). Okay. All right. And -- and three years worth of documentation, so let's just say in the course of a year -- like I said, I don't -- I don't have the standards right with me. They are in my office, but they are not right here.

Let's say, you know, you need to -- you need to show that everybody's going in front of the disciplinary board, for example, and you have a form that shows that. How many examples of that form would you have to show -- give them?

A. Ma'am, I -- I don't know. That

has -- that has been so many years ago, it really has, a number of years.
Q. Okay. Got it. All right. Okay. And I think I know the answer to this, but I'm -- I'm going to ask it. Have you ever been fired from a job?
A. Fired from any, no, ma'am.
Q. Uh-huh (affirmatively). Okay. All right. So I want to start getting into working in 2012. Let me ask this: Have you ever worked directly for the Madison Parish Sheriff's Office?
A. Directly for Madison Parish, no.
Q. Okay. And so the entire time that you have been working at the facilities in Tallulah, you have always worked with either LaSalle or Security Management; is that right?
A. Yes, ma'am.
Q. Okay. All right. So you started working for LaSalle in 2012. What was your employment relationship with -- with LaSalle; were you salaried or were you paid hourly?
A. I was salary, yes, ma'am.
Q. I'm sorry. Say that one more time.
A. Salaried assistant warden.
Q. Okay. All right. And that was a

full-time position?
A. Yes, ma'am.
Q. All right. And roughly, how many hours a week?
A. Fifty roughly.
Q. And you started as assistant warden; is that correct?
A. Yes, ma'am.
Q. What facility did you start with?
A. Jackson Parish Correctional Center in Jonesboro.
Q. Okay. And how long were you at Jackson?
A. From March 12th, 2012, until -- until January 1st, 2014.
Q. And January 1st, 2014, where did you go?
A. Transferred to Madison.
Q. What was your position at Madison?
A. Assistant warden.
Q. Did you have -- how long -- did that -- let me back up.
So you started as assistant warden at Madison in 2014 for LaSalle. Did you have any other facilities that you were working for for

LaSalle?

A. No, ma'am.

Q. Okay. Did you have any promotions while working for LaSalle at Madison?

A. The warden, he left September of 2015. He was transferred to another facility and they promoted me from assistant warden to warden.

Q. Okay. How long were you warden?

A. From September of '15 until September of '18, then I transferred to Richwood. LaSalle asked me to transfer to Richwood. They had an opening as assistant warden. My title changed from warden to assistant warden, but they kept my salary the same and I was an hour closer to home.

Q. Uh-huh (affirmatively). Okay. All right. So that was 2018 to how long did that go?

A. From 20 -- September of 2018 up until September -- I believe September of '15 to September '18, I was the warden at Madison. September of '18 until January of -- hold on. I went to Richwood as assistant warden, I came back as assistant warden -- I'm trying to remember the dates.

MR. MEAUX:

I mean, that's -- Eli Meaux for that. I mean, we don't have the documents in front of us, but, I mean, I -- I can represent that I know what -- roughly, what the date is, I mean, if you -- if that's okay, Elizabeth.

MS. CUMMING:

Yeah. Yeah. That's fine. I'm looking for --

MR. MEAUX:

Okay. My --

MS. CUMMING:

It's not a memory test.

MR. MEAUX:

My understanding from the documents, I believe he's referring to January 2020.

MS. CUMMING:

Okay.

THE WITNESS:

When I came back to Madison.

MR. MEAUX:

I -- I believe that's what the documents say.

MS. CUMMING:

Okay. All right.

THE WITNESS:
I apologize.
MS. CUMMING:
No, no. Don't -- you're doing fine. You're doing great.
MR. MEAUX:
I just want to get the timeline right.
MS. CUMMING:
Okay. Yeah, yeah. No. That's fine. That's great.
BY MS. CUMMING:
Q. Okay. So you came back to Madison 2020. What position did you come back to Madison to?
A. Assistant warden.
Q. Okay. All right. And how long have you had that position or how long did you keep that position at Madison?
A. From January '19 until June 1st of 2021.
Q. Okay. And that's when things switched over to Security Management?
A. Yes, ma'am.
Q. Okay. All right. And what is your

current position?
A. Warden.
Q. Okay. When did you get promoted to warden?
A. September 1st of 2021, there was another -- except June 1st of 2021 until September 1st, three months, they had a transitional warden. They brought somebody else in to make sure there was a transition, good smooth transition from LaSalle Management to Security Management, and he left September 1st and I took over as -- as warden.
Q. Who was that transitional warden?
A. His name was Ray Hanson, H-A-N-S-O-N. Now, I'm not sure who -- whose payroll he was on, LaSalle or Security, but -- so --
Q. I'll get -- I'll get Eli to -- to give us that information at some point.
Okay. Okay. All right. So when you went from assistant warden to warden at Madison, did you apply for that?
A. Not in writing. I just talked to the owners of Security Management and told them that I would like to stay home.

Q. Okay. All right. Okay. Who are the owners of Security Management? Who did you talk to?

A. Jack Varner, the third. Trey Varner, him and his father, Jack Varner, the second, owned the company.

Q. Okay. And then going back to that 2014 time period when you went from Jackson Parish to Madison -- well, actually, no. Sorry.

When you went from being assistant warden at Madison 2014 to I think it was 2015 you became warden, did you apply for that promotion?

A. No, ma'am. No.

Q. How did that come about?

A. I knew that the warden was leaving and I talked to a fellow at LaSalle Management. Their corporate office told them I was interested in the job, would like to have the job and they gave it to me.

Q. Who did you talk to at the corporate office for LaSalle?

A. Johnny Creed. Johnny Creed.

Q. That's C-R-E-E-D?

A. Yes, ma'am.

Q. Okay. Okay. And did you have any

like formal interview board or process or anything like that?

A. (Shook head negatively.)

Q. Okay. Okay. And then when they asked you to go down to Richwood, do you know why they -- they asked you to do that?

A. Well, they knew I was interested in getting closer to home where I actually live. Like I said, it was a -- it's a solid hour closer and they had another warden that they wanted to bring in from out of state. They wanted to bring him into Madison, make room for him and move -- transfer me to Richwood, so it was like win-win for him and for me.

Q. Who was the warden that they wanted to bring in from out of state; do you know?

A. Yes, ma'am. His name is Phil Bickham, B-I-C-K-H-A-M.

Q. Do you know why they wanted to bring him in?

MR. MEAUX:

I'm going to object. That calls for speculation, but, I mean, he can answer, if he knows.

THE WITNESS:

My guess would be he was at a prison in some facility in Georgia and he wanted to get back closer to home. He's actually from south Louisiana originally; and so he's a retired Texas TDJC warden who went to work for LaSalle, so he got back closer to home and so did I.

BY MS. CUMMING:

Q. Okay. All right. And so -- so that was -- so your time at Richwood was we -- we think, you know, roughly September 2018 to January of 2020?

A. Yes, ma'am.

Q. Okay. All right. I can -- I can pull up some documents, but -- to -- to confirm that, but yeah.

And so why did you -- do you know why they asked you to come --

Well, let me ask this: Did you ask to go back up to Madison or did they -- did LaSalle ask you to go back up to Madison?

A. I was -- I mean, I kind of like Madison. I had built up a relationship with a lot of people there and we were trying to do some good things, so -- pay didn't change, but the job

duties were the same, so --
Q. Okay. What -- what were you -- what were you trying to go back to Madison to do?
A. Ma'am?
Q. You said you were trying to do some good things. What -- what were you trying to do?
A. Well, I had been at Madison '14, '15, '16, '17, most of '18. One of the -- one of the perks of -- of working in Madison is next door to the prison up there is two houses; and I was given one of those houses to live in and wasn't charged any rent or board, you know, so it was okay.
Q. Okay. All right. And who was -- and when you came back to Madison, who was the warden?
A. Arthur Anderson.
Q. Did you -- had you worked with Arthur Anderson before?
A. No, ma'am. That was my first time.
Q. And who -- you were assistant warden over like both Building 3 and Building 4; is that right?
A. Yes, ma'am.
Q. And so in any of the -- sort of the

position changes that you had when you were at LaSalle, did you ever -- like did you ever have to take an exam or do anything like that?

A. No, ma'am.

Q. And did you ever have like a formal interview process?

A. Only when I originally started back in March of 2012.

Q. Okay. All right. And that formal interview process back in 2012, who -- who was that with?

A. The owner of the company, Billy McConnell, Johnny Creed; and I believe Mr. McConnell's son, Clay, was in the interview, I believe he was.

Q. The pastor, right, or was a pastor? You don't need to answer that. It's not a question.

MR. MEAUX:

I -- I think she wasn't asking a question. She was just --

THE WITNESS:

All right.

MR. MEAUX:

Yeah.

BY MS. CUMMING:
Q. Yeah. I'm just orienting myself. Okay. What sorts of questions did they ask you; do you -- do you remember?
A. Not many questions really. Mr. Creed, I had known Mr. Creed, he was chief of operations under Secretary Spradling with Department of Corrections for a number of years. Mr. Creed knew me. You know, Mr. McConnell mainly talked about the company, his thoughts, his Christianity and we -- it was a very, very, very informal cup of coffee, you know, drinking in his office, you know, and offered me a job and he told me where it would be and so forth, so --
Q. Okay. So what -- what do you recall about -- well, let me ask -- sorry. I'm having --
MR. MEAUX:
I think she -- I think maybe she dropped out or something or something happened. It sounded like maybe she was getting a phone call.
THE REPORTER:
I know. That was strange, it did. Or maybe her computer kicked.

MS. WASHINGTON:
I think her computer just -- so yeah. She's texting me right now, and she said just hang for a second. She'll be right back.
MR. MEAUX:
Okay. Sounds good.
MS. WASHINGTON:
That's fine. Cherie', if you want to, it's 12:08. We can just go off the record for right now.
MR. MEAUX:
Yeah. We certainly agree to go off the record.
MS. WASHINGTON:
Okay. Great.
(A short recess was taken at 12:08 p.m.)
BY MS. CUMMING:
Q. Okay. So we were talking about the -- we were talking about the interview with Billy McConnell, Clay McConnell, Johnny Creed in his office, you-all drinking coffee talking about sort of the -- the company.
And so I wanted to ask, what do you recall is sort of your impressions of what --

what the company was all about? What -- you know, what was -- what was Billy McConnell and Clay McConnell telling you?

MR. MEAUX:

I'm going to object to the form, but he can answer.

THE WITNESS:

Well, I had heard some good things about the McConnell family. LaSalle Management and I got a good feeling after talking to them and originally -- originally, the plan was he wanted to take over Madison Correctional Center and trying to work out all the terms with the sheriff at the time. And it didn't work out, so he said, but I still have a job for you if you want it. I said, well, where would that be. He said Jackson Parish Correctional Center.

So originally, I was supposed to go to Madison, but I didn't. So I did start with the company, LaSalle Management, like I said, in March of 2012 and then July -- January 1st of 2014, they worked out all the -- all the particulars with the

contracts and all that with the sheriff and -- and so they took over. But anyway, you asked how the feeling I got talking to him the first time I ever met either of the McConnell fellows and I enjoyed the conversation.

BY MS. CUMMING:

Q. Yeah. Okay. What did you -- but what had you heard about LaSalle? What -- you know, where -- where had you heard the good things that you heard?

A. Well, I guess the only thing I really heard was that if you are interested in working in private corrections, you would want to go for LaSalle Management. There were other private facilities, private corrections companies in the business at the time.

Q. What made LaSalle -- so, I mean, I think GEO was operating in the state at that point and I'm trying to think. There were probably a couple others, CCA maybe. What made LaSalle sort of more desirable over those other companies?

A. The owner --

Q. Billy McConnell?

A. -- Mr. Billy.
Q. Bill McConnell?
A. Yes, ma'am.
Q. Got it.
A. I think a lot of him.
Q. Okay. Okay. I want to go into we -- we talked a little bit about like some of the -- some of the -- the training that you've done and gotten when you were with the state.
When you started with LaSalle, did you get any training?
A. No, ma'am.
Q. Okay. And were you ever responsible for conducting any training when you were with LaSalle?
A. I wasn't responsible for conducting any training. I was responsible for trying to get training accomplished.
Q. Okay. All right. I'm going to get into some of those questions a little bit later, but okay.
Okay. And you -- you were talking about the -- that you -- you did have some training and that you offered some training in investigations at the -- when you were with the

Department of Corrections with the state; is that right?

A. Yes, ma'am.

Q. Okay. And so I -- I want to ask about some of the particulars of that. Did -- did you have training in taking witness statements?

A. When I was with the state corrections?

Q. Uh-huh (affirmatively).

A. I don't remember.

Q. Okay. Did you have training in documenting a scene?

A. Like preserving a crime scene or something or just -- I -- I don't remember. I don't remember.

Q. Okay. What about training in collecting physical evidence?

A. No, ma'am, I don't remember.

Q. Did you have any training in maintaining physical chain of custody?

A. I don't believe so.

Q. Do you have any training in collecting records as part of an investigation?

A. I don't remember.

Q. And did you have any training in gathering and reviewing video as part of an investigation?
A. No, ma'am.
Q. So I just want to sort of go through and make sure I understand. Have you in your time with LaSalle specifically, so 2012 to 2021, have you ever requested any internal transfers or promotions?
A. Internal transfer/promotions?
Q. Transfers or promotions.
A. The only promotion I've -- I've ever received from LaSalle as being promoted came on originally as assistant warden, got promoted to warden; and then when I transferred from Madison to Richwood, my title changed from warden to assistant warden.
Q. All right. But those were not things that you affirmatively requested yourself, those were things that LaSalle was asking of you; is that right?
A. No. No. It was -- it was kind of I'm going to call it a mutual agreement. I was asked if I would like to go back to Richwood closer to the house, somewhat less

responsibilities from warden to assistant warden but not really, and my salary stayed the same. I said sure, I sure will, yeah. It's a little bit closer to home.

Q. Okay. And then going back to Madison, who -- who asked -- did you ask first or did LaSalle ask first for you to go back to Madison?

A. I found out that they had a position open, assistant warden position in Madison, and I called Mr. James McCormick and talked to him -- talked to him about it and he sent me back. So --

Q. And that assistant warden position, did that -- did you have a decrease in pay when you went back to Madison?

A. No, ma'am.

Q. Okay. Have you ever had a decrease in salary?

A. Ma'am, let me go back. I'm sorry. Whenever I went from Richwood back to Madison as assistant warden, I did take a cut in pay. I did take a slight cut in pay, yes, ma'am.

Q. Okay. All right.

All right. And have you ever been

formally demoted?
A. No, ma'am.
Q. And have you ever -- have you ever falsified a record or made a false statement related to your employment?
A. No, ma'am.
Q. Okay. Have you ever received a verbal warning or counselling from a supervisor?
A. No, ma'am.
Q. Okay. Have you ever received a written warning from a supervisor?
A. Not a written warning, no, ma'am.
Q. Okay. And have you ever received a final warning from a supervisor?
A. I'm not sure what -- what you would term to be a final warning is. The only thing I've ever received from a supervisor was from Warden Arthur Anderson while he was the warden and I was assistant warden.
Q. And what -- what did you receive from Warden Anderson?
A. You asked what did I receive?
Q. Uh-huh (affirmatively).
A. What we called an employee rule violation report.

Q. And what was the rule violation?
A. Well, I don't really know.
Q. Okay.
A. I don't really know. He put it in writing he was not happy with me because -- and it's a long story and I'm certainly not going to get into it, but he wanted me to work nightshift because there was a personality conflict.
Q. Okay. Who was the personality conflict with?
A. Me and him.
Q. Okay. What -- how did that -- how did that look in day-to-day interaction with him?
A. He didn't want to look at me. So he thought his best thing to do was put me on nightshift; and he actually asked a major that worked for me, he told the major to tell me I'm being assigned, and I told the major you don't have the authority to do that, I'm your supervisor; and when he found out about it, he wrote the employee rule violation for it.
Q. Okay. Do you know which major it was?
A. Yes, ma'am. Steven Chase. He passed away July of last year.

Q. Yeah. Okay. So I want to make sure I understand. So Arthur Anderson and you, you had a personality conflict?

A. Yes, ma'am.

Q. Arthur Anderson asked Major Chase to write you up for something; is that right?

A. No, ma'am. He asked Major Chase -- he ordered Major Chase to put me on nightshift working nights.

Q. Okay. Okay. And you told Mr. Major (sic) that you wouldn't do it?

A. I told him that he didn't have the authority to place me on nightshift. I said this is what we are going to do, though. You're going to work nightshift one week and I'll work nightshift another week, and that's what we did.

Q. So Anderson worked nightshift one week and you worked nightshift one week; is that right?

A. No, ma'am. The major, Major Chase, worked nightshift and I worked one nightshift. We -- we alternated.

Q. Okay. Have you ever gotten any kind of disciplinary write-up, to your knowledge?

A. That's the only one, ma'am. That's

the only one I ever received in my corrections career.

Q. Okay. When -- when was this?

A. Probably the year 2020, the latter part of 2020. LaSalle would have access to that.

Q. Okay. All right. Have you ever been placed on a performance improvement plan?

A. Not to my knowledge. Nobody's ever mentioned it to me, no.

Q. Okay. Sorry. I'm -- I'm looking for one thing. The problem of having a computer die, I lost all my exhibits.

MR. MEAUX:

Got you.

MS. CUMMING:

All right. Sorry. One second.

All right. Okay. So this is going to be Exhibit 1, and I don't know what it's called. I'm going to show it to you and hopefully you or Eli can tell me what it's called.

(Exhibit 1 to be marked.)

MR. MEAUX:

Is this -- I assume this is something we produced in discovery?

MS. CUMMING:
Yeah. It's Bates number -- I'm going to be looking at Bates No. Stinson -- MAD-EE6.
MR. MEAUX:
Say M -- M what? I'm sorry.
MS. CUMMING:
M-A-D, as in like the word Madison, dash, EE6.
MR. MEAUX:
EE6. Okay.
MS. CUMMING:
It -- it looks like it's maybe like an HR system computer printout or something like that.
MR. MEAUX:
All right. Can you zoom in on that a little bit, Elizabeth, because it's --
MS. CUMMING:
Yeah.
MR. MEAUX:
We are kind of on a big TV here.
MS. CUMMING:
Yeah.
MR. MEAUX:

And, Chris, if you need to stand up and walk to the TV to get a look at it --
THE WITNESS:
Okay.
MR. MEAUX:
-- a little better --
BY MS. CUMMING:
Q. Can you see that?
A. Yes.
Q. Okay. All right. And so I am not going to make any guesses about where this comes from, I'm just going to say that -- that your attorney has provided this in the course of discovery. And it looks like it -- it's got the title up here (indicated) of Job History?
A. Uh-huh (affirmatively).
Q. And it starts August 8th, 2016, and then it goes up to 2019.
A. Okay.
Q. So it looks like it's warden one all the way through and then it's got your annualized salary listed --
MR. MEAUX:
Elizabeth, based on our TV, we -- that -- that on -- on the screen we are

looking at, the boxes that show like us and you here are covering that annual -- I can see A-N and then the box is covered.

MS. CUMMING:

Oh.

MR. MEAUX:

We see the document.

MS. CUMMING:

You might try and --

MR. MEAUX:

I might be able to move -- if you give me a second, I might be able to move my mouse to see where the boxes are on the screen.

MS. CUMMING:

Yep.

MR. MEAUX:

Give me a second to do that. Okay. Yeah. I was able to put you guys in the box. Okay. We can see it now.

BY MS. CUMMING:

Q. Okay. All right. So it looks like we have got 9/8/2018 is the transfer and that lines up with what you recall as being the transfer down to Richwood; and then but it has

you still listed as a warden and you keep the same pay; and then it has -- on 12/22/2019, there are a couple of entries that I'm sort of trying to understand, and it looks like there's also a decrease in pay.

A. Right.

Q. Would this line up with when you went from Richwood to Madison?

A. Yes, ma'am. I was saying January 2020, but effective -- that would be the payroll effective date, latter part of December of '19, yes, ma'am.

Q. Okay. All right. So you -- you -- I don't know. You might have taken vacation days or something, but -- but you stopped at Richwood as -- and you had that assistant warden position at Richwood, even though it says warden on here; is that right?

A. Yes, ma'am. I was not the warden at Richwood.

Q. Okay. All right. And then when you went back up to Madison, you were -- you -- you took that drop in pay and you were assistant warden, and that happened at the end of 2019; is that right?

A. Correct.
Q. Okay. All right. I just wanted to make sure that this was reflecting the same thing that we were talking about.
Okay. All right. And do you know -- do you know why there was that drop in pay?
A. Because I was assistant warden and Mr. McCormick didn't feel like I needed to keep making the warden's pay that I was making. As a matter of fact, the wardens and assistant wardens always got bonuses every year, and he called me and told me that I wouldn't be getting a bonus because I was the warden, which -- or I was making warden's pay. I'm sorry. And it's neither here nor there, but that's the reason. It's my job responsibility was not going to be as warden when I transferred back to Madison. It was going to be as an assistant warden.
Q. Okay. All right. Okay. All right. And you talked about you -- you were willing to go back down to Richwood because you wanted to be a little bit closer to home. I guess I'm -- I'm also -- I'm trying to figure out why -- why did you pick up the phone and try and go back to

Madison; was -- was it less important to be close to home, did some -- yeah.

A. What -- what is the question, why I picked up the phone? I didn't pick up the phone. I was made aware that they had an assistant warden position open at Madison and they couldn't find anybody to go to Madison and I was asked to go back. I talked to Mr. McCormick.

Q. So I guess I'm -- I'm a little confused because I think your earlier testimony was that, you know, when I was asking if you had ever requested transfers, my understanding of your earlier testimony was that you were Richwood as an assistant warden in part because LaSalle had said that they needed -- the warden position opened up at Madison and they wanted to move you down to Richwood and you said that was fine to be closer to home, but that when you found out about the assistant warden position, you -- you asked for that transfer.

A. Yes. I -- I did ask for it when I found out there was an assistant warden. They didn't have an assistant warden. I did ask.

Q. I'm trying to understand why you asked for that transfer.

A. Do what?
Q. Why you asked for that transfer?
A. I wanted to keep on working. I didn't want to come to the house. I didn't want to go back to the house and do nothing. And they had an assistant warden position, they had changed wardens. After I left, they brought in Phil Bickham and Billy Tigert and an assistant warden or Arthur Anderson. I'm sorry. They brought in three wardens in a little over a year, and nobody was staying in Madison very long.
Q. Were you -- was your position that Richwood was in jeopardy, were you going to be phased out of that or something?
A. Not that I know of. I got suspended, but I wasn't being terminated.
Q. Okay. When were you suspended from Richwood?
A. It was October of '19.
Q. Okay. Why were you suspended?
A. They had received ICE detainees and one committed suicide. They didn't have the grounds to terminate me after an investigation, Department of Justice did an investigation. They didn't have grounds to terminate me, so I sat at

home for a couple months. I still got paid.
Q. Okay. When did that ICE suicide happen?
A. It was in October of '19.
Q. Okay. Was there any kind of like -- any sort of --
Let me ask this: How did -- how did that suspension process work?
A. I was told to stay home.
Q. Who told you to stay home?
A. Mr. McCormick.
Q. Was there any kind of hearing, board, anything like that?
A. With LaSalle?
Q. Yes.
A. No, ma'am.
Q. Did Mr. McCormick tell you why he -- he was telling you to stay home?
A. Something to the effect Department of Justice or they had come in to do an investigation. Like I said, nobody was terminated. I was the assistant warden. The warden -- the warden's position hadn't been filled and I was asked -- Mr. McCormick asked me twice to delay my vacation and stay, keep trying

to operate the prison until they found a warden.

And during that time, it had been I think probably a month that Richwood didn't have a warden position or didn't have the warden position filled, and so I was -- it wasn't in writing, but I was the acting warden. Mr. McCormick referred to me as the acting warden; and the man committed suicide, he hung himself, and I was told to stay home.

He made the -- he made the comment lack -- lack of confidence; and when I asked him why there was a lack of confidence in somebody hanging themself, he said because you didn't cut him down. I walked over there or I walked to the cell block where he was at. There were nine other people there before I got there who didn't cut him down, including two nurses.

Q. Okay. What was the man's name who died by suicide?

A. Pardon?

Q. What was the man's name who died by suicide?

A. Ma'am, I don't remember. He was a Cuban detainee.

Q. When you say that he used the words

"lack of confidence," is that Mr. McCormick said that?

A. Yes.

Q. And -- and he was referring to you?

A. Yes.

Q. That he had lack of confidence in you?

A. (Nodded head affirmatively.) Yes, ma'am.

Q. What's Mr. McCormick's position in the -- in the company?

A. I have no idea, ma'am.

Q. Is he your boss, or when you were working for LaSalle, was he your boss?

A. Yes.

Q. Was anybody else suspended after this man died?

A. Not that I know of.

Q. I'm sorry. Say it one more time.

A. Not that I know of, ma'am.

Q. Okay. So the Department of Justice conducted an investigation. Did anybody else conduct -- did LaSalle conduct its own investigation?

A. Not to my knowledge.

Q. Okay. When you --
Well, let me ask this: In 2018 to 2021, run me through, you know, what -- what we can call your chain of command. Who was -- your direct boss, who was above them?
MR. MEAUX:
What -- what time period are you asking about, Elizabeth? Say that again.
BY MS. CUMMING:
Q. 2018 to -- to 2021, so let's start at Richwood. At Richwood, what was your kind of chain of command?
A. Richwood, I worked for the -- the warden. Ray Hanson was the warden and I was one of two assistant wardens at Richwood. Ray left and they hired another warden in January of -- January of '19. They brought in a guy by the name of Brady. I'm going to spell his last name. It's G-A-G-N-A-R-D. It's actually pronounced Gagnard. It's French.
Okay. He was the warden, I was assistant warden, and there was another assistant warden, and then Brady left. He had discussed it with LaSalle and he left in, if I remember correctly, August, September of -- of that year

and -- yeah. There's just the warden quit and there was just --

Q. And I'm sorry. Which year, that's 2018?

A. No, ma'am. 2019.

Q. 2019. Okay. All right. Go ahead.

A. Yes, ma'am. The other assistant warden quit and the warden quit, and so my supervisor at that time would have been Mr. McCormick since they didn't have a warden.

