# Transcript of the Testimony of

# JAMES MCCORMICK

February 28, 2024

JAMES MURRAY, ET AL v. JAMES LEBLANC, ET AL

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES MURRAY, LATAVIUS PASCHAL, ANTONE HENDERSON | CIVIL ACTION |
| VERSUS | NO. 21-CV-592-SDD-RLB |
| JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL | SECTION " " |
| | MAG |

* * * * * * * * * * * * * * * * * * * * * * *

Deposition of JAMES MCCORMICK, 165 Dawn Drive, Silsbee, Texas 77656, taken via Zoom Conference, on Wednesday, February 28, 2024, beginning at or about 9:00 a.m.

APPEARANCES:

RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
By: Elizabeth Cumming, Esquire
4400 S. Carrollton Avenue
New Orleans, Louisiana 70119
(ATTORNEY FOR PLAINTIFFS,
JAMES MURRAY, LATAVIUS PASCHAL,
ANTONE HENDERSON)

PROVOSTY SADLER DELAUNAY, APC
By: H. Bradford Calvit, Esquire
934 3rd Street, Suite 800
Alexandria, Louisiana 71301
(ATTORNEY FOR DEFENDANT,
LASALLE MANAGEMENT)

APPEARANCES: (CONTINUED)

HAMMONDS, SILLS, ADKINS, GUICE,
NOAH & PERKINS, LLP
By: Evan M. Alvarez, Esquire
Alejandro Perkins, Esquire
2431 S. Acadian Thruway, Suite 600
Baton Rouge, Louisiana 70808
(ATTORNEY FOR DEFENDANTS,
JAMES LEBLANC AND SETH SMITH)

REPORTED BY:
Lillie R. Burch, CCR
Certified Court Reporter
Certification No. 87177

I N D E X

Page No.

EXAMINATION BY MS. CUMMING.........8, 272
EXAMINATION BY MR. CALVIT.............269

INDEX OF EXHIBITS

EXHIBIT NUMBER 1
(Contract Services Agreement 2014, 11 pages)

EXHIBIT NUMBER 2
(Services Agreement Between Madison Parish Law Enforcement District & LaSalle Management Co., 2-2-2020)

EXHIBIT NUMBER 3
(Letter to Terminate Agreement, 2-26-21)

EXHIBIT NUMBER 4
(Supplemental Reimbursement Invoice)

EXHIBIT NUMBER 5
(Bills to DPS&C, 26 pages)

EXHIBIT NUMBER 6
(Letter from DOC to Byrd w/attachments)

INDEX OF EXHIBITS (CONTINUED)

EXHIBIT NUMBER 7
(Employee Rule Violation Report)

EXHIBIT NUMBER 8
(Sergeant's Board Questionnaire)

EXHIBIT NUMBER 9
(E-mail from McCormick to Anderson Re: Promotion Quenton Hudson, 2-10-2020)

EXHIBIT NUMBER 10
(Letter of Resignation from Director of Nursing)

EXHIBIT NUMBER 11
(Staffing document)

EXHIBIT NUMBER 12
(Daily Shift Drop Sheet)

EXHIBIT NUMBER 13
(Post Order Index)

EXHIBIT NUMBER 14
(Institutional Policy)

INDEX OF EXHIBITS (CONTINUED)

EXHIBIT NUMBER 15
(Offender Population Management System, LA DPS & Corrections Basic Jail Guidelines Checklist)

EXHIBIT NUMBER 16
(Initial Classification Form)

EXHIBIT NUMBER 17
(Medical Tracking Spreadsheet)

EXHIBIT NUMBER 18
(Critical Incident Reporting Policy 6-15-2020)

EXHIBIT NUMBER 19
(Critical Incident Log)

EXHIBIT NUMBER 20
(Basic Jail Guidelines Re: Tyrone Mays)

EXHIBIT NUMBER 21
(Quarterly Summary Report for Basic Jail Guidelines, 27 pages)

EXHIBIT NUMBER 22
(Document Checklist)

INDEX OF EXHIBITS (CONTINUED)

EXHIBIT NUMBER 23
(MPM55, 11-23-2020, 14 pages)

EXHIBIT NUMBER 24
(MPM50, Critical Accident Reporting)

EXHIBIT NUMBER 25
(Initial Incident Report Re: Don Murray)

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading, signing, sealing, certification, and filing are specifically waived;

That all objections are hereby reserved until such time as this deposition, or any part thereof may be used or sought to be used in evidence.

* * * * *

Lillie R. Burch, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

* * * * *

(JAMES MCCORMICK, AFTER HAVING BEEN FIRST DULY SWORN BY THE ABOVE-NAMED CERTIFIED COURT REPORTER, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

EXAMINATION BY MS. CUMMING:

Q. We are here today taking the deposition pursuant to the Federal Rules of Civil Procedure. There is no objection to the use of Zoom for this deposition or to the court reporter being remote. At the end of your deposition your attorney, Mr. Calvit, will discuss reading and signing with you.

Would you please introduce yourself for the record.

A. My name is James McCormick.

Q. Can you provide your address and phone number. These will be subject to some stipulations previously agreed to with counsel.

A. My address is 165 Dawn Drive, Silsbee, Texas 77656. My phone number is 903-733-0150.

Q. Do you have any previous deposition experience?

A. Yes, ma'am, I do.

Q. In what context?
A. I've been a 30(b)(6) witness a few times as well as in my individual capacity.
Q. And in your individual capacity, was it related to your employment?
A. Yes, ma'am.
Q. And your employment with LaSalle specifically?
A. As well as other occasions, yes.
Q. And on those occasions you were a defendant; is that correct?
A. In years past I have been a defendant, yes.
Q. Have you ever been a plaintiff?
A. No.
Q. So I assume since one of the attorneys that previously deposed you was me, I assume you have gotten through the ground rules for depositions, but I will go ahead and go over them just to refresh your memory.
We have the court reporter here. The court reporter is taking down everything that you and I say. So it's important that you speak up and answer clearly.

If I ask you a yes or no question, rather than nodding your head or answering uh-huh or huh-uh, make sure you answer with "yes" or "no" so it's clear on the transcript.

I'm going to be asking you a series of questions. Even if you know exactly where my question is going, let me get the full question out so that there's a full question and then an answer that appears on the transcript and it's clear that you understood the question and were responding.

I'm going to at some point today ask a bad question, something that's not clear. So when that happens, just ask me to back up, ask me to clarify, and I will do my best to clarify and make sure that we're on the same page so you can answer what I'm asking.

You have taken an oath. It's the same oath that you would take if you were testifying in a court of law. So it's particularly important that you give us full and accurate and truthful testimony. We're interested in finding out everything that you

know that's relevant to this litigation. So if at any point you need to amend or supplement an answer, that's completely fine. Just let me know. If we've talked about something, we've moved on to a different area, and something jogs your memory, you remember something else, it's perfectly fine to go back and perfectly fine to change your answer.

You are entitled to breaks. I am supposed to offer a break every hour, but I don't because I don't remember. It's not intentional. So if at some point you want to take a pause, that's completely fine, just please speak up. The only thing I ask is if I have asked a question that you go ahead and answer the question on the table before we take that break.

Your attorney, Mr. Calvit, is in the room with you. You can also speak with Mr. Calvit during your breaks. If we come back from a break, I'll ask if you spoke with Mr. Calvit.

I see you are in a conference room. It looks like Mr. Calvit is with you.

Is there anybody else there?
A. No.
Q. Is there any reason, medication, sleep deprivation, illness, or any other hardship that would interfere with you understanding my questions and to provide complete and truthful answers today?
A. No.
Q. Where are you today? It's a nice-looking place.
A. We're at the LaSalle corporate office in Ruston, Louisiana.
Q. And where is that located, what's the address of that?
A. 195 Bastille Lane, Ruston, Louisiana.
Q. Okay, thank you. And when you say the LaSalle corporate office, is that LaSalle Corrections, LaSalle Management?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
It's the office for all of LaSalle's operations combined.

MS. CUMMING CONTINUES:
Q. What is your understanding as to why we are here today?
A. Due to some litigation filed by former inmates at the Madison Parish Correctional facility.
Q. What did you do to prepare for this deposition?
A. Got notified and briefly met with my attorney.
Q. Did you review any documents?
A. No, ma'am.
Q. Do you have any documents or anything that you will be referring to with you in the room today?
A. No, I do not.
Q. I want to try and do a little definition section at the front end which will hopefully avoid some confusion later on. We're going to be talking about the facility at Tallulah, Louisiana, which I understand are several different buildings. There is the Southern Correctional Center, or SCC, also referred to as Building 4; is that right?

A. I know Building 4. I'm not sure about Southern Corrections or any of that, but I'm familiar with Building 4.
Q. All right, I'll try to refer, then, to Building 4. And then there's Madison Correctional Center which is also referred to, confusingly -- there's Madison Correctional Center, which I think people refer to all of the buildings, but also that's how people refer to Building 3. Does that sound right?
A. Yes. I think I follow your thought there.
Q. So when you're referring to the various buildings, you're referring to them as Buildings 1, 2, 3 and 4; is that right?
A. Yes, ma'am.
Q. We're going to be talking primarily about the 2019 to 2021 time period. My understanding is that LaSalle stopped operating Buildings 3 and 4 in 2021; is that correct?
A. Sometime in 2021, that is correct.
Q. So we'll be talking up to the

point when LaSalle stopped that operation. If I slip into present tense, I am referring back to that time period unless I specify explicitly otherwise. But if at some point it's unclear, just ask me what time period I'm asking about.

I did want to also ask you, you said you had been previously designated as a 30(b)(6) deponent for depositions. What topics have you been designated as a 30(b)(6) on?

A. Generally policy, procedure and practice.

Q. And that was during your time at LaSalle?

A. Yes, ma'am.

Q. Is it policy and procedure and practice about any specific facility or about LaSalle as a whole?

A. Specifically it was about a specific incident or facility.

Q. Have you ever been deposed as a 30(b)(6) designee related to policy, procedure and practice related to Madison?

A. No.

Q. I want to get just some background information on you, starting with your education. Where and when did you graduate from high school?
A. I graduated in 1982 from Tarkington High School which is located in Cleveland, Texas.
Q. And then after high school what schooling did you have?
A. I have a hodgepodge of hours from primarily Sam Houston State University and another university in Oklahoma called Redlands Community College, but I do not have a degree.
Q. The hours that you took at Sam Houston, what sorts of classes were you taking?
A. I took some criminal justice courses, I took some basic general education courses. That's been forty years ago, I don't recall it all, those are the ones that come to mind.
Q. So that would have been directly after or close to after you left high school?
A. Yes, ma'am, and then sometime

thereafter.
Q. And then at Redland in Oklahoma what sorts of courses were you taking?
A. I actually took some computer classes there.
Q. Roughly when was that?
A. Around 2000.
Q. Other than the course hours any other education we haven't covered?
A. No, ma'am.
Q. Do you have any professional licenses or certifications?
A. I think my Texas jailer's license has expired, but other than that, no.
Q. When did the Texas jailer's license expire?
A. Somewhere in the mid two thousands when I stopped that line of corrections. Yes, that would be about right.
Q. What is the Texas jailer's license?
A. Texas requires that if you are a correctional officer in a county facility that you have to have what is called a Texas commission on jail standards. Licensing just

verifying your competency in standards and practices.

Q. Did you have to get any kind of annual continuing education?

A. Yes.

Q. What sort of continuing training requirements were there?

A. Continuing education was forty hours of annual in-service training which was refresher training for the initial training you had received previously as well as cultural diversity and any new state laws or statutes that may have been passed that were relevant to your licensing in previous years.

Q. So if you are working an eight hour day, you're in training an eight hour-day, that's a full week of training roughly; is that right?

A. I don't think I understand.

Q. You said it's forty hours of annual in-service training?

A. Correct.

Q. So if you're working an eight-hour day or in training for an eight-hour day, that would take a full week;

is that right?
A. Yes.
Q. Do you know who put on that training?
A. It's a group called TCOLE, Texas Commission on Law Enforcement and Officer Education. It's administered through the state.
Q. Moving from schooling, can you run me through your employment history say from the age of eighteen when you left high school on.
A. I spent the first two or three years after high school working primarily in the construction industry. I believe in 1986 I began work with the Texas Department of Criminal Justice. It was referred to at that time as TDC. I began my career with them at the Goree Unit in Huntsville, Texas. I functioned as a correctional officer as well as a facilities safety and compliance officer.
I left there I believe in 1990 and transferred, actually promoted to Eastham State Prison. That's now renamed the

Wainwright Unit. And I was there for ten years the rank of lieutenant and as captain.

And I left there in 2000 and entered the private sector corrections with Corrections Corporation of America. I worked multiple locations with them primarily assigned to the Liberty County facility in Liberty, Texas, and the Tulsa County facility in Tulsa County, Oklahoma.

And I went to another facility in Oklahoma in a location in Hinton, Oklahoma. And then I stayed there until about 2006, 2005.

I actually then left the field of corrections for two years. My father was diagnosed with terminal cancer so I made a decision and went home and stayed with my dad. I worked for a company called Brookshire's. You may know the Brookshire's Food Company. One of my high school and college friends worked for them and he knew the situation and he offered me a position doing theft investigations and security for their company. That allowed me to take care of my dad.

And after my father passed I went back to working corrections. I actually went to the state a while and was a chief of security of operations for the state of Wyoming. I would have to say probably the best job I ever had in my life, but my wife didn't like twenty below zero weather, so we didn't stay there.

I ended up coming to work back in Texas with a company called CiviGenics. And I was working for CiviGenics at the Bowie County Correctional Center in Texarkana, Texas. And two years after that I was promoted into the regional director role and had oversight of fourteen prison units in Texas and Arizona.

That company was sold and I came on-board with the new owners, called Community Education Centers based out of New Jersey. And that was sold.

And at that point I came to work for LaSalle Corrections. I will back up for full clarity. I had a one-year noncompete clause on my employment contract so I actually did nothing for one year. And then

came to work for LaSalle Corrections in 2017 I believe it was, end of 2016. And went back to Bowie County, Texas as the warden of that facility, and LaSalle became the operator at that time.

And I believe it was in July of 2019 I came over and became the director of operations for the Louisiana operations for LaSalle. And I remained in that capacity until mid 2021.

And then I went back to the Texas side and I am currently the regional warden with oversight of Texas, Louisiana, and Georgia facilities for LaSalle. Excuse me, Texas, Arizona and Georgia, not Louisiana.

Q. Arizona and Georgia did you say?
A. Yes. Arizona, Georgia, and Texas.
Q. And that was in 2021?
A. Yes.
Q. Do you remember or know roughly when in 2021?
A. I want to say in July.
Q. Oh, July, okay. Okay, thank

you. That's really helpful. I just want to go back and clarify just a couple of things.
So you were a captain when you left what is now Wainwright and went to CCA, is that right, to Liberty County; is that right?
A. Yes, that's correct.
Q. And then at Liberty, when you were with CCA for that I guess roughly six years, did you stay at that captain level, did you have any promotions in that time?
A. When I originally went to CCA I was chief of security. And then I promoted to the assistant warden position.
Q. And then when you went back into corrections working in Wyoming as chief of security was that chief of security for like the state system or for a specific facility?
A. I was assigned to the Wyoming State Penitentiary, but I had duty that included four other facilities as well.
Q. How long did your wife tolerate the negative twenty degree weather?
A. About eight months.
Q. I'm with her, that sounds hard.

Okay, it was in 2008 that you came back to Texas?

A. That sounds about right, yes.

Q. When you came back to Texas, just to confirm, you went to Bowie County in Texarkana as a warden, right?

A. Yes.

Q. And the name of the company, Civigenics; is that right?

A. C-i-v-i-g-e-n-i-c-s.

Q. Does that still exist?

A. No, ma'am.

Q. Was it bought out by anybody?

A. Yes. It was bought out by Community Education Centers.

Q. And then Community Education Centers, you were working under them. Was that until roughly 2015?

A. '15 or '16, somewhere right there. I was trying to remember exact dates, but yeah, that's pretty close.

Q. But you had that noncompete when -- well, let me ask this. What happened with Community Education Centers?

A. Community Education Centers was

acquired by the Geo Group.

Q. Did Geo keep the operations of that fourteen units that you had oversight over as regional director?

A. They maintained operations of some of them and some they did not.

Q. The noncompete that you had with Community Education Centers, did that also apply to Geo?

A. Yes. I had to think for a moment. That noncompete was survival by mergers and acquisitions, yes.

Q. Did you ever work with Geo or were you ever employed by Geo?

A. No.

Q. So how did your employment in that 2015, 2016 time period end?

A. How did it end?

Q. Yes.

A. I didn't want to go to work for GEO because I didn't want to transfer to another state so I exercised my option within the employment agreement that I receive the one-year salary to remain on the sidelines basically. That's what I elected to do.

Q. So when GEO acquired Community Education Centers did you apply to try and keep your same position or anything like that?
A. No.
Q. So you had about a year where you were receiving your salary but you weren't allowed to work for another company basically; is that correct?
A. That's correct.
Q. And then you were able to go back to work I think you said in 2016?
A. 2016, 2017, whatever date that my noncompete expired, yes.
Q. And that was as warden at Bowie, correct?
A. Correct.
Q. So you have been a LaSalle employee since 2016; is that right?
A. Correct.
Q. And you moved into the role of director of operations. Well, help clarify for me. In 2019 you moved into a more administrative role; is that right?
A. Yes.

Q. What precipitated that move from being at Bowie County and sort of doing more frontline corrections work and moving into more administrative work?
A. The company had a need for someone in that position, decided I was the right person for that spot.
Q. And that position, that was director of operations, correct?
A. Yes.
Q. Director of operations of Louisiana specifically; is that right?
A. Yes.
Q. So what were your responsibilities as director of operations for Louisiana?
A. Oversight of facility operations for the facilities located within Louisiana under LaSalle's operation.
Q. Did that include facilities that were holding ICE detainees and people who were DOC sentenced and pretrial, it was all populations?
A. Yes.
Q. But you left that position in

July of 2021; is that correct?
A. Yes.
Q. Who took over after you left that position in 2021?
A. I'm not certain as to who did that immediately after I left.
Q. Does someone hold that position now?
A. Yes.
Q. Who holds that position now?
A. Mr. Ramos.
Q. Do you know Mr. Ramos's first name?
A. Yes, but I can't spell it. We call him Indy. It's Indalecio or something. We call him Indy Ramos.
Q. When did Mr. Ramos take over that position?
A. Oh, I'm not sure.
Q. Was it in the last six months?
A. I think it was maybe a little before that, maybe within the last year.
Q. At sometime in 2023, would that be right?
A. That's close. Like I said, I'm

focused on Texas so I don't really keep up with that.

Q. So when you left in 2021 was there anybody that you, you know, kind of transitioned into your position, showed the ropes, anything like that?

A. No.

Q. Was the move from being warden at Bowie to being the director of operations for Louisiana in 2019 something that you applied for?

A. No.

Q. Was it the sort of deal where if you wanted to stay with LaSalle that was going to be your new job?

A. No. No, it was not forced.

Q. So it was offered to you?

A. Yes.

Q. Who offered it?

A. It would have been Mr. Cooper, the executive director of LaSalle.

Q. Was it regarded as like a promotion or a lateral move?

A. A promotion.

Q. Did it come with an increase in

pay?

MR. CALVIT:

Object to the form of the question. Go ahead.

THE WITNESS:

Yes.

MS. CUMMING CONTINUES:

Q. Prior to coming into this position in 2019 had you ever worked in Louisiana with the Department of Corrections or in any correctional facility in Louisiana?

A. No.

Q. So up to that point your career had been in Texas, Oklahoma, Wyoming, and that was it; is that right?

A. Yes.

Q. What kind of background, training, information, any orientation did you receive related to Louisiana when you came into that position?

A. None.

Q. In 2019 did you have to physically move your home?

A. I maintained an apartment residence in Ruston and my family remained in

Texarkana.

Q. How often were you in Ruston when you were the director of operations for Louisiana?

A. Daily.

Q. Weekdays?

A. Yes. And weekends as needed and required.

Q. How frequently was that required?

A. Sporadic. There was no schedule.

Q. Did you personally pay for the residence in Ruston or was that something that LaSalle covered?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

It was provided by LaSalle.

MS. CUMMING CONTINUES:

Q. I want to go back through your employment history. Well, let me ask this. In 2000 you went to work with a private company, CCA; is that right?

A. Yes.
Q. Did you have to keep your Texas jailers license when you were working for the private company?
A. That's where I was required to take the jailers license.
Q. I'm sorry, say that one more time.
A. That's when I initially acquired the jailers license was upon employment with the private company.
Q. So you first got it in roughly 2000; is that right?
A. Correct.
Q. What did you have to do to get the Texas jailers license?
A. At that time attend like a ninety-six-hour classroom course and an additional time period, I don't recall the exact number of hours, of practical application. And then a state test at the end of that.
Q. Let me take it piece by piece. The ninety-six-hour course, what topics were covered in that?

A. A lot of state constitutional law as it pertained to the operations of county correctional facilities. And practical applications of typical things used and utilized in the correctional environment: Restraint techniques, general management techniques of incarcerated individuals.

Q. So general management techniques, are we talking like sort of facility system-wide management techniques or techniques that you would use with an individual you were dealing with?

A. Both.

Q. So on the individual level, what sorts of techniques were you taught?

A. The use of restraints, use of defensive tactics, levels of force to ensure compliance, protection from harm.

Q. And then on the sort of facility system-wide management level what sorts of areas were covered?

A. Inmate grievance procedures, inmate access to court procedures, that type of stuff.

Q. Was inmate classification

covered at all?
A. Yes.
Q. What sorts of things were covered in inmate classification?
A. At that time specific to the state of Texas they operated with two options for classification. One was referred to as a point additive system. One was referred to as a decision tree.
Q. You said a point what system?
A. Point additive.
Q. Point additive and decision. So those are two ways of classifying people; is that correct?
A. Specific to the state of Texas, correct.
Q. So the point additive system, what did that consist of?
A. Every person who was arrested and incarcerated, depending upon their classification, has an initial point scale that is established by the nature of the charge, the nature of the crime. And then you take into consideration multiple factors such as age, previous criminal history,

previous documented institutional history. And each of those categories would be assigned a point, or two points, or three, based on the answers to the question. And at the end of that literally add up the points and it's going to give you a specific number. And that number is going to fall within one of three ranges of low, medium, or high. And that would be their classification.

