**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| ROBERT YOUNG,<br><br>Plaintiff<br><br>v.<br><br>JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, et al,<br><br>Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Docket Number:<br>3:23-cv-681-SDD-RLB<br><br>JUDGE:<br>SHELLY D. DICK<br><br>MAGISTRATE:<br>RICHARD L. BOURGEOIS |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT SHERIFF MANCUSO**

NOW INTO COURT, through undersigned counsel, comes Plaintiff Robert Young who files this Memorandum in support of his Motion for Summary Judgment against Defendant Calcasieu Parish Sheriff Tony Mancuso.

## I. PROCEUDRAL HISTORY

On October 4, 2023, Plaintiff filed his First Amended Complaint naming Calcasieu Parish Sheriff Tony Mancuso as a Defendant in both his individual and official capacities.[1] Defendant Sheriff Mancuso chose to hold prisoners in his legal custody (Calcasieu detainees) at the Catahoula Correctional Center ("CCC"). Defendant Mancuso's choice subjected these Calcasieu Prisoners, including Plaintiff Young, to a serious risk of harm because plainly unconstitutional conditions, including understaffing, lack of supervision, and lack of classification, contribute to overwhelming violence at CCC.[2]

[1] ECF No. 5. Defendant Sheriff Mancuso answered on November 9, 2023. ECF No. 13.
[2] See, infra at 10-17 and ECF No. 103-3 at 22-29 for further analysis of the violence at CCC and how understaffing and lack of classification contributed.

Plaintiff Young was incarcerated at CCC twice—first from October 2020 to June 2021 and second beginning in April 2022.[3] Both times, he was arrested in Calcasieu Parish, booked by the Calcasieu Parish Sheriff's Office ("CPSO"), and subsequently transferred to CCC to be held as a pretrial detainee.[4] For the duration of both periods at CCC, Mr. Young was incarcerated at the expense of Calcasieu Parish and remained in the legal custody of CPSO.[5]

During his first stint at CCC, Plaintiff Young was stabbed by another inmate with an ice pick, and an L was carved into his head.[6] After returning to CCC in April 2022, the violence he suffered continued: he was consistently extorted, and was beaten at least four times by a prisoner known to be "terrorizing everybody on the dorm."[7] Then, on August 8, 2022, Mr. Young was stabbed and burned with boiling water by two other prisoners.[8] He suffered a pneumothorax (partially collapsed lung), severe burns, a corneal abrasion, and several stab wounds.[9] Treatment for Mr. Young's injuries required a four-day hospital stay.[10]

As detailed below, in the course of discovery, Plaintiff has amassed documentary and testimonial evidence from Defendant that establishes his liability as to multiple Federal and State law claims set forth in the First Amended Complaint. Specifically:

- While Calcasieu detainees were housed at CCC, Defendant Sheriff Mancuso was aware that CPSO retained legal custody over these individuals and, by extension, a duty to protect them from harm.

---

[3] Exhibit 1, Deposition of Robert Young at 34:25-35:9.
[4] Id. at 23:16-18, 24:12-14.
[5] Exhibit 2, Billing Records from CCC to CPSO for Robert Young.
[6] Exhibit 1, Deposition of Robert Young at 46:9-24.
[7] Id. at 47:16-48:25; 49:1-3; 49:5-12; 52:3-8; 54:11-57:24.
[8] Id. at 54:11-57:24; Exhibit 3, Zachary Northrup Unusual Occurrence Report; Exhibit 4, Earldarrius Brooks Unusual Occurrence Report.
[9] Exhibit 5, Medical Records of Robert Young; Exhibit 6, Deposition of Robin Perrin at 101:1-19.
[10] Id. The facts surrounding the stabbing and burning of Plaintiff Young are set forth in more detail in Plaintiff's Motion for Summary judgment directed at the Louisiana Department of Public Safety and Corrections (DPSC).

- Defendant Sheriff Mancuso was aware that CCC was plagued with rampant, uncontrolled violence, resulting in multiple reported hospitalizations of Calcasieu detainees.
- Defendant Sheriff Mancuso willfully failed to take any affirmative steps to investigate known violence or to adopt or implement adequate oversight policies and/or practices to protect people in his legal custody from risk of harm.
- Defendant Sheriff Mancuso, by virtue of the failures delineated above, breached his duty to protect Calcasieu detainees, causing significant, actual damages to Plaintiff Young; multiple subordinate officers, acting in the course and scope of employment for CPSO, likewise contributed to investigative and protective oversight failures that caused harm to Plaintiff Young.

## II. Law

### A. Legal Standard for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[11] The party asserting that a fact cannot be genuinely disputed must support the assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."[12] If a party has satisfied the requirements of Fed. R. Civ. P. 56(c), then summary judgment should be granted.[13]

[11] Fed. R. Civ. P. 56(a).
[12] Fed. R. Civ. P. 56(c)(1)(A).
[13] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Summary judgment can be granted only if the inferences drawn from the underlying facts have been viewed in a light most favorable to the non-moving party.[14] A genuine issue is one that could permit a reasonable factfinder to enter a verdict in the non-moving party's favor.[15] A material fact is determined by substantive law and whether it could affect the outcome of the suit.[16]

### B. Operative Law

Plaintiff has alleged both conditions of confinement and episodic acts and omissions claims against Defendant Sheriff Mancuso in his individual and official capacities

In the Fourteenth Amendment context, the Fifth Circuit has applied Bell v. Wolfish's reasonable-relationship test to cases attacking "general conditions, practices, rules, or restrictions of pre-trial confinement."[17] This reasonable-relationship test requires that the condition giving rise to the constitutional violation "has no reasonable relationship to a legitimate governmental interest."[18] Bell v. Wolfish defines the governmental interests at play in the Fourteenth Amendment context as "restrictions and conditions on [a pretrial detainee] to ensure his presence at trial,"[19] or "appropriate action to ensure the safety of inmates and corrections personnel."[20]

For a conditions of confinement claim, "a plaintiff is not required to prove deliberate indifference."[21] Rather, "[p]laintiffs must prove the existence of a condition, practice, rule, or restriction that was so inadequate that it resulted in a serious deprivation of his basic human needs

---

[14] Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).
[15] Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
[16] Id. at 248.
[17] Hare v. City of Corinth, 74 F. 3d 633, 643 (5th Cir. 1996); ECF No. 39 at 18-19, 20.
[18] Duvall v. Dallas Cnty., 631 F. 3d 203, 2017 (5th Cir. 2011).
[19] Bell, 441 U.S. at 537.
[20] Id. at 547.
[21] ECF No. 39 at 20-22; Edler v. Hockley Cnty. Comm'rs Ct., 589 F. App'x 664, 669 (5th Cir. 2014), citing Duvall v. Dallas Cnty., Tex., 631 F.3d 203, 207 (5th Cir. 2011).

and was not reasonably related to a legitimate governmental objective."[22] A formal written policy is not required to establish a condition or practice; rather, "it may reflect an unstated or de facto policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by officials, to provide an intended condition or practice."[23]

A supervisor is liable under 42 U.S.C. § 1983 for failures to supervise or train individuals and entities under their control, and/or for polices or failures to implement policies, when the supervisor exhibits deliberate indifference towards likely or obvious rights violations arising from these failures of training, supervision, or policy.[24] This Court has previously held the standards for episodic acts and omissions claims is as follows:

> imposing liability on defendant in his *individual* capacity in such a case, a pretrial detainee must establish that the defendant acted with *subjective* deliberate indifference. A person acts with such indifference if (1) 'he knows that an inmate faces a substantial risk of seriously bodily harm; and (2) he disregards that risk by failing to take reasonable measures to abate it.' To establish liability of a defendant in his or her *official* capacity, thereby holding the municipality accountable for the constitutional violation, the detainee "must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifferences to the detainee's constitutional rights. The test for this form of indifference considers not only what the policy maker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights.[25]

---

[22] Murray v. LeBlanc, No. CV 21-592-JWD-RLB, 2023 WL 6544932, at *5 (M.D. La. Aug. 31, 2023) (citing Shepherd v. Dallas, 591 F. 3d 445, 452 (5th Cir. 2009) (internal quotations omitted).

[23] ECF No. 39 at 18 (citing Zavala v. City of Baton Rouge / Par. Of E. Baton Rouge, No. CV 17-656-JWD-EWD, 2018 WL 4517461, at *9 (M.D. La. Sept. 20, 2018 citing Shepherd v. Dallas, 591 F. 3d 445, 452 (5th Cir. 2009)).

[24] Porter v. Epps, 659 F. 3d 440, 446 (5th Cir. 2011); Gates v. Texas Dep't of Prot. & Reg. Servs., 537 F.3d 404, 435 (5th Cir. 2008) (finding supervisory liability when "(1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in constitutional injury") (emphasis added); see also Brumfield v. Hollins, 551 F.3d 322, 328 (5th Cir. 2008); Davidson v. City of Stafford, Texas, 848 F.3d 384, 397-98 (5th Cir. 2017) (defining objective deliberate indifference when supervisor fails to adopt a policy and deprivation of constitutional rights is a likely consequence of failure to adopt policy).

[25] ECF No. 39 at 19-20 (emphasis in original) (internal citations omitted).

Even when a supervisor enacts facially-valid policies, but fails to implement them in a constitutional manner, that failure constitutes an official policy that can support liability.[26] As the Fifth Circuit summarized the law in Porter v. Epps: "[a] failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[27] The Fifth Circuit went on to clarify: "[t]o establish that a state actor disregarded a known or obvious consequence of his actions, there must be actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights and the actor nevertheless chooses to retain that program."[28]

Finally, pursuant to Louisiana's duty/risk formulation, negligence requires proof of five separate elements:

> (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).[29]

Relatedly, La. Civ. Code Ann. Art. 2320 imposes vicarious liability on a sheriff, in his official capacity, for a deputy's state law torts committed in the course and scope of the deputy's

---

[26] See, e.g., City of Canton v. Harris, 489 U.S. at 388; Littell v. Houston Indep. Sch. Dist., 894 F. 3d 616, 624 (5th Cir. 2018); Garza v. City of Donna, 922 F. 3d 626, 637 (5th Cir. 2019).

[27] Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011) (internal quotations omitted).

[28] Porter v. Epps, 659 F. 3d 440, 447 (5th Cir. 2011) (internal quotations omitted, emphasis added); see also Doe v. Taylor Indep. School Dist., 15 F.3d 443, 453 (5th Cir. 1994) (applying the same standard in assessing individual supervisory liability claims as used in assessing municipal liability). The Fifth Circuit has recently re-articulated and re-affirmed Porter's constructive notice standard for a showing of deliberate indifference. See Crittindon v. LeBlanc, 37 F.4th 177, 186 (5th Cir. 2022), cert. denied, 144 S. Ct. 90, 217 L. Ed. 2d 21 (2023) (holding supervisory liability may be found for failure to adopt policies if such failure results in constitutional injuries: "when the officials act, or fail to act, with deliberate indifference, a disregard for a known or obvious consequence of their actions. Plaintiffs must introduce evidence that each Defendant had actual or constructive notice that their failure to adopt policies would result in constitutional violations.") (internal quotations omitted).

[29] Boykin v. La. Transit Corp., 96-1932, p. 8 (La. 3/4/98).

employment.[30] This code provision is read in conjunction with LA. R.S. § 42:1441, which limits the liability of the state for damages caused by, among others, Sheriffs and their employees. The statute preserves individual and vicarious liability, however, noting that it "shall not be construed to affect any personal liability which may arise from damage caused by any . . . sheriff . . . or the employee of any such public officer."[31]

## III. Argument

### A. Defendant Sheriff Mancuso and his office are aware that they retain legal custody over Calcasieu detainees held in out-of-parish jails.

As this Court has previously held, "[a jailer] is most certainly under an obligation to carry out the functions of his office. Those functions include . . . the duty to protect a prisoner."[32] On October 16, 2020, CPSO and Catahoula Parish Sheriff's Office signed a Prisoner Housing Agreement ("PHA") to govern an indefinite arrangement wherein Calcasieu detainees would be held at the CCC.[33] The fact of this agreement's formation and subsequent memorialization is direct evidence of Defendant's awareness that CPSO maintained legal custody over, and an associated duty to protect, Calcasieu detainees while they were held at out-of-parish facilities such as CCC.

The substance of the PHA confirms CPSO's awareness as to these legal obligations. The agreement provides that "CPSO has the sole authority to release a pre-trial or sentenced prisoner not in the custody of the Dept. of Public Safety."[34] Commander Chris Domingue, CPSO's 30(b)(6)

---

[30] Riley v. Evangeline Parish Sheriff's Off., 94-0202, p. 1 (La. 4/4/94); Bellard v. Gautreaux, 675 F.3d 454, 464 (5th Cir. 2012).

[31] La. R.S. § 42:1441(B); see also Jenkins v. Jefferson Parish Sheriff's Off., 402 So. 2d 669 (La. 1981) (discussing the evolution of sheriffs' vicarious liability for deputies' actions under Louisiana law).

[32] Crittindon v. Gusman, No. 17-512-SDD-EWD, 2020 WL 1862567, at *15 (M.D. La. Apr. 13, 2020) (quoting Porter v. Epps, 659 F.3d 440, 445 (5th Cir. 2011)).

[33] Exhibit 7, Prisoner Housing Agreement, at 1.

[34] Id. at 3.

designee,[35] likewise confirmed that CPSO maintains legal custody of its pretrial detainees irrespective of the site of imprisonment:

> Q. Am I correct, though, that at least in terms of the pretrial detainees . . . these were individuals who were facing criminal charges in Calcasieu, correct?
> A. Correct.
> Q. And they were in the custody of the Calcasieu Parish Sheriff's office and y'all's detention centers on the legal basis of these pending criminal charges in Calcasieu, correct?
> A. Right.
> Q. And that legal basis for holding them in custody, those pending charges in Calcasieu remained the same even when you evacuated them to other facilities, correct?
> A. Correct.[36]

Recognizing the office's duty to protect prisoners in its custody, CPSO requires that CCC "meet the minimum standards as outlined in the LSA/DOC Basic Jail Guidelines or satisfy the American Correctional Association Standards . . . [and] must comply with all applicable federal, state, or local laws and regulations"[37] including the United States and Louisiana Constitutions. The PHA also features several reporting requirements wherein the housing agency (i.e., CCC) must notify CPSO:

- "In the event of any unauthorized release, the CPSO shall be immediately notified by the Housing Agency."[38]

---

[35] See Exhibit 8, Notice of Rule 30(b)(6). Commander Domingue is the Commander of the Calcasieu Parish Sheriff's Prison. Exhibit 9, 30(b)(6) Deposition of Christopher Domingue at 24:19-21. He was designated to testify on the following topics: 1. Efforts to locate alternatives to hold CPSO detainees and prisoners after Hurricane Laura; 2. Practices for reporting requirements for facilities holding CPSO detainees and enforcement of such reporting requirements; 3. The negotiation and perfection of the housing agreement between Catahoula Correctional Center (CCC) and CPSO; 4) Reporting and information CPSO received from CCC related to CPSO detainees; 5. Notifications CPSO received from CCC related to hospitalizations and other emergency medical care CPSO detainees received while at CCC; and 6. Reviews, corrections, and payment of invoices received from CCC for holding CPSO detainees.
[36] Exhibit 9, 30(b)(6) Deposition of Commander Domingue, at 159:12-160:5.
[37] Exhibit 7, Prisoner Housing Agreement at 2.
[38] Id.

- "Housing Agency agrees that any escape, attempted escape, staff assault, serious illness or hospitalization of any prisoner held under the terms of this contract shall be reported to CPSO as soon as reasonably practical."[39]
- "The Housing Agency will notify the CPSO of any criminal charges filed against a prisoner or of any activity that would likely result in litigation."[40]
- "In the event of a medical emergency, the Housing Agency shall proceed immediately with necessary treatment up to, and including, emergency transportation and hospitalization. In such an event, the Housing Agency shall notify the CPSO immediately regarding the nature of the illness or injury, type of treatment provided, and current location of the prisoner."[41]

Finally, the PHA included provisions that allowed for modification or termination of the agreement after reasonable notice giving "the necessary time to make arrangements for the housing and transfer of the inmates in question."[42]

As discussed below, the PHA's substantive requirements are underinclusive, poorly articulated to CCC staff, and predominantly unenforced by CPSO. Despite these failures, these provisions clearly demonstrate CPSO's understanding of its obligation to track the well-being of those in its custody and intervene to protect Calcasieu prisoners when the risks of harm become knowable.

---

[39] Id.
[40] Id. at 3.
[41] Id. at 4.
[42] Id. at 2, 6.

**B. CPSO willfully failed to take affirmative steps to investigate known or knowable violence at CCC or to otherwise remediate such unconstitutional conditions.**

Per the evidence set forth above, Defendant Sheriff Mancuso understood his duty to protect detainees in his legal custody. Despite this understanding, Defendant failed to take even the most basic steps to stay apprised of conditions his detainees were subjected to at CCC. Commander Domingue unequivocally testified that CPSO took no steps to determine if CCC met minimum correctional standards,[43] including determining if CCC had a functional classification system, adequate staffing, or adequate medical care.[44] Nor did any CPSO staff physically visit CCC in response to particular incidents or to otherwise monitor the conditions to which its detainees were subjected.[45] Indeed, when asked about such in-person visits, Commander Domingue stated that the reason for this lack of oversight was that "[w]e had our own problems at our own jail."[46]

CPSO never bothered to develop adequate systems to fully capture the violent conditions to which those in its custody were subjected. Commander Domingue testified that inmate fights were required to be reported "if it involved an injury."[47] But despite this requirement, Defendant never initiated discussions nor developed concrete standards with CCC officials to determine the

[43] Classification, staffing, and medical care adequate to protect inmates from risk of harm have long been requirements for minimally adequate jails and prisons under both the Eighth and Fourteenth Amendments of the United State Constitution and its attendant jurisprudence. See Jones v. Diamond, 636 F.2d 1364, 1375 (5th Cir. 1981); Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Farmer v. Brennan, 511 U.S. 825, 857(1994); Hare v. City of Corinth,74 F. 3d 633, 639 (5th Cir. 1996). The Basic Jail Guidelines offer evidence that the consensus of correctional officials in the state of Louisiana is that these elements are required for minimally adequate facilities. Exhibit 10, 2022 Basic Jail Guidelines at 1, 14, 18, 30-31. The PHA provides additional evidence of Defendant Sheriff Mancuso's knowledge of these obligations as it formalizes the need for the housing agency to provide functional classification—with the CPSO offering to provide "any information . . . upon request"—proper transport procedures, remote access for court appearances, and adequate medical care and staffing. Exhibit 7, PHA at 3-4.

[44] Exhibit 9, 30(b)(6) Deposition of Christopher Domingue at 96:3-8. Id. at 105:1-8, 106:9-16. Had Defendant enforced the classification requirement, he would have discovered that, not only did CCC fail to implement a functional classification system, but also that the facility did not even have an acting classification specialist. See ECF No. 103-3 at 15-19. Similarly, had Defendant enforced the provisions pertaining to medical care, he would likely have spoken to CCC's two nurses, both of whom treated violence-induced injuries on a near-daily basis. Id. at 28.

[45] Id. at 194:24-195:3; 176:1-8; Exhibit 1, Deposition of Robert Young at 133:1-10.

[46] Exhibit 9, 30(b)(6) Deposition of Christopher Domingue at 176:1-8.

[47] Id. at 165:20.

types of injuries or severity thereof that would require notification.[48] Defendant chose to "simply passively wait around" for incomplete and late notifications from Catahoula, turning a blind eye to the full extent of the knowable condition of violence at CCC.[49] As an example, Calcasieu prisoner, Kody Ardoin,[50] was attacked in a cell by a DPSC-sentenced prisoner, Larry Smith. Mr. Ardoin killed Mr. Smith in the ensuing brawl. Mr. Ardoin was arrested and criminally charged in the homicide.[51] Although this would be a reportable incident under the PHA,[52] CPSO could not produce any evidence of any notification, investigation, or any other action by CPSO to investigate this fatal violence involving a prisoner in CPSO's legal custody.

Further, directly demonstrating the consequences of the disorganized notification process that CPSO never bothered to correct, Commander Domingue testified that Defendant did not receive notification of the incident at the center of the instant case, wherein Plaintiff Young was stabbed, burned, and kept in the hospital for four days.[53] In response to this omission, he stated that, "The only way we would ever [could] have known is if someone in his family would have called us."[54] Though intended to point the finger at CCC, this testimony exemplifies the deliberate indifference of Defendant's inaction. As this Court found in Crittindon, this "state of affairs" at CPSO where "staff were passive and essentially flying blind unless contacted by a concerned

---

[48] Id. at 191:20 – 192:8.
[49] Crittindon v. Gusman, No. 17-512-SDD-EWD, 2020 WL 1862567, at *12 (M.D. La. Apr. 13, 2020).
[50] Exhibit 11, Billing Records from CCC to CPSO for Kody Ardoin. Mr. Ardoin killed Mr. Smith on 6/10/2021 and was arrested for Manslaughter 6/11/2021.
[51] Exhibit 12, Records Related to homicide of Larry Smith by Kody Ardoin.
[52] See, supra, at 8-9.
[53] Exhibit 9, 30(b)(6) Deposition of Christopher Domingue at 193:17-22; 195:18-196:10.
[54] Id. at 194:2-4.

family member, evinces a reckless disregard" for the rights of Calcasieu detainees to be free from omnipresent, life-threatening violence.[55] Put simply, "[t]he ostrich defense is no defense."[56]

### C. Defendant Sheriff Mancuso and his employees had direct knowledge of the unconstitutional condition of violence at CCC that led to harm of Plaintiff Young and other Calcasieu detainees.

Despite the lackadaisical approach Defendant Sheriff Mancuso took to identify harms coming to prisoners in his legal custody, he could not escape the knowledge that serious harm was consistently befalling Calcasieu detainees at CCC. During both periods of incarceration at CCC, Plaintiff Young experienced the uncontrolled violence that is a known hallmark of the facility.[57] And he alerted Defendant through his employees of this uncontrolled violence prior to his return to CCC in April 2021. Upon finding out that he and other Calcasieu detainees were being transferred back to Catahoula, he asked staff, "Have you all been to that place? That place is not very good."[58] More directly, he told a CPSO staff member that he "did not want to go back to Catahoula because it's dangerous up there and you could end up dying."[59] CCC was well-known as a violent facility, colloquially called "Stab-a-ganastan"[60] or "Stab-a-houla."[61] Mr. Young could not have been the only person anxiously awaiting transfer back to CCC who spoke to CPSO deputies about the violent conditions there.

---

[55] Crittindon v. Gusman, No. 17-512-SDD-EWD, 2020 WL 1862567, at *15 (M.D. La. Apr. 13, 2020).
[56] Id. at *16 ("Bafflingly, the ECPSO Defendants note that Sheriff Williams learned of the overdetention 'when he was contacted by the news media,' while Wardens Hedgemon and Knight 'learned of it when [they] saw it on the television,' as if this information constitutes proof that they are not liable").
[57] Exhibit 1, Deposition of Robert Young at 37:15-16; 38:12-14; 42:2-3; 47:16-48:25; 49:1-3; 49:5-12; 52:3-8; 54:11-57:24; 117:3-9. Mr. Young also provided a full inventory of the weapons commonly held by prisoners at CCC, including "world daddies" (knives provided by correctional officers), "bone crushers," shanks, ice picks, and "little sharpened [] pieces of metal . . . like a little pencil." Id. at 39:9-40:21.
[58] Id. at 131:23-24.
[59] Id. at 132:3-5.
[60] Id. at 117:3-9.
[61] Id. at 117:12-13. Mr. Young's testimony about violence at CCC is further detailed and fully corroborated by documentary evidence set forth in the Memorandum in Support of his motion for summary judgment against DPSC Defendants, incorporated by reference. See ECF 103-3 at 22-29.

Additionally, CCC staff were required to notify CPSO of any hospitalization of a prisoner in the legal custody of Defendant.[62] In theory, notifications were supposed to be provided to Bonding Sergeant Michael Hollan[63] by CCC Assistant Warden Eric Stott, a named Defendant in this matter.[64] If applicable and available, Defendant Stott would include CCC's incident report and any hospital records stemming from the event in question.[65] In turn, Sergeant Hollan would generate a separate incident report and save all the documentation in CPSO's jail management system.[66] These incidences of violence and subsequent hospitalizations—including life-threatening stabbings, beatings, and overdoses—were reported up the chain of command by Sergeant Hollan. According to Commander Domingue, "if someone got in a fight and had a broken bone or had to spend a few days in the hospital we're going to let the sheriff know."[67] In such instances, beyond Defendant Sheriff Mancuso, other command staff members were also supposed to be verbally informed.[68]

Defendant Sheriff Mancuso must have been aware of the following litany of harm to his prisoners over the course of 2021 and 2022[69]:

[62] Exhibit 7, Prisoner Housing Agreement at 4.
[63] Sergeant Hollan was a direct subordinate of Commander Christopher Domingue. Exhibit 9, 30(b)(6) Deposition of Christopher Domingue at 166:9-10.
[64] Id. at 162:2-163:1; 186:6-15.
[65] Id.
[66] Id. at 162:20-163:1.
[67] Id. at 170:21-24.
[68] Id. at 167:1-14.
[69] Plaintiff sought discovery to establish Defendant Sheriff Mancuso's knowledge of the pattern of widespread violence at CCC from the inception of the housing agreement but were only able to obtain limited discovery production from Defendant Sheriff Mancuso before Plaintiff's motion to compel production of discovery from CPSO was denied on the basis that discovery outside the time period of Plaintiff's incarceration was beyond the scope of the instant case. ECF No. 101. Plaintiff notes that the enumerated instances of injury likely undercount the knowable harm befalling Calcasieu detainees.

- Robin Wood [John Doe 1] was stabbed upwards of nineteen (19) times in the back, resulting in a collapsed lung and the placement of a breathing tube.[70]
- Adrent Carter [John Doe 2], a Calcasieu detainee, stabbed Dustin Redeaux, another Calcasieu detainee, in the face.[71]
- Aaron Carter [John Does 3] was hospitalized after being kicked and beaten by three other prisoners; according to the CCC incident report, staff only intervened once Mr. Carter knocked on the control room flap while blood poured from his head.[72]
- Adam Freeman [John Doe 4] was hospitalized after being assaulted by two unidentified attackers; he received care for a broken nose and jaw.[73]
- Kmoane Young [John Doe 5] was stabbed multiple times in the head, neck, and back, resulting in, among other injuries, a collapsed lung (necessitating a breathing tube) and puncture wounds.[74]
- John Doe 1[75] was sent to the hospital after an altercation led to gashes on his forehead and mouth.[76]
- Dustin Redeaux was routed to the hospital after he had been in seizure for an undetermined amount of time and only brought to the hospital after an hour. By the time he arrived at the hospital his condition was so dire CCC reached out to CPSO to arrange for his release.[77]

[70] Exhibit 13, CPSO Hospitalization Notifications at 193. Sergeant Hollan's self-generated incident report notes that Mr. Wood was stabbed in the back "a few times." Id. In reality, though, attached medical records indicate that Wood was stabbed "upwards of 19" times. Id. at 195.
[71] Id. at 187. Subsequently, on January 11, 2022, Defendant was notified that Mr. Redeaux was hospitalized after suffering from several seizures. Id. at 56.
[72] Id. at 178-79.
[73] Id. at 162-163, 174.
[74] Id. at 58-60.
[75] Where the identities of Calcasieu prisoners of subjected to violence at CCC were extracted directly from medical records, names have been redacted in accordance with the Protective Order entered in this case. See ECF No. 50.
[76] Exhibit 14, *In Globo* Records of Violence at CCC at 66**.**
[77] Exhibit 13, CPSO Hospitalization Notifications at 56.

- Jacob Paul Perry [John Doe 8] was beaten with a belt at the back of his dorm by five other prisoners.[78] Notably, CCC incident reporting provided to CPSO shows that CCC only learned of this incident after Mr. Perry's mother called the facility.[79]
- John Doe 2 was hospitalized after he was stabbed eleven (11) times and beaten, swelling both eyes shut.[80]
- Dexter Allen was hospitalized after swallowing drugs and experiencing symptoms of overdose.[81]
- John Doe 3 was hospitalized for facial swelling, rib pain, and bruising.[82]
- Frederick Mixon [John Doe 12] was routed to the hospital after having his jaw broken in three places.[83]
- John Doe 4 was treated for laceration(s) to his chest.[84]
- David Pullard and Nathaniel Conner were hospitalized after being attacked by four other prisoners.[85] Pullard suffered "multiple injuries to the head" and Conner received treatment for multiple stab wounds.[86]

Even when CPSO was directly notified of violence at CCC, command staff took no investigative steps to prevent future incidents or to otherwise audit the safety of the facility where hundreds of Calcasieu detainees were housed. CPSO had no formalized policy for affirmative investigation when a prisoner in its custody was injured or involved in an altercation. To this end,

---

[78] Id. at 47-50.
[79] Id.
[80] Exhibit 14, *In Globo* Records of Violence at CCC at LGH Records at 168.
[81] Exhibit 13, CPSO Hospitalization Notifications at 21-22.
[82] Exhibit 14, *In Globo* Records of Violence at CCC at CPSO at 131.
[83] Exhibit 13, CPSO Hospitalization Notifications at 7.
[84] Exhibit 14, *In Globo* Records of Violence at CCC at 115-16.
[85] Exhibit 13, CPSO Hospitalization Notifications at 1-6. No medical records were provided by CCC staff for either Calcasieu prisoner.
[86] Id.

Commander Domingue testified as follows: "The only follow-up – I mean, we would read the report and if we had any questions we would call Stott about it."[87] Such follow-up was "[u]sually just for [their] knowledge," meaning that, even if CPSO staff did extract supplemental information, there was no policy or practice to document and/or organize those findings in a retrievable manner.[88]

Similarly, once a Calcasieu detainee was hospitalized, the extent of CPSO's follow-up consisted of intermittent calls to the hospital while the prisoner was still admitted; no subsequent investigation was conducted regarding the root cause of the incident, and CPSO did not make any effort to ensure that prisoner was held safely thereafter.[89]

Notification documentation provided by Defendant confirms the functionally non-existent follow-up: internal incident reports generated by Sergeant Hollan,[90] without exception, leave the section entitled "Violation Investigation" blank.[91] More directly, documentation of multiple notifications—including two confirmed stabbings and a questionable "bunk fall"[92]—contain explicit "NFI" or "NOI"[93] notations.[94]

Finally, in keeping with CPSO's reckless passivity towards Calcasieu detainees held at CCC, Commander Domingue doubted CPSO's oversight duties altogether: [A]s far as what happened to [Calcasieu detainees] inside another jail . . . I would think that responsibility kind of

---

[87] Exhibit 9, 30(b)(6) Deposition of Christopher Domingue at 174:18-20.
[88] Id. at 12-17.
[89] Id. at 189:9-14.
[90] In reality, such incident reports are no more than one or two sentence notations that Eric Stott had called to report the incident.
[91] See, e.g., Exhibit 13, CPSO Hospitalization Notifications at 1, 7, 21.
[92] That there is no documented investigation of the latter incident is uniquely egregious. A sparse incident report generated by CCC indicates that Mr. Mixon, a Calcasieu prisoner who had broken his jaw in three places, himself claimed that he had fallen from his bunk. Exhibit 13, CPSO Hospitalization Records at 8. Records further indicate that Assistant Warden Stott's represented that "the particular dorm he was in had a camera system that was down at the time of the incident." Id. at 7. Despite the sparse incident reporting and concerning detail that an entire dorm was without functional surveillance, Sergeant Hollan marked "NOI" on the incident report that he generated. Id.
[93] "NFI" and "NOI" stand for "No Further Investigation" and "No Outside Investigation," respectively.
[94] Exhibit 13, CPSO Hospitalization Notifications at 1, 7, 193.

ends when you're in someone else's custody."[95] As the Fifth Circuit has explicitly recognized, "a jailer is 'under relatively little time pressure' and 'has the means, freedom, and the duty to make necessary inquiries.'"[96] Defendant failed to make such necessary inquires here, instead relying on an impermissible "ostrich defense" to feign ignorance of the condition of violence at CCC that pose an obvious and intolerable risk of harm to Calcasieu detainees, including Plaintiff.[97]

### D. Although Defendant Sheriff Mancuso knew or should have known of rampant violence at CCC, he failed to take any steps to keep people in his custody, including Plaintiff Young, safe from obvious and overwhelming risk of harm.

Although Defendant Sheriff Mancuso and his office were aware of the unconstitutional condition of violence to which it subjected those in its legal custody, he failed to take any steps to remediate risks of harm to those individuals, including Plaintiff.

Catahoula Parish Sheriff Edwards, a named Defendant in this matter, was clearly dependent on Calcasieu detainees to fund his efforts to takeover CCC operations from LaSalle Management, reaching out to Defendant Sheriff Mancuso for his commitment of continued housing of Calcasieu detainees at the facility.[98] Rather than take the opportunity to find ways to address the lack of reporting, rampant violence, and chaos at CCC that was sending dozens of Calcasieu prisoners to the hospital, Commander Domingue responded on behalf of Defendant Sheriff Mancuso with platitudes pledging loyalty to Defendant Sheriff Edwards over the safety of people in CCC custody.[99] Defendant Sheriff Mancuso's failure to take any steps to remediate the obvious risks of harm to Calcasieu detainees are particularly blameworthy considering

[95] Id. at 159: 8-11.
[96] Thomas v. Gryder, No. 17-1595-EWD, 2019 WL 5790351 at *7 (M.D. La. Nov. 6, 2019) (quoting Douthit v. Jones, 619 F.2d 527, 535 (5th Cir. 1980)).
[97] Crittindon v. Gusman, No. 17-512-SDD-EWD, 2020 WL 1862567, at *16 (M.D. La. Apr. 13, 2020).
[98] Exhibit 15, Correspondence between Sheriff Toney Edwards and Sheriff Mancuso at 1.
[99] Id. at 2.

Defendant's monthly compensation of CCC for holding Calcasieu detainees. From September 2021 to September 2022, Defendant Sheriff Mancuso held hundreds of people at CCC, paying over 20 million dollars to CCC in the course of the year.[100] As this Court has previously found, "surely that money could be made to talk, whether in the form of . . . refusal to house inmates in [Catahoula], or some other measure."[101]

### E. Defendant Sheriff Mancuso breached his duty of care to Plaintiff by willfully failing to take adequate ameliorative steps in response to a knowable risk of severe violence at CCC.

Based on the documentary and testimonial evidence set forth above, it is clear that Defendant Sheriff Mancuso had a duty of care towards Plaintiff Young and all similarly-situated Calcasieu detainees.[102] Defendant breached that duty by failing to develop adequate investigative and oversight practices expected of any reasonable jailor. Defendant's subordinate employees similarly breached their duty to investigate harm and act to prevent further harm to people in their legal custody, including Plaintiff Young.[103] Defendant's failure to intervene or direct his employees to intervene to prevent further harm from coming to Calcasieu detainees at CCC allowed violence impacting Defendant's prisoners to go unchecked.[104] As a direct result of Defendant's abandonment of Plaintiff Young in the violent atmosphere at CCC, he was attacked and suffered both physical and psychological harm.[105]

---

[100] Exhibit 16, CCC Billing Invoices from September 2021 to September 2022. May 2022 starts a decline in the number of Calcasieu detainees held at CCC. Based on evidence from CPSO, this decline can be attributed either to CCC's movement of detainees to Bayou Correctional Center in Madison Parish or to CPSO's efforts to consolidate their out-of-parish prisoners. Exhibit 9, 30(b)(6) Deposition of Christopher Domingue at 98:1-12. This decline could also be attributed to Defendant Sheriff Mancuso's knowledge of violence at CCC. Either scenario is evidence of Defendant Sheriff Mancuso's deliberate indifference because, even as he started to move people out of CCC, he still took absolutely no steps to protect those who were still there, including Plaintiff.

[101] Crittindon v. Gusman, No. 17-512-SDD-EWD, 2020 WL 1862567, at *12 (M.D. La. Apr. 13, 2020).

[102] See, supra, at 7-9.

[103] See, supra, at 10-12.

[104] See, supra, at 10-17.

[105] See, supra, at 1-2.

## IV. CONCLUSION

For the forgoing reasons, Plaintiff respectfully request this Court grant his Partial Motion for Summary Judgment against Defendant Sheriff Mancuso.

Respectfully submitted,

/s/ Jack Stephens

**ELIZABETH CUMMING (**Bar Roll No. 31685), T.A.
**EMILY WASHINGTON** (Bar Roll No. 34143)
**JACK STEPHENS** (Bar Roll No. 41468)
Roderick and Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
Phone: (504) 620-2259
Fax: (504) 208-3133
elizabeth.cumming@macarthurjustice.org
emily.washingting@macarthurjustice.org

-AND-

/s/ Stephen J. Haedicke

**STEPHEN J. HAEDICKE** (Bar Roll No. 30537)
Law Office of Stephen J. Haedicke
1040 Saint Ferdinand St.
New Orleans, LA 70117
Phone: (504) 291-6999
stephen@haedickelaw.com

Dated: June 23, 2025