Transcript of the Testimony of

# ROBIN NIX PERRIN, LPN

January 13, 2025

ROBERT YOUNG v. JAMES LEBLANC, ET AL

AMERSON • WHITE
COURT REPORTING · EST.2000

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT YOUNG,<br>Plaintiff, | CIVIL DOCKET NO.<br>23-681-SDD-RLB |
| VERSUS | JUDGE:<br>SHELLY D. DICK |
| JAMES LEBLANC, ET AL,<br>Defendants. | MAGISTRATE:<br>RICHARD L. BOURGEOIS |

VIDEOCONFERENCE DEPOSITION OF ROBIN NIX PERRIN, 1077 Beverly Street, Jena, Louisiana 71342, taken via Zoom, in the above-entitled cause on the 13th of January, 2025, commencing at 1:42 p.m.

REPORTED BY: CHERIE' E. WHITE
CCR (LA), CSR (TX), CSR (MS), RPR
CERTIFIED COURT REPORTER

APPEARANCES:

ATTORNEYS REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
4400 South Carrollton Avenue
New Orleans, Louisiana 70119
Phone: 504.620.2259 |Fax: 504.208.3133

(BY: Elizabeth Cumming, Esquire)
E-mail: elizabeth.cumming@macarthurjustice.org

CO-COUNSEL REPRESENTING THE PLAINTIFF, ROBERT YOUNG:

LAW OFFICE OF STEPHEN J. HAEDICKE
1040 Saint Ferdinand Street
New Orleans, Louisiana 70117
Phone: 504.291.6999 |Fax: 504.291.6998

(BY: Stephen J. Haedicke, Esquire)
E-mail: stephen@haedickelaw.com
(Not present)

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, CATAHOULA PARISH SHERIFF'S OFFICE:

FROSCH, RODRIGUE, ARCURI, L.L.C.
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Phone: 504.592.4600 |Fax: 504.592.4641

(BY: Ronald "Shane" Bryant, Esquire)
E-mail: sbryant@fralawfirm.com

ATTORNEYS REPRESENTING THE DEFENDANT, CALCASIEU PARISH SHERIFF:

MUDD, BRUCHHAUS & KEATING, LLC
422 E. College Street, Suite B
Lake Charles, Louisiana 70605
Phone: 337.562.2327 |Fax: 337.562.2391

(BY: Lenzi C. Hebert, Esquire)
E-mail: lhebert@mbklaw.net

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANTS, JAMES LEBLANC AND MR. SMITH:

FRILOT, LLC
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Phone: 504.599.8016 |Fax: 504.599.8116

(BY: A. J. Krouse, Esquire)
E-mail: akrouse@frilot.com

E X A M I N A T I O N  I N D E X


| BY: | PAGE |
|---|---|
| Ms. Cumming | 7 |
| Ms. Hebert | 129 |
| Mr. Krouse | 131 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 32 | Employment File | 23 |

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically NOT waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

CHERIE E. WHITE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath.

ROBIN NIX PERRIN,

1077 BEVERLY STREET, JENA, LOUISIANA 71342, after having first been duly sworn by the above-mentioned court reporter, did testify as follows:

MS. CUMMING:

We are taking this deposition pursuant to the Federal Rules of Civil Procedure. There's no objection to the use of Zoom for this deposition or to the court reporter being remote. At the end, we will -- we will talk about reading and signing and all of that stuff.

EXAMINATION BY MS. CUMMING:

Q. Could you please introduce yourself for the record?

A. My name is Robin Nix, Perrin. I'm actually a Nix now. My married name has been removed.

Q. Okay. All right. So I should refer to you as?

A. Nix.

Q. Ms. Nix. Okay. Great. Thank you. All right. My name is Elizabeth Cumming. I represent the plaintiff in this action. Do you

have any previous deposition experience?
A. I do not.
Q. Okay. And have you ever been a party to a lawsuit before?
A. I have not.
Q. Okay. So just so you know kind of what to expect, I want to go over a couple of ground rules with you just so you know kind of what's going on here.
We have the court reporter here who is taking down everything that we say, so it's really important that you speak up and that you answer verbally so that she can get down everything that you're saying. So if I ask you a yes or no question, rather than nodding your head or saying uh-uh (negatively) or uh-huh (affirmatively), I may ask you to say is that a yes or a no. I'm not trying to be a jerk. I'm just trying to make sure that it's clear on the record.
A. Yes, ma'am.
Q. I am going to ask a series of -- of questions. Even if you know exactly where I am going with the question, just make sure -- let me get my question out and then you can answer just

so that it -- we have a clear kind of question and answer on the -- on the transcript.

You've taken an oath. It's the same oath that you would take -- that you would take as if you were testifying in a court, so it is really important that you tell the whole truth as, you know, to the best of your recollection.

As we are going through and if I ask you a question that sort of jogs a memory or, you know, kind of changes an answer, we can go back and you can let me know, you know, what that -- you know, what that additional information or what that different information is to supplement a previous answer.

I will be asking a series of questions. At some point, I promise you I'm going to ask a bad question that's -- that's not clear, that I ask too many parts or something's -- something's unclear. When that happens, just ask me to clarify and I'll go back and -- and try and clarify the best I -- I can. It's really -- it's important that you understand the question so that, you know, when you answer you -- you can answer accurately and truthfully.

You can take breaks. The only

question that I -- the only thing I ask is that if I've asked you a question, you go ahead and answer the -- the question that's on the table. And during the break, you can speak with Mr. Bryant. I may ask when we come back if -- if you spoke with anybody.

I -- I don't think we are going to go super long today. I'm going to try and get you out of here pretty efficiently, but I -- I try to offer a break about every hour. I'm -- I'm not the best at it. So if at some point we have been going for a while and you need a break, just let me know, okay?

A. So this is like a drawn out thing?

Q. It will probably be about two hours maybe.

A. Okay.

Q. All right. Like I said, I will try to be efficient.

Is there anyone else in the room with you?

A. No, ma'am.

Q. Okay. And is there any medication, sleep deprivation or any other hardship that would interfere with your ability to understand

and truthfully and accurately answer my questions today?

A. No, ma'am.

Q. Okay. And you did a great job there letting me get my question out, even though you knew exactly where I was going, so keep it up.

What is your understanding of why we are here today?

A. The only thing that my subpoena said was that it's -- can I say their names?

Q. Yes.

A. Robert Young versus James LeBlanc and so that's -- that's all I have.

Q. Okay. Do you -- do you recall Robert Young at all?

A. I remember the name. Other than that, no.

Q. Okay. And where do you remember the name from?

A. From the prison.

Q. Okay. And that's CCC?

A. Yes, ma'am.

Q. All right. Catahoula Correctional Center?

A. Catahoula Correctional, yes, ma'am.

Q. Got it. Okay. And you understand that you were not named as a defendant in this action today, we are just talking to you as a witness, correct?
A. Yes, ma'am.
Q. Okay. And what did you do to prepare for this deposition?
A. I showed up.
Q. Okay. When did you first learn about the deposition?
A. I don't remember what day I got this. It was a day last week. I -- I don't remember what day.
Q. Okay.
A. I had grand babies, so maybe Tuesday, Tuesday or Wednesday.
Q. And have you talked with -- I'm not asking for content, just have you talked with Mr. Bryant related to this deposition?
A. Yes. That day.
Q. Okay. And have you reviewed any documents in preparation for today?
A. I have not.
Q. Okay. So I'm going to be asking primarily about the time period 2021 to 2022.

I -- I may be asking a little bit before and after that. I'll try and specify the time period, but if it's not clear, just let me know and -- and I'll -- I'll give you dates.

And then the facilities that we are going to be talking about today are primarily the Catahoula Correctional Center or CCC. Is there any other name that you refer to that facility by?

A. No, ma'am, just CCC.

Q. Okay. All right. So just to get us started, you know, can I get a little bit of background information on you starting with your education?

A. I've been an LPN for 20 years. I graduated in 2005. Like how in depth do you want?

Q. Well, let me -- let me start with this. Where did you go to high school?

A. Jena High School.

Q. Okay. And did you graduate?

A. I did. I graduated in 1999.

Q. Okay. And then after high school, where did -- did you -- did you have any other schooling?

A. I did. I went through EMS school.
Q. All right. And when was that?
A. I graduated in May of '99. I think I started EMS school in maybe August or September of '99.
Q. Okay. And what was the name of the school?
A. It was in Winnsboro. I don't know. I don't remember the name of it.
Q. And how long did that training take?
A. I think it's a six-month course, if I'm not mistaken. I took boards and failed them by one and then got accepted into the LPN program and was married and already had two stepchildren, and so I just decided that nursing would be better than EMS.
Q. Okay. All right. But -- so you never worked in EMS; is that correct?
A. I did not.
Q. Okay. Got it. Okay. Thank you. So that would have been in '99. When did you -- when did you start LPN school?
A. Born in 2003. He was a year old when I started, so I started in May of 2004.
Q. Okay. So May --

A. Graduate --
Q. Go ahead.
A. Sorry. Graduated in December of 2005.
Q. Okay. And what was the name of the school?
A. Rod Brady. It's CLTCC, Central Louisiana Technical College (sic), but it's the Rod Brady Campus in Jena.
Q. And when you finished in 2005, what -- what did you finish with?
A. LPN.
Q. LPN. Okay.
A. Licensed practical nurse, yes, ma'am.
Q. Great. After that, any additional schooling?
A. No, ma'am.
Q. Okay. And are you in school currently?
A. I am.
Q. Okay. Where are you in school currently?
A. Northwestern --
Q. Okay.

A. -- State University.
Q. And what are you in school for?
A. RN.
Q. Okay. Okay. And so currently you are still an LPN; is that correct?
A. Yes, ma'am.
Q. Okay. All right. When do you anticipate becoming an RN?
A. I should graduate in December 2025.
Q. Okay. All right. Do you have any -- other than the LPN and, you know, you are working towards the RN, any other professional licenses or certifications?
A. I did not know this until recently. I do carry a CNA license for the state of Louisiana. It was something that, you know, in LPN school your first bit is CNA.
Q. And what does the CNA stand for?
A. Certified Nursing assistant.
Q. And so you could serve either as an LPN or a CNA; is that right?
A. Yes, ma'am.
Q. Okay. So as an LPN, just sort of generally we will get into, you know, what -- what happens at CCC in a little bit; but just

sort of generally as an LPN, can you tell me about what you are allowed to do? What is in your scope of licensure?

A. I can start IVs, I can give medicines by mouth, we can hang piggybacks, IV fluid. I mean, assessments.

Q. And when you say "assessments," what all is included in that?

A. You know, listening to the heart, the lungs, the abdomen, you know, blood pressure, vital signs, finger sticks.

Q. Okay. And is there -- okay. So we have got IVs, oral meds, hanging fluids, IV fluids, assessments. Anything else that you can think of?

A. Not off the top of my head, no, ma'am.

Q. Okay.

A. Draw -- I mean, I can draw blood.

Q. Uh-huh (affirmatively).

A. Can't mess with any ports, you know, and you can't take blood. Actually, our scope of practice doesn't say that I can't take it. It's the RN's scope of practice that says they can't delegate.

Q. All right. Okay. That's -- that's interesting. That's good to know. So by port, no PICC lines or anything like that?
A. No.
Q. Okay. All right. And -- and when you say you can't touch, that's like you can't -- you can't place them, you can't flush them, you can't --
A. I can't access them, no, ma'am.
Q. Okay. Got it. All right.
A. Sorry.
Q. Okay. Is there anything -- so your comment about sort of what an RN can't delegate, that leads me into -- are there -- is there anything that an RN that --
Let me ask it like this: Anything that an LPN can do, but under the supervision of an RN?
A. Not that I couldn't do on my own. I mean, you know --
Q. Right. That's exactly what I was asking. And so now that you are becoming an RN, what sorts of things are you able to do? Well, you know, in December when you become an RN, what sorts of things will you be able to do that you

couldn't do as an LPN?

A. It would be more of the supervisory positions, a lot of patient teaching, which we do as LPN also. I can't do IV pushes as an LPN. As an RN, you can, you know.

Q. And so when you say more supervision, what sorts of things?

A. Like charge nurse. As an -- as an LPN, in some aspects as an LPN, like at a nursing home, you can have -- be a charge nurse for your floor or your hall, but you still have usually an RN in-house or, you know, somebody that comes in and maybe on the weekend or -- or whatever. I don't know. I've never worked in a nursing home. The only thing I've ever done is the prison and hospital, so --

Q. Okay.

A. But --

Q. Got it. Okay. So -- and a charge nurse, just sort of generally what -- what sorts of things would a charge nurse do?

A. In a hospital, they -- they do your IV pushes, you know, they access the ports or the, you know, PICC lines, things that we can't. They do the blood products and that type of

thing. And usually, RN or the charge nurse for that floor is the one who does the, you know assessments. I mean, possibly, they handle the doctors when they make rounds, those type things.
Q. Okay.
A. As an LPN, I can make rounds; I can take off orders; I can -- you know, I can call the doctor; but usually with the other things that we are doing, like passing medicines or hanging piggybacks and wound care and those things, the RN will do rounds.
Q. Got it. Okay. All right. So as an LPN, are you able to diagnose?
A. No. Neither is an RN.
Q. Okay. All right. That was going to be my next question. Okay. So --
A. Well, you have a -- a -- like a nursing diagnosis, but we don't, you know -- you -- no. We can't diagnose.
Q. Okay. All right. When you say a nursing diagnosis, what -- what does that mean?
A. We have care plans; like in the hospital, the LPNs sign off on them too, you know, of like different things that they come in with. You know, if they are dehydrated or, you

know, they are diabetic, you know, it's your nursing diagnosis and you do your care plan off of that, you know. Make sure that they have had fluids, you know, or they have fall rest. You know, that's care plans, what we are going to do to take care of them in the hospital, along with the physician's orders, and we have our own little, you know, plan of care also.

Q. I see. Okay. So if someone comes in who is dehydrated, the nursing diagnosis might be dehydration and all of the things that the nurses will do to deal with that hydration; but if a provider sees that person, they will say dehydrated because of?

A. Well, they will do the orders to like make sure they have IV fluids. Ours will be simpler to the effect of, you know, make sure that their pitcher is, you know, filled with ice water and, you know, make sure we are doing our Is and Os to keep the balance, so make sure they are having enough in and enough out, you know, whether that be taking them to the bathroom or having to weigh, you know, linens or that kind of thing.

Q. Got it. Okay.

A. And making sure we write down, well, they had a glass of tea or they had two pitchers of water today, that thing.
Q. Okay.
A. Those things.
Q. All right. And when you are talking about like documenting, you are -- you are talking about all of the documentation that you need to do?
A. Yes.
Q. Got it. Okay. Great. That's helpful. Thank you. Can you -- you mentioned that most of your experience has been either in the prison or in a hospital.
Can you just sort of run me through where your -- your employment history since 2005 since -- since you've been a nurse?
A. Just a general hospital, heart and medical center. I worked for Haven Home Health for a short period, and that's -- and here. That's the only places that I've ever worked.
Q. And "here" is at --
A. Catahoula Correctional.
Q. -- CCC? Got it. Okay.
MS. CUMMING:

All right. I'm going to show you what we are going to mark as Exhibit 32. This is going to be page 3 of Exhibit 32. And I think this is attached to your -- an application. I can -- I can scroll above if you want to see that.

(Exhibit 32 marked and viewed.)

THE WITNESS:

Okay.

BY MS. CUMMING:

Q. So it looks like there's an application that comes in to LaSalle Corrections, and then down here (indicated) it looks like a CV. Did you type this up?

A. Yes, ma'am.

Q. Okay. And so just this looks like what you just ran through. I just want to confirm that it's correct. This is LaSalle General Hospital, Hardtner Medical, and then I think you left off the -- the home health.

A. Yeah. I literally worked there for, I don't know, maybe a month or two.

Q. All right. Okay.

A. Not my thing.

Q. Okay. All right. I got you.

What -- what sorts of things were you doing for that -- that home health?

A. You did in-home visits, take vital signs, answer any questions, you can do patient teaching, those sorts of things. Lots of paperwork.

Q. Okay. All right. And that was about a month?

A. Yeah.

Q. Okay. All right. And do you recall when you started working at CCC?

A. It's February of maybe 2020.

Q. Yeah.

A. I don't -- I don't remember exactly. I think it was 2020. Was it February of 2020?

Q. Yeah. I think that's right. Just looking back up on page 2, it looks like first day worked was February of 2020.

A. Yeah.

Q. Good memory. Good job. So it looked like between -- it looked like your last date of employment at the hospital at, I'm sorry, I think it was Hardtner Medical Center was 2018. Other than working for that home health organization, was there anything else you did in

that two years?
A. No. I -- I came home to take care of my ex-husband's mother.
Q. Okay.
A. She was terminal, so --
Q. Oh, okay. I'm sorry. That's hard work.
Okay. All right. So -- and when you applied in February 2020, you applied with LaSalle Corrections but to work at CCC; is that correct?
A. Yes. They owned this prison at the time, LaSalle Corrections did.
Q. Okay. Were you -- when you put in an application, it says, "Facility: Catahoula." Did you write that in there or did LaSalle, or -- or how did that decision get made?
A. On where I would work?
Q. Uh-huh (affirmatively).
A. Here. I mean, this is where I applied.
Q. Okay. All right.
A. They had a position available here.
Q. Okay. Got it. At Catahoula?
A. Yes, ma'am.

Q. Got it. Okay. And in the time when you were employed by LaSalle, did you work at any other correctional facilities other than CCC?
A. I did.
Q. Okay. Where -- where else did you work?
A. Well, hold on. I don't remember if the prison -- if -- if Catahoula had taken over by then.
Q. And you mean Catahoula Parish Sheriff?
A. Yes, ma'am.
Q. Okay.
A. I don't -- I don't remember when that -- when that -- when that happened.
Q. Okay. I might be able to help you out there. I think it was in 2021 that the -- that the parish sheriff's took over the operation of CCC. We will go down to page 8 just to -- so you don't have to take my word for it; but it looks like this is a status change report and it looks it's got facility under new management sometime in 2021.
A. I'm trying to remember if we still had ICE. When I originally started here, we had

ICE. This was a detention center.
Q. Uh-huh (affirmatively).
A. When they lost the contract for ICE and went back DOC, I moved to Rivers and worked there for -- maybe we lost the contract at the end of October and all the detainees were gone then. It's either October or November. I'm not -- don't quote me on the date because I am not sure.
Q. Uh-huh (affirmatively).
A. I did some work at Rivers Correctional probably for, I don't know, maybe a month, a month and a half and then I came back here. I think I was back here fully by December or January.
Q. Okay. When you were at River, were you doing -- were you caring for ICE detainees or -- or DOC or what -- what was the population?
A. They had both.
Q. Okay.
A. They had one dorm I think of DOC, I think, and then I know that they had detainees.
Q. Okay. So just I want to make sure I understand. So when you started work in 2020, there were ICE detainees at CCC. Was it

exclusively ICE detainees?
A. Yes, ma'am. They had maybe one dorm of -- of DOCs that, you know, did the kitchen, the maintenance.
Q. Okay.
A. That thing.
Q. Okay. Got it. So like a trustee dorm?
A. Yes, ma'am.
Q. Okay. And then when the ICE detainees left out of CCC, you went over to River. River was operated by LaSalle at that point, correct?
A. I -- I do not know. I think, but I do not know 100 percent.
Q. Okay. How did you come to go over to River? Did you ask to go or did they tell you, hey, you can go over to River, anything like that?
A. I do not recall how I -- I don't.
Q. Okay.
A. I think a lot of employees had maybe that we were still with LaSalle and that's how. I -- I do not recall.
Q. Okay. So you don't --

A. I don't know.
Q. You don't recall like a LaSalle management employee saying, hey, like you're now assigned to go work at River or anything like that?
A. Not that I recall, no, ma'am.
Q. Okay. And so when you were at River, River had both DOC and ICE; is that right?
A. I'm assuming that they had the same like what we had here, a dorm of trustee; but I don't know that 100 percent.
Q. Got it. Okay. And when -- and so you were at River about a month, month and a half. And would that have been like in the early part of 2021 maybe?
A. The end -- end of the year, beginning of -- of the new year. I know --
Q. Okay.
A. I know it's around that time.
Q. Got it.
A. But I don't -- I don't know the exact dates.
Q. Yeah. That's fine. Yeah. It just helped -- knowing the time of year is helpful, so that's -- that's good.

And then you came back to CCC. When you came back to CCC, was it still under LaSalle Management?

A. I -- I do not remember. I don't -- I don't know. I really don't. I don't remember. They had to have been because both facilities were owned by LaSalle Corrections. I don't remember having to do any, you know, any more paperwork, any -- you know, any of that.

Q. Okay.

A. But I don't --

Q. Great.

A. -- I don't know for sure.

Q. Uh-huh (affirmatively). So that's great, just sort of what you remember about kind of the paperwork or application, like that's all -- that's helpful. That's good.

Okay. So you came back and what was the -- what was the population of people who were being held at CCC when you came back?

A. DOC.

Q. Okay. All right. Do you recall roughly how many people were being held?

A. No, ma'am.

Q. Okay. And what was your employment

relationship with LaSalle; were you salaried or hourly?

A. Hourly.

Q. Okay. And were you full-time or part-time?

A. Full-time.

Q. And when CPSO took over the facility, did that change?

A. As in like did I go salary or was I paid by the hour?

Q. Uh-huh (affirmatively).

A. Still hourly and --

Q. Okay. And --

A. -- and still full-time.

Q. Still full-time. Great. Okay.

A. Yes, ma'am.

Q. Okay. Did you ever -- have you ever received any disciplinary action in your -- in your time as a nurse?

A. At other facilities or this facility?

Q. Anywhere. At CCC, other facilities, anything like that?

A. I have been written up, yes, ma'am.

Q. Okay. What was that write-up for?

A. I was doing case management at Hardtner Medical Center and I failed to do a -- I think it was a re-cert and I was written up.

Q. And you say like a re-cert, what's that mean?

A. Like in case management, we are responsible for getting like Medicare and Medicaid days approved for the people who are in the hospital and I missed a deadline. I -- I'm pretty sure that that was what the write-up was about for that.

Q. Okay.

A. I can't -- I'm pretty sure.

Q. Okay. I got it. All right. And what was the -- the consequence of that write-up?

A. Just a write-up that went in my file.

Q. Okay. So no suspension or anything like that?

A. No, ma'am. I've never been suspended.

Q. Okay. Great. Perfect. And did you ever receive any training related to working in a correctional environment?

A. No, ma'am.

Q. Okay. All right. And then you -- you are no longer working at CCC; is that correct?
A. That is correct.
Q. Do you recall when you left?
A. August of '23.
Q. Okay. And can I ask why you left?
A. I started school.
Q. Okay. So turning now to CCC, can we talk a little bit more specifically about what you were doing as an LPN working at CCC?
A. We -- prior to ICE or after ICE?
Q. All right. That's a good question. All right. Let's take it in reverse order. So let's say in 2023, tell me about what -- what you would be responsible for in 2023.
A. We did sick calls, we did doctor days where the nurse practitioner would come in and see the patients, take off orders, you know, make sure medications are ordered daily, that the cart is stocked, lab draws when those things were ordered, any emergencies, any fights that required medicals. I'm trying to run through a day.
Any intakes; and that would require

going over their medicine, making sure their medications were ordered, doing their like history and physical, you know, asking them, you know, do they have diabetes, high blood pressure; you know, making sure, you know, we contact either the previous prison or a pharmacy or whoever to get a medication list, if they came with nothing. I think that would be about it.

Q. Okay.

A. And any discharges. You know, we would do our paperwork for that, make sure they understood what medicines they were on or get them ready and have their medicines packed up for if they were going to a different prison.

Q. So like transfer meds?

A. Yes, ma'am.

Q. Got it.

A. I used to fill out a form and make sure that they had enough supply.

Q. Got it. Okay. All right. So that's 2023. Let's try and take another step back, another year, in 2022. Was there anything on that list that you weren't responsible for in 2022?

A. No, ma'am.

Q. Okay. Well, did you have anything else additional that you would be doing in 2022?
A. No.
Q. Okay. Take another step back into 2021. Anything on that list that you wouldn't have done in 2021?
A. (Shook head negatively.) No, because I don't -- we didn't have detainees in 2021. I think it was 2020 that our last -- yeah.
Q. Okay. So '21 through '23 when you have non-ICE detainees, you've got DOC, did -- did you have pretrial as well?
A. Yes.
Q. Okay.
A. Yes.
Q. So you got DOC and pretrial '21 through '23. Your responsibilities were primarily sick calls; doctor days; the medication, like taking off medications and orders; making sure that the cart was stocked; lab draws; emergencies; evaluating people after fights; intakes, including H&Ps; and then discharges; is that about right?
A. Yes, ma'am.
Q. Okay.

A. I mean, we have things like in the office, like you have to check your AED every day; you have to check your -- you know, your supplies; you know, counts and things like that.
Q. And when you say check the AED, just to make sure it's functioning?
A. Yes, ma'am.
Q. And for the record, what is an AED?
A. I don't --
Q. Something external defibrillator?
A. I was like uh-huh (affirmatively), uh-huh (affirmatively). I don't -- the A is not coming to me.
Q. It's not coming to me either. Yeah. I know the E-D but not the A.
A. Oh, that's going to drive me insane.
Q. Automatic external defibrillator?
A. There you go.
Q. Yeah. Okay. That's correct, right?
A. I think so.
Q. Okay.
A. I think.
Q. All right. Let me know if it comes to you and that's not right.
A. I will.

Q. Check supplies, check the AED. Anything else?
A. Not that I can think of.
Q. No. That's good -- that's helpful. That's a good list. So that was '21 through '23, those were your responsibilities.
Let's go back to 2020 when the ICE detainees were there. What is -- what were you responsible for then?
A. Med pass, taking off orders, helping with sick call, possibly helping with doctor call, but usually I was on the floor passing medicines. So any medicines that I ran out during pill call, I would turn in to the pharmacy tech and those would be ordered.
Q. So in 2020, your primary responsibilities were med pass, taking off orders, helping with sick calls, sometimes helping with doctor call and then just making sure -- again, making sure that the cart was stocked, right?
A. Yeah. And preparing for intake or discharge, you know, we would have to fill them in, you know, go to the meds and take them off the cart, get them ready or add new meds as we

NIX PERRIN, LPN, ROBIN 1/13/2025


got new people in.
Q. And -- and in -- in '21 to '23, you did not have responsibility for med pass; is that correct?
A. Correct.
Q. Okay. Who was doing med pass then?
A. One of the officers. You know, I guess they have a specific officer that does pill call.
Q. Okay. In 2020, how many LPNs were working at the facility?
A. So you had -- because we did doctor call or they did doctor call daily, so you had two LPNs for the doctor call, an LPN and an RN that worked the -- the shift per se. Like your two LPNs for doctor call, they worked I think until like 4:30. Your other RN and LPN would work 7:00 to 7:00.
Q. Okay. So two LPNs working doctor call, one LPN working 7:00 to 7:00, an RN working 7:00 to 7:00?
A. A pharmacy tech during the day and then you had your HSN. Is there another? I think we had two RNs doing sick call, and then you had a full medical records staff, so two

medical records staff maybe.
Q. Were they credentialed in any way that you know of?
A. Not that I'm aware of. I -- I don't know if they had credentialing.
Q. Okay.
A. They made the charts, broke down the charts, those type things, styled the charts, pulled the charts that were needed for doctor call.
Q. Okay. So -- and in terms of were all of those people -- let me see how to ask this, like was there kind of like a relief factor? So there were two LPNs who would be working for the doctor call, would they -- you know, was there another set of LPNs that would come in on weekends or anything like that?
A. No. It's that no doctor call during the weekend, so those two LPNs I guess worked Monday through Friday.
Q. Okay. So two LPNs; one LPN working Monday through Friday, one LPN working 7:00 to 7:00 Monday through Friday?
A. No. Those two -- those two LPNs that did doctor call, they worked Monday through

Friday.

Q. Got it. Okay.

A. And then one of those did psyche, because we had psyche like every -- once a week. And then -- and then you had a shift of an RN and an LPN.

Q. And the RN and the LPN and the shift, that would be 7:00 to 7:00, right?

A. Yes, ma'am.

Q. And that shift, so that would be a separate LPN from the LPNs who were doing the doctor call; is that right?

A. Uh-huh (affirmatively).

Q. Okay. All right. And then you also said two RNs you think doing sick call; is that right?

A. Yeah. Sometimes they would -- during the week, they would have two RNs. On the weekend, skeleton screw. You just have your RN, your LPN, and then back then we had a -- a medical officer and usually that was an interpreter.

Q. Okay. So on weekends you would have an LPN and RN working 7:00 to 7:00 onsite?

A. Uh-huh (affirmatively).

Q. Okay.
A. You had your day crew and your night crew.
Q. Okay. All right. So you would have a total of four; an LPN and an RN for the day, an LPN and RN for the night. You would have four people covering the weekends?
A. Uh-huh (affirmatively).
Q. Okay. And then you would also have four people covering those shifts during the week; is that right?
A. Uh-huh (affirmatively), for that extra --
Q. Monday --
A. For the extra things, for -- you know, for the doctor call, for psyche, if that was that day, yeah.
Q. Okay. So sorry. I -- I confused myself again. I want to make sure. So in terms of the -- the people who were working 7:00 to 7:00 --
A. Uh-huh (affirmatively).
Q. -- is there always an LPN and always an RN --
A. Yes.

Q. -- at the facility?
A. Yes.
Q. Okay. And then during the week, Monday through Friday, you would also have two LPNs who were doing the doctor call?
A. Uh-huh (affirmatively).
Q. And then --
A. And possibly an extra RN to do any extra sick calls or anything like that.
Q. Got it. Okay. And then you would also have the pharmacy tech and then you would have the two medical records clerks?
A. Yes.
Q. Got it. Okay. And then you said you -- you talked about an HSN. Is that like a director of nursing?
A. Yes, ma'am.
Q. Okay. So there was a director of nursing in 2020?
A. Yes, ma'am.
Q. I'm sorry. You said HSN. What does HSN stand for?
A. I have no clue.
Q. Okay. All right. Do you -- do you remember who that person was?

A. Denise Finley --
Q. Okay.
A. -- when I was there.
Q. Okay. And what was her licensure?
A. LPN.
Q. Okay. All right. And was she working Monday through Friday?
A. Yes, ma'am.
Q. Okay. What were her hours?
A. I'm going to say 8:00 to 4:30. I -- 8:00 to 5:00.
Q. All right. And then I think you said that the doctor would come in. Would that be an M.D. or an NP?
A. Two NPs.
Q. Okay. And, again, we are just -- we are talking about 2020, and so it was two NPs?
A. Uh-huh (affirmatively).
Q. Okay.
A. And then I -- I'm not sure the credentialing on the psychiatrist.
Q. Okay. But you had two NPs who were dealing with somatic care and then you had an -- either an NP or an M.D., a provider, someone who can prescribe medication who was dealing with

psyche stuff; is that right?
A. Yes, ma'am.
Q. Okay. How often would that person come in?
A. It was a Zoom appointment and they -- once a week --
Q. Okay.
A. -- that they seen patients. Now, if we had things going on or, you know, emergencies, you just set up the Zoom.
Q. Okay. So they would be regularly scheduled for once a week, but --
A. Yes.
Q. -- if someone was in crisis, you -- that person was also on call?
A. Yes. You had them on-call.
Q. Okay. All right. And the two NPs, were they on call if they weren't at the facility?
A. Yes.
Q. Okay. And how frequently did one or both of the NPs come into the facility?
A. One every day and then the other one, he had certain days that he came, but I don't -- I don't remember the days. And they

changed, you know, changed.

Q. And the one who came in every day, how -- how many hours would he be there when he came in, or she?

A. Usually here early morning and would stay until after noon, so --

Q. Okay. So full-time?

A. Yes, ma'am.

Q. Full --

A. Yes, ma'am.

Q. Okay. Okay. All right. So that's 2020. Tell me about what -- did it change in 2021?

A. Yes, ma'am.

Q. Tell me about what it was in 2021.

A. Two -- two LPNs and medical records full-time. We were here from 8:00 to 5:00, Monday through Friday, and then our nurse practitioner usually came on Thursday or Fridays. Sometimes that day changed. You know, if he had -- you know, he may need to rotate to a Monday of a week or whatever, but usually for the most part, it was Thursday or Friday.

Q. Okay. Okay. So you've got two LPNs 8:00 to 5:00, Monday through Friday. Was it just

one person in medical records?
A. Yes, ma'am.
Q. Okay. One person in medical records, the NP one time a week usually on Thursday or Friday, but it depended; is that right?
A. Uh-huh (affirmatively).
Q. How many hours would the NP spend when he came in?
A. It would be an all-day thing.
Q. Okay. What about weekends?
A. If they had a problem or needed anything or had a question, they would contact one of the nurses and then the NP's number is listed in medical also --
Q. Okay.
A. -- if they needed that.
Q. Okay. And then in the evenings if they had -- if there was a problem, who would cover that?
A. Same.
Q. Okay. All right. And was there a psyche NP in 2021?
A. No. The NP did all of the above.
Q. Okay. Who was the NP in '21?

A. Elijah Booth.
Q. Okay. And who were the NPs in 2020?
A. Elijah Booth and Kim Fannin.
Q. Okay. And who was the psyche NP?
A. I -- I do not recall.
Q. Okay. But as far as you know, Elijah Booth isn't a psyche NP; is that correct?
A. I don't know his credentialing --
Q. Okay.
A. -- or certification. I don't -- I just know it says NP.
Q. Okay. All right. So that's '21. So it's two LPNs who you're -- you're there 8:00 to 5:00, Monday through Friday, and then when you are not there, you are on call; is that correct?
A. Yes. If they have a problem, both numbers are listed.
Q. Okay. All right. And so is there like a call schedule or anything like that?
A. Not really, no, ma'am.
Q. Okay. Okay.
A. And then at some point, they got a night nurse. I don't remember when that was.
Q. Okay. Was that before you left?
A. Yes.

Q. Okay. So it would have been before 2023?

A. Yes.

Q. Okay. All right.

A. I just don't remember the date.

Q. Okay. And that was -- and the night nurse, that -- that person was an LPN?

A. Yes, ma'am.

Q. Okay. Who is the LPN who came on as the night nurse; do you recall?

A. Ms. -- I can see her face. Ms. -- if it comes to me, I will stop you and tell you, but I don't --

Q. Okay.

A. It's not --

Q. Hopefully, it will come to you in the next little bit. If not, it's going to be one of those things that comes to you at 2:00 a.m. in the morning.

A. That's terrible. Ms. --

Q. Okay. All right. So the staffing that you -- you were describing for '21, other than the addition of the night nurse, that was -- that was pretty much the -- the medical staffing for '22 and '23; is that correct?

A. Uh-huh (affirmatively).
Q. Okay. Okay. Was there an --
A. Wanda. I'm sorry. Ms. Wanda.
Q. Okay. Do you remember Wanda's last name?
A. No.
Q. Okay. Well, Wanda, though. That's good. That's her first name, correct?
A. Yes, ma'am. I apologize for interrupting.
Q. No. No. That's -- that's great.
Okay. So let's -- let's stick with -- let's stick with the 2021 to 2023 time period. Was there an M.D. who was ever on call?
A. Not that I recall.
Q. Okay. And do you recall ever having an M.D. like review charts or anything like that?
A. Oh, yeah. Yes.
Q. All right. What -- what do you recall about that?
A. Well, we would send in the notes.
Q. Okay. And how would you send those?
A. I -- that was not my -- not my -- it wasn't my task, so I don't know how they were sent.

Q. Okay. Whose task was it to send them?

A. Usually Chrystal did that.

Q. All right. And that's Chrystal Breland?

A. Uh-huh (affirmatively).

Q. Okay.

A. But I'm assuming that we would scan and e-mail.

Q. Uh-huh (affirmatively). Okay. And do you happen to know how charts were selected to send?

A. Just random.

Q. Okay. And do you know the M.D. who was reviewing those charts?

A. I did at the end, but I -- it's not the same. We had a -- no.

Q. So this wasn't someone who was coming in who was seeing patients face to face who was talking with you, this wasn't someone who was --

A. No. No. I dealt with Elijah.

Q. Got it. Elijah Booth, the NP?

A. Yeah.

Q. Got it.

A. Yeah. We dealt with him.
Q. Okay. So just walking through kind of what you described as some of the -- some of the responsibilities you had in, you know, '21 through '23, you talked about emergencies. What -- what would count as an emergency?
A. Well, I mean, if, you know, it was a fight that we got called to the dorm for or we had a lady, like I don't know if they came off the street or she was like here seeing somebody, but like passed out in the lobby. You know, then I know one of the staff didn't feel good and we ended up, you know, having to send them somewhere to be looked at. I think they were thinking like heart attack. You know, so those type things.
Q. So not the --
A. And then --
Q. Not just, you know, people being held in -- in the prison but also, you know, visitors and staff?
A. Yes.
Q. Okay. All right. For people being held, you talked about fights happening in the dorm.
If an LPN was onsite, so let's say

it was in that 8:00 to 5:00 range on a Monday through Friday, can you walk me through, you know, how you get notified and what you would do if -- if there was a fight?

A. There are -- they have walkie-talkies, so the -- what do you call her, the operator for that dorm, you know, if they see something, if it's in the dorm or if it's on the yard, they call a specific code, you know. And now sitting here, I can't even think of the codes; but, you know, we may not be dispatched to the actual fight itself. If they feel like we need to, then they will call whatever code in medical and then, you know, we will respond to the area, whether it be the yard or the dorm or the hall or -- if not and they break the fight up and see that there's blood or, you know, whatever, then they can bring them to medical, you know, if we weren't called to the actual code itself.

Q. So in medical, you -- you had a walkie-talkie?

A. Yes, ma'am.

Q. Okay. And so you -- you would be able to hear whatever the radio traffic was?

A. Most of the time, yes.

Q. Okay. And then if you knew if you heard Code 3, medical, that was your time to get up and go to --

A. Yeah. Get your gloves and go wherever.

Q. Okay. What all would you bring when you -- when you heard that Code 3 medical, what would you bring?

A. Usually, gloves. Sometimes we would grab the bag which had, you know, like blood pressure cuffs, stethoscope, O2 sat. Sometimes we would grab the actual manual blood pressure cuff. I don't even remember now what all the bag has in it. You know, you're limited on what you can have, so --

Q. Why -- why is that?

A. Well, I mean, like here, all we have is an oxygen tank, an AED. You know, we don't have big medical -- you know, it's not like I have a crash cart or anything here. So you have your AED, oxygen tank and -- and we would usually pack the AED with us. It's small enough that it goes.

Q. Okay.

A. But usually during the code, you would know whether it's an actual fight, you know, or whether it's like something medical, like they have passed out or, you know, fallen out in the yard.
Q. And how would you know that? What -- how would that information get to you?
A. By the code, but I don't remember the codes. I guess a ten. I don't remember the codes.
Q. Okay. So if it's -- if it's a code, what -- and the code would be a number; is that right?
A. It -- I -- yeah. It's a number, so you would know, oh, it's a fight or, oh, it's -- you know, this is actually a medical, like somebody's, you know, passed out or, you know, something like that, you would -- you could determine whether it was a fight or not, but I don't remember the codes.
Q. Okay. So, I mean, just, for example, I'm not asking you to say just as an example Code 3 medical, 3 would tell you that it was a fight; Code 6 medical, 6 would tell you someone -- someone had fallen out from something?

A. Yeah. Well, I -- yeah.
Q. Okay.
A. But I don't -- I don't remember the actual numbers.
Q. Yeah. That's fine. Yeah. I just want to make sure I understand. Okay. All right. So if you -- if you didn't have to respond to the --
Well, in what sorts of instances would you -- after a fight would you be asked to respond to the dorm?
A. It -- just if they said whatever code in medical, we would go then.
Q. Okay.
A. If it was just a fight, once they got it broke up, the -- the whoever's, you know, they would either be brought down separately I guess. I don't know. We would be in the office, so who else was over on the block is not who I was dealing with, whoever was in the office was. So I don't -- I don't know how they chose which one to send or any of that. Just whoever they brought into my office and said, hey, they were just in a fight and he's leaking, fix it, so that's what we did.

Q. Okay. All right. So you -- you don't know how it was that -- that they would decide, okay, this -- this requires medical to actually respond to the place or --

A. No.

Q. -- this required -- you know, we are able to bring this person down?

A. No.

Q. Got it.

A. Because whenever they called over the thing or whoever hollered and said we need medical, we would either report there or they would say we are bringing somebody, and you just get your office prepared for them bringing somebody.

Q. Okay. Got it. Okay. At what level of emergency care was -- I think you sort of touched on this, but I want to make sure I understand. What level of emergency care could CCC provide onsite before you would have to route someone out?

A. I mean, like -- I mean, we can patch up, you know, like if it's something superficial or, you know -- but usually, if we had any doubts, we just send them on to let them be

checked anyway. I mean, that's -- I mean, if it's a little laceration, you know, that's -- but if it's anywhere in the torso area that it could have hit something vital or anything like that, we usually would watch them, watch their vital signs, watch their oxygen levels, those type things.

Q. And when you are talking about watching them, would you be watching them in the -- in the office or where -- where would they be?

A. Both. We would watch them in the office or our office was right beside what they called the block, and so they would just sit there and we would monitor.

Q. And the block, were those cells?

A. No. This is -- I mean, they have little places where you put the handcuff, but it's open; like you just sit there, but you can't go anywhere.

Q. I see. Okay. So it's like it's on the hall, it's open?

A. Yes.

Q. Someone has a line of sight on you?

A. Yes. Yeah. You just have the

little -- the little hooks that you put the -- the handcuffs on.

Q. Okay. I see. All right. And so if you -- if someone had been stabbed and you were kind of monitoring them, how frequently would you be taking vitals; you know, what -- what would that look like?

A. It's according to what their vitals looked like initially, you know.

Q. Okay. So if someone gets stabbed somewhere in their torso, you're not sure what all was hit and so you -- you take their vitals, what -- what all are you taking and what are you looking for?

A. Blood pressure, pulse, oxygen. We don't do a temperature. So you are looking for any drop in the oxygen level, you're listening to lungs to see if you can hear breath sounds on both sides, you are listening to see if you can hear any air, you know, without the stethoscope, those type things. And you're looking at how deep the puncture wound is, you know, is it a small laceration, you know, where is it, those type things.

Q. Okay. All right. And so this is

all -- these are all things that you are looking at kind of using your training and kind of professional knowledge as a nurse, correct?
A. Yes.
Q. Okay. All right. If a fight happens -- and, again, I'm talking about that '21 to '23 time period -- if a fight happens when an LPN isn't there, like in the evening or over a weekend, what happens?
A. The lieutenant, I think that's what they call them, your shift supervisor or shift head, whoever has, you know, the discretion, usually maybe sometimes they would call us and say, hey, it's in this area, you know, what do you think. Usually, my answer is I'm not there, I'm not looking at it. If you feel unsure about it, if you feel unsafe about it, send them on.
Q. So on the weekends, were the LPNs ever expected to come in to evaluate people who had been in a fight?
A. Expected?
Q. Uh-huh (affirmatively).
A. Not that I'm aware of. I do need to ask if I can take a break --
Q. Yes, of course.

A. -- use the restroom.
MS. CUMMING:
Yes, of course. Is five minutes okay or do you need ten minutes?
THE WITNESS:
Well, I have to figure out where they want to send me to the restroom, so --
MS. CUMMING:
All right. Let's -- let's go off until 2:54, okay.
THE WITNESS:
Okay. 2:54, and I just -- how will I --
MS. CUMMING:
I -- I would just leave it on, and if -- if you can see where the little microphone button is, that -- that will mute you.
THE WITNESS:
(Complied.)
MS. CUMMING:
Yeah. Good.
(A short recess was taken.)
MS. CUMMING:

All right. We will go back on.
BY MS. CUMMING:
Q. Okay. So we were talking about what happens after hours, so to speak, if there's a fight. And so you were saying that the shift supervisor has the discretion to call the LPN, correct?
A. Yes, ma'am.
Q. Okay. And that there were -- in your understanding, there was not an expectation that an LPN would come in after hours to assess someone if there was a fight, correct?
A. Not that I'm aware of, no, ma'am.
Q. Okay. And so then either the shift supervisor would make the call to send that person out to the emergency room or not, correct?
A. Correct.
Q. Okay. All right. And sometimes they -- the shift supervisor would call, but your advice would generally be send them if you are worried, right?
A. Yeah.
Q. Okay. Got it. If -- if a fight did happen while the LPN was there, was there anybody who was able to give like sutures or anything

like that at CCC?
A. Sutures?
Q. Uh-huh (affirmatively).
A. No.
Q. Okay. All right. So if there was a laceration that was big enough, that person was going to have to go to the -- to the hospital, correct?
A. Yes.
Q. Okay. Okay. So I want to sort of take this in two parts, and the -- the first part will be if like when an LPN is there onsite. We have talked a little bit about sort of you're watching someone if there's been a laceration.
What other -- what other criteria would you consider if you were going to send some -- you know, to determine whether or not you needed to send someone to the emergency room after a fight?
A. I mean, it would be how they acted, if their vital signs deteriorate, where it's at, how deep it is, you know. I guess maybe number of, you know --
Q. Number of stab wounds?
A. Yeah, lacerations or stab wounds

or --

Q. What about if it wasn't a stabbing, just, you know, like a -- maybe an orbital fracture, maybe, I don't know, a -- metacarpal fracture?

A. I've -- I've sent them out for that too. You know, if the area is swelling, if they can't move their eyes, you know, up or down, side to side without pain. You know, if they can't move the extremity, if there's any deformity, you know, visual deformity. You know, can't bear weight, those type things.

Q. Okay. You're talking about can't move your eyes without pain. What would that indicate?

A. That that orbital bone could be broken and maybe some muscle tissue is -- you know, can get stuck down there. If it's hard to do up, down, side to side without, you know, a lot of pain.

Q. Uh-huh (affirmatively). And what about for like a head injury, would you do any kind of assessment for that?

A. You check the pupils. You know, when you are talking to them, you are assessing

them for person, place and thing. You know, are they oriented, do they know where they are at, do you know the time of -- you know, time of year, time of day, you know, when you are talking to them and you can, you know, judge those things.

Q. Okay. Would you ever send people out for, I don't know, to borrow an NFL term, like a concussion protocol or something like that?

A. We have or I have personally, you know, wasn't sure on, you know, how hard they hit their head or they had, you know, lacerations, multiple lacerations with, you know, their head was slammed in the wall or, you know, whatever. I've sent them out for that.

Q. All right. And now when the LPN isn't at the facility, do you know what criteria is used to determine if someone needs to go out to the -- to the ER?

A. I do not.

Q. Okay. Would that get written down any place that you know of that a shift supervisor could refer to?

A. I do not know.

Q. Okay.

A. As far as, you know, what their -- what they have as far as their shifts or -- I don't -- I don't know.
Q. Okay. But you as a -- in the medical department, you're not aware of any time that the medical department was asked to put together anything like a checklist or, you know, kind of of like a flow decision tree or anything like that?
A. No, not -- not that I'm aware of. Now, they may have had something done like that because this was a DOC facility prior to ICE, so they may have had something prior to that in place that I don't know anything about.
Q. Okay. All right. But just in terms of what you recall from '21 to '23, you -- you don't recall hearing about or seeing anything like that?
A. No.
Q. Okay. Okay.
A. Not that I recall.
Q. If someone needed emergency care beyond what the facility could offer, where did -- where did they go?
A. We had contracts with LaSalle

General Hospital. And what is Riverland called now? Riverland is called Trinity, Trinity Medical.

Q. Where's Trinity?

A. Ferriday, like on that highway like going towards Vidalia, so it's pretty much I think the same distance from LaSalle General to here and Trinity to here.

Q. All right. And -- and where is LaSalle General?

A. Jena.

Q. Okay.

A. There are no hospitals in Catahoula Parish.

Q. So -- and the -- and you said there are contracts. Was there -- LaSalle Management had a contract or had contracts with LaSalle General and Trinity; is that right?

A. The Catahoula, are -- are we going from -- we are talking about present or before?

Q. Oh, good question. Let's -- let's take that '21 to '23 time period.

A. Catahoula Correctional.

Q. Okay. And then before that in 2020, was it still Catahoula?

A. No. That was LaSalle Management.
Q. Okay.
A. And they had contracts with back then it was Riverland. I don't think they had changed their name yet and built their new hospital and facility, so if you look, I think the contracts will be with Riverland Hospital and LaSalle General.
Q. Got it. Great. Thank you.
A. But at some point, Riverland changed their name to Trinity Medical and built a new hospital and facility and they moved out of the old building.
Q. Got it.
A. But I don't know when that took place.
Q. Got it. Okay. That's helpful. Thank you.
Okay. But CCC is an entity, not the sheriff's office, but CCC as an entity is the one that had the contracts with LaSalle General and Trinity, formally Riverland; is that right?
A. I don't know how that works. I don't know if Catahoula Correctional is an entity by itself. I don't -- I don't know the answer to

that.

Q. Okay. I got you. Fair enough. Okay. Would -- would one of those get used -- would one of those get used more frequently than the other?

A. We would try to alternate, you know, same distance, so you're not, you know, just whichever one.

Q. Yeah. Okay. So one -- if the last person who went out went to LaSalle General, the next person you sent out you'd try to send to Trinity?

A. Yeah. I mean, usually we would try to, you know. Now, sometimes you could get more stuff done at, you know, LaSalle General, you know. If Trinity's CT was down for the week or -- you know, or if, you know, LaSalle General -- at some point, one of them's CT was down. I don't remember. Well, why would you want to send patients there if, you know, they probably need a CAT scan. You know, so for the next week or two, you're going to -- all go to LaSalle because their machine's down or, you know, those type things; but for the most part, I've sent to both.

Q. Got it. Okay. Thank you. And how

would those transports happen to the hospital?
A. During the day, I would call transportation, tell them I needed -- well, let me ask this. Are we going -- are we just going for a regular fight or am I calling the ambulance?
Q. Well, that's my question to you. So I guess in that '21 to '23 time period, what -- what were all of the available ways to get to the hospital, if -- if you needed to send someone?
A. So I would -- if it was something I felt was emergent and they needed to get out of here and somebody else needed to watch them and have their eyes on them, I would call the ambulance.
Or, you know, if it was a fight on fight, I think he's got a broke nose or -- you know, but his vitals are stable, you know, his oxygen level is all right, he's talking, he's -- you know, all of this, you know, I just need to get him an X-ray of his face and, you know, so I can send him to wherever else he needs to go, then I would call transportation, have transportation set up for them to come and get them. I would make copies of, you know, any

medicines he takes, anything we did while they were here and send that with them and call and report.

Q. Okay. And who would you call and report that to?

A. To whatever ER I'm sending him to.

Q. Okay. All right.

A. When you call the ambulance, you don't have to call a report. They do their own report.

Q. Okay. And when you would call an ambulance, how would that go?

A. Either I would call -- when we had Northeast here, you would actually just call their direct number, whatever number is listed in the nurse's station in there, I would call it, tell them I need an ambulance to Catahoula Correctional and they would send me an ambulance. I think Northwestern (sic) pulled out at some point and we were -- then I would have to call 911. I would call 911, tell them what I needed and then they would dispatch from there.

Q. And 911, would that go to the sheriff's office?

A. Yes.

Q. Okay. All right.
A. Well, I assume.
Q. Okay.
A. Where -- wherever their 911 hub is. I don't know.
Q. Okay.
A. I just dial 911.
Q. Okay. And so there was a period of time when you could contact Northeast Ambulance directly to say, hey, I need an ambulance?
A. It was their -- I think it was like their dispatch line. I don't -- I don't know what number that was that was listed. I just called that and say I need an ambulance.
Q. Got it. Would the nurse be responsible for making that phone call or would Control 1 do that?
A. Either/or. If I -- if -- if we are in the middle of doing something and I can't get to the phone and make the call myself, then we would say, you know, have somebody, whoever's down there, whoever's -- you know, we need an ambulance --
Q. Uh-huh (affirmatively).
A. -- if we are busy working.

Q. Yeah. So in terms of the charting at CCC, how did that work?
A. Can you be more specific, like what --
Q. Yeah.
A. I don't know what you're asking for.
Q. Yeah. So let me ask this: Did you have an electronic medical record at CCC?
A. I don't know if they consider that an electronic medical record; but yes, we chart electronically, like it has their -- their information in it, yes.
Q. Okay. And would you also -- and when you talked about charting electronically, would that be in the PTS?
A. Yes.
Q. Okay.
A. Yes.
Q. And just for the record, I -- I don't know what PTS stands for. I don't think I've talked to anybody who does yet.
A. I don't either.
Q. Okay. So -- but that is the -- like the jail management system, like the electronic jail management --

A. Yes.
Q. -- system at CCC?
A. Yes. It has all of their stuff in it.
Q. Okay. And so nurses would have access to PTS?
A. Yes, ma'am.
Q. Okay. All right. And so there would be medical entries entered by the nurse, and so there would be notes kept electronically that way, correct?
A. Yes, ma'am.
Q. Got it. Okay.
MS. CUMMING:
Okay. I want to show --
BY MS. CUMMING:
Q. And then we have been talking about hospital routes. Would that information get entered --
Well, let me ask this. Whenever you sent someone out to the hospital, let's take an example of someone who was in a fight at the time that an LPN was there and the LPN decided to send that person out to the hospital. Can you walk me through every place that that would get

documented, every piece of paper that you would fill out?

A. We have like a little form that you fill out for if you send somebody to the ER for -- I think it's for the Department of Corrections in case they get admitted or, you know, you have to submit that saying, hey, he -- he left this facility. Tell me the question again because I -- I lost myself.

Q. Sure. Sorry. Before -- before I do that, I just want to ask you when you submit that form, who would you submit that form to?

A. If the Department of Corrections called, then you know the next day, say, it was somebody and they got hurt and ended up staying in the hospital, I would have to submit that form for their records saying, you know, this is why he went out, you know, this is his DOC number or, you know, it had like his information on it and then it had the incident on what led to why he is being in the hospital.

Q. Okay. What was that form called?

A. I have no clue.

Q. All right. And would that be a form that you would submit -- for DOC people, would

you also submit that for pretrial people too to DOC?

A. Yes, ma'am.

Q. Okay. All right. So pretrial or DOC, if someone gets hurt and has to go to the hospital, you are sending that form to DOC?

A. Yeah.

Q. Okay.

A. If they -- if they stay, but I just -- I guess I was taught when I got here that it's just easier to go ahead and fill that out because it has everything you need on it for them to do like a face sheet when they go to the ER. It has their name, their date of birth, if they are allergic to anything, we can write their vitals on it and then it kind of gives a little synopsis of what happened; a stab wound, you know, right arm, you know, cleansed, wrapped, here he is.

Q. Okay.

A. You know --

Q. So --

A. -- and usually we would make a copy of like if they were on medications, make a copy of their MAR and that way they will have a

medication list, just trying to expedite what they will need for an ER visit.

Q. Okay. Got it. Okay.

A. And that -- that form has a name on it, but I -- for the life of me, I don't -- I can't remember what it says.

Q. Okay. Yeah. If it comes to you, you know, sing out.

A. I will.

Q. Okay. And you said you would submit it to DOC. How would you do that; by e-mail or fax or --

A. By fax.

Q. All right. Do you know what fax number you would send that to?

A. The one that's on the form.

Q. Okay.

A. Or if there -- there is a certain person that called and said, hey, fax it to -- you know, because usually a contact person from DOC would call, whoever's going to, I guess, handle that -- that case or I don't know how they do that.

Q. Okay. Did -- was there a specific contact person that routinely was in touch with

CCC?

A. Yeah. But I don't remember her name.

Q. Okay.

A. But I actually think it was just the secretary for that particular group of ladies that -- that did that. I think it was their secretary.

Q. And this was someone at headquarters?

A. Yes, ma'am.

Q. Okay. So you would send it by fax and the fax that you would send, would that be like through a fax machine or would you send -- you know, sometimes you can send faxes through e-mail. Would it -- how -- how --

A. We have a fax machine.

Q. Okay. Okay. All right. So there's that form that would have information about why they were going out; like what their injury was, what you-all were able to do at CCC, a copy of their MAR?

A. Face sheet.

Q. Face sheet. Okay. And so that's separate from this DOC thing that you are talking

about?
A. Yes, ma'am.
Q. Okay. All right. Tell me about the face sheet. What's that?
A. I don't know. You just go in there and press face sheet and it prints their information; like their name, their address, if they have a -- you know, like an emergency contact on there, that type thing.
Q. And you say "go in there." You are talking about going into PTS --
A. PTS, yes.
Q. -- right?
A. Yes, ma'am.
Q. All right. So PTS has a button that says face sheet, you click on that, it produces the face sheet?
A. Yes.
Q. Okay. And where all does that face sheet get sent?
A. I just staple it with that DOC form and a copy of their MAR, put it in an envelope and give it to the officer.
Q. Okay. And so that's going to the hospital with them?

A. Yes, ma'am.
Q. Okay.
A. Or I give it to the -- you know, if -- if they are going by EMS, then I give it to the EMS guy.
Q. Okay. All right. Got it. So that's part of the -- like the hospital transport packet?
A. Pretty much, yes, ma'am.
Q. Okay. All right. Anything else that's going with the person?
A. (Shook head negatively.) Not that I can think of. I mean, I usually try to make, like I say, a copy of the MAR, the face sheet and that sheet, that --
Q. Got it.
A. And that's it.
Q. Okay. And -- okay. All right. And if the person is admitted or staying at the hospital, then that form, that goes -- that's faxed to DOC. Any -- any place at the facility where you are writing down, you know, where someone went to the hospital or something like that?
A. Yeah. I have a log.

Q. Okay. All right. Tell me about that log.
A. I have anybody that leaves the facility, whether it's the dentist, to a doctor's office, whether it's an ER, I had a logbook. I mean, I'll -- you know, a log. Just a form, you know, that says what date, what they went out for, maybe it has like their DOC number. I don't know. It's -- it just -- it was a log form.
MS. CUMMING:
All right. I'm going to show you Exhibit 30 and see if this looks familiar to you. So Exhibit 30 is two PDFs, so I'm going to show you both of them. This is the first PDF. It's ten pages. I can blow it up if --
(Exhibit 30 viewed.)
THE WITNESS:
Okay. I was going to say. I can't --
BY MS. CUMMING:
Q. Can you see that a little better?
A. Yes.
Q. Okay.
A. That's it.

Q. That's your log?
A. Yes.
Q. Excellent. Okay. Great. Just for the sake of completeness, I'm going to show you these other pages in this first PDF. This health insurance claim form, would that be something you would send to the hospital?
A. You're going to have to blow that up. I can't --
Q. Yeah.
A. Please.
Q. Is that a little better?
A. Yeah. I've never sent -- I don't -- I don't know that form.
Q. Got it. Okay. This all may be -- Eceptionist, is that something that you deal with?
A. I did a little bit of Eceptionist.
Q. Uh-huh (affirmatively).
A. Chrystal did a lot of the Eceptionist.
Q. Got it. Okay.
A. But I am familiar with it, yes.
Q. Okay. All right. I'm just going to scroll through and show you the rest of this.

All right. So -- but on page 1 of Exhibit 30, this first PDF, that's your -- that's your log that you are talking about?

A. Yes.

Q. I'm also just going to show you the second. This is also the log that you are talking about for tracking inmate medical services?

A. Yeah. Can you blow it up?

Q. Yeah, yeah. Is that better?

A. Yes. Yes, ma'am.

Q. Okay. Great.

A. I'm sorry. I thought you heard me.

Q. No problems. The hazards of Zoom. Okay. So this log, so this -- you were keeping this log in 2021 and through 2023; is that right?

A. Yeah. I mean, both of us.

Q. Okay. You and -- and Chrystal Breland?

A. Yeah. Mostly me. That was pretty much I did most of that.

Q. Okay. If someone was sent out after hours, like when you weren't there, would that make it into the log as well?

A. Yeah, because usually I would get --

you know, the ER sends back paperwork or prescriptions or, you know, something; so usually they will send it back in an envelope like we sent their stuff in.

Q. Okay. All right. So would you wait until -- I just want to make sure I'm understanding.

So if someone goes out, so let's say it's a -- it's a Tuesday night, someone's gone out at like 11:00 o'clock, you come into work the next day on a Wednesday, would you have information or paperwork about the fact that someone went out with multiple lacerations on a Tuesday night?

A. I should. Sometimes we weren't aware, you know, like if just say they set the stuff in transportation instead of setting it in medical, you know, if the paperwork was on our desk when we came in on -- on Wednesday morning; then yes, I would know.

Q. Okay. And would you -- if the paperwork was on your desk and you knew, would you -- would you put that into the -- the log?

A. Yes.

Q. Okay. Got it. Okay. And would you

keep those logs monthly?
A. Like what do you -- I don't --
Q. Well, okay. So let's say you've got your -- your -- your date of service. Would you just sort of keep the log running continuously so, you know --
A. No, no, no. Monthly.
Q. Okay.
A. I see what you're saying now. Monthly.
Q. Okay. And then so at the end of the month, what would -- what would happen with that month's log?
A. I do not remember what I did with them.
Q. Okay. We talked with Chrystal Breland earlier this morning. What -- what she recalls was that the logs would be put into a binder and kept in the medical office; does that sound right?
A. Yeah. We do have a binder in there.
Q. Okay.
A. Yes.
Q. And that you would keep the -- even at the end of the year, you would still keep the

logs, the -- the transport logs for the previous year in a -- in a binder; does that sound right?
A. Yeah. Or move them to an envelope and then just put on -- yeah.
Q. And that envelope, where would that be kept?
A. Now, that, I would say maybe medical records.
Q. Okay. All right. Okay. All right. But you don't like throw them away or anything like that?
A. Well, I haven't -- I don't know the answer to that.
Q. Okay. Okay.
A. I don't -- I don't remember throwing any of them away. I do remember the binder, and like if the binder gets too big, we would get the big manila envelopes, write on it what it was and put it in medical records. There's an extra room in medical records like that has boxes in it --
Q. I got you.
A. -- and put them in there. But as far as, I mean, like do they still have stuff from 2021? I don't --
Q. Yes.

A. I don't know. I don't know the answer to that.
Q. Okay. All right.
A. I know they moved a bunch of stuff to the shed, but I don't know where.
Q. Uh-huh (affirmatively).
A. So --
Q. Okay. Okay. Beyond this log of, you know, people going out for -- for outside care, would you keep a log to -- sort of related to unscheduled hospital trips or emergency hospital trips?
A. No. It was all on the same one.
Q. Okay.
A. You know, dentist, X-rays, other doctors' appointments and ER, they were all -- all that one -- the one that you showed me a picture of.
Q. Uh-huh (affirmatively).
A. It all went on that one.
Q. Got it. Great. Okay.
MS. CUMMING:
All right. Now, we -- we were talking about medical records. I want to show you what's been previously marked as

Exhibit 10. Just going up here.
(Exhibit 10 viewed.)
BY MS. CUMMING:
Q. You need me to blow it up?
A. No, ma'am. I was just trying to figure out what that was.
Q. Oh, all right. Well, that's -- that's going to be my question, if you have seen it before and if you know what it is? And I can scroll down for you.
A. Scroll down.
Q. Uh-huh (affirmatively). And tell me if you need me to stop or go back to anything.
A. I mean, this looks like -- go back up to the top.
Q. (Complied.)
A. I don't know what form, like what -- it's a report of some sheet of some -- I mean, like he was in Cell 2 and he was in D-Dorm and he was in E-Dorm. This is like a -- like where he's been in the facility?
Q. So up here (indicated), I -- I see it's called activity sheet for booking number and then it's got a number. Have -- have you ever seen a form like this before?

A. I don't know if I saw one like that.
Q. Uh-huh (affirmatively).
A. Like if I've ever -- I don't know if I've ever had to print an activity sheet.
Q. Okay. Yeah. That -- that's fine. Does this look like something that would maybe come out of PTS?
A. Oh, yeah.
Q. Okay. All right. I -- I know you haven't seen this form before. I'm going to ask you about a couple of -- of details on it to see if you -- you happen to know what they mean. If not, that's -- that's fine. So down here (indicated) at the bottom of page 2 on May 2022, we've got this health care event and it's got the location nurse. I guess the health care event, do you know what that signifies?
A. I don't.
Q. Okay.
A. I mean, would that -- I do not.
Q. All right. And it looks like it's got D-56. Do you know what that means?
A. D-56, that's what dorm he was in and what bed number.
Q. Okay. Great. So -- and --

A. It says --
Q. Go ahead.
A. Because it says location and up top, you know, it said like Cell 1, blah, blah, blah, that's got to be where he was in the computer located at, you know, D-Dorm, Bed No. 56.
Q. Got it. Okay.
A. But even in the one up top above the one you just asked me about?
Q. Uh-huh (affirmatively).
A. It says, "Health event," and then it has jailer, like jail, D-R.
Q. Let's see. Going up to page -- okay. On 5/12/22 --
A. Yeah.
Q. -- health care event?
A. Yeah. See, they --
Q. Got it. Uh-huh (affirmatively).
A. All of them say health care event, so I don't understand that.
Q. Okay. I don't either.
A. I don't --
Q. Yeah. Okay.
A. Nurse. Okay.
Q. On -- on the location, do you know

how would -- would the nurse enter the location, or does that automatically get filled in?

A. I guess that automatically gets filled in because half the time I -- I could tell you where -- what dorm, you know, maybe what dorm they come out of, but I can't tell you a bed number.

Q. Yeah.

A. And that other number has got to be a -- I would assume that's a bed number.

Q. Yeah. And -- and we've had testimony to that effect from security, so I think that's right.

A. But we don't --

Q. So we'll --

A. We don't enter it. When I -- from what I remember on our notes, it didn't ask for like their bed number, even a dorm number. You would just chart it, you know, because you were already in their -- in their chart, so we didn't have to put, you know, where they were located or any of that.

Q. Okay. All right. So that would just be automatically filled in by PTS?

A. It would have to be.

Q. Got it. Okay. All right.
A. Not something that we would put in, though.
Q. Great. That's -- that's perfect. That's exactly what I needed to know.
Okay. And let me -- here (indicated) where it says like location nurse, does that indicate like maybe there's a chart entry that's happening or -- I don't know. Do you have any idea what that might mean?
A. I do not.
Q. Okay. And up here (indicated) on the top of page 2 on 8/8/2022 where it says Location, RMC, do you know what RMC is?
A. No. RMC.
Q. Okay. All right. We also have an RRMC up on the bottom of page 1. I -- one theory was Rapides Regional --
A. That --
Q. -- Medical Center?
A. Well, that's what I was thinking, is it -- is it Rapides Regional Medical Center and maybe the other one is just Rapides for, you know, Rapides Medical Center? I don't -- I don't know.

Q. Is there like a -- how would that -- you know, if someone is -- is sent to the hospital, is staying at the hospital, is there a way to kind of keep track of that in PTS?

A. I -- I don't -- I don't know. On mine, like I would have to chart, you know, so we had to get notes every day from, you know, if they were in Rapides or, you know, Cabrini or whatever, you know. So we would -- you know, I would either scan what -- the notes that Rapides sent and put a note in that said, you know, offender is currently housed at Rapides Regional, you know, see note and -- you know, or I would -- I would actually type the whole note itself out on there, you know, whatever they sent me from that hospital stay, I would chart.

Q. Got it.

A. So try -- to try to keep my records as updated as, you know, theirs.

Q. Got it. Okay. This might be a good time to -- I have Mr. Young's medical records. So before we get into those, let me just ask is there anything that you recall about Mr. Young?

A. I remember the name and it's -- other than that, that's it.

MS. CUMMING:
Okay. So this is going to be Exhibit 31. We are going to go down or we are -- we are just going to cover the first 11 or first 10 pages of this.
(Exhibit 31 viewed.)
BY MS. CUMMING:
Q. So can you see this?
A. Somewhat, yes, ma'am.
Q. All right. All right. I can blow it up some, if that helps. Does that help?
A. Yes.
Q. Okay. All right. So just I want to -- I'll -- I'll show you a couple pages of this and my -- my question is going to be have you ever seen a printout like this before?
A. Yes.
Q. Okay. What is this?
A. This is our nurses' notes.
Q. All right. And these are nurses' notes that are in PTS?
A. Yes.
Q. Okay. All right. And would there be like a -- so this, as it was given to us, there's -- it just sort of launches right into

the notes. Would -- would there normally be anything like kind of up at the top explaining this note?

A. No.

Q. No? Okay.

A. Uh-uh (negatively). No. It's going to --

Q. So there's --

A. It's going to show you the injuries. That's --

Q. Okay. So there's no like cover sheet or anything like that?

A. Uh-uh (negatively).

Q. Okay. All right.

A. It's not going to say this is so and so's chart, no. It's strictly -- it just goes into the entries.

Q. Got it. Okay. And then this date here (indicated), when you enter into PTS to enter a note, does this date and time, is this automatically filled in with the date and time that you are entering the note, or is this something that you type in?

A. I can type it in. Like you type it in.

Q. Okay. So you could enter it. So this is 21:27, but you could be entering this at 10:30 at night, but you were talking about something that happened at 9:30 at night; is that right?
A. Yes.
Q. Okay. All right. And then this third column S, do you -- do you know what that means or what that designates?
A. I have no clue what that is.
Q. Okay. All right. And then this fourth column S-H-V 001, do you have any idea what that means?
A. No, ma'am.
Q. Okay. Down below, nurse is also noted in that, so I don't know if that helps or --
A. I -- I don't -- I don't know what it pertains to, no.
Q. Okay. All right. Is there any version of this that sort of has column headers that would say, you know, this is where you put in, I don't know --
A. Not that I recall, no.
Q. All right. And then we have got

this fifth column for emergency call. Does that get automatically filled in; is that something you type; what is that? Do you know what that means?

A. It's like a drop-down, I think, if I remember correctly, like you -- you have stuff to choose from.

Q. And do you -- do you recall what all -- so I see emergency call and nurse notes. Do you recall what else there was to choose from?

A. I do not.

Q. All right. And then we have got RMC and nurse in the sixth column. Do you know what that is or what that means?

A. I don't. Like, I -- I mean, I could speculate like Rapides Medical Center or whatever, but then I don't know why it would say nurse at the bottom. I don't -- I don't know what it correlates to.

Q. Okay. All right. And then it's got your name. So is this something that you would have to type in yourself, or when you log in, this automatically populates?

A. When I log in, I think it automatically populates.

Q. Great. Okay. And then here (indicated) in this last column, all of this information, where does this come from?

A. So that comes from the paperwork from Trinity. Like the CT of the abdomen and pelvis, that would be something they did in the ER that I would have -- I would have gotten that back from there.

Q. Okay.

A. So probably their ER record.

Q. Okay. Got it. And you would have just like copied and pasted --

A. No. I would have typed it.

Q. -- what was in the ER record?

A. I would have typed it.

Q. Okay.

A. Yeah.

Q. Got it. Okay. And do you know who -- would you keep -- we have talked about sort of the out-of-facility medical care log. Would you keep a log of injuries that people had received or anything like that?

A. Well, usually on -- on that form, does it -- it's not going to be a list per se. It would just say, you know, ER and we know that

was usually probably an injury or a stabbing or a fight. But no, as far as, you know, Mr. Donald, you know, had a broken nose, and then this one had that, no. I don't -- I don't remember a log of specific injuries, no.

Q. Got it. Okay. All right. So the closest that you would have would be -- we'll -- we can go back to Exhibit 30, this --

A. Yeah. Because it says, you know, service provided, you know. Well, if they went to LaSalle General ER and reason for service was altercation, you know, stab wounds, fight, you know, so -- but not specific, not that he had 32 stab wounds and a broken nose, no.

Q. Uh-huh (affirmatively). Got it. Okay. All right. Do you know -- do you know who would pay for medical care if someone had to leave the -- leave out of the facility for medical care, who would pay for that?

A. I have no clue.

Q. All right. Do you know who would know that?

A. I do not.

Q. All right. Was -- do you know was there anybody who was responsible for kind of

keeping track of billing for medical care?
A. I -- I have no clue.
Q. Okay. Okay. You -- you indicated that even -- even for pretrial people, if they were going out to the hospital, you would -- you would need to -- if they ended up getting admitted and staying in the hospital, you would need to inform DOC; is that right?
A. I'm pretty sure, yeah.
Q. Uh-huh (affirmatively).
A. Because on -- do you have that form?
Q. I don't. If I did, I would have shown it to you. Sorry.
A. Because on it, you know, you can either have your DOC number or it's something else under there maybe that the pretrial guys get, like another number. I -- I don't know. I don't know how that works, but when you are -- maybe like a booking number. I don't know. It's some number that I would put in there to -- for them to know, you know, if they didn't have a DOC number, you know, the six digit number, there was another number that I put in on there for them to know that, yeah, that that was a pretrial or --
Q. Yeah. And -- and I can -- I can

represent to you that there -- yeah. Catahoula would -- would assign a booking number and it was usually longer than the six digit DOC.

A. Yeah. It was -- yeah. I knew it was longer than like an original DOC number, but I don't know how that works.

Q. Yeah. Okay. Yes. No. I -- I would love a copy of that form, so -- but I -- I don't have it right now.

MS. CUMMING:

Okay. All right. I -- I did want to show you one other thing. This page 11 of the medical records, Exhibit -- Exhibit 31. Show that to you. So this looks like this is a fax coming from DOC.

(Exhibit 31 viewed.)

THE WITNESS:

Yes.

BY MS. CUMMING:

Q. All right. And then we have got some case managers. Does this look like something you've seen before?

A. Yes.

Q. Okay. When -- when would you have seen this before?

A. So if they are admitted, DOC, they -- they send their nurses' notes or whatever to DOC just like they would do us. You know, I would have to call for mine, but I'm assuming -- well, I'm not even going to say that because I don't -- I don't know if their case manager from the hospital and DOC's case manager just have an understanding and they just send them, you know, the notes every day. I don't know how that works, but usually I would either have to get in touch with the nurse that was taking care of the offender or the case manager and ask them for daily updates, you know, or I would call personally and say, hey, I'm checking, you know, on my guy in whatever room, you know, and then DOC would forward what they get because they know that he is our offender here, you know, they would forward what they get to us. That way I would have a copy of it.
Q. Got it. Okay. And they would do that by fax, correct?
A. Yes. Or e-mail.
Q. Or e-mail. Okay.
A. Yeah.
Q. All right. And then here

(indicated), it's got a list of case managers, it's got Alisa Horton. Does that name look familiar to you?

A. I don't recall. I honestly don't.

Q. Do you recall any of these case managers to any --

A. That's what I was looking to see. I -- I don't -- I do not know. I don't. I want so say that Tammy sounds familiar, but I'm not a thousand percent. I don't know.

Q. Okay. Yeah. And the fax number, is that -- do you know is that their fax number?

A. The one that's highlighted or I don't -- I don't -- which one are you --

Q. Yeah.

A. Oh, sorry.

Q. Yeah. Sorry. I keep thinking you can see my cursor. Can you see that highlighting in blue?

A. I do. I -- I don't recall the fax number, so I can't tell you if that's theirs or not.

Q. Okay. Catahoula Correctional Center, that's in a 337 area code?

A. Catahoula?

Q. Uh-huh (affirmatively).
A. It's a 318 area code.
Q. 318. Great.
A. Yes, ma'am.
Q. Okay. All right. Okay. All right. Do nurses have a say in where someone can be held?
A. Can you be more specific?
Q. Uh-huh (affirmatively), yeah. So, you know, if someone has some sort of medical issue, can nurses say, look, this person really shouldn't be held on a dorm?
A. Like do we have a say in that?
Q. Uh-huh (affirmatively).
A. I still -- you're still going to have to break the question --
Q. Sure.
A. -- further down for me.
Q. I guess let me ask this. Like can you assign someone that if you think it's medically necessary that someone not live in a dorm, can you assign them to live in a cell or, you know, some other housing assignment that is not on a dorm?
A. Where -- there -- there are only two

things here --
Q. Uh-huh (affirmatively).
A. -- a dorm or a cell. So when you say "somewhere else," where else?
Q. Well, let me -- let me ask you this. Can you -- can you direct someone to be housed in a cell rather than a dorm?
A. Like for their safety?
Q. If you think it's medically necessary.
A. I thought someone was knocking on the door.
Q. Okay.
A. For their safety, I -- I -- the only person that I've ever asked to not be put in a dorm was a guy with a -- he had a CPAP and I preferred that he not be in a dorm.
Q. Okay. Do you --
A. So --
Q. Do you happen to remember his name?
A. I do not.
Q. Okay.
A. And I don't think we ended up -- I don't think he ended up staying here.
Q. Okay.

A. You know, that there's like maybe one plug in these dorms, and if you unplug their microwave, they are probably not going to be very happy with you. So I don't think the guy ended up staying here, so --

MS. CUMMING:

I'm going to show you exhibit -- what's been previously marked as Exhibit 23 and that may help. I'm just trying to understand. This is page 20 of Exhibit 23. It's dated 8/1/2022. I'll represent to you we have previous testimony that this (indicated) column, this first column is a cell number; second column is race; third column is the name of the person in the cell; the fourth column is why they are in the cell; fifth column is their status; and then this (indicated) column, this next column is the person who kind of assigned them or put them in the cell. So we have got in Cell 2 Mitchell Brevelle.

(Exhibit 23 viewed.)

THE WITNESS:

Now, if it's something like if they

have scabies --
MS. CUMMING:
Uh-huh (affirmatively).
THE WITNESS:
-- or, you know, something like that where they are going to completely infect the whole dorm, yes. I've -- I've put people in the cells for scabies. I've -- when we did COVID stuff, you know, we had a whole COVID dorm, or actually we had a pre-COVID dorm and we had a COVID dorm, you know, but I don't --
MS. CUMMING:
Yeah. Okay. All of -- all of that makes sense.
THE WITNESS:
Yeah. You know, or if it's something like that. Now, if it's somebody who has -- just say I've had guys who have came back with their mouths wired shut, you know, or they have the periorbital or they just had a major surgery, then yes, I will say you have to go to a cell. If they refuse to go to a cell, I make them sign a release that

holds me not liable for it so if something happens in the dorm -- because I've had them do that to me, you know, where they will say my people are going to take care of me when I get to the dorm, you know --

MS. CUMMING:

Uh-huh (affirmatively).

THE WITNESS:

-- so --

BY MS. CUMMING:

Q. Okay. I -- I got you. So infectious disease, COVID, scabies, things like that?

A. Yeah.

Q. If someone's coming back with like post-surgery or after a serious injury where they might be more vulnerable?

A. Yeah.

Q. The rather horrifying example of the poor man on a CPAP machine, so those are examples of when you would say, look, you really should be in a cell; is that right?

A. Yes.

Q. Okay. Got it. All right. So I -- do you happen to remember why this guy -- why he

was in a cell?
A. I do not.
Q. Okay. All right.
A. Now, and also, if they say that they are suicidal or, you know, they make those types, then we'll put them -- I have seen them on that sheet where they will put my name on there. If I put them on like a 72-hour hold or, you know, for suicide precautions or whatever, I've seen them put my name on there like that.
Q. Okay.
A. Yeah.
Q. And so that was going to be my next question is like how does -- how does your name get up -- well, on this sheet?
A. That would be my only other explanation is that I obviously fussed at somebody, told them that they better not -- you know, that he better stay in there for whatever reason --
Q. Got it.
A. -- medical.
Q. Okay. When -- when you need to fuss at -- I mean, I fuss at people for a living, so I understand. If you -- if you needed to fuss at

someone, who would you fuss to?
A. Probably to the lieutenant on shift. If it was something -- you know, if they called me, just say they called me and said that he was, you know, saying he's suicidal or whatever, I would tell them to put him in a suicide cell, put him in a suit, you know. And I don't know. This name doesn't even ring a bell to me --
Q. Okay.
A. -- so -- and that was -- also, what was that, 8/1 of '22?
Q. Uh-huh (affirmatively).
A. Yeah. I -- I don't know why.
Q. Okay. Yeah. That's -- that's fine. Yeah. And now I'm just sort of asking kind of in general like how-it-all-works questions; so yeah, that's -- that's fine. Okay.
A. But, I mean, like when we get intake, they don't say, hey, you know, where do you think this one should go and where do you think this one should go. They don't -- they don't -- they tell us, hey, this -- they are all going to B-Dorm, you can do your intake before we get in there, or, you know -- I mean, they don't -- whoever the lieutenant is on shift does

the assignment I think. Maybe.
Q. Got it. Okay.
A. They don't ask.
Q. They don't ask. Right. You have to -- you have to say?
A. Yeah.
Q. Got it. Okay. So if someone -- if someone is -- is in a cell because you think it's important for their safety, for any of those reasons or the safety of the other dorm, where -- it -- it looks like it gets documented sort of on the cell checklist if your name shows up or an LPN's name shows up. Is there any other place where that would get written down?
A. Like if I put somebody in a --
Q. Uh-huh (affirmatively).
A. -- a cell?
Q. Uh-huh (affirmatively).
A. I don't know if that would be something that I would -- I mean, I would definitely chart like if they refused. You know, say they have came back from surgery, they have wired their mouth shut, I know for sure that I would chart if they refused to stay in the cell, but I don't know if I would chart, you know, that

they are in a cell.

Q. Uh-huh (affirmatively).

A. And that there wasn't a form or, you know, a log or anything on my end.

Q. Got it. Okay.

A. Usually, I didn't -- like when I chart, I didn't put specifically like, you know, offender is in Dorm D, you know, or that -- you know, we didn't chart where they were housed per se. I mean, and maybe if I was -- like if we responded, I would sometimes chart, you know, responded to D-Dorm for altercation where, you know, offender was found on the floor, you know. But usually when I charted, I didn't chart where they were housed.

Q. Got it. Okay. And -- and I'm -- I'm thinking now just about the recommendation that someone be in a -- in a cell, like would that be written down any place that would be passed onto security?

A. Not -- not that I'm aware of, no.

Q. Okay. And then if once you felt like, you know, for the example of the -- the person whose jaw was wired shut, once -- once his wires came out, his jaw was set, would -- would

you have any way of documenting that you felt like he was medically cleared to come out of the cell?

A. I would just put a nurse's note in or I would tell the lieutenant on shift like, hey, I saw him, he looks good, you know, he went to the hospital yesterday, they cut the wires, you know, he can -- you know, or you'll see like a change in his diet or whatever and, you know, I'll just say, hey, he -- he can go back to the cell when you-all -- or go back to the dorm whenever you get a chance or when you-all are moving people next time.

Q. Okay. All right. But that would just be kind of like a verbal conversation --

A. Yeah.

Q. -- with a lieutenant?

A. Yeah.

Q. Okay.

A. Because sometimes they want to come out and sometimes they don't, you know.

Q. Uh-huh (affirmatively).

A. So it would be whatever he told -- you know, I would ask and say, hey, does it feel -- you feel like you can make it in a dorm,

you know. If no, then I'd be like okay, and then just never say -- you know. But if he asked to come out and I felt like he could, then I would tell whatever lieutenant was on shift or whoever had -- you know, was doing the -- the cell movements for that day.

Q. Okay. Were there any restrictions medically on who CCC was to hold?

A. Like specifically?

Q. So, you know, like could CCC hold people with a poorly controlled chronic illness, like poorly controlled diabetes, poorly controlled cardiovascular disease?

A. Harder in jail to hold anybody with any chronic disease, but, I mean, we have pill call, you know, they get their medicines. We do -- you know, if the doctor orders blood pressure checks or, you know, we do routine labs here. If you're not eating a bunch of crap out of commissary and, you know, that kind of thing, you can -- I've had some terrible diabetics here who refuse to -- to do right, but when you go and look at their commissary bill, it's, you know, HoHos and, you know, 40 things of cookies and then they want to know why they are peeing all

the time and their vision is blurred. Well, it's because your sugar is high because you don't take care of yourself. But yes, it maybe can be managed here.

Q. Okay. All right. So, I -- I mean, can you ever think of a time when you have been concerned about CCC's ability to provide medical care for someone?

A. Now, some -- we've gotten a couple -- and I don't know any names off the top of my head, but multiple things where you're having -- had one guy, what did he have? I think he -- his was heart related, like he was on blood thinners, he was on -- I think he had had like triple bypass a couple of years prior, was like blood thinners, stuff that, you know, your labs have to be monitored, you know, every few days, constant. Those things we don't -- I don't have -- I have to send out labs, so you are looking at three to four days for things to come back in, you know.

Q. Uh-huh (affirmatively).

A. So complex things like that where you are having to monitor labs daily or change this to that and you're having multiple doctor visits and cardiologists and stress tests, those

are -- to me are more complicated to handle here.
Q. Uh-huh (affirmatively). Okay.
A. Rural area, you know. But diabetes, I mean, that -- you know, you take your medicine right and you eat right, then those things are manageable. High blood pressure is manageable.
Q. Okay. All right. Okay. So things that are complex that require multiple inconsistent lab draws, things that --
A. Yeah.
Q. -- that require a lot of multiple --
A. I mean, coumadin, when you take coumadin, you have to have lab draws like weekly.
Q. Okay.
A. You know, so it's more complicated. I draw the lab, then I'm looking at, you know, whenever -- according to when I draw it, it could be four days for the lab results to come back, you know. Well, I'm sure that five things have changed since the last time I drew it, so then you are just constantly, you know --
Q. Uh-huh (affirmatively). Okay. I see. If you are -- what about people on psychiatric medications that require lab monitoring?

A. Usually, those are done like every three to six months, like your Depakotes or your -- I haven't had anybody on Lithium, but I don't know what the timeframe is on that. Just speaking from Depakote, usually, that's a three- to six-month lab, you know, to check the liver function because it's harder on the liver.

Q. Uh-huh (affirmatively). And so that -- you feel like that's not something that -- that CCC can't handle?

A. No. He's -- when he -- the way that he worked, you were usually drawing labs on those types of people every three to six months anyway, you know; if it was managed well and he was okay with the labs, maybe yearly, you know.

Q. You said "he." Who's "he"?

A. Elijah.

Q. Elijah Booth?

A. Yes, ma'am.

Q. Got it. Okay. All right.

A. But usually you were drawing labs on them every six months anyway.

Q. Uh-huh (affirmatively). Okay. All right. Okay. If you had someone at CCC that you did have a concern about, either medically or, I

don't know, let's say psychiatrically who wasn't stable, would -- were you able to -- I don't know. Were you able to do anything about that to try and find an alternate place for that person?

A. I mean, I could talk to the -- I don't know what you would call them in there anymore, captain, assistant. It's not assistant warden. It was the office that was right beside ours, and I don't do good with rank. That's not -- I had a terrible time with that. So the two guys that were in there, it wasn't the assistant warden and the warden, but they were below them. Maybe captain and something else. I don't know. You know, we could talk to them and try to say, you know, maybe he needs to be changed to another facility or, you know, I -- you know, he needs more help than, you know, what we can give here, so that --

Q. Okay.

A. There was a guy. I can't remember that guy's name. And then a lot of times, Chrystal could -- you know, like especially with the stuff with the Eceptionist, you know, if it was somebody that had a bunch of stuff, we could submit that to DOC and say, you know, look, we

are just -- we are not equipped here and they would find alternate placing, like, you know, down south or at one of their bigger facilities where they had in-house medical or, you know, an actual medical unit.

Q. Like one of the state-run prisons?

A. Yes, ma'am.

Q. All right. Okay. Okay. All right.

A. There is -- there was a -- it's a -- what did he call it? It's a packet like that we would fill out. I would have to do like copies of their MARs, their medical records. You know, we would actually have to have a physician's order to do the form and submit it, you know, to try to see if we could get them transferred to a bigger facility.

Q. And a physician's order, that would be NP Booth?

A. Uh-huh (affirmatively).

Q. Okay.

A. Yeah. And I can't -- it's a certain -- we called it something and I can't think of -- I can't think of the word that he would write an order for it --

Q. Okay.

A. -- to be transferred.
Q. Got it.
A. But that didn't mean that the state was going to -- I mean, they had the decision to accept it or not.
Q. Got it. How -- I don't know. Roughly, do you know how frequently the -- the state would deny if you were asking for them to take someone?
A. I've had them deny a few, you know; but then I've had them move, you know, a good bit too, so --
Q. Okay. That form that would be sent, would that be faxed or e-mailed?
A. Scanned and e-mailed.
Q. Scanned and e-mailed. Okay. Do you know what e-mail address?
A. I do not. It was just in my -- my e-mails.
Q. Okay.
A. I just click it.
Q. And would -- would both you and Nurse Breland send those?
A. Uh-huh (affirmatively).
Q. Okay. So they would both be coming

from your -- your e-mail addresses?
A. Uh-huh (affirmatively).
Q. Okay.
A. Yeah. We had a specific work e-mail.
Q. What was your work e-mail at the time?
A. R -- I don't know if it was rnix or if it was rnixperrin. I can look it up, I think.
Q. Sure. Yeah. And just for the record, you are referring to your phone?
A. I am. Sorry.
Q. Okay. Great. Yeah.
A. And I don't think I'm going to be able to pull it up because now my Outlook is all school related.
Q. Oh, okay.
A. Yes. So I would have logged out of everything that I had for work.
Q. Okay.
A. So --
Q. All right.
A. I won't --
Q. I'm sorry. Go ahead.
A. One was something. It would have

been my first -- like first initial and either Nix or Perrin or them together, and I don't know if they used -- I don't -- I don't remember who we used.

Q. Was it Yahoo by any chance?

A. Either that or a Gmail.

Q. Okay. Okay. I think we have -- we have gotten a couple of reports of Yahoo e-mail addresses, so that -- that might be it.

A. Okay.

Q. But we will -- we will see what we can do. All right. That's -- that's helpful, though. Thank you.

So we have been -- we have talked about how as a nurse you would see people after altercations, after fights and assess their injuries.

In the course of a month, do you have any estimate of how frequently you would see -- you know, see people with -- with injuries after a fight?

A. One to two a day.

Q. Okay. Like every day of the month, you would see one to two a day?

A. Yeah.

Q. Okay.
A. I mean, every day we were here, you had at least, you know, a fight or two that required that, yes.
Q. And then would you ever see injuries, I don't know, just as an example, like orbital fracture or like a fracture of the -- the metacarpal that, you know, are things that are usually sustained in fights? Would you ever see injuries like that, even if there wasn't a fight reported that made you think that there had been a fight?
A. Usually, yeah. They would, you know, put in a sick call or they would have one of the officers, you know, be like they just wanted you to look, you know, his hand is swollen, you know.
And a lot of times they don't tell us what -- you know, it's zip lip. You know, we ask questions not -- not to ask questions about what happened, you know, like we are not trying to figure out who did it. We just need to know the mechanism, like, I mean, are you hitting -- are you hitting the head here or, you know, like what are you hitting your knuckles on. Is it the

wall, is it a skull, is it soft tissue, so we know what to look for. But a lot of times they don't -- they wouldn't say anything.

Q. Uh-huh (affirmatively). Okay. And how often would you see injuries kind of like that?

A. With the -- like the hands or the orbital fracture?

Q. Uh-huh (affirmatively).

A. You want daily or weekly?

Q. Yeah, daily.

A. Just might as well say one of each.

Q. Okay.

A. You know, maybe one every day, one every two days. Periorbital fractures were pretty common, you know, at least one a week, maybe two a week. Broken jaws, you know, same. You know, we may get lucky and go two weeks without having to send somebody, but it's pretty regular.

Q. And so that was -- that's -- that's kind of my next question was in terms of sending people out to the hospital in the course of a month, how frequently would you have to send people out?

A. ER visits, I would have -- we will just say ten, ten plus per month. I mean, you know, some -- some months less; some months more.

Q. Got it. Okay.

A. You know, the things like football, you know, the Super Bowl or, you know, different things, fights, if they are, you know, big fights on TV, World Series, those type things, you know, whatever month those are held in, it may be more, it may be less.

Q. Okay. And the people that you saw who had been in fights and you were -- you were looking at their injuries, do you know did they ever have access to any kind of mental health assessment or mental health care?

A. Like during our assessment?

Q. Well, not -- not necessarily during the assessment, but like after -- after they were in a fight, after something had happened, you know, did they ever have access to any counselling, mental health care, anything like that?

A. No. I mean, we would talk to them; but other than that, no.

Q. Okay. And did any security staff

from CCC ever interview you about injuries a prisoner sustained?
A. Like more --
Q. Like -- yeah. Like as part of an investigation, if they were, you know, investigating a fight, did they ever talk with you?
A. I mean, they may ask at different times, like hey, you know, made your nurse's note for that incident that happened today or, you know, can I have that, you know, what about the ER report for this guy, so yeah. I mean --
Q. So mostly to get medical records from you?
A. Yeah.
Q. Okay. All right. And who -- who -- was there any particular point person that -- that you would talk to on the security side and who requested medical records?
A. He -- the captain.
Q. Okay.
A. I think that's what he was.
Q. Do you --
A. Yeah. Captain.
Q. Do you remember his name?

A. He has a mustache.
Q. Okay.
A. Mitchell.
Q. Mitchell. Great. Okay.
A. Mitchell. He has a mustache.
Q. It came to you. That's good.
A. It did.
Q. And did you ever take photos of injuries?
A. Like I have sent and asked like permission for me to send to our physician, and then but as far as putting them in the chart, no. You know, I asked the guy, hey, can I take a picture of your leg to send to our doctor. He watched me take the picture, I sent it, delete.
Q. Okay.
A. So --
Q. When you have taken photos to send to the doctor, what -- what sorts of things were you taking pictures of?
A. Well, this guy had -- we were thinking he -- I think he was like a new intake and we were having trouble with his pulse in that leg, so we were worried about a clot. I think Chrystal had sent him out once, I had sent him

out once, and we were both just baffled. I think they had done a doppler and we were showing him, you know, it's definitely discolored, you know, what -- so -- and then we put him on for him to see him I think the next day, so --

Q. Uh-huh (affirmatively).

A. And then we got another guy that we got from down south. He had eczema so terrible, like his socks were stuck to his leg, like peel off, and we sent that to Elijah to see, you know, if there was specific cream. We know what he normally uses with eczema, but with this being such an exacerbated case, we wanted him to look at his legs and say, hey, you know, is there something else you want us to start putting on this before you see, you know, that type of thing.

Q. Okay.

A. So usually we just do all of our measuring and write it all down when we are dressing the wound and taking care of them.

Q. And when you send the -- the photos to the doctor, how are you sending that; by e-mail, by text?

A. By text.

Q. Okay. All right.
A. And we have done that -- we have done that like those two occasions that I know of.
Q. Has anybody from security ever asked you to take a photo for evidence as part of an investigation?
A. Not that I remember.
Q. Okay.
MS. CUMMING:
All right. If we can take just five minutes, I -- I think I'm pretty close to done, but I just want to make sure that I've -- I've asked you everything I need to ask you.
And then the way it's going to work is I'm probably going to come back and tender you to the -- the lawyer for the Calcasieu Parish sheriff, Lenzi, and then to the lawyer for former Secretary LeBlanc and -- and Chief Smith, AJ. I'm -- I -- I may have one or two redirects, but probably not and then --
THE WITNESS:
So there are -- somebody else is

going to question me now?

MS. CUMMING:

They might. It will be very, very short. I promise you, you are in the very, very close -- we are in the homestretch, okay?

THE WITNESS:

Yes.

MS. CUMMING:

So if we could just take five minutes?

THE WITNESS:

Yes, ma'am.

(A short recess was taken.)

MS. CUMMING:

All right. I am officially going to tender you to Lenzi Hebert, the -- the lawyer for Calcasieu.

CROSS-EXAMINATION BY MS. HEBERT:

Q. Hi. I promise we will be very quick and we will keep this moving right along.

Okay. When you were working at the -- the Catahoula facility, were you aware that Calcasieu Parish detainees or inmates were housed there?

A. Yes, ma'am.
Q. Were you aware that the plaintiff in this case, Mr. Young, was a Calcasieu Parish detainee?
A. I don't recall where he came from, no, ma'am.
Q. All right. Did Calcasieu Parish Sheriff's Office ever have any control over your day-to-day operation at the Catahoula facility?
A. Not that I'm aware of, no, ma'am.
Q. At the time that the Calcasieu detainees or inmates were housed at the Catahoula facility, were you ever considered to be an employee of the Calcasieu Parish Sheriff's Office?
A. Not that I'm aware of, no, ma'am.
Q. Did -- are you aware of any time that Calcasieu Parish Sheriff's Office would ever supervise your work at the Catahoula facility?
A. Like can you be more specific with your question? Like did they ask for stuff from me or did they look at my stuff or --
Q. Sure.
A. Is that what you mean?
Q. Did they ask you how you did your

job, how to handle patients or anything like that?

A. No, ma'am, not to my knowledge.

Q. Did you -- were you ever required to report to Calcasieu Parish in regards to this incident with Mr. Young?

A. Personally, no, ma'am, not that I recall.

Q. Okay. And were you ever paid by Calcasieu Parish Sheriff's Office in relation to your work at Catahoula?

A. No, ma'am. Like did I receive a paycheck from Calcasieu?

Q. Yes. That's what I mean.

A. No, ma'am.

MS. HEBERT:

All right. Thank you. That is all the questions I have. I will tender to Shane, AJ, whoever.

CROSS-EXAMINATION BY MR. KROUSE:

Q. Okay. Hey, Ms. Nix. My name is A. J. Krouse, and I represent Secretary LeBlanc, Seth Smith, Department of Corrections. I'm an attorney in New Orleans.

My first question for you is who was

your payroll employer during the time period that you were at Catahoula Correctional Center?

A. For some of it, it was LaSalle Corrections; and then once Catahoula Parish Sheriff's Office took control of the prison, then it was Catahoula Correctional is who wrote -- you know, who deposited my check.

Q. And can you give me the approximate time period that you were employed either by LaSalle or Catahoula while you were an LPN at the facility?

A. So from February of -- did we do 2020 I think is when I started, and that was LaSalle Management owned the facility and I was unsure of when the sheriff's office took over. I don't know the specific date.

Q. And so when was your last day at Catahoula?

A. August of 2023.

Q. And do you recall who your direct supervisor was for LaSalle Management?

A. No, sir.

Q. Okay. Would it have been a medical doctor or another nurse or you just don't recall?

A. Well, when LaSalle Management --

Q. Yes.
A. -- was here, we had a -- so we had RNs on staff, so that would have been the direct supervisor for me, whoever I worked with that was the RN.
Q. Okay. And for Catahoula?
A. And for Catahoula, I'm -- I'm assuming either the assistant warden and warden or -- and I don't know how rank goes. I don't know if the captain was above us or I don't -- I don't know the answer to that.
Q. Okay. At no time while you were at Catahoula were you ever employed by the Louisiana Department of Corrections; is that correct?
A. No, sir.
Q. That is correct?
A. That is correct.
Q. Okay. And nobody from Louisiana Department of Corrections ever provided you any type of orders or directives or how to do your job; is that correct?
A. That's correct. That I'm aware of.
Q. Yes, ma'am. Now, I think your earlier testimony was that you don't recall Mr. Young at all; is that correct?

A. I recall the name.
Q. Okay. But you don't recall treating him for injuries allegedly sustained at Catahoula; is that correct?
A. I do -- I -- I do not remember the incident, no, sir.
Q. Okay. And -- and not only do you not recall the incident, but you don't recall providing any medical treatment to Mr. Young while you were employed there?
A. No, I -- I don't. I mean, I -- if I remember the name, that means I've seen him in medical; but as far as what he came down there for or what I treated him for, no, I do not.
Q. Okay. And when Elizabeth showed you the exhibit, I'm not sure whether it was 31 or 32, but basically had your name with the notes that you typed up from the hospital that were provided to you; do you recall that?
A. Yes, sir.
Q. Those notes were not your notes. They were somebody from the hospital; is that correct?
A. That is correct. Because he was not in my care.

Q. Okay.

A. I sent him to the emergency room. What I read of that a little bit, she didn't go through the whole thing. I just read like the first little bit, looked like he had been sent to the ER, so that was the physician and the nurses' notes for the ER visit. He -- he said -- they said not much longer.

MR. KROUSE:

That's all the questions I have. Thank you very much.

THE WITNESS:

Thank you.

MR. BRYANT:

Liz, do you have any redirect?

MS. CUMMING:

No, I do not, so --

MR. BRYANT:

All right.

MS. CUMMING:

Unless you have anything, Shane.

MR. BRYANT:

All right, Robin. So we are done with your deposition now. What's going to happen is Chérie here is going to type

this up and then you have a chance to look at it before it's finalized. You do not have to do that.

Would you like to see it before it's finalized?

THE WITNESS:

Yes, sir.

MR. BRYANT:

Okay. So just tell Chérie where you would like her to mail that to.

THE WITNESS:

We need a physical?

MR. BRYANT:

Yes. Some place for her to mail it to.

THE WITNESS:

Okay. 1077 Beverly Street, Jena, J-E-N-A, 71342.

MR. BRYANT:

Got it. All right. Robin, that's it. You can and should go ahead and get off of this thing. You are done for the day.

THE WITNESS:

Thank you so much.

MS. CUMMING:
Thank you very much. We really appreciate your time.
(The deposition was concluded at 4:28 p.m.)

CORRECTION SHEET

PAGE LINE DESCRIPTION

_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________
_____ _____ ______________________________________

WITNESS: ROBIN NIX PERRIN
TAKEN ON: JANUARY 13, 2025
BY: CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

WITNESS CERTIFICATE

I, ROBIN NIX PERRIN, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

_________________ ___________________________

DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: January 13, 2025

REPORTER'S PAGE

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for the court reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; also, that any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

Cherie' E. White

CHERIE' E. WHITE, CCR(LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that Robin Nix Perrin, to whom the oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 141 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

NDTCA · Signed Electronic Transcript

CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO. 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)