Q. And who -- who was Mr. McCormick's boss?

A. Rodney Cooper.

Q. And what is Rodney Cooper's position?

A. I believe his title is like executive director or something like that with LaSalle Management.

Q. Okay. And who is Rodney Cooper's boss?

A. That would be Billy McConnell.

Q. Okay. All right. And you're not sure of what Mr. McCormick's position or title is; is that right?

A. No, ma'am.

Q. Okay. All right. You said Ray Hanson quit in August of 2019 because he got disgusted with you-all. What -- why was that?

MR. MEAUX:

I'm going to object to the form. I -- I don't think -- could you re-ask the question? I think you might have said the wrong name there.

BY MS. CUMMING:

Q. Oh, okay. Okay. Who -- was it Gagnard?

A. Gagnard, Brady Gagnard.

Q. Gagnard. Okay. Sorry.

A. It's looks like Gagnard, he quit in either August or September of 2019. He -- he wasn't happy with LaSalle -- with LaSalle; and the other warden, assistant warden, he also quit about that same time right -- right before Mr. Gagnard -- Gagnard, right before he quit. So there was a warden and two assistant wardens, and like most of the time, it was just me.

Q. Okay. Who was the other assistant warden?

A. His name was Archie. Last name, I'll spell it. A-U-L-T-M-A-N, Aultman,

Archie Aultman.
Q. All right. And so why -- why did they quit; do you know?
MR. MEAUX:
I'm going to -- I'm going to object. It calls for speculation, but if he knows, he can answer.
THE WITNESS:
Brady -- Brady, just he got -- he got mad about the way they were doing things, okay. But Brady quit after Archie quit.
Archie's wife worked at Richwood as an RN. She was a registered nurse, and Mr. McCormick instructed Grady to terminate Archie's wife, and when -- when Brady told him what he had been told to do, I said, you know Archie's going to quit too and he did. He terminated his wife and then, ten minutes later, Archie quit, so -- and then two -- two weeks roughly, maybe three weeks later, Brady quit.
BY MS. CUMMING:
Q. Okay. Do you know -- do you know

why Mr. McCormick asked Brady to -- to fire this RN?

A. I --

MR. MEAUX:

Yeah. I was going to object to speculation, but he can keep going.

THE WITNESS:

I don't know. I don't know.

BY MS. CUMMING:

Q. All right. And so you have -- you have this exodus of -- of people, but do you know was there any other -- you know, did they have any complaints that they voiced to you before they left?

A. No, ma'am.

Q. Okay. All right. DOJ's investigation into the -- into the death of this man, do you recall what steps DOJ took to -- to investigate?

A. There were -- it was four people I believe came from wherever they came in from, Washington, wherever, you know, and they interviewed for maybe an hour and a half, just that. That was it. I don't know who else they interviewed or if they interviewed anybody else.

I don't know.

Q. Did they ask to see any records or logbooks or anything like that?

A. I think they had already gotten them from somebody. I didn't -- I didn't produce any. They didn't ask me for anything. But they had video of -- not of the man hanging himself, but video of the hall officers going in, finding him, running out the cell, people looking and so things like that. So I don't know who's got that video. I haven't seen it.

Q. Do you know when did -- when did Richwood start holding ICE detainees; do you know?

A. Spring -- of that same year, Spring of 2019.

Q. Is Richwood still holding ICE detainees?

A. I believe we are.

Q. Okay. So in -- so you were -- you were suspended October 2019. How long were you suspended for?

A. The thing you produced a while ago was all the -- the dates and then salaries and times.

Q. Uh-huh (affirmatively).
A. December 22nd I believe it was of 2020; is that right?
Q. Yes. Yeah.
A. Okay.
MR. MEAUX:
I'm going to -- I'm going to -- I think he even said December 22nd of 2020. I think it's 2019.
MS. CUMMING:
You're -- yes, you're right.
BY MS. CUMMING:
Q. You know what?
A. I apologize.
MR. MEAUX:
Yeah.
THE WITNESS:
Yeah.
BY MS. CUMMING:
Q. Let me -- let me show it to you again to avoid confusion.
A. That would have been the date I went back to work at Madison.
Q. Okay. All right. I'm going to -- let me show you this again.

A. Yes, ma'am.
Q. All right. Yeah. Okay. So 9/8/2018 transfer, this reflects you're going to Richwood. 12/22/2019, this rehire, that's when you come off of suspension; is that correct?
A. That's correct.
Q. Okay. So when Mr. McCormick called you and told you to -- that you were suspended, did he tell you, you are suspended for two months or did he say you're just suspended, stay home?
A. He didn't give a date or timeframe.
Q. Okay. Okay. All right. And was there any kind of paperwork that you got related to that suspension?
A. No, ma'am.
Q. No. Okay. And when -- and this December 22, 2019 rehire date, did you ever go back to Richwood to work?
A. No, ma'am.
Q. Okay. And so this December 22, 2019 date, is that referring to when you called to ask to -- to go to Madison?
A. It was sometime before December 22nd of 2019 that I talked to Mr. McCormick.
Q. Okay. Do you know did you or did

LaSalle ever receive a -- any kind of letter or findings or a copy of the investigation into -- into this death?

MR. MEAUX:

I'm going to object. It's speculation vis-a-vis whether he knows whether LaSalle got anything. If he does, he can answer. He can certainly answer whether he got something.

THE WITNESS:

I don't know whether LaSalle got anything. I did not receive anything from LaSalle, no, ma'am.

BY MS. CUMMING:

Q. Okay. Okay. All right. So I want to move into when you started at LaSalle in 2012, did you receive like the employees general rules of conduct?

A. I believe that I did, ma'am. I believe I did.

MS. CUMMING:

Okay. And I'll -- I'll show you what we are going to mark as Exhibit 2.

(Exhibit 2 to be marked.)

BY MS. CUMMING:

Q. This is an 11-page document. I'm going to scroll through it just so you can -- and so this is coming -- the authority is listed as Rodney Cooper, and that's the --
A. Yes, ma'am.
Q. That's who you named previously as Mr. McCormick's boss, right?
A. Yes, ma'am.
Q. Okay. All right. And I'm just going to scroll through this.
A. Ma'am, you asked if I received that when I started at Jackson Parish in March 2012?
Q. Yes.
A. Okay. What you are showing me there was not in effect at that time in March of 2012.
Q. Okay. Do you know when this -- when this came into effect?
A. No, ma'am. Sometime later. Rodney Cooper, his -- his name being on that, I -- I don't know, but it was -- when I started at Jackson Parish Correctional Center, it was under -- owned and operated by LaSalle Management and the sheriff's department. We were all deputized through the Louisiana Sheriff's Association, so there would have been another set

of rules, another set of, you know, not that.
Q. Okay. So -- so in 2012 when you started when you were working in Jackson or Jonesboro? Sorry.
A. Yes, ma'am.
Q. Yeah. When you started, you were -- were you --
Well, yeah. Let me ask that. What -- what was your understanding of the relationship between LaSalle and the Louisiana Sheriff's Association?
A. When I started at Jackson?
Q. Uh-huh (affirmatively).
A. I don't know, ma'am. I mean, I didn't have any dealings with the sheriff or deputy. I would come by the prison every once in a while, but as far as a relationship, I have no idea.
Q. Okay. All right. And so when you -- but when you started at -- in -- in 2012, were you -- were you considered like a sheriff's deputy? Did you go through --
A. I was sworn, yes, ma'am.
Q. You were sworn. Okay. Did you go through any kind of an academy or anything like

that? Did you hear my question?
A. No, ma'am. What's --
Q. Did you go through any kind of an academy or anything like that?
A. I'm sorry. No, ma'am. No, I didn't.
Q. Okay. All right. Did you have any kind of training that would -- you know, related to -- to being sworn?
A. No, ma'am.
Q. Did you -- did you ever go through POST?
A. 92-hour corrections POST?
Q. Uh-huh (affirmatively).
A. No, ma'am.
Q. Okay. All right. Did you ever receive this Employees General Rules of Conduct?
A. Yes, I did, after it went into effect.
Q. Do you know when it went into effect?
A. No, ma'am, I don't.
Q. Okay. Do you know -- do you recall where you were, like which facility you were at?
A. Must have been Madison. I'm pretty

sure it would have been Madison, yes.
Q. Okay.
A. But I'm -- I'm not sure, ma'am. I think it was Madison. It could have been Richwood. I'd have to -- I don't know if I happen to know the date. Is there an effective date on that?
Q. I don't think there is, but we will -- we will scroll through the 11 pages together and see. I'm on page 10 where it's got Chris Bell. Do you know who Chris Bell is?
A. Yes, ma'am. He's a regional warden. He's retired Texas corrections. He's over a certain region of prisons somewhere in Texas I think. Jason Eason, I don't -- I don't know him. Randi Clifton I think, well, yeah, she -- she left LaSalle a couple years ago, so I don't --
Going back to your original question, though, the effective date, I have no idea. If I knew the effective date, I would be able to tell you where I was at, either Madison or Richwood.
Q. And then this is -- is unsigned, but it doesn't look like there's an effective date.
Okay. All right. All right. All

right. So when you went back up to Madison in December 2019, January 2020, what -- what were your responsibilities?

A. What were my what?

Q. What were your responsibilities? What were your job duties?

A. Overseeing the various operations of the prison facilities, the -- the two prisons, MCC Building 3 and SCC Building 4, along with LTCW female facility. Probably take care of problems.

Q. Okay. What -- what kind of problems?

A. Oh, maintenance issues, employee disciplinary problems.

Q. So employee disciplinary problems, what -- what kinds of things are we talking about?

A. Ma'am, that could be anything: Somebody just not reporting for work; disgruntled employee doesn't want to get along with a fellow employee; somebody wants to change shifts, goes from days to nights, nights to days; the hiring process, trying to hire people.

Q. Okay. Okay. So when you were --

when you started back at Madison, who did you report to directly?
A. The warden.
Q. Okay. And when you came back, was that Arthur Anderson?
A. Yes, ma'am.
Q. And who -- who else during your -- during the time at LaSalle when it was under LaSalle, who else did you report to?
MR. MEAUX:
You're asking about MPCC, right?
MS. CUMMING:
Yes.
THE WITNESS:
I was going to ask. That was it. He was the only warden I worked for. He was there when I got back from Richwood and he was there until I transferred over from LaSalle with Security Management.
BY MS. CUMMING:
Q. All right. And then under Security Management, did you have any other wardens that you worked under?
A. No, ma'am.
MR. MEAUX:

Well, and it -- it got -- kind of -- kind of real quick, I do believe that he had previously mentioned there were some transitional wardens between Richwood, excuse me, Madison when they switched over, I think there were a few transitional wardens.

THE WITNESS:

There was one.

MR. MEAUX:

Tell her wardens.

THE WITNESS:

There was one transitional warden. He started June 1st of 2021. LaSalle was gone. LaSalle left. Security Management took over.

BY MS. CUMMING:

Q. And that was Ray Hanson, correct?

A. Yes, ma'am.

Q. Got it. Okay. Got it. So you reported directly to Arthur Anderson. Who was above Arthur Anderson?

A. Would be James McCormick.

Q. Okay. And above James McCormick?

A. Rodney Cooper.

Q. Okay. And above Rodney Cooper?
A. Billy McConnell.
Q. Okay. And that didn't change in a year, a year and a half that -- that you were back at Madison before Security Management took over?
A. No, ma'am.
Q. Okay. Okay. And then who reported to you?
A. There were two majors: Captains, Major Steven Chase and Major Tommy Farmer, and the captains reported to him, so --
Q. Okay. Who were the captains; do you recall?
A. Oh. Would have been a Captain Wendell Muse, Captain John Murray. Those are the only two names I can recall, ma'am, at that time.
Q. Okay. Are Muse and -- and Murray still there?
A. No, ma'am. Captain Muse has went out, has left, and Murray is still there.
Q. Is Captain Muse working some place else?
A. I don't know that. He was injured on the job a year and a half ago and he hasn't

returned to work since then.

Q. Okay. Are the -- is Madison subject to like monitoring or auditing?

A. Yes, ma'am.

Q. Okay. Who all was responsible for -- for, you know, auditing the facility?

A. Okay. We are required to be audited every year, once a year by the state. We have Basic Jail Guidelines, the government facilities, and they will send in a couple of auditors every year to audit.

Q. Okay. Anybody else?

A. Yes, ma'am. Used to be, I can't remember the correct title of it, the female prison on that middle side, it's owned by the state. They have a -- used to be Office of Risk Management that would come in, send somebody in to look at everything, make sure Allstate property is -- is there, no state property is missing, all the tags are still good, state property tags, but that's all on the women's side. That's done once a year.

Q. All right. And when you say that the state owns it, the -- the state owns the physical building?

A. The entire complex on the women's side, yes, ma'am.

Q. Okay. All right. And so that's why ORM is coming in, to actually look at the physical plant; is that right?

A. Right.

Q. Okay. So it has less to do with operations, more to do with is there water?

A. Yes, ma'am.

Q. Okay. Anybody else looking at the men's side?

A. We -- we have the state fire marshal's office that comes in, along with the health department periodically.

Q. How often does the fire marshal come in?

A. Ma'am, it varies, but fire marshals and health inspectors are, just guessing, three or four times a year, each one of them. That's just a guess, though.

Q. Okay. What are the fire marshals looking for?

A. Making sure the fire code is -- is being obeyed, making sure we are doing everything we should be doing, fire alarm systems, smoke

alarms, a lot of different things that go along with that.

Q. What about the health inspector, what's the health inspector looking for?

A. Sanitary conditions of the housing facilities, the kitchens, bathrooms.

Q. Do you have advance notice of those inspections?

A. I'm sorry?

Q. Do you have advance notice before the fire marshal or the health inspector come in?

A. No.

Q. All right. And so going back to the, you know, one year audits by the state, you said that's for the Basic Jail Guidelines; is that right?

A. Yes, ma'am.

Q. Okay. So what is your -- what is your understanding of the purpose of those audits?

A. Basic Jail Guideline audit?

Q. Uh-huh (affirmatively).

A. Make sure that we are following -- we are operating our facility, even though it's not like a DOC facility, we are required to

maintain a lot of different things, whether it's medical related, classification, security related.

Q. Okay. So what's the function of the audit?

A. To ensure that we are abiding by the BJG, Basic Jail Guidelines.

Q. Okay. And who -- who's responsible for -- for doing that monitoring?

MR. MEAUX:

I'm going to object to the form. Can you be a little more specific? I'm not sure what you're talking about.

MS. CUMMING:

Sure. Sure.

BY MS. CUMMING:

Q. I guess let me ask this. Do you know who -- who do you -- who do you deal with when -- when the state comes in to -- to do that monitoring?

MR. MEAUX:

And -- and you are talking about now?

BY MS. CUMMING:

Q. Let's start with --

MR. MEAUX:
Or do you mean back during the time?
BY MS. CUMMING:
Q. Well, let's start with --
Well, let me just ask this. We will -- we will back all the way up. So when that annual inspection time comes around, and now I'm talking about when you were assistant warden in, you know, 2020, 2021, when that annual inspection time comes around, what happens?
A. We will be notified ahead of time, usually a couple months out on the day of our audit, okay? And then the date rolls around, audit day and the auditors will come in and inspect. They come from David Wade Correctional Center in Houma, Louisiana and they will do the audit.
Q. So who gets notified at Madison that couple months out?
A. Myself or the assistant warden, warden even at that time, 2020, 2021, and the two majors, which would have been Major Steven Chase and Major Tommy Farmer.
Q. Okay. Okay. And who -- who from the state reaches out to tell you this is -- this

is when we are trying to schedule your audit?
A. One of the auditors.
Q. Okay. How many auditors usually come?
A. Two.
Q. Okay. Do you know their names?
A. Yes, ma'am. Tyrone Mays, M-A-Y-S, and last name is actually Malcolm. I'm trying to think. I'm sorry. First name is Roderick, last name is Malcolm.
Q. And it's -- it's been consistently those two that -- that show up every time; is that right?
A. Several years, yes, ma'am.
Q. Okay. How do they notify you that the audit is going to happen on a certain day; is it by phone, by e-mail?
A. They have done it both ways.
Q. Okay. And it's -- and it's always either one of them; is that right?
A. Yes, ma'am.
Q. Okay. All right. Do they -- and so in the -- in the -- after you get word that the audit's going to happen in a couple of months, what happens next?

A. Well, we try to make sure we do a little extra cleaning, make sure, you know, the -- the housekeeping part is done, everything's from mowing the grass to a little touchup, maybe a little touchup painting.
There's a set of files that are maintained and we have a lady that takes care of those files and we always -- we communicate a lot, quite a bit, make sure the files are -- are complete, the documentation's good.
Q. Who is it that maintains the files?
A. Her first name is Jessica. Her last name is Shoemaker, S-H-O-E-M-A-K-E-R.
Q. Okay. And is -- was she -- was she doing that back when LaSalle had the facility?
A. No.
Q. All right.
A. That was after June 1st of 2021.
Q. Okay. All right. So back when LaSalle had the facility, who -- who was maintaining those files?
A. It was several of us, myself included. It -- it was my responsibility as assistant warden to make sure that files were kept up and with my two majors, Major Farmer and

Major Chase. I also had a lieutenant helping me gather documentation. We had to have three years worth of sample documentation in each file, in each folder, so it was a group process, a group effort, but I was ultimately responsible for it.

Q. Okay. All right. So when you get the call that the -- that the audit's going to happen on a date, you're doing some extra housekeeping, you're painting, all of that stuff.

The -- the set of files, did -- was there -- was there work that needed to be done after to prepare for -- for the visit on the files?

A. There might -- several of us would look at the files. A different set of eyes is a good thing when something like that is coming on. I -- I have two or three of us. We would look at the files and we would say, oh, well, we missed something. But we maintained the files throughout the year, we didn't wait until the last minute and then find out we have got a problem. There was several of us doing that throughout the year.

Q. Okay. And when you say that you "maintain the files," you are talking like you

had a physical, you know, paper file that -- that you would keep?

A. (Nodded head affirmatively.)

Q. Answer verbal. I didn't quite hear you.

A. Yes, ma'am.

Q. Where -- where did you keep those files?

A. In an office in the administration building at the women's prison.

Q. When the -- when Security Management took over for LaSalle, what happened to --

Well, let me ask this: After the audit is done, what happens to the files that -- that you were keeping for the -- the purposes of the audit?

A. We keep them in an office.

Q. How long do you keep them?

A. Until the next year, we -- we keep the files. I mean, nothing changes. Well, I take that back. The documentation, because we have to -- you basically had a year, you took out a year, so there was all a year worth of file.

Q. And when you took out a year, what -- what happened to it?

A. It was destroyed.

Q. Okay. And when security -- when Security Management took over for LaSalle, what happened to -- to those files?

A. They were left in the office and the company, new company, Security Management, hired Ms. Shoemaker to do that, to take care of those BJG files; and they were in the office and the file stayed in the same office and we actually had somebody new working taking care of them.

Q. Okay. So files from 2021, would those still be in the -- the BJG files?

A. Documentation would be, yes, ma'am.

Q. Okay. And what about --

Well, let me ask this: Do you recall was there an audit that happened in 2020?

A. No, ma'am. I don't believe there was. COVID thing, they missed 2022, the state cancelled, shut down the -- the BJG officers going -- going to the private facilities. I believe it was 2020 and then they started back in '21. I believe, Ms. Cumming, I believe that's right.

Q. All right.

A. But then the state did miss an

entire year for any audits being completed.
Q. Okay. But to the best of your recollection, they started back in 2021?
A. I believe so, yes.
Q. Okay. All right. Okay.
All right. So the documentation that's in these files, what -- what all is included?
A. I believe there's a total of around 118, 120 BJG files, there's a number of medical related classifications, security practices. We have to have -- keep -- keep file -- on file fire marshal inspections, health department's inspections. It -- it covers a lot of different information; how we manage the prison, you know, water temperatures, you know, recreation time, things like that, you know.
Q. So let's -- let's take disciplinary, for example. Was there documentation that you would have to keep on -- on disciplinary?
A. Disciplinary for inmates?
Q. Uh-huh (affirmatively), yes.
A. Yes, ma'am.
Q. Do you -- do you recall what kind of documentation you would have to keep on that?

A. We would -- one of the things we have to keep is if an inmate receives a write-up, if it's in a -- what we call a schedule A or schedule B high court or low court, we would receive the disciplinary report and then I believe there's a 24-hour period before we hold the court on him.

If it's something where the inmate could possibly be arrested or lose good time, then we refer to what's called regional court, which is done via Zoom with staff at Wade Correctional Center as a private entity. Excuse me. We can't take good time. It has to be done by the state, so we will defer it, you know, to the state and do it through a Zoom and then the state, David Wade Correctional Center, staff will, you know, maintain it, if the determination is guilty or not guilty or if there's any forfeiture of good time. That's -- that's one that comes to the top of my head.

Then there's an appeals process that they can go through with the Louisiana Department of Corrections, so that's the only thing I can think of right off top of my head.

Q. Okay. All right. So -- so that's

the process that you were laying out. Are there pieces of paper that as someone goes -- as an inmate goes through that process, what kind of -- what pieces of paper get -- get generated to document that?

A. Right. Yeah. That's done. We -- we -- that's a formal record that we have to keep, we are required to maintain. So, you know, if the inmate's found not guilty, then it's, you know, dismissed, whatever, you know, there's no penalty or no punishment, so -- but, as I was saying, the state can -- can take good time. That's the only way. We -- we can't recommend, we can't -- we have to -- they have to do everything if there's a possible forfeiture of good time for an offender or inmate.

Q. Okay. All right. So -- so there is a formal record that's created, I hear -- I hear what you are saying there.

My question is, are there certain -- are there certain forms, are there certain documents that the state needs to see?

A. Ma'am, can you speak up? You went out there for a few seconds. Can you start over, please?

Q. Sure. So -- so the -- I hear what you're saying, that there's a formal record that's created, that -- that it's -- the disciplinary process is documented.

My question is when the -- when the auditors come in and they are looking to make sure that your disciplinary process follows the Basic Jail Guidelines requirements, what -- what pieces of paper -- you know, like is there -- is there a verdict form, is there a disciplinary board sign-in, are there disciplinary board minutes? What -- what types of documents does the state look to see?

A. There are. Everything is kept on file. The disciplinary report, the -- the -- the minutes of the report. That's all logged onto the report itself, whether the report is dismissed or if the verdict is X amount of days lost of good time, forfeiture of good time. All that's part of the -- the inmate's permanent prison folder.

Q. Okay. So all right. So that's -- that's in each person's permanent correction file?

A. Yes, ma'am.

Q. That would go with them to another facility if they got transferred; is that right?
A. Yes, ma'am.
Q. Okay. So -- so now kind of coming back to the -- the auditing process, do you take examples of that? So, you know, like you -- you -- you are going through this process. Do you take examples of like a specific inmate's disciplinary process and put that in with the -- with the Basic Jail Guidelines' folders for the auditors to look at?
A. Yes, ma'am. Sure do.
Q. Okay. How many examples do you -- do you put in the Basic Jail Guideline folders?
A. We -- we just need one for each calendar year, one example.
Q. Okay. How do you pick which example?
A. Luck of the draw.
Q. Do the auditors ever ask to look at, you know, random inmate files to -- to just do a spot check on -- on any other, you know, disciplinary documentation for someone that's not in the BJG folder?
A. Nope. They have never questioned me

or asked me that.
Q. Would they -- would they be able to have access to inmate files if they asked for them?
A. Yes, ma'am.
Q. And so that -- that one example, that's pulled out from that person's file or a copy is pulled out from that person's file and that's put into the -- the actual BJG physical folder, right?
A. I'm sorry. You -- you froze up again.
Q. Okay. So I -- I just -- I want to make sure I understand. So the -- a copy of the person's inmate disciplinary documentation, that record, the -- the one that you-all choose to show to the -- the auditor that's copied out of the inmate's folder and that's put into the Basic Jail Guideline folder, correct?
A. Yes, ma'am.
Q. Okay. All right. Do auditors request any documents prior to the monitoring visits?
A. No, ma'am. The only thing that we are required prior to the visit is to have when

they arrive the most recent fire marshal inspection, most recent health department inspection; but as far as something other than that, they have never asked me. It's never been asked, so --

Q. Okay. Okay.

MR. MEAUX:

Elizabeth, before you ask another one, I think a bathroom break would be --

THE WITNESS:

Yeah.

MR. MEAUX:

-- good right now.

THE WITNESS:

Stretch my legs.

MR. MEAUX:

I was about to ask you for one and he just said it.

MS. CUMMING:

You got it.

THE WITNESS:

Thank you.

MR. MEAUX:

Okay. Could we say -- it's 1:35 right now. What time you think? Could we

just say -- what time would you want to come back, Elizabeth?

MS. CUMMING:

You want to do five minutes, ten minutes?

MR. MEAUX:

We don't have that many bathrooms. Let's take ten.

MS. CUMMING:

Okay. All right. Ten minutes.

THE WITNESS:

Might be 20.

MR. MEAUX:

No. No. Thank you, Elizabeth.

MS. CUMMING:

Uh-huh (affirmatively).

(A short recess was taken at 1:35 p.m.)

BY MS. CUMMING:

Q. So all right. So we have been talking about the state audits. We have been talking about what happens beforehand. Walk me through the day of the -- the audits. You wake up, you have your coffee, it's audit day. What happens next?

A. We'll give the auditors a phone call

and ask them when they are going to be there because we have a little breakfast for them and have a private area where they can sit and visit and -- and have the files, the BJG files out; and they get there and usually, usually -- they can do it one of several ways. They will both look at files, and once they are done with that, then they'll do a walkthrough of the physical plant or one may look at the files and then somebody, the other guy starts looking at the physical plant, doing a walkthrough of all the dorms, kitchens, housing units, maintenance shops, looking at the grounds.

Generally, they are -- they are roughly 8:00 to 9:00 o'clock in the morning, 2:00 to 3:00 o'clock, 3:00 or 4:00 o'clock in the afternoon they are -- they are finishing up and leave their -- but if we get to have a bad audit or an audit where we failed or flunked, so -- and that's it. And then they send their findings to Department of Corrections in Baton Rouge, and along with the -- their report, which is several pages long, and we'll -- we'll get a -- we will get something from Department of Corrections in Baton Rouge later on -- it might be about a month

or two -- saying congratulations, you've successfully -- thank you for your 302 Basic Jail Guideline process.

Q. Okay. All right.

A. So --

Q. So the -- the area where you kind of set up the breakfast and the files and all that stuff, like where is that in the facility?

A. We do it over at the administration building at the women's side. It's -- it's got -- there's a room there, small conference room with a table and chairs where they have the privacy, not be interrupted by a staff, so --

Q. Okay. So when they are doing the walkthrough or when, you know, whoever ends up breaking off does the walkthrough, are they with a staff person?

A. Oh, yes, ma'am. Either myself, the -- the major, whether it's the men's prison or the women's prison, the major of that prison or captain, lieutenant, I believe three or four of us walking around following his lead, whoever he wants to talk to. They will stop and talk to staff in private, they will stop and talk to other offenders, inmates in private. We don't

question the inmates or the staff what did you-all talk about, what did you-all say. It's none of our business, so --
Q. Wow. So when -- when the auditors are talking to staff, where does that happen?
A. Wherever the staff is at. If the staff is in the control center, our kitchen, dining room, their office, wherever, you know, wherever they are at at that particular time when the monitors are walking around.
Q. And then was there -- if they are talking to -- how do you ensure that that conversation stays private?
A. Well, I've never had a complaint that from one of my staff where somebody, another staff member wanted to know what they were talking about. That's -- that's a no-no. If somebody got something bad to say about me or the facility, that's fine. They can air it, they can talk about it in private. If it's something bad I'm going to hear about it anyway, so --
Q. Okay. But there's no like people -- people don't get relieved from their duties to go into a private space or anything like that, they are -- they are out in the hallway or they are --

A. Yes, ma'am.

Q. -- out in the control room?

A. Yes, ma'am.

Q. All right. And then for inmates, is -- where do those conversations take place?

A. Wherever the inmate is at; if it's in a housing unit, if he's in the kitchen working, a trustee working outside the fence, wherever he happens to be.

Q. Okay. So if someone's on a dorm, if an inmate's on a dorm and the auditor comes in, is there any kind of private space that's away from, you know, the other people on the dorm, staff, anything like that where the -- where the inmate can talk to the auditor?

A. Yes, ma'am. Yeah, we will make sure nobody gathers up around the auditor so they can talk in private.

Q. Okay. Where -- where does that happen?

A. Where do they talk at? Wherever they happen to be at. I mean, like I said, in a housing unit, on a job site, wherever, you know. If the inmate doesn't want to talk to the auditor, he doesn't have to. If he does,

whatever he talks about, that's -- that's held private.

Q. Okay. So if an auditor walks into a dorm and is -- is talking to an inmate on the dorm, everybody on the dorm can see that the inmate's talking to the auditor; is that right?

A. That's possible.

Q. Okay. All right. Do the auditors -- do they go through -- do they look at logbooks?

A. Yes, ma'am.

Q. Okay. What logbooks do they look at?

A. Movement, if there's a movement made from -- from one housing unit to the other; day-to-day daily -- call it activities or what's going on, when account clears, recreation time starts, when it ends, when the dorms are fed. Anything out of the ordinary that happens, they are supposed to log that in a logbook.

Q. And those logbooks, are the -- are the auditors looking at those sort of like where they are, like in the control room, or are they looking at that copies that are part of the -- the --

A. Yes, ma'am. I -- I've seen them look through those logbooks. Yeah. We have -- we have a logbook where we keep all of our temperature checks for our ovens and -- and the scullery, dishwashing equipment. There's a logbook for that. So anything they want to look at, they are -- they are welcome to it. We don't hide or try to deceive.

Q. All they have to do is ask; is that right?

A. Yes, ma'am. Absolutely. You-all not hungry yet?

MS. CUMMING:

I'm like a camel. I can -- I can just go.

BY MS. CUMMING:

Q. Okay. So I want to get into classification. Let me -- let me start with -- with an overview. Why -- what is your understanding of sort of the function of classification in corrections generally?

A. The function. Okay. When we receive inmates, there's an inmate process, there's a couple intakes; a classification intake, a medical intake. You have to make sure

that's all done, create a file in our Jail Management System, our JMS, for that particular inmate.

When the inmate's released, we have to release him on the correct date, especially not a day too late. If the inmate, if we receive a detainer from -- from the courts, it could be on the local, federal level, you know, some type of detainer, make sure that's filed and we don't release that inmate without notifying the law enforcement agency that wants them.

They could tell you a whole lot better than what I can. I -- I stay out of their way. All I know is they do a good job. They -- they do a good job. We -- we don't have any significant -- thank God, we haven't had any significant problems that was caused by a bad classification error. I'm thankful for them.

Q. Okay.

A. Is there any where you are going with this, maybe I can get -- I might not know because that's not my specialty, but --

Q. Sure. No. I -- I mean, I guess really my -- my question is at the "why." So when someone comes in and they go through a

classification process, just trying to get your understanding of -- of why. Why is that important?

A. Well, housing a person that is -- should not be incarcerated, that -- that's just as bad as not having him if he escapes. In other words, if somebody is not supposed to be serving time in a facility anywhere, and that's never happened to me, but we -- we -- we certainly don't want that to happen.

Making sure they are -- they are -- they are imprisoned, I'm going to call it, they might have a different term, their prison file is good. Everything that happens to them or everything that involves them in my prison has to go on the JMS, Jail Management System. So that's a really, really important -- you know, again, releasing somebody, holding somebody past their out date, that's a -- that's a huge no-no. We don't want that, and it's almost as bad to release one a day or two too early, so --

Q. Oh, I -- I heartily agree. You do not want to hold anybody past their -- your -- their release date. So I guess -- I guess my question is more to thinking about someone's file

when they are coming in and making sure it's up to date, along with the absolutely critical function of making sure that they get out on time.

Is there any other -- in terms of like where they are housed and who they are housed with, is there any role that classification plays in that in your understanding?

A. Yes, ma'am. One of the questions that they would ask is if they have any known enemies at the facility, okay. And if -- if they claim -- claim to have a known enemy at the facility, either in Building 3 or Building 4, then we will look up and see if we have that person there. And if we have that person there that he's claimed to be his enemy, then we won't house them together.

Q. All right. So right. And so I guess that's -- that's sort of to the -- getting -- getting closer to the heart of the question is the why is that information, why is that important? Why -- why do you avoid housing them together?

A. Well, we are going to keep them

separate. If -- if he tells us, you know, if he doesn't know or if he doesn't want to tell us, then we have no idea.

Q. But is that -- the intention there is -- is to try and reduce violence; is that correct?

A. Yes, ma'am. Yes.

Q. All right.

A. Or the possibility of violence, yeah.

Q. Okay. All right. And so --

Okay. So you -- you kind of were giving me an overview of -- of the various intakes. I want to stay on specifically classification, specifically talking about, you know, not the question of -- of, you know, release date and calculating all of that, but the question of like where people are housed and who they are housed with.

Do you know how that information, how that classification process works at intake?

A. Classification officer interviews the inmate upon his arrival.

Q. Okay. And do you know where that interview happens?

A. Yes, ma'am. In the classification office. We also take a picture of the inmate.
Q. And what sort of information is the -- is the classification officer trying to get?
A. Emergency contact information, do they have any known enemies at our facility; there's a PREA form, Prison Rape Elimination Action form, that the inmate is required to fill out, has he ever been the victim of any type of sexual abuse. That's all I can think of. I'm sure there is more questions that they asked, but that's all I can think of.
Q. Does the classification officer review anything else, to your knowledge?
A. Not that I know of.
Q. Okay. Do they review disciplinary history or anything like that from other facilities?
A. If we get that information, they -- they can review it.
Q. Okay. Have you heard of a classification board or an Initial Classification Board?
A. Yes, ma'am. That's what they do at

state facilities, uh-huh (affirmatively).
Q. Okay. At -- at state facilities. So what does -- how does that work at state facilities?
A. It would be a couple -- couple people, somebody out of security. I'm talking past experience from the state that I retired from. We had three people; a member of security, a member -- somebody from medical, and somebody from the classification department.
The facility I -- I retired from was a work facility. I had 580 beds. Every man worked. Every man worked. We had people come in and confined in a wheelchair, paraplegics, they worked, did menial tasks.
But anyway, all the ICB, Initial Classification Board, make sure that he was medically and physically appropriate to work; and if he wasn't, then we would ship him to another facility, another state prison and get some basic information, education level, did he have any job skills, things like that, enemies, known -- known enemies. That's all I can remember.
Q. Okay.
A. But we do not have Initial

Classification Board in Madison. We are not required to.

MS. CUMMING:

Okay. I want to ask you about this next document. This is going to be Exhibit 3.

(Exhibit 3 to be marked.)

THE WITNESS:

Ma'am, we -- okay. We'll do that now. What is the date on that?

MS. CUMMING:

This is -- so Exhibit 3 is Madison Correctional Center, Initial Classification Board and it's May 28th, 2021.

THE WITNESS:

I'm not familiar with that.

BY MS. CUMMING:

Q. Okay. You're not familiar with this one?

A. Yes, ma'am. Excuse me, but if you look at the information there, it's DOC number, his name, his race, custody status. Custody will always be medium custody and where he's housed at. Now, that's -- that's not a review board.

That's an initial -- initial classification, and all that means is that classification has entered that information into our Jail Management System. So as far as it being a board per se, it's not a board. It's just one person, that classification officer that has completed that, and there's no medical information on there. That's -- that's something entirely different than what the state does.

Q. Okay. And the classification officer, that's -- that's Edward McDowell; is that correct?

A. Yes, ma'am. He's -- he's transferred actually to a state job now, but somebody has taken his place. We still have two classification officers at the men's side.

Q. Okay. When did McDowell leave for the state job?

A. When did he leave?

Q. Uh-huh (affirmatively).

A. It was last year maybe back September, October.

Q. Okay. And it's a state Department of Corrections job?

A. Yes, ma'am. Yes, ma'am. He -- he's

a re-entry specialist, something like that, and he actually works out of the women's prison at LTCW.

Q. Oh, okay. So he's still at Madison, he's just working for the LTCW?

A. Yeah. He -- he stopped working for the private sector. He's a state employee now.

Q. Got it. Got it. Thank you. All right. Okay. So do you know -- do you know where this form came from?

A. No, ma'am.

Q. Okay. All right. So even though it says Initial Classification Board, there is not, in fact, a board at Madison, correct?

A. Not a board per se, no, ma'am.

Q. Okay. All right. And so you're understanding of this form is that this is just -- this is just reflecting that this information got entered into the Jail Management System --

A. Yes.

Q. -- correct?

A. Yes, ma'am.

Q. All right. The Jail Management System, what -- what is that?

A. Pardon?
Q. What Jail Management System does --
Well, let me ask this. In -- in 2019 to 2021, what Jail Management System did LaSalle have?
A. PTS.
Q. Okay. And what Jail Management System does Security Management have?
A. The same system, ma'am.
Q. And you indicated that the custody is always going to be medium. Why is that?
A. Well, we are not allowed to house maximum custody inmates. Now, at our facility, an inmate can become maximum custody, maximum custody status if he goes to the lockdown, so -- there -- there should actually be on that form another column where his custody status changed from medium to maximum because his living quarters, 4LD, that's lockdown. L-D stands for lockdown. For whatever reason -- whatever reason those two offenders went to lockdown, their custody status changes from medium to maximum.
Q. Okay.
A. And when they are released from lockdown, their custody status changes from

maximum back to medium.
Q. Okay. Are people when they first come into the facility, are people sort of initially held in lockdown during some sort of any kind of transition period; do you know?
A. It could be one of several different reasons. If we get an intake at 10:00 o'clock at night, classification staff isn't there, okay, we are going to lock them up, make sure they are good and safe until they are -- until the next day until classification staff comes in and can complete the intake process. That's one of the reasons. Are you talking about new arrivals or just anybody?
Q. New arrivals, intakes.
A. New arrivals. One -- one of those guys could have had an enemy, he claimed an enemy. It could have been on a weekend late at night when classification staff isn't there. That's all that comes to mind right now.
Q. Okay. So, but your understanding of how -- how the process works is that when an intake comes in, it's, you know, 9:00 to 5:00 on a normal Monday through Friday, the classification officer is there, the

classification officer is going to do an interview, is going to assign that person a custody level and going to assign that person a housing location, but that -- but they don't have to go to lockdown initially; is that correct?

A. Right. It's not required, not initially.

Q. Okay. And this document, do you know who -- do you know who generates this document?

A. I don't know who generated that one.

Q. Okay.

A. If you scroll down, is there a name at the bottom of the page?

Q. Looks like it's got --

A. Edward McDowell.

Q. Edward -- all right. And -- and are those his initials?

A. Yes, ma'am.

Q. Okay. All right.

MR. MEAUX:

Can you scroll so I can get the Bates number there, Elizabeth?

MS. CUMMING:

Sure. It's ICB, paren, 5, slash,

21, paren, 1.
MR. MEAUX:
Great. Thanks, Elizabeth.
BY MS. CUMMING:
Q. Do you know does this document get generated every time there is a -- an intake?
A. It should be, ma'am.
Q. Okay. And where would this be kept?
A. I don't know. The original hard copy, I'm not sure. It should be stored, if nothing else, digitally.
Q. Where would it be stored digitally?
A. I believe the inmate's file, the inmate's prison folder.
Q. Okay. Would it be e-mailed anywhere?
A. I'm not sure.
Q. If -- I'm sorry. Go ahead.
A. I'm not sure, Ms. Elizabeth.
Q. Okay. And so you said the -- the inmate's prison folder, so one copy would be in Durrell Joseph's and one copy would be in Henry Mark's?
A. I'm going to assume that it would be in there. That should be part of their master or

their permanent prison file, yeah.
MS. CUMMING:
Okay. Okay. Let me go to Exhibit 4. This document, it's 13 pages. I'll scroll through it, but the top of it is called Current Inmate Location List, but then there's also run date and time, January 1, 2020. It looks like it's got a time, military time, 0937.
I'm just going to scroll through all 13 pages just so you can see. Eli, this Bates starts on CILL, paren, 2019, dash, 2020, close paren, '21.
(Exhibit 4 to be marked.)
BY MS. CUMMING:
Q. So my question is going to be do you recognize this document?
A. Yes, ma'am.
Q. Okay. What is this?
A. It's called by a couple different names, normally bed roster --
Q. Okay.
A. -- listing everybody in that particular housing unit.
Q. Okay. And when you say "that

particular housing unit," it -- here it says it's talking about -- we are on page 8 right now, but it has a name, it's got a booking number, it's got a class. The class says DOC.

Does that mean that that's a sentenced person being held for the department?

A. Yes, ma'am.

Q. Okay. And then it's got cell and it says 4C070. What does that mean?

A. Okay. The word cell is -- is not appropriate. It's housing unit. That is housing unit Building 4, C dorm, bed 70.

Q. Great. And so I'm going to keep scrolling down. And so now I'm on page 13, we have got cell 4D001. Does that -- tell me what that means.

A. That's -- that's the housing unit, D dorm, Building 4, D dorm, bed 1.

Q. Okay. And so this is a -- a listing of multiple housing units and who all is on -- on each of these housing units; is that --

A. Yes, ma'am.

Q. Okay. All right. How is this document produced?

A. It's part of the PTS system, would

be -- we would run one -- hope to run a bed roster. We will do it several times a day. It's digitally printed. I mean, we print it up.

Q. So you said you -- you would run it several times in a day. What -- on what --

A. Several times a day, yes, ma'am. I like to do them -- I want them to do it at least twice a day because we have two shifts, a dayshift and a nightshift, and each shift should have a current one when they come on duty or prior to getting -- or the shift could do it prior to them getting off duty to pass it on to the next shift. They might could have -- might be missing an inmate. We want to see who's in one particular bed in Building 4, C dorm, bed 19, it looks like it's Alex Arceneaux, is he there.

Q. Okay. And so when these are -- how -- how many copies are -- are printed off each time you -- you run one?

A. I don't know.

Q. And this is a report, like you -- you -- you go to a computer that has PTS on it and you -- you run this as a report; is that correct?

A. Correct.

Q. Okay. Is there any way to pull a census, a dorm census from a particular date? So, you know, right now, it's February 1st, 2024, but say you want to go and you want to look at who was in Building 4, C dorm on January 15th, 2024. Is there any way to do that?

A. I don't know, ma'am. I don't know if that's possible or not.

Q. Okay. So when these are -- are printed off, do you know who on each shift definitely has one of these bed rosters?

A. I don't know who all would have one, ma'am. A supervisor in Building 3 and a supervisor in Building 4 should each have one --

Q. Okay.

A. -- of their building.

Q. So if someone needed to access the bed roster to -- to double check counts or something like that, how would they do that?

A. By going into PTS, they could print up a hard copy or just scroll through the screen monitor.

Q. Okay. And so if this bed roster is being produced twice a day, is that -- at the end of the shift, is it -- is it kept anywhere?

A. Is the hard copy kept on file maybe?
Q. Yes.
A. I don't know if it is, ma'am. Probably not.
Q. Okay. And what about is there a digital copy that's e-mailed anywhere?
A. Not that I know of.
Q. Okay. Okay. All right. I'm on page 2. So we -- we have said -- we talked about class DOC. That means it's a sentenced person.
I'm want to look down here at Jalen Thomas. It says, Class: PREPARIS. I'm wondering what -- what does that mean?
A. Pretrial.
Q. Okay. All right. And building agency, EPPJ, what's that mean?
A. I believe that acronym is Evangeline Parish Police Jury.
Q. Okay. And so this is a pretrial person that's -- that has charges out at Evangeline but -- but being held at Madison; is that right?
A. Yes, ma'am.
Q. Okay. All right. And he's on the same dorm as Samuel Allen and Jordan Doucet, and

both of them are sentenced people according to the -- the classification; is that correct?

A. Correct.

Q. Okay. So if someone is on a dorm and they are feeling unsafe and they want to leave for whatever reason, how -- how can they do that?

A. Tell the officer what they need in their terms, check out, catch up, get to PC, Protective Custody, got an enemy there for whatever reason.

Q. Okay. How do -- how do they do that?

A. By telling the officer.

Q. Okay. Do they have to put anything in writing? Do they -- is there any special form that they have to do?

A. You talking about now or at that time?

Q. At that time.

A. No, ma'am.

Q. Okay. What about now?

A. Now, they are going to put something in writing.

Q. Okay.

MR. MEAUX:
Elizabeth --
THE WITNESS:
I don't want to take them out of the dorm, but they are going to tell me something, oh, I can't tell you that, you know, I'm not a snitch and all that. That's -- we are not -- we are changing our thought process. We have to.
MS. CUMMING:
Okay.
THE WITNESS:
At that time, no, they didn't have to do anything.
BY MS. CUMMING:
Q. Okay. But now if someone wants to leave a dorm, they have to put something in writing?
A. We are going to -- we are going to sit down and talk to them. They know who their enemy is if they truly have any enemies. They don't have to tell anybody else in their dorm, but we are going to pull them out and talk to them in private, so --
Q. Okay. Okay. So at that time, would

you take any steps to -- to look into why someone was trying to leave the dorm?
A. Would I or my staff?
Q. Well, let's start with you.
A. Okay. I probably wouldn't have known about it until well after the fact, but I believe that my staff would have taken -- you know, instead of just turning a deaf ear, I don't believe my staff did that. If they did, I never heard of it, don't know anything about that. But they shouldn't because there could always be something and you have to wade it through, a lot of lies to get to that little bit of truth. It's always there somewhere.
Q. Okay. All right. And so in your day to day, you know, when you are -- when you were operating as an assistant warden, let's say, would you -- would you spend time going on to the dorms?
A. When I could making rounds, yes, ma'am.
Q. Okay. How frequently would you do that in the course of a shift?
A. In the course of a shift?
Q. Uh-huh (affirmatively).

A. Oh, I -- I can't -- I don't -- I'm not sure how to answer that. I've got 2 buildings, 9 dorms, 24 lockdown cells just at the men's side and, you know, since I've been warden, you know, it's when I can. It's when I can.

Q. Okay. So let's say in the course of an average month, how frequently would you do a walk -- walkthrough?

A. Now or then?

Q. Now.

MR. MEAUX:

I'm going to object. That calls for speculation, but he can answer.

THE WITNESS:

Then or now?

MS. CUMMING:

Then.

THE WITNESS:

Okay. I don't -- I don't know. I -- I'm not sure.

BY MS. CUMMING:

Q. Okay. What about now?

MR. MEAUX:

I don't know. Don't look at me.

THE WITNESS:

Every now and then, whenever, whenever. My duties have multiplied since I became warden.

BY MS. CUMMING:

Q. Okay. Okay. All right. So if someone -- someone comes, asks to -- to move off of a unit, where -- and, you know, as you said, you probably wouldn't find out about it until way after the fact, where would you expect to see -- what would you expect to see written down about that move?

A. In the control center logbook for whatever housing unit he was in, there should be a notation in there, the date, time -- excuse me, date and time that he was moved, if he was moved just from A dorm to B dorm or from B dorm to a lockdown cell. It should all be notated.

Q. Okay. Should there be a notation of who made the move?

A. It should be, yes.

Q. Okay. And is there a notation of why the move was made?

A. It may or may not be.

Q. Okay. And what about any kind of documentation or notation of any kind of checking

for enemies?
A. Besides the intake process, and that's -- that's it, unless the inmate claimed to be -- claims to have an enemy, wants to give somebody a name or alleged enemy's name.
Q. Okay. And so when -- when someone moves from one dorm to another, there's -- there's no formal process to look and see, oh, these two people had a fight previously or -- or anything like that?
A. What -- what two people would that be?
Q. So let's take John Doe and James Dean, and John Doe and James Dean had a fight on -- in Building 4, C dorm in, I don't know, October 2020. In January 2021, John Doe is about to be moved onto a dorm where James Dean is.
Does anybody go back and look and say, oh, John Doe and James Dean just had a really bad fight a couple months ago, we probably shouldn't move John Doe onto that dorm with James Dean. Does that happen?
A. I understand what you're saying now. Yes, ma'am, we do that, uh-huh (affirmatively).

Q. Okay. How do you do that?
A. The supervisor will go get with, find out from -- if he remembers the fight or if he doesn't or if somebody makes him aware of the fight, which could be the inmate because they are not going to want to go back into the same dorm because it could turn out to be more serious than it was. Instead of a simple fistfight, it could turn out more serious.
So they would just talk about it, try to find out if there was anything. We basically ask the inmate can you live in this dorm, and he knows where his enemy's at and he will tell us the biggest majority of the time, so and so or I can't go in there because he doesn't want anymore trouble.
Q. Okay. But there's not any place, any -- any document or any place where, you know, the -- the person doing the move, the -- the CO responsible for the move, that they can go look and say, oh, these two people should not be in a dorm together, you're -- you're entirely relying on the inmate to tell you; is that correct?
A. Or not just the inmate but staff also.

Q. But you're relying on staff memory; is that correct?
A. Yes, ma'am.
Q. Okay. Is that documented anywhere, that process of, you know, talking to staff, talking to the inmate, anything like that documented when someone's making a move?
A. The move itself is documented.
Q. Okay. But -- but there's not any documentation of what steps the staff member took to see, oh, John Doe and James Dean, they -- they shouldn't be housed together?
A. Not that I know of.
Q. Okay. All right. What about -- what about when you have someone who -- who seems to be prone to getting beat up, they have gotten beat up a lot and then you have people who seem to be prone to beating people up, they beat people up a lot, is there any process to look and see, oh, we should probably not put those two people on because --
So let me -- let me go back to my John Doe and James Dean. John Doe has gotten beaten up four or five times in his time at Madison. James Dean has beaten up four or five

different people, not necessarily John Doe. Is there any process to look and say we should maybe not put John Doe and James Dean on the same unit?

MR. MEAUX:

I'm going to object to the form of the -- the question. Some of the terms are vague. The frequency is a little vague, but I'll -- I'll let him answer, if he can. Go ahead, Chris.

THE WITNESS:

Okay. You're asking if there's a process, something in writing, no, ma'am.

BY MS. CUMMING:

Q. Okay. What about not in writing?

A. What we will do, though, is we will transport that inmate to another prison, we will give him somebody else, we will move him from one building to the next before it gets to beating up, you said, four or five times or something like that. Before somebody beats somebody up four or five times or before somebody gets beat up four or five times, we are going to -- I mean, if it's something serious enough, I'll request a transfer through the Department of Corrections to get him transferred to a DO6 or something, so --

Q. What's -- what's serious enough?
A. Somebody's been stabbed, somebody's been raped.
Q. Okay. When's the last time you asked for someone to be moved to the Department of Corrections?
A. I don't remember.
Q. Okay. Let's say from 2019 to now, do you have a rough estimate of how many times you've asked to have someone moved to the Department of Corrections?
A. From the year 2019 until now? I have no idea.
Q. More than five?
A. Yes, ma'am.
Q. More than five?
A. Uh-huh (affirmatively).
Q. Okay. When you asked to -- to move someone to the Department of Corrections, how do you do that?
A. Send in an e-mail request to Baton Rouge.
Q. To Baton Rouge. Okay.
A. Yes, ma'am.
Q. Who do you e-mail in Baton Rouge?

A. Usually, it's a fellow by the name of Dwayne Cambre, C-A-M-B-R-E. I don't remember his job title. He works directly under chief of operations, Seth Smith.

Q. Okay. And you would send that request by e-mail usually?

A. Yes, ma'am.

Q. What was your e-mail address under LaSalle; do you know?

A. I honestly don't remember. I -- I really don't remember, ma'am. I can give you my e-mail address now.

Q. Yeah. Tell me that now, uh-huh (affirmatively).

A. It's cstinson@securitymgmt.net. Security Management dot net. I thought you were going to ask a while ago when you asked about my phone number and address.

Q. So -- okay. If -- if you remember, was the LaSalle address likely something similar, like C Stinson or some iteration of your name?

A. Yes, ma'am. Yes.

Q. All right.

A. LaSalle should be able to tell you. It's in their database. They should still have

it.

Q. Okay. We will -- we will ask. Eli's familiar with it, so -- but your estimate is more than five times. Let me ask this: More -- more than ten times that you would have e-mailed DOC to try and get someone moved?

A. From the year 2019 through '14 or '24, yes, ma'am, probably so.

Q. Okay. All right. More than 20?

MR. MEAUX:

I'm going to go ahead and object because the --

THE WITNESS:

No.

MR. MEAUX:

-- the counting up is inherently speculative. He can answer certainly, but --

THE WITNESS:

I don't know. I don't know, ma'am, I really don't.

MS. CUMMING:

All right. Okay. All right. I want to go to what we'll mark as Exhibit 5. This is two pages and it's

titled Madison Correctional Center Voluntary Statement, and this is for Donald Dorsey. This is Bates No. Dorsey BF10. And then the second page is Donald Dorsey's, another voluntary statement, and this is Dorsey BF11, the Bates. So I want to just ask you kind of generally about that.

MR. MEAUX:

It's not up on the screen, Elizabeth.

MS. CUMMING:

Oh, I'm sorry. I need to share my screen. Thank you, Eli.

(Exhibit 5 to be marked.)

BY MS. CUMMING:

Q. Okay. Now -- now, can you see the document that I'm talking about?

MR. MEAUX:

Yeah.

BY MS. CUMMING:

Q. Okay. All right. I'm just going to show you these two pages. I'm on page 2. I'm down here (indicated) where it says Witness. Do you know whose signature that is?

A. No idea.
Q. I'm sorry. Say it one more time?
A. I have no idea.
Q. All right.
A. It's not mine.
Q. Okay. All right. So this is a voluntary statement form, according to the title. Do you know does this document look familiar to you?
A. Not that particular document, but I have seen voluntary statements.
Q. Okay. Yeah. And I'm -- I'm not going to ask you about the specifics of this one, I just want to ask you about how voluntary statements are used. So how -- how are voluntary statements used?
A. Well, like in this particular instance here, this inmate, Donald Dorsey, he's claiming that he doesn't have any problems with J. Clifton Douglas. So in signing that, it means that he -- to us, he's telling us that he can live in whatever housing unit J. Clifton Douglas is in.
Q. Okay. Why -- how does this -- how does this statement come about; like is this --

is this filled out and signed on the dorm, is it signed in an office; how does this happen?

A. It's signed in a supervisor's office.

Q. Okay. Would there be a corresponding voluntary statement from anybody else that's named in -- in a voluntary statement?

A. There could be. In this particular instance, I don't know if there was.

Q. Okay. I'm on page 2. This one says "More generally, I can live in B dorm, Building 3."

Do you know what the purpose of -- of a statement like this would be?

A. Just guessing, this particular inmate, Donald Dorsey, staff was considering moving him into B dorm in Building 3 and the inmate put it in writing, yes, I can live in -- in B dorm.

Q. Does -- does a voluntary statement get made or filled out every time someone is moved from one dorm to another?

A. Not necessarily, no.

Q. Okay. What -- what -- what occasions would a voluntary statement be made?

A. Maybe just for an example, this particular inmate, Donald Dorsey, he came out of A dorm because he had a problem, maybe he got into a fight. They left the other guy in A dorm and they said, well, look, Dorsey, can you live in B dorm; and he says yes, so he signs off on the statement.

Q. Okay. But this doesn't -- but it doesn't always happen that if you are moving from one dorm to another you sign a voluntary statement; is that right?

A. No.

Q. Okay. And so I guess my question is like is there a particular set of circumstances when a voluntary statement is used, or is it just kind of if you happen to have a voluntary statement form, then you use it?

A. Well, I'm not sure how to answer that. You know, the situation, the circumstances, it could be one of several different things.

This guy here in particular, Donald Dorsey, I'm just guessing that he was moved out of another dorm for some reason and they found a dorm that he could live in that he said he could

live in, B dorm.

Q. Okay. So is there -- is there like a procedure or a policy around when a voluntary statement is used?

A. Not that I'm aware of.

Q. Okay. I'm going to go to Exhibit 5.

MR. MEAUX:

Well, that -- that was Exhibit 5, right?

MS. CUMMING:

Oh, I'm sorry. Yes. Yes, it was. This is going to be Exhibit 6.

MR. MEAUX:

Okay.

MS. CUMMING:

Thank you for keeping me straight.

MR. MEAUX:

I'm writing them down.

MS. CUMMING:

All right. This is Exhibit 6. This is one page. I'm going to scroll through.

(Exhibit 6 to be marked.)

BY MS. CUMMING:

Q. Does this document look familiar to you?

A. Yes, ma'am.
Q. Okay. What is this document?
A. Classification. I would classify who we can classify as a trustee.
Q. And it's got Arthur Anderson as warden and it's got you as assistant warden.
Did you have any role in drafting this document?
A. No, ma'am. And the effective date, May 1st, 2014, Arthur Anderson wasn't there. That effective date should have changed whenever he signed off on it and as warden because that's his signature. That is his signature.
Q. Okay.
A. So that effective date should have changed. I don't know when he came to Madison. It was sometime in 2019, but I am familiar with the document, but I was assistant warden.
Q. Okay. So this -- this is the document that -- that would have been in place in -- in 2019.
Do you know did the classification policy change at any point between 2019 and 2021?
A. No, ma'am, not that I know of.
Q. Okay. And so this is the document

or the classification policy that would have been in effect that whole time that you were assistant warden, correct?

A. Yes, ma'am.

Q. Okay. And if I -- if I -- if I asked this, apologies. Do you -- do you know who wrote this?

A. No, ma'am.

Q. Okay.

A. I don't know what -- I may have had a part. I don't remember. The warden on May 1st, 2014 was Keith Deville. I was assistant warden. We may have corroborated on that particular policy. We did on several because there were no policies in existence when we came to Madison. So I might have had a part in it. I don't remember.

Q. Okay. All right. Is there any other policies at Madison that -- that you can recall that -- that deal with the question of -- of classification, specifically the aspect of classification about like where people are housed and who they are housed with?

A. I can't think of anything, ma'am. I mean, there may be. I think there are like

between 80 and a hundred different policies in effect. I -- I -- but I don't know the answer to your question.

MS. CUMMING:
Okay. I want to go to what's going to be Exhibit 7, and this is seven pages.
(Exhibit 7 to be marked.)
BY MS. CUMMING:
Q. Can you see it?
A. Yes.
Q. I'm just going to scroll through all seven so you can see the shape of it.
MS. CUMMING:
Eli, it's ESI-James Murray 190 is the first Bates number.
MR. MEAUX:
Okay. Is it 190 through whatever the -- I mean, how many -- how many pages you said it was?
MS. CUMMING:
Seven pages and I think it's continuous.
MR. MEAUX:
Okay. It looks like 190 through 196 or something.

MS. CUMMING:
Yeah.
BY MS. CUMMING:
Q. All right. Have you seen these documents before?
A. Yes, ma'am.
Q. Okay. What are these documents?
A. Basic Jail Guidelines.
Q. Okay. And these are -- these also have sort of a self evaluation and then a guidelines compliance section. What are these documents used for?
A. Each Basic Jail Guideline that we have has -- okay. Right there.
Q. Okay.
A. II-A-012 Classification System, Security, we have a folder for that particular document. When you open up the folder, that document is on the left. That documentation proving that we meet the guideline is on the right. Now, that's a blank one that hasn't been -- that's something that's in the files awaiting signature. I will sign off on the left-hand side where it says Staff. The monitors will sign the right-hand side when they do an

audit. So yeah. There's seven sections. That's Part II - Security out of seven different parts.

Q. Okay. So this goes into the folder for that provision and then inside the folder are all of the things that show you were in compliance with that provision; is that what I'm understanding?

A. That's correct.

Q. Okay. And then when the audit happens on that day, you-all sign and the monitors sign; is that right?

A. Well, no. Staff signature, that would be my signature or a major; and actually now, I have an assistant warden, but that would be signed beforehand. After we make our file look and all of our BJG files on the day of the audit, one of the monitors will -- will sign under the monitoring committee.

Q. Great. Thank you. That's exactly the clarification I was -- I was trying to understand.

Okay. So in the folder then under protocol, would you have the written policy and procedure?

A. Yes, ma'am.

Q. All right. And so the policy that was included in the BJG folder, and I'm talking about the 2019 to 2021 period, was that that policy that we just looked at?

A. I believe it was. Okay. You talking about in 2021 now?

Q. 2019 to 2021 while LaSalle had the -- had the facility.

MR. MEAUX:

Well, he wasn't there in 2019 I think is what he's saying.

THE WITNESS:

Yeah.

MR. MEAUX:

And there wasn't an audit in 2020 I think is what he said.

THE WITNESS:

Right.

BY MS. CUMMING:

Q. Did you keep your folders even though there wasn't an audit?

A. Yes, ma'am.

Q. Okay. So in the folder for 2020, did you have that same policy that we were looking at for this provision?

A. We would have. Even though we didn't have an audit that year, ma'am, we did keep the files, the folders up to date with documentation. So there was documentation and -- and people couldn't understand why they said they aren't going to have an audit, but they might change their mind and we would be caught shorthanded, so -- but --

Q. So in that, let's say, the 2020 folder, did you have -- you had that policy that we were just looking at --

A. Yes, ma'am.

Q. -- as Exhibit 6? Okay. For classification forms and formats, what all did you have in the folder for that?

A. Just guessing because I don't know. If I had the folder right now, I could tell you what's in there. When it comes to forms and formats, the format part, I don't know about that.

A form could be that initial classification, the ICB form that you brought up a while ago earlier, that could be on there. Offender orientation materials, that's -- that's such as the handbook. Classification plan would

be part of the policy and procedure.

Q. Okay. So that was going to be my next question. So the classification plan, did you have a separate document for classification plan?

A. I don't think so. Don't remember.

Q. Okay. So your understanding of classification plan is that -- that your policy covered classification plan; is that right?

A. Yes, ma'am.

Q. Okay. All right. And so this -- this policy that we looked at as it -- as in Exhibit 6, that's your classification plan; is that right?

A. Yes, ma'am.

Q. Okay. All right. So, and you were talking about in '20 you -- you have the folders now. What's -- is there anything different in the folders now for this provision?

MR. MEAUX:

I -- I'm making an object -- I'm just going to object because I would -- I would consider that subsequent remedial measures, but just put it on the record; but he can answer, if he can answer it.

THE WITNESS:
Could you say it again, please, ma'am?
BY MS. CUMMING:
Q. So now you still keep the folders for the Basic Jail Guidelines?
A. Yes, ma'am.
Q. Do you have anything different in the folders now for this provision than what you had under LaSalle?
A. I don't think that there would be any difference, ma'am. I don't remember of this particular guideline changing. They do have changes from time to time, but I don't remember that one changing; so no, I don't think -- I don't think there's any difference. There may be, but I don't believe that there is.
Q. Okay. And so you're -- and so you're not changing any of the -- the materials that you are providing in support; is that right?
A. I'm sorry. I didn't understand you.
Q. You're -- you're not changing -- because there's no difference in the provision, you are not changing any of the materials that you are providing in support?

A. Right.
Q. Okay.
A. Yes, ma'am.
Q. All right. Okay. So if we went up to -- to Madison, we would be able to go into the room and look at the Basic Jail Guideline folder for II-A-012 and that would be pretty similar to what you were showing the -- the department, the state auditors back in -- in 2019 and 2020, if they had had one?
A. Yes, ma'am.
Q. Okay. And then down here (indicated) where it says Documentation, it says Offender Housing Records and Offender Classification Records. Were these included in the folder as well?
A. They should be. Could you scroll down a little bit?
Q. (Complied.)
A. A little bit more.
Q. (Complied.)
A. Okay. Right there, Ms. Elizabeth, the primary documentation, that's that IP, Institutional Policy, that you had on your screen earlier, okay, had Arthur Anderson's signature.

The Secondary Documentation is offender housing, I'm sorry, Offender Assignment to Housing and S-2 Trusty Board Review. Offender housing does -- assignment to housing, that could be -- I'm not sure, but it could be ICB, or Initial Classification Board, okay, so that's part of the documentation.

The Offender Trusty Board Review is where we review the possibility of putting a particular offender outside of the fence, outside of the wire, so that is a group effort. We look at his record to see if he's worthy. We do not put such offenders of any type outside of the prison working. They work inside of the prison, but they don't work outside. So that's the documentation that would go along with that particular guideline. And that -- that P-1, S-1 and S-2 probably has not changed since 2019. In all probability, it hasn't changed.

Q. Okay. And so your documentation is probably not going to change, even though the -- the facility switched operators; is that right?

A. Yes, ma'am.

Q. Okay. All right. So the offender assignment to housing, that Initial

Classification Board, that might be one example of something that might be put in there for that; is that right?

A. Correct.

Q. Okay.

MS. CUMMING:

All right. I want to show you -- I'm sorry. Bear with me one second.

MR. MEAUX:

Yeah. Elizabeth, when you -- when next time you reach a normal stopping point, we could -- can we get another bathroom break and water break and such?

MS. CUMMING:

Do you want to take one right now while I -- while I pull up this other thing to pull up?

MR. MEAUX:

Yeah.

MS. CUMMING:

Okay.

MR. MEAUX:

Yeah, that works. So 2:55, we can come back at 3:05; will that work?

MS. CUMMING:

Yeah.

MR. MEAUX:

Okay.

(A short recess was taken at 2:55 p.m.)

MS. CUMMING:

So we are back on. I'm going to share my screen. This is going to be Exhibit 8. So we were talking about like the -- the documents, the housing assignment forms and so I wanted to show you this. This is dated 6/19. And I'm sorry. The copy is not the best, but it says Initial Classification, 6/19/2020, James Murray. It's got custody printed as medium. This is by Edward McDowell.

(Exhibit 8 to be marked.)

BY MS. CUMMING:

Q. Would this be another housing assignment document?

A. Can you scroll to the top?

Q. Sure. That's -- that's the top.

MR. MEAUX:

Yeah. I think if you look in that kind of filled in bar, I think you can see the words in there.

THE WITNESS:
Initial classification.
BY MS. CUMMING:
Q. Well, let me back up. Have you seen this document before?
A. I've seen documents like that, that particular document, yes, ma'am.
Q. Okay. All right. And what are these documents?
A. Is your question what is this document?
Q. Yes.
A. It's part of the initial classification where the inmate offender arrives.
Q. Okay. And is this part of the -- would this go into the folder, the -- the Basic Jail Guideline folder for classification for that provision that we were just looking at?
A. It would go into that particular inmate's folder.
Q. Yeah. So I know it would go into the inmate's folder. My ask is, is this one of the -- the housing assignment documents that would be included in the Basic Jail Guideline folder, an example, not just this particular one,

an example?
A. Yes, ma'am. It could be, yes.
Q. Okay. You're not certain if it is or not?
A. No.
Q. Okay. All right. But if it -- if this folder -- if this document was included in the folder under LaSalle, it would be included under the folder in -- under Security Management; is that right?
A. It would be, yes.
Q. Okay. All right. Okay. So from 2019 to 2021, was there -- was there any kind of matrix or housing unit assignment plan or any -- any kind of anything where you could look to see, okay, this dorm is used to house this sort of -- of inmate, this dorm is used to house that sort of inmate, anything like that?
A. I'm not sure about 2019 because I wasn't there; but yes, it could be.
Q. There -- oh, what about 2020 and 2021 when you were there?
A. It could be.
Q. There could be, but you're not sure?
A. Yes, ma'am.

Q. Okay. Do you know was there -- where would that be if -- if there was one?
A. It would be kept on the computer in the Jail Management System, JMS.
Q. Okay. What would it be called; do you know?
A. I'm not sure.
Q. Who would have access to it?
A. People that have access to PTS.
Q. Okay. Do you know was there ever a point at which --
Well, let me ask this: Like I -- so I -- I hear what you're saying that -- that you don't know if it was documented anywhere.
Was there ever -- do they -- was there ever kind of a -- an understanding among the people that worked at Madison that this dorm is used for this type of person, this dorm is used for this type of person, so Building 3, C dorm, that's where we are going to keep people that -- that have kind of medical needs; Building 4, D dorm, that's where we are going to keep people that are, you know, problem children and get into fights a lot; was there anything like that?

A. Not that I know of.
Q. Okay. What about holding pretrial people, was there any designated dorm for holding pretrial people?
A. When I came back end of '20, beginning of '20, I'm sorry, the end of '19, beginning of '20, we did not have a designated pretrial dorm in place.
Q. Okay. And so when you did not have a designated pretrial dorm in place, where were pretrial people housed?
A. They were mixed in with DOC.
Q. When did that change?
A. I don't remember. I don't know.
Q. All right. Do you know why that changed?
A. No, ma'am, I don't. I mean, I wasn't -- it wasn't my place to make that decision. The warden did.
Q. Okay. That was Warden Anderson at the time, correct?
A. Yes, ma'am.
Q. All right. Did the warden consult with you in making that decision?
A. Nope. No, ma'am.

Q. Did -- did the warden, to your knowledge, consult with anybody in making that decision?
A. Not to my knowledge.
Q. All right. So at some point in 2020, there was a dorm that was designated for pretrial people; is that correct?
A. Yes, ma'am.
Q. All right. And that was J dorm, correct?
A. Yes, ma'am. 4-J.
Q. 4-J. When all of the people were moved onto 4-J, all of the pretrial people were moved onto 4-J, was there any review to see if they could all live together?
A. Not to my knowledge.
Q. Okay. So I want to turn now to staffing. So actually, before I go there, let me ask about the pretrial people.
Do you know when we were looking at that bed roster, there was someone who was from Evangeline Parish. How is it that -- that Madison comes to house pretrial people from other parishes?
A. Parishes that don't have enough bed

space to house somebody, whether it's a DOC inmate or a pretrial inmate, they -- they might call or e-mail myself or one of my supervisors, or at that time the warden or a major, asking if we had bed space available.

Q. Okay. And would you enter into like a contract with these other parishes?

A. At that time, there was not a contract, no, ma'am.

Q. Okay. Is there -- are there contracts now between Madison and other parishes?

A. Yes, ma'am.

Q. There are?

A. Security Management and other parishes, yes.

Q. Okay. All right. Security Management enters into the contract with the other parishes?

A. Yes, ma'am.

Q. And so before there were contracts, how did -- how was the -- how was payment worked out? I mean --

Well, let me ask this. Were you paid -- was Madison or LaSalle paid by other parishes to hold people for them?

A. (Nodded head affirmatively.)
Q. Answer one more time. I -- I couldn't hear you.
A. Yes, ma'am. Yes, ma'am.
Q. Okay. And so the -- how was the rate for payment set?
MR. MEAUX:
I'm going to object. It's speculation. I don't know that we have established that he would know that, but if he knows it, we can -- he can say it.
THE WITNESS:
Don't know, ma'am.
BY MS. CUMMING:
Q. Okay. Do you know who would have been responsible for setting the rate for -- of payment?
A. Somebody at LaSalle Management headquarters --
Q. Okay.
A. -- would have done that.
Q. And so your understanding would have been the agreement would have been between LaSalle and the -- the parish sending the pretrial person; is that correct?

A. Yes, ma'am.
Q. Okay. Would the -- would the Madison Parish Sheriff's Office have had anything to do with it, to your knowledge?
A. No, ma'am.
Q. I'm sorry. Say it one more time.
A. I don't believe Madison Parish Sheriff's Department would have had any -- anything. It would have been strictly between that parish, particular parish and LaSalle Management.
Q. Okay. And so when another parish wanted to send someone, a pretrial person out, they could contact you, they could contact the warden. Who else would they contact?
A. One of the two majors.
Q. Okay. And so if they contacted one of the two majors or they contacted you, did you have to seek approval from anybody?
A. No.
Q. I'm sorry. Say one more time.
A. I'm sorry. No, ma'am. No, ma'am.
Q. No, ma'am. Okay. All right. And so you could -- you had authorization and the majors had authorization themselves without

asking anybody else to say yes, Evangeline; yes, Iberia, send this person and -- and we will hold this person for you?

MR. MEAUX:

I -- I'm going to go ahead and object to the form. I don't know that he said anything about the majors yet, but he can speak to that.

THE WITNESS:

If myself or at the time the warden, Warden Anderson, if they -- if he received a phone call, he could accept or deny taking that -- that particular inmate for whatever reason.

BY MS. CUMMING:

Q. Okay. All right. You -- you said -- you testified earlier that when I was asking who else would -- would -- could get the phone call or the e-mail about transferring someone, you said that the two majors could also receive those phone calls or those e-mails; is that correct?

A. Yes, ma'am.

Q. Okay. And you said that the two majors would not have to ask anybody before

accepting; is that correct?

A. That did -- they would ask me. I don't know if they ever asked the warden, but they would ask me, hey, we got a call from Evangeline Parish to get the first housing unit, can we do it. If we had bed space, absolutely.

Q. Okay. All right. So they would ask you and -- and -- but you were in a position to be able to authorize --

A. Yes, ma'am.

Q. Okay. All right. Okay. What -- what criteria did you consider in determining whether to accept or reject someone from another parish?

A. The only criteria I ever looked at was how were they medically wise; were they confined to a wheelchair, something like that, if they had some type of existing medical conditions, some serious meds.

Even now, we get phone calls, e-mails wanting us to house inmates that are on controlled narcotics. We do not house inmates that -- that are on controlled narcotics, so that -- that would be the only criteria that comes to mind.

Q. Okay. And would you -- before accepting or refusing a transfer, would you ask for medical records or something like that?
A. Yes, ma'am. We would ask for a medical summary.
Q. Okay. Okay. Any -- would there be any other documentation that you would ask for prior to accepting or refusing a transfer request?
A. No, ma'am. With pretrials, Department of Corrections doesn't have to be notified, even at that time and even now, to transfer a DOC inmate from one facility to another, it has to be approved through somebody in Baton Rouge.
Q. Okay. So -- okay. And so you or Warden Anderson would be able to accept someone.
How did LaSalle know, okay, we have got three people from Evangeline Parish. How did LaSalle know to go get their money from Evangeline?
A. They would have to correspond. We would -- we would notify LaSalle that we picked up two particular inmates from Evangeline Parish and LaSalle would -- they would have to do the

follow-up as far as collecting reimbursement for the per diem.
Q. Okay. And so how did you let LaSalle know?
A. I didn't do it. A lady that -- that was working or still works there, she -- she would notify them. She would notify LaSalle and also notify DOC if there were DOC inmates through a billing process, okay?
With the parish pretrials like these two from Evangeline, DOC is not involved because they are not DOC inmates, so we would note -- we would correspond directly to Evangeline Parish.
Q. Okay. So do you know would she put together an e-mail, would she make a phone call; how -- how was she communicating with LaSalle?
A. I'm sure it would have been an e-mail.
Q. And do you know who she was e-mailing at LaSalle?
A. No, ma'am.
Q. All right. So your job was to say yes or no on the transfer, the pretrial transfer request. If it was a yes, you would let your -- this -- this lady know -- what -- what was her

name?

A. Susan Mayberry.

Q. Okay.

A. M-A-Y-B-E-R-R-Y.

Q. So you would let Susan Mayberry know, Susan Mayberry would send an e-mail probably to someone at LaSalle, you don't know who, and then LaSalle would go to Evangeline and say we have got your people, pay us?

A. Yes, ma'am.

Q. Okay. All right. Do you know was there a different -- did different parishes pay different rates? So like, you know, Iberia pays more than Evangeline for pretrial housing?

A. I don't know, ma'am. Don't know. I know how it is now, but I don't know how it was then.

Q. Okay. All right. How is it now?

A. Every parish pays the same. It's the same per diem for pretrial inmates as for DOC.

Q. Okay. What is that these days?

A. From 36 to 39 daily.

Q. It's gone up a whole $3.

A. Two dollars. It was 24 something

for a while.

Q. Yeah. Yeah. I think, even the last time I looked, it was like 23 something, but yeah. All right.

A. Yeah.

Q. Okay. So you never got -- no one from LaSalle ever said, hey, if Iberia calls you up, definitely take these from Iberia because they are paying 50 something; you never got anything like that?

A. Right. No, I didn't.

Q. Okay. All right. Did you ever get any instruction from LaSalle or from anybody else to say, look, you have to prioritize the -- the sentenced people over -- overtaking pretrial people? Did you ever get any kind of instruction like that?

A. No, I didn't.

Q. Okay. Okay. Now, I want to turn to staffing. So who determines the total number of positions, let me say that, positions necessary to staff MCC and SCC?

A. Okay. At that time under LaSalle, it would have been the warden.

Q. So Anderson would have said, to

adequately run this facility, we need, you know, two sergeants, two lieutenants, two rovers. I'm just making up positions, but he -- he would have said this is what our -- I think you called them drops. This is what our -- the number of drops that we need; is that right?

A. Yes, ma'am.

Q. Okay. All right. Do you know how he came up with that?

A. I don't know how he did it, no, I don't.

Q. All right. How do you do it?

A. I looked at -- now I will look at what we need to have in each building. In each building, one building would have two control centers, another building we have three control centers, so that's five control center officers right off the top. I want to have what I think is ample staff and it's -- I don't remember what our staffing report is now or our staffing policy says right now, but you -- you can never have too many. You can have not enough or you can be short.

Q. So what -- what's ample staff?

A. Okay. Just let's see.

MR. MEAUX:
You mean now or -- or do you --
MS. CUMMING:
Yeah.
MR. MEAUX:
-- mean then?
MS. CUMMING:
Now I'm -- I'm -- I'm asking what about what he does.
MR. MEAUX:
Okay.
THE WITNESS:
For the dayshift, good staffing would be 15; for nightshift would be 13. And the reason for the difference is during the dayshift, I have to have a kitchen officer full-time. At nighttime, I don't need a kitchen officer, except for about two hours in the morning from 4:00 until 6:00.
MS. CUMMING:
Okay.
THE WITNESS:
That's for two kitchens, for two buildings, so that's the difference.

BY MS. CUMMING:
Q. Okay. And so -- so that's your -- your -- your staffing numbers. You said you had five that would go to the control officer. Where -- how -- what were the posts that you would need to fill?
A. I have -- I want to try to have or I would like to have a supervisor, at least a lieutenant in each building, at least four more -- at least four more officers on the floor to make counts, take care of any kind of problems that arise, a fight, anything going on, medical emergency. That's all I can think of right now.
MS. CUMMING:
Okay. I want to show you what's going to be Exhibit 9 I think.
MR. MEAUX:
Yeah. Nine is the next one.
MS. CUMMING:
Thank you. It takes a village to keep me on track with exhibit numbers.
(Exhibit 9 to be marked.)
BY MS. CUMMING:
Q. All right. Can you see that?
A. Yes, ma'am.

Q. All right. Do you recognize this document?
A. Yes, ma'am.
Q. Okay. What is this document?
A. Staffing reports for Building 3 and Building 4, MCC and SCC.
Q. Okay. This is three pages. It's three different dates, so I'm going to show you all three and then I'm going to ask you some specific questions about it.
MS. CUMMING:
So this one is for -- this first page is for 1/14/20. Eli, the Bates number is Staffing 1 through 3 I think.
MR. MEAUX:
Okay.
BY MS. CUMMING:
Q. And then the second page is for February 4, '20, and this third page is for May 4, '21. Okay. So how does this document get created?
A. My human resource lady on the men's side creates that and keeps up with that.
Q. Okay. What's her name?
A. Adrienne Reed, R-E-E-D.

Q. And did Ms. Reed work in HR for LaSalle or is she new with Security Management?
A. No. She -- she also worked at LaSalle.
Q. Okay. All right. And what information is Ms. Reed pulling from to generate this document?
A. She just keeps up with the document as we hire people and as people leave employment, she just -- it's an ongoing process.
Q. Okay. So this document, this reflects every -- all the entire staff complement at Madison; is that right?
A. Yes, ma'am.
Q. Okay. All right. So this is every single person that was working at Madison on January 14th, 2020?
MR. MEAUX:
Well, I think real quick I don't know if it -- it says MCC, SCC. I don't know if that's the whole of Madison.
MS. CUMMING:
Okay. Yeah. Fair.
BY MS. CUMMING:
Q. This is every single person working

at Building 3, Building 4 in January 14th, 2020, correct?

A. Yes, ma'am.

Q. Okay. All right. So down here (indicated) where it says Assigned and then Security Slots and then Total Employees and Allowed, I want to kind of walk through each of those.

So Assigned, what does that mean?

A. It's a total of each, A, B, C and D above the names. It should be a total of those names like 18, assigned 18, 23, there should be 23 names under 18 and going on down B, C and D.

Q. Okay. And then security slots, what does that mean?

A. That's how many we would like to have on that particular shift; 18, 24, 24 on B, 21 on C, 21 on D or -- yeah, 21 on D.

Q. Okay. And then Total Employees, what's that?

A. A total of the four, A, B, C and D. I'm sorry. It may be -- I believe it's the total of A, B, C and D and 8-hour staff also.

Q. And -- and what is 8-hour staff?

A. If you look to your right under

Administration, top right, Jerry Brooks, major; Edward McDowell, Captain Chase, lieutenant -- lieutenant --

MR. MEAUX:

Can you blow it up a little, Elizabeth?

THE WITNESS:

Yeah. That's your administration.

MR. MEAUX:

Yeah. She's able to.

BY MS. CUMMING:

Q. Okay. Got it. All right. So they are -- they are -- because they work 8-hour days rather than the 12-hour days; is that right?

A. Yes, ma'am.

Q. Okay. Okay. And then Allowed, what does that mean?

A. I don't know what that really means, I don't. All I understand is what we are supposed to have and what we actually have.

Q. Okay. And that's reflected in the Assigned and Security Slot, what -- security slots is what you are supposed to have --

A. What we would --

Q. -- assigned is what you --

A. Yes. What we would like to have, uh-huh (affirmatively).
Q. Okay. All right. And the security slots, though, what you would like to have, who -- who determines that?
A. I suppose the warden did. I don't have anything to do with that at the time.
Q. Okay. Going now to February 4th, 2020, the allowed number has -- has decreased and the total number of employees has decreased.
Do you -- do you know why there was this decrease in -- in employees from January 2020 to February 2020?
A. COVID hit.
Q. In February 2020?
A. Yes, ma'am.
Q. That was February -- February 4th, 2020.
A. Yes, ma'am. The entire staff was under COVID protocol, including me, including our prison, this prison. We didn't lose anybody to COVID, but we had quite a few go out for extended periods because of COVID.
Q. Okay. I'm -- I'm -- I'm going to push you a little bit on that just because we all

STINSON, WARDEN CHRIS 2/1/2024


lived through it. My pretty clear memory is that the state didn't go into lockdown until the -- the middle of March 2020 and so COVID -- you -- COVID was a thing. I think we were all talking about it in February, but it wasn't -- it wasn't causing lockdowns yet. We didn't -- we didn't know what it was going to become in February 2020, so I just want to kind of ask you again. Was it COVID or was it something else?

A. I have attributed it to the onset of COVID. My mother passed away April 1st of 2020 from Alzheimer's and COVID. She was in a nursing home and it was in full fledge. It was off the hook then.

It had already started and that is the reason I believe the staffing was down like -- like it is. It's between that and not getting any applications --

Q. Okay.

A. -- overall. I don't have the --

Q. All right.

A. -- statistics, Elizabeth, but I -- I've -- I've always -- we have talked about it. We have attributed it to the COVID thing, and I don't remember when COVID -- Department of

Corrections went into COVID protocol, but it was -- it was spring and it wasn't long after February 4th of 2020, as far as transferring inmates, taking our cook inmates that did test positive for COVID to Angola, things like that.

Q. Okay. When you say "we have" -- "we've talked about it," who all have you talked about that with?

A. HR people. And -- and, again, I wasn't the warden then, tried to talk to him about it, my majors.

Q. Okay. All right. Okay. So when you were talking about -- well, let me ask this: Were you talking about this -- this dip in staffing like in -- in 2020, like around that time?

A. Yes, ma'am.

Q. All right. All right. So was there --

Okay. All right. In February of 2020, do you recall were there any steps that were taken to try and increase the number of applications, you know, figure out hiring, any -- anything like that?

A. You asked me if there was any kind

of steps taken, as what type of steps?

Q. That's -- that's what I'm asking you to -- to try and -- and get your numbers back up.

A. We didn't do anything any different. We had an open website. People can apply and come to the prison and pick up an application. We kept that -- in effect, kept that going.

Q. But you didn't do -- you didn't do anything different?

A. No, ma'am.

Q. All right. And now this is May 4th, 2021; and here it looks like we have got assigned and then we have got security slots, and it looks like the number of security slots has gone down from February of 2020. Do you know why that was?

A. No, ma'am, I don't.

Q. Okay. And do you know who would have been responsible for that?

A. The warden.

Q. Okay. All right. So I want to go to the -- so we have -- we have talked about the number of staff. I want to go to the actual positions.

MS. CUMMING:

I'm going to show you what will be

Exhibit 10.
(Exhibit 10 to be marked.)
BY MS. CUMMING:
Q. All right. This is four pages. It's four different draft sheets, so we have got a couple of different dates here. The first one is April 25th, 2021. I can blow it up a little bit. So this says Daily Shift Drop Sheet. What is a drop?
A. Job assignments for that particular day, position that needs to be -- needs to have somebody manning it.
Q. Okay. And have you seen this document before?
A. Yes, ma'am.
Q. Okay. What is this document?
A. Daily shift drop sheet.
Q. Okay. And so this is every day the positions, the work assignments that need to be filled; is that correct?
A. Yes, ma'am.
Q. Okay. So I want to run through these to make sure I understand. So shift captain, here it's John Murray. What is a shift captain?

A. He is the shift supervisor, the supervisor of that shift.
Q. Okay. And then here it says DC-1 staff, but there's -- and DC-2 staff, both of these are blank. What -- what does this refer to?
A. There was no longer any DC-1 staff or DC-2 staffs. February of '21, another company took over those two buildings. DC-1 and DC-2 is actually two separate buildings. It is now Bayou Correctional Center. So front gate officer, we didn't have a front gate, so front gate officer, all of DC-1, all of DC-2, there was no -- no such thing.
Q. Okay. So this is buildings that were operated by someone else. Okay.
A. Yes, ma'am. They shouldn't have used that particular form. They should have revised that form.
Q. All right. And then moving down into MCC staff and SCC staff, so these are staff for the -- and the positions for the two buildings, Building 3 and Building 4, that we have been talking about, right?
A. Yes, ma'am.

Q. Okay. All right. So there's lieutenant, sergeant, control one, control two, there are two rovers and there's kitchen; is that right?
A. Yes.
Q. Okay. All right. And then for Building 4, it looks like there is only a sergeant, a control one and then one rover; is that right?
A. Yes, ma'am.
Q. All right. Do you know why next to control two there's N-A?
A. I don't know for certain, but I have an idea. The two -- the two dorms with that particular control monitor were emptied. They were emptied for a while just from remodeling, painting and -- but I'm not for certain, but I believe that's why.
Q. Okay. And what about for -- for J, were there people in J in April 2021?
A. I don't know for sure. There probably were.
Q. Okay.
A. I don't know why there's not somebody's name beside it.

Q. Okay. For -- for control J, there's no one's name assigned, okay.
A. Yes, ma'am.
Q. Okay. And then it looks like there's no lieutenant for Building 4; is that right?
A. That's right.
Q. All right. So let me ask this: How does this get filled out, this drop sheet?
A. One of the supervisors would have filled it out.
Q. Okay. What level of supervisor?
A. It could have been a sergeant or lieutenant.
Q. Okay. And would the sergeant and lieutenant who is responsible for filling this out, were they responsible for saying -- seeing who showed up to work that day and then assigning them drops?
A. Yes, ma'am.
Q. Okay. All right. And at what point in the shift would the -- would the sergeant or lieutenant have filled this out?
A. Any time during the 12-hour shift.
Q. At any time during -- during the

shift?
A. Yes, ma'am.
Q. All right. So let's say Reuben Fletcher shows up to work or let -- let me get a better example. Marvella Mitchell shows up to work. How does Marvella Mitchell know to go to control one?
A. They will be assigned at roll call.
Q. Okay. All right. So this would not necessarily need to be done prior to roll call. The roll call assignment goes out, and then at some point, the -- the sergeant or lieutenant who made the assignment fills this out; is that right?
A. Yes, ma'am.
Q. Okay. All right. And where -- where are these -- these drop sheets, these completed drop sheets kept?
A. At that time, I don't know. I can tell you what we do now.
Q. What do you do now?
A. They are e-mailed as part of the shift pack, e-mailed to myself, my assistant warden and both majors.
Q. Okay. All right. At that time,

you -- you -- you don't know what happened to them?

A. No, ma'am.

Q. This May 2021 drop sheet, there's a rover that's written in. Do you know -- do you know whose handwriting that is?

A. No, I don't.

Q. Okay. Do you know why this would have been written in rather than typed in like the others?

A. I don't.

Q. And does this -- just looking at the -- the drop sheet positions of lieutenant, sergeant, control one, control two, just these positions, does this reflect all of the positions that -- that needed to be -- all of the posts that you would expect to see at Building 3 and Building 4?

A. Yes, ma'am.

MS. CUMMING:

Okay. I want to show you -- this is going to be Exhibit 11.

(Exhibit 11 to be marked.)

BY MS. CUMMING:

Q. Can you see that?

A. Uh-huh (affirmatively).
Q. All right. Have you seen this document before?
A. Yes, ma'am.
Q. All right. What is this document?
A. Post order index for all the post orders that we have.
Q. Okay. And so this is -- this reflects all the various posts at -- at MCC and SCC?
A. Yes, ma'am.
Q. Okay. And so we have got a couple of things on here, so there's major and shift captain, shift lieutenant, etc. But then we also have -- we have dormitory officer and program security officer and night patrol officer. I did not see those posts on the drop sheet.
A. Okay.
Q. Do you know are these -- were these still posts that were posts that needed to be filled in 2020 and 2021?
A. Okay. Number 14, 15 and 16?
Q. Uh-huh (affirmatively).
A. Number 14, dormitory officer, we didn't have enough staff to put a staff, a male

officer in every housing unit. Number 15, program security officer, that was when we had a re-entry program and that went out the window several years ago. We kept that post order in place. Night patrol officer, we haven't filled that position in several years.

Q. Okay. All right. So for the -- the dormitory officer, you didn't have enough staff and so that post just sort of went away because you didn't have anybody to staff it; is that right?

A. Yes, ma'am.

Q. Okay. Was there anybody responsible for kind of taking on the -- the duties of a dormitory officer?

A. The roving security officers would make rounds through dorms. They would make rounds to count, just various -- various times. So they would -- they would fulfill the dormitory officer, plus the control center officer, he or she can monitor two dorms. There's a big glass, Plexiglas window that they can see into the dorm.

Q. All right. So the dormitory officer position just didn't exist in -- in 2020; is that right?

A. Right.
Q. Okay. Were the rovers responsible for -- for documenting their rounds?
A. No, ma'am. The control officer would document when somebody went in to make a round or to feed or whatever reason.
Q. Yeah. Okay. And so would the control officer also document when the rover came by to make a round?
A. The control officer should, yes.
Q. Okay. And when the rover is making a round, does that mean that the rover is actually like walking onto the dorm, walking around the dorm?
A. Yes.
Q. Okay. And that should be noted in the -- in the control log?
A. Yes.
Q. All right. If the -- if the rover sees something while they are walking around the dorm doing their round, how does that get documented?
A. If they see something what, something wrong; is that what you are getting at or --

Q. Yeah. I mean, it could be anything from, you know, people snorting drugs in the toilet to someone having a seizure on one of the racks, anything.

A. Yeah. That information should be passed onto the control center officer and he or she in control should notate it in their logbook.

Q. Okay. And how frequently were the rovers expected to walk through the dorms?

A. At least once an hour, at least.

Q. All right. So if you had one rover in Building 4, say, how many -- how many dorms were in Building 4?

A. Five.

Q. Say again.

A. Five.

Q. Five. Okay. And how -- how long should a walk around a dorm take?

A. It depends on what the officer wants to do. There's no set -- set timeframe that he has to be in there or not, so --

Q. To do the job correctly, to do it well, what -- what would you expect as a supervisor to see how long a round takes?

MR. MEAUX:

I'm going to object to the form, but -- but he can answer.

THE WITNESS:

I'm not -- I'm not sure how to answer that, "to do his job well," so, I mean, officer presence means a lot.

That's -- that's a lot of it, so, you know --

BY MS. CUMMING:

Q. Okay. But you don't -- as the assistant warden, well, now as the warden, you don't have any expectation for -- for any kind of minimum amount of time that a -- that a rover should spend on a dorm doing an inspection, doing a round?

A. I don't have a set time that he should be in there for ten minutes, minimum ten minutes. I mean, that -- you know, my staff are well aware that if there's something going on there, going on in a dorm, something you mentioned, snorting drugs or whatever, you know, if they need to stay in there for 30 minutes, that's fine.

If they go in there and make a count, count might take six, seven minutes, just

]guessing, to get a good accurate count, return to the control center; but to do their job well, that's kind of a -- I'm not -- I'm not really sure how to answer that. If they are doing their job, they are doing their job well just by going in the dorm, getting a good count, settling any issues, any problems, anything that's going on that shouldn't be going on.

Q. Okay. How frequently -- how frequently are -- are -- are counts supposed to be done?

A. It depends, ma'am. I don't remember right now how many counts are supposed to be done during the dayshift and how many counts are supposed to be done during the nightshift. I'm not sure. I'd have to look at the policy or talk to my two supervisors. I believe it's a minimum of six counts in a 24-hour period, three on dayshift, three on nightshift.

Q. Okay. You had mentioned that you didn't have the dormitory officer because you -- you didn't have enough staff.

When you -- when you didn't have enough staff, what was the most important post to make sure got covered?

A. I'm sorry. Could you repeat the question, please?

Q. What's the most important post to have covered?

A. You have to man your control center post, you have to have at least somebody roving on the hall to make counts and going to dorms, make rounds.

Q. Okay. So in a -- in a hypothetical, one person shows up for a shift. What's -- what's the post that you cover with that one person?

A. All the posts are going to stay covered on hold on that previous shift over. They are not going to leave --

Q. Okay.

A. -- until we can get ample staff in.

Q. Okay. All right. Would you --

Well, let me ask this: So your -- your primary responsibility is monitoring the -- or is supervising the majors; is that correct?

A. That's my first line supervisors, yes, ma'am.

Q. Okay. How do you check and see the majors are doing their jobs?

A. How do I check and see?
Q. Uh-huh (affirmatively).
A. I can tell you now as warden how I check and see because we --
Q. Okay.
A. -- we communicate nonstop throughout the day. Major Chase passed away last July and he hasn't been replaced; and I don't know that he will ever be replaced, but we have a great open line of communication and that's through text, phone calls, in-person visits, making rounds, visiting, sitting down eating a meal.
Q. Okay. All right. Do you ever go back and -- and, you know, take a look at logbooks, take a look at reports, make sure that everybody's writing what they need to write, anything like that?
MR. MEAUX:
Again, now or -- or at the time?
BY MS. CUMMING:
Q. Well, let's start with at the time.
A. I wasn't allowed to do very much. I did get a lot of e-mails and I looked at everything that I got. I read everything that was sent to me via e-mail. Under LaSalle at that

time, they had what -- what's called Critical Incident Reports, CIRs; and that was quite a bit of work that we had to turn in to LaSalle, a great -- a great deal of paperwork. I did get those; inspection reports, fire marshal, health inspections, so -- and, again, the last five months under LaSalle, the -- no. About the last six months under LaSalle, I was working nightshift, so -- oh, and I was not allowed by the warden to go to the female prison for any reason. I had to stay strictly at the male prison working nightshift. So even though my assistant warden now is assistant warden at both prisons, my major that's assigned to the men's prison, he can go to the women's and vice versa. Everybody's authority is recognized throughout, so -- but anyway.

Q. Okay. So, and you said earlier that -- that you weren't allowed to do very much. What -- and I know you got -- you -- you talked about that in the e-mails, the CIRs. What were you not allowed to do?

A. Make any decisions.

Q. Okay. With -- I want to come back to the -- the critical incident stuff that --

that you were talking about. I want to come back to that in -- in a second, but first, I want to go to disciplinary.

Did you have any role in the disciplinary process?

A. For inmates or staff?

Q. For -- let's start with inmates.

A. Yes. I -- I could have done something, I could have -- if I needed to, as far as discipline wise, you know, writing an inmate up for an offense, something they did wrong, yeah. My staff took care of that, though.

Q. Okay. So -- all right. I think Eli was in on a couple of the depositions where I was -- I was trying to tax myself to understand the disciplinary process, so I'm going to see if I -- if -- if I have better -- better luck with you.

A. For staff or inmates?

Q. For -- for staff or, I'm sorry, for inmates, we are staying on inmates right now. We will -- we will get to staff in a second, but I want to start with inmates.

So for inmates, you had -- you had referenced that some thing, like, you know, to --

to take away good time, some things need to go up to the regional court; and I also understand that there are schedule A and schedule B, so let's start with schedule A.

Tell me about what sorts of things are schedule A disciplinary infractions and how that process works.

A. Okay. There -- there's a rule book, disciplinary rules for adult offenders. A schedule A write-up would be a number 6. Number 6 is disrespect. Somebody called me by my name, hey, Stinson, instead of Warden. The rule says you are supposed to refer to staff by their correct title. That's a minor. That's a -- that's a misdemeanor writing.

I'm trying to think. Most of the rule violations, the majority are schedule B, contraband, aggravated disobedience. There are a dozen categories of sex offenses. It's -- it's -- and it's all enumerated. Those are all -- I believe they are all schedule B.

The only other schedule A write-up I can think of is, hey, 30 W, which is a basic if nothing else fits, use this. So I think that's a schedule A, but, like I said, the majority of

them are schedule B offenses.

Q. Okay. All right. And so schedule B, that's -- that's the slightly more serious?

A. Yes, ma'am.

Q. All right. And who determines -- and so the write-up itself, the person who is doing the write-up determines if it's schedule A or schedule B; is that right?

A. Yes, ma'am.

Q. All right. So if it's schedule A, so if someone calls you Stinson or someone just gets on your nerves or something, what -- what happens; what's that process?

A. If it's a schedule A write-up, it's heard by one person, okay, disciplinary officer, it has to be a sergeant or above. If it's a schedule B write-up, it has to be heard by two people, two different staff, okay? If it's a schedule B, it has to be referred to or deferred to regional, then that two-person board will defer it then.

Q. Okay. All right. So if it's schedule A, can someone go -- go to lockdown?

A. No, ma'am.

Q. Okay.

A. That's not one of the penalties.
Q. What -- what -- what are the punishments or consequences for -- for schedule A infractions?
A. They could take commissary privileges, phone privileges. That's about it. There's -- there's not much that you can do to a person for a schedule A.
Q. Okay.
A. If I had a schedule B, same scenario; commissary, take commissary privileges, phone restrictions. That's all I can think of right now.
Q. Okay. So for schedule B and now let me -- let me back up on schedule B. So can schedule B be handled -- well, okay. So if you have a schedule B write-up, does every schedule B write-up have to be sent to the Department of Corrections?
A. No, ma'am. No, ma'am.
Q. Okay. Which schedule B write-ups have to be sent to the department?
A. We are going to send assault on staff, a serious fight, an aggravated fight, two or more offenders against one is considered to be

a gang fight. We are going to send that. A property destruction is a significant property destruction that may -- and there's no cutoff. It's -- it's -- it's up to us, but an inmate destroys something of value, maybe a $500 tool of some type, then we are going to send that up the chain to regional court.

Run of the mill stuff, an inmate's got some marijuana, we are -- we're going to do that and we are also going to ask the sheriff's department to make an investigation and make an arrest. All we can do is present it to Madison Parish Sheriff Department. That's all I can think of right now.

Q. Okay. All right. So those are the things that -- that would go to the Department of Corrections; is that right?

A. The more serious, yes, ma'am.

Q. Okay. How -- how does that decision get made?

A. My major. My major's going to make that decision.

Q. Okay. And then when it goes up to the Department of Corrections, what happens?

A. We will defer it from our regional

court. We will tell him, may put him on notice that it's being deferred to regional court and we will -- we will fax all the information to David Wade Correctional Center, and then they will set up a docket on what day and what time to hear that inmate via Zoom.

Q. Okay. How long does it take to get onto that -- that docket?

A. It depends on Wade Correctional Center. It varies.

Q. So like are we talking about a matter of days or can it be as long as a month?

A. No. It's usually a matter of days, maybe a week or so. I don't recall ever taking a month. I don't recall that.

Q. And then is the person in lockdown the whole time waiting for that hearing?

A. Yes, ma'am.

Q. Okay. If it's -- if it -- if it does not go to DOC, the major decides to sort of keep it in-house, what's the process there?

A. If they tell us that very thing, keep it in-house, that's what we do. We will -- if he's found guilty, he will receive some type of punishment, reprimand or whatever, so -- and

if he's -- if he's found innocent, he will be released and everything will be expunged.

Q. Okay. So when the Department of Corrections does its audits on -- on the disciplinary process, does it ask to see those schedule B write-ups that get referred to Wade or is it asking for in-house or is it asking for both?

A. They don't do that at the time of audit because we send a -- in a monthly report to our BJG monitors, so they compile that information every month, every month.

Q. Got it. Okay. And when you say that you put that into -- and we will get into the -- the monthly report, but just while we are on it now, when you say that you put that into the monthly report, do you send underlying documentation with that monthly report or are you just giving them numbers of this is how many schedule Bs we had?

A. It all depends. It's mostly -- it's pretty much all going to be numbers. They are going to get that, but --

Q. Okay.

A. -- but we have a significant death

in custody, escape, a confirmed rape, something like that we are going to send a synopsis and paperwork, so --

Q. Okay. So when you say that you send information on schedule Bs to DOC monthly, what -- what you're saying is you send them a number. You say, you know, we had ten schedule B write-ups as an example; is that right?

A. Yes, ma'am.

Q. But you're not necessarily saying we had ten, you know, inmate-on-inmate fights this month, you're just saying this is -- this is our disciplinary number?

A. Well, no. It is broke down by categories; inmate on inmate, inmate on staff, staff on inmate. There's several different breakdowns, categories.

Q. All right. Okay. All right. And then I want to go to lockdown. Well, let me start with what is lockdown?

A. Administrative segregation, admin seg known by several different names. They used to call it the hole, the dungeon, yeah. Correct name, correct terminology is administrative segregation.

Q. Okay. And is there -- well, why do people go into administrative segregation?

A. It could be a number of different reasons, ma'am. They have committed assault on staff, inmate, found a weapon in the cell phone. It could be some type of sex offense, exposed themself, masturbated in front of staff; for protective custody, it could be, you know, numerous different reasons.

Q. So is there a difference between people who go to admin seg for disciplinary reasons versus protective custody reasons?

A. Is there a different reason?

Q. No, no. Is there -- is there a difference in the way that they, you know, are in lockdown or -- or -- or experiencing ad seg?

MR. MEAUX:

I'm going to object to the form, but yeah, he can -- you can respond.

THE WITNESS:

I'm -- I'm not sure how to answer that. I mean, if somebody goes to protective custody, declares PC, wants to go to lockdown, the same procedure as if that same inmate had had a knife. I mean,

there's a procedure, things that we do.

BY MS. CUMMING:

Q. Okay. So, and when they are -- when -- when they are in lockdown, the -- the guy who has the knife and the guy who said PC, you know, put me in ad seg, do they -- is there any difference in their access to commissary?

A. They are not going to receive commissary, ma'am, while in ad seg.

Q. Okay. So the guy on PC isn't receiving commissary and the guy with a knife isn't receiving commissary, right?

A. Right.

Q. Okay. And is there any difference in their access to yard time?

A. No, no difference.

Q. And is there any difference in their access to phones?

A. No, ma'am.

Q. And is there any difference in their -- now, I'm trying to think of what else. Okay. We will -- we will leave it there. There's no -- they are not treated differently is -- is the point, though, right?

A. No, ma'am.

Q. Okay. And the guy on PC and the guy with the knife, neither one of them has access to visits in lockdown; is that right?
A. Right.
Q. Okay. What about attorney visits?
A. They both will be allowed attorney visits.
Q. They both will?
A. Yes, ma'am.
Q. Okay. All right. But not -- but not family visits, correct?
A. Correct.
Q. Okay. So what about coming off of lockdown, how does -- how does the guy on PC come off of lockdown?
A. When he's ready to come out or if we can find a dorm where he claims he doesn't have any enemies, we will move him out.
Q. We have been talking about PC. I just want to make sure we are talking about the same thing. How do you -- how do you define protective custody or PC?
A. I -- I don't know what the definition would be. We look at PC, an inmate wants to go to protective custody, he claims

there's a reason, okay? What's the reason? I have an enemy. Who is it? Well, I'm not going to tell you. That's what they used to do. That's what they were allowed to do for so long.

We are in the process now of changing that. Just because he comes out of -- he doesn't have an enemy. A lot of times, most of the time, they don't have enemies. They are going to have an enemy, though, because they can't pay their debt. They bought too much drugs, they bought a cell phone and can't pay for it or they borrowed it or whatever, commissary, so I can't pay them. So before him and his buddy or before he jumps on me, I'm going to go to protective custody.

Q. Okay. So if someone wants to -- to get onto protective custody, how -- what's the mechanism for them to do that?

A. He's going to go to the control center or he's going to get an officer when the officer makes the round, he's going to tell them I need to get out, got an enemy, whatever. They are going to get him out of the dorm, they are going to talk to him in private to see if he will tell anything or say anything about what's truly

going on.

Q. Okay. All right. And so then he gets put into the -- the lockdown cells after that; and now when he comes out, when he -- how does -- how does he -- yeah. Walk me through from the -- from the point of view of someone who's asked for protective custody, has been put in the lockdown cell and now wants to get out of the lockdown cell. Walk me through how that happens.

A. Well, we going to take him out of the cell, get his personal property out of the cell, and if he -- if he feels like he can go into a particular dorm, doesn't have any problems, no known enemies in there, he had some -- any problems in there, then we will put him back in the dorm.

Q. Okay. So let's start from the how -- how does he -- how does he say I need to come off of protective custody; does he just say it, does he need to fill out a form; what does he do?

A. He doesn't have to fill out a form as long as he says it. That's all it takes to get out.

Q. Okay. And so let's go back to -- to John Doe and James Dean, John Doe wants to come out of protective custody. You take him to, you know, Building 4, dorm C.

Do you hand John Doe a list of everybody who is on Building 4, dorm C to ask him if he has any enemies on there?

A. No, ma'am.

Q. Okay. How do you ask him if he has any enemies on -- on 4-C?

A. We will just ask him if he has any known enemies in there; and if he goes in there and he tells us that he doesn't have any enemies and he gets in there and he sees somebody that is truly an enemy, then he can get back out.

Q. How does he get back out?

A. Well, tell somebody, tell an officer. Tell an officer at the control center or tell an officer making a round, didn't know he was in here.

Q. Okay. What if -- what if it's James Dean, the guy that beat up John Doe, what if it's James Dean that's coming out of lockdown and James Dean has no problem being on a dorm with John Doe, but John Doe sees James Dean come

onto the dorm?
A. Uh-huh (affirmatively).
Q. Does anybody -- how -- how do you handle that?
A. If they notify staff, they will remove one of them, maybe James Dean, maybe John Doe. We will separate them.
Q. Okay. So one of them has to notify staff?
A. Yes, ma'am. Somebody does.
Q. Okay. When you said -- when you were talking about, you know, somebody coming on a dorm and saying, oh, there's that -- if -- if he sees someone who's truly an enemy. What do you mean by "truly an enemy"?
A. Well, I guess when I use the word -- I shouldn't have used the word "truly." If -- if in his mind, it's an enemy, they know if they are enemies or not. If one of them declares I've got an enemy, whether he tells us who the enemy is or not, then we are going to get him out, then he will have to go to protective custody.
MS. CUMMING:
Okay. I want to show you what's going to be Exhibit 12.

(Exhibit 12 to be marked.)
BY MS. CUMMING:
Q. Have you seen this document before?
A. Yes, ma'am.
Q. All right. What is this document?
A. It looks like an administration segregation log. Can you blow it up a little bit more, please?
Q. That better?
A. All righty.
Q. Okay. And this is four pages, but we're -- I think we are just going to stick on the first -- no. Actually, no. We are going to go on to the second page too, but let's stick on the first page for right now.
MS. CUMMING:
Eli, it's ASL 2021 is the Bates.
MR. MEAUX:
Okay.
BY MS. CUMMING:
Q. Okay. So how does this -- how does this get generated?
A. How does it get generated?
Q. Yes.
A. It's created -- excuse me. I

believe that report was created by lieutenant or Sergeant Earnest Puckett at the time from the shift supervisor's office. That was everybody in lockdown on that particular day, July -- is that 2020?

Q. What information is he drawing from?

A. Okay. Well, the inmate's name, his race, the date he was placed in lockdown, comments, the reason he was placed in lockdown. Medical PC, PC, PREA. That means he claimed a PREA allegation; medical; medical. One in Building 4, the first one, he was placed in there for defiance, Rule No. 3, which is a schedule B violation; and then onto the right, the authority, supervisor placed him in there or had him placed in there.

Q. Okay. So the authority is the person that actually does the -- does the assignment to lockdown; is that right?

A. It could be. It may not be, ma'am. If you go down a little bit under Authority, you see Sergeant Fletcher. He could have placed one in PC and there's one in -- one in the medical. No. That's -- that's not good.

MR. MEAUX:

Could you blow it up a little --
THE WITNESS:
Yeah.
MR. MEAUX:
-- a little bit, Elizabeth, because I think that's where we are having trouble?
THE WITNESS:
SCC, A lockdown, Jermaine Zeno, put it on July 14th, 2020, contraband, Lieutenant Guice put him in there. Lieutenant Guice is a supervisor. He should have put him in there. He could have had him placed in there because another officer found contraband on that particular inmate, so -- but the name Guice, Lieutenant Guice and everybody under authority, they -- it was their decision to place the inmate in there. Medical -- medical, somebody from medical department would have ordered that person to be put in there for a medical reason.
BY MS. CUMMING:
Q. Okay. So the -- the question is where -- where does -- when Lieutenant Puckett is

putting this together, what is he looking at?
A. I'm sorry. I didn't understand, Elizabeth. Say it again.
Q. When Lieutenant Puckett is putting this together?
A. Uh-huh (affirmatively).
Q. Where -- what is he looking at to get all of this information?
A. He gets that information from each building, each control center officer. They had a log in each control in each building who's in lockdown and why, and he compiles all that information. That's part of the shift packet.
Q. Okay. So it's part of the shift packet. All right. So then that goes into the next question, which is why -- why is this log put together?
A. Recordkeeping purposes.
Q. And how is it -- how is this log kept?
A. It's created daily. Is that what you mean?
Q. Oh, the -- that's -- that's helpful to know too. All right. So it's created daily, and then after the shift, what happens to it?

A. It's e-mailed to -- now its e-mailed to myself, both majors and both captains at the men's side. And I'm sorry. I believe now classification I believe does get a copy. I'm pretty sure they do.

MR. MEAUX:

Is that now or at the time?

THE WITNESS:

At the time, 7/24-26, 2020.

BY MS. CUMMING:

Q. All right. So it would be e-mailed as part of the shift packet, right?

A. Yes.

Q. Okay. All right. And -- and it would be kept with the -- with the shift packet; is that right?

A. Yes, ma'am.

Q. All right. Okay. So on to page 2, the segregation log, it looks like this is for July 28th, 2020. Have you seen this document before?

A. Yes, I have. It's been a long time.

Q. Okay. When did this document stop being used?

A. I'm not sure. I believe Ray Hanson,

the interim transitional warden, stopped that because he said all -- his thoughts and I agree with him, everything that's documented there; why inmates in PC, what time breakfast fed, dah, dah, dah. All of that information is documented in the logbook in control center. So that form was created by LaSalle Correctional Management to keep up with admin seg.

We do the same thing. We still do the same thing documenting the same information in the logbook --

Q. Okay.

A. -- but I don't know when it ended for sure.

Q. Okay. It was after LaSalle left?

A. Yes, ma'am.

Q. All right. Where would this document be kept?

A. I have no idea.

Q. All right.

A. I have no idea.

Q. All right. Would you expect to see -- so, you know, here we have got only breakfast on 7/28/2020.

Would you expect to see that, you

know, lunch and dinner are -- are also served?
A. Yes, ma'am.
Q. Okay. And you would -- would that all be filled out on the same sheet you would expect?
A. It should have been, yes, ma'am.
Q. Okay. So what happened here?
A. As in?
Q. Well, did they --
MR. MEAUX:
I object to the form of that question, so ask him --
BY MS. CUMMING:
Q. Did they not get lunch and dinner?
A. I doubt that very seriously.
Q. Okay. What -- what -- where would this -- when this segregation log was -- was in use, where would this be kept?
A. I have no idea.
Q. Okay. Do you know, was anybody responsible for -- for looking at these segregation logs to make sure that they were being filled out?
A. I don't know. The major should have been looking at them. He should have been -- the

major should have received that particular form. Now, I don't know if he did or if he didn't.

Q. Okay. How is -- I'm sorry. Go ahead.

A. I'm sorry?

Q. How would the major have received the form?

A. Should have been hard copy, copy -- copy placed in his box. He should have -- I don't -- I don't know of any other way he would have had to get a hard copy. That's for Building 3.

Q. Okay. I want to switch gears and ask about shakedowns. What -- let me start with what is a shakedown?

A. A shakedown is when you search for unauthorized items, contraband, things an inmate shouldn't have. A shakedown could be conducted on a unit, on a housing unit, work area, anywhere.

Q. And have you ever participated in a shakedown?

A. Yes, ma'am.

Q. Okay. And when was that?

A. The last one or the first one or --

Q. The last one, the last shakedown you did?
A. Last shakedown, last Friday morning.
Q. Okay. That was in Madison?
A. Yes, ma'am.
Q. Okay. Do you regularly participate in shakedowns?
A. I do.
Q. Okay. And so tell me what happens during a shakedown.
A. We go into a housing unit, we line everybody or place everybody on that box, get everybody out of the shower, off the telephones. We strip search, strip every inmate, take their personal belongings, look through them, get them dressed, either take them out on the rec yard, if the weather permits, or we place them in the kitchen. Once we get everybody out of -- out of the dormitory, then we go through all their stuff and we look at things they shouldn't have.
Q. Okay. Who has the authority to order a shakedown?
A. Myself, the assistant warden and the majors.
Q. Under what circumstances would you

order a shakedown?
A. I -- that could be one of many things; maybe we had a fight, maybe -- maybe somebody destroyed a TV, destroyed a microwave, walk into the dorm making a round, you smell mojo or marijuana, you know. It just depends and then there doesn't have to be a reason.
Q. So how frequently -- I'm going back to the 2019 to 2021 period or the period that -- 2020 to 2021 when you were at Madison.
How frequently were there unscheduled shakedowns?
A. Not very often. Not --
Q. Okay. So -- sorry. Go ahead.
A. I -- I'm sorry. I was just repeating myself. I have a bad habit of doing that. Not very often.
Q. Not very often. Okay. So I want to make sure -- I want to make sure I understand what "not very often" means. So let's say in the course of a given month, how many unscheduled shakedowns would there be?
A. Once, maybe twice.
Q. All right. What about scheduled shakedowns, were there -- was there any kind of

like routine shakedown schedule?
A. During that time period, no, ma'am.
Q. Okay. What about now?
A. Now, we are going to -- we are going to shake down a dormitory or two or three dorms a week. We -- we do a lot of shaking down.
Q. Okay. All right. Is there any kind of difference between a -- like an unscheduled shakedown that you are doing, you know, because you are walking through the building and you smell mojo and like a regular routine shakedown?
A. Well, there's really no such thing as a regular, routine scheduled shakedown. Shakedowns have to be unscheduled. We don't know about it.
Today's Thursday. I'm going to drive back to Tallulah tomorrow or, I'm sorry, this evening. We are probably going to do a shakedown. I'm going to call one of our majors and we are not going to know about it until about 7:00 or 7:30 tonight. The less people that know about it, the better it is.
So to answer your question, shakedowns, they are always unscheduled. If you have a scheduled shakedown, the inmates know

there's a schedule, then you are defeating the purpose because they are going to move stuff, hide stuff, whatever.

Q. Okay. I want to go to some incident reporting, tracking, stuff like that.

Well, actually, while we are talking about shakedowns and searches, in -- in that 2020, 2021 period, what was the -- what was the practice for searching staff coming in for contraband?

A. We would do random shakedowns on the staff. We have looked through -- even now, even at that time, during that timeframe, they are required to -- to carry anything in a clear backpack, zip-up clear backpack, and my supervisors would go through stuff. They would go through personal items. We -- we would do that every day. Even to this day, we still do that.

Q. What happened if someone was found carrying something in like a cell phone, knife, things like that?

A. Cell phone, small pocket knife, we would have them go put it back in their vehicle. If it was something illegal, drugs, alcohol,

firearm, and I don't remember the last time that happened, but we would have called the sheriff's department. So I don't remember the last time.

It's been a couple years ago, a couple, three years. I don't remember if it was under LaSalle, during that timeframe, or under Security Management, but a staff member was found bringing something in.

Q. Okay. Was the staff member charged?

A. We have had them charged, yes, ma'am, and arrested on the spot.

Q. Okay. And that -- that incident, that happened it sounds like maybe around the transition period. Do you remember was the staff person charged?

A. No, ma'am, I -- I really don't. It's been a few years ago. Again, I don't know if it was under -- I don't remember if it was under LaSalle Management or Security Management.

Q. All right. So I want to talk about reporting. When an incident happens, so I'm talking about like a fight, stabbing, drugs are found, any -- any -- the whole gamut of incidents; who -- who is informed?

A. Again, we are talking about that

timeframe in 2019, LaSalle created -- okay. Who is informed? The -- we had -- at the time, we had what we called duty officers, still do. The warden was not in duty rotation, but I was; myself, two majors and four captains.

So if something happened after normal work hours, whoever had the weekly duty officer or was in the weekly duty officer rotation would get a phone call. If it's something serious enough, then everybody and their brother would respond; but if it's something the matter that can be taken care of by the shift on duty, we would do it that way. But everybody was called if it was something serious.

Q. Okay. And so what -- what's -- what's serious, when does everybody get called?

A. Stabbing; escape; death; an assault on staff. Typical fights, nobody armed, that -- that wouldn't be something we would be notified for.

Q. What if it's like a two-on-one fight or something like that, would you get notified for something like that?

A. Yes, ma'am.

Q. Okay. So if it's just a one-on-one

fight with no weapons, you wouldn't get notified during your off hours. When would you -- when would you get notified of that?
A. Find out about it the next morning.
Q. Okay. How -- how would you find out about it the next morning?
A. Shift packet.
Q. Okay. And so for the -- the serious incidents when you would get notified, when you were, you know, out of the building, who was responsible for making that notification?
A. The ranking supervisor should, should have made the notification.
Q. And how did you get that notification?
A. Phone call.
Q. Okay. All right. All right. And so you said everyone's informed, so -- so you. Who else?
A. Well, the warden would have been informed, myself, two majors, four captains.
Q. Would anybody from the Madison Parish Sheriff's Office have been informed?
A. Could have been, yes, ma'am --
Q. Okay.

A. -- if the warden notified them.
Q. Was there any kind of like criteria for, okay, if it's this sort of incident, we definitely have to call someone from MPSO?
A. I don't think there was anything in writing. My thoughts, when I got a call, if it was somebody, something serious, if somebody committed a crime, then we were going to present it to the Madison Parish Sheriff's Department. If they made an arrest, great; if they didn't, okay. All we could do was present it to them.
Q. Okay. Okay. So if -- if it was something that you were going to notify MPSO, who at MPSO would -- would be the point person to -- to receive that?
A. Whoever. We would notify dispatch and they would dispatch a deputy, so --
Q. So you would like call 911?
A. Yes, ma'am.
Q. Okay.
A. Absolutely.
Q. Okay. All right. Did -- did you, as when you were assistant warden at LaSalle, did you have like a -- like a point person that you would -- you would have contact with at -- at the

MPSO?
A. No, ma'am. There were -- I had a good relationship with the sheriff, his chief deputy, a couple of his detectives, investigators. They all had my number and I had their -- their number, so had a really good relationship.
Q. Okay. How frequently would you be in contact with the sheriff?
MR. MEAUX:
Real quick, do you mean the -- the -- the sheriff personally or do you mean the sheriff's office as an entity?
MS. CUMMING:
The -- the sheriff personally. He said that he had the sheriff's number, so I'm asking how often he used it.
MR. MEAUX:
Okay. Sorry.
THE WITNESS:
We talked every couple of months I guess. It was usually he -- he would get a phone call from a disgruntled parent, want to know about the daughter or her son or something and give me the phone number

and ask me if I could call and try and make things a little bit more -- make it better for them, you know, find out what's going on, so -- but it wasn't very often; from time to time, every couple months.

BY MS. CUMMING:

Q. Okay. All right. And then what about the sheriff's chief deputy and -- and kind of the people in --

A. Same. We had a good -- good relationship, still do. Every -- every couple months, I'd see him at the grocery store every once in a while. Of course, he lives in Tallulah and I don't. I live out of town. But same with investigators, you know, we see each other. We didn't socialize or anything like that. We just had a good relationship, very good, professional relationship.

Q. Okay. All right. So, but if they had any questions, they -- they had -- they had your number, they could pick up the phone, they could always get you and they could always get information from you; is that right?

A. Yes, ma'am.

MS. CUMMING:

I want to show you what's going to be Exhibit 13. All right. I'm going to blow this one up.

(Exhibit 13 to be marked.)

MR. MEAUX:

You have to blow this one up pretty good. It's really small.

BY MS. CUMMING:

Q. All right. We are just going to focus on this first page and I'm going to scroll across. But just looking at this, does this document look familiar to you?

A. No, ma'am.

Q. No. Okay. All right.

A. It looks like some type of medical document, but I don't -- I don't recall seeing it.

Q. Okay. So I've been calling it the medical tracking log. I think it's when it was produced to me by the defendants, it's the medical tracking spreadsheet.

I'm -- I'm trying to figure out who -- who compiles this or who creates it. Do you have any thoughts?

A. Could you slide it over, go to the

right a little bit more, please?
Q. Uh-huh (affirmatively).
A. Yes, ma'am. That -- that document is compiled in medical, a lady in our medical department. We call her our medical clerk. She does other things. That is -- the receptionist form. If you'll notice, there's -- there's amounts there, dollar amounts to the left, the inmate's name and then dates of service, service provided, different things.
The company at that time, LaSalle, would pay a medical invoice and then we would turn or Lasalle would turn that into the state for reimbursement. That's -- that's basically how that works, how it goes.
Q. Okay. So this document, this would go to the Department of Corrections to -- to tally up how much medical the state needed to pay LaSalle back for in -- in a given month; is that right?
A. I believe so. I believe so.
Q. Great. All right. Do you know at -- at the time, I'm talking 2020, 2021, who -- who was the medical clerk who was putting this together?

A. A lady by the name of Patricia McClodden, M, lower case C, upper case C, L-O-D-D-E-N. McClodden.
Q. McClodden, okay. All right. Was -- was she like an RN, an LPN?
A. No.
Q. No. Okay. But she was your medical clerk?
A. Yes, ma'am.
Q. All right. Okay. Is she still with Security Management?
A. She is.
Q. Okay. And do you know who Ms. McClodden would send this to at the department?
A. No, ma'am, I don't.
Q. Did anybody from LaSalle headquarters or main corporate office, did they -- did they get a copy of this?
A. I don't know.
Q. Okay. And do you know sort of who from LaSalle was arranging with the -- the department to get reimbursement for this stuff?
A. No, ma'am, I don't know.
Q. Okay. All right. All right. Okay.

That's -- that's very helpful. But in -- in terms of what you were looking at in -- in doing your -- your work as an assistant warden and what you look at now doing your work as a warden, you wouldn't necessarily be looking at this document; is that right?

A. No, ma'am.

Q. Do you happen to know what Ms. McClodden would look at to put this document together?

A. I have no idea where she got the information. I don't know if there's a particular program DOC has designed to -- to gather that information. I don't know. I don't know.

Q. Okay. All right.

MR. MEAUX:

And real quick, Elizabeth, are we going to -- are we going to formally put all of these exhibits in at the end of everything?

MS. CUMMING:

Yes. Yeah, like -- like we have done in the last couple of times. And I'll send a link to Chérie, but I'll --

I'll send you guys the link too.
So I want to go to Exhibit 14.
(Exhibit 14 to be marked.)
BY MS. CUMMING:
Q. Okay. Can you see that?
A. Yes, ma'am.
Q. All right. Does this document look familiar to you? It's 15 pages, so I'll scroll through the 15 pages, but my first question is going to be does this document look familiar to you?
A. Yes, it is.
Q. Okay. What is this document?
A. How to report a critical incident.
Q. All right. And do you recall when you received this?
A. Actually, I never received one, but I got my hands on one after I came back to Madison, would have been January, February of -- January I guess of 2020.
Q. Okay. So this one, the effective date is June 15, 2020. Was there -- was there a prior iteration of this document that you got when you came back to Madison?
A. I don't know why that's dated

June 15th, 2020, because while I was at Richwood, they had started a critical incident reporting process here at Madison in 2019. Now, I don't know if that policy was six months late, seven months later coming in and going into effect after they had already implemented; so I never did understand, I never did question why.

Q. Okay. All right. But when you came back, how did you get your hands on it when you came back to Madison?

A. Somebody gave me a copy of that and some of the critical incident forms that -- that we were required to use.

Q. Okay. Do you -- do you recall who that was that gave it to you?

A. Steven Chase, Major Chase.

Q. Okay. Did you receive any training related to this policy?

A. No, I did not.

Q. Do you know did any -- I'm sorry. Go ahead.

A. I wasn't going to say anything.

Q. And do you know did any of your subordinates receive any training related to this policy?

A. Yes, ma'am. When I found out about this, I wanted to learn about it. Major Chase gave me this policy, and I talked to him and Captain Farmer at the time, Major Farmer. Talked to several people about it and they all told me the same thing, that a guy by the name of Darren Charpentier had came, who is assigned to Richwood, he had came to Madison sometime in -- well, '19, latter part of '19 to give staff training.

I had met Darren Charpentier at Richwood, but I never did receive any training and I don't know -- I never found a training roster. Maybe he did one and he brought it back with him. I don't know who received the training or if it was an 8-hour training or 2-day training, so -- but I learned about CIs.

Q. Okay. All right. So there was some -- some training that happened that was given by Darren Charpentier, but -- but you don't know what the training was or what was covered or anything like that, right?

A. Yes, ma'am.

Q. Okay. And -- okay. What was your understanding of -- of why there was this

critical incident reporting policy?

A. My understanding, somebody from Texas got really, really technical and wanted something like that. Everything in -- in the policy, everything in from one on down, two on down and so forth, we know to report those things and there was -- maybe it was something to get a -- a real good picture of everything. We weren't the only facility using the CIRs. I think all of the Texas prisons were using them.

Anyway, it's a good tool if you have somebody to sit down and on a prior shift just do nothing but CIs that do anything -- don't do anything but compile this information in all these different forms and check off these boxes, so -- but going back, I don't know who received the training. I was told they came over and gave training. I wasn't present for the training.

Q. Okay. And you said it's a good tool if you've got someone to do it. What -- what's -- what's the -- what's the usefulness of the tool?

A. Keeping some -- somebody to compile it on the computer, compiling all the information, making -- you know, another way of

reinventing the wheel I guess. It's -- my own -- never mind. That's all.

Q. Okay. Well, I mean, is there -- is there any -- any part of -- of this that you -- that you think is useful?

A. I think it's all useful, but the format and the way it's designed, it's -- it's -- it's too -- it's too lengthy. It's too -- it's too much involved. It's -- it's -- it's a -- you waste a great bit -- great deal of time compiling a report, an incident; you had -- you had somebody die or you had an escape, you know; whereas, this should be clear, short and concise. Everybody involved writes a statement.

I mean, anyway, it's just whoever fabricated this or came out with it probably got a master's degree or a -- or a doctorate degree in criminal justice, but -- and that's great, but it's -- it's so unnecessary, but we did it. I learned how to do it. I did a couple, my staff, Major Chase, bless his heart, he got kuddos from a Dripping Springs, Texas lady by the name of Jennifer Collet. She -- she sang his praises more than once to me about how good his CIs were. He was very, efficient, did a great job.

Q. Uh-huh (affirmatively). Okay. So --

Okay. So let me ask you this: So if it wasn't for this critical incident policy, what would be -- what would you put together to document a thorough investigation?

A. Well, it depends on -- on what you're investigating I guess. You just -- you gather all the facts, you get all the witnesses, everybody that has first-hand knowledge, not what they heard, not what they think, you know, you -- you get statements. You have to have somebody, a lead person.

Now, we have three or, I'm sorry, assistant warden and two given majors that all -- all three are very proficient at investigating getting to the bottom, cutting through all the -- digging through all the mud to get to what you're looking for. It's -- it's very -- it's the same process. I guess there's different ways to skin a cat, but the final outcome is the same.

With this particular report, the Critical Incident Report that -- that I suppose they are still using, they invest a lot of time into completing something that could be done just

as well, much faster, much easier.

Q. Okay. So did -- what was -- what was your role in this critical incident policy?

A. I -- I really didn't have a role.

Q. Okay.

A. But I could do one. All my supervisors could do one, so I wasn't in charge of critical incidents, so --

Q. Okay. So you didn't have any particular role. You -- you didn't have a responsibility to review them --

A. I reviewed them --

Q. -- or anything like that?

A. -- but I didn't have to, but I -- and I -- I did review some.

Q. Okay. Did you -- were you ever responsible for doing like initial incident reports?

A. I don't remember.

Q. Okay.

A. I don't remember.

Q. Were you ever responsible for -- for reviewing initial incident reports to -- to -- I guess sort of the first line supervisor to -- to make sure that everything was accurate and

correct?

A. I don't remember if I was or not. I don't remember.

Q. Okay.

A. Might have.

Q. Okay.

MS. CUMMING:

All right. I'm going to show you Exhibit 15.

(Exhibit 15 to be marked.)

BY MS. CUMMING:

Q. So we are on page 2. Does this document look familiar to you?

A. Yes, ma'am.

Q. All right. What is this document?

A. Critical incident log.

Q. Okay. And what is the purpose of this?

A. Well, it's an ongoing log for -- that one was from January of 2021. The different incidents that took place, the reporting numbers, the supervisor, the incident requires his signature.

Q. So why -- why is this put together?

A. I believe they were -- we were

required to keep that, all the incidents that occurred in the month of January. That one started January 1st and all the way down to January 5th, so there's probably several more pages if that one ends on the 5th.

Q. Yeah. It's 14 pages, so I can show you all 14 pages. Yeah. So it -- it -- it goes -- it's a bunch of different -- yeah.

So -- okay. So yes, that's the -- that's the what of what it is. It is -- it is a listing of the critical incidents that were reported.

The -- the question is -- and -- and yes, it's required by the policy. Do you know was -- is there anything -- anything that you could use this log for?

A. No, ma'am. No.

Q. All right. Do you know where that was maintained while it was -- so let's say we are back in January of 2021. Where would this log be kept while it was still active?

A. I believe the major kept it, if I'm not mistaken. I believe Major Chase kept that log and, like I said, that was an ongoing thing and different people would use it.

Q. Okay. So would it be like in his office or something?

A. I believe so.

Q. Okay. And after the month was over, what would -- how would the log be stored?

A. I'm not sure. I don't know.

Q. The CI number, the CI 210, all this stuff, MPM-04, do you know at what point in an incident that number would be created?

A. I'm sorry. Could you repeat the question, please?

Q. Do you know when in the course of an incident that number would be created?

A. It would be created when the incident report was done. And that last one on the bottom, CI, critical incident of -- that's for '21, first number is 21, then January 5th, 21/01/05, it's actually year '21, calendar year '21, 01, January and then the MPM-5 is -- or 1-5, I don't remember what the M-P stands for or MPM, but it was all -- there was something that they always stressed, wanted to keep everything in sequential order back when MPM -- those three letters, I don't know what they -- I don't remember what they stood for.

Q. Okay. Do you know what the purpose of the -- of the critical incident number is?
A. Ma'am?
Q. Do you know what the purpose of the critical incident number is?
A. For recordkeeping. I'm assuming that's why they -- you know, everything had a specific number.
Q. The underlying critical incident, so, you know, this is referring to, you know, you were talking about CI 21/01/05 MPM-15. That -- that's also referencing there's -- there's a report that goes with that critical incident, right?
A. Yes, ma'am.
Q. Okay. Where would that underlying report be kept?
A. Would have been faxed to Dripping Springs.
Q. Okay. Faxed or e-mailed?
A. I -- I'm not sure, faxed or e-mailed. Probably e-mail, probably e-mail.
Q. Okay. And did Madison Parish under LaSalle, I'm talking about 2020, 2021, did Madison Parish keep a copy of that Critical

Incident Report?
A. Yes, ma'am.
Q. Where did it keep a copy of that Critical Incident Report?
A. They were boxed up and placed in storage.
Q. Okay.
A. We -- we stored them at the prison.
Q. Okay. Where is the storage, like kind of the archive storage at the prison?
A. It's to the left of Building 3, MCC.
Q. Okay. All right. When LaSalle left, did LaSalle leave with -- did it -- did it take all of that archived reporting?
A. Not immediately, no.
MS. CUMMING:
Okay. I want to go to what's going to be Exhibit 16.
(Exhibit 16 to be marked.)
BY MS. CUMMING:
Q. So this is titled Monthly Activity Report. Does this document look familiar to you?
A. Yes, ma'am.
Q. All right. What is this document?
A. Monthly Activity Report for DOC.

Q. Okay. So this is what you would send to the department every month, right?
A. Yes.
Q. All right. Who was responsible for putting this together?
A. The shift major.
Q. Okay. So it's got deaths and an explanation of the death. It's a reference to Connie Brown. And then it's got the -- the majority of the report is just kind of numbers, right? So here where it says Assaults, do you know where the offender on offender, offender on offender with significant injury, where these -- where these numbers came from?
A. The major would have got those numbers from any -- any injury reports, any -- any assaults, he would have got the reports so he could send the -- send the report in.
Q. So the injury reports, what -- tell me about what you are talking about there.
A. I'm sorry. Say again, please.
Q. Injury reports, what -- what is that?
A. Well, anything from medical. Offender on offender assault, it's going to be in

medical. They are going to be seen by medical, okay? He's going to get that information from medical. The supervisors, security supervisors would have had it also, so he would compile it. They -- they have done it different ways. You can keep a running total.

So many people will even print that form up, some, not my staff, but I've seen people that print that form up and they will -- every time they have something falls in that category, an apprehension, you know, they have somebody escape, have an apprehension, they will make a note of it and a date, and then before it's sent in to DOC, they will enter it all in the computer so it's nice and complete.

Q. Okay. Okay. Did you have any role in -- in helping to put together any of the information in this document?

A. No, ma'am.

Q. All right.

A. No, ma'am.

Q. Did you ever review it for accuracy?

A. I did read over it, uh-huh (affirmatively), yeah.

Q. Would you ever check it against

anything to make sure that it was accurate?
A. I never did that, no, ma'am.
Q. So the offender-on-offender assaults, was that only referring to sentenced people or did that also include if a sentenced person and a pretrial person got into a fight with each other?
A. That would have been strictly DOC.
Q. Okay. So if a DOC person hit a pretrial person, you would not count that?
A. No. I would because it would be an offender on offender, even though it's a DOC on pretrial.
Q. Okay. If it's two pretrial guys who are hitting each other, would you count that?
A. No, ma'am.
Q. Okay. Now, I think down here (indicated), there's also a schedule B. I think it's on another one, but on -- when you were talking earlier about reporting discipline -- a disciplinary action to the Department of Corrections, would this be the form on which you would report how many disciplinary actions you took?
A. Disciplinary actions towards

inmates?

Q. Yes.

A. Scroll up some more, please.

Q. I think I found it. Schedule B reports, that third --

A. There you go. Yes, ma'am.

Q. All right. So schedule B reports, that is -- that's referring to the number of write-ups and referrals to the disciplinary process, correct?

A. Well, that schedule B report is a total of 12. Now, I don't know if any of those 12 or if all of those 12 would have been deferred to regional court. So it -- it doesn't breakdown, that's just a -- just a total.

Q. Okay. And it doesn't break down, you know, where -- where 6 of those 12 related to that offender-on-offender assault or, you know, was it contraband? It doesn't -- it -- you -- you can't tell from this what -- what they are, right?

A. Right.

Q. All right. When you sent this monthly report or when -- when Major Chase sent this monthly report, did you send any of the

underlying disciplinary documentation with it?
A. No, ma'am. I don't believe we would have.
Q. All right. All right. Do you know how -- I'm sorry to be jumping around, but on assaults, there's offender on offender with significant injury. Do you know how significant injury is defined?
A. Needs offsite medical attention, that would be significant. I'm not sure of the medical -- medical definition.
Q. Okay. So if the -- the person that goes offsite is a pretrial person, would that get counted here?
A. No, ma'am.
Q. Okay.
A. That report, ma'am, is just strictly DOC inmates, DOC offenders.
Q. So what if the -- the person that goes offsite for medical care is pretrial, but the -- but the assault was from a -- from a sentenced person, would it be included then?
A. I don't know.
Q. All right. Do you know what the purpose of this Monthly Activity Report is?

A. The state is compiling information.
Q. Do you recall ever getting a phone call or a follow-up from Tyrone Mays or Robert Malcolm?
MR. MEAUX:
I believe it was Roger Malcolm, by the way.
THE WITNESS:
Yeah, Roderick. Roderick, ma'am.
MS. CUMMING:
Roderick. Okay.
THE WITNESS:
Phone call about -- about what? I mean --
MS. CUMMING:
Following up on -- with questions about this Monthly Activity Report.
THE WITNESS:
That particular report? I don't remember getting a phone call from anybody.
BY MS. CUMMING:
Q. Okay. Not this particular report, any Monthly Activity Report?
A. The only thing I can remember,

ma'am, is I remember getting a phone call one time because we hadn't sent it in. I got chastised about that, so we took care of it. As far as questioning any numbers or anything that was plugged in, I -- I don't recall ever getting a call about that.

Q. Okay. Okay. All right. Just sort of generally, so I know that the auditors would come once a year.

Other than that once a year and when they would call to sort of set up the -- the visit, did -- do you recall any other times that either Tyrone Mays or Roderick Malcolm -- or Roderick Malcolm reached out to or called you with questions about anything?

A. They probably did, but I don't remember about what the subject would have been or when it would have been. I don't talk to them very often, not -- no, sure don't, so I don't remember when the last time or for -- or what reason.

MS. CUMMING:

Okay. I want to go to Exhibit 17.

(Exhibit 17 to be marked.)

BY MS. CUMMING:

Q. This is six pages, and I'll scroll through it. My question is going to be does this document look familiar to you?

A. Yes, ma'am.

Q. All right. What is this document?

A. Something that the DOC -- I don't remember the title of it. Again, it's reporting numbers and incidents. It's -- I believe it was generated, though, by either Tyrone Mays or Roderick Malcolm of the northeast region, which includes us, those facilities listed there that there is drug testing.

Q. Uh-huh (affirmatively). Okay. All right.

A. Employee inmate drug testing.

Q. All right. So you've seen this document before?

A. Yes, ma'am.

Q. When have you -- when have you had access to this document and when have you seen this document?

A. Whenever Warden Mays would send it out.

Q. And so this is something that's put together by Warden Mays you said. Do you know

what Warden Mays relies on to -- to put this document together?

A. The monthly reports that all of his prisons in his area that sent -- that are sent in, that's -- that's a breakdown. That's a compilation of everything in the northeast region. That's previous information from all the prisons and the parish.

Q. Okay. And so here, I'm looking at assault with significant injury. This version is redacted because that's what I put my hand on when I was looking through the exhibits, but this one is from Madison Parish Correctional Center and it has sort of like a little description of -- of what happened. Do you know where he got that information from?

A. From the monthly report.

Q. Okay. So he wouldn't have -- have called to -- to follow up with you-all to -- to get this information?

A. No, ma'am. He would have got that information from us, initially from us and then we would have also notified him. In that case there, we would have sent him an e-mail. We should have sent him an e-mail the day after it

happened. That's a minor incident, and -- but it would also be on the monthly report sent in to him, so that's where he's getting that from.

Q. Okay. So -- so I want to -- I want to back up and make sure. So there's the monthly report where you're reporting numbers primarily, but then if something happens like this where someone goes out to the hospital to get medical care after an assault, you e-mail Tyrone Mays; is that right?

A. Yes, ma'am.

Q. Okay. Would -- would you yourself be responsible for e-mailing Tyrone Mays or just anybody from Madison?

A. No. My major or my captain could have done that.

Q. Okay. But the point is someone has to e-mail the -- the regional team leader for the Basic Jail Guidelines when -- when someone goes out, right?

A. Yes, ma'am.

Q. Okay. All right. And so he might also have gotten this narrative from that e-mail; is that right?

A. Could have possibly, yes.

Q. Okay. So the e-mails to Tyrone could have come from the major, from the captain or from you; is that right?
A. Yes, ma'am.
Q. What about the warden, would the warden have sent any?
A. Possibly. Possible.
Q. And so what would trigger an e-mail? Someone getting routed to the hospital. What else?
A. A significant incident.
Q. So a significant incident that didn't involve someone getting routed to the hospital, what would that include?
A. A death, escape, an assault on staff. Power outage would be a significant incident, power outage, fire.
Q. Okay.
A. You could go on and on and on about -- significance is anything, anything out of the ordinary; a plane crash. Golly.
Q. Okay.
A. I mean, things you don't want at a prison.
Q. Okay. And then assaults that lead

to hospital routes, deaths, things like that; is that right?
A. Yes, ma'am.
Q. Okay. Along with Tyrone Mays, who else from the department would you e-mail?
A. That's it.
Q. Okay. Just Tyrone?
A. Yes, ma'am. He's our BJG monitor for DOC.
Q. All right. What e-mail address would you send that to?
A. Just his work address.
Q. Okay. Would it be like his name at, you know --
A. Yes, ma'am, at la.gov.
Q. Okay.
A. I don't know about the form or fashion of his name, but --
Q. Got it. At MCC and SCC in that 2020, 2021 time period, did you have any responsibility for investigations?
A. They weren't assigned responsibilities, but -- but I did do some. I helped them out. To the extent I was allowed to, I was -- I helped the majors or if the captain

was looking into something, you know, allegations of this or that, you know, whether it involved inmates or staff.

Q. Okay. How did you help out?

A. Just -- just digging. When you're investigating something, you're asking a lot of questions, interviewing people, talking to people.

Q. So when you would conduct interviews, how would you -- how would you document, you know, what -- what information you were getting?

A. Had a legal pad and I would take notes, who, what, when, where, why, if they knew.

Q. And then would you -- would you request that they complete like a formal statement after you had interviewed them; would you write up a statement for them? How -- what -- what would you do with it?

A. It depends on the circumstances, what -- what was going on. If I was talking to an inmate, inmates don't like to write anything, the majority don't. They don't want their name appearing on anything, and I wouldn't ask them and I wouldn't dare -- wouldn't try and make

them, you know, if they weren't volunteering the information, it would be appreciated. And when you put everything together, and either you have something solid or you don't have anything.

Q. Okay. And so when you would keep -- when you would write notes, how would you -- how would you keep them?

A. How would I keep them?

Q. Uh-huh (affirmatively).

A. I'd write -- I would take notes on a legal pad and I'd have a file folder or whatever -- whatever happened, whatever was cited, you know, I'd keep them for a while. I might keep them six months, throw them away or -- or shred them rather.

Q. Okay. So you didn't have like a file or a record maintenance schedule or anything like that?

A. A file maintenance record? No, I did not.

Q. Okay. So you would -- when you were helping on investigations, you would take notes, you would keep them on a legal pad, you would tear them off of the legal pad, put them into whatever the file was that you were

investigating, but then you would destroy them after about six months; is that right?
A. Yes, ma'am.
Q. Okay.
THE WITNESS:
Sorry. I got to take a break. Be back in a minute.
MS. CUMMING:
Yep.
(A short recess was taken.)
BY MS. CUMMING:
Q. All right. Okay. So you were talking about how you helped out doing interviews.
In terms of the -- so you said it was the majors and the captains. Were they the ones who were primarily responsible for interviews or for investigations?
A. Yes, ma'am.
Q. All right. Do you know when -- did they have any training in investigations?
A. I have no idea.
Q. Okay. Did you have a corporate or -- or a company phone when you were with LaSalle?

A. A corporate phone, yes.
Q. Okay. What was the phone number of that phone?
A. Area code 318-638 -- I don't remember the last four numbers, Elizabeth. I'm sorry.
Q. Okay. All right. If you -- if they come to you, tell me.
A. I will. I'll let you know.
Q. Okay. Thank you. What was the carrier?
A. AT&T.
Q. Okay. How many of you-all had company phones?
A. The warden, myself, both majors, all four captains. I believe -- I believe the nurse had one. The classification department did not have one. My maintenance -- maintenance man had one, carried one. I believe that's it.
Q. Okay. All right. And what -- what did you use the phones for?
A. What did I use it for?
Q. Uh-huh (affirmatively).
A. Company business. My supervisor told me I could use it for my personal business,

so I had family phone numbers and friends, you know, so carried it 24/7. I was on call 24/7.

Q. Okay. Did you ever take pictures related to an investigation with that corporate phone?

A. I don't remember. I probably did, but I don't remember.

Q. Okay. If -- if you did, where -- where would you have sent those pictures to be included in the investigation?

A. I don't know if I would have sent them anywhere. If I would have sent them to anybody, it would have been to one of the majors or one of the captains or they would have sent me pictures that they used or if they took a picture with their company phone.

Q. Do you recall if they sent you pictures related to an investigation?

A. I don't recall, no.

Q. Did you take pictures with your personal phone related to investigations?

A. No, I did not.

Q. Did you ever use your personal phone to send messages related to detainees?

A. Related to what?

Q. To -- to inmates, detainees.
A. No, ma'am.
Q. Did you ever use your personal phone in any investigation?
A. No.
Q. Did you ever use your personal phone to communicate with coworkers?
A. No.
Q. Okay. Do you have a corporate or company camera?
A. Did I at that time?
Q. Yeah.
A. In that timeframe?
Q. Uh-huh (affirmatively).
A. There was a camera on the phone, yes.
Q. Okay. But other -- you didn't have like a separate camera other than the phone camera?
A. (Shook head negatively), no, ma'am.
Q. Okay. All right. So other than sort of helping out with investigations whenever captains or majors asked for your help, did you have any kind of official role in reviewing or supervising investigations?

A. No. I wasn't designated in writing, but I would assist. If I found something that I thought needed to be corrected or needed to be redone or something that I thought about, hey, let's look at this, you know, offer advice.

Q. Okay. So how frequently would you review investigations to see if there was something that -- that, you know, could be done better?

A. Whenever an investigation would come up, I would look at it and help out.

Q. How were they provided to you?

A. How was the classification provided? I was told about it and I would get with the supervisor and we would put our heads together and maybe get one or two other people in there and maybe they knew something that we didn't know.

Q. Okay. So there's an incident that happens, the major or the captain investigates it.

A. Okay.

Q. They -- they conclude their investigation; there is some packet. What would you expect to see in -- in a concluded

investigation?

A. The final outcome, exactly what did happen, maybe -- maybe the truth as to what happened.

Q. Okay. So how would that be; are you -- are you handed a packet of paper, are you e-mailed documents?

A. I'm not sure how to answer that. I mean, you have whatever happened, whatever it is. Somebody's been murdered, you -- you do a number of different things to look into it; and the more people that you have to look -- to look into it, you know, whether it's taking statements, taking pictures, finding out what was going on, try to find out what was going on, what was seen, what was heard, wading through all of the untruths to get to the truth, if that makes sense.

I mean, it's -- it's -- there's a lot to it. There's -- and I'm not an expert, not -- not by any means, but there's a lot that goes into it and investigating anything, a traffic accident. You know, it might be something minor that's real easy, but then when it gets into something where somebody's been hurt or something like that and you're having to go

through the facts or go through what you know to find out what is true and then compiling everything and -- and putting it down on paper. So as far as getting handed anything, giving -- I mean, yes, that's the best way I can sum it up.

Q. So it's put down on paper. What's the paper that it's put down on, what -- what form does that take?

A. What form?

Q. Yeah.

A. I'm sure I'm not understanding the question.

Q. All right. Someone's murdered. Connie Brown is murdered in MCC. You have an investigation that happens into how Connie Brown is murdered, correct?

A. I would assume, yeah.

Q. Okay. So if you are not necessarily taking an active part in the investigation, but you are looking at the investigation after it's closed, after there has been some sort of decision about, okay, we now know enough about what happened to close this investigation, if you wanted to look at how that investigation happened, if you wanted to look at the steps that

they took, if you wanted to look at who they interviewed, if you wanted to look at how they gathered evidence, if you wanted to look at what -- how they were piecing together the evidence that they did gather, would they write that up into a report?

A. Absolutely.

Q. Okay. Would that also include -- in that report, would they include statements from the people that they talked to?

A. Should include that.

Q. Okay. Would they also include how they gathered the evidence, what their method was for gathering evidence?

A. Sure. That should be part of the finalized report.

Q. Okay. And so what I'm asking is when an investigation is done, there is a finalized report, correct?

A. Correct.

Q. All right. What -- is it -- is it printed out on a -- is it handwritten on -- on yellow legal pad note paper and that's the final form of the report? Is it typed into a form? Is it sent to you by carrier pigeon? How do you

have access to the investigative report?

A. Well, I don't think we are going to do carrier pigeon. What we are going to do is type it up on a computer, your repeated form. There's not an investigation form. An investigation is everything that goes into trying to find out any information. All that's going to be sent out and it's going to be sent out by e-mail. It can be typed up; and I like to have people sign things, a signature also instead of just a typed name.

Q. Okay. So it's going to be sent out by -- by e-mail. Who -- who -- who gets the -- the final investigation?

A. At that time, LaSalle would have got it via CIRs.

Q. I'm sorry. Say that one more time.

A. LaSalle would have got it via Critical Incident Reports. An investigation at that time, in that timeframe would have been done on CIR and I would have got it too along with the warden and --

Q. All right. And so the -- the -- the Critical Incident Reports, the critical incident reports are -- are reflecting the investigation

that happened into whatever the incident was; is that -- during the -- the LaSalle time period; is that right?

A. Yes.

Q. Okay. Would there be any other kind of separate investigation that that wasn't captured by the Critical Incident Reports?

A. No, ma'am. Everything should have been included in the CI report.

Q. Okay. Great. All right. And so when you are looking over an investigation -- so let's keep it to the -- the LaSalle time period, so let's call them Critical Incident Reports -- would you look over every Critical Incident Report?

A. No, ma'am.

Q. Okay. How would you decide which Critical Incident Report you wanted to look at?

A. I don't know if there was a method to picking and choosing. I was told that the warden looked over some of them. And when I say looked over them, I'm not looking at the hard copy. I'm looking at what was e-mailed, okay, opening it up on my computer.

Q. Okay.

A. So --

Q. All right. And so when you are looking at them, are you looking at them before they are finalized and closed or are you looking at them with an eye to see what else could we -- could we look into here?

A. Both. But it -- what I was looking at was a finalized copy, and if I saw something that just glared at me that didn't look right or seemed right, then we would send it back for a revision.

Q. Okay. If you sent something back for a revision, would that be by e-mail?

A. Yes, ma'am.

Q. How frequently? I mean, let's just say in the course of a given month, how frequently would you send something back for a revision?

MR. MEAUX:

Objection. Calls for speculation, but he can answer.

THE WITNESS:

I don't know. I don't remember. It's been a little while back, but I remember that I did.

BY MS. CUMMING:
Q. Okay. And when you sent something back for a revision, how -- how quickly would you expect that revision to be done?
A. In a couple days.
Q. Would you include the -- the Dripping Springs e-mail on any kind of suggested revision that you might make?
A. No, ma'am. No. Because they send it to Dripping Springs anyway, so -- and Dripping Springs did send back -- I remember a couple coming back to us, not to me, but to other staff, and they sent -- forwarded CIRs to them that just go ahead and say, hey, you-all forgot this or you need to change this or, you know, something else and then they would send it back to them.
Q. Okay.
MS. CUMMING:
All right. I want to show you what's going to be Exhibit 18.
(Exhibit 18 to be marked.)
BY MS. CUMMING:
Q. Can you see that?
A. Yes, ma'am.
Q. All right. So this happened -- find

my mouse. There we go. This happened October 18th, 2020. We have been talking about the critical incident reporting forms, so this is page 1. It says, "Document Checklist."

Is this -- is this part of the -- the stuff that -- that you were talking about related to the -- the critical incident reporting forms and policy?

A. Yes, ma'am.

Q. Okay. All right. So down here (indicated), it's got this acknowledgment; and it's got a statement that, you know, "the information submitted is complete and accurate." So what is this -- what is this acknowledgment for?

A. That I've read -- that I've read over on what's attached or what was -- what all accompanied that particular CI.

Q. And do you -- did you do anything to verify that the information in these various reports was complete and accurate?

A. Yeah. I verified everything was checked off on the yes side. If you scroll up, everything on the executive review, that's exactly -- that's actually the form itself;

initial incident review, supervisor summary. So somewhere in there, there should be several more sheets of paper with those different forms, whether it's 2.15-1, 15-2, 15-3 on down the list.

Q. Okay. And so your -- your review was to make sure that each of these things was in the -- in the packet. Was it also to -- to make sure that they were accurate and complete?

A. As far as I knew, yes, ma'am.

Q. Okay. Were you also reviewing to see if there was any additional investigation that -- that could be done?

A. When I looked at that -- that's been, when, November of 2020 or 2021?

Q. October of 2020.

A. Okay. When I actually did that at the bottom right, I believe it was later on, November 9th, okay? So everything that's in the yes side, I reviewed that, I looked at that.

As far as conducting another investigation of some type, I don't know if I did or not. I'd have to look at the -- the rest of the paperwork that should have accompanied that --

Q. Okay.

A. -- where I -- unless it's farther down.

Q. We will -- we will -- yeah. We will scroll through the whole thing.

A. What was -- okay. James Murray got punctured. Okay.

Q. So this is the -- this is the initial incident report, correct?

A. Yes, ma'am.

Q. And this is -- this is done by Lieutenant Puckett, right?

A. Yes, ma'am.

Q. All right. And Lieutenant Puckett would have been the one that wrote this synopsis of what happened?

A. Yes, ma'am.

Q. Okay.

A. Ms. Cumming, excuse me. Could you scroll back up? I -- I was trying to compare that CI number that's on that sheet right there and compare it to the other.

Q. Uh-huh (affirmatively).

A. Ten of 2020.

Q. You -- you want me to go back up?

A. Yes, ma'am. If you could go back

up, please.
Q. Uh-huh (affirmatively).
A. Yeah. That's the same one. Okay.
Q. Okay. Do you -- so here it -- it indicates notification by telephone, looks like you were notified at 11:26. Do you recall being notified of this incident?
A. No.
Q. I'm sorry. Say it one more time.
A. No, ma'am. I don't recall that particular notification.
Q. Okay. And then it looks like James McCormick, this is the same James McCormick we were talking about earlier, correct?
A. Yes, it is.
Q. All right. And he was notified the next day?
A. Yes, ma'am.
Q. And now this is the facility and executive review. Do you know what this -- this is for?
A. Yes, ma'am.
Q. All right. What's this for?
A. That went straight to Director McCormick, Arthur Anderson and the warden sent

that and it's a real quick synopsis of the inmate being physically attacked, stabbed.

Q. Okay. Do you know what this facility and executive review form is -- is supposed to be for, like what -- why?

A. It's -- I've always -- always thought it was just another way of giving everybody a heads up as to what happened, when it happened and the details of -- of what happened.

Q. Okay. And so it -- here it says it was found that offender Howard Willis was the offender that actually attacked and stabbed Murray, and then he was placed on ad seg. All right. So here is the supervisor summary. Did you review this?

A. I'm sure I did.

Q. Okay. What's the -- what's the point of this supervisor summary?

A. Just what the title says it is, I guess.

Q. So do you know how it was that when we were talking about the -- I'm sorry. Let me go back up here to this executive review.

It says offender Howard Willis was the offender. My 9th grade English teacher is

screaming in my ear about the passive voice. Do you know how -- how it was that Willis came to be identified?

A. No, ma'am.

Q. All right.

A. I don't know.

Q. All right. And then down here (indicated), it's talking about Willis, Treaudo and Harris.

Do you know how it was that those three became -- came to be involved in this?

A. No, ma'am. I don't know who determined that.

Q. Okay. And do you know why it is that Treaudo and Harris, there's no mention of them in that executive review?

A. No, I don't.

Q. All right. So we have the witness statement from Johnathan Knox. Do you know how Johnathan Knox's statement was taken?

A. No, I don't.

Q. And then we have got a witness statement from Esco Tillman. Do you know how Esco Tillman's witness statement was taken?

A. No, I don't.

Q. And then it looks like this is a statement from Darius Mikel. Do you know -- or Davis (sic) Mikel. Do -- do you know that name?
A. No, ma'am.
Q. Okay. Do you know how he came to be selected to -- to give a witness statement?
A. No, ma'am.
Q. All right. Do you know where that statement was taken?
A. No, ma'am.
Q. And then this is Timothy Kordish. Do you know how he was selected to give a statement?
A. I do not.
Q. Do you know where the statement was taken?
A. No, ma'am.
Q. Are there any other -- well, I'll scroll through the rest of the documents, but if -- if they aren't included in this CIR, this Critical Incident Report, would there -- would there be any other statements taken from anybody else on the -- on the dorm?
A. Everything should be included in that -- in that packet.

Q. So if there are no other statements in this -- in this Critical Incident Report, then that means that there were probably no other statements taken from anybody else on the -- on the dorm; is that correct?

A. I would say so.

Q. Do you know why there were no other statements taken from anybody else on the dorm?

A. No, ma'am.

Q. Okay. Is there any other place, other than this critical incident report, where any other staff statements would be taken?

A. Not that I'm aware of, no.

Q. Was there any investigation conducted into -- right now, I'm just sort of scrolling through so you can see what -- what else is in the rest of the report, but tell me if you see something and you want me to stop.

Was there -- was there any investigation undertaken by you, by the majors, by the captains to -- to determine if the staff were at their posts at the time of this assault?

A. Investigation as to whether staff were at their posts?

Q. Yes.

A. No, ma'am. I didn't investigate that and I am not aware of anybody investigating that.
Q. Okay. Do you know was there anybody who looked into who was supposed to be in the control room at the time that this attack happened?
A. No.
Q. Okay. And did you as assistant -- assistant warden ever ask anybody to check into that?
A. I did not, no.
Q. Okay. Do you know who was supposed to be roving deputy at the time that this assault happened?
A. I don't know who the roving officer would have been.
Q. Okay. Did you ask anybody to check into the -- who the roving officer was?
A. I'm sorry?
Q. Did you check -- did you ask anybody to check into who the roving officer was?
A. No, I did not. But looking at the names of who went into the dorm, they would have been the roving security staff on duty.

Q. Okay.
A. Statements of Knox and Puckett and whoever else it was, the third person I think.
Q. Tillman, Esco Tillman.
A. Tillman, yeah, Esco.
Q. All right. But that's just based on their appearance in this Critical Incident Report, right?
A. Yes, ma'am.
Q. All right. That's not independently verified and you didn't have any -- you -- you did not look into, you know, like what the drop sheets said for that evening or anything like that, correct?
A. I didn't look at the drop sheet, but I know who was on duty by looking at all the reports.
Q. What all what -- what reports?
A. The CI report.
Q. Okay. So just in the CI report, but I'm asking about if -- if you looked at anything outside of the CI report to see who -- who should have been on duty?
A. No, I don't believe I did.
Q. All right. And -- and did you ask

anybody to look outside of the CI report to confirm or see who -- who should have been on duty?

A. I don't remember asking anybody, I don't.

Q. Do you know when Willis was placed on ad seg?

A. Willis?

Q. Howard Willis.

A. Howard Willis. No, ma'am. I -- I don't remember.

Q. Okay. Where would it be documented if -- if he had been moved to ad seg on October 18th, 2020?

A. That should have been documented in that control center logbook.

Q. Okay. Would it also have been documented in the bed movement logbook?

A. I mean, yes, it should have, uh-huh (affirmatively).

Q. All right.

A. Correct.

Q. All right. Did Howard Willis have a disciplinary hearing?

A. I -- I'm -- I don't remember. I

don't know.
Q. Okay. If he -- if he had had a disciplinary hearing, would that have gone to the regional court?
A. Yes. It should have been deferred.
Q. Okay. If -- if a disciplinary hearing is deferred up to the regional court, is there any documentation of that hearing that -- that stays with Madison?
A. It will stay in his master prison folder, which is part of his -- part of his permanent prison record, yes.
Q. Okay. Do you know was Brian Harris placed on lockdown?
A. Yes. When?
Q. Well -- well, let's first ask do you know was he --
A. Oh.
Q. -- put on lockdown?
A. I don't know if he was or not.
Q. Okay. And -- and you don't know when it would be if he was?
A. Right.
Q. Okay. Do you know did he have a disciplinary hearing?

A. I don't know.
Q. All right. If he had had a disciplinary hearing, would that have been deferred to the regional court?
A. Yes, ma'am, it should have been.
Q. Okay. And, again, if -- if it had been deferred to the regional court, the -- what documentation would have been maintained by Madison related to that hearing?
A. It -- it would have been part of his master prison folder kept on the Jail Management System.
Q. All right. And then was Mitchell Treaudo placed on lockdown?
A. I don't know.
Q. Okay. And I'm sorry. For Brian Harris and Mitchell Treaudo, if -- if they were placed on lockdown, where would that be documented?
A. It should be documented also in the control center logbook and ad seg log form, that exhibit earlier. It should also be documented there.
Q. Okay. So that ad seg log and the control log. Would it also be documented in the

bed movement log?
A. Yes, ma'am.
Q. Okay. Do you know did Mitchell Treaudo have a disciplinary hearing?
A. I don't know.
Q. If he had had a disciplinary hearing, would that have been deferred to the regional court?
A. It should have been, yes, ma'am.
Q. And if it had been deferred to the regional court, would documentation have been maintained by Madison in his master prison file?
A. Yes.
Q. Okay. In the course of this investigation, were you aware of James Murray's legal status?
A. In the course of what now? In the course of what?
Q. Were you aware of James Murray's legal status?
A. His legal status as in?
Q. Was he pretrial or was he sentenced?
A. No, I wasn't. I think everybody was under the impression that he was a pretrial at that time, but he actually had DOC, a DOC number,

and when -- when people saw that DOC number -- so, but no. I -- I never thought -- I never did two thoughts about it, though, really. Even if he didn't have -- even if he had a DOC number, it doesn't mean he's a DOC inmate. He could be doing parish time waiting for sentencing.

Q. Okay. So -- so you didn't know and you didn't really look into -- into James Murray's legal status --

A. Right.

Q. -- correct? All right.

A. Correct.

Q. Were -- were you aware of either Howard Willis or Harris or Treaudo's legal status at the time?

A. No, ma'am.

Q. All right. In the course of the investigation of this incident or -- or the reviewing of this report, did you ask anybody to look into what their legal status was?

A. I don't know if I did or not.

Q. Okay. Did you --

Well, okay. What steps did you take to prevent future attacks like this after this incident?

A. What steps did I take?
Q. Yes.
A. I don't remember any specific steps that I took, not as assistant warden.
Q. Do you know did anybody -- did you or anybody order a shakedown after this attack?
A. I don't know, Elizabeth. I don't remember.
Q. Do you know was information related to this attack provided to classification?
A. I'm sure that it was, but I'm -- I can't verify that it was or wasn't.
Q. Okay. But --
A. I would think that it was. It should have been.
Q. Okay. What -- if information had been provided to classification, what information would -- would that have been?
A. Just the relevant facts, everything, you know, the stabbing, evidence, being called, transported and so forth, the other offenders involved.
Q. How would that information have been conveyed to classification?
A. Probably would have been sent by

that e-mail.

Q. Who would have been responsible for sending that e-mail?

A. It's no one person's responsibility. The major could have done that, shift captain, shift lieutenant.

Q. Okay.

MS. CUMMING:

All right. This is going to be Exhibit 18 (sic).

MR. MEAUX:

Hey, Elizabeth, real quick.

MS. CUMMING:

Uh-huh (affirmatively).

MR. MEAUX:

We have been here for more than the six hours or more than the seven hours that's allowed. Do you have an end goal in sight here?

MS. CUMMING:

Well, we have been here for five.

MR. MEAUX:

No. We have been here since 11:00 o'clock --

THE WITNESS:

Yeah.

MR. MEAUX:

-- and it's now 6:10.

THE WITNESS:

It's been over seven actually.

MS. CUMMING:

So yes, we are -- we are close. I've got --

MR. MEAUX:

I need "close" expressed in the number of minutes, please.

MS. CUMMING:

Right. I've got one, two, three, four, five exhibits that I want to go through. I think we can probably do it in 30.

THE WITNESS:

Really?

MR. MEAUX:

Yeah.

THE WITNESS:

I've got a two-and-a-half-hour drive back to Tallulah.

MR. MEAUX:

Can we go -- can we go off the

record, please?

MS. CUMMING:

Sure.

(A discussion was held off the record.)

MS. CUMMING:

All right. So I want to go to Exhibit 19?

MR. MEAUX:

That will be the next one.

MS. CUMMING:

Yeah.

(Exhibit 19 to be marked.)

BY MS. CUMMING:

Q. All right. Okay. So this is related -- this is dated November 23rd, 2020. I'm just going to go down here.

Again, this is your signature at the bottom, that acknowledgment on page -- the first page?

MR. MEAUX:

She's asking you yes, it is?

THE WITNESS:

Oh, I thought you were telling me. Yes, it is.

BY MS. CUMMING:

Q. It is. All right. And so I'm not going to go through all of the -- the detailed questions, but here, let's -- let's just look at -- actually, let's go down here (indicated).
Do you -- do you recall anything about this incident? Are -- are you reading?
A. No. I said no, ma'am.
Q. Oh, I'm sorry. I didn't hear you.
A. I'm sorry.
Q. Okay. You -- you don't recall this incident. Okay. Do you recall if there was a shakedown ordered after this incident?
A. I do not.
Q. Okay. All right.
MS. CUMMING:
All right. This is going to be Exhibit 20.
(Exhibit 20 to be marked.)
BY MS. CUMMING:
Q. Do you know how it was that Mr. Henderson came to have a broken hand?
A. I do not.
Q. All right. Would you expect to see a Critical Incident Report if it had -- if he had broken his hand in a fight?

A. Well, he's saying that he broke his hand, so I don't know if he broke his hand or he actually saw the doctor and I -- I'm not seeing all the date. 1/28?

Q. Yes. I think it's -- it's 1/28/21.

A. 1/28/21. Okay. There should have been a CI done, though, if he did make sick call. That's a request. That's -- that's not -- that's not anything from the nurse. That's his request to make sick call to see medical, so -- but if there -- if he did see medical, medical should have followed it up. There should have been -- there should have been a CI completed, yes.

Q. Okay. All right. All right. Do you -- do you have any recollection of any investigation into a fight involving Mr. Henderson in January of 2021?

A. No, ma'am.

MS. CUMMING:

Okay. And this is going to be Exhibit 21.

(Exhibit 21 to be marked.)

BY MS. CUMMING:

Q. All right. I'm going to -- going to go down to 50. All right. Let me see if I can

get up here.
All right. This incident occurred January 20, 2021 in J dorm. Do you recall this incident?
A. No, ma'am.
Q. Okay. Do you recall was there a shakedown done after this incident?
A. I do not recall.
MS. CUMMING:
And then this is going to be Exhibit 22. I'm sorry. This copy is -- is bad.
(Exhibit 22 to be marked.)
MR. MEAUX:
Is that -- is that one my fault, Elizabeth? Did the original look like that?
MS. CUMMING:
I mean, ultimately, yeah, because it did come from you guys. I don't have independent access to this stuff.
MR. MEAUX:
I'm probably sure that's how bad it looks like on my end.
BY MS. CUMMING:

Q. All right. Do you recall this incident?
A. No, ma'am.
Q. All right. Do you recall if there was a shakedown done after this incident?
A. I do not.
Q. All right. Do you know if it was reported to classification?
A. I don't know for sure that it was reported or not.
Q. Okay. All right.
MS. CUMMING:
All right. I've got one -- see, I told you a half an hour. We are in the homestretch.
All right. This is going to be Exhibit 23. I want to go back to the -- the write-ups that -- that you've received.
(Exhibit 23 to be marked.)
BY MS. CUMMING:
Q. Now, you indicated in your earlier testimony that you did not recall why it was that Warden Anderson wanted to move you to the nightshift; is that correct?

A. Yes, ma'am.

MS. CUMMING:

All right. I am going to show you Exhibit 23.

BY MS. CUMMING:

Q. All right. Warden. This is an Employee Rule Violation Report. Go ahead and read this, tell me if you have seen this before.

A. I've read it numerous times, ma'am. I know exactly what it says.

Q. Okay. What does it say?

A. A lot of untruths.

Q. Okay. So would this be part of why Warden Anderson wanted to move you to the nightshift?

A. That's part of it, yeah, but that's not -- that's -- we are going to get out of here on the time we was talking about because I would have to take up five minutes of your time and let you talk to somebody that witnessed something involving Warden Anderson and I'm going to leave it at that. That doesn't mean anything to me. That's not important to me.

Q. Okay. Well, it -- it's important to me, so I'm -- I'm happy for you. This is the

last thing that we are talking about, so I'm happy for you to take up five minutes of -- of telling me what -- what you want to tell me about Warden Anderson.

A. I think blow it up just a little bit, please.

Q. (Complied.)

A. Okay. That's not true. That's not true.

Q. Okay.

A. I'm -- wait. I'm -- I'm getting ahead of myself. I'm getting ahead of myself. Who wrote that?

Q. You know as much about this document as I do.

A. Okay. Blow it up a little bit. I believe Arthur Anderson wrote it. If I did, ma'am, if I had did what that man said I did, I would have been terminated. I should have been terminated. I should have been arrested.

Q. Was there any kind of suspension noted with this rule violation report?

A. No, ma'am.

Q. Okay. Was there any kind of -- any other sort of like disciplinary action taken by

LaSalle?
A. No, ma'am.
Q. Okay. So you're saying that nothing in this report happened at all?
A. There was no use of force.
Q. There was never a use of force on September 15th, 2020?
A. No. It says Assistant Warden Stinson, you were involved in a use of force with Major Chase. Did anybody investigate an assistant warden and a major being involved in a use of force? Nobody ever did. Nobody from LaSalle, nobody from the sheriff's department.
Q. Okay. Who -- who got this report?
A. Who got that?
Q. Uh-huh (affirmatively).
A. What do you mean who got it?
Q. So -- so if Arthur Anderson wrote this, which I think it says name and job title, reporting employee, it says Arthur Anderson; so if Arthur Anderson wrote this, who did he send it to?
A. After I signed it?
Q. Uh-huh (affirmatively).
A. I signed it acknowledging that I got

a copy of it. I guess he sent it to LaSalle. That's what -- that's what a warden should have done if he thought that his assistant warden and a major were involved in something like that.

Q. Okay.

A. That's what I would have done if my assistant warden and a major -- if I knew for a fact, if I knew that it was true that they were involved or if I thought that they were involved, I would have had somebody come in and investigate it. I would have -- I would have stayed neutral because that's -- that's investigation 101. The sheriff's department wasn't made aware of it. Nobody investigated anything.

Q. So -- so you were never questioned related to this rule violation; is that correct?

A. Not by anybody, ma'am. No, ma'am.

Q. Okay. And so -- and so you don't know who at LaSalle received this?

A. No, ma'am, I don't know who received it. I've -- I've always assumed somebody got it, but nobody -- like I said, nobody ever talked to me about it, nobody ever called, not LaSalle, not the sheriff's department.

Q. Uh-huh (affirmatively). Okay. So,

and -- all right. I'm going to go into -- there's another one, just to sort of -- and then there's this one, and this is -- also, this is related to the 16th and it's related to Malcolm Muse. I don't believe your signature is on this. Have you seen this document?

A. No, ma'am. Not that one.

Q. Okay.

A. I didn't sign for it, did I?

Q. No. Okay. Do you know did anybody at LaSalle ever question you about anything related to Malcolm Muse?

A. No, ma'am.

Q. Okay. So -- all right. You made -- you made it sort of a reference to tell me if I misunderstood, but a reference to things that -- that Arthur Anderson has done and people that have seen things that Arthur Anderson has done. Can you be -- can you be more explicit about that?

A. Well, whenever he left Tallulah, he stole quite a few -- a quite few items. He lived in what we call a bachelor quarters. It's a little small about a 12-by-12 room. He stole a TV and a bed. Anyway, he stole a bunch of items

when Anderson was in town. He lives in Lubbock, Texas and he's -- he wouldn't be here, he would be in Tallulah for about -- he might make it for two weeks and then he would be gone for two weeks. Every time something happened, I was in charge. I was in charge. I say every time something -- not every time, but the biggest majority of the time.

I tried to work with the man. The man did not have any compassion or any desire to work with me. He -- and I don't want to be personal. I never wanted it to be personal with him, but this right here (indicated), I've never seen that.

The other one that I signed off on, anything I've received -- that I received, I'm going to sign for it. It's always going to be in blue ink and I've got a -- my wife says I've got a stratagem signature. I don't know about that, but anyway, it's -- it's hard to duplicate I think, so that's more -- that's just him.

The other one that I did sign for, the other VR-1, that did not happen.
Steven Chase isn't here to defend himself. There was no working cameras at the time. So it's his

word against mine, but I accepted that. I accepted it, I took it on the chin, I kept my mouth shut and I prayed about it a lot because I'm a better man than he will ever be.

Q. Did this one happen with Malcolm Muse?

A. This one right here (indicated)?

Q. Yeah.

A. Don't know anything about it.

MR. MEAUX:

Just read it and --

THE WITNESS:

I -- I've read it.

MR. MEAUX:

Yeah.

THE WITNESS:

It's -- okay. The other one was David Wade. What was the first one with the -- my signature?

MS. CUMMING:

(Complied.)

THE WITNESS:

Okay. What's the date on that one, 9/15/2020. Okay. Can you scroll back, please?

MS. CUMMING:
(Complied.)
THE WITNESS:
Can you scroll down just a little bit?
MS. CUMMING:
(Complied.)
THE WITNESS:
Okay. Ma'am, the reason, the way I'm going to try to prove that it's fiction is because I was supposed to sign for it and then there's supposed to be a recommended action. What type of penalty is he recommending? Now, if he does it the right way, he's supposed to have Mr. McCormick come over and hold the first level. Didn't do that because it didn't happen.
I honestly don't think he wanted Mr. McCormick to come over here and talk about that, but the first one, there was no recommended penalty either. It's like it didn't happen. There has to be somebody hearing the first level.
It's the same as the law enforcement

writing the speeding ticket. That cop can't say, oh, it's a $50 fine. No. You have to go in front of a judge or somebody else. So yeah, I'm aware of both -- no. I'm sorry. I'm not aware of that one. The first one I am.

BY MS. CUMMING:

Q. Okay. All right. And -- and I just want to make sure I understand what your testimony is.

What is your testimony regarding whether or not you were involved with a use of force on Malcolm Muse?

A. Was I involved?

Q. Yes.

A. No, ma'am. No, ma'am. I don't know anything about Chase being involved.

Q. Okay. All right. So --

A. Now, he's saying that I was involved with a use of force with Malcolm Muse and then he says Major Chase having knowledge of being involved in a use of force in his job and making sure proper procedures -- no, ma'am.

Q. So McCormick never came to talk to you about either of these --

A. No, ma'am.
Q. -- correct?
A. Correct.
Q. Okay. McCormick never came to talk to you about either of these?
A. I don't think he talked to Steven Chase about it. If he did, nobody ever mentioned it to me. He didn't talk to me about it.
Q. Okay. Okay. So throughout this deposition, it's -- it's been pretty clear through both your direct testimony and other things that you've kind of hinted at, there was some really significant friction with Anderson and that was impeding your -- what you would have liked to do your job; is that fair?
A. That's a fair assessment, yes, ma'am.
Q. All right. Did you ever talk to anybody at LaSalle about the problems that you were having with Warden Anderson?
A. No, ma'am.
Q. Did you ever talk to anybody else anywhere about the problems that you were having with Warden Anderson?

A. Nobody besides my wife.
Q. Okay. Did you talk to anybody of your coworkers, like Major Chase or anybody like that about the problems that you were having with Warden Anderson?
A. Yes, ma'am, I did. I talked to two people at work: Major Chase, who's deceased, and Major John Murray, who was a captain at the time back in '19, '20 I believe, Major John Murray, the three of us talked. We talked several times about it and prayed about it. Both those men were about to quit.
I retired from the state. I get a retirement check, a decent check every month. I want to keep working. I don't want to go home, but those two men were about to give up. They were at their wits end.
Now, John Murray, you are welcome to talk to him and he will tell you, he won't lie to you about anything. He will tell you what he talked about and the things he saw Warden Anderson do.
I do have a question, though. Why are these coming up last, these two exhibits.
Q. That's the order of my outline.

A. Okay. All right.
Q. So -- so you talked to -- to Chase, you talked to John Murray. Do you know why Warden Anderson left?
A. Do I know why he left?
Q. Uh-huh (affirmatively).
A. I'm -- I'm pretty sure the reason he left was because Security Management was taking it over, taking over the men's prisons and the women's prison effective June 1st, and they weren't going to keep him as a warden.
Q. Do you know anybody other than -- so did John Murray have -- so I'm understanding, and tell me if I'm wrong, I'm understanding that both John Murray and Steven Chase had problems with Warden Anderson too; is that correct?
A. Yes, ma'am.
Q. All right. Do you know of anybody else at Madison who had similar problems with Warden Anderson?
A. No, ma'am. I -- I don't know of anybody else. No. No. Those two men first hand, I -- I say first hand. They -- they witnessed and listened to him and had several problems with him. That's -- that's not hearsay.

That's them telling me, them telling me.

Q. Okay.

A. I shared with them the -- there is one other person you can talk to, Adrienne Reed, who overheard a discussion that me and Arthur Anderson had, and she was in her office 6, 8 feet away around a corner. Major Chase was standing in the door when the conversation happened, but he's not here anymore. He got loud with me, he -- he was doing a quick background.

Hurricane -- Hurricane Laura came through, it hit Rapides Parish, lost power. My wife couldn't get the generator started at our house, so -- no. I'm sorry. That was another time. The air-conditioner stopped working at our house, had a window unit. She was sleeping in our den and I called him about five minutes after 8:00 that morning. It was on a Wednesday or Thursday morning, cutting power lines down, Rapides Parish got hit pretty good. Called him and I said -- I called him boss -- Boss, do me a favor, I need to run home and see if I can get an air-conditioner in town, not going to be able to find one in Alexandria, bring it -- bring it to the house, hook it up, the air-conditioner is

down. And his exact words to me were, yeah, you need to go home and be the man at your house. And he was sitting down at the table and I pointed a finger at him and said don't you ever talk to me like that again. And that was August 2020 and that's when it happened and I can stand -- I'm not going to -- I'm not going to preach.

But if you ever get to depose him, get ready. And I try not -- God's words tell me not to talk bad about people and I try not to, but -- and I'm not preaching to you-all, but I'm telling you I didn't do that, I didn't deserve that; and if anybody thought I did, then they should have investigated it. Nobody -- like I said, this one, I don't know anything about that. The first one I did, yeah. Oh, yeah. I did get a copy, but nothing happened. So I'm going to shut up. I'm going to get off my soapbox.

Q. Okay.

A. Next question.

Q. All right. Well, that's -- that's why I'm asking you about these. Like I said, what we are trying to get at is everything that you know, so you, know, thank -- thank you for --

for the information that you are providing.

In terms of -- just want to make sure I'm understanding the -- the Anderson friction. It sounds like a lot of the friction was very personal rather than fundamental agreements around the operation, but tell me if that's wrong.

A. Ma'am, I agree. It became personal. I'd have to go back August of 2020 when Hurricane Laura hit Rapides Parish, I had some damage to my house, no power, air-conditioner out; but that was the day. Prior to that, everything was okay.

Go talk to the staff over there and ask them how much respect they had for -- for him and how much those people have for me, and not that my job is a popularity contest, but I treat everybody with respect; and the thought of doing something like that to somebody, it never crossed my mind.

I've been in this business almost 44 years. I can take it to my grave, very few regrets. Beating an inmate, it hasn't cost me a penny yet. I haven't done anything yet. I've watched people do federal time, you know, and that's not good. I'm -- I'm not going to -- I'm

not going to do that. Not going to do that. I'll make mistakes, but I'm not going to do something like that. I should have had to answer to that if I had done that. But yeah, you -- you ever get a chance to depose Arthur Anderson, you-all live with that.

MS. CUMMING:

All right. Well, Eli, make it so, please.

MR. MEAUX:

I'm trying to find him.

THE WITNESS:

Lubbock, Texas somewhere.

MS. CUMMING:

Okay. I don't think that we have any other questions. Thank you for -- for bearing with us. Thank you for your time.

MR. MEAUX:

And just formally, we reserve the right to make any evidentiary objections about any of the exhibits at a future date, but we have looked at them here today.

THE REPORTER:

Eli, do you want him to read and

sign?

MR. MEAUX:

Yes.

(The deposition was concluded at 4:43 p.m.)

CORRECTION SHEET

PAGE LINE DESCRIPTION

_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________
_____ _____ _________________________________________

WITNESS: WARDEN CHRIS STINSON
TAKEN ON: FEBRUARY 1, 2024
BY: CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

WITNESS CERTIFICATE

I, WARDEN CHRIS STINSON, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

__________________ ______________________________

DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: February 1, 2024

REPORTER'S PAGE

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for the court reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; also, that any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

CHERIE' E. WHITE, CCR(LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that Warden Chris Stinson, to whom the oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 322 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

NDTCA · Signed Electronic Transcript

CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO. 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)