Q. So you're talking about when somebody is coming in you are looking at all of these things. Was there ever a time that you received instruction while going through this course on reevaluating the point additive system number that is assigned to a person?

A. I don't follow the question.

Q. The points are considering things like charge, age, institutional behavior. So it sounds like this is an assessment done when someone comes in who is arrested, who is coming into a facility. They get a number that is this tally of points for each of those areas that you were describing. After that initial intake was it

practice in Texas, did you receive instruction at any point someone could reevaluate that number, someone could look at those areas and decide, all right, this guy has been involved with multiple assaults, we need to increase the number from that point system? Does that make sense?

A. Yes. Activity like you just described, disciplinary behavior, institutional behavior could trigger a reevaluation, reclassification, and it could modify that number based off the results of that, yes.

Q. And then the decision tree, tell me about that.

A. It operated basically the same as the point system except it was a tree that would lead you, starting with the initial charge, and if it was a category A, B, or C, that would lead you with an arrow to another section. And then the answer to that section would lead you to another. And when you work your way across the page you end up at a high, medium, or low, depending on the answers you provided as you worked across.

Q. In one facility could whoever was responsible for making that classification decision use either approach or did the facility decide we're going to go with the point additive system, or we're going to go with this decision tree system?
A. You have to use one or the other. They weren't interchangeable within the same facility.
Q. In the facilities that you were working in in Texas which approach did you use?
A. I'm sorry, what?
Q. Which did you use, the point additive or the decision tree?
A. I actually used both.
Q. Did you have a preference for one over the other?
A. No.
Q. In the ninety-six-hour course to get the license, the Texas jailer's license, was investigations covered?
A. No.
Q. All right, now, the practical application aspect of the course, what did

that consist of?
A. The proper use of hand restraints, basically those type of things, how to fill out a report.
Q. Okay, so would you practice on each other like how to restrain, how to handcuff people, things like that?
A. Yes.
Q. And then you said filling out reports. What kind of reports would you practice?
A. Just basic report writing on just multitudes of reports. And it was just basic training of who, what, where, when, why. How to write a report that can be factually correct and read by anyone.
Q. Tell me how that worked. You would sit down and write a report and then someone would go through and kind of redline it and say here's how you could improve it? How did that work?
A. No. It was more mundane than that. It was just covering the who, what, when, where, why. Writing in the first person, things like that.

Q. And so you got that license in about 2000. You kept it until -- well, do you know roughly what year you let that go?
A. I can't remember. When I went to Oklahoma obviously I didn't need a Texas license in Oklahoma anymore, so I didn't obtain the annual in-service. So that license just expired.
Q. And then when you came back to Texas in 2008-ish, back to Bowie County as warden, did you have to get that Texas jailer's license again?
A. Yes. I re-activated it. I had to catch up on my past cultural diversity and those requirements. And I did so, and my license was re-activated.
Q. And then did you keep your license all the way through 2016?
A. Yes.
Q. Do you have to have your license currently in your current role?
A. No.
Q. So when you came back and you re-activated your license in 2008 when you started working at Bowie what sorts of areas

were covered in that?
A. If I remember correctly, I had to catch up on cultural diversity. And there was one other class I can't remember. I'm sorry, I don't remember what it was, but it was a required and/or refresher and I had to go back and make up those hours and become current.
Q. You had to take forty hours of classes, is that right?
A. Not to re-activate the license, no.
Q. How many hours did you have to take to re-activate the license?
A. Twelve, fourteen. It was a nominal number.
Q. And after you re-activated it did you have annual continuing training and continuing education that you had to do?
A. Yes.
Q. What was that, how many hours of continuing education did you have?
A. Forty hours of in-service.
Q. And the forty hours of in-service, what did that cover?

A. It's a refresher of the high points of the original ninety-six. And it would also include any substantial changes that had been made during the past legislative session, which was typically a two-year cycle. And if it was pertinent to us we would include that in the forty hours of in-service.
Q. So you re-activated in roughly 2008. You took forty hour refreshers from 2008 all the way through 2019; is that right?
A. Yes.
Q. And then from 2019 to now you let it lapse?
A. Yes.
Q. So I just want to make sure I understand. So that would hit things like state law, any updates to state law, restraints, any change in restraint practice, grievance procedures, access to court, any changes in that. Classification. Any other high points that you can think of?
MR. CALVIT:
Object to the form. Go ahead and answer.

THE WITNESS:
There were periodic changes to suicide prevention protocols, things like that, yes.
MS. CUMMING CONTINUES:
Q. The classification procedures, the point additive and the decision tree, that process you described, were there any updates to that that you recall?
A. I'm sure there were but those would have been through the Texas division on jail standards setting out any updates. And those changes would have been adopted as they were sent to us.
Q. So they would have been incorporated into any forty-hour training?
A. No.
Q. They wouldn't have?
A. No.
Q. So if there were updates to the Texas jail standards how would you get those?
A. They would come from the Texas division on jail standard staff in Austin and they would send those out typically under the heading of technical guidance or technical

advice was the term they would use and they would send that out to all jails, all two hundred fifty-four counties.

Q. But that would not be incorporated into any kind of refresher training that you were getting to maintain your Texas jailers license; is that right?

A. That's correct.

Q. In any of your roles related to corrections did you receive training related to investigations?

A. No.

Q. Did you ever in any of your roles related to corrections receive training on taking witness statements?

A. No.

Q. In any of your roles related to corrections did you ever receive training on documenting a scene?

A. Yes.

Q. Tell me about where and when you received that training.

A. That's part of the training for report writing, who, what, when, where. That's how you were taught to write a report.

What did you see, where did you see it, when did you see it.

Q. I think you referenced earlier talking about writing in the first person, does that mean writing in the --

A. Writing exactly what you saw and what you did. Not what someone else saw and what someone else did. Only what you saw and what you did.

Q. So rather than saying so and so was identified as the perpetrator, it would be I identified so and so as the perpetrator because I saw X; is that fair?

A. That's accurate, yes.

Q. So that's documenting, that's the training that you recall from that. Did you ever receive any training on collecting physical evidence?

A. Limited, yes.

Q. Where and when did you receive that training?

A. During my tenure with the Texas Department of Corrections we received some training based on evidence preservation such as, you know, how to collect a piece of

evidence. An example would be an allegation of sexual assault, that you needed to obtain clothing or any articles related to that and maintain those in the secure chain of custody. That's the line of training I would receive.

Q. And that was before you went to the private sector, that was when you were with TEC?

A. That's correct.

Q. Did you ever receive any training related to collecting and preserving records associated with an investigation?

A. Not any formal training in that, no.

Q. Did you ever receive any training in gathering, reviewing, preserving, video related to an investigation?

A. No. No training on it, no.

Q. You said not any formal training. What about any informal? What do you know about collecting, reviewing, and maintaining documentary and video evidence?

A. If you need to read something that someone else has wrote a report, to make

it a part of the overall, I will collect those documents and put it together as one complete report.

MR. CALVIT:

We've been going an hour. Can we take five minutes?

MS. CUMMING:

Sure.

(At this time, a recess was held.)

MS. CUMMING:

Back on the record.

MS. CUMMING CONTINUES EXAMINATION:

Q. Prior to working with LaSalle did you work with Brian Rodeen?

A. Not prior to working with LaSalle, no.

Q. Let me ask you this. Where and when did you work with Brian Rodeen?

A. When I came to work for LaSalle he was at Bowie County and was leaving as I was coming in. And then when I came to Louisiana in 2019 I interacted and worked with Mr. Rodeen in my role as director of operations and in his role as director of

compliance and policy.
Q. So he had the role of director of compliance and policy in 2019 and he worked with you; is that correct, in 2019?
A. Yes.
Q. Through 2021?
A. Yes.
Q. How much overlap was there between you two at Bowie County?
A. No overlap.
Q. So you were coming in, he was leaving, you all never worked together at any point?
A. No.
Q. What role was he leaving at Bowie County?
A. I think assistant warden.
Q. Do you know what he was leaving to go do?
A. Can you repeat that?
Q. Do you know what he was leaving to go do?
A. He took the role of director of compliance and policy.
Q. Prior to working for LaSalle did

you work with Rodney Cooper?
A. I did.
Q. Where?
A. At the Eastham State Prison in the early 1990s.
Q. How long did you all work together?
A. Five or six years.
Q. What was his role at that point?
A. He was the assistant warden.
Q. And what was your position at that point?
A. I was a lieutenant and a captain.
Q. Did you all work closely together?
A. I have yet to define closely. Not every day. No, it was a large facility.
Q. Was he involved in your promotion from lieutenant to captain?
A. I don't think so, no.
Q. When you were lieutenant and captain were you on day shift or evening shifts?
A. All three.

Q. As assistant warden was he at the facility during the day or in the evening?
A. Primarily days.
Q. Prior to working for LaSalle did you work with Arthur Anderson?
A. No.
Q. While working for LaSalle have you worked with Arthur Anderson?
A. Yes.
Q. In what capacity?
A. Arthur Anderson was the warden at the Madison Parish Correctional facility and I was director of operations at that facility under my purview.
Q. Is that the only time that you all had sort of worked together or worked in proximity with each other?
A. No. After LaSalle left Madison Parish operations Warden Anderson transferred to our Limestone, Texas correctional facility in the capacity of assistant warden there. And when I left in 2021 and went back to the Texas operations then I started interacting with Anderson again at that facility.

Q. Have you ever been demoted?
A. I guess you could say I voluntarily demoted, left Louisiana to go back to Texas. I went from a director position to a regional position. It was voluntary.
Q. What drove that decision, that voluntary decision?
A. Primarily my family situation, my wife.
MR. CALVIT:
Object to the question seeking perhaps a husband/wife communications. Object to the form of the question.
MS. CUMMING:
Are you instructing him not to answer?
MR. CALVIT:
Well, if he's going to talk about what he and his wife talk about, yes. I don't know that he has to do that to answer your question.
MS. CUMMING:

I mean, I think it's also waivable, but --

MR. CALVIT:

Well, it's his privilege. And I'm going to explain that privilege to him and he may or may not. If you want to go down this route, take a break, I will talk to him about the spousal privilege and he may or may not assert it.

MS. CUMMING:

All right, do you want to take two minutes and tell him about spousal privilege and he can decide whether or not he wants to answer?

(At this time, a discussion was held off the record.)

MR. CALVIT:

All right, go ahead.

MS. CUMMING CONTINUES EXAMINATION:

Q. Okay, so what was behind that voluntary decision to move from a directional position to a regional operations position in Texas?

A. My wife was twenty plus years in

the Texas education retirement system. And transferring to Louisiana was not an option. It would have cost her dearly on her retirement at the end. So the decision was made that we need to stay in Texas. And I was tired of being away from my family and my wife, so I wanted to go back to the Texas side.

Q. Did that move from director of operations on the Louisiana side to a regional director -- or is that regional coordinator?

A. Regional, yes, that's the right word.

Q. Regional, okay. Did that come with a change in salary?

A. No, it did not.

Q. So on the Texas side, when you went to that regional position who was your direct boss?

A. Jay Eason.

Q. And what is Jay Eason's role?

A. Director of operations.

Q. For Texas?

A. Correct.

Q. How many people does Mr. Eason have under him as director of operations for Texas?
A. That number changes periodically. It's going to be in the neighborhood of twelve hundred, thirteen hundred.
Q. And then in terms of people who are in your position, the sort of regional position, how many people have that position?
A. How many people have the same position I have?
Q. Yes, that same level.
A. Just one, me.
Q. Okay, so how many regions are there in Texas?
A. There's one region in Texas.
Q. What is the difference between what you do and what he did?
A. I'm basically like an assistant to him.
Q. Got it, okay. And what do you do in that assistant role?
A. I have oversight of all the facility operations and for LaSalle in the

Texas region.

Q. Do you have anybody helping you with that responsibility?

A. I have a gentleman named Robert Parker.

Q. What does Robert Parker do?

A. Robert Parker works directly under me and assists both Mr. Eason and I with the daily operations of the LaSalle facilities in the Texas region.

Q. Is there anybody else?

A. There are a lot of people in different roles throughout the region. Not directly, but there are lots of people in different roles.

Q. If you can go down sort of like a tree. If Mr. Eason is at the top, you're right below Mr. Eason, and then there's Robert Parker?

A. Right.

Q. And I'm not talking about the specific facilities, I'm not talking about the structure at each facility that LaSalle operates in Texas. I'm just talking about the corporate oversight structure, if that

makes sense. Can you sort of walk me through what all those various positions are?

A. As you just described, it would be Mr. Eason, myself, Mr. Parker. And from there it branches down to each facility and wardens at each facility.

Q. Is there anybody who is responsible for going in person to the various facilities in Texas and looking at, you know, what those facilities are doing, how they are operating, whether or not those operations are aligning or consistent with what LaSalle understands is its obligations to operate in Texas?

MR. CALVIT:

Object to the form of the question, compound.

THE WITNESS:

Each of our facilities is inspected and audited regularly by multiple entities to include the state of Texas Commission on Jail Standards, as well as the United States Marshal Service, Detention Operations Division. And another

would be the ICE. They have their own inspection and audit division as well.

MS. CUMMING CONTINUES:

Q. We spoke with Mr. Rodeen a couple of days ago. And he was describing, he said there was a woman named Carla. I'm trying to find her last name. Who had the responsibility to kind of go to all of the various facilities in Texas. Carla Stone. Does that name ring a bell?

A. Yes, I know her.

Q. What is Carla's role?

A. Carla has expertise in the Texas Commission on Jail Standards. And she assists our facilities that fall under the purview of the Texas Commission on Jail Standards in relation to compliance of those state statutes and policies.

Q. So she's your subject matter expert on making sure that LaSalle's facilities in Texas are operating in compliance with the Texas Commission Jail Standards, jail guidelines; is that right?

A. Only for those facilities that

fall under the purview of Commission on Jail Standards.
Q. And that depends on what population the facility holds?
A. That's correct.
Q. What population is subject to the Texas Jail Standards?
A. Any inmate who is a pretrial or a sentenced individual under the purview of the county judicial system.
Q. And then also Texas has an audit procedure that is run outside of LaSalle where it checks to see if those facilities are complying with the Texas Jail Standards; is that correct?
A. That's correct.
Q. Does Carla have a role in that process?
A. No.
Q. She doesn't have a role in the audit process?
A. No.
Q. I just want to make sure. So I understand she doesn't have a role on the Texas side. Does she have a role assisting

LaSalle facilities when it comes time for that Texas Jail Standards audit?

A. Yes.

Q. All right, thank you. This is helpful.

So that's on the Texas side. When you were director of operations on the Louisiana side can you walk me through what the corporate roles were on the Louisiana side?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

I was the director of operations. There was no one between myself and the facility. It was me and then down to the facility wardens.

MS. CUMMING CONTINUES:

Q. So you didn't have a you in your current role and you didn't have a Robert Parker; is that right?

A. That's correct.

Q. What about a Carla Stone, was

there anybody in that equivalent position on the Louisiana side?
A. No.
Q. And that's for that full-time period that you were in Louisiana from 2019 to 2021 it was you and then straight down to the facilities, correct?
A. Correct.
Q. All right, let me just close the loop on this section and then we can move on. Other than the voluntary move back to Texas moving from director to regional have you ever been involuntarily demoted?
A. No.
Q. Have you ever had an involuntary decrease in salary?
A. No.
Q. Have you ever falsified a record or made a false statement related to your employment?
A. No.
Q. Have you ever received a verbal warning or counseling from a supervisor?
A. Probably at some point, but it would have been verbal and -- but no formal

disciplinary, no.

Q. Have you ever received written warning from a supervisor?

A. No.

Q. Have you ever received a final warning from a supervisor?

A. No.

Q. Have you ever been placed on a performance improvement plan?

A. No.

Q. So we were running through sort of the structure of the Texas side and the Louisiana side and I want to turn back to that. On the Louisiana side, again talking in the 2019 and 2021 time period, who did you report to directly?

A. Rodney Cooper.

Q. And Rodney Cooper's title is what?

A. Executive director.

Q. Where is Rodney Cooper based physically?

A. At that time he was based here in the corporate office.

Q. In Ruston?

A. Correct.
Q. Where is he now?
A. I don't interact with him every day. I don't know if he's still here or not.
Q. So when you had the apartment in Ruston and you were working as the director of operations Rodney Cooper was your direct boss. Was he everyday working out of the office in Ruston?
A. Pretty much, yes.
Q. Do you know who was above Rodney Cooper?
A. I don't know that.
Q. In that 2019-2021 time period who were your direct reports, who was directly below you?
A. Each of the facility wardens.
Q. How many facilities were under your purview in that time period?
A. Six.
Q. Six?
A. Six, yes.
Q. And so each of those six wardens answer directly to you; is that right?
A. Yes.

Q. I want to go through year by year. So starting with 2019 how many of those six held Louisiana Department of Corrections sentenced people or held Louisiana pretrial people?
A. They were all transitioning from DOC to ICE except Madison at the time I got there. And it was a brief period of no more than two or three months all of them had transitioned to ICE with the exception of Madison.
Q. So when you arrived in July 2019 there was about three months where they were not all ICE detention centers. Was Catahoula part of your count, was that run by LaSalle in 2019?
A. It was.
Q. Did Catahoula transition to ICE in 2019?
A. Yes, it did.
Q. Was there ever a point at which the Catahoula Parish sheriff's office took back operations of -- well, let me ask this. When I say Catahoula, what was that facility called?

A. Catahoula Detention Center.
Q. Your contract to operate that facility, was that with the Catahoula sheriff's office or the Catahoula law enforcement district?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
I don't know the exact entity but, yes, there was an agreement between LaSalle and the Catahoula government.
MS. CUMMING CONTINUES:
Q. Did that agreement terminate at any point during your tenure as the director of operations?
MR. CALVIT:
Object to the form the question. You can answer, go ahead.
THE WITNESS:
Yes.
MS. CUMMING CONTINUES:
Q. Do you recall when that agreement terminated?

A. Not precise. It was late '20, early '21.

Q. All right, when that agreement terminated was the Catahoula Detention Center holding ICE detainees?

A. I think so, yes. Or had just changed and went back to DOC. Catahoula Parish actually bought the facility from LaSalle and reverted back to DOC operations rather than ICE.

Q. So 2019 there were six LaSalle operated facilities in Louisiana, all of them were transitioning from holding DOC people to holding ICE detainees over two to three months except for Madison; is that right?

A. That's correct.

Q. Before you came into this position as director of operations in 2019 for Louisiana do you know who held that position?

A. No, I do not.

Q. When you came into that position did you meet or talk with anybody to kind of show you, all right, this is the job, these are the ropes, this is how you do it?

A. No.
Q. The transition from holding DOC people to holding ICE detainees, it sounds like that was already underway when you started in 2019; is that correct?
A. That's correct.
Q. Do you know how that came about, how that transition started?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
No, I don't know.
MS. CUMMING CONTINUES:
Q. The director of operations Louisiana position that you came into in 2019, did that exist prior to 2019 and your occupancy of the role?
A. Not to my knowledge. I don't know the answer to that.
Q. Okay, so let's move to 2020. At that point how many facilities still held -- let's take the first six months of 2020. How many facilities in Louisiana still held DOC people and how many were holding ICE

detainees?
A. Only the Madison facility was housing DOC at that time, all the others were housing ICE.
Q. So by the first six months of 2020 the transition had been completed with the exception of Madison, all of the other LaSalle operated facilities in Louisiana were holding ICE detainees?
A. Yes.
Q. And how many facilities was that?
A. Five.
Q. What were those five facilities?
A. Winn, Catahoula, River, Richwood, and Jackson.
Q. When you started in 2019 there were six facilities. What was the facility that dropped out?
A. Sorry, could you repeat that?
Q. Yes. From 2019 were there any facilities that LaSalle stopped operating?
A. No.
Q. And then 2021, again let's take just the first six months of 2021. How many

facilities was LaSalle operating?
A. In Louisiana?
Q. Yes.
A. Six.
Q. All right, and it was the same six, Winn, Catahoula, River, Richwood, Jackson, holding ICE detainees and Madison holding DOC people; is that right?
A. Yes.
Q. Do you know why it was that Madison never moved over to holding ICE detainees?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
No.
MS. CUMMING CONTINUES:
Q. Going to this Louisiana director of operations in 2019 when you came into that role, what was your job description?
A. Oversight of the daily operations of the facilities.
Q. What does that look like day-to-day?

A. I don't think I understand the question.

Q. Say on a given Monday you start work. How are you engaging in oversight of the Louisiana facilities?

A. I would typically visit a facility, communicate with the warden upon arrival. I would walk the facility, as I called it, or you could call it a tour. Just observe the overall operations of the facility, the cleanliness, the sanitation, talk with staff, talk with inmates and detainees. As I would call it, assess the overall mood of the facility.

Q. How frequently were you going into facilities?

A. I was in some facility on an almost daily basis.

Q. Did you keep -- if you had six facilities you were responsible for did you keep a regular rotation or did some facilities require more attention than others?

A. I had no regularly scheduled route. And some required -- some were

larger, some were smaller. So I might spend more time in a larger one, less time in a smaller one.

Q. Which facility did you spend -- well, let me ask you this. What were the facilities that you felt like you spent the most time at or more time at than others?

MR. CALVIT:

Object to the form. Go ahead and answer.

THE WITNESS:

I didn't keep a record of that kind of stuff. I don't really have an answer for that.

MS. CUMMING CONTINUES:

Q. Of those six facilities, which were the largest, which were the three largest?

A. The Winn Correctional Facility is the largest. Followed by the Richwood facility would have been the second largest. And then probably after that it would have been the Jackson Parish facility.

Q. What was the capacity of the Winn facility?

A. Sixteen hundred.
Q. And for Richwood?
A. Between twelve and thirteen hundred.
Q. And Jackson?
A. Twelve hundred plus.
Q. Do you recall what the capacity was for Catahoula and River?
A. River is the smallest. It's just under six hundred. And Catahoula was between six and seven hundred, if my memory is correct.
Q. What was the capacity for the Madison facilities?
A. About four hundred on the men's side, four to five hundred. And about equal number on the women's side.
Q. All right, so four or five hundred on the men's, four hundred on the women's?
A. Uh-huh (indicating affirmatively).
Q. Winn, Richwood, and Jackson, you gave the capacities as roughly sixteen hundred, twelve hundred, twelve hundred

roughly. Were those facilities at capacity, were they full?

A. Fairly close. Most of the time on a daily average they would have been ninety percent.

Q. What about Catahoula, was that full?

A. Yes, similar, ninety, ninety-five percent.

Q. And River, was that full?

A. Yes.

Q. And Madison on the men's side, was that full?

A. I don't recall it ever being completely full, no.

Q. Was it close to that ninety percent occupancy? Well, let me ask you this. Do you know roughly what percentage it was filled to?

A. At times it was at capacity, depending on the needs of DOC and other parishes within the state.

Q. How much of the time was it at capacity, do you know?

A. I don't know.

Q. What about the women's side, was that full?
A. It may take a fairly consistent number of females in that four hundred range, somewhere in there.
Q. In a given week how many days would you spend in a facility?
A. Almost daily at least three to five days a week.
Q. And then when you worked in a facility what were your activities?
A. What were my what?
Q. What were your activities?
A. I didn't hear you.
Q. During your work week if you weren't at a facility what were you doing?
A. I have an office here at the Ruston office and I would be here.
Q. What sorts of work did you perform out of the office?
A. I had reports, I had human resource responsibilities, I had financial meetings, I had meetings with other entities that we were involved in business with, future projects, just a hodgepodge of things.

Q. So the reports, what sorts of reports do you have responsibility for?
A. I would be reviewing disciplinary reports, I would be reviewing food service operation reports, maintenance reports, various things like that.
Q. And disciplinary reports, is that staff discipline?
A. Yes.
Q. So you were primarily reviewing reports; is that right?
A. Yes.
Q. What were you reviewing for, like accuracy, typos, what was the function of that review?
A. Accuracy of the report, relevance of the report, any impact that could have on operations.
Q. So when you were reviewing for accuracy and impact on operations did you ever do anything to double check or spot check, like using information outside of the report?
MR. CALVIT:
Object to the form of the

question.
THE WITNESS:
I don't follow the question.
MS. CUMMING CONTINUES:
Q. Let's say it's a disciplinary report and you're looking at it and you're trying to think about how it might impact operations, trying to think about, you know, whether or not it's accurate. Would you ever in reviewing those look at other documents to see if they would confirm what you were reading in the disciplinary report?
A. Not necessarily, no.
Q. And then your HR responsibilities, what did they include?
A. Hiring, promoting, dismissing, anything to do with human resources.
Q. And that was at the facility level?
A. Yes.
Q. Did you have a role in -- say a staff member did something, they got a disciplinary write-up. Were you responsible for determining what the disciplinary response should be or did you just sign off

on whatever the chain of command at the facility said to do? How did that work?

A. I was just providing oversight. I had direct disciplinary responsibilities with wardens. Each warden managed their own facility and their own disciplinary process. I just had oversight looking at it to be sure people were being treated fairly and that we were following and being consistent with our company policies and procedures in that world.

Q. So the only people that you would directly discipline would be wardens; is that correct?

A. Wardens and possibly the assistant wardens.

Q. And then the financial meetings, what did they include?

A. Budgets. Budgets for food service, budgets for maintenance, budgets for transportation. We purchase vehicles. We have to have vehicles repaired. That's a big part of our operations. So I would look into those, make the determination if a vehicle has two hundred fifty thousand miles, you

might want to replace it. And I would make those types of decisions.

Q. So the budgeting, you were doing budget for each facility?

A. Each facility had budgets, yes, just like any other business.

Q. So when you would -- let's say for Madison. If you were putting together the budget for Madison would you have the wardens sitting in the room with you? Who all would help you with that budget?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

The company has a financial department and we have accounts and they would generate reports that would indicate where we were within the budget, or where we were outside the budget, sometimes over, sometimes lower. And I would review those periodically to see where we were at and where we needed to make adjustments.

MS. CUMMING CONTINUES:
Q. You say the company has accountants. Would that be LaSalle Management?
A. LaSalle Corrections. LaSalle Management, yes.
Q. And the accountants, do they work in the same building, in that Ruston building?
A. Yes.
Q. And the information that they base those budget reports on, is that all kept in that Ruston building?
A. We have business managers located on each facility and they work in conjunction with the accountants in the corporate office.
Q. Would the business managers be at the facility itself?
A. That's correct.
Q. What were the business managers' responsibilities related to financial stuff?
A. One of their main functions was they paid the bills. Every entity that we deal with, vendors, food service providers,

all of those people obviously bill us for their services and those are all processed by the business manager for payment.

Q. So the business manager is paying the bills for the local facility. Does the business manager at the local facility also receive payments?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

I don't know the answer to that. I never asked where payment came, how it arrived.

MS. CUMMING CONTINUES:

Q. But when the business manager is paying the bill or taking care of that does the business manager send records back to the accountants at the Ruston office so the Ruston office can keep track of what the local facilities are doing?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

I don't know the mechanics of how that works, but I'm sure there was something in place.

MS. CUMMING CONTINUES:

Q. The accountants who were at the Ruston office, they were the ones who were putting together the reports that you would look at to see, all right, Madison is over budget this month because we had a truck break down or whatever?

MR. CALVIT:

Object to the form of the question. Go ahead.

THE WITNESS:

Yes, that's correct.

MS. CUMMING CONTINUES:

Q. Say you got a report from the accounting department, but for whatever reason you wanted to look at the underlying documents that they relied on in putting together that report, could you walk down to the accounting office and ask them to pull that file for you?

A. I don't know if I'm following you. If I had a question about something,

yes, I could ask to see, did we get three bids before we purchased the new vehicle, yes, I could do that. And that was in conjunction with the facility and the accounts together, I would talk to them.

Q. I'm just talking about the physical process. That stuff that is either at the Ruston offices or it's something that the people in the Ruston offices could get their hands on; is that right?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

As I mentioned earlier, I don't know the mechanics of how they communicate that, but that's the general, yes.

MS. CUMMING CONTINUES:

Q. Let me ask a general question. What is your understanding of how the contracting between LaSalle and the local sheriffs or the local law enforcement district works?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

I really don't have an understanding of that. All of that was in place prior to my role.

MS. CUMMING CONTINUES:

Q. Do you know when LaSalle started contracting with Madison Parish law enforcement districts?

A. No.

Q. Do you know who was involved in negotiating the contracts between the Madison Parish law enforcement district and LaSalle?

A. No.

Q. I want to show you what we will mark as Exhibit 1.

MR. CALVIT:

Hold on. Change of topics?

MS. CUMMING:

Yes.

MR. CALVIT:

You want to take a break?

THE WITNESS:

I'm good.

MR. CALVIT:
Okay, we can keep going.
MS. CUMMING CONTINUES:
Q. This is eleven pages. It's the services agreement between Madison Parish Law Enforcement District and LaSalle Management Company and also LaSalle Corrections effective January 1, 2014. Did you have any role in the negotiation of that contract?
A. No. I was not even affiliated with this company in 2014.
Q. I want to go down to where it talks about some of LaSalle's business offerings. I will represent to you that LaSalle is being contracted to operate SCC which we talked about was Building 4; MCC, which is Building 3, the women's side. And Bayou View, and I will represent to you that that, from prior deposition testimony, is Buildings 1 and 2, sort of at the front of the facility.
MR. CALVIT:
Is there a question there?
MS. CUMMING:
I'm just representing to him

what the contract is for so that he can be oriented for the set of questions.

MR. CALVIT:

I object to the form. If there's a question, I object to the form.

MS. CUMMING CONTINUES:

Q. Have you seen this document before?

A. I don't recall seeing it. I may have, but I don't recall, no.

Q. Here on page three it describes what LaSalle's obligations are under the contract, what it's supposed to be doing: Adequate staffing, three meals a day, access to reasonable medical care, reasonable access to court, managing business affairs. And then maintaining and acquiring instructional materials and supplies appropriately sufficient to ensure compliance with basic jail guidelines.

With this one, do you recall, did you have any role to ensure that this part of the contract was being complied with?

A. That was part of my role of oversight, to make sure that we were in compliance with basic jail guidelines, which we were.
Q. How did you accomplish that role?
A. We were audited each year by the auditors from BJG who was assigned by the DOC to audit the facility and we passed.
Q. Did you have any role or did you participate in helping the facility prepare for that audit?
A. Our daily operations were the preparation --
MR. CALVIT:
She's asking you personally. Forget about the company.
THE WITNESS:
No, I did not.
MS. CUMMING CONTINUES:
Q. Did you have anybody that you consulted with, talked to, or who provided information or guidance, you know, had subject matter expertise in the Louisiana basic jail guidelines?

A. No.
Q. Did LaSalle have any responsibility or obligation under this contract, in your understanding, to work with the state to keep Madison facilities full?
MR. CALVIT:
Object to the form the question.
THE WITNESS:
I don't have any understanding of any agreements like that, no.
MS. CUMMING CONTINUES:
Q. Did you have any contacts with anybody at the Louisiana Department of Corrections?
A. Limited, yes.
Q. Who did you have contact with?
A. I recall Seth. I'm trying to recall Seth's full name. He was the deputy director.
Q. What were your contacts with Mr. Smith?
MR. CALVIT:
She's reminding you that Seth's last name is Smith.
THE WITNESS:

Oh, okay, yes. It was, you know, I'm trying to recall. We had a vehicle break down one time on the bridge in Baton Rouge with a bus full of DOC detainees. And we contacted him as an FYI to let him know that we had an issue --

MR. CALVIT:

Stay away from "we".

THE WITNESS:

Excuse me. That the facility transportation vehicle was having issues and I was dealing with it and everything was safe and secure at home. That would be the type of conversations I would have with LaSalle.

MS. CUMMING CONTINUES:

Q. Did you have any conversations with Undersecretary Bickham?

A. Can you repeat that?

Q. Did you have any conversations with Undersecretary Bickham?

A. I don't think so, no. I don't even know that I know that name.

Q. You indicated that the capacity on the men's side was four hundred to five hundred. But that there were times when the Madison facility was not at its full capacity. Did you yourself ever instruct any of the wardens to reach out to anybody at the Department of Corrections to, you know, try and get more people to fill that facility?
A. I would probably say yes.
Q. I'm sorry?
A. I did not directly contact the Department of Corrections asking for any additional inmates, but I probably had that conversation with the facility warden.
Q. As the director of operations for Louisiana did you ever instruct or direct the facility wardens to reach out to either the Department of Corrections for Louisiana or any other entity to try and get more people to fill those beds?
A. Yes.
Q. Do you recall what the results of that directive was?
A. Sometimes they got more bodies, sometimes they did not.

Q. Who would you direct to reach out to try and get more bodies?
A. I would be talking with the facility warden.
Q. Okay, so in your time from 2019 to 2021, if you noticed that there was a dip in the number of people at Madison who would you call to try and get more people into Madison?
A. Only the facility warden.
Q. Who was that, do you have a name?
A. Arthur Anderson was the last warden. And prior to Arthur Anderson was Billy Tigner.
Q. And then after you directed the warden to get more bodies into the facility would the warden ever report back to you?
A. First, I never directed the warden to get more bodies. I would ask the warden if he had made any calls, were there any more available, did anybody need to utilize the bed space that we had. And yes, I would get a response back, hey, we have ten new arrivals or we have twenty new arrivals.

Q. So when you got the response back did you get that by phone, by e-mail, how did that response come?
A. It would be by phone or in person when I was talking with him.
Q. So when there was body space available at Madison do you know who all the warden would reach out to to try and get those beds filled?
A. No, I don't know directly who all their contacts were.
Q. Were they reaching out to entities other than the Louisiana Department of Corrections?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
We didn't. The facility did not receive very many inmates direct from the Department of Corrections. My recollection is that the majority of the inmates that were received at Madison were coming from other parishes throughout the state.

MS. CUMMING CONTINUES:

Q. So the practice was when there was bed space available it was the warden's responsibility to let people know, either DOC or other parishes or whoever needs to lock people up, let people know, hey, we've got bed space available, we can take your people?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

Yes, the wardens would communicate with their counterparts throughout the state. And there were times, as you recall, there were five hurricanes that made landfall in the State of Louisiana in 2020. And there was a lot of contact between the facilities down south along the coast where they were calling us for available bed space. Those are the ways the wardens would manage the beds they had and they would make those beds available to other correctional

facilities that may be in need of available bed space.

MS. CUMMING CONTINUES:

Q. Going now to page four, looking at section 3D. Section three provides that LaSalle is going to maximize the occupancy -- that's what we've been talking about -- by entering into contracts with various governmental agencies to house whoever. When LaSalle was operating at Madison and was housing people from other parishes did LaSalle enter into contracts with those other parishes? For example, a contract with Iberia Parish to hold a certain number of pretrial or sentenced people.

MR. CALVIT:

Objection to form.

THE WITNESS:

If I understand your question, yes, LaSalle had many agreements with other --

MR. CALVIT:

She asked for contracts.

THE WITNESS:

That, I don't know the exact

answer to. We did do business
with multiple other parishes and
entities.
MS. CUMMING:
Brad, if he needs clarity, he
can ask for it. You can object to
form, but let him answer.
MS. CUMMING CONTINUES:
Q. So you had agreements, but
you're not sure if those agreements were
actually in writing?
A. That's correct.
Q. Looking down here at 3-D, it
says: LaSalle shall maintain a monthly
average occupancy for the prison facilities
within one percent of the monthly average
occupancy of all LaSalle managed prison
facilities in the State of Louisiana. Do you
know what that provision is aimed at?
A. I do not.
Q. Do you have any idea how LaSalle
would go about ensuring that it is complying
with this part of the contract?
MR. CALVIT:
Object to the form of the

question.

THE WITNESS:

No, I do not.

MS. CUMMING CONTINUES:

Q. I will represent to you that this contract was for a term of ten years with provisions to terminate on either side. But when you came in in 2019 do you know if this was the contract that was in place?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

I don't know for sure, no.

MS. CUMMING CONTINUES:

Q. And you don't recall if you ever saw this contract?

A. No.

Q. If this was the contract that was in effect when you came in in 2019 would you have had access to it?

A. If I requested it I would have seen it, but I don't know that I ever requested to see it. Never had a reason.

Q. In your understanding --

MR. CALVIT:
Elizabeth, if we're going to do a thirty-minute lunch break at some point, then I would like to go ahead and order lunch. But if you think you're going to finish by one or even one-thirty I will skip lunch, but I can't go much longer than that.
MS. CUMMING:
Can we do a fifteen-minute lunch break? I don't think I'll be finished by one, but I'd like to move on through this.
MR. CALVIT:
Let's take five minutes so I can get a lunch order for us.
MS. CUMMING:
Okay.
(At this time, a recess was held.)
MS. CUMMING:
Back on the record.
MS. CUMMING CONTINUES EXAMINATION:
Q. I want to go to Exhibit 2. This

is an agreement between Madison Parish Law Enforcement District and LaSalle Corrections dated February 1, 2020. So this would have been when you were in the position of the operator of the Louisiana facilities; is that correct?

A. Yes.

Q. Do you recognize this document? And I can scroll through as much of it as you'd like. It's a contract.

A. No.

Q. You do not?

A. No.

Q. Did you have anything to do with the negotiation of this contract?

A. No.

Q. I'm on page two. This indicates that the contract is for operation of Building 4, Building 3, and the women, but it takes out Bayou View, which is Buildings 1 and 2. Do you know why LaSalle stopped operating Buildings 1 and 2?

A. Not direct knowledge, no.

Q. I mean, you were the director of operations with oversight over all Louisiana

facilities that LaSalle was operating, correct?

A. Operations, yes. I was not the financial business development type person. That was outside of my purview.

Q. Sure, but there's a whole section of a facility, two buildings, Buildings 1 and 2, that are no longer being operated by LaSalle. Do you know why that was?

A. I was told that there was a business decision made between the owners of the facility to split their assets and that we were only going to be affiliated with one half when they decided to split. So my focus was to just look at the parts that we operate. I had nothing to do with the other half.

Q. Who told you that?

A. My boss.

Q. I'm sorry, say again?

A. My boss, Mr. Cooper.

Q. Mr. Cooper, okay. Did you ever have access to or request to see this renegotiated contract?

A. No.
Q. When did Mr. Cooper tell you that LaSalle would no longer be operating Bayou Corrections Center, Buildings 1 and 2?
A. I would have to assume it was whenever this went into effect.
Q. You said that Mr. Cooper told you that the owners had decided to split their assets. Owners of what?
A. I'm assuming there were owners of all four buildings together. And Buildings 1 and 2 had been removed from that original deal and we were only operating Buildings 3 and 4.
Q. So your understanding was that it was the owners of the buildings that comprised Madison Correctional Center, right?
A. That's my understanding, yes.
Q. Not the owners of LaSalle?
A. That's my understanding, correct.
Q. I want to show you what will be Exhibit 3. This is dated 2-26-2021. Have you seen this letter before?
A. I don't recall seeing it.

Q. Do you know who decided to terminate the contract between Madison Parish Sheriff's Office and LaSalle?
A. That was above me. I would not be involved in that conversation.
Q. That was going to be my next question. Were you present for this conversation on February 26?
MR. CALVIT:
(Inaudible)
THE WITNESS:
The answer is no.
MS. CUMMING:
Brad, let the witness testify. So I'm going to ask the question again. If you have an objection, you can say you have an objection, but the witness has to answer.
MS. CUMMING CONTINUES:
Q. Mr. McCormick, were you present at this meeting on February 26?
A. No.
Q. Do you know who was present at this meeting of February 26?
A. No.

Q. In your role as the director of operations for Louisiana did you have contact with Sheriff Byrd?

A. Yes.

Q. On what occasions?

A. Various occasions. Sometimes on a social level just to say hello. Or if we needed law enforcement assistance, then I would actually contact the sheriff.

Q. On what sorts of occasions would you need law enforcement assistance?

A. If there were serious incidents that occurred at the facility involving something that could be criminal in nature we would notify the sheriff's department and ask for assistance.

Q. How would you notify the sheriff's department?

A. That would depend upon the nature of the incident. If it was an emergency it could have been a nine-one-one call. If it was something nonemergent it could be a personal phone call.

Q. Would you make that personal phone call?

A. No.
Q. Who would make that personal phone call?
A. The warden or designee onsite at the time.
MR. CALVIT:
Let's go off the record for A minute.
(Discussion off the record.)
MR. CALVIT:
Back on the record. Thank you.
MS. CUMMING:
Mr. McCormick, you spoke with your attorney during your time off the record?
THE WITNESS:
I did.
MS. CUMMING CONTINUES EXAMINATION:
Q. So your contact with Sheriff Byrd, you would see Sheriff Byrd socially sometimes if there was law enforcement, if there was a need for law enforcement at the facility. Any other times related to your work, to your role as the director of operations for Louisiana that you would have

contact with Sheriff Byrd?
A. Just in what I described.
Q. What about anybody else from the Madison Parish sheriff's office?
A. I did have one interaction with the chief deputy.
Q. What was that interaction?
A. There had been an escape from the women's facility and he was designated as the point person for the sheriff's department while we were looking for the escapees.
Q. Who was the chief deputy at that time?
A. I do not even recall his name, I'm sorry.
Q. What year was that?
A. 2020.
Q. So going back to this February 26, 2021 meeting do you know if there were any notes or meeting minutes or any documents that came out of this meeting?
A. I don't know.
Q. When were you informed that the contract between MPSO and LaSalle would be ending?

A. I don't recall the exact date I was notified.
Q. Was it before the end of February or after the end of February?
A. Oh, I don't recall.
Q. Is there an understanding -- well, let me ask you this. As the director of operations did you have instruction or did you know how many inmates LaSalle needed to have at a facility in order for LaSalle to keep operating it?
A. No.
Q. Was there a capacity percentage that LaSalle needed to maintain in order to keep operating a facility?
A. There was no established number that I'm aware of, no.
Q. After LaSalle ended its contract with MPSO and I believe it terminated operations at the Madison Correctional Center buildings that were still operating May 31, 2021 how did the transfer process go from the one operator to the next?
A. That's a pretty broad question. I don't know how to answer that.

Q. Well, do you know who took over operations for Madison?
A. Do I know? To my knowledge, it was the owner of the property.
Q. And when one operator is leaving and another operator is starting is there any kind of process, any kind of checklist, any sort of routine that ensures that a smooth transfer of operations happens?
A. Yes. No two are ever the same, but there are steps in the process such as who owns what piece of property, what property will be left behind, those types of things. There's usually going to be discussions about the staff and how to allow the incoming operator an adequate time and space to visit with the staff to let them know what's going on. And that their jobs are secure or not, if they choose not to keep them, those types of tasks.
Q. So from the end of February through May did you participate in any of those discussions to assist with the transfer from LaSalle Operations to -- I'll just tell you it was Security Management that took over

-- to Security Management?
A. I did have conversations with Mr. Jackie Verner.
Q. What did those conversations include?
A. I can recall talking about transport vehicles. At that time vehicles were very hard to come by and we arranged for Mr. Verner to maintain use of some vehicles that we had at the facility while he was awaiting the delivery of new vehicles that he ordered. We wanted to ensure smooth operational changeover with no major hiccups for anybody involved.
Q. What about staff, do you know how that transition happened?
A. We made the staff available for Mr. Verner and his team or people to visit with any time he needed to. Make job offers to anyone they wanted to make job offers to. And have discussions about bringing them on.
Q. For the upper ranking staff, captains and above, was there anybody that Security Management didn't keep?
A. I don't know the answer to that.

Q. Did Security Management reach out to you or ask for your opinion of staff performance?

A. I don't know that I can answer questions about individual staff when we're talking.

Q. What about for inmate records and documents. I assume, but tell me if I'm wrong, I assume the facility was emptied of inmates and repopulated on May 31 to June 1; is that right?

A. That's an accurate assumption.

Q. So you have people who are in LaSalle, in a LaSalle operated facility on May 31, and on June 1 they wake up in a Security Management operated facility. How were inmate medical records, security records, things like that, how was that transfer done?

A. The records belong to the facility regardless of who is there doing the operation. So they would have remained there at the facility.

Q. What about operational records, things like incident reports related to

specific inmates or investigations related to inmates, would those have been kept at the facility?
A. Inmate records would have remained at the facility.
Q. I'm asking about investigations. Are investigations considered inmate records?
A. The facility wasn't in an investigation role, so we didn't have investigations.
Q. Who was responsible for investigations at the facility?
A. If there were investigations to be done that would be done by the local law enforcement.
Q. So if there's an incident, there's a fight between two people, unless the Madison Parish sheriff's office is called in there's no investigation done?
A. There would be a critical incident report completed.
Q. Okay, and a critical incident report, what is that?
A. It's a document that would document the fact of the incident that

occurred and all the pertinent information around that incident, such as who the participants were and what actions were taken to resolve the issue, whether there was a use of force involved or not a use of force involved, and it would document facts around that incident.

Q. Okay, we'll get to that, we'll come back to that.

The critical incident reports involving inmates, were those transferred, do they stay with the facility, or did LaSalle keep possession of those?

A. I don't know the answer for sure.

Q. What about documents related to operations? So things like shift rosters or drop sheets, staff write-ups, things like that, would those have stayed at the facility or would those have gone someplace else?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

I think most employee files

remained there for the employees in regards to their training records and things such as that. LaSalle maintained only the payroll records, things related to that.

MS. CUMMING CONTINUES:

Q. And the jail management system that is used, I think it's the PTS. Would LaSalle have uninstalled that from various computers or would that have remained at the facility?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

The incoming operator, if they wanted to maintain something such as PTS that LaSalle was paying a fee for, if the incoming operator wanted to pay it we would help them and assist in the transition for them to assume that service. If they didn't, then I assume we would have disconnected that service and removed it.

MS. CUMMING CONTINUES:
Q. Do you recall, did LaSalle assist with Security Management assuming that agreement?
A. I do not know.
Q. Who at LaSalle was responsible for overseeing the transition from LaSalle to Security Management operations?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
That would be multifaceted. I was tasked with part of the operational side. There's people with the business side. There's others with the medical side. There's multifaceted people that would be involved. The IT department. There's a lot of moving parts.
MS. CUMMING CONTINUES:
Q. Were there any policies, post orders, anything like that at LaSalle that LaSalle used in the operation of Madison that

were considered proprietary that LaSalle took with it?

A. Yes.

Q. What sorts of things were those?

A. That would be the policies, that would be the post orders, those would be considered proprietary.

Q. All policies?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

Policies that were written by LaSalle. There were other policies that were mandated by the DOC. Those are not ours. Those would not be proprietary.

MS. CUMMING CONTINUES:

Q. What policies are written by LaSalle?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

I can't -- I can't begin to

answer that at this moment. We had personnel policies, various policies.

MS. CUMMING CONTINUES:

Q. I mean, I know we have the critical incident reporting policy, we're going to go through that. That's a LaSalle policy, is that correct?

A. Yes, that's correct.

Q. In terms of things that are directly related to the operation of the facility, things like classification, food service, search procedures, anything directly related to how a facility is run, were those LaSalle policies or local facility policies?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

That would be a combination of state DOC mandated policies and LaSalle's policies that would be written to supplement those or enhance those for operational purposes.

MS. CUMMING CONTINUES:
Q. When you say state DOC policies do you mean policies that are required by the state DOC or policies the state DOC has written that have to be used?
A. I can give you an example and hope this helps answer your question. The state will tell you how many times a day you have to feed someone, those types of things. Those are the state policies I'm talking about, basic jail guideline policies that we had to follow.
Q. At the facility, and talking specifically about Madison, you've got state sentenced people and DOC is paying to hold those people in the local facilities; is that your understanding?
A. Yes.
Q. So Madison, LaSalle, would get paid in part by how many DOC people it was holding in the local facility; is that right?
A. Yes.
Q. Who was responsible for counting how many sentenced people were at Madison?
A. We counted every day. They were

broken into categories of what parish they came from or DOC.

Q. As the operator of the facility LaSalle personnel would have been responsible for counting how many sentenced people are at Madison and how many people DOC had to pay for; is that right?

A. Yes, that's correct.

Q. I want to show you Exhibit 4. It's five pages. I'll start here on page two. Does that document look familiar at all to you?

A. No.

Q. And then down here it's got two names and it's got date of birth, state DOC start date, end date, transfers, total number of days. Does this document look familiar to you?

A. No.

Q. You have not seen this document before?

A. No.

Q. Do you know, this information, where it has a start date and an end date and a total number of days and a billing rate, is

this the information that would need to be provided to the Department of Corrections or to the sheriff's office to give to the Department of Corrections so that you all could get paid for holding however many DOC people you were holding for however many days?

MR. CALVIT:

Object to the form of the question. He's not a corporate representative. He doesn't get paid anything, so the question is nonsensical. And object to the form of the question, it lacks foundation. Object to the form of the question period. Thank you.

THE WITNESS:

The answer to your question is I don't know.

MS. CUMMING CONTINUES:

Q. I'm going to show you Exhibit 5. This is twenty-six pages. My question is going to be about just this printout form and whether or not this is something you have ever seen before, if you know where it comes

from.

A. No, I do not.

Q. And then this is going to be Exhibit 6. It's eight pages. It starts off with a letter from DOC to Byrd. There's some back and forth. My main question is it looks like there's e-mail correspondence between the state and Brandi Floyd. Do you know who Brandi Floyd is?

A. I do.

Q. Who is she?

A. At that time Brandi was one of the accountants in the Ruston office. I don't even know if Brandi still works here or not.

Q. In early 2021 she was working in the Ruston office, LaSalle's offices, correct?

A. That's correct.

Q. You referenced the guideline audits previously and I just want to confirm. What was your understanding of the purpose of -- well, let me ask you this. Was Madison subject to audits under the basic jail guidelines by people acting for DOC?

A. Can you repeat the question?
Q. Sure. Was Madison subject to audits under the basic jail guidelines by people acting on behalf of the Department of Corrections?
A. Yes.
Q. Do you know what the purpose of those audits were?
A. Yes.
Q. What was the purpose?
A. To ensure that we were operating the facility in accordance with the basic jail guidelines.
Q. Do you know who was responsible for conducting those audits?
A. I know who conducted them.
Q. Who conducted them?
A. A gentleman named Tyrone Mays.
Q. And who is Tyrone Mays?
A. I was told that Tyrone Mays was an assistant warden at the Gateway Correctional Facility with the Louisiana Department of Corrections.
Q. And he's the one who conducted audits for Madison, is that correct?

A. During my time, yes.
Q. Do you know how audits were done?
A. I was not a part of the audit.
Q. Do you know how frequently audits were done?
A. Annually.
Q. When audits were done, was that visit planned with anybody from Madison?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
I don't think I understood the question.
MS. CUMMING CONTINUES:
Q. Well, let me ask this. Were audits scheduled in advance?
A. I don't know the answer to that.
Q. Do you know whether documents were requested in advance of an audit?
A. I don't know the answer to that.
Q. Do you know what was reviewed onsite when an audit happened?
A. I don't know the answer to that.

Q. Were you ever onsite when an audit was being conducted?
A. Yes.
Q. When you were onsite when an audit was being conducted what did you observe?
A. I didn't observe anything. I didn't get in the way of the auditor.
Q. Did you meet the auditor?
A. I did.
Q. What did you discuss with the auditor?
A. I thanked him and welcomed him to the facility and offered our assistance in any way we could while he was there to perform his audit functions.
Q. Did the auditor have anybody with him?
A. I don't recall.
Q. So how long were you at the facility when the audit was being done?
A. A few hours.
Q. And in your time while you were at the facility when the auditor was also there what were you doing?

A. Visiting with the warden.
Q. And what were you talking about with the warden?
A. Ma'am, I don't recall exactly.
Q. Who was the warden at that time?
A. During one of the audits it would have been Warden Anderson.
Q. In your time from 2019 to 2021 how many audits were there at Madison?
A. I think we had two and they skipped 2020 I think because of COVID. But I know we had two around the year 2020.
Q. How many audits were you present for?
A. I was present for one.
Q. Which audit?
A. I think it was the last one.
Q. Why were you present?
A. I tried to be present at as many facility audits as possible. That was part of my job, to ensure our operations was being run proper.
Q. Did you know in advance when you would need to be at a facility when an audit was being done?

A. Typically only a day or two ahead.
Q. Who told you that an audit was happening?
A. I would get notified by the warden.
Q. And so if it was part of your job what did you do, why were you there?
A. Kind of like our report card. We've been working towards this all year and we take pride in what we do and I want to see that someone comes and does the audit and grades us, you know. Did we do well, did we not do well.
Q. Okay, so you show up on audit day. Walk me through what you do.
A. When I show up on audit day I literally do nothing but be there to welcome them to the facility and offer assistance in any way while that audit is being conducted.
Q. I'm sorry, you're breaking up a little bit. Can you repeat that, please?
A. I said on audit day I do nothing but welcome them and be available to assist them in any way they request while they

conduct an independent audit.
Q. Have they ever requested your assistance?
A. Not this particular one, no.
Q. Prior to the other facilities in Louisiana turning to hold ICE detainees, did you participate in audits or were you present for audits by the basic jail guideline team leader for the state auditor for any other facilities in Louisiana?
A. No.
Q. So Madison is the only place where you have been present when an audit was being conducted?
A. Yes.
Q. Tyrone Mays is the only auditor you have ever seen conduct an audit?
A. Yes.
Q. Is anyone else from LaSalle other than facility staff, going back to the 2019 audit, was anyone from LaSalle present at Madison when that audit was being conducted?
A. I don't recall.
Q. Did the basic guideline auditors

ever request assistance from Madison Parish Correctional Center's staff during an audit?
A. I don't recall.
Q. Do you know what documents were prepared in anticipation of an audit?
A. I don't know of anything prepared in anticipation of an audit.
Q. Can you walk through the categories of what documents are prepared in anticipation of an audit?
A. I just answered I don't know of any documents that are prepared in anticipation of an audit.
Q. Did you have a copy of the basic jail guidelines?
A. I did, yes.
Q. You did?
A. I did.
Q. When did you receive it?
A. I think I honestly found it in my office when I moved into the Ruston office.
Q. What year was the copy that you found, what year was that dated?
A. I don't recall that, I don't

remember.

Q. Did you receive any updated versions of the basic jail guidelines from 2019 through 2021?

A. No, I don't recall.

Q. Did you receive any e-mails or notifications of amendments to specific provisions of the basic jail guidelines in your time from 2019 to 2021?

A. If I did, I don't recall it.

Q. Did you have an e-mail address when you were director of operations for Louisiana?

A. I did, yes.

Q. What was the e-mail address?

A. It's the same as it is now. It's jmccormick@lasallecorrections.com.

Q. Okay, we touched on staff disciplinary measures. And you had indicated that you did not -- the warden at each facility was responsible for disciplining their own staff. You may have a role in discipline of wardens and maybe assistant wardens; is that correct?

A. Yes.

Q. Did LaSalle have like a uniform across the facility a graduated or progressive discipline system?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

Yes, LaSalle had a progressive disciplinary policy.

MS. CUMMING CONTINUES:

Q. When did that progressive disciplinary policy go into effect?

A. I don't know the answer to that.

Q. When you came in in 2019 as the director of operations for Louisiana, was it in effect then?

A. Yes.

Q. And did that apply to all facilities in Louisiana?

A. Yes.

Q. I'm sorry, operated by LaSalle?

A. Yes.

Q. Where was that policy kept?

A. Each facility would have had that. Typically it's the human resources

department and the warden.

Q. Okay, so each facility had a copy. Did you have a copy?

A. I had a copy available, yes.

Q. Where was it available?

A. In my office.

Q. Was it a hard copy or on a computer?

A. Both.

Q. Were there ever any updates to that progressive disciplinary system?

A. I don't recall it during my time.

Q. And so what was the lowest level of discipline and what were the intervening steps and then termination would be the highest? Walk me through the middle.

A. The lowest level would be a verbal reprimand, followed by a written reprimand, followed by some type of more stringent punishment such as a possible suspension, followed by termination. And there was an option in there for demotion as well.

Q. Were there criteria for

considering what was appropriate to be addressed with the verbal reprimand, what was appropriate to be addressed by demotion, what was appropriate to be addressed by termination?

A. There was discretion granted to each warden to make those decisions based on each incident and each occurrence.

Q. So each warden has discretion, but with that discretion, were there parameters for that discretion? Did certain things require a certain level of discipline? You know, if someone left keys on a counter and the inmates were able to grab those keys, does that require a suspension?

A. It could, yes.

Q. But if the warden likes the guy that left the keys on the counter could the warden say, okay, I'm just going to give you a verbal warning of that?

A. That's not a good analogy of the discretion. If it was the first offense, maybe the second offense, then the punishment level would rise with that.

Q. I guess what I'm trying to ask,

were there mandatory minimums or ceilings on what certain kinds of staff offenses could --

A. There are certain offenses that resulted in immediate termination, such as harassment, discrimination, those types of things. We had a zero policy for that.

Q. Before someone was suspended or demoted or fired was there any kind of process? Was there an investigation, was there a hearing, was there anything like that?

A. Yes.

Q. What sort of process would be involved in let's say a suspension? What sort of process would be involved in that?

A. It's basically a three-step process. Someone with knowledge of the incident would write the initial disciplinary. Another independent person would then conduct the investigation of the disciplinary, which would include the statements from the employee accused of the violation as well as any other information pertinent to that. Then that person would provide all of that to the disciplinary

department, which is the warden, to make the final decision with all the information gathered.

Q. And then when the warden made a decision was there any appeal from that?

A. Two levels of appeal.

Q. Where did those levels of appeal go?

A. The first level of appeal would come to me and the second level of appeal would have gone to Mr. Cooper.

Q. Those appeals, are they done in writing?

A. Yes.

Q. So for termination, what is the process for that?

A. The exact same process.

Q. And demotion, is the process any different?

A. No, same process.

Q. So any process that involves someone losing salary, either a part of a salary or all of a salary, that's the process; is that right?

A. Yes.

Q. How are these staff disciplinary write-ups, things like that, appeals, all of that process, how is that documented?
A. We have a disciplinary form.
Q. Where is that form kept?
A. At each facility they have that form available.
Q. I understand the form is available at the facility. Let's say that the warden wrote one up, they went through that process for suspension, that completed paperwork, where is that kept?
A. In the employee file.
Q. Where is the employee file kept?
A. In the human resources office.
Q. Is that a paper file or a digital file?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
A paper file. If they scanned it in electronically, I don't know that for sure.
MS. CUMMING CONTINUES:

Q. How long are disciplinary documents or files kept?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

Can you repeat the question, please?

MS. CUMMING CONTINUES:

Q. How long would disciplinary documents be kept?

A. As long as that person is employed.

Q. And after the person leaves LaSalle's employment how long is that document kept?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

As long as that file is maintained, which would be forever.

MS. CUMMING CONTINUES:

Q. Was there any way of tracking which employees were frequently involved in

incidents?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
The answer to that question is no.
MS. CUMMING CONTINUES:
Q. Have you ever heard the term early warning system?
A. Have I heard the term early warning system?
Q. Yes.
A. Yes, I have heard of that.
Q. What is your understanding of what an early system is?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
It's a siren that goes off before the tornado hits the town.
MS. CUMMING CONTINUES:
Q. In a disciplinary personnel employment context related to corrections and

law enforcement have you ever heard the term early warning system?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

No.

MS. CUMMING CONTINUES:

Q. Was there any way of tracking employees who were frequently involved in uses of force?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

There was no tracking device for that.

MS. CUMMING CONTINUES:

Q. Was there any way of tracking employees who frequently left their post during shift?

MR. CALVIT:

Say that again. I didn't understand it. I didn't hear it all.

MS. CUMMING:
Was there a way of tracking employees who frequently left their post during shifts?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
No.
MS. CUMMING CONTINUES:
Q. I want to show you what is going to be Exhibit 7. This is an employee rule violation report. Have you seen a form that looks like this before?
A. Yes.
Q. Is this the form that was used to provide a written reprimand?
A. It appears to be, yes.
Q. It this also the form that would start that process that you're describing related to suspensions, terminations?
A. Yes, that's a disciplinary form.
Q. Now sort of the specifics of this form. Do you recall this incident involving Assistant Warden Stinson and Major

Chase?

A. I would need to see the entire form instead of just sections of it.

Q. Sure. Tell me when you're ready for me to scroll or if you need me to enlarge anything.

A. (Witness reading document.) Okay, you can scroll up.

Q. This is page two.

A. I'm trying to read that handwriting.

Q. Is that your handwriting?

A. No.

Q. Do you know whose signature that is at the bottom?

A. That looks like Warden Arthur Anderson's signature.

Q. I want to show you page three now. Tell me when you're ready to scroll.

A. Okay, I'm good.

Q. So it's two incidents, it looks like both of them are written up by Warden Arthur Anderson. One involving Malcolm Muse, the other involving Connie Brown, both involving staff members, Major Chase and

Warden Stinson, correct?
A. Yes.
Q. Do you recall being notified of either one of these incidents or both of these incidents?
A. I don't recall.
Q. Do you recall reviewing either of these rule violation reports?
A. I may have, but I don't recall.
Q. Say again?
A. I may have, I do not recall.
Q. I'm sorry, you're cutting out. I think I got it, but just one more time.
A. No, I do not recall.
Q. Do you recall if you had any role in determining any sort of disciplinary response?
A. No, I do not recall.
Q. Where would it have been documented if you did have any role in determining any kind of disciplinary response to these incidents?
A. It would not be documented on either of these forms. I would have been the secondary person reviewing that, not the

primary.
Q. Would you have been informed of these two write-ups?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
I would have only been informed if the warden at the time felt that it was necessary that I be informed.
MS. CUMMING CONTINUES:
Q. And you can't recall if that was the case or not?
A. No, I don't recall that.
MR. CALVIT:
What was the number of that exhibit?
MS. CUMMING:
This is 7.
MS. CUMMING CONTINUES:
Q. On page one, signature of employee, do you know whose signature that is?
A. It looks like Chris Stinson.
Q. And do you know whose

handwriting this is in the comments section?
A. No, I don't.
Q. What responsibilities did you have related to promoting people?
A. Relating to what?
Q. Promotion.
A. I wasn't involved in the facility promotions except maybe the warden and assistant warden levels, not below that.
Q. Who would be responsible for promotions below the warden and assistant warden level at a local facility?
A. The facility warden.
Q. Do you know, at the facility level did LaSalle have any kind of structure for wardens to evaluate applicants for a promotion?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
Yes.
MS. CUMMING CONTINUES:
Q. What was that structure?
A. The job would be posted,

advertised, employees who met the minimum qualifications had the opportunity to apply for promotion. There would be an interview process and the candidates would be interviewed. And then the warden would make the final decision on the best candidate to fill the position.

Q. Was there a standardized set of questions that were asked as part of the interview process?

A. No.

Q. I want to show you Exhibit 8. This is a seven-page exhibit.

A. I'm familiar with that.

Q. This is the sergeant's board questionnaire.

A. Yes.

Q. And this is for Tillman.

A. Okay.

Q. But looking at the form, the sergeant's board questionnaire, was this something that was a set of questions that was used across various LaSalle operated facilities or was this specific to Madison?

A. Specific to Madison.

Q. Do you know who developed this set of questions?
A. No.
Q. This set of questions would not have been used at, say, Richwood for someone who was applying for a promotion?
A. Not necessarily.
Q. Was this set of questions developed by someone at Madison or was this something that was provided by LaSalle as a resource for local facilities to use if they wanted to?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
I don't know the answer to that.
MS. CUMMING CONTINUES:
Q. Have you seen a document that looks like this before?
A. Not that specific document, but I have seen many forms of something similar to that.
Q. And I'm not asking about Mr. Tillman's specific sergeant's board

questionnaire and his answers, but the sergeant's board questionnaire form with these questions on it, have you seen that before?

A. Have I seen questions before?

Q. It says Sergeant's Board Questionnaire at the top. It's got question number one: Tell me why you want to be a sergeant. Number two, You enter a building and if there are two offenders fighting with several other offenders standing around watching, what are you going to do? Question three, Offender approaches you and states he has been sexually assaulted by two other offenders the night before, what actions do you take? Question four, What does PREA stand for? Question five, Upon being assigned to your new shift as sergeant you determine shift morale is low, what actions do you take? Have you seen that on a form that says Sergeant's Board Questionnaire, have you seen that before?

A. Not until today.

MR. CALVIT:

All right, our pizzas are

getting cold. How long do you have to go?

MS. CUMMING:

A couple more hours. If you want to take fifteen minutes and eat your pizza, you can do that.

MR. CALVIT:

I'll take as long as we need to eat pizza.

(At this time, a recess was held.)

MS. CUMMING CONTINUES EXAMINATION:

Q. On suspensions and terminations and demotions for people at local facilities, do you recall in your time as director of operations for Louisiana anybody who was suspended, terminated or demoted?

A. Sure, yes.

Q. Who do you recall was suspended in your time?

A. I can't give you a name specifically.

Q. Do you recall which facility or facilities people were suspended from?

A. Are you talking about that I

directly did the suspension, or others?
Q. That you knew of the suspension.
A. Oh, I can't recall specific names, no, absolutely not.
Q. Can you recall the facilities where they were working?
A. No. I'm sure they occurred and they would be recorded somewhere, but, no, I don't recall specific names.
Q. What about terminations, was there anybody who was terminated for cause during your time as director of operations for Louisiana?
A. Terminated by me?
Q. That you knew of a termination that occurred.
A. Again, I know there were, more than one, but no, I can't recall names right now. That's been a while.
Q. Do you recall which facilities they were working at before they were terminated?
A. Yes, probably all of our facilities.
Q. Do you recall what rank, like

captain, major, CO?
A. The majority were COs.
Q. Demotions, do you recall whether there were any demotions during your time as director of operations for Louisiana?
A. Yes. I can't give you names right now.
Q. I'm sorry, say again? You're breaking up.
A. I do recall occasionally there were demotions, but I don't recall exact names right now.
Q. Was Chris Stinson demoted during your time as director of operations?
A. Yes, by me.
Q. By you, okay. Do you recall when that was?
A. In late 2019, somewhere in that timeframe.
Q. Late 2019 did you say?
A. Yes.
Q. Do you recall which facility he was working at when he was demoted?
A. No, ma'am, I do not.
Q. Let me ask this. Why was he

demoted?

A. My memory is I think he may have been at the Richwood facility. And it was during the transition from DOC to ICE and Chris was struggling with that transition and the requirements to be a warden on a facility with ICE versus the requirements of working with DOC. And he was demoted and moved to Madison because Madison had a population of DOC that better fit Chris's skill-set.

Q. What is the difference in skill-sets that is required to be a warden at a facility holding ICE detainees versus a warden at a facility holding DOC people?

A. It's very different. The Department of Corrections inmates are convicted felons. ICE detainees are not in a criminal setting, they are actually administrative detention centers with vastly different standards of care and vastly different standards and expectations from ICE. And their standards are off the charts compared to the DOC. Completely different, night and day.

Q. So Stinson could not meet the

higher standards that are required to maintain ICE detainees; is that correct?
A. Chris Stinson struggled with those standards, that culture. It's two different cultures from ICE and DOC, completely.
Q. Was there a precipitating incident or issue that came up that resulted in you demoting Chris Stinson?
A. Not specific incidents, more of a series of events over time that Chris was not a good fit for that role.
Q. When we deposed Chris Stinson a couple of weeks ago he indicated that you said that you had lost confidence in his abilities. Is that accurate?
A. It sounds accurate, yes.
Q. Was Chris Stinson moved directly to Madison or was he suspended for a period of time?
A. I don't recall. I'm sorry, I don't recall that.
Q. Did you consider terminating Chris Stinson from employment?
A. I don't recall specifically, but

that's possible.
Q. Was there anybody else that you spoke with or consulted with related to the demotion of Chris Stinson?
A. No. That decision is the director of operations.
Q. So the decision to demote belonged exclusively to the director of operations, correct?
A. That's correct.
Q. I want to show you Exhibit 9. This is Exhibit 9. It's just one page. It's related to the promotion of Quenton Hudson. And this is an e-mail from you to Arthur Anderson.
A. Okay.
Q. What I want to ask you about is --
MR. CALVIT:
Slow down. He's trying to look at it and you started moving it.
MS. CUMMING:
Let the witness tell me what he needs, Brad.
MR. CALVIT:

There was no question on the board and I was telling you that we needed to see it. So you don't tell me how to run a deposition under those circumstances.

MS. CUMMING:

Mr. McCormick, let me know when you need me to scroll it down.

MR. CALVIT:

And I'll let you know when I need to scroll it down, okay?

MS. CUMMING:

I'm waiting for the witness to tell me what he needs to finish looking at the document.

MR. CALVIT:

I get to read it, too, Elizabeth. And if I can't read it or I need to look at it again I'm going to ask you to accommodate me, okay? Thank you.

THE WITNESS:

Okay, please scroll. Okay, I've read it.

MS. CUMMING CONTINUES EXAMINATION:

Q. So the question I have is what was going on at Madison based on what you recall from reading this e-mail just now and what you just recall generally? Do you know what was going on at Madison in terms of promotions, was there any kind of trouble there?

A. If you'll notice, it says in there he claims he was promoted by Warden Tigner. So Warden Tigner was terminated for cause. And a new warden came in and inherited some of the issues that had been created by Warden Tigner which called for his termination. And he was trying to do right by this employee to make sure that we took care of our employee and did what was right.

Q. When was Warden Tigner terminated for cause?

A. I don't recall the exact date, but I do recall that prior to Warden Anderson coming on-board Warden Tigner was terminated for cause.

Q. Were you involved in that decision to terminate him for cause?

A. I was.

Q. Was anybody else?
A. No. As the director, that was my role, that was my responsibility.
Q. So why did you terminate Warden Tigner?
A. His character came into question.
Q. In what way?
A. He was not truthful with me during some questioning. And I know I couldn't allow it.
Q. What was he not truthful with you about?
A. It was involving a female inmate at the facility and the appearance of impropriety.
Q. Was he involved in a relationship?
A. That was never substantiated, but it was alleged. And the appearance of it was not good and it was denied by the female inmate, but the appearance of it was still bad and the warden had allowed that situation to grow and the appearance became very bad. And then he was not truthful with me when I

questioned him about it.
Q. What was he not truthful about?
A. A couple of things about where she was at certain times during the day and the evening. And if he had signed her in or signed her out of a housing area. And I could tell by looking at the records that he was not truthful with me in his answers. So that's why you see e-mail with that name in it and the new warden trying to correct a situation.
Q. How long had Warden Tigner been at Madison?
A. I don't know the answer to that. He was there the first time I showed up in 2019.
Q. Do you recall, did you fire him in 2019, early 2020, do you know roughly when?
A. I don't recall. Somewhere close to the transition time from when the ownership entity of Building 1, 2, 3, 4 made their separation.
Q. And so based on the contracts, the February 1, 2020 contract that we were

looking at that had those buildings excluded, would that have put it in early 2020 you think?

A. Whatever the date is on there, it's somewhere around that time.

Q. So Warden Tigner is fired. And so that gets into what Warden Anderson is writing, I'm finding these types of incidents more and more. These types of incidents, is that like someone says that they've gotten a promotion but there's no paperwork and things are kind of a mess?

A. I don't know the answer to more and more. I don't know that. I just know of the one I was dealing with in this string of e-mails.

Q. This individual who said that he was promoted by Warden Tigner, did he get the pay associated with that promotion, do you know?

A. Based off of my understanding, I'm going to assume that that's what we were talking about. He had received the promotion but had not received the pay commensurate with the promotion and I wanted to make sure

that got corrected.
Q. Did he receive any kind of backpay back to the time when he said that he had been promoted to this position?
A. That's what I would be alluding to in my e-mail. If we owe this person, then we need to make it right. And the status change request that was mentioned in my e-mail, that's the form that would be used to make that backpay. It's a status change form.
Q. What about resignations at the facility level, did you have any responsibility related to that?
A. No, ma'am. Resignations are a daily occurrence in our industry and any others.
Q. Did the local facilities conduct any exit interviews?
A. Periodically, but not on a regular basis, no.
Q. I want to show you what is going to be marked Exhibit 10. Mr. McCormick, tell me when you need me to scroll down.
A. Okay.

Q. Do you recall being notified that the director of nursing was resigning?

A. No, ma'am.

Q. I'm sorry, say one more time?

A. No, I do not recall that specifically.

Q. Did you participate in any efforts to hire an interim or replacement for this director of nursing?

A. No. That fell in the world of our medical department. I would have had very limited input in that.

Q. I want to move into staffing. Who would be responsible for determining the total number of staff positions necessary to, you know, adequately staff and operate a facility?

A. That would have been a combination of myself, the warden, the management team of the facility. It typically would include the major, assistant warden, the warden and myself to sit down and make that determination.

Q. So it would be you, the warden. And you said the management team. Who all is

included in the facility management team?
A. When I say management team I'm talking about senior management there. That would usually look like major, assistant warden, and the warden.
Q. And what sorts of things would you consider when you were coming up with the posts that were necessary?
A. You would start with the housing assignments. How many housing locations do you have. And then it would evolve to the mission of that facility. Is there programs involved, are there educational places. Everywhere where inmates may be moved to, working in, or participating in some type of program would require some level of supervision. And that would be the culmination of discussion and of booking at a layout facility and decide what the appropriate number of staff will be for that.
Q. So how does that work? You get into a room with the warden, the assistant warden, the majors. Do you have a schematic or a blueprint of the facility?
A. Yes.

Q. So you're looking at the blueprints of the facility. Do you have like a program list or anything like that?
A. A program list?
Q. Yes, that lists out exactly what you're talking about, anyplace where people might move and need to be supervised.
A. It's unique to each facility. They are not all the same. So just because you have five hundred inmates in facility A and five hundred in facility B, their staff levels may or may not be remotely similar. It's based on the mission of the facility, as well as the design of the facility and the inmates being housed there. It's never the same.
Q. And that makes sense. So I guess my question is, how do you know what the mission is? Because it's different for each facility, and you are one person, you're dealing with six different facilities. I know I couldn't remember off the top of my head all the various details of missions. How does --
A. That's why the discussion would

include the management team at each facility. Because they have that knowledge of what their mission is.

Q. Would there be any documents that you could look at or help them remember, oh, right, we've got X number of GED classes, we've got X number of people who are working as trustees, we have this, we have that, keeping straight all the problematic elements at a facility?

A. There's no one document that would encompass all of that, no.

Q. So that's just sort of like in the head of the warden, assistant warden, and the majors; is that right?

A. That's correct.

Q. How frequently would you assess the number of posts necessary to run a facility?

A. Once the initial staffing is established there would be no need to assess that again unless something substantial changed with the mission or the design of the facility or the population numbers of the facility.

Q. I want to show you Exhibit 11. Tell me when you need me to scroll down.
A. Okay.
Q. I'm not asking about the specific content of the document, just the form. Have you seen this form before?
A. Yes.
Q. What is this?
A. That is the staffing document for the Madison Parish facility.
Q. And this staffing document, is this what you would complete when you are sitting in a room, you and the senior management team for Madison?
A. No.
Q. Okay, the positions that are listed in this far column on the left, would that reflect what you all discussed as the positions that were necessary?
A. Yes, it would be a reflection of that.
Q. And then down here where it has security slots, do you see where I'm pointing?
A. Yes.

Q. The security slots, is that reflecting the number of staff positions for each shift that you and the senior management team determined was necessary to run the facility?
A. It would reflect that, yes.
Q. These are columns. There's assigned, security slots, total employees. I think I understand all of those. But then there's "allowed". What is allowed?
A. It would be their maximum number.
Q. Their maximum number of --
A. Maximum number of positions allowed. Per A team, B team, C team, those are shifts. And that would be the allocated number allowed for each of those. You're only looking at A team there, you're not looking at all of them.
Q. Okay, so it's eighty-nine total people are allowed to be on A team?
A. No. You have assigned twenty-three, thirty-four. The total that they are putting in over there of one eleven, I don't have a calculator in front of me,

that looks like the total if you combine A, B, C, D and eight hour together. It's actually the total of A, B, C and D.

Q. So assigned is on the left side, there's A, B, C, D. Those are shifts, correct?

A. Yes.

Q. And up above there's a list of employees who are on each shift. And if you go across, you can see what their rank is; is that right?

A. That's correct.

Q. And then there is administration and those would be the eight hour; is that correct?

A. Most of them, yes.

Q. And then looking down here at the bottom part of the table, assigned. Assigned would be these are the number of bodies that you actually have on each shift that you can put into a security slot; is that right?

A. That's right.

Q. And then the security slot, is that the number of places that you and the

senior management team have determined should exist to operate the facility?
A. Yes.
Q. Okay, total employees. Your thought is that that reflects the total number of bodies available to go into the security slots across all the shifts; is that right?
A. Yes.
Q. So that's one eleven. And now this allowed. That's where I'm still getting confused, that eighty-nine. What is your understanding of that?
A. It appears that we have overhired. We budgeted eighty-nine and we're actually at a hundred and eleven.
Q. So there are forty-eight, sixty-nine, ninety security slots.
A. Okay.
Q. That's ninety, okay. So if there are ninety security slots are you saying that you only budgeted for one --
A. Eighty-nine.
Q. So you budgeted for one under the number of security slots?

A. When I say budgeted, that was our initial calculation of the staffing. We knew there were eighty-nine spots. We needed eighty-nine people to fill that number of slots on a twenty-four-hour basis. Broken up into four cards, four teams. They call them teams.

Q. Tell me if my math is wrong. Twenty-four plus twenty-four plus twenty-one plus twenty-one is ninety, though, right?

A. Yes.

Q. Okay, so there are ninety slots.

A. Yes.

Q. Why do you only need eighty-nine people?

A. Because we probably had a change somewhere along the line where we added another slot, another person, since the original staffing document was done. And it was reflected in the number going up by one because we added somewhere. That's the most logical answer for that. It could be another turnout or it could be another recreation officer. For some reason we added one.

Q. When it says allowed, how does

that -- if the number of slots goes up, as it appears to have done here, how does that allowed number change to correspond to the number of slots that you --

A. It should have just been changed. It obviously doesn't appear that it got changed, but it could have. It evolved. We've added someone. And it didn't get carried over into that column for allowed.

Q. Do you know who puts together this document?

A. Yes. We just went through that. We do the staffing that I'm involved in originally. And then the warden and his team sit down and divide them up into the four teams. And establishes A, B, C and D. You have a day shift card and a night shift card. And then you have another day shift card and a night shift card. They work twelve-hour schedules. One is on, one is off on days and nights. And then over in administration, those typically don't change. They are basically going to be Monday through Friday or some set schedule where they don't rotate. That one total that you're looking for, it

could be in transportation over there where you see that. Because for some reason our transportation needs may have increased and we had to add someone to pick up that extra load.

Q. Where does that allowed number, whoever is putting together this document, where do they look for that number?

MR. CALVIT:

Objection to the form of the question.

THE WITNESS:

I don't have the answer for that.

MR. ALVAREZ:

Elizabeth, before the next question, I'm going to be hopping off. My partner, Al Perkins, who is enrolled in the case has now come on.

MS. CUMMING:

All right, thanks, Evan.

MS. CUMMING CONTINUES:

Q. Down here where it says any problems that are found addressed with Deputy

Warden John Toffers. Who is that?
A. That's an indication of that form being a little old. John Toffers was a previous warden there before Billy Tigner, before Arthur Anderson, and before me.
Q. This is dated January 2020.
A. I see it.
Q. This document would have been generated during your time as director of operations, correct?
A. That's correct.
Q. So this is page two. This is dated 2-4-2020. Do you see that?
A. I see that.
Q. So this is about a month later and here it's got assigned. The numbers have gone down from January of 2020. Do you agree?
A. Yes, I agree.
Q. Do you know why that number went down?
A. No, I don't know right offhand.
Q. Going to May 3, this is May 4, 2021.
A. I agree, yes.

Q. And down here the security slots, that number has gone down.
A. Yes.
Q. So do you know what precipitated that decrease in the number of security slots?
A. One could be because we no longer had Buildings 1 and 2. So those would be separated out. And I don't -- I can't verify without seeing count sheets, but we may have deactivated one or more housing areas because the population had decreased and we didn't man those anymore.
Q. This is dated May 2020. Did you participate in additional discussion regarding security slots at Madison between February 2020 and May 2020?
A. No.
Q. Do you know who would have made the decision to decrease the number of security slots?
A. Yes. That would have been the warden and the operational team there.
Q. Would you have participated in that?

A. No.
Q. What about the decision to determine what positions would need to be staffed during each shift, did you participate in that?
A. During the original staffing analysis, yes.
Q. So in your time from 2019 to 2021 how many times did you engage in a staffing analysis for Madison?
A. I don't know that I ever engaged in any to Madison. They were already established when I came on-board.
Q. So you never did any kind of original staffing plan with Madison that you can recall; is that right?
A. That's correct.
Q. And the changes to the staffing plan, that would have been done by the warden and the warden's senior management team, is that correct?
A. That's correct.
Q. So LaSalle would authorize the wardens to make that decision, is that correct?

A. That's correct.
Q. This is going to be Exhibit 12. Aside from the particulars of this have you seen this form before?
A. Yes, I have seen that type of form before. Every facility uses basically that type of form.
Q. So the form is specific to Madison but every facility has something that's similar to that; is that right?
A. Something similar, yes.
Q. This Madison form, it's called a daily shift drop sheet. Is that terminology exclusive to Madison or is that terminology used across LaSalle operated facilities?
A. The words drop sheet, I have never seen it anywhere but Madison. It's a daily shift post sheet is what it is. It's where officers are assigned. And that's only for one part. It says C team at the top right. That's one of four. There will be an A, B, C, and D.
Q. So this drop sheet is from April 25, 2021 C team. C team designates that a certain period of time, for a twelve-hour

shift, that is how the facility is being staffed; is that correct?
A. That's correct.
Q. Do you happen to remember what time period C team was on?
A. I do not.
Q. So this left column where it says posts that are listed, those are determined based on the staffing analysis?
A. They are determined on the staffing analysis and the population in the facility at the time.
Q. Okay, so let's say there's an original staffing analysis that is done. That's the staffing analysis that is done with you and the senior management at some point when LaSalle gets a new contract, right?
A. Okay, yes.
Q. And you say we need for each shift a lieutenant, a sergeant, control one, control two, three dorm officers, two rovers, kitchen, and we need two transport, for example. The population --
A. What exhibit is this?

Q. Exhibit 12.
A. Okay.
Q. The population drops and you may not have a full dorm. Is there a staffing analysis that is done that changes the posts listed on that left-hand side?
A. The staffing analysis will assume a full occupancy. What you're looking at there is a snapshot of one day and one shift. And when the population drops to less than thirty, forty percent, you're going to have a lot of blanks on there because there is no one there. There's no inmates there, there's no need to have staff there. So we would only man and staff those positions where we have inmates and require staffing.
Q. So this is April 2021. This is after LaSalle is no longer operating DC1 and DC2 which I think are also the Bayou buildings; is that right?
A. That's what it looks like, yes.
Q. So there's no staff here because LaSalle is not operating there, right?
A. I'm telling you based off reading that form, it's my assumption looking

at that that there were no inmates there. Therefore, there was no staff there. Now, I'm not speaking for the people who were running Madison Parish on 4-25. That's their decision to make, not ours. But that form was used prior to them coming. And I'm telling you that's how we would have utilized that form.

Q. On April 25, 2021 LaSalle was operating MCC and FCC, Building 3 and Building 4, at Madison; is that correct?

A. I believe that's correct. You'd have to remind me what date we actually made the change and went to the others.

Q. Based on that termination letter it was May 31.

A. Okay, about a week before this, okay.

Q. So we agree LaSalle was operating Building 3 and Building 4. We're going to ignore buildings 1 and 2 right now.

A. That's true.

Q. So focusing on Building 3 and Building 4. Building 3, the original staffing analysis would consider, all right,

if we have people in Building 3 these are the positions that we need to have; is that right?

A. I don't follow your line of questions.

Q. I'm trying to understand. For just MCC staff for this post column right here. These posts, who decides what goes in this post column for Building 3?

A. Each shift supervisor would be deciding what they needed based on the population that's there.

Q. Okay, I'm not talking about who is filled in to staff, I'm talking about just this column that says post.

A. That would be the warden and the chief of security would decide that. Because we've abandoned and collapsed multiple posts if the population had dropped to a lower number.

Q. You said the chief of security. Who is the chief of security at Madison?

A. The major. That's an interchangeable term.

Q. So it would be either Major

Chase or Major Farmer, depending on the time period, right?
A. That's correct.
Q. So the warden and the major would decide how this post column gets filled out, is that what you're telling me?
A. That's correct. And that post column will not be consistent from day to night. Because some posts are filled in the daytime but not filled at night. So we won't have the same posts showing up on all of these forms. It's going to vary on days and nights.
Q. So the Major and the warden, how frequently are they deciding, okay, we need a lieutenant and a sergeant and two control operators and two rovers and kitchen during the day, and we need only a sergeant and one control operator and one rover at night, as an example. How frequently do they change up those posts that need to be assigned?
A. It's going to change depending on the population of the facility on each given day. Because one day we may have one place open and the population decreases and

it will be closed the next day because we don't need it anymore.

Q. So would the major and the warden get together every single day and regenerate this post column on these drop sheets?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

No, they would not get together every single day. The captain at the top of the list up there had the authority to make those decisions based on his expertise and knowledge.

MS. CUMMING CONTINUES:

Q. Make what decisions?

A. Make the decision to not put somebody in an empty housing area if there was no inmate there. They could make that decision, yes. We're not going to man them just because we did yesterday, or just because it shows up on the master, it's not going to be manned if it's vacant and

unoccupied, no, we're not going to do that.
Q. Let's get into the staff column. It seems like that's where you want to go. The staff column, the second column here where it's got names and all of that. John Murray, listed as shift captain, he's the one filling in. It's Frederick Fletcher is the lieutenant in Building 3, Rubin Fletcher, the sergeant in Building 3, all of those names; is that correct?
A. Yes, that's correct.
Q. All right, so if Captain Murray decides we don't need someone, we don't need a rover in Building 3, that first rover position, it looks like there's no name there, would he make a notation like no need because of population? Explain why he decided in his expertise that that post didn't need to be filled.
A. I can't answer that because he didn't make any notations.
Q. Looking at this here going down to Building 4, SCC, we've got control two, that's listed as NA. What is your understanding of what that means?

A. Not applicable.
Q. Say again?
A. I'm assuming that NA would mean not applicable.
Q. And then control J, there's no name there. Do you know why there would be no name in control J?
A. No, I don't have an answer for that.
Q. The rover position, would that be the rover position as it's defined in the post orders?
A. The rover is the person who's roving between locations.
Q. So the rover --
A. When it says control one, control two, those are stationary positions, the rover moving back and forth.
Q. So control one and control two, they are stationary positions. Where are they stationed?
A. They're stationed between two dorms. You would have two dorms and you would have a control room between the two dorms with large plexiglass walls, windows,

where they can oversee what's going on in each of those dormitories. Then you would have a rover that goes on the outside on the floor moving around between the dorms.
Q. So the rover is going outside like in the hallways going from dorm --
A. That's correct.
Q. So the rover is not necessarily on the dorms?
A. No, the rover is on the dorms. He or she may be in dorm one for a while, then maybe in dorm two for a while, and back and forth. They are roving.
Q. Is the rover the same thing as a dorm officer?
A. The rover is a dorm officer who is splitting their time between two dorms.
Q. Is it always just two dorms or could it be more than that?
A. There's a possibility that it could be more than that.
Q. Looking down on page two it looks like this is for A team for May 2021. And there's a rover that's handwritten in in blue ink.

A. Uh-huh (indicating affirmatively).

Q. Do you know whose handwriting that is?

A. I do not. I'm going to assume that's John Murray since he's the one that filled out that roster.

Q. And here in the 5-17, again these are the same positions, it's lieutenant, sergeant, control one, control two, kitchen, same for Building 4, except there's also control J, correct?

A. Yes.

Q. And this is C team. Looking at page two, this is listed at 5-17-2021. The shift captain is listed as John Murray. And it's A team. And then going down to page three of the exhibit, this is also 5-17-2021. It's now C team, but the shift captain is still listed as John Murray. Do you know why that would be?

A. Yes, he was probably filling in and running two shifts.

Q. So when a shift captain is running two twelve-hour shifts how does that

work?
A. That's not necessarily -- that's two twelve-hour shifts separated by twelve hours. Remember, you have four cards for a twenty-four-hour period. So you have like an A, B, C, D. So you have an A shift day, a C shift day, a B shift night and a D shift night. So he could actually be working his days off in place of someone else.
Q. Okay, but here this is dated May 17, 2021 and it's A team. And then this is dated May 17, 2021 and this is C team.
A. Right. So that, I'm going to just assume that they put his name in there either by error, because obviously he's not working twenty-four straight hours.
Q. Okay.
A. And then we do have instances where two cards are covered by one captain. There's not necessarily a captain assigned twenty-four hours a day. You would have two captains to cover four cards, a day shift captain and a night shift captain. Does that make sense?
Q. Yes.

A. He or she would pick which card they want to spend time with, if that makes sense.

Q. Yes, it does. So say Murray is the shift captain for A and C?

A. That's right.

Q. And is Captain Murray still making the post assignments for A and C even if he is not necessarily there the whole time that C team is there or the whole time that A team is there?

A. He would be making them in conjunction with the lieutenants and the sergeants.

Q. All right, and then 5-18-2021, again it's John Murray, back to A team?

A. Yes.

Q. These daily drop sheets at Madison, when the transfer happened over to Security Management did LaSalle keep these or did those stay on site?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

I don't know the answer to that.
MS. CUMMING CONTINUES:
Q. I'll show you Exhibit 13. It's eighteen pages. They are all post orders. I can scroll through them one by one or let me know if there's a specific one you want to look at. These are called Madison Correctional Southern Correctional Center post order index. Are these post orders written by and specific to Madison or does LaSalle have post orders that are used across all the LaSalle operated facilities?
MR. CALVIT:
Object to the form.
THE WITNESS:
I'm not certain --
MS. CUMMING:
I'm sorry, you're cutting in and out. Could you repeat that.
THE WITNESS:
I said I don't know the definitive answer to that. They could very well have been specific to Madison.
MS. CUMMING CONTINUES:

Q. These indicate that they were revised July 1, 2020. Do you have any knowledge of who did that revision or how that happened?

A. Yes. Typically the wardens were responsible for the issuance of post orders.

Q. Would they be responsible for revisions?

A. Yes.

Q. So LaSalle authorizes the wardens to issue post orders for their own facilities; is that right?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

That is correct. And those revisions could happen for various reasons. Like we talked about earlier, if things changed, we add a position or we change something about the operation of the facility, that post order may need to be modified to match those changes.

MS. CUMMING CONTINUES:

Q. So when you say we, are you talking about LaSalle at a corporate level?
A. No. Excuse me. When I say the word "we" I'm always in this context and this conversation referring to the facility of Madison Correctional Center.
Q. Okay, got it, thank you.
All right, and so here there are two different post orders. One, number eleven, defines a roving security officer and number fourteen defines a dormitory officer, correct?
A. Yes, I see that.
Q. So we can go down to number eleven. This is page sixteen of the exhibit. And this is the dormitory officer's responsibilities, right?
A. Yes, that's what it's labeled.
Q. So part of the responsibility is to supervise all activities inside the dormitory within view of the post and remain alert as to any disturbances, unusual occurrences, rule infractions, and report these to the shift supervisor. Do you see where I'm reading?

A. Yes, I'm following along.
Q. So within view of the post, my question is do you know, was the post inside the dorm or some other place?
A. A dorm officer would have been posted inside the dorm.
Q. And then Number 9, page thirteen of the exhibit, the roving security officer. And this would encompass the responsibilities of the roving security officer; is that right?
A. Yes.
Q. So the roving security officer is not going to stay on a dorm during the shift, but just sort of move around, correct?
A. That's correct.
Q. So there are two different roles really according to the post orders?
A. With overlapping duties and responsibilities, yes.
Q. If there was no dormitory officer, when we were looking at those drop sheets there was no dorm officer listed in those posts, correct?
A. In what we were looking at

previously?
Q. Yes.
A. That's correct.
Q. So when there is no dorm officer is there a requirement for a certain number of times that a rover has to go onto each dorm?
A. There's no requirement for a set number of times, no.
Q. Going back up to this index, does this index on page one of the exhibit reflect all of the possible security positions or security slots, to use the language of the staffing sheet, that would have been available at Madison?
MR. CALVIT:
Object to the form.
THE WITNESS:
I don't know the answer to that without looking at a complete staffing analysis to make sure everything was covered.
MS. CUMMING CONTINUES:
Q. Do you know the last time there was a complete staffing analysis in Madison?

A. No, I do not.
Q. Where would a complete staffing analysis be kept?
MR. CALVIT:
Object to the form.
THE WITNESS:
I don't know where that original would have been done because it would have preceded my time. I don't know where it would be.
MS. CUMMING CONTINUES:
Q. If someone needed to refer back to that original staffing analysis where would they look?
MR. CALVIT:
Object to the form.
THE WITNESS:
I don't know the answer to that, either.
MS. CUMMING CONTINUES:
Q. Did you ever attempt to look back at the original staffing analysis for Madison?
A. No, I did not.

Q. What would be with the mandatory post, you know, you are super super short staffed, but you absolutely have to have someone in, you know, your top three posts? What are your top three mandatory posts?

MR. CALVIT:

Object to the form.

THE WITNESS:

It's kind of a long answer to your question considering the fact that the State of Louisiana does not have any required statutory requirement for staff levels at any facility. It's only what is deemed adequate and necessary for each individual facility. So there is no definitive number, to answer your question.

MS. CUMMING CONTINUES:

Q. I'm not asking about number. What I'm asking about is is it the most important thing to have a shift sergeant, is it the most important thing to have the control center staffed, is it the most important thing to have the dormitory

staffed? If you are short staffed what is the most important post to make sure is covered?

MR. CALVIT:

Object to the form of the question.

THE WITNESS:

In my experience, the most important thing to have would be the control room officers since they control the entrance and exit doors.

MS. CUMMING CONTINUES:

Q. We've gone through the local -- well, let me ask this. Do you have a role in local facility operations?

MR. CALVIT:

Object to the form.

THE WITNESS:

Do I have a role in what?

MS. CUMMING:

Like local, each jail's operations. Do you have any role?

MR. CALVIT:

Object to the form.

THE WITNESS:

I don't understand that. I have oversight, yes.

MS. CUMMING CONTINUES:

Q. Okay, but in that oversight do you have any kind of duties or responsibilities related to operations at each facility that LaSalle has operations at?

MR. CALVIT:

Object to form. Go ahead.

THE WITNESS:

My primary duty is to ensure that we are operating the facility in accordance with the guidelines established and any statutory requirements.

MS. CUMMING CONTINUES:

Q. Does that include the United States Constitution?

A. It includes any statutory requirements established by the state or jurisdiction where we're operating the facility.

Q. Does that include the United States Constitution?

A. That includes the statutory

requirements established by the State of Louisiana in this case.

Q. Is Louisiana bound by the United States Constitution?

A. They have an Attorney General, so I would assume so.

Q. Do you have any role in local facility policy drafting or policy adoption?

MR. CALVIT:

Object to the form.

THE WITNESS:

Local facilities don't establish policy, they establish facility procedures in accordance with policies from the company and/or those policies that are established in this case by the Department of Corrections.

MS. CUMMING CONTINUES:

Q. The Louisiana Department of Corrections?

A. Correct.

Q. And the policies you're referring to were the basic jail guidelines?

A. That's correct, yes, ma'am.

Q. So the facility procedures are authorized to develop its own procedures; is that right?
A. Procedures, yes.
Q. Does LaSalle have a company policy related to classification?
A. No. We defer to whatever the classification requirements are for the jurisdiction that we're doing the work for, whether that's the Louisiana DOC, ICE, US Marshals, whoever that may be.
Q. Do you know if the Louisiana Department of Corrections has a classification provision in its basic jail guidelines?
A. Would you repeat that. I didn't hear you. It's real muted.
Q. Does the Louisiana Department of Corrections have a classification provision in its basic jail guidelines?
A. I don't know the answer. I haven't read that closely on it to see. I will assume yes.
Q. And the LaSalle operated facilities holding DOC people, they are

authorized by LaSalle to draft and adopt their own procedures related to classification, correct?

A. Staying within the boundaries of the basic jail guidelines, yes.

Q. Do you know how classification worked at Madison?

MR. CALVIT:

Object to the form.

THE WITNESS:

I never sat in on a classification hearing or committee there, no, I did not do that.

MS. CUMMING CONTINUES:

Q. Do you know what they considered in making classification decisions?

A. Well, I know that all the inmates came to us already classified. Everyone that came to our facility was either a medium or lower classification as established by the state DOC or a previous facility that they had been housed in. And then we would make any changes to classification based on their institutional behavior.

Q. When you say people were coming in already classified, how was that information being conveyed to Madison?
A. It came with the inmate's file.
Q. And then what was the process for making any changes to that classification?
MR. CALVIT:
Object to the form. Are you talking about specifically at Madison what was the process?
MS. CUMMING:
Yes.
THE WITNESS:
The normal process would be if an issue or occurrence arose that necessitated a review of that classification it would be to classify the inmate to a higher level of security. That would be based on the inmate's behavior or actions and he would go before a committee and it would be reviewed. And the circumstances around whatever that action was could

determine if his classification now needs to be elevated. For example, if an inmate is caught trying to climb out a window and escape, he would go before a committee and they'd say you are not a medium anymore, you're an escape risk. That makes you a higher classification.

MR. CALVIT:

How much longer are you talking?

MS. CUMMING:

I don't think all that much longer. I mean, it depends. Why, do you need a break?

MR. CALVIT:

Well, not in the next three minutes, but in the next fifteen, yeah. What do you want to do? I mean, we can keep going until I tell you I have to take a break now.

MS. CUMMING:

Let's take a break.

(At this time, a recess was held.)

MS. CUMMING CONTINUES EXAMINATION:

Q. So you said that at Madison that inmates are coming to Madison already classified. And if something happens, then there is a classification committee. Who is on that classification committee?

A. It's not a committee. It's the chief of security and/or the captain, whoever the highest ranking one is, would make that decision. I used the analogy of someone trying to crawl out of the window. The sergeant that caught him would place them in segregation, single cell. And then the captain and/or the major would be the one that came along behind would be the one saying why is this guy in here, and he would tell him. Okay, and he would sign off. This person remains in segregation, whatever word you want to use. In Madison you only have general population and segregation. That's your options. There is no high and low. It doesn't exist.

Q. So either you are in gen pop or you're in segregation?

A. Yes, ma'am.

Q. Does that also include protective custody?
A. It could if someone needed protective custody. Yes, it could.
Q. Did anyone at Madison ever reach out to the Department of Corrections, if it was a sentenced person, and say we can't handle this person?
MR. CALVIT:
Object to the form.
THE WITNESS:
I'm not personally aware of any of those phone calls or reaching out.
MS. CUMMING CONTINUES:
Q. You were talking about back in Texas there would be like a points additive system where someone is going through a whole form and they may be looking at institutional behavior and they are adding up points and that person has a number associated with them and that number sort of puts them in high, medium, or low. Or the decision tree which is sort of a guided way of looking at institutional behavior and how that's weighed

in determining classification. Did that exist at Madison?
A. No.
Q. If you had someone that was not able to live on the general population tier because they were vulnerable to attack or they were attacked repeatedly, they themselves weren't necessarily the disciplinary problem, they just happened to get punched a lot, was there any place at Madison that people like that, vulnerable people, could go?
A. You're asking me a hypothetical. That would go into what we just discussed. That could necessitate a placement into a single cell.
Q. Would that be lockdown?
A. That's one word. I don't particularly use that word, but yes, single cell, separation cell. You can apply a lot of different terms to it.
Q. Segregation?
A. Segregation, that's another term.
Q. Did Madison have a way of

keeping people separated who just couldn't get along for whatever reason, got into fights all the time?

A. I wasn't there for day-to-day operations, but I can assure you that if Joe and Harry had a conflict possibly from the street or somewhere, one may live in one dormitory, one may live in another dormitory, and they have no reason to interact with one another.

Q. Sorry, say that last part again. You broke up a little bit.

A. I said one could live in one dormitory, one could live in another, and they would have no reason to interact with each other.

Q. How would they come to be assigned -- I guess the question is, was it happenstance that two people who have a world beef would end up in two different dorms or was that by design?

A. It would be more happenstance that they end up in the same dorm. Because we have no way of knowing that these two people had a beef from somewhere else until

one of them comes and tells us, I don't like this guy, we don't get along. And at that point the decision is made, you live here, let this one live over here, you guys stay away from each other.

Q. So let's say that information has come to light. Let's say John Doe and James Dean get into a fight in Building 4, dormitory A. What is the method for tracking that John Doe and James Dean should not be in the same dorm together after they've gotten into a fight?

MR. CALVIT:

Object to the form.

THE WITNESS:

I don't know that there's an established method other than just making the sound correctional decision to separate the two and house one in one location and one in another.

MS. CUMMING CONTINUES:

Q. And so if James Dean gets moved to Building 4, dormitory C, but then doesn't want to live on that dorm for whatever

reason, is there some way that people are keeping track that if you move James Dean around Building 4 or into Building 3, if John Doe is on that dorm you shouldn't put him in there?

MR. CALVIT:
Object to the form.
THE WITNESS:
Again, I don't know the mechanics of how the internal jail management system works for housing, but that would be one way.
MS. CUMMING CONTINUES:
Q. I want to show you Exhibit 14. Tell me when you're ready for me to scroll down.
A. Go ahead.
Q. This is titled Madison Correctional Southern Correctional Center. And this is called an institutional policy. Have you seen this document before?
A. No, not until today.
Q. I'm sorry, say again?
A. No, not until today.
Q. Okay, this is the first time

you're seeing it?
A. Yes.
Q. Would there have been any other forms related to classification either from LaSalle or the corporate entity of LaSalle that that Madison would have had to follow related to classification?
A. Only the BJG guidelines.
Q. All right, that's the next exhibit. This is going to be Exhibit 15.
A. Okay.
Q. We're on page one and that's the offender population management system that you just read. Does that look familiar to you?
A. No, I'm not familiar with it myself.
Q. I want to go down to the classification. That's going to be my next question. This is page four of the exhibit. Take a look through and tell me if you need me to scroll.
A. Okay.
Q. Have you seen this, 2-A-12, the basic jail guideline provision and then that

common protocol documentation. Have you seen this section of the document, this provision, basic jail guideline, before?

A. No.

Q. Did you ever look at Madison Parish's classification policy to see if it complied with or met the requirements of the Louisiana basic jail guidelines on classification system?

A. No, I did not.

Q. And then just to close the loop on this. This form is titled Louisiana DPS and Corrections Basic Jail Guidelines Checklist. And along with the provision underneath there are little check boxes for self-evaluation for the facility, guidelines compliance audit. Have you seen this document before?

A. No, ma'am.

Q. This next one is going to be Exhibit 16. I'm asking just specifically about this form, not necessarily specifics related to Brian Harris or anything like that. Just this initial classification form. Have you seen this before?

A. I do recall, I think I have seen this form before, yes.
Q. When have you seen this form before?
A. I don't recall exactly, but I think I do remember seeing that somewhere.
Q. Related to Madison?
A. I don't recall that. I don't know where, but I think I have seen this form.
Q. Have you seen it completed or have you seen sort of like a plain version of it?
A. I don't recall, ma'am. I think maybe just a blank version of it.
Q. Are you familiar with J dorm in Building 4 at Madison Correctional Center?
A. I know where it was located.
Q. I'm sorry, you say you know where it was located?
A. Yes, ma'am. I'm familiar with knowing where the layout of the facility is. It's been a little while, but I do remember J dorm, yes.
Q. Did J dorm have any kind of

particular use?
A. No, ma'am, that I don't recall, no.
Q. At any point did J dorm's particular use change?
A. Ma'am, I don't recall that.
Q. Did you have any involvement in the disciplinary process for inmates at Madison?
A. No, ma'am.
Q. Did you have any involvement in the process of putting people in lockdown or administrative segregation at Madison?
A. No, ma'am.
Q. Do you know anything about the conditions of administrative segregation or how those cells were run at Madison?
A. No, ma'am. Only what was in policy.
Q. And policy, is that the Madison policy or did LaSalle have a corporate policy related to administrative segregation and lockdown?
A. It would be the policy in effect by the basic jail guidelines.

Q. The Louisiana basic jail guidelines, correct?
A. Yes, ma'am.
Q. And any other policies or procedures that were instituted by the facility warden?
A. The warden could have modified something. If he wanted to grant recreation or for whatever reason someone might want something different.
Q. So you left the disciplinary process, the lockdown, that running and its compliance with the basic jail guidelines, you left that to the staff at the facility, correct?
A. Yes, ma'am, for the warden and the staff.
Q. This is going to be Exhibit 17. All right, this is small so let me know if you need me to blow it up or scroll up or down or left or right.
MR. CALVIT:
Is there a heading at the top?
MS. CUMMING:
That's it, that's the top.

MS. CUMMING CONTINUES:

Q. Have you seen this document before?

A. No, ma'am, I have not.

Q. Were you informed if someone from Madison Detention Center had to go to the hospital?

A. Generally, yes.

Q. How were you informed?

A. Telephonically.

Q. Who usually phoned you?

A. The duty warden.

Q. The duty warden is whoever is at the facility, the highest ranging person at the facility at the time; is that right?

A. No, ma'am. The warden, assistant warden, and the major, one of those three was designated each week to be what we referred to as the duty warden, who would take after hours calls. So normal business hours I would get a call from the warden. After hours I would get a call from whoever the designated duty warden was.

Q. I'm going to show you Exhibit 18, the Critical Incident Reporting Policy.

Are you familiar with this document?
A. Yes, ma'am.
Q. It's got an effective date of June 15, 2020. Do you recall, was there a policy in place before that effective date?
A. I don't think so, no.
Q. And when this policy went into effect -- well, let me ask this. When did you receive a copy of this document?
A. It would have been somewhere near the effective date, probably just before then.
Q. Do you recall how you received a copy of it?
A. Just based on my own knowledge, I would probably have received it from Mr. Brian Rodeen. Because he would have been the keeper of that document and the originator of it.
Q. And would he have e-mailed it to you, faxed it, carrier pigeon, how would you have gotten it?
A. I would have gotten probably an e-mail and a hard copy.
Q. Do you know what precipitated

the creation of this document?
A. Yes.
Q. What was it?
A. This document was the incident reporting mechanism that was in place in Texas operations prior to 2020. And Mr. Rodeen had operational purview of that function in Texas. And when I came on-board to the Louisiana operations from Texas I had discussions with him and told him I would like to implement this reporting mechanism in the Louisiana facilities so that it would be standardized with all our other facilities, such as Texas, Arizona, and Georgia.
Q. What's the value of having standardized reporting?
A. It's something I was familiar with and it was a document that we liked to use because it provides all of those answers to the questions that I alluded to earlier, why, what, where, when. That's all contained in here and it gives you a pretty good snapshot of what occurred in any given incident.
Q. Did you ever receive any

training related to this policy, like how to implement this policy in Louisiana?

A. Mr. Rodeen provided training to the facilities in Louisiana about that policy, yes.

Q. When did he provide that training to the facilities in Louisiana?

A. It would have been sometime shortly after the date that it was rolled out, the effective date.

Q. Did he have any handouts or curriculum or anything like that related to the training he provided?

MR. CALVIT:

Object to the form.

THE WITNESS:

I'm not sure what his handout curriculum may have been, I don't know.

MS. CUMMING CONTINUES:

Q. Did he have people sign in or did he have any way of tracking who had participated in the training?

MR. CALVIT:

Object to the form.

THE WITNESS:
I don't know. You'd need to ask him that.
MS. CUMMING CONTINUES:
Q. But you as the person who is sort of overseeing the facilities, did you have any way of keeping track of who had gotten training on this form?
A. I would have depended on Mr. Rodeen for that information.
Q. So you never asked which facilities got the training and who at those facilities got the training?
A. I don't recall specifically asking, no.
Q. Did people at Madison receive training on this policy?
A. I can't answer that definitively. If Mr. Rodeen kept records of the training he should have that.
Q. I'm going to scroll down to nine and ten and eleven of the exhibit. These are sort of charts that define critical incident priority levels. So priority one, priority two, priority three, do you know who was

responsible for determining whether an incident was a priority one, a priority two, a priority three?

A. The determination is a follow-by-numbers type document, so it would have been the supervisor who initiated the document to begin with. On page one it says the initial report. So whoever that supervisor was that was completing the initial report would have determined a one or a two or a three.

Q. Down here at 1-8 where it says accident or injury, serious, required medical care. It's defined as serious injury involving inmate which required offsite medical care of a serious nature. What is medical care of a serious nature?

A. Well, it says it right there, for example, extreme medical measures that requires extended time in the hospital. So if someone leaves to go get stitches and returns to the unit in an hour, no, that would not be considered extended time to a medical center. If they were admitted to a hospital, that would be extended time.

That's my interpretation of that.

Q. So hospital admissions specifically?

A. Extended time at the hospital, yes.

Q. What if you are in an emergency room setting being evaluated, receiving treatment for twenty-four hours but are not actually admitted?

MR. CALVIT:

Object to the form.

THE WITNESS:

There's a lot of hypotheticals that could be read into this, but I'm going to stand by extended time in the hospital. If someone went to the hospital to get stitches, no, I'm not going to consider that extended time.

MS. CUMMING CONTINUES:

Q. I understand that. But I guess I'm trying to understand, you said this is a paint by numbers sort of thing. So the shift supervisor should be able to look at this document and say, okay, this is clearly a

priority one. But if you've got someone who has gone to the hospital, they're stabbed in the lung, you don't know if they're going to be admitted or not, they need to decide if it's a level one, a level two, how would you guide that person?

MR. CALVIT:

Object to the form.

THE WITNESS:

I think you would need to read the other stuff in there other than just one. There's a critical act. So if someone got stabbed in the lung, I would assume that's a criminal act.

MS. CUMMING CONTINUES:

Q. So 1-12, criminal act, any alleged criminal act committed by a person at the facility, to result in criminal charges.

A. Right. So you can't just rely on 1-8 to be the determining factor. There's twelve other possible scenarios that could necessitate level one.

Q. If someone receives a battery, which could be charged criminally, would that

be a level one?
A. Is it listed on there? Assault or sexual assault of any kind. So if someone was assaulted and they had injuries, yes, it falls under level one. It's 1-10.
Q. I'm looking at criminal acts. So someone is hit. They may not be stabbed, they may not be seriously injured even. They have lacerations and bruising. But if someone hit me and bruised me and caused lacerations and I wanted to press charges, that could result in criminal charges, correct?
A. Theoretically, yes.
Q. Okay, so criminal act, if someone gets hit, would that be a level one?
MR. CALVIT:
Object to the form.
THE WITNESS:
I would have to know all the details of it and so would the person filling out the report. A mutual combat fight, probably not.
MS. CUMMING CONTINUES:
Q. But if someone is sort of

standing there and someone comes up and sneaks them, would that be a level one?
MR. CALVIT:
Object to form.
THE WITNESS:
I don't know how to answer that question without knowing all the details surrounding it.
MS. CUMMING CONTINUES:
Q. I'm going to show you Exhibit 19. This is fourteen pages. I'm not going to scroll all fourteen pages. Let's look at page two. It says critical incident log and then it's got a bunch of different handwriting on it, critical incident number. Are you familiar with this document?
A. Yes, ma'am.
Q. Do you know how this is compiled?
A. Yes. It's in numerical order.
Q. Is it one person sitting down and filling it out or is it a bunch of different people filling it out?
A. It's a perpetual log. So it can be A shift, B shift, C shift, D shift, and it

goes into perpetuity.

Q. Do all of the LaSalle operated facilities use a log like this?

MR. CALVIT:

Object to the form.

THE WITNESS:

Yes, all the LaSalle facilities maintain a critical incident log.

MS. CUMMING CONTINUES:

Q. At Madison do you know where this critical incident log was kept?

A. Not the specific location. It was somewhere accessible by each of the shift supervisors.

Q. The shift supervisors, were they the ones who were responsible for filling out the date, the time, the level, the nature of the incident, the report number?

A. That's correct, yes.

Q. If a shift supervisor enters the critical incident does that mean that they are the ones who are responsible for, you know, investigating, looking into the incident?

A. Not necessarily by themselves,

no.

Q. Who all would be involved in looking into it?

A. Can you repeat that?

Q. You said the shift supervisor would not be responsible for looking into an incident by themselves. Who else would share in that responsibility?

A. It would be a culmination of the shift supervisor, sergeants, lieutenants, other correctional officers. It could be anyone that would help him or her and assist him or her in gathering information necessary to fill out the report.

Q. Who is the person who's kind of the point person who has the ultimate responsibility for gathering all of the information, looking over it, putting it all together, you know, taking responsibility for it?

A. Ultimately it's going to be the shift supervisor's responsibility to ensure that it gets done.

Q. And what is the purpose of the critical incident number?

A. That's the number in the system that was assigned to it. Those are kept in a repository at our office in Dripping Springs, at our regional office.

Q. Does anybody go back and look through critical incidents for patterns or trends or anything like that?

A. None that I'm aware of, no.

Q. Do you know why it is that the critical incidents are kept in that repository at Dripping Springs?

MR. CALVIT:

Object, calls for speculation.

THE WITNESS:

One of the primary reasons is so we can retrieve those any time we need to review something, such as what we're doing today, when litigation is filed and things like that.

MS. CUMMING CONTINUES:

Q. Outside of litigation are there any other occasions when you would look back at critical incident reports?

A. No, not really. I mean, there

has not. I'm not saying there couldn't be, but there hasn't.

Q. I show you Exhibit 20. Have you seen anything that looks like this document before?

A. I'm not familiar with that exact form, no. I recognize the information that it's asking for, but I'm not familiar with that form.

Q. Let me show you the full thing. And then you go back up to the top, this goes to Tyrone Mays, basic jail guidelines. But you did not receive this form or review it or anything like that?

A. No. That form went to Louisiana Department of Corrections.

Q. And you didn't get a copy?

A. No.

Q. This next one is going to be Exhibit 21. Tell me when you're ready for me to scroll. Same question. Are you familiar with this form, have you seen it before?

A. No, I don't think that's something that I would have been copied on, no.

Q. I'm going to show you all six pages quickly just to confirm. And tell me if there's something that catches your eye and you want me to stop. This is not familiar though, the form?

A. No. That doesn't look like a form anybody would have sent me with all the information of basically every facility in the State of Louisiana, no.

Q. The northeast region.

A. There's a lot of them that I have nothing to do with. So that form was obviously the property of someone else.

Q. It's a quarterly summary report for the basic jail guidelines. It's compiled by Tyrone Mays. But you never got a copy of it?

A. No.

Q. Would you get notified of critical incidents at each of the facilities in Louisiana?

A. Yes.

Q. And would you get notified of all levels of critical incidents?

A. No.

Q. What levels of critical incidents would you receive notification of?
A. All level one I would receive a telephonic notification and then all level twos I would receive an e-mail typically once it was filed. And level threes remained on the facility level and did not require upper notification.
Q. And you said once it was filed, that's the critical incident report?
A. Yes. The facilities have twenty-four hours to file the initial, and then I would get an e-mail. Whenever they sent that to the office in Dripping Springs I would also be on that mailing list. On level ones I would get a telephonic call basically immediately or as soon as possible. And then level threes, those were maintained at the unit level and did not require higher level notification.
Q. So there is an incident reporting packet that's described in the critical incident reporting policy. We can go back through the policy and go through it painfully, but does that sound right?

A. You say incident reporting packet?

Q. Yes. There was like an initial incident report, there are witness statements, there are staff statements, there's an injury report, there's a supervisor summary, there's a facility and executive review, a whole packet of documents that gets put together related to critical incident; does that sound correct?

A. If it's a level one or two, yes. Level threes do not require the complete packet be filled out, only the initial document.

Q. Thank you for that clarification. All right, we're talking only about level one and level two right now. If that packet has to be put together beyond the notification you get by phone or by e-mail do you receive that full packet of information?

A. At some point, yes. Again, we're talking theoreticals. Some take weeks if not months to finalize. Worse case scenario, death in custody, waiting on toxicology reports, all of those things could

delay the final filing of that report.

Q. But once it's final, then you get a copy of that full critical incident report?

A. Yes. I would be on the e-mail as it's sent up to a lady in our office named Jennifer Collette who is the keeper of all of those records. I would be on e-mail distribution.

Q. Prior to the critical incident being finalized would you ever have reason to receive parts of it or to have any kind of input into any kind investigation or review of an incident?

A. I would get the initial notification obviously and I could and have at times followed up with particular bits and parts of it, such as discovery of contraband, hey, how this arrives, who may have brought this, how did it get into our institution. Those types of questions, yes, I could ask those.

Q. How often would you follow up on a specific incident?

A. I didn't have any set pattern.

Just as I worked through them to try and determine. If something I read caused me to have questions in my mind I may follow up with the warden about that.

Q. What sort of things would raise questions for you?

A. Obviously if we had a death in custody or something. I would be anxiously awaiting to hear what the cause of death was. So I might call periodically, say, hey, has the sheriff's office received toxicology reports yet? Because we as a private company don't receive that information, local law enforcement would receive that as well as criminal charges. If the inmates chose to pursue or we chose to pursue we would have to depend on local law information to provide additional information.

Q. If local law enforcement was not involved, if the sheriff's office did not respond or was not called in -- and now I'm talking specifically about Madison -- was there anybody at Madison tasked with conducting investigations?

A. The facility personnel don't

have any investigatory abilities. We can't compel anyone to cooperate with us in an investigation of a possible crime.

So to answer your question, if the local law enforcement chooses to or not to investigate something, it's outside of our control.

Q. So talking about criminal investigation for purposes of bringing charges. What about for the purpose of looking at facility operation and identifying what caused the incident to happen and developing corrective action plans to prevent it from happening in the future? Was there any kind of -- I'll use the word investigation, but we could also use root cause analysis, corrective action planning? Whatever word LaSalle uses that you want to use for that.

A. It's just basic sound correctional management. We try not to keep people together who didn't get along well. We try within reason to separate those people. If we had officers that we suspected were introducing contraband we could enhance

searches at the front door, search people on random suspicion, we could even administer drug tests on a random suspicious basis. Yes, we can take those types of steps. But we have no law enforcement ability to launch criminal investigations or compel anyone to cooperate with the investigation if they chose not to.

Q. If someone was looking into an incident related to a critical incident report does LaSalle's staff at Madison have access to cameras or cell phones with cameras to collect photographs that would be useful in reviewing a critical incident?

A. We didn't allow cell phones or cameras inside the facility. And the video surveillance system within the facility functioned on a very limited basis at best.

Q. When was there a video surveillance system in Madison?

A. Sorry, when?

Q. Yes.

A. When it was installed?

Q. Yes.

A. I have no idea. What was there

when I got there was there when I left and it was not a fully functioning system.

Q. What was there when you got there?

A. Cameras in the ceiling and a recording device in the closet that, as I stated earlier, was very limited in its functionality.

Q. You said cameras in the ceiling. What ceilings had cameras?

A. Different throughout the facility.

Q. Were there cameras in the ceilings of the dorms?

A. In some locations, yes.

Q. And in Buildings 3 and 4 were there cameras in the dorms?

A. In some locations, yes.

Q. And you said that there was a recording box in a closet; is that right?

A. There were recorders, a series, a stack of recorders. Typically each recorder can only have sixteen ports, so that means sixteen cameras, can run through one recorder. If you have more than sixteen you

have to add another recorder. And that system was very limited in its functionality.

Q. What do you mean when you say it was very limited in its functionality?

A. It had considerable age, use and destruction. Parts of it had been destroyed, tampered with by inmates, and wasn't functioning.

Q. What parts of it had been tampered with by inmates?

A. The parts they could reach and access which was in the ceiling. So they could break the camera lens or cover the camera lens with paper or whatever.

Q. Other than going to the recording box was there a place where you could see the feed from the cameras?

A. No, ma'am. If the lens was covered or the camera wasn't working, there was no video.

Q. I'm not asking if the camera lens was broken. I'm saying if there was a camera lens was there a place that the feed if it existed would go, you know, would show up on a monitor?

A. Yes.
Q. Where was that?
A. That would have been in the security supervisor's office. That I know for sure. And I believe it was in the control room.
Q. If there was an incident that happened and someone was looking into it for a critical incident report would someone go and check to see if it happened to be one of the units where the camera lens wasn't covered or the camera lens wasn't broken?
MR. CALVIT:
Object to the form.
THE WITNESS:
I can't speak to what they did each time, but yes, that was a part of the normal practice and procedure. If an incident had occurred check to see if there was any video available to retrieve.
MS. CUMMING CONTINUES:
Q. And if there was video available to retrieve how is that video preserved?
MR. CALVIT:

Object to form. Go ahead.

THE WITNESS:

It would most typically be downloaded onto a disk or a zip drive.

Q. And where would that disk or zip drive be kept?

A. If it was evidence of a potential crime it would be presented to the law enforcement agency when we requested their assistance. Otherwise, it would usually be maintained in an envelope with the critical incident report.

Q. And the physical critical incident report, where would that go?

A. A copy was maintained at the facility and an electronic copy sent to the regional office in Dripping Springs.

Q. When LaSalle left Madison did LaSalle take with it the physical copies of the critical incident reports that may have also included physical attachments like disks or hard drives or things like that?

MR. CALVIT:

Object to form.

THE WITNESS:
To my my knowledge, no.
Q. Do you know where at Madison those physical files were kept?
A. I know they were kept in more than one location. Some of them were kept at what we refer to as the women's center. There was an admin building there. And some were maintained there. And then on the Building 3 and 4 side there was another location where they had the file cabinets in the file room and maintained stuff inside the file room.
Q. Was that in that Building 3 administrative office area?
A. That's my recollection, yes. Now, if they were taking them off site to another location due to space, I'm not sure.
Q. Did you yourself or did you direct anybody or ask anybody to have either the building owners or the Madison Parish sheriff's office or Madison Parish law enforcement district to repair the cameras that were broken?
A. I did.

Q. How did you make that request?
A. I made that request in person to the owner of the facility.
Q. That was Mr. Verner?
A. Yes, ma'am.
Q. When did you make that request to Mr. Verner?
A. I don't recall the exact date and time. It was somewhere within the first six or eight months of my interactions with that facility.
Q. What was Mr. Verner's response to your request?
A. I don't recall his exact response but it never got done.
Q. Did you follow up after that in-person meeting with Mr. Verner?
A. I don't think I had any follow-ups with him about that, no.
Q. Did you have any other follow-ups with Mr. Verner about anything?
A. No. I just met Mr. Verner periodically, you know. He owned lots of land around there and I would see him passing by the facility and just speak. But no, no

other follow-ups.
Q. Did you ever ask anybody at LaSalle if there was anything that LaSalle could do to fix those video cameras?
A. I mentioned it to my boss and it was determined that that was the responsibility of the property owner to upgrade that system or to maintain that system.
Q. Did you ever talk to anybody at the Madison Parish sheriff's office or Madison law enforcement district regarding the repairs to the video system?
A. No.
Q. So there was video at Madison when you were the director of operations for Louisiana from 2019 to 2021. It was limited in its functionality, but it did exist, is that right?
A. The system existed, but it was useless to try to retrieve anything because it was basically nonfunctioning. The system was there, but it just wasn't functioning.
Q. Did anyone try and receive information from that system from 2019 to

2021?
A. Certainly. But there was nothing to retrieve because ninety percent of the cameras was not functioning and there was no video to retrieve.
Q. But for the ten percent of cameras that were functioning, someone did retrieve that video?
A. If it was applicable to what we were trying to find, yes.
Q. And if someone did retrieve video from a camera that was functioning, that ten percent, that would be attached as either a disk or a flash drive to the physical critical incident report and kept with that file; is that right?
A. That's correct. Or it would be provided to the local law enforcement entity who we had asked for assistance.
Q. What about photographs, were photographs ever taken as part of a review of a critical incident?
MR. CALVIT:
Object to the form.
THE WITNESS:

Yes. Typically photographs were taken of inmate injuries and they would be attached to the incident report in the same manner as the video would have been if it were available.

MS. CUMMING CONTINUES:

Q. So the physical photograph would be attached. What about the digital copies of the report that are sent to Dripping Springs, would there be photographs attached to those?

A. Yes. There would be digital photographs then copied onto paper and sent as part of the CI.

Q. How were the photographs taken?

MR. CALVIT:

Object to the form.

THE WITNESS:

How were they taken? I don't follow that question.

MS. CUMMING CONTINUES:

Q. Were they taken with a camera, were they taken with a cell phone that had a camera on it, how were the photographs taken?

A. Both ways. The facilities were assigned digital cameras and they had those cameras available. There were occasions when a battery had gone dead on a digital camera, whatever. In that case, the shift supervisor who was allowed to have a cell phone could utilize a personal cell phone, take a photograph. Or utilize cell phones of such as the major or warden and then we would have gotten the photos from there.
Q. Did the lieutenants have like a shift cell phone that they had when they would come onto the facility?
A. I don't know. I don't recall that detail very clearly.
Q. So if someone took a photograph of an injury how was that photograph distributed?
A. It would be downloaded and made a part of the incident report.
Q. Downloaded to where?
A. Printed off on a color printer on a piece of paper and added to the critical incident report.
Q. But there's also a digital part

of the incident report, correct?
MR. CALVIT:
Object to the form.
THE WITNESS:
Yes, you could copy it and send it on the zip drive. Yes, the pictures would be there if there were any pictures that were part of the report.
MS. CUMMING CONTINUES:
Q. Would you or the wardens or the assistant wardens receive texts of the injuries as part of the notification, that initial notification?
A. Receive what?
Q. Texts or e-mails.
A. I don't know about texts. E-mail.
Q. You would get an e-mail?
A. (No response)
MR. CALVIT:
I don't know that y'all are talking about the same things. You were talking about photos. I'm not sure what you're talking about.

MS. CUMMING:
I will clarify.
MR. CALVIT:
Thank you.
MS. CUMMING CONTINUES:
Q. If someone takes a picture of an injury at Madison do they text or e-mail you that photograph of the injury?
A. They would attach a copy of that photo to the original incident report and it becomes part of that package you talked about earlier.
Q. So for a level one where you get a phone call, not necessarily an e-mail but a phone call, would you have gotten separate from the initial incident report, because it may be before the initial incident report, would you have gotten a text or an e-mail with a photograph of the injury?
A. No.
Q. For a level two where you are getting the incident report and that's how you're getting notified by e-mail, the photograph would be attached to that; is that right?

A. Once the packet was complete. I did not get photos with the initial report when they were calling me within an hour of the incident occurring, no, I didn't get photos with that. I only got a phone call.
Q. I want to show you what is going to be Exhibit 21. This is twenty-seven pages. I'm not going to go through all twenty-seven pages. We'll start with this document checklist. Does that form look familiar to you?
A. Yes.
Q. And this form indicates all of the incident reporting forms that would be included in this critical incident report; is that right?
A. Yes.
Q. So that's page one. Page two, this is the initial incident report for a level two, this is what you would receive by e-mail; is that correct?
A. Yes.
Q. This looks like it's a level two, Lieutenant Puckett. It looks like Anderson, Stinson, Major Farmer and Major

Chase were notified by Lieutenant Puckett at eleven-thirty. And it looks like you were notified at two-four-four a.m. the following day by Arthur Anderson. Do you recall that?

A. No, ma'am, I don't recall that one specifically.

Q. All right, this document, page three, the facility and executive review, this is to you; is that correct?

A. Yes.

Q. This is the whole document so it looks like it was prepared by Steven Chase on 6-22. But just for reference, this incident happened on 10-18 at around eleven-fifteen p.m., right?

A. Right.

Q. So this document that's prepared, you know, two-and-a-half, three weeks later by Major Chase, what is the point of this facility and executive review form?

A. It was finalized. They have fifteen days to finalize the report. And that's all this is, is just the final report.

Q. You receive this document. And when you receive this document do you receive

it with the packet of everything else?
A. Yes.
Q. So you don't receive this document separately?
A. No.
Q. And how do you receive the packet, is it by e-mail?
A. Yes.
Q. And it includes all of the attachments, right?
A. Yes.
Q. This is the supervisor summary of the incident on page four. What distinguishes the supervisor summary of the incident from the initial incident report?
A. Because the initial could be a sergeant filling it out. And then the supervisor would be the supervisor of the department. And in this case it was the major who reviewed it and either concurred or had other questions about what went on.
Q. So this just happens to be Lieutenant Puckett who happened to write the initial --
A. That's right.

Q. -- a more detailed description of what he did, what he saw?
A. Yes.
Q. Do you recall reviewing this report?
A. I don't recall that particular report, no.
Q. This is page five, the supervisor summary of the incident. This is the second page of that where it was staff witnesses and then it's got --
A. Go back up, scroll back up. Okay, right there. It says it, yes, provide notification and information below. And there's an example where they immediately contacted the Madison Parish sheriff's department on 10-18 at twenty-three thirty-six in the morning. So at eleven thirty-six they notified the sheriff's department that we had a potential crime.
Q. Did the Madison sheriff's office respond?
A. That, I do not know.
Q. All right, but Madison was made aware, the sheriff's office was made aware

that a crime had happened?
A. Yes.
Q. All right, page six, this is the third page of the supervisor summary. Inmate participants and witnesses. Would a supervisor ever pull a tier roster so that if somebody needed to come back and look at who all was on the housing unit at the time of an incident, you know, they could see who that was and maybe identify other witnesses?
MR. CALVIT:
Object to the form.
THE WITNESS:
They could. I don't see the reason why. Because they could always pull that tier roster at any time they wanted to. There's no urgent need to do that that night. They captured the ones they believed to be the witnesses, in this case four different people.
MS. CUMMING CONTINUES:
Q. So October 18, 2020, Lieutenant Puckett is pulling the people that he is pretty sure are involved in things that

happened on 3B.

A. Uh-huh (indicating affirmatively).

Q. But let's say three or four days later on, say, October 25, new information comes to Lieutenant Puckett's attention. And he's thinking, jee, I wonder if I could get some more witnesses to that thing that happened on October 18. Where could he go to get the specific tier roster that reflects everybody who was on that unit on October 18?

MR. CALVIT:

I'm going to object to the form.

THE WITNESS:

At that point he probably should not be doing that. Because it had been referred for criminal prosecution. So at that point anyone choosing to talk to inmates should be a criminal investigator. And we make it a point to try not to muddy the waters once there's a criminal investigation.

MS. CUMMING CONTINUES:

Q. All right, there's no criminal

investigation happening. I can tell you there wasn't that happened with this. Madison Parish sheriff may have been involved, but they did not investigate this criminally. So take the criminal investigation off the table. I just want to know about what procedure Lieutenant Puckett, for example, would take if he wanted to get a historic tier roster from an earlier date.

MR. CALVIT:
Object to the form.

THE WITNESS:
It could be printed from the jail system at the facility at any time.

MS. CUMMING CONTINUES:

Q. So even if people had moved off and on the unit you can go back to October 18 and look at who was on that unit on October 18; is that right?

MR. CALVIT:
Object to the form.

THE WITNESS:
That is correct.

MS. CUMMING CONTINUES:

Q. That is the function of the PTS?
A. It's termed JMS. That's the jail management system. And there are many brands of that out there. This one happens to be PTS.
Q. So there are many brands of jail management system. This particular one, PTS, does have that functionality to pull historic tier roster, correct?
A. Yes, to the best of my knowledge, that is the basic function of all of them.
Q. So this is the witness statement of Jonathan Knox. Do you know how employee witness statements are taken in critical incident reviews like this?
A. Each officer is provided with a statement and they write or type their own statement in their own words.
Q. Does anybody go through and conduct an interview with the officer?
MR. CALVIT:
Object to the form.
THE WITNESS:
Conduct an interview?

MS. CUMMING:
Yes.
THE WITNESS:
Well, there it is right there, there's the officer's statement. So there's no interview of them. They provide their statement.
MS. CUMMING CONTINUES:
Q. So they sit in a room and they write out their statement, they have no one questioning them, no one prompting them, no one requesting specific pieces of information; is that correct?
MR. CALVIT:
Object to the form.
THE WITNESS:
We don't prompt them. As a matter of fact, part of their training is they are told not to prompt people on how to make a statement. It's their own independent statement.
MS. CUMMING CONTINUES:
Q. So here we've got Knox and I believe there's another statement from

Tillman. Were Knox and Tillman separated prior to making their individual statements?

MR. CALVIT:

Object to the form.

THE WITNESS:

I was not present during the time they were writing the statement so I don't know the answer to that.

Q. As a matter of procedure should they have been?

A. As a matter of procedure each officer is writing their own statement. There's no procedure in place that says you have to be in separate rooms with site and sound separation, no, we don't have that.

Q. Going down to page twelve, this is witness documentation. It looks like this is from Darius Mikel. This was on Three Bravo dorm where the incident happened. And he says: I ain't seen nothing, I was asleep. Do you know why Mr. Mikel was selected to give a statement?

A. I'm going to assume he lived in the same dormitory and was in close proximity

to wherever the incident occurred.

MR. CALVIT:

You don't have to assume anything.

THE WITNESS:

The only reason he would be selected is he would be in the general vicinity of the incident.

MS. CUMMING CONTINUES:

Q. But there is not indication on this form as to why he was selected to give a statement?

A. No. Other than the words "witness documentation" at the top.

Q. And there is no indication on the form of the circumstances under which Mr. Mikel was approached or interviewed or how the statement was gotten, correct?

A. That's correct.

Q. And you don't know, you don't have knowledge of that, correct?

A. No.

Q. On page fourteen, this is a statement from Timothy Kordish. Looking at this document, is there any indication of why

Timothy Kordish was requested to give a statement?

A. No.

Q. Is there any indication of the circumstances that Mr. Kordish wrote down the statement that he didn't witness anything?

A. No.

Q. Is there any indication of who requested that Mr. Kordish give this statement?

A. No.

Q. And you don't have any personal knowledge of that, correct?

A. No.

Q. If there were any other statements taken of people who were on that housing unit would they appear in this packet?

A. They should, yes.

Q. This is page sixteen, an accident or an incident report. These accident and incident reports, these would be included in the packet that you receive of the critical incident, correct?

A. That's correct, yes.

Q. And then here is -- that's the full twenty-seven pages.
Was there any investigation, review, any steps taken to determine if staff were at their posts when this incident happened?
MR. CALVIT:
Object to the form of the question.
THE WITNESS:
I'm not aware of any.
MS. CUMMING CONTINUES:
Q. And that's not reflected in any of the documents that we've just scrolled through, correct?
A. I'm sorry?
Q. In any of the documents that we just scrolled through there's not any indication of an investigation of staff to determine if they were at their posts?
A. No, ma'am.
Q. Do you know who was supposed to be in control at the time?
A. No, ma'am. That would require looking back on the roster to see.

Q. That's the drop sheet that we were looking at earlier?
A. Yes, ma'am.
Q. Did you yourself or did you direct anybody to look back at the roster to see who should have been in control at the time?
A. No.
Q. The people who were involved in this were Howard Willis, Mitchell Treaudo and Brian Harris who were the attackers. They attacked James Murray. I think that was in Lieutenant Puckett's summary. We can go back up there if you want to confirm --
MR. CALVIT:
Object to the form.
MS. CUMMING CONTINUES:
Q. Do you know if Brian Harris was disciplined as a result of this incident?
A. I don't know the answer to that.
Q. Do you know if Brian Harris was placed on lockdown as a result of this incident?
A. I think I read somewhere that he was. I didn't know before that. I think if

you scroll back it says they were.
Q. That's based on what you see in this report, correct?
A. Yes.
MR. CALVIT:
Like every other question he's answered for the last hour.
MS. CUMMING CONTINUES:
Q. This is page nine. Is that what you're referring to?
A. Yes.
Q. So that, you're drawing from this report. But you don't have any independent knowledge of that, correct?
A. No.
Q. Did Howard Willis have a disciplinary hearing?
A. I don't know.
Q. Other than what you see in this document do you have any independent knowledge whether or not Brian Harris had a disciplinary hearing?
A. No.
Q. Do you have any independent knowledge of whether Mitchell Treaudo had a

disciplinary hearing?
A. No.
Q. Are you aware or do you have any independent knowledge beyond what's in this document of Willis Harris or Mitchell Treaudo's legal status; were they sentenced, were they pretrial?
A. No.
Q. Are you aware of what Mr. Murray's legal status was, was he sentenced or was he pretrial?
A. No.
Q. Did you or did you ask anybody to determine whether or not what Willis Harris's, Treaudo's and Murray's legal statuses were?
A. No.
Q. Did you direct or did you request anybody to direct any action to prevent future attacks similar to this one?
A. I don't understand that question. That's something we do every day. Can you ask the question again, rephrase it?
Q. Sure. So this incident happens. Did you or did you direct anybody to review

procedures to see if there was something that could be improved to try and prevent a fight like this from happening again?

A. Not specific to this incident.

Q. Was the information related to the fight between Harris, Treaudo, Willis, and Murray provided to classification?

MR. CALVIT:

Object to the form.

THE WITNESS:

I don't know the answer to that, either.

MS. CUMMING CONTINUES:

Q. This is going to be Exhibit 23. This is fourteen pages. This is MPM55 dated 11-23-20 at four p.m. Going to the facility review on page two. This is prepared by Major Chase. Do you recall this incident?

A. No.

Q. This is the facility and executive review. It says it's directed to you. Did you receive the critical incident packet related to this incident?

MR. CALVIT:

Object to the form.

THE WITNESS:
It's printed right there that I received an e-mail.
MS. CUMMING CONTINUES:
Q. You're referring to where it says to director of operations and then it has your name printed, James McCormick, and it has the incident number, is that what you're referring to?
A. Yes, ma'am.
Q. So this to you indicates that you received this packet, correct?
A. That's correct.
Q. And in this facility executive review Major Chase indicates that Mr. Murray was being physically attacked, being beat across his back with a belt, and that he refused to give the names of who was beating him after he was questioned by security staff. Do you see that?
A. I see that, yes.
Q. Here is the initial incident report on page three. It looks like you were notified by Warden Anderson at five-thirty. Warden Anderson was notified at five

twenty-seven by Lieutenant Meadows. You were notified at five thirty-one p.m. by Warden Anderson at eleven twenty-three twenty that same day. Do you recall that?

A. I don't recall that, but it says I was.

Q. This is page four, it's a supervisor summary --

MR. CALVIT:

Has there been something to show this is one or two?

THE WITNESS:

It was 1.11.

MS. CUMMING:

The priority level, is that what you're asking about?

MR. CALVIT:

Yes. There it is.

MS. CUMMING CONTINUES:

Q. All right, this is the supervisor summary. It only lists Robert Thornton as a witness, even though Lieutenant Meadows was also there and then it --

MR. CALVIT:

Object to form.

MS. CUMMING CONTINUES:
Q. Supervisor summary page three only lists James Murray. Do you disagree that that's what it says?
A. That's what it says.
Q. And then page seven is Robert Thornton's statement. Page nine, this is witness document for James Murray. Here James Murray provides a statement. Take your time and read it. He named specific people to the best of his ability who were beating him including giving Vick Meadows a first and last name. Do you see that?
A. Yes.
Q. Do you know why it says Murray refused to give names when questioned?
A. I do not know.
Q. Did you question Major Chase regarding this write-up in the executive review?
A. No.
Q. Did you direct anybody to question Major Chase about why he included that line about Murray refusing to give names in the executive review?

A. I don't recall, no.
Q. Did you or did you direct anybody to conduct any investigation to determine if all staff were at their posts during this time?
A. No, I did not.
Q. Did you or did you instruct anybody to look back at drop sheets to determine what posts were assigned to what staff at the time of this incident?
A. No.
Q. Are you aware of the custody status of Vic Meadows, Rufus, Smoke, or Nick?
A. No.
Q. Are you aware of the custody status of Mr. Murray at this time?
A. No.
Q. Did you take any steps or direct anybody to take any steps to review this incident and determine what operations or procedures could be improved to prevent another assault like this from happening?
A. No.
Q. All right, this is going to be twenty-four --

MR. CALVIT:
Elizabeth, how much longer do you intend to go?
MS. CUMMING:
Not much longer. I mean, I think fifteen minutes.
MR. CALVIT:
Thank you, okay.
MS. CUMMING CONTINUES:
Q. All right, this is Exhibit 24. This is sixty-five pages. We won't go through all sixty-five pages. This is incident number that ends in MPM50. I will just tell you there are two incidents that are under the same critical incident number. Do you have any idea how that came to be?
A. No.
Q. Have you seen just on page one, this form that's listed as the critical incident reporting. And then it's got some reporting forms and it's got some handwriting on it. Not getting into the handwriting and the highlighting, just the form itself, have you seen that form before?
A. Yes.

Q. When have you seen that form before?
A. That's a form that's -- not this specific one, but the form is used by Jennifer Collette as she goes through the review process to see if there are any missing documents. And then she notifies the facility what is missing so they can get it in for completion.
Q. Do you know how and why this form came to be generated?
MR. CALVIT:
Object to form.
THE WITNESS:
I don't. It's Jennifer's form. She would have to explain that.
MS. CUMMING CONTINUES:
Q. So this first incident involves -- this is the facility and executive review on page five involving Allen Williams and Kevin Cook. I'm not going to ask you any specific questions about that. It does appear you were notified at four forty-four. That's page six, you are looking at Sergeant Kimble Marshall's designation as a priority

two. And this indicates that you received notification at four forty-four a.m., about an hour after Arthur Anderson was notified, and Arthur Anderson notified you. Do you see that?

A. I see that.

Q. Do you recall being notified for this incident?

A. No, I don't remember.

Q. I'm going to skip down to page forty-four. This has the same critical incident number, but this occurred on January 20, 2021 at ten-thirty a.m. This is page forty-four. This indicates that videotape was retained at unit level with the original critical incident packet. Do you see that on forty-four?

A. Yes.

Q. Do you know why it would be checked that videotape was retained, but then the camera is not working?

A. I don't know why.

Q. Do you know whose handwriting that is?

A. I do not.

Q. This is forty-five. This is the initial incident report. This is also a level two according to Cantrell Guice. Arthur Anderson was notified at ten-thirty a.m. by Captain Murray. And it appears that you were notified verbally at eleven-thirty a.m. by Arthur Anderson. Do you recall being notified of this incident?

A. No, I do not.

Q. On page forty-six, this is the facility and executive review. This relates to Latavius Paschal being physically attacked by unknown offenders. This was again prepared by Steven Chase.

A. Yes.

Q. So he could not identify or he said Latavius Paschal had been attacked by unknown offenders. Going back up here, this indicates that this was also sent to you, correct?

A. Yes, it does.

Q. This full packet was sent to you when it was completed, correct?

A. Yes. I would have been on the e-mail list when it was sent to Jennifer

Collette, yes.

Q. And this is forty-seven. This is the supervisor summary incident written by Lieutenant Cantrell Guice. Lieutenant Guice writes: I asked offender Paschal, "Who jumped you?" And he replies back to me, "Lieutenant, I'm not a snitch." Do you see that?

A. I'm reading it now. Okay.

Q. So a statement from Frost on page fifty. A statement from CO Wiggins on fifty-two. And that is on page fifty-four, this is a witness documentation and statement from Latavius. He's pretrial. And Latavius says in his statement that he was laying in bed when offender Don Dorsey started attacking him and that Dexter Long also started attacking him with a knife. He then also provides Rufus Demarcus's name and his statement. Do you see where I'm talking about?

A. I do, yes.

Q. Do you know how it came to be that Lieutenant Guice wrote in his supervisor summary that Latavius Paschal refused to name

who was attacking him when he provides three full names in his statement?

A. We need to look at what date and time the statements were written, both the lieutenant's statement and the inmate's statement.

Q. The Latavius statement is dated 1-20-21. The date is at the bottom. So Latavius's statement. It looks like the time is ten-twenty a.m. Do you see it?

A. I see it.

Q. The supervisor summary is also dated 1-20-21 and it is also timestamped ten twenty a.m.

A. The answer to your question is no, I don't know why.

Q. And then going back up to the facility and executive review, that was prepared by Steven Chase on February 1, 2021, so that would be after Latavius Paschal's dated statement, correct?

A. Yes.

Q. Major Chase is saying that Latavius Paschal was physically attacked by unknown offenders, correct?

A. Correct.
Q. Is there any indication in Major Chase's executive review or in the supervisor's summary where they have looked into, evaluated, or done anything to follow up on Latavius's statement that he was attacked by three people whose full names he provides?
A. No.
Q. Did you or did you direct anybody to look into why no one looked into the names that Latavius Paschal provided?
A. No, I did not.
Q. Did you or did you direct anybody to review this incident and determine if there were any operational procedures that could be improved or changed to prevent fights like this from happening?
A. No, I did not.
Q. Were the three people that Latavius Paschal named as being his attackers reported to classification?
A. I do not know that.
Q. Did you direct anyone or do you know, did anyone shake down this tier after

the fight?
A. I do not know.
Q. Did you ask about a shakedown?
A. No, I did not.
Q. This is going to be Exhibit 25. The only documents I have are these two documents. It's the initial incident report from Don Murray. It looks like you were notified by Warden Anderson. I can't quite make out the time. Do you recall?
A. I do not recall.
Q. This would have been on February 18, 2021. All right, this is the supervisor summary on page two. It's the clearest. Take a look at that. Do you recall this incident?
A. No, I don't recall it specifically.
Q. Do you recall or did you direct anybody or did you look to see who was assigned to control room, rover, dorm deputy, any of those posts on this day?
A. No, ma'am.
Q. Do you recall, did you or did you direct anybody to look into whether or

not anybody had abandoned their post on this day?
A. No.
Q. Do you know where the rest of this critical incident report is?
A. No, ma'am, I do not.
MS. CUMMING:
Can we take two minutes? I think I'm pretty close to the end but I want to double check.
(At this time, a recess was held.)
MS. CUMMING:
All right, I'm ready whenever y'all are. We're back on the record. I will note it's before five. I'm finished with my direct questions to you. Your counsel, counsel for DOC, may have questions. So I tender you to them. I may have some follow-ups depending on what they ask you.
MR. PERKINS:
Al Perkins. I have no questions.

MR. CALVIT:
We're going to take four or five minutes and decide what we're going to do.
(At this time, a recess was held.)
EXAMINATION BY MR. CALVIT:
Q. Mr. McCormick, when you were giving a summary of the prisons that were your responsibility in Louisiana did you omit one?
A. I omitted the LaSalle Parish facility.
Q. Going back to the questions that were asked about the operations, I'll see if I can cover them so Ms. Cumming doesn't need to.
Describe the path of detainees or the group of detainees that were kept at LaSalle Corrections, or LaSalle Correctional, in Olla, Louisiana during your tenure.
A. It was in the process of transitioning from Louisiana DOC to ICE detainees in 2019 when I came on the Louisiana side of operations. It continued

to operate as an ICE facility. And sometime shortly after I went back to the Texas side it reverted back to Louisiana DOC.

Q. What is the bed count of LaSalle Correctional?

A. Between six and seven hundred.

Q. Let's talk a little bit about, there were some comments about proprietary records. Let's talk about what you meant by that.

A. The proprietary records that I was referring to was anything created by LaSalle that was blank copies left there. We took those with us, but we did not remove anything that was operational, had already been put in place. Those stayed.

Q. And postings on the walls?

A. All.

Q. Log books?

A. All of that stayed. We left all of it.

Q. You made some mention about employee files kept forever. Do you know what the records retention policy is for LaSalle employees?

A. I do not know what the HR retention policy is, no.
Q. Did y'all remove any employee files from Madison when you left the management of Madison?
A. To my knowledge, no.
Q. You made mention of the ability at Madison perhaps to go back in time and print out something that would be, I'm not sure, you called it a dorm register, a dorm roster. Do you remember speaking about that?
A. Yes, sir.
Q. While you were at Madison did you ever ask someone to print something like that out for you?
A. No.
Q. Do you know whether Madison has checked the data to allow Madison, whoever is operating it, to create one of those?
A. I do not know the answer to that.
Q. Your testimony about being able to create one of those is based upon what?
A. My past experience using multiple platforms such as PTS.

Q. So as far as whether the data was corrupted, got lost, was overwritten at Madison, you do not know that?

A. No.

MR. CALVIT:

That's all I have. Thank you.

MS. CUMMING:

I have just one follow-up.

FURTHER EXAMINATION BY MS. CUMMING:

Q. On the LaSalle Parish facility you said that it was transitioning from holding Louisiana DOC to holding ICE detainees in 2019. Do you recall when that transition was completed?

A. I got here July of 2019. August, September timeframe of 2019, sixty to ninety days.

Q. So August, September 2019, roughly, LaSalle had the ICE detention facility, correct?

A. Correct.

Q. From 2019 to 2021 was LaSalle operating the LaSalle Correctional Center that whole time as an ICE detention facility?

A. Yes.

Q. You said after you left LaSalle Correctional went back to holding Louisiana DOC detainees, correct?
A. Correct. Now it's Harris County, Texas detainees.
Q. Did LaSalle Correctional when it reverted back to holding DOC and then the Harris County people, does that remain a LaSalle operated facility in Louisiana?
A. Yes, ma'am.
Q. Did LaSalle ever stop operating the LaSalle Correctional Center at any point from 2019 to present that you know of?
A. No.
Q. The Harris County, Texas detainees at LaSalle, are they pretrial or are they sentenced?
A. I do not know.
Q. Is LaSalle Correctional subject to the Texas jail guidelines that we were talking about when it took over Harris County detainees?
A. I don't know that.
Q. Who would know that?
A. The facility.

Q. Do you know, does anybody from the Texas department of -- I'm sorry, whoever is responsible for doing the monitoring, the audits for the Texas jail standards, do they come over to LaSalle Corrections to do audits on the facilities that are holding the Harris County detainees?

A. I don't know that.

Q. Does LaSalle Correctional Center hold Harris County people? You're not sure if they are pretrial or sentenced. Do you know if it holds Louisiana pretrial people from other parishes?

A. I don't know that.

Q. But as far as you know, it continues to be operated by LaSalle Corrections, correct?

A. Yes, that's correct.

MS. CUMMING:

Okay, that's it.

MR. ALVAREZ:

Thank you.

MS. CUMMING:

Brad, read and sign?

MR. CALVIT:

Recommend he waive.

* * * *

(At this time, the deposition was concluded.)

I, LILLIE R. BURCH, Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this proceeding was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

______________________________
LILLIE R. BURCH, CCR
Certified Court Reporter

REPORTER'S CERTIFICATE

I, LILLIE R. BURCH, Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was administered, do hereby certify that JAMES MCCORMICK, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing pages;

That this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the foregoing transcript has been prepared in compliance with transcript format guidelines required by statute or by the Rules of the Louisiana Certified Shorthand Reporter Board; and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangement for deposition services;

That I have acted in compliance with the prohibition on contractual relationships, as

defined by the Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter;

That I am not of counsel, not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

___________________________

Lillie R. Burch, CCR
Certification No. 87177