Transcript of the Testimony of

# COMMANDER CHRIS DOMINGUE

April 10, 2025

ROBERT YOUNG v. JAMES LEBLANC, ET AL

AMERSON WHITE
COURT REPORTING · EST.2000

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

ROBERT YOUNG — CIVIL ACTION

VERSUS — NO. 23-681-SDD-RLB

JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL

* * * * * * * * * * * * * * * * * * * * * * *

Deposition of COMMANDER CHRIS DOMINGUE, 1901 Wilmax Street, Lake Charles, Louisiana 70605, taken via Zoom Conference on Thursday, April 10, 2025, beginning at or about 8:00 a.m.

APPEARANCES:

RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
By: Emily Washington, Esquire
Jack Stephens, Esquire
4400 S. Carrollton Avenue
New Orleans, Louisiana 70119
(ATTORNEY FOR PLAINTIFF,
ROBERT YOUNG)

MUDD, BRUCHHAUS & KEATING, LLC
By: Lenzi C. Hebert, Esquire
422 East College Street, Suite B
Lake Charles, Louisiana 70605
(ATTORNEY FOR DEFENDANT,
CALCASIEU PARISH SHERIFF)

DRAFT COPY

APPEARANCES: (CONTINUED)

FROSCH, RODRIGUE, ARCURI, LLC
By: Ronald S. Bryant, Esquire
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
(ATTORNEY FOR DEFENDANT,
CATAHOULA PARISH SHERIFF'S
OFFICE DEFENDANTS)

FRILOT LLC
By: Suzanne M. Risey, Esquire
1100 Poydras Street, Suite 1700
New Orleans, Louisiana 70163
(ATTORNEY FOR DEFENDANTS,
LEBLANC AND SMITH)

REPORTED BY:

Lillie R. Burch, CCR
Certified Court Reporter
Certification No. 87177

DRAFT COPY

I N D E X

Page No.
EXAMINATION BY MS. WASHINGTON...........5
EXAMINATION BY MR. STEPHENS......160, 195
EXAMINATION BY MS. HEBERT.............193

INDEX OF EXHIBITS

EXHIBIT NUMBER 46
(Notice of 30(b)(6) Deposition)

EXHIBIT NUMBER 47
(Prisoner Housing Agreement, 10-16-2020 - Mancuso 1441-1447)

EXHIBIT NUMBER 48
(Letter dated 1-2021 from Sheriff Edwards to Sheriff Mancuso - Mancuso 589-590)

DRAFT COPY

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading, signing, sealing, certification, and filing are specifically waived;

That all objections are hereby reserved until such time as this deposition, or any part thereof may be used or sought to be used in evidence.

* * * * *

Lillie R. Burch, CCR, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

* * * * *

DRAFT COPY

(COMMANDER CHRIS DOMINGUE, AFTER HAVING BEEN FIRST DULY SWORN BY THE ABOVE-NAMED CERTIFIED COURT REPORTER, WAS EXAMINED AND TESTIFIED AS FOLLOWS:)

EXAMINATION BY MS. WASHINGTON:

Q. Good morning. My name is Emily Washington. I'm one of the attorneys representing the plaintiff, Robert Young, in this matter. I'm going to be taking part of the deposition today and then Jack Stephens who also represents Mr. Young will be taking some of the other topics.

This deposition is being taken pursuant to the Federal Rules of Civil Procedure. And it's my understanding that there is no objection to this deposition being conducted by Zoom or to the oath having been administered remotely.

Would you please state and spell your full name for the record.

A. My name is Christopher Joseph Domingue. C-h-r-i-s-t-o-p-h-e-r J-o-s-e-p-h D-o-m-i-n-g-u-e.

Q. Mr. Domingue, what is your current rank just so I can refer to you by it

DRAFT COPY

today?
A. Commander.
Q. Okay, thank you. And what is a good address for you?
A. The department address?
Q. A residential address if we needed to serve you with anything there.
A. 1901 Wilmax Street, Lake Charles, Louisiana 70605.
Q. Perfect. And a good phone number?
A. 337-263-4289.
Q. And it's my understanding that you might have some constraints on your time with us today; is that still true?
MS. HEBERT:
Yes. We will need to be done at one, one-thirty. And then if we're not done by then we can make something else work. But we do, yes, have to be done by one-thirty.
MS. WASHINGTON:
I'll keep that in mind. And we're going to try our best to be done with our questioning by that

DRAFT COPY

time. But obviously if we need to we'll complete it another time.

MS. HEBERT:

I appreciate that. Thank you.

MS. WASHINGTON CONTINUES:

Q. During the deposition today we're going to be discussing both the Calcasieu Parish sheriff's office as well as the Catahoula Parish sheriff's office. And I know both of them use CPSO as their acronym, which is unfortunate for us. So I'm going to try to use the full parish name when I'm talking about either one of them just to avoid confusion. And I'm just going to ask that you try to do the same. And if you slip up, I may remind you just so we have a clean transcript. And if I slip up, please remind me just so we don't all end up confused at the end of this. Does that make sense?

A. Yes, ma'am.

Q. The Lousiana Department of Public Safety and Corrections might also come up during the deposition and I may use the acronyms DPSC or DOC to refer to the department. You'll understand what I'm

DRAFT COPY

referring to?
A. Yes, ma'am, I will.
Q. Have you ever given your deposition before?
A. I have had I believe two before.
Q. When was the most recent one?
A. Probably about three or four years ago.
Q. In terms of those depositions were you a party to the litigation?
A. The first one was when I was thirteen. So it was about a car accident that my aunt had.
Q. Okay, how about the more recent one?
A. More recent one, I was not personally a party but the Calcasieu Parish sheriff's office was.
Q. In that situation were you designated like you are here as a 30(b)(6) deponent for the agency or were you just a witness in that matter?
A. I was just a witness. I certified some records.
Q. And generally what was the

DRAFT COPY

nature of that litigation having to do with the sheriff's office?

A. I don't quite remember. I just remember that I was the records custodian.

Q. For the sheriff's office?

A. No, for the corrections division of the sheriff's office.

Q. Before we get into the meat of the questioning I just want to go over a few ground rules or mutual expectations for the deposition today just so we're both on the same page as we go through the questioning. We have a court reporter here, Ms. Burch. She's taking down everything we say. So it's just important that you speak up and give me audible verbal answers to my questions so that we can have a clean transcript at the end of this. Nodding and shaking our head like we do in usual conversation doesn't come across on the page, if that makes sense.

A. Yes, ma'am.

Q. You understand that the oath you just took is the same oath as if you were testifying in a court of law?

A. Yes, ma'am.

DRAFT COPY

Q. We are interested in finding out everything that you and the Calcasieu Parish sheriff's office know about facts and events that underlie this lawsuit. So I'm just looking for full and complete answers to my questions today.

If at any point during the deposition you remember something that would have been responsive to a question I asked earlier, would you please let me know that so we can go ahead and supplement your response on the record?

A. Yes, ma'am.

Q. And by the same token, if you realize that you misspoke or just made a mistake or said something incorrectly, please let me know that as well so that we can make that correction and get the proper testimony on the record. Does that make sense?

A. Yes, ma'am.

Q. If at any point today I ask you a question that you don't understand, it's confusing or you're just not sure what I'm asking you about, please let me know that so I can attempt to rephrase my question for

DRAFT COPY

you. Is that okay?
A. Yes, ma'am.
Q. You are entitled to take as many breaks as you need during our time together. All I ask is that if I have posed a question to you that you go ahead and answer that question, and then we can go off the record and take a break. Does that make sense?
A. Yes, ma'am.
Q. Is there any reason, whether that's medication, sleep deprivation, any kind of hardship or stress that would interfere with you understanding and truthfully answering questions today?
A. No, ma'am.
Q. And you understand that you are not personally named as a defendant in this lawsuit?
A. Yes, ma'am, I do.
Q. But you also understand that on behalf of the Calcasieu Parish sheriff's office you have been designated as their representative to testify on various topics pursuant to Rule 30(b)(6) of the Federal Rules?

DRAFT COPY

A. Yes, ma'am.
Q. And so this rule allows us to name the sheriff's office itself as an entity to be deposed and then they designate one or more, today one, on its behalf to testify. Does that make sense?
A. Yes, ma'am, it does.
Q. So in that regard, you understand that you are here to testify about information not only just known to you but known to or reasonably available to the sheriff's office itself as an entity?
A. Yes, ma'am.
Q. Have you ever been designated as a 30(b)(6) witness before?
A. No, ma'am, I have not.
Q. What is your understanding as to why you were designated as the 30(b)(6) witness for the Calcasieu Parish sheriff's office in this matter?
A. If anybody else was designated they would have to ask me those questions.
Q. I'm going to share my screen with you. Give me one second. Let me know if you can see anything up there. Is there a

DRAFT COPY

document up on your screen?

A. Yes, there is.

MS. WASHINGTON:

I'm going to go ahead and mark this as Exhibit 46 to the deposition in this matter. And it is a four-page document. I'm just going to flip through the pages here.

MS. WASHINGTON CONTINUES:

Q. So this is the notice that we served on the Calcasieu Parish sheriff's office for the taking of this 30(b)(6) deposition. Have you seen it before?

A. Yes, ma'am. I have it in front of me.

Q. Okay, perfect. And I want you to just take a minute to look through the six topics that are listed on pages 2 and 3 of this exhibit and just let me know when you have reviewed them.

(Witness reviewing documents)

A. I'm done.

Q. Are you able to provide full and complete testimony on these topics today?

A. Yes, ma'am.

DRAFT COPY

Q. Are there any topics listed there which you feel that you are not able to provide full and complete testimony on today?
A. No, ma'am.
Q. Okay, great. Commander, where are you located physically for this deposition?
A. I'm -- the address?
MS. HEBERT:
Our office, Mudd, Bruchhaus & Keating.
MS. WASHINGTON CONTINUES:
Q. Other than your counsel who I can see present with you is there anyone else in the room with you all?
A. No, ma'am.
Q. Did you prepare for this deposition today?
A. I met with my attorneys, but other than that, no.
Q. When did you meet with your attorney?
A. It was a few days before the first deposition was scheduled. I'm not exactly sure of the date.

DRAFT COPY

Q. And other than your attorney, did you speak with anyone else about the deposition today?

A. I told everybody I was having one but I didn't discuss the information of it.

Q. Okay, have you had any conversations either with the current sheriff or former sheriff, Mancuso, having to do with this deposition?

A. No, ma'am, I haven't.

Q. And other than just as a matter of scheduling have you spoken with anyone else with the Calcasieu Parish sheriff's office about the deposition?

A. I spoke to our in-house legal and only told them I was having one about the matter.

Q. And who is that, who is the in-house counsel?

A. Rob McCorquodale. But actually, the conversation happened with his paralegal, Elizabeth Daley.

Q. And in terms of the Catahoula Parish sheriff's office is there anyone there

DRAFT COPY

that you spoke with regards to this deposition?

A. No, ma'am.

Q. And how about the Department of Corrections, did you speak with anyone with DOC regarding this deposition?

A. No, ma'am.

Q. This litigation was filed in August of 2023. Since it was filed have you ever been asked to look for any documents or records? I'm thinking about things that would be responsive to discovery that was served on the agency.

A. Yes, ma'am. I think I personally pulled his record and documents.

Q. Are you referring to Mr. Young?

A. Yes, I am.

Q. Are there any other records other than ones specifically related to Robert Young that you looked for or pulled having to do with this litigation?

A. I think I had my staff pull the contracts.

Q. And when you say your staff, who does that refer to?

DRAFT COPY

A. That refers to Hollie Howard. She is the jail records supervisor.
Q. What is her first name?
A. Hollie, H-O-L-L-I-E.
Q. Did you review any documents in reparation for the deposition today?
A. No. I reviewed the documents when I pulled the records a few years ago.
Q. But not since that time?
A. No, ma'am, not since that time.
Q. And I know you have the deposition notice in front of you there. Are there any other documents or reference materials that you have in the room that you might be referring to today?
A. Yes, ma'am. I have the prisoner housing agreement.
Q. Okay.
A. And the addendum.
Q. Can I just ask you this. On the prisoner housing agreement that you have in front of you, is it Bates numbered? Is there like Mancuso and then a number after it usually in the bottom right-hand corner?
MS. HEBERT:

DRAFT COPY

It might have gotten cut off in the printing. Sorry, guys.

MS. WASHINGTON:

That's okay.

MS. WASHINGTON CONTINUES:

Q. Let me ask you this. How many pages is the prisoner housing agreement that you have in front of you?

A. Seven.

Q. And how did you come to have the prisoner housing agreement that you have right in front of you for this deposition today?

A. My attorney gave it to me.

MS. HEBERT:

My apologies. I just printed out the one we produced. But I think the Bates is cut off. We can print out the Bates if that will make it easier.

MS. WASHINGTON:

It doesn't. We're going to go through it at some point here.

MS. HEBERT:

I printed it out for ease of

DRAFT COPY

reference.

MS. WASHINGTON:

Yes, I appreciate that. I just wanted to know if we're working on the same document as we will get to later.

MS. WASHINGTON CONTINUES:

Q. So the assault at the center of this lawsuit occurred at the Catahoula Correctional Center. Do you have any familiarity with that detention facility?

A. I have never been to it. I know where it's at. I know its name. I used to know some of the people that worked there. But that's about it. I mean, other than the fact that we sent inmates there and we dealt with them.

Q. We'll get into that obviously more later. But in terms of the people that you used to know that worked there, who is included in that?

A. That would be Margie Price and I believe he was the assistant warden, Stott.

Q. Eric Stott?

A. Yes.

DRAFT COPY

Q. How do you know Ms. Price?
A. From dealing with her on the phone. And I also am a committee member on the Louisiana Sheriff's Association's Jail Training Committee and they come to the conference every year.
Q. Where is this conference?
A. Her and her husband.
Q. Where is that conference held?
A. It's held at L'Auberge in Lake Charles.
Q. And when you say you know her from the phone, what kinds of interactions have you had with her historically?
A. Billing.
Q. Billing. Can you be a little bit more specific, billing for what?
A. Billing for the inmate housing. And also I'd call to say, hey, how many people can you take for me? Usually we would deal with Eric Stott for that, but if he wasn't available we would go to her.
Q. And I guess perhaps you just answered the question but maybe there are more context. In terms of Assistant Warden

DRAFT COPY

Stott, what interactions have you had with him historically?

A. The same. We would call and say, Hey, how many beds do you have? I would see him at the conference. And then also if anything happened at Catahoula he would usually be the guy to call to tell us.

Q. Just to make sure I have an understanding of the timeframe that you are referring to. In terms of billing for inmate housing, what time period would you have been in touch with Ms. Price regarding that?

A. Well, it would have been, you know, September of 2020 until -- I'm trying to think of the date we last housed there. And then probably a few months after the last housing date.

Q. All right.

A. I don't remember what date they no longer worked there. I know at some point they left.

Q. And in terms of Warden Stott, is that the same timeframe that you were talking to him? And I mean in terms of how many people Catahoula could take from you all.

DRAFT COPY

A. Yes, ma'am, it would be the same timeframe. But I do want to clarify something.
Q. Sure.
A. I would rarely talk to them because my staff would actually take care of that.
Q. Right.
A. But there would be times that I would speak to them.
Q. In terms of your staff, who would be having these contacts, who would that be?
A. So it was Michael Holland was our main point of contact.
Q. And what was his position?
A. He is the bonding sergeant, or was at the time.
Q. Anybody else who would have been in frequent contact with Ms. Price or Warden Stott?
A. Hollie Howard.
Q. And she was or maybe still is the jail records person that you mentioned?
A. Yes, ma'am.

DRAFT COPY

Q. Anyone else from Calcasieu who would have been making those contacts?

A. Yes. Anna Shockley would also speak to them about billing. But Anna would do the audits. We would very frequently have to audit each facility. Not just for billing, but just in general to make sure that they had our inmates.

Q. What do you mean by that?

A. Well, it's very complicated moving -- we had twenty-two different facilities. And over, you know, eight hundred to nine hundred inmates, they would move them between facilities and would not tell us. We were also tracking Department of Corrections' inmates that would be released or transferred and we would not know. So we had to keep our population audited to make sure that we were correct. We didn't want to lose anybody.

Q. And when you talk about auditing, can you tell me a little bit about how Ms. Shockley would do that? Was that records she was reviewing, phone calls, in-person visits; like how did the audit

DRAFT COPY

process work?
A. She would get a list of our inmates from the facility and take our list that we had designated for that facility and compare them.
Q. Okay, cross reference them?
A. Yes, ma'am. And it was all done at her desk. She didn't go anywhere.
Q. Okay, that makes sense, thank you.
In terms of the Catahoula Correctional Center, during the deposition today I may refer to it as CCC. Will you understand what I'm referring to?
A. Yes, ma'am.
Q. And you are currently employed by the Calcasieu Parish sheriff's office?
A. Yes, ma'am.
Q. What is your current position?
A. Commander of the Calcasieu Parish sheriff's prison.
Q. How long have you been in that position?
A. July 1, 2024.
Q. And generally speaking, what are

DRAFT COPY

your responsibilities in that position?
A. I'm responsible for every inmate and every employee that is in my facility. I also work at the pleasure of the sheriff. So I deal with policy budgets, managing staff. I have a warden and two assistant wardens and a captain that work below me.
Q. Okay, that's useful. And am I correct that your entering of this position sort of lines up with when Sheriff Guillory became sheriff?
A. Yes, ma'am.
Q. And just so I have some context. It's my understanding that in addition to the sheriff's prison, Calcasieu also has a correctional center?
A. Yes, ma'am. The Calcasieu Correctional Center, which is owned by the police jury and ran by the sheriff's office as the constitution of Louisiana says we have to. And then the law enforcement district which is the sheriff's office owns the Calcasieu Parish sheriff's prison.
Q. Physically are they part of the same complex?

DRAFT COPY

A. They are. They're right next to each other separated by a road. We have a central booking and a central release. So they are treated as one system.
Q. I just didn't hear you. How are they separated physically?
A. By a road.
Q. A road, okay.
A. Yes, ma'am.
Q. Is there any difference between the populations that are held in either the sheriff's prison or the correctional center?
A. At the time the storm happened and until recently there was not.
Q. Is there now?
A. There is. We are making an effort to keep our DOC, federal, and city inmates at the sheriff's prison for billing reasons.
Q. And is there another commander over the correctional center?
A. Yes, ma'am. There are two commanders in the corrections division.
Q. You and the person over the correctional center?

DRAFT COPY

A. Yes, ma'am.
Q. Have you ever worked at the correctional center rather than the sheriff's prison?
A. Yes, ma'am. The correctional center is my home. I started there. I worked most of my career there. This will be the second time I've worked at the sheriff's prison.
Q. When was the other time?
A. 2011 to 2013 I was the purchasing, safety, and sanitation lieutenant.
Q. I want to briefly run through just a little bit of your education and work history before we get into the topics today. In terms of your education can you just run me through any schooling that you have attended starting with high school?
A. I graduated high school. I attended a very small amount of college. In terms of work education, I have been through the POST Academy, the Correctional POST Academy. I am a level three POST instructor for the State of Louisiana.

DRAFT COPY

Q. And where did you graduate high school?

A. Sulphur High School.

Q. What year was that?

A. 1995.

Q. And then in terms of the college courses, where was that?

A. I went to McNeese for one semester and I have sixty hours at Amarillo College of Law Enforcement. It's not sixty hours, excuse me. Sixty units or credits.

Q. Got it, okay. In terms of being a level three POST instructor are there particular topics or subject areas that you teach in?

A. Yes. I teach the basic standards for a correctional officer in the State of Louisiana.

Q. Do you have any military experience?

A. No, ma'am.

Q. Other than the POST certifications that we talked about do you have any other professional licenses or certifications?

DRAFT COPY

A. No, ma'am.
Q. When were you first employed by the Calcasieu Parish sheriff's office?
A. In 1996.
Q. Have you been employed with the Calcasieu sheriff continuously since that time?
A. No, ma'am.
Q. Then let's walk through that a little bit. When you were first hired in 1996 by the Calcasieu Parish sheriff's office what position were you hired into?
A. Correction officer.
Q. How long did you stay in that position?
A. For two years.
Q. Was that at the correctional center?
A. Yes, ma'am, at the Calcasieu Correctional Center. When I started, the sheriff's prison was being built.
Q. And what did you do next?
A. I became the shift supervisor on the night shift. We didn't have rank in those days, so that would be equivalent to a

DRAFT COPY

lieutenant in our current structure.

Q. How long did you stay in that position?

A. About three years or maybe two-and-a-half. I stayed in that position until Beth Lundy became sheriff, which I believe was in 2000.

Q. Probably like June of 2000?

A. July. Sheriffs always take over in July.

Q. In July, okay. So what did you do next?

A. In her administration I was the shift lieutenant for both the Calcasieu Parish Sheriff's Correctional Center and the Calcasieu Parish Sheriff's Prison. So I ran both shifts at night.

Q. How long did you do that?

A. I could only take it for about a year-and-a-half, and I quit.

Q. Did you quit the sheriff's office entirely?

A. I did.

Q. What did you do after that?

A. I went to work for the Texas

DRAFT COPY

Department of Criminal Justice. I worked in the institutional division at the Clements Unit in Amarillo, Texas.

Q. What was your position while you were there?

A. I was a correctional officer. I worked in -- they called it just post custody. I was in the building. The end of the line for the Texas system for disciplinary. And we also had all the major gang leaders within our area of the prison.

Q. How long were you in that position?

A. Five months.

Q. So what did you do after that?

A. I went to work for a private company called TransCor America. And they did contract extraditions.

Q. Where were you located for that?

A. That's hard to say because it was a traveling job. So they were based in Nashville, Tennessee. I worked in that office for awhile and was transferred to the Texas office in Taylor, Texas. However, most of the time I worked from my home. I would

DRAFT COPY

leave for a month or two and come back.
Q. How long did you work for them?
A. Two-and-a-half years.
Q. So by my estimate, we're at maybe around 2005; is that right?
A. I came back to the sheriff's office in August of 2004.
Q. Is that where you went after TransCor America?
A. Yes, ma'am. I tested another -- I'm going to say tested -- I went to another company called Prisoner Transport Services and did a two-week run with them. Then the sheriff's office called and offered me my job back, so.
Q. And so when you went back to the sheriff's office in 2004 what position were you hired into?
A. Correctional officer. I started from the bottom again.
Q. How did that happen? Who contacted you, what offer did they make you?
A. I guess I need to clarify that. When I left TransCor I went and saw Tony Mancuso when he was still the marshal and

DRAFT COPY

asked for my job back. He was sheriff elect at the time.

Q. So then let me ask you this. From 2004 to the present have you been continuously with Calcasieu Parish sheriff's office?

A. Yes, ma'am.

Q. Walk me through what positions you have held since you returned to the sheriff's office in August of 2004.

A. I was the intake supervisor for a few years. Then I took the shift lieutenant position that I had once had during Wayne McKelvin's tenure. I got that position back just at the Calcasieu Correctional Center. And I had that position from 2006 until 2011.

Q. Okay.

A. And then 2011 until about 2013 I was the purchasing, safety and sanitation lieutenant. My office was at the Calcasieu sheriff's prison, however, I did the whole complex.

And then I was the records lieutenant for a few years. I think from

DRAFT COPY

2013 to maybe 2015. And then I was a captain in that same position. That position turned into a captain's position, if that makes sense.

Q. That was starting in 2015?

A. Yes, ma'am. And then in July of 2024 I became commander.

Q. So from 2015 to July of last year you were in that records position as a captain?

A. Yes. And we can call it records position. That was just my main job. But basically I was over operations of the jail.

Q. When you say the jail, are you referring to both the sheriff's prison and the correctional center or just one of them?

A. Both.

Q. In that role as captain who were you reporting to?

A. I reported to Commander Daniel Burkarlter and Warden Jeff Miller.

Q. Was that for the entirety of the time that you were in that position?

A. Yes, ma'am.

Q. And just so I understand. The

DRAFT COPY

commander and the warden that you reported to, they had responsibilities at both the correctional center and the sheriff's prison?

A. They were over the correctional center. However, you know, we kind of work as a team. So there was a commander at the sheriff's prison and a warden at the sheriff's prison, but the system kind of works as one.

Q. And in terms of the structure, who within the corrections division reports directly to the sheriff?

A. The commander. Of course, there's assistant chief and chief also in between that structure.

Q. So it's commander, assistant chief, chief, sheriff?

A. Yes.

Q. In terms of just like the reporting and supervision does the commander go to the assistant chief or can the commander go directly to the sheriff?

A. It depends on which administration you're talking about. Tony Mancuso's administration?

DRAFT COPY

Q. Yes.
A. The commander could go directly to the sheriff. There were no rules about that.
Q. Could anyone go directly to the sheriff in that administration?
A. Yes. The sheriff had an open door policy.
Q. So in your position as captain you could go directly to the sheriff?
A. I could have, yes. I may have gotten in trouble from the commander but I was certainly welcome to do it.
Q. Okay, understood. And so other than your employment with the Calcasieu Parish sheriff's office and with the Texas Department, and then the contract extradition transport services companies, have you worked for any other law enforcement or corrections agencies that we haven't talked about?
A. No.
Q. Is there anything in terms of your work history that we didn't just cover?
A. I had one other job. I worked at Kroger for like eight years. That's it.

DRAFT COPY

Q. That was before the sheriff's office?

A. Yes. That was my teenage years. I kept that job, you know. We didn't make any money when I started at the sheriff's office so I had to have two jobs. So I kept that job for a while.

Q. Do you have the deposition notice still in front of you, the one I had marked as Exhibit 46?

A. Yes, ma'am.

Q. Can you look at topic one.

A. Yes, ma'am.

Q. This one says: "Efforts to locate alternative locations to hold Calcasieu detainees and prisoners after Hurricane Laura, specifically including inquiries made to other parishes, private prison operators, and the Department of Public Safety and Corrections, to identify alternative locations, criteria used to evaluate potential alternative locations, and final decision-making regarding alternative locations to hold Calcasieu detainees." Do you see where I'm reading?

DRAFT COPY

A. Yes, ma'am.

Q. We are going to launch into that topic now. Just taking a step back before we talk about Hurricane Laura specifically. Generally, did the Calcasieu Parish sheriff's office have a plan for the evacuation of its detainees when a significant storm was approaching?

A. We have to go over a little bit of historical context. Laura was not the first devastating hurricane that we ever had. In 2005 we had Hurricane Rita. We were not prepared. We learned a lot of lessons. So when Laura -- and we have evacuated many times. We have evacuated for Hurricane Lily, Rita, Ike, and Gustav. Lily was a very -- it was just our females were taken. It wasn't a big deal. Rita, we had problems. We had inmates on school buses, we had an escape.

So we learned a lot of lessons. And then Gustav, we did much better. Ike, the department of Corrections came and got our inmates. So when Laura hit we kind of -- we were ready. There wasn't a written plan but the people that worked there had the

DRAFT COPY

experience from the past storms and the evacuation went well.

Q. Prior to Laura when was the last time that Calcasieu had evacuated its correctional facilities?

A. That would be two thousand -- it was Hurricane Ike. I'm trying to remember what year that was.

Q. 2012, right?

A. Yes, somewhere in there. But that was the last time we evacuated.

Q. And so outside of the storm evacuation context in 2020 prior to Laura was Calcasieu holding any of its pretrial detainees in other facilities outside of the parish?

A. No. We never had that practice.

Q. And so I want to start now talking about the time period immediately prior to Hurricane Laura making landfall and some of the discussions and decisions that were happening.

It's my understanding that Laura hit on August 27, 2020. Is that your recollection?

DRAFT COPY

A. Yes, ma'am.
Q. And were all persons in Calcasieu Parish sheriff's office custody moved prior to Laura making landfall?
A. All but our juvenile inmates which were -- we will have to define anyone that was under the age of seventeen. And any new bookings that came in after the evacuation was complete.
Q. So leaving out those two categories, approximately how many people did Calcasieu evacuate before Laura hit?
A. It was over nine hundred. I don't know the precise number, but it was over nine hundred people.
Q. And in terms of what I will call legal status of the people who were evacuated, there were Calcasieu pretrial detainees?
A. Yes.
Q. And by that I mean people facing charges within the parish.
A. Yes, ma'am, that's correct. We had -- the majority of them would have been Calcasieu. I call that pretrial.

DRAFT COPY

Q. Let me ask you this while we're talking about pretrials. At the time of the evacuation was Calcasieu holding any pretrial detainees from other parishes?

A. We may have had some people that we picked up for detainers but we were not -- I believe we had one person we were holding for Vermilion Parish because he had been an employee of theirs in the past.

Q. Understood, okay. But it was very few people and they were held for kind of specific reasons?

A. Right. We were not being paid to hold anybody, if that makes it more clear.

Q. Yes, it does, thank you. I appreciate that.

Were there also DOC sentenced prisoners that were in Calcasieu's custody?

A. Yes.

Q. Do you have an estimation of how many DOC prisoners y'all had to evacuate?

A. Normally we would have kept about three hundred to three hundred fifty of the Department of Corrections' inmates. That was our norm. I believe we were under that

DRAFT COPY

because after COVID our population dropped from about 1300 to about 900. But I would estimate about 300, or maybe 280.
Q. Okay, thank you.
And you talked about juveniles. Approximately how many juveniles did you have in custody at the time of Laura?
A. If I remember correctly, we had about seven or eight of them. And this was at the time the law classified seventeen-year-olds as juveniles.
Q. Ultimately what happened with those seven to eight that you said they didn't evacuate; where were they held?
A. Well, so everyone that stayed stayed in our intake area. So it's our booking area. And the only reason that they did not evacuate is no one would take them. After the storm Vermilion took them for us.
Q. In terms of any new bookings that you referenced, they also were being held in the intake or booking area during the storm?
A. Yes, ma'am.
Q. Were you all holding any federal

DRAFT COPY

or US marshal prisoners at the time?
A. Yes, ma'am, we were.
Q. Were they evacuated?
A. They were.
Q. Where did they go?
A. They were split up between the facilities. I'm not specific on which facility they actually ended up in. However, I had to spend some time tracking them down because the marshals wanted them moved to a place they had a contract with. I do know that quite a few of them ended up in St. Tammany Parish.
Q. And where did the marshals want to move them to?
A. Iberia or St. Martin.
Q. How many federal prisoners do you estimate were in Calcasieu's custody at the time of Laura?
A. I would say twenty to twenty-five.
Q. Was Calcasieu holding any ICE detainees?
A. No. We do not have a contract with ICE or CBP.

DRAFT COPY

Q. Am I correct that at the time of Laura you all had both male and female prisoners?
A. Yes, ma'am.
Q. When did members of the Calcasieu Parish sheriff's office start having discussions about whether y'all would need to evacuate the facilities for Laura?
A. I believe that started happening as soon as the storm came into the Gulf.
Q. And at that point, what were the discussions, what was being discussed?
A. I wasn't in any of those discussions. However, Commander Burkarlter told us to be prepared.
Q. What did that mean?
A. That pretty much like means to make sure you have your affairs in order, your family in order, and be prepared to not leave work.
Q. Other than the commander who was involved in the conversations about Laura?
A. That would be the command staff. All the commanders at the time, the assistant chief, chief, and sheriff.

DRAFT COPY

Q. We heard about the one commander that you reported to. There was another one at the sheriff's prison; is that right?
A. Yes. So thinking back on one of those things, I might have to clarify.
Q. Sure.
A. At some point Warden Jeff Miller became commander of the sheriff's prison and Brandon Strenth became the warden of the correctional center.
Q. Would this have been before Laura?
A. Yes, it was. I just remembered that, to clarify the prior question.
Q. Sure. And so in terms of -- go ahead.
A. I was just going to ask you to repeat your question.
Q. Sure. So in going through who the command staff was who would have been involved in discussions about evacuations for Laura, you indicated it would have been the two commanders. Who held those positions at the time?
A. That would be Jeff Miller and

DRAFT COPY

Daniel Burkarlter.
Q. How do you spell his last name?
A. Can I write it real quick?
Q. Yes.
A. So it's B-U-R-K-A-R-L-T-E-R.
Q. Okay, got it. That one is hard for my mouth to say. I'm going to call him Commander B. And then you said that there would have been also the assistant chief. Who was in that position at that time?
A. That was Bubba Mayeaux.
Q. What is the last name?
A. Mayeaux.
Q. And the chief at the time?
A. The chief at the time was Gary Guillory.
Q. As in now chief Guillory?
A. Yes, ma'am.
Q. And this was with Sheriff Mancuso, correct?
A. Correct.
Q. Was there anybody else other than the command staff that was involved directly in the discussions about evacuations for Laura?

DRAFT COPY

A. I don't know specifically, but it would have been the other commanders of other divisions within the sheriff's office.

Q. The noncorrectional divisions?

A. Correct.

Q. In terms of you being told to be prepared was any information communicated to you about whether the prisoner population would need to be evacuated?

A. So that's hard to answer. Because we're always prepared every time a storm comes into the gulf. However, it was not tracking towards us. So I guess you would call that, we were alert, we were on alert. But no one thought it was going to hit us.

Q. Did that change at some point in time?

A. Twenty-four hours before landfall.

Q. And what either discussions or information was communicated at that time?

A. I received a call from Commander Burkarlter that said the sheriff said we're sending them out. And when I say them, the

DRAFT COPY

inmates. And then Brandon Strenth, the warden, was actually our contact for DOC. So he made the call to request assistance from the Department of Corrections.

And just to clarify, twenty-four hours out I still don't believe we thought we were going to get direct strength.

Q. So in terms of contacting DOC to request assistance, who from the Department of Corrections was contacted or involved in discussions with Calcasieu about evacuating for Laura?

A. I'm trying to remember the guy's name. He was the emergency preparedness person. Every parish in the state would deal directly with him. I do believe that he's the warden of the Catahoula Parish jail now.

Q. Okay.

A. I know his name, but I can't remember it.

Ms. HEBERT:

I know his name, too, and I also can't remember it, but it will come to me.

MR. BRYANT:

DRAFT COPY

I know his name if you want me to tell you.
MS. WASHINGTON:
Please, James.
MR. BRYANT:
Trevor McDonald.
MS. WASHINGTON:
Thank you.
MS. WASHINGTON CONTINUES:
Q. Is that who you were thinking of?
A. Yes, ma'am. Brandon Strenth called him and at some point Brandon stopped communicating with him and I started communicating with him.
Q. And where was he physically located?
A. Trevor or --
Q. Yes, Trevor. Was he at DOC headquarters?
A. I believe so.
Q. And what was the nature of the communications with I guess now Warden McDonald?
A. They were very short. It was:

DRAFT COPY

How many inmates do you have? I will get back with you with numbers. He would either text or call me back and tell me what facilities and how many beds they had. And that was about it.

He was doing a lot of -- from my perspective he was doing a lot of work to try to find us bed space. And so we would have a very short conversation about: Hey, this parish has this many beds.

Q. And let me ask you this, then. When he was providing you with that information were you then contacting the parish facilities on Calcasieu's behalf or he was doing that?

A. No, ma'am, he was facilitating everything. In fact, before I could get off the phone really with him, before I could do any work to get any list together or anything, I had people waiting on my lawn.

Q. Like to transport?

A. Yes, ma'am. I almost cried because they came and they came fast.

Q. Other than Warden McDonald was there anyone else with the Department of

DRAFT COPY

Corrections that y'all were in touch with at this point? And I mean like during the evacuation.

A. No, ma'am.

Q. He was the sole point person?

A. That's correct.

Q. Were there other parishes that were also evacuating, like Cameron or any of the surrounding parishes?

A. From what I understand, yes. But I only have direct knowledge about Cameron because we take -- we always help Cameron. And they came to us and went with us.

Q. And so Warden McDonald I assume as part of the same process was finding locations for the Cameron prisoners as well?

A. Well, the only thing he would have known is that they were with us.

Q. They were just added to your total count?

A. That's correct.

Q. Had you all been in touch with either Warden McDonald in this emergency preparedness role or someone else in that

DRAFT COPY

role at DOC prior to Laura?
A. Whoever was in that position we would talk to once or twice a year. They wanted to make sure that we were prepared.
Q. Was that just a phone call or something more extensive?
A. It was usually a phone call. I'm trying to keep this straight in my head, because things changed after Laura. There may have been an e-mail every once in a while that says, hey, make sure you have your plan together, this is your contact person.
But any specifics, we would have a phone call.
Q. Just I guess sort of structurally, what is your appreciation of why the Department of Corrections has a role in assisting parish facilities with evacuations of their prisoners?
A. I think, and this is just conjecture, I do believe that Katrina and Rita and then the fact that we had to evacuate all thirteen coastal parishes during Gustav at one time. And then of course we on this side of the state had Ike right after

DRAFT COPY

that, a week after that.

Q. Right.

A. So I think just the history of those storms, you know, a smart person would make that decision after that.

Q. Got it, understood.

So in terms of the facilities, the parish sheriff's offices that were going to take on your population just in terms of communication during the evacuation, were you or anyone with Calcasieu in touch directly with them?

A. I had very limited conversations with a few facilities. Like Livingston Parish, we had a lot of conversations. Of course, they're very short because they knew what we were going through. But mainly they showed up. And we were not ready for how fast they showed up.

Q. And in terms of when you say mainly they showed up, am I correct that the actual facilities, the sheriff's offices, were showing up themselves to do the transport?

A. Correct. They came with buses,

DRAFT COPY

they came with vans. I walked outside to walk to the sheriff's prison and the entire road between our facilities was filled. And I was still expecting them to be on their way. We were not ready.

Q. Understood. So when was the facility actually evacuated?

A. That day. And so it happened on -- that was the twenty-sixth. It was about twenty-four hours before landfall. And I'm trying to remember exactly how long it took us, but I have no recollection of how long it took. That day was traumatic for me, so.

Q. I completely understand. And we're going to get into which specific facilities y'all sent people to. Were any of them operated by private operators?

A. Yes.

Q. Which ones were those?

A. Okay, so I do know that Catahoula, LaSalle Correctional. And when I say LaSalle Correctional, I mean the actual parish, LaSalle Parish Correctional.

Q. Yes.

DRAFT COPY

A. Madison, I believe at the time it was called Bayou Corrections.

Q. Yes.

A. And I believe those are the only ones, but I'm not for certain.

Q. Okay, thank you. And were you or anyone with Calcasieu directly in touch with those facilities that had private operators or was that through the Department of Corrections?

A. During the evacuation, no. After the evacuation, yes, I was in contact with them.

Q. I'm just focusing now on the during part. So that's helpful, thank you.

A. Okay.

Q. At the time before Laura hit how long did Calcasieu estimate that its prisoners would be held out of parish?

A. Every storm they come back in a couple of weeks. We have never had them leave more than a couple of weeks, nor would we have ever expected that they would have gone longer than that.

Q. Am I correct, then, that there

DRAFT COPY

wasn't any discussion at the time before the storm arrived about what the plan would be if they needed to be out of parish for longer than the usual couple of weeks?

A. No. It was unthinkable to us. It was -- no one could have imagined it. There was no plan.

Q. So in terms of identifying the locations where y'all sent your population, am I correct that that was done by now Warden McDonald at the time that he was at the Department of Corrections?

A. Yes. But he didn't decide which inmates. I believe it would have been -- and it was probably a callout through the Louisiana Sheriff's Association as well, you know, to say, hey, Calcasieu needs help, Cameron needs help, what can you do.

And so he may have gotten those bed space numbers from the LSA. I don't really know how that process worked.

Q. And it sounds like, and correct me if I'm wrong, it sounds like the information you all were getting was which parish or facility and how many beds they had

DRAFT COPY

available?

A. Yes. And I may need to clarify something on the prior answer about the plan. Because I just remembered.

Q. Sure.

A. So our plan was that our population was going to go to Phelps Correctional Center. I'm sorry, I just remembered that.

Q. And when you say your plan, do you mean like generally speaking, like before Laura entered the Gulf?

A. Yes. So our actual hurricane plan and our discussions with the Department of Corrections was that our entire population would go to Phelps Correctional Center.

Q. And when had that been put in place?

A. That was two or three years prior to Laura.

Q. And that was --

A. It may have been way before that.

Q. And that was worked out between the Calcasieu Parish sheriff's office and the

DRAFT COPY

Department of Corrections?
A. Yes.
Q. Was that something that was written down somewhere? Like when you say plan, are we talking about a document or a conversation?
A. No, that was more of a conversation. We actually went to Phelps Correctional and centered toward it. And for a while we were sending our employees up there to clean it because it was closed.
Q. What happened to that plan?
A. What happened is in between that plan was made and Laura hitting Louisiana Work Force started operating it. So we did send over three hundred inmates to Phelps Correctional and staff.
Q. As part of the evacuation for Laura?
A. Yes.
Q. But they just didn't have the space anymore to take everyone; is that right?
A. Correct. And they did not stay there more -- the entire time.

DRAFT COPY

Q. The three hundred?
A. Yes. They had to be evacuated from Phelps Correctional Center.
Q. When was that?
A. It must have been three or four days after the storm.
Q. Were they then sent to some of these other locations or did you all have to identify new bed space at that time?
A. That's a hard question to answer. I can tell you what happened.
Q. Sure.
A. They received damage. They didn't have any water. It was a very bad situation. So DOC buses came and picked them up, told us where they were going. We didn't identify any facilities. In transit they were rerouted, and we did not know. And so facilities that we did not use prior to this second evacuation, there were more facilities that opened up. So I spent the next few days tracking down those three hundred inmates.
Q. Do you recall which facilities those three hundred that were originally at Phelps ended up at?

DRAFT COPY

A. No. But in my recollection I remember that Franklin Parish and East Carroll and Caldwell may have been involved in taking some of those.
Q. In terms of both the three hundred that went to Phelps and then the other original evacuation locations how did Calcasieu decide which specific individuals would go to which location?
A. That was actually me. And so basically our computer system has a housing module and our plan is that we move the inmates by their housing location. So you go with the inmates that you have always been with. It cuts down a lot of problems. So basically the first people that got into the sally port, I knew how many beds they had, I started with a certain location. And I believe that was B pod. And I started in B-1 and when I ran out of bed space I drew a line, those inmates got moved, they went on the bus.
Q. And you continued in that method until the facility was evacuated?
A. Yes, ma'am. Leaving my trustees

DRAFT COPY

last to go.

Q. How many trustees did y'all have at the time?

A. And this will be an educated guess, sixty or seventy.

Q. Am I correct that you all had a specific housing location, a dorm or something that housed all the trustees together?

A. That's correct.

Q. At the time that y'all were evacuating what was Calcasieu's understanding of, for lack of a better word, the terms of the housing arrangements with these other facilities? Were you all going to be paying for this? What was discussed in terms of the arrangement, if anything?

A. Nothing was discussed, you know. The Louisiana sheriffs always help each other. And so usually, you know, it would be a week or two. There's never been any bills associated with that. So with that being said, there was no discussion about that.

Q. Right, because it was thought to just be a couple of weeks of evacuation,

DRAFT COPY

these facilities were going to help y'all out, and they would be back in your custody in a few weeks; is that right?

A. Correct.

Q. At the time that they were evacuated what information if any did Calcasieu send with the individuals to the various facilities that they were going to? Did y'all provide any information to the receiving facilities about who they were receiving?

A. Yes, ma'am. Every year a few weeks before hurricane season starts we duplicate the inmate's file with their basic information and we keep a hurricane file. And we keep that in order of their housing location. So we grab that file and then the police jury's medical department will give us the inmate's medication and a transfer summary. They will put those two things together and it follows the inmate to wherever they go.

Q. In terms of the inmate files, that was like a physical copy that you make in terms of a duplicate?

DRAFT COPY

A. That's correct.
Q. And the same thing for the medical transfer summary?
A. Correct. We put those together in the same file.
Q. In terms of medication, that's something that y'all pull together in advance of hurricane season just to have at the ready?
A. The medication is done at the last minute. They grab whatever the inmate has left in their supply.
Q. But the medical transfer summary would say sort of the medical needs and the medication for anybody that was being transferred?
A. Right. Those are also done last minute. Because if we were to do them ahead of time their medical wouldn't be correct.
Q. Understood. And so this hard copy of the inmate file as well as the medical information went with each of the individuals that y'all evacuated?
A. That's correct.
Q. And just to be really specific

DRAFT COPY

about it. How did these files go? Did you all provide this to the transportation officer or physically how did that take place?

A. We have them in milk crates. And, of course, you know, my clerical staff is not there. So a deputy had to go pull them out of the milk crates, verify that we had a folder for each inmate. And usually they'll put a rubber band around them with the medication. And we'll put them in a box and it's handed to the person in charge of the transport for that agency.

Specifically we kind of want that to go with the vehicle they are on. If they get on a bus it goes with this vehicle. If they have more than one bus they would be separated to go on the vehicle that they were in.

Q. I understand. Do you recall which deputy was assisting with pulling those files for the Laura evacuation?

A. I have no idea. It was probably multiple deputies from shift.

Q. I want to turn now to the

DRAFT COPY

continued housing of Calcasieu prisoners out of parish after the storm. So it's my understanding that the facility sustained pretty horrific damage; is that correct?
A. The roof was scraped off.
Q. And was a determination or estimation made of how long it would be before y'all could bring people back into parish?
A. Our maintenance department probably had a lot of discussions with them. I do know that we would have to -- one of the buildings does not belong to us. So that building, we were not involved in some of those discussions. And I'm trying to remember exactly how that was presented to me. But it was at least a few weeks if not a month before anybody realized that it was going to be longer than anyone ever imagined. And through the whole process, through this whole five-year process, we were being told, oh, we'll have that open soon, we'll have that done soon.
So if you think of it in terms of a contractor at your house leading you on

DRAFT COPY

and telling you that I'm almost done but never shows up, it was that same kind of process.

Q. Understood. Just so I remember, it's the correctional center that's not owned by the sheriff's office?

A. That's correct.

Q. So ultimately how long were Calcasieu prisoners held out of parish?

A. Until February of 2025.

Q. When did the correctional facilities in Calcasieu reopen?

A. The sheriff's prison reopened in January of 2024 only for female housing. The correctional centers are a little harder to nail down a date. Because we always had intake open. And at some point we found two tiers in our trustee section that would work that would not leak. And we went through several different times of opening sections and having to close them.

So my recollection is that sometime in 2023 we were fully operational.

Q. At the correctional center?

A. At the correctional center, yes.

DRAFT COPY

Q. And in terms of sort of population like legal status and I guess male/female when it was fully operational in 2023, who was being held there?

A. All males. We tried to keep only pretrial. We did have some DOCs but only if we needed them as a trustee for operational reasons.

Q. And then in terms of the sheriff's prison, it became fully operational in January of 2024?

A. No. Only the section that housed females. That part of the building is detached. So it was fixed and we were able to bring our females back from the other parishes.

Q. And so then when did the rest of the sheriff's prison reopen?

A. As of today it's still not fully open. I have two sections for males. And it opened in August of 2024. But the majority of the building is still closed.

Q. So at least, roughly speaking, what is the capacity at the correctional center since it became re-operational in

DRAFT COPY

2023?

A. 661 is its rated capacity. However, about 580 is its operational capacity. But we're always over the operational capacity.

Q. And then in terms of the female unit in the sheriff's prison what is the capacity there?

A. It's 126.

Q. And then the two sections that y'all have reopened for men in the sheriff's prison, what is the capacity?

A. One of them is 254 and the other is 32.

Q. And is that rated or operational?

A. That's rated. I don't really have an operational capacity on those quite yet.

Q. And you said February of 2025 was when you had everybody first back into custody; is that right?

A. That's correct.

Q. And what is that number, or approximate number, how many people is that?

DRAFT COPY

A. As of yesterday we were at 908.

Q. Once y'all realized that this was going to be a much longer evacuation and out of parish housing than anticipated or envisioned what discussions did the Calcasieu Parish sheriff's office have about where and how to hold its prisoners on kind of a longer term basis?

A. As I remember it, it was -- and these would be discussions in kind of passing between me and my boss -- is like they're going to have to stay where they're at, you know, we have no other choice.

We had discussions about maybe trying to reduce population. We were having bigger discussions about how to get them to court.

Q. And other than I guess you and the commander having these discussions in passing was there any communication that was happening, to your knowledge, amongst the larger command staff? Or how was the sheriff being apprised of these discussions?

A. The sheriff was the one that told us, hey, they're going to have to stay

DRAFT COPY

where they're at. They would have regular meetings about the situation.

Q. And that's the command staff?

A. Correct.

Q. Were you in on those meetings personally?

A. No, ma'am.

Q. That's something that your commander would report out to you about?

A. Yes, ma'am.

Q. I know you said that intake remained open; is that correct?

A. Yes.

Q. So what was the process if someone was picked up, arrested, and brought to intake or booking after Laura, after the evacuation?

A. So basically the same as daily operation. We would do our regular booking. They would go in the holding cell. And we would call each of the twenty-two facilities that we had and we would ask them if they could take more. And whoever we could get to show up would show up and take them away pretty much on a daily basis, sometimes twice

DRAFT COPY

a day from different facilities.

Q. In terms of Calcasieu's own booking process can you just describe to me what is involved in that?

A. So the officer, the deputy or the trooper, you know, depending on who they work for, would come to a solid core door, we will search the inmate, bring them in. The officer will write them on a log. They also have to complete an arrest/booking sheet with all the necessary information. We fill out a property log. We search the inmate again. We take their clothing from them. We make sure that we have that logged and stored and put away on the proper -- we call it a hook number. It's a number assigned to their property in their file. We take all of that written information and put it into our database. Then we take the person to the AFIS machine which is automated fingerprints. We fingerprint them, photograph them. We will also DNA them if the state requires us to and we don't have DNA on file. And we have medical questionnaires, pre-questionnaires, classification

DRAFT COPY

questionnaires. We'll do those questionnaires. We'll make sure there's nothing physically wrong with the inmate or mentally wrong with the inmate. Ninety-nine percent of the time they will see someone from medical and they will ask them a ton of questions for their benefit and their files. And then after that, we will make sure the inmate has his log information for the telephone. And then we will put them in a holding cell.

Q. And so that was all still going on when someone came into intake after Laura, correct?

A. Correct.

Q. How much of the information that you just described to me that's collected during the booking process makes it into that hard copy inmate file that you described transferring with an individual?

A. We print what is called a booking sheet from the computer. So most of that goes in there. The only thing they will probably not get is the questionnaires. We would -- if the facility would ask for

DRAFT COPY

anything further we would provide them with anything they would ask for.

Q. Because you knew that you were transferring everyone who came into booking out to another facility, am I correct in understanding that Calcasieu wasn't making its own housing assignments anymore?

A. That's correct. We had no way, there was no way to do that.

Q. There was no reason to do it, right, understood.

A. Right.

MS. WASHINGTON:

I may have a couple more questions on this topic, but I'm getting ready to move on to topic three. We've been going for almost two hours. Do you need a break at all?

THE WITNESS:

Sure.

MS. WASHINGTON:

Let's go off the record for about five minutes and I'll collect my notes and we'll move on.

DRAFT COPY

So it's 9:51. We'll take about five minutes and I'll be right back.

THE WITNESS:

Okay.

(Recess)

MS. WASHINGTON:

Let's go back on the record.

MS. WASHINGTON CONTINUES EXAMINATION:

Q. Before we move into topic three, Commander, can you walk me through -- it might be a big ask -- but the twenty-two facilities that you have been referencing that ended up with Calcasieu prisoners at some point in time?

And maybe we can break this down. In terms of the original evacuation we talked about Phelps which I know itself was then evacuated, but let's keep Phelps in the original bucket.

A. Okay.

Q. On the day before Laura hit what other facilities did y'all send people to?

A. Okay, so the only thing I remember are the twenty-two facilities but I'll try to start in the north and work my

DRAFT COPY

way down.
Q. Okay.
A. Bossier Parish sheriff's office, Webster Parish sheriff's office, Richland Parish sheriff's office, East Carroll Parish sheriff's office, Bayou Correctional Center, Louisiana Transitional Center for Women, Concordia Parish sheriff's office, Caldwell Parish sheriff's office, Franklin Parish sheriff's office, the LaSalle Correctional Center in LaSalle Parish, Catahoula Parish -- actually, they were LaSalle at the time that we were there.
Q. Right.
A. But Catahoula Parish. How many is that so far?
Q. Eleven.
A. St. Tammany parish sheriff's office, Livingston Parish sheriff's office, Tangipahoa Parish sheriff's office, Vermilion Parish sheriff's office, Lafayette Parish sheriff's office. What number am I at now?
Q. Sixteen.
A. If I could see a map, I could probably --

DRAFT COPY

Q. This is not a memory test. We can move on and if one pops into your head yell it out and I'll add it.

A. Rapides Parish sheriff's office. I'll stop there, but I promise you it's twenty-two.

Q. That's fair. Let me ask you this. Obviously we're going to be talking about Catahoula in more detail, but do you remember between the facilities you just listed, were there some that took larger numbers than others?

A. Yes. Catahoula took a lot, East Carroll took a lot. Oh, Tensas Parish sheriff's office.

Q. Did Tensas take a lot?

A. Yes.

Q. So Catahoula, East Carroll and Tensas?

A. Yes. Those are my three main places. And Rapides Parish was taking a lot. They were picking up a lot but a lot of those were DOCs. At some point we'll have to talk about the DOC matter, but they were taking a lot of DOC inmates. I don't know what that

DRAFT COPY

number came up to because we started treating DOCs differently.

Q. What do you mean by that?

A. There was a point that Secretary Leblanc called the sheriff and said we are taking your DOC inmates away from you. And it wasn't for any bad reason. It was a logistical reason.

Q. When did that happen?

A. Probably a few months after the storm when everybody realized they were not coming back.

Q. When you say a logistical reason, tell me about that.

A. I'm having to track that they're my inmates and they're in these other twenty-five facilities. They belong to DOC but DOC has also got them in these facilities where they also have other inmates. But then they are also having to track the Calcasieu inmates. That was a nightmare. It was easier to release those people to the facility where they were at because they were already DOC approved and let them take responsibility entirely for them. Because

DRAFT COPY

they were getting paid for them anyway.

Q. I'm sorry, could you repeat the last little bit that you said. You froze for a second. Lillie, if you heard his last testimony please read it back.

(At this time, the court reporter read back the previous answer as follows:)

Answer: "I'm having to track that they're my inmates and they're in these other twenty-five facilities. They belong to DOC but DOC has also got them in these facilities where they also have other inmates. But then they are also having to track the Calcasieu inmates. That was a nightmare. It was easier to release those people to the facility where they were at because they were already DOC approved and let them take responsibility entirely for them. Because they were getting paid for them anyway.

MS. WASHINGTON CONTINUES:

DRAFT COPY

Q. In terms of -- let's just take Catahoula and East Carroll and Tensas since those tend to be the locations that had the highest number or concentration of Calcasieu's evacuated prisoners.

So at the time that Calcasieu understood that it would be holding people out of parish for longer than y'all originally anticipated, did you take any steps to gather further information about these facilities or evaluate these facilities in any kind of way?

A. No. The most we did was make sure that we had very good contacts with them. I did call every warden personally and made sure that if they had any problems that I, you know, that they could reach out to me. And I made sure that I built that relationship with each warden.

Q. During the time period where Calcasieu was holding people out of parish, so any time in that four- to five-year time period, were there any facilities that y'all stopped using to hold people out of parish?

A. Many. We reduced -- we were

DRAFT COPY

doing our best to reduce our population. Housing in these facilities was costing about ten million dollars a year. And we hadn't yet been reimbursed from FEMA or the police jury. So there was a big effort to try to reduce the amount of people and the amount of facilities, you know, that they were in. And having twenty-two different facilities was a nightmare. So if we could take a smaller facility and move those inmates out and let them go to another, we would.

Q. What steps did y'all take to try to reduce the overall population?

A. We were having conversations with the judges, you know. We would also make sure we found a place for the DOC inmates that would not take a bed from the facility that we needed to send our pretrials to.

Q. Understood, okay. Let's move on to talking about topic three in the 30(b)(6) Notice that you have in front of you. It's the one about the negotiation and perfection of the housing agreement between Catahoula Correctional Center, CCC, and the Calcasieu

DRAFT COPY

Parish sheriff's office. Do you see that?
A. Yes, ma'am.
Q. So at some point a written agreement for prisoner housing was entered into between the Calcasieu sheriff's office and the Catahoula Correctional Center; is that correct?
A. Yes.
Q. How was the desire for a written agreement first raised?
A. The Calcasieu Parish Police Jury requested that we do this for FEMA reimbursement.
Q. When you say the police jury, was there a particular individual or individuals that were in contact with the Calcasieu sheriff's office?
A. Yes. I believe that would have been Kelly Fontenot.
Q. Is that a man or a woman?
A. That's a woman.
Q. What was her role?
A. Her role, she's financial -- I don't know her title but she's the financial person for the Calcasieu Parish Police Jury.

DRAFT COPY

Q. Who was she in touch with in terms of the sheriff's office?
A. I talked to her a few times. And then I'm assuming Darren Boyd spoke to her because he was the one that had the contracts drawn up and signed.
Q. Who is Mr. Boyd?
A. Darren Boyd was the captain, assistant warden, whichever one you want to say, at the sheriff's prison. I actually -- he had my position first. I replaced him.
Q. Your current position?
A. The position at the time of the storm.
Q. Does he still work for the sheriff's office?
A. No. He has passed away.
Q. Who with Catahoula were y'all in touch with to tell them about the need for a written agreement or a desire for a written agreement?
A. I'm not exactly sure. At the time that this was happening Darren Boyd was doing everything he could to help me. So he took this task and took care of it.

DRAFT COPY

Q. Were there discussions about entering the written agreement with, and I'll just use your term, the command staff?

A. No. The only thing I remember is Daniel Burkarlter saying that we needed to get this done. Other than that it was just a standard thing.

Q. And that was your commander at the time?

A. Correct.

Q. I'm going to share my screen with you. This is a six-page document that has been previously marked as Exhibit 17 to these depositions. This is the first page of it, Prisoner Housing Agreement, October 16, 2020. The agreement between Calcasieu Parish sheriff's office and the Catahoula Correctional Center. And I will flip through to show you the last page here which is a signature page with Darren Boyd for Calcasieu and Sherman Ford signing for Catahoula. Are you familiar with this housing agreement?

A. Yes, ma'am, I am.

Q. I'm actually going to change the document that I am working off of with you.

DRAFT COPY

And I'm going to show you why. You'll see here, we're on page 2 of the document. There's a two at the bottom of it, if you're looking on the screen. I'll scroll down to the bottom. Do you see that?

A. Yes, I do.

Q. And on the next page of the PDF, which is PDF page 3, you'll see at the bottom here is actually page 4 of the housing agreement. Do you see that?

A. Yes, ma'am, I do.

Q. Okay, so this document itself has the sequential Bates numbering of Mancuso 502 through 507. It's a six-page document that's Exhibit 17. We realized during discovery in this case that page 3 was missing from the document and so went back to your counsel to locate the missing page.

So I'm going to stop sharing this original version that we received and I'm going to share with you a complete version that hopefully will look like something that you have in front of you.

Give me a second. Okay, I'm sharing my screen again. Is it up there for

DRAFT COPY

you?

A. Yes, ma'am.

MS. WASHINGTON:

I'm going to go ahead and mark this as Exhibit 47 to these depositions. This is a seven-page document that has the sequential Bates numbering of Mancuso 1441 through 1447. And I'll just show you this version includes page 3.

Does the version that you're looking at in front of you, the hard copy, include page 3?

THE WITNESS:

Yes, ma'am.

MS. WASHINGTON CONTINUES:

Q. We're going to walk through a little bit of this. You're welcome to look at the version that's up on the screen or the one in front of you on the screen if that's easier. I will just confirm for you that we are looking at the same portions of the document.

So in terms of the general

DRAFT COPY

structure of this agreement was this language that already existed prior to the execution of this specific agreement between Calcasieu Parish sheriff's office and Catahoula Correctional Center?
A. I do not know.
Q. Prior to this specific agreement with the Catahoula Correctional Center have you seen a prisoner housing agreement that looked like this in general form and structure and language before?
A. Prior to all twenty-two of them being signed I had never seen a prisoner housing agreement ever.
Q. Okay.
A. Nor had we ever had one of these signed before.
Q. And so I take it from what you have just said that this prisoner housing agreement was used or entered into with all of the entities or facilities where Calcasieu was holding its prisoners after evacuating from Laura?
A. Correct.
Q. Other than the fill-ins, like

DRAFT COPY

the date of the agreement, Catahoula Correctional Center like we see here on page 1, the per diem at the bottom of page 6, and obviously the signatures page, other than those that I'm calling kind of the handwritten filled-in portions, were the prisoner housing agreements identical for all twenty-two facilities?

A. I believe so. It seems that I remember there may have been one or two facilities that wanted a few words changed.

Q. Do you remember which one or two facilities that was?

A. I do not.

Q. Do you remember if Catahoula was one of the facilities that wanted anything changed?

A. I do not.

Q. Was the language of this agreement something that came from the Calcasieu Parish sheriff's office or something that came from the Calcasieu police jury?

A. Well, I can't -- the first part of that question I can't answer, I don't

DRAFT COPY

know. The second part of the answer I would say we would never take anything that they spoon fed to us and use it. We would do our own research.

Q. And maybe this was sort of part of your answer on the first part. Do you know who with the Calcasieu Parish sheriff's office was involved in drafting or discussions about the language to be included in these housing agreements?

A. There wouldn't have been any discussion within the command staff of the sheriff. Darren Boyd was our guy who did all of these type things. And he would have either, A, drafted this himself; or did the research to find the perfect forms somewhere, and then he would have passed it by our legal department before having it signed.

Q. And by legal you mean the in-house counsel?

A. Correct.

Q. When you say that Darren Boyd did all these types of things are you referring specifically to the prisoner housing agreement that Calcasieu entered into

DRAFT COPY

after Laura or are you talking about like contracting and agreements more generally for the sheriff's office?

A. Usually for anything with the correctional division if it was a high level issue Darren Boyd would do the research and any paperwork that went along with that.

Q. And was that like a role or responsibility that he had been given or I guess delegated by the command staff of the sheriff's office?

A. Yes. Depending on what position he was in, this always followed him. He also supervised the person that keeps track of our compliance and our compliance with the basic jail guidelines, the DOC liaison you could call it. That's always been in his wheelhouse.

Q. How long was he with the sheriff's office?

A. He started maybe a year, year-and-a-half before me. I believe he started in 1995. And he was with us until two or three years ago.

Q. Was he still employed by the

DRAFT COPY

sheriff's office at the time that he passed away?

A. He was not.

Q. Did he retire when he left the sheriff's office or did he leave for some other reason?

A. He left for another reason.

Q. What was that?

A. He was terminated.

Q. Why was he terminated?

A. I'm not -- can I answer that question?

MS. HEBERT:

I'm going to object to the form, but you can answer.

THE WITNESS:

He burglarized someone's home and had drug use.

MS. WASHINGTON CONTINUES:

Q. To your knowledge, prior to that had he had any, I don't know, write-ups or disciplinary issues during his employment with the sheriff's office?

MS. HEBERT:

Object to the form. You can

DRAFT COPY

answer.

THE WITNESS:

Not to my specific knowledge. I have no idea. I've never seen his personnel file.

MS. WASHINGTON CONTINUES:

Q. Who terminated him?

A. The sheriff is the only one that can terminate anyone.

Q. And that was Sheriff Mancuso?

A. Yes, ma'am.

Q. Am I correct in understanding that it would have been Darren Boyd who was in contact with the facilities or the entities where Calcasieu was housing individuals having to do with the housing agreement?

A. Correct.

Q. Did you personally have any role in discussions of or negotiations with the facilities having to do with the housing agreements?

A. No, ma'am, I didn't. If anyone would call me about it I would give them Darren's telephone number and say, hey, call

DRAFT COPY

him, he's handling it.

Q. And other than -- I know you mentioned the person, somebody that Mr. Boyd supervised that dealt with basic jail guidelines. Was there other staff that was employed by the Calcasieu sheriff's office that worked with Mr. Boyd specifically with regard to these prisoner housing agreements?

A. He may have had help from Mike Holland. And he may have had help from Rose Leblanc. She was a lieutenant at the time. However, I don't know for sure.

Q. And Lieutenant Leblanc, what was her role at the time?

A. At the time, she was -- she was administrative lieutenant. She would review use of forces and just administrative tasks.

Q. Looking here at the first page of the prisoner housing agreement, Exhibit 47, it says the agreement was entered into on the 16th of October 2020. Do you see that?

A. Yes, ma'am.

Q. Do you recall when these discussions started occurring in terms of the Calcasieu police jury and the sheriff's

DRAFT COPY

office about getting these prisoner housing agreements in place?

A. No, I do not.

Q. Do you know if this data, mid October of 2020, is that around the time that those discussions were occurring or -- I'm just wondering if it's close in time.

A. It would have to be. Because my recollection is that we needed this done quickly to make sure that FEMA would reimburse us due to the calculations of how much it was going to cost.

Q. And were all of the housing agreements, all of the twenty-two facilities, entered into around the same time?

A. Around. There were a lot of facilities that drug their feet, took a long time to sign. There was lots of discussion and yelling about why aren't you done with this yet. So it took a while.

Q. And by done with this yet, did they mean like done with holding your prisoners out of parish? What did that mean?

A. Okay, let me explain.

Q. Yes.

DRAFT COPY

A. Why do you not have all the contracts signed yet and turned in to the police jury. Why haven't you had this person at this facility signed.
Q. This was the police jury urging the sheriff's office to get these agreements finalized?
A. Correct.
Q. Do you recall if Catahoula was one of the feet dragging facilities or not?
A. I -- I don't remember which facilities were dragging their feet except maybe one and I think that was Madison, which was Bayou Correction.
Q. That tracks. Do you know just looking at the handwriting in this filled-in portion right here, do you recognize that handwriting? It looks to be the same at the top of page 1 and also the part about per diem at the bottom I think on page 6.
A. It does not look like Darren Boyd's handwriting, but I can't say it's not.
Q. I want to look at page 2 under general conditions in the first section there. So it says: "Housing agency must

DRAFT COPY

meet the minimum standards as outlined in the LSA/DOC Basic Jail Guidelines or satisfy the American Correctional Association standards. In addition, housing agencies must comply with all applicable federal, state, or local laws and regulations." Do you see where I'm reading?

A. Yes, ma'am.

Q. It references the basic jail guidelines there. And you brought the guidelines up just a minute ago. What are the basic jail guidelines?

A. They are a set of basic standards that DOC and Louisiana sheriffs agreed to to be able to house a DOC inmate.

Q. What exactly is the purpose of the guidelines?

A. To my understanding, in the 1990s there was a lawsuit and the sheriffs were put under the consent decree. And it was part of the consent decree that they be created. And even though we're not under the consent decree anymore, it is a good practice to keep that going, that practice.

Q. In terms of this provision that

DRAFT COPY

we're looking at, Section 1 under general conditions on the second page of the housing agreement, did Calcasieu take any steps to determine that the facilities that it was entering into these housing agreements with met what's in this provision, the minimum standards and the jail guidelines, et cetera?

A. No, ma'am.

Q. I'm going to flip to page 3. And we're still under general conditions as the heading, just showing you that it's continuing. And I want to look at Section 3 which is at the top of page 3. It talks about CPSO, which here means Calcasieu Parish Sheriff's Office, will notify the housing agency in their preferred method of communication, e-mail, fax, when a release is authorized.

So this is talking specifically about releasing a pretrial or sentenced person. My question is in terms of the agreement. Do you know what the preferred method of communication was with Catahoula Correctional Center?

A. I believe it was fax, but we

DRAFT COPY

didn't do that with any of them. We forced all of the facilities to e-mail.

Q. What e-mail address was Calcasieu using in terms of any communication with facilities based on these housing agreements?

A. At that time we were using the corrections records at CPSO dot com.

Q. When you say at that time, do you mean for the duration of when Calcasieu was holding its prisoners out of parish?

A. No. We actually changed that e-mail address probably a few years ago to CCR at CPSO dot com.

Q. Do you know if you were still -- and by you I mean Calcasieu -- was still holding prisoners at Catahoula at the time that the e-mail address changed?

A. I don't believe we did.

Q. And maybe this is a good time for me to just ask this. When did Calcasieu stop holding people at Catahoula?

A. I really don't know. I think it was sometime in either late 2023 or early 2024, but I may be wrong.

DRAFT COPY

Q. Do you recall why Calcasieu stopped holding people at Catahoula?
A. It was part of our consolidation. We actually moved everyone that was left at Catahoula to East Carroll.
Q. Okay.
A. And actually Catahoula moved some of our inmates to Bayou Correction or Security Management, I don't know what name they were under at that time. But they actually started moving some of our inmates out to take other people's inmates.
Q. Okay, and when did that occur?
A. I don't know. It was towards the end of us housing anyone there.
Q. So just to make sure I understand. Catahoula itself had already moved some of the Calcasieu prisoners to Bayou and then after that Calcasieu moved the rest of its prisoners out of Catahoula and moved the remaining individuals to East Carroll?
A. Correct.
Q. Just to sort of follow the path here. When did Calcasieu have all of its

DRAFT COPY

prisoners returned, or did it?
A. I'm sorry, you cut out.
Q. In terms of East Carroll, when did Calcasieu take all of its prisoners back from East Carroll?
A. February of 2025.
Q. Was it part of this most recent return?
A. Yes. They were the last facility that we had inmates at.
Q. And how many were still there at the time that they came back in February of 2025?
A. Thirty.
Q. Thirty?
A. Yes, ma'am.
Q. And in terms of Bayou, did Calcasieu's prisoners who were moved to Bayou by Catahoula get returned to Calcasieu?
A. I do not believe. I think that they reduced through attrition.
Q. Like released?
A. Well, it would happen a couple different ways. People would be released, we would be ordered by the court to bring

DRAFT COPY

someone back, or they would become a DOC inmate, they would receive a DOC sentence, and at that time we would relinquish responsibility.

Q. To the Department of Corrections?

A. Right, they always have responsibility, but to the facility that they were being housed at at the time they became DOC.

Q. Understood, okay. And so am I understanding you correctly, back to this communications piece, that in terms of the housing agreements Calcasieu was only communicating with the facilities by e-mail rather than fax?

A. Yes. But I wouldn't say it that way. I would say if we had to send a document that we were doing our best to make sure it went through e-mail, but most communications with them happened over the phone.

Q. And when you say with them, are you referring to all of the housing agencies?

A. Yes, ma'am.

DRAFT COPY

Q. And maybe we need to break this down a little bit more specifically. But who from the Calcasieu Parish sheriff's office was responsible for communicating with the Catahoula Correctional Center during the time that Calcasieu was holding prisoners at that facility?

A. Michael Holland.

Q. Anyone else?

A. That was their main point of contact. Of course, either every once in a while I would talk to them, every once in a while Hollie Howard would talk to them, and every once in a while Anna. Anna probably e-mailed them, probably didn't call them, from what I know about Anna.

Q. In terms of the Catahoula Correctional Center, who at Catahoula was communicating with Michael Holland or anyone with the Calcasieu Parish sheriff's office during the time period Calcasieu was holding people at that facility?

A. That would have been Stott.

Q. Eric Stott?

A. Yes, ma'am.

DRAFT COPY

Q. Anybody else?
A. Hollie Howard and Anna Shockley would have had communication with Margie Price about billing issues and making sure our inmates were still there. But any discussion about how many they would take from us or any problems would be Mike Holland and Eric Stott.
Q. Still on page 3 of Exhibit 47. There's a section there called custody and supervision. Do you see that?
A. Yes, ma'am.
Q. In Section 2 it says: "The housing agency will utilize their own classification process to determine appropriate custody levels." It goes on to say that the CPSO, meaning Calcasieu, "will provide any information relative to classification, past disciplinary issues, security threats, and gang affiliation to the housing agency upon request." Do you see where I'm reading?
A. Yes, ma'am.
Q. And in terms of the use of the word "classification" in that provision, what

DRAFT COPY

is your understanding of what classification means in the corrections context?

A. It's a set of standards or rules to properly place an individual into the appropriate housing area.

Q. What do you mean by appropriate housing area?

A. So you wouldn't want to house a person with no criminal history and had only a DWI with one that had committed murder or a violent act.

Q. Are there any --

A. There would be more to that, but that's the simplest explanation.

Q. Without belaboring the point for too long, what are some other things when you say there's more that goes into it? What other things go into it?

A. Their physical condition, their mental health, mental condition, their age. You wouldn't want to put someone even if they had committed a violent crime, with a walker or in a wheelchair, with someone, you know, with someone that would prey on them.

Q. So generally speaking it sounds

DRAFT COPY

like you're describing factors, behavioral history, things like that that would be considered so as to ensure the safety of the prisoners?

A. Correct. And the safety of the facility and staff as well.

Q. Here it's talking about -- and by here I mean this section of the housing agreement -- it's talking about the housing agency utilizing their own classification process. In terms of this housing agreement what does classification process mean?

A. My interpretation of it is that, you know, each correctional facility uses their own set of rules or their own system. There are a number of different philosophies and classification systems.

Q. But am I correct in understanding that whatever the system is specifically, it's supposed to achieve that goal that we were just talking about in terms of considering various factors and histories to ensure that somebody is held safely within the facility?

A. Correct.

DRAFT COPY

Q. Did Calcasieu Parish sheriff's office take any steps to determine that the facilities that these housing agreements were entered into with had classification processes as envisioned by this provision?
A. No, ma'am. As long as that facility was DOC approved, that told us that their standards were up to par.
Q. I'm going to flip to page 4 of this exhibit. We're still on Exhibit 47. And I'm looking here under the section called injuries and emergency medical attention. Do you see that?
A. Yes.
Q. In the first section there, Section 1 says: "The housing agency will be responsible for any medical treatment that occurs within the facility." Do you see where I'm reading?
A. Yes, ma'am.
Q. And it goes on to say: "Including dental care, mental health care, pharmaceuticals, and record keeping."
A. Yes, ma'am.
Q. It also references in Section 2

DRAFT COPY

there that: "The housing agency will ensure adequate resources, training, and personnel available to provide emergency medical treatment." And also that: "The agency will provide for emergency transportation and hospitalization." That's in Section 3. Do you see those two provisions?

A. Yes, ma'am.

Q. And similar to what I was just asking in terms of the classification process, did Calcasieu Parish sheriff's office take any steps to evaluate the medical care and medical resources available at the facilities that they were entering into these prisoner housing agreements with?

A. No, ma'am.

Q. I'm going to skip ahead to page 6, still on Exhibit 47. I want to look at the bottom box that says agency billing. Do you see that?

A. Yes, ma'am.

Q. There are a couple of boxes in this little chart for per diem rate. Do you see that?

A. Yes, ma'am.

DRAFT COPY

Q. It's handwritten in there a $26.39 per day per offender. My first question is, this is the per diem rate that was agreed upon at least between Calcasieu Parish sheriff's office and the Catahoula Correctional Center for this agreement. Was the same per diem rate agreed to between Calcasieu and each of the facilities that it housed its prisoners at?

A. Yes, ma'am. That's the state rate.

Q. Okay, that's what I thought. And how was that rate decided upon? And I guess I mean that both generally in terms of these housing agreements or specifically with Catahoula?

A. Generally we had no choice. We could not pick up our inmates. They could have charged us fifty dollars and we wouldn't have any choice. We couldn't move. We had no choice.

Q. Do you know how the per diem rate was agreed to? I suppose we can talk specifically in terms of Catahoula Correctional Center.

DRAFT COPY

A. I think that that is the rate that they charged for every inmate and I think that was standard through the state. So when Hurricane Laura happened every facility charged us the same amount.

Q. And when you said that's the state rate, I assumed, but let me make sure, that you were referencing the per diem that the Department of Corrections pays to local facilities that are holding DPSC sentenced prisoners; is that right?

A. That's correct. For a normal offender. There are a few other different -- there's at least one more rate for parole violations.

Q. Right, okay. I asked you this before in terms of the handwriting on page 1. Do you recognize whose handwriting that is at the bottom of page 6?

A. Okay, so the numbers I do not. The actual per day and per offender looks just like Darren Boyd's handwriting.

Q. Flipping to the last page, the signature page, page 7 of Exhibit 47, some of this we've already gone over. So that

DRAFT COPY

signature in terms of Calcasieu Parish sheriff's office is Darren Boyd, correct?
A. Correct.
Q. And that's the same Darren Boyd that we've been discussing?
A. Correct.
Q. In terms of the listing there, assistant warden, I know you said there were a couple different titles you could use, but assistant warden, does that refer to one of the Calcasieu facilities specifically?
A. No. So when I told you I was a captain, that was my rank. But my title was assistant warden. That was the same with him. His rank was captain and his title was assistant warden.
Q. That was the position that you were in from 2015 up until just last year, correct?
A. Yes. He actually -- we were equals. So his role was security at the sheriff's prison.
Q. Okay. And what was kind of like within your realm of responsibility at the time you were equals?

DRAFT COPY

A. All of this is my realm of responsibility; however, he came in to help. And like I said, whenever, you know, these kinds of things were in his wheelhouse. Even though it might have been someone else's responsibility and not his, our commander would have him do it.
Q. And that's the commander with the name I can't pronounce that you told me about earlier?
A. Burkarlter, yes.
Q. Were there other people during this time period, 2020 to 2024 roughly, who had authorization or power to enter into either housing agreements or other contractual arrangements corrections-wise on behalf of the sheriff's office other than Mr. Boyd?
A. Yes. I mean, me or Daniel Burkarlter or Brandon Strenth or Jeff Miller.
Q. And that was all capabilities or authorizations that flowed down from Sheriff Mancuso?
A. Yes, ma'am. Of course each item would have to be approved. And that would be

DRAFT COPY

coordinated through our in-house counsel.

Q. In terms of the housing agency here which is Catahoula Correctional Center, this is signed by an individual named Sherman Ford. Are you familiar with Sherman Ford?

A. I spoke to him a couple of times and I saw his name many times, but I -- that's about all I know about him.

Q. Do you recall anything about the circumstances under which you spoke to him the couple of times?

A. I think it's whenever we couldn't get ahold of Stott.

Q. Did the Calcasieu Parish sheriff's office have any interactions with Catahoula Parish's Sheriff Edwards during the time period that Calcasieu was holding individuals at the correctional center?

A. Yes, ma'am. When he bought the facility back from LaSalle Corrections he requested a letter of support.

Q. And I am actually going to show you that in a minute. Other than that interaction, how else, to the extent he was, Sheriff Edwards involved in terms of the

DRAFT COPY

holding of Calcasieu prisoners at the correctional center?

A. That was the first time that I ever even knew his name. Other than that, my only involvement with him would be through the LSA jail training conference.

Q. Are you familiar with an individual named Pat Book? He used to be the warden at the Catahoula Correctional Center.

A. Yes, ma'am, I'm familiar with him through the jail training conference. Also, I may have spoke to him one or two times. My understanding was that he floated between two different facilities when it was the LaSalle system.

Q. It's my understanding that he had some involvement at the Madison Parish facility. Does that match your recollection?

A. Yes, ma'am. I didn't realize they were the same system, I thought they were a different company.

Q. Madison has I think a lot going on, so I think you're correct.

The last person that I wanted to ask you about was Jeremy Wiley. He also is I

DRAFT COPY

think during some of this time period with the Catahoula Parish sheriff's office, probably like an assistant warden or warden position. Are you familiar with Mr. Wiley?

A. No, never heard of him.

Q. But it sounds like, based on your prior testimony, that Warden Stott, or Eric Stott, was the main point of contact between the Catahoula Correction Center and the Calcasieu sheriff's office during the time Calcasieu was holding people at CCC?

A. That's correct.

Q. I'm going to stop sharing this document with you and share another document. I believe you may have this in front of you but let's take a look real quickly. This is a thirteen-page PDF that we have previously marked as Exhibit 45 to these depositions. This is the first page of the document. The second page is the signature page. And the remainder of the pages is Exhibit A that's described here on page 1, which I'm happy to show you the content of as necessary. But first I just want to ask if you recognize this document.

DRAFT COPY

A. I do.
Q. And I think you have it in front of you; is that correct?
A. That's correct.
MS. HEBERT:
This one is Bates numbered, just to clarify, for your reference. The Bates number didn't get cut off.
MS. WASHINGTON CONTINUES:
Q. Okay, so on this one, Commander, I have the first page as being Mancuso 1355 and the last page being 1367. Is that the same as your version?
A. That's correct.
Q. So just looking at the first page, this appears to be an addendum to the prisoner housing agreement that had been entered into by Calcasieu Parish sheriff's office and the Catahoula Parish sheriff's office in October of 2020 that we were just looking at. Is that your understanding of what this is?
A. Yes, ma'am.
Q. And the addendum appears to concern FEMA reimbursement that Calcasieu

DRAFT COPY

intended to seek for costs associated with holding its prisoners out of parish during this time period. Is that your understanding?

A. Yes, ma'am.

Q. So how did this addendum come about?

A. The lady, Ms. Kelly Fontenot, from the Calcasieu Parish Police Jury, called me and she said she had been speaking to someone with the state. I don't know what his name was. But he had advised her that we needed to add this into the contract to make sure that FEMA would reimburse us. Because they believed if we didn't comply with the -- I'm trying to remember the acronym -- it is a purchasing set of guidelines, guidelines for purchasing in the federal system. That there was a possibility that we would not be reimbursed.

So he wanted -- he actually wanted us to backdate contracts, which I told her was not going to happen. And there may have been some yelling. But we eventually agreed to get these signed.

DRAFT COPY

Q. Does Ms. Fontenot still work for the police jury?
A. Unfortunately, yes.
Q. When did Ms. Fontenot contact you about this matter?
A. I do not have an exact date, but it was at least six, seven, eight months later.
Q. When you --
A. And we didn't immediately get it done. We delayed for a little bit.
Q. Why was that?
A. Our attorney, in-house attorney, was going back and forth with them.
Q. I think I understand just from how it operates in other locations, but just so I understand specific to Calcasieu, what is the relationship of the police jury to the sheriff's office?
A. They own the building. They are supposed to maintain the building. They are supposed to pay a per diem for their inmate and they are supposed to facilitate all their needs, the funding for their needs. And there's other things beyond the corrections

DRAFT COPY

division that they are supposed to do for the sheriff's office, but it's not in my wheelhouse, so I don't know.

Q. That makes sense, thank you.

When you said Ms. Fontenot had talked to someone with the state, I know you don't remember the exact name, but what part of the state, or what role was this person in?

A. If I remember correctly, it would be in the procurement field.

Q. Is this with corrections or otherwise?

A. No, ma'am. This would be probably in the governor's office or administrator's office, somewhere in that chain of command.

Q. Other than Ms. Fontenot, you, in-house counsel for the sheriff's office, who else if anyone was involved in discussions about getting the housing agencies to sign this addendum?

A. I'm not exactly sure who, but I believe someone from the police jury administration called the sheriff directly to

DRAFT COPY

voice their frustration about us dragging our feet.

Q. How did you hear about that, you personally?

A. I got yelled at on why we hadn't got them signed yet.

Q. By the sheriff?

A. No, ma'am. By Daniel Burkarlter. But we actually did not get these signed, our legal department actually took that task on.

Q. And am I correct, we'll flip to the next page, you can see this one is specific to Catahoula on page 1. But were these addendums added to all of the prisoner housing agreements?

A. Yes, ma'am.

Q. I'm looking at page 2 of this document and it looks like in terms of Catahoula that it was signed there by Pat Book with the date of January 31, 2022. Do you see that?

A. Yes, ma'am.

Q. Then it looks like a signature of Sheriff Mancuso above with the date of

DRAFT COPY

April 11, 2022. Do you see that?
A. Yes, ma'am.
Q. I'm just wondering, is there an explanation for the three months or so that passed between the addendum being signed by the housing agency and then signed by Calcasieu?
A. I have no idea.
Q. During the time that Calcasieu held its prisoners at the Catahoula Correctional Center, we went over that timeframe earlier, other than this addendum were there any other changes or additions or even discussions about changes or additions to the housing agreement?
A. There was one facility, I think it may have been LaSalle, I'm not exactly sure, that wanted to change the medical part of it. Because they did not want to pay for their pharmaceuticals they received on a daily basis.
Q. Was that change made?
A. No. I believe we just moved our inmates.
Q. So other than that discussion do

DRAFT COPY

you recall any other discussions or suggestions or changes or additions to the housing agreements?

A. No, ma'am.

Q. As promised, I'm going to show you another document. Do you see something up there on your screen?

A. Yes, ma'am.

Q. This is a two-page document that I'm going to mark as Exhibit 48 to these depositions. It's got Bates numbering at the bottom of Mancuso 589 to 590. I'm just zooming in here a little bit on the top of page 1 of Exhibit 48. Are you familiar with this letter?

A. Yes, ma'am.

Q. I believe you referenced it earlier in our discussion?

A. Yes, ma'am.

Q. And so I guess generally speaking it looks to be a letter from Sheriff Edwards of Catahoula Parish to Sheriff Mancuso of Calcasieu Parish in January of 2021. And as detailed in the letter, Sheriff Edwards was reaching out to parishes whose

DRAFT COPY

pretrial detainees were already being held at Catahoula and asking those sheriffs' offices if they would basically vouch to continue housing pretrial inmates at Catahoula Correctional Center after Sheriff Edwards finalized the purchase of the facility. Is that your understanding of the basic outreach of this letter?

A. Yes, ma'am.

Q. And so, as you said, it requests a written letter of intent from the Calcasieu Parish sheriff's office as part of the ask of the letter; is that right?

A. Yes, ma'am.

Q. And page 2 of this exhibit appears at least to me to be such a letter of intent provided by you. But generally the Calcasieu Parish sheriff's office to Sheriff Edwards of Catahoula Parish in February of 2021; is that correct?

A. Yes, ma'am.

Q. The body of the letter says, at least part of it: "We intend to house our inmates with Catahoula Parish for the continuous future." Do you see that?

DRAFT COPY

A. Yes, ma'am.
Q. And you are in fact a signatory on this letter?
A. Yes, ma'am.
Q. Did you have discussions with others with the Calcasieu Parish sheriff's office before sending this response to Sheriff Edwards?
A. Commander Burkarlter gave me the letter and said the sheriff asked that we send the letter.
Q. Sheriff Mancuso asked that you send this letter to Sheriff Edwards?
A. Yes, ma'am.
Q. And I guess at the time of this letter at least, what did you or the Calcasieu Parish sheriff's office mean by we intend to house our inmates with Catahoula Parish for the continuous future?
A. Well, at that time we had no end to our housing dilemma, so as long as we needed bed space we would continue to hold our inmates there.
MS. WASHINGTON:
I'm going to stop sharing this.

DRAFT COPY

Okay, I have one more topic with you, which I hope is going to be the shortest of my three. It's topic six. It's about 11:25 right now. Do you want or need a short break before we launch into my last topic?

MS. HEBERT:

Yes, we'll take one.

THE WITNESS:

Yes, please.

MS. WASHINGTON:

Let's go off the record. I'll come back in a few minutes. I'll just turn my video back on when I'm back.

MS. HEBERT:

Okay, thank you so much.

(Recess)

MS. WASHINGTON:

Okay, we can go back on the record.

MS. WASHINGTON CONTINUES EXAMINATION:

Q. Commander, the last topic for me is topic six, if you want to look at the 36 (b) (6) Notice in front of you again. This

DRAFT COPY

one is about reviews, corrections, and payments of invoices from Catahoula Correctional Center for holding Calcasieu detainees.

So I want to talk about some different forms of invoicing and payment during the time period when Calcasieu was holding its prisoners at Calcasieu and other facilities.

And first I want to talk about the Department of Public Safety and Corrections. We received some billing records from Calcasieu. And it looks like during this period of time there were still some DOC sentenced prisoners that Calcasieu was billing the Department of Corrections for; is that right?

A. That's correct.

Q. And just so I have an understanding. Were those DOC sentenced individuals who were being physically held in Calcasieu or were they in another facility?

A. They would only be the ones physically being held in Calcasieu.

Q. So I guess that's a little bit

DRAFT COPY

of what I'm trying to understand. I think I saw that perhaps at some point in time there was your group of trustees, like the sixty to seventy people that I think you mentioned previously. Did they return to be held in-parish at some point in time?

A. No. Two things could happen. A, we use that person as a trustee and if you remember from prior questions we were able to open a couple of housing areas within the trustee area. So if we could use that person as a trustee we would not transfer them.

Q. Okay.

A. The other reason would be if they also had pending charges that were still open, the court ordered us to keep them there.

Q. And when you say keep them there you mean keep them in Calcasieu?

A. Correct.

Q. And just in terms of the timeline I think some of the billing records that we have date back at least to January of 2021. So that would have been, you know, only a few months after Laura and Delta. At

DRAFT COPY

that point in time what group of DOC sentenced individuals would Calcasieu have been billing the department for?

A. Only if they were with us, physically with us at the correctional center.

Q. And during at least this time period, 2020 let's say to 2024, who with the Calcasieu Parish sheriff's office had responsibilities related to invoicing the Department of Corrections for holding DOC prisoners?

A. That would be Danielle Landry.

Q. And what is her position?

A. Currently her position is lieutenant over the personnel office.

Q. Okay.

A. At the time, she had the same job. She does personnel and she also supervises our archive for corrections, our archive system. She has two or three people that work for her in that department.

Q. So other than DOC sentenced individuals who are either working as trustees or who also had open charges in

DRAFT COPY

Calcasieu and that were physically located at Calcasieu, those were the only DOC individuals that Calcasieu was billing the department for prior to people returning from out of parish or your facilities fully reopening?

A. Correct.

Q. And I know that you referenced before the time when Secretary Leblanc contacted Sheriff Mancuso about basically taking the DOC sentenced prisoners that y'all had moved out of parish. Has there been a point in time since then where Calcasieu has started holding I guess more or new purely DOC sentenced individuals at its Calcasieu facilities, the reopened facilities?

A. Not intentionally. Our problem is that we create, or the court system creates, about ten DOC inmates a week, depending on the court's schedule. So if we, A, can't find a place for them to go, or -- I'm kind of losing my train of thought about this. If we can't get them out of there then they pile up to the point they are taking the bed space from our pretrial inmates. So we

DRAFT COPY

have to find a place for them to go.

Another thing is if they have any medical problems, it could be a simple medical problem, the other facilities will not take them. And then of course DOC doesn't exactly have the room for a while. We may get on a list to try to move them. Sometimes I get some pushback saying our facility can't do anything different that DOC can't do so that they need to stay with me. And I have to push back and say, look, I'm not in the housing business, I'm trying to get them moved on so that we can house our pretrial inmates, we have limited space. Which I understand that, you know, everybody has limited space.

Q. Let's talk about payments that Calcasieu Parish sheriff's office was making related to the holding by other facilities, other housing agencies, of Calcasieu's during this post Laura time period. I'm going to show you again Exhibit 47 which is the prisoner housing agreement that I think you have a version of in front of you that you're welcome to look at. And I want to

DRAFT COPY

look at page 2. There's a reference at the top there in the definitions section for a billing coordinator. Do you see that?

A. Yes.

Q. It says: "An institutional staff member of the Calcasieu Parish Sheriff's Office Corrections Division designated by the commander of corrections to coordinate, monitor, and assist with the monthly billing process throughout the duration of this emergency situation." Do you see where I'm reading?

A. Yes, ma'am.

Q. And so during the time that Calcasieu Parish sheriff's office was holding people out of parish, specifically including the time people were at Catahoula, who was the billing coordinator per the housing agreements?

A. So that would be Hollie Howard. We did not call her the billing coordinator. She was the person that pretty much just was the person that did it.

Q. Was she doing or handling billing for all twenty-two of the facilities

DRAFT COPY

with which Calcasieu had housing agreements?
A. Yes, ma'am.
Q. Did she have any help?
A. Yes, ma'am. She had me. She also had Anna Stockley. And there are seven more people in jail records and I'm sure that any one of them also would help her.
Q. But she was sort of the point person or the person overseeing the billing piece of the housing agreements?
A. Yes, ma'am.
Q. In terms of the commander of corrections that's referenced in that billing coordinator definition, what specific position is being referenced there in terms of some of the ones that we've talked about, if it is one of the ones we've talked about?
A. If that was actually correct, it would have an "s" on it. It would be commanders. And that would be Jeff Miller and Daniel Burkarlter.
Q. I know we talked about the timeline a little bit. But am I correct that Commander Miller was in the commander position at the time of the Laura

DRAFT COPY

evacuations?
A. Correct.
Q. Where are they both now?
A. Commander Burkarlter is the commander over compliance at the sheriff's office. And Jeff Miller is now the assistant chief of corrections, which is a position that did not exist in the prior administration during the time of the storm.
Q. But I guess for at least the period of time that we're talking about, like late 2020 when Laura hit through at least 2024, these were the two individuals who were in those two commander positions?
A. Yes, ma'am.
Q. How did Hollie Howard get designated as -- even if we don't call her the billing coordinator -- the person who was functioning in the role as the billing coordinator in the housing agreements?
A. The billing falls under my command and always has. And normally our division secretary would send out bills. But this was more complicated than she could handle. And so because Hollie works for me I

DRAFT COPY

gave it to Hollie.
Q. Who is or was the division secretary that you were referring to?
A. That would be -- I can't remember her name. Her last name is Bailey.
Q. How do you spell that?
A. B-A-I-L-E-Y, I think.
Q. Okay, got it.
A. I'm trying to remember her first name. I've known her for twenty years and I can't remember her first name. Robin.
Q. Robin?
A. Robin Bailey, yes, ma'am.
Q. You said that she would normally send out bills. What kind of bills was she responsible for sending out prior to this housing agreement situation?
A. She would do the bureau prisons, the US marshal, the Lake Charles city, the parish, the police juries responsibilities. We call them a parish, the parish bill. And the DOC bill would be done by Danielle Landry because that one is always complicated and never right.
Q. So still on Exhibit 47, the

DRAFT COPY

housing agreement with Catahoula, I'm looking ahead to page 5 which has the billing and financial provisions. In Section 1 there it says that the housing agency will prepare and forward invoices for certification. And that once approved and certified the invoice is placed in line for payment with the appropriate department with the Calcasieu Parish sheriff's office. Do you see where I'm referring to?

A. Yes, ma'am. I'm sorry, I was on the wrong number one.

Q. Do you see billing and financial provisions, Section 1 there?

A. Yes, ma'am, I do.

Q. What does it mean for an invoice to be approved and certified in terms of these housing agreements?

A. I don't know where Boyd got the certified from. If I were doing this document I would strike that out. But basically our accounting department will not pay any bill without the proper authority in that department approving that bill.

So basically we had to audit

DRAFT COPY

those bills and sign off on it, and then send it to our accounting department to pay.

Q. And in terms of the auditing process, who was responsible for that?

A. Hollie Howard. In the beginning it was kind of hard for us to wrap our minds around the fact that a lot of the bills were incorrect. So I made an Excel spreadsheet to audit. As I said before, we would take their bill and print a bill out of our system, we would cross reference and put any discrepancies on a spreadsheet. And then we would actually give our accounting department an amount to pay.

Q. And if I understand correctly, the amount to pay for a given facility would be the number of days by the number of Calcasieu individuals for a given month?

A. Correct. We call that the number of man days.

Q. And so when there's the reference there again in Section 1 under billing and financial provisions on page 5 in line for payment with the appropriate department, what is that in reference to?

DRAFT COPY

What is the appropriate department, what does that mean?

A. That's accounting. It means that we'll send it to accounting and they will process it and send out the check.

Q. And we'll get to this in just a minute, but just so I understand. Right now we're talking about the invoicing and billing and payments associated just with the housing per diem for individuals. But I believe that there's also some provisions in here for medical invoicing, correct?

A. Correct.

Q. And we'll get to that process, but in terms of just the payment piece of the medical invoices, was that also ultimately paid out through the accounting department?

A. Yes. And that would be depending on what type of inmate was being housed.

Q. Right. And we'll get to the medical stuff in a minute. I just wanted to make sure there wasn't some other department that was also involved in payments.

A. Not in payments, but in

DRAFT COPY

approving there is.

Q. And when you say in approving there is are you referring to having to do with medical stuff?

A. Yes.

Q. Let's put that to the side and we'll come back to that in just a minute.

In terms of how Calcasieu was receiving the invoicing just for the housing per diem from Catahoula it says here that invoices could be sent by e-mail or mail. I'm looking again at page 5 on Exhibit 47. Do you know how Catahoula was providing its invoices to Calcasieu?

A. I believe they mailed them as well as e-mailed them.

Q. And the e-mails were going to the e-mail address that's listed here in the housing agreement?

A. Yes, ma'am.

Q. And who, at least in terms of the e-mails, who were those e-mails coming from, the housing per diem invoices?

A. I believe Margie Price.

Q. I can't remember if I asked this

DRAFT COPY

before. That e-mail address, who had access to it, or who received e-mails that were sent to that e-mail address?

A. I have two answers for that.

Q. Okay.

A. At one time it was everyone in jail records. However, we changed to a work order program. And at that time it was Change Gear. And those e-mails would go directly into the Change Gear. It's like a ticketing or request program. They would also -- that program would also kick an e-mail to everyone who worked in jail records and myself.

Q. In terms of the spreadsheet that you talked about developing for the auditing of the housing per diem payments to the facilities, where was that spreadsheet kept?

A. The blank one would be kept, you know, in the file on anybody's computer. Basically we would fill the spreadsheet out, print it, sign it, and then attach it to the invoice to go to accounting. And then we would scan that into a share that we have in Microsoft for billing. Then we would put

DRAFT COPY

that under each facility's name. So if it was for Catahoula, we would basically label it "Catahoula March 2023".

Q. And those scans that would have been the audit spreadsheets for, you know, by month by facility, does Calcasieu Parish sheriff's office still have those for the time period we've been talking about post Laura and until people returned to parish?

A. Yes, ma'am, we do still have them. And we don't just put in just the spreadsheet, but we attach that to the actual invoice they sent us and scan it in as one document.

Q. So it's like a little packet?

A. Yes, ma'am.

Q. Okay, great. I want to move on and talk about the medical billing. Is there anything else with regard to how Calcasieu was receiving and processing and paying invoices to the various facilities for the housing per diem? Is there any other part of that process or anybody else involved that we haven't just talked about?

A. There's a couple things I would

DRAFT COPY

say. First is that we paid these bills even though they were not our responsibility. We wanted to make sure these agencies got paid. It is the Calcasieu Police Jury's responsibility to pay them. But the way we operate, we pay the bill and the police jury reimburses us for the bills. And then they were reimbursed by FEMA. But to this day I do not believe the sheriff's office has been paid back for that yet.

Q. Have you received any payments from the police jury?

A. I do not believe so.

Q. What do you think that total amount is, ballpark?

A. I don't know. I believe we've been reimbursed by FEMA. I'm not sure if they were reimbursed and they gave the money to us, but there was a date that FEMA stopped paying. And from that date that FEMA stopped paying we have not received any funds from the police jury.

Q. Do you remember when the FEMA payment stopping date was?

A. It was sometime in 2023.

DRAFT COPY

Q. Do you have an estimate of how much, and I'm thinking just in terms of the housing per diem, not the medical, the Calcasieu Parish sheriff's office was invoiced or billed for from the time that y'all evacuated for Laura until February of this year?

A. I've never seen that number. I would be afraid to see that number.

Q. I was going to say that. I want to move on to medical billing and then I will actually be about done with my topics.

Okay, I'm still showing you Exhibit 47 and you have got it in front of you. I want to look up to page 4. At the very bottom there under injury and medical attention, that Section 4, it says: "The housing agency will promptly forward medical invoices for outside medical care to Calcasieu Parish Sheriff's Office." Do you see that?

A. Yes, ma'am.

Q. The first thing I'm hoping that we can do is work through what all was included in "outside medical care" in terms

DRAFT COPY

of what Calcasieu was being invoiced for.
A. If they had to leave the facility for any medical care that would be out of routine, then we would pay. If they received medical care within the facility, like from one of their nurses or the physician would come to the facility, or they received any kind of medication or pharmaceuticals, that's included in the per diem.
Q. Would you all get any record in any form of medical care that was being provided inside of the facility to Calcasieu detainees?
A. No. Not unless our nurses specifically called and asked for it.
Q. Let me just run through a couple of specifics and see if that's included. What about amublance or EMS services for routing out of the facility to receive care, is that something that is included in outside medical care that Calcasieu was being invoiced for?
A. Yes.
Q. What about emergency room care,

DRAFT COPY

actual cost of treatment, medication, evaluation, et cetera, provided at an emergency room or emergency department to a Calcasieu detainee?

A. Yes. Now, if a prescription came back with them and that prescription was filled within the facility, then no on that part. But yes on the rest.

Q. And while we're talking about prescriptions and pharmaceuticals, I will represent to you that in some of the billing records that we received in discovery it seems that there are some groups of pharmaceuticals or prescriptions that Calcasieu was being billed for. Tell me a little bit about that. What types of prescriptions or pharmaceuticals was Calcasieu responsible for?

A. We had disagreements with all the facilities. They would continuously send the pharmacy bills even though they were included in the per diem. We would call them and say, hey, we don't pay this. And they will still send the bill.

Q. Would you all pay those portion

DRAFT COPY

of the bills?
A. If any of them got paid it would have been accidental.
Q. What if a prescription was let's say written at a provider at an outside facility and filled either at that facility or somewhere outside of the actual correction center, would that be included in outside medical care?
A. Probably it would be. Because the facility has a pharmaceutical provider, you know. We don't just run out to the pharmacy for most things. There are a few that you can't get from those providers. And just from my experience we'll go to the pharmacy and pick something up, or we couldn't get it in time from the pharmaceutical company that they use. But I think that would be something that we would pay if it was filled outside of the facility.
Q. So just as an example. Let's say there's a Calcasieu detainee being held at Catahoula Correctional Center. They are sent out for an emergency. There's a prescription that's written while they are at

DRAFT COPY

an outside hospital and filled either at that hospital or somehow outside of the Catahoula Correctional Center, that would be an invoice that would be sent to Calcasieu for payment?

A. Yes, ma'am, I do believe. It's only ethical, if that makes sense.

Q. I understand. I'm just trying to understand the contours of outside medical care. And this is very helpful, so I appreciate that.

What about in a nonemergency situation? Let's say a serious or complicated chronic condition that requires some kind of specialty care that can't be provided within the correctional facility, so an individual is regularly sent out for appointments. You know, maybe it's dialysis or other testing or checkups for chronic conditions. Would that fall as an outside medical care that Calcasieu was being billed for?

A. Yes, ma'am.

Q. Is there anything else that falls within outside medical care as kind of a general category that I just haven't

DRAFT COPY

thought of but that you know, from having lived through this, that Calcasieu was being billed for from these housing agencies in terms of medical care?

A. No, ma'am.

Q. I'm going to stop sharing my screen so I can see you better.

Specifically thinking about Catahoula Correctional Center, who at Catahoula was sending Calcasieu invoicing for outside medical services?

A. I'm not sure about the medical. The only thing I do know is that Margie Price would send us the housing bills. But I don't know if they had a private medical or if it came from LaSalle Management's headquarters, I'm not sure.

Q. Do you know the form by which you all received it? Was it put hard copy into the mail, was it coming through e-mail attachment, fax?

A. Normally we wouldn't get anything by fax. I would turn the fax machine off and tell people that it was broken. But I think mostly came by the US

DRAFT COPY

Postal mail.

Q. And who with Calcasieu Parish sheriff's office was responsible for either directly receiving the medical invoicing or who did the medical invoices ultimately end up with in terms of Calcasieu?

A. It went to Cynthia Roberts. She is an employee of the Calcasieu Parish sheriff's office. She's security within the nurse's station. And at the time, this has changed, but at the time she would also do some office work for them. And when I say them, I mean the Calcasieu Parish police jury's nurses.

And that's something I need to clarify from earlier. When I said our nurses, we don't have nurses anymore. But at the time of the storm we had two nurses that worked for us, the rest worked for the police jury.

So Cynthia Roberts would process that. And I don't know if she would show it to the director of nursing or not. Then it would be sent off to our accounting department.

DRAFT COPY

Q. Who was the director of nursing in the February of 2024 timeframe?
A. I'm trying to remember if he was still -- I believe it was Jeffrey Clark.
Q. Okay.
A. I'm having a little trouble remembering if he was with us before the storm happened.
Q. But he was with you all at least the majority of the period when you were holding people out of parish?
A. Yes, ma'am.
Q. And in terms of the actual invoicing for outside medical services can you tell me a little bit about what that invoicing looked like? What information was Calcasieu receiving from the housing agency?
A. The few that I seen, from what I remember, they just send us the actual bill from whatever services it was. So Cindy, or Cynthia, would take that. We'd have to find out who the inmate was being billed to, whether it was the parish, Lake Charles city, DOC. That would decide who was going to pay that bill.

DRAFT COPY

Q. Okay.
A. There are a whole bunch of rules that I cannot keep track of in my head and I don't know that I know all these rules, but if they are a DOC inmate, then DOC will pay "if this" and "if that". Some of those are included in the per diem that we get from DOC. So it's a lot to it. And I didn't do that every day. Actually, I never did that. So I'm not specifically aware.
Q. Let me ask you a couple of questions about that. In terms of the bill for services, that would include the individual's name who had received treatment?
A. Yes.
Q. And just based on the ones that you have seen, it would provide information as to what care was being billed for?
A. Correct. I had one not too long ago that it took me a while to find the name on it and what services. It had really nothing to do with billing. I was trying to get him transferred as a medical emergency to DOC. And I went through the medical and the bills and stuff and I was having a hard time

DRAFT COPY

with it.

Q. But theoretically, you would be getting a bill from the ambulance service that would be for an ambulance route to the emergency room, correct?

A. Correct.

Q. Or a bill from the emergency department that says, I don't know, you know, this is the cost for both administering ten sutures plus whatever pain medication was administered on site. I'm making this up obviously, but things like that.

A. Yes, ma'am.

Q. Other than whatever the bill contained about the treatment that was being provided or what the service was, was Calcasieu getting any other information through the invoicing process about why the particular outside medical care was needed?

A. I couldn't answer that question specifically. It would depend on whether they would add the nursing notes into that invoice.

Q. Did that happen at least sometimes?

DRAFT COPY

A. I don't know. I can tell you when I look at stuff like that it's mainly in the context of a transfer. And I have to make sure they collect all that information for me. So I don't know if it's coming in with the invoice or if I got it because I asked for it.

Q. Understood. And in terms of the invoicing for outside medical services from the housing agencies, how regularly was Calcasieu getting those invoices? Was it on like a weekly or monthly basis, or just whenever the invoice came in?

A. I think the standard from all of the facilities, we would receive those once a month.

Q. And then you talked about some of the complications of who's being ultimately billed for the medical services. I am with you, I understand that there are many rules, some of which I understand, many of which I know that I do not. But just in terms of Calcasieu, was Calcasieu making a determination about which bills it would pay based on the status of the prisoner?

DRAFT COPY

A. Yes.
Q. And so there were some bills that Calcasieu would not be paying because it was some other agency's responsibility in terms of medical services; is that right?
A. That is correct. We do not want our taxpayers to pay for a bill we don't owe.
Q. Would Calcasieu send that bill or invoicing on to the agency? Let's talk specifically about like the Department of Corrections. How would that work?
A. No, I do not believe we would. We would tell the agency that's sending our bills that that's not our bill. And we would argue the point, make our case about it. But we would not get into the business of them talking, saying they were overbilled, if that makes sense.
Q. It does. You all were not acting as a middle man. So you were only paying the medical invoicing that you believed were for prisoners that were Calcasieu's responsibility. If it were determined that those medical expenses were some other agency's responsibility you were

DRAFT COPY

letting the housing agency know that and they could go duke it out with that other entity; is that right?

A. That's correct.

MS. WASHINGTON:

I have a couple of follow-up questions, but I also want to briefly look through my notes and make sure I don't have any more so I can ask you one last little round before I pass you off for other topics. So if we can go off the record for a couple of minutes. I'll come back on video when I'm ready.

(Recess)

MS. WASHINGTON:

Okay, let's go back on the record. I've just got a couple of sort of straggler questions from going through my notes.

MS. WASHINGTON CONTINUES EXAMINATION:

Q. Starting back with the medical invoicing. To the extent that Calcasieu was not going to pay invoices for outside medical

DRAFT COPY

services for an individual based on their status or who was responsible for that individual, did Calcasieu let the housing agency know that?

A. I believe on most of them. But the facilities that kept sending the same pharmaceutical bills, we got tired of beating a dead horse and we would just set that to the side or mail it back to them.

Q. Let's take like an example. Let's say it's somebody who was being held at Catahoula. There is a medical invoice that's sent to Calcasieu, but it's for something that the Department of Corrections would be responsible for paying. Would Calcasieu let Catahoula know that it did not intend to pay that invoice because it was the responsibility of the Department of Corrections, for example?

A. Yes. However, that situation would be hard. Because if they were DOC they would have been released from our custody already.

Q. Let me ask you this. It's my understanding that there is some medical care

DRAFT COPY

that DOC is responsible for paying even for pretrial detainees in the state of Louisiana. Is that your understanding?

A. Yes. I don't know if it's for payment, but they do coordinate services.

Q. In terms of any communication that was happening between Calcasieu and Catahoula about medical invoicing, would it have been Cynthia who would have been reaching back out to Catahoula?

A. Probably not. She wouldn't do any of that. She would bring it to either me or Hollie to have to do. I'm pretty sure if it were something like -- and that's only for the pharmaceuticals. If it was anything else she would probably write out something saying, hey, this is being denied, and send it on to accounting.

Q. Does Cynthia still work for the sheriff's office?

A. Yes, she does.

Q. In the same role that she was in during this time period?

A. She's in the same role but her responsibilities have been reduced. Because

DRAFT COPY

the only thing that we are going to provide for the Calcasieu police jury is security within the nurse's station. We will not get involved in any day-to-day operations.

Q. Got it. That's what you were describing before, okay.

And in terms of the medical invoicing that Calcasieu was receiving from these housing agencies, where is that, where is that documentation kept?

A. The medical department has an EMR and also those would be sent on to accounting. And they have a records management system. It's all going to be paper, though. It will go into a box for that month or whatever and be sent to archiving.

Q. To your knowledge, does the Calcasieu Parish sheriff's office either within the medical EMR or with accounting or in storage still have the medical invoicing records from the time period when Calcasieu was holding people out of parish?

A. I can't speak to the EMR because it doesn't belong to us, I don't have access

DRAFT COPY

to it. But as far as accounting, and inmate records, we follow the laws. We keep everything for the amount of years that they need to be kept. So if I'm not mistaken, I think financial records are like ten, but some financial records are forever. So it depends on where it falls in that financial archiving filing system.

MS. WASHINGTON:

I have a couple of other quick followups for you, but I'll just flag now for your counsel, Lenzi. I know we still have some outstanding discovery requests. I think some of them cover some of these areas that the Commander has testified to. There are records you also have, including the spreadsheet that we were talking about before and the scans --

MS. HEBERT:

I made a note of all of the specifics so we can gather it. It kind of helped, actually, just kind of bringing it to memory for them at

DRAFT COPY

least. And now we have some directed stuff we can look at and pull. I've already made my little notes about all of it. It may take a second, but at least we have some directed paths to look at. So we can get what y'all require going through years of documents.

MS. WASHINGTON:

And we will put together a follow-up e-mail.

MS. HEBERT:

No problem.

MS. WASHINGTON:

All right, a couple of last questions for you, Commander.

MS. WASHINGTON CONTINUES EXAMINATION:

Q. Going back to some stuff we talked about before. The twenty-two or twenty-one other prisoner housing agreements other than Catahoula that we looked at, with the other housing agencies, to your knowledge, does the Calcasieu Parish sheriff's office still have copies of those as well?

DRAFT COPY

A. Yes, ma'am.

Q. Where are those located?

A. I believe our legal have them. However, we were keeping a copy of them at the jail as well. And we sent them to the archiving department. And so since then our archiving for the jail has downsized and the archiving for the entire Calcasieu Parish sheriff's office has picked up everything. So I imagine they're sitting in a box in the archives. But we have digital scanned copies of all of them.

MS. HEBERT:

We can get those.

MS. WASHINGTON:

Okay, perfect.

MS. HEBERT:

I don't have them right now, but we can get them. And he means in-house counsel, by the way, when he says legal.

MS. WASHINGTON:

Understood.

MS. WASHINGTON CONTINUES EXAMINATION:

Q. So generally speaking, when the

DRAFT COPY

Calcasieu Parish sheriff's office evacuated, the detainees that were in its custody and moved them out of parish, those individuals remained the responsibility of Calcasieu Parish sheriff's office, correct?

A. As far as tracking and whether they got out of jail or in jail, I believe so. And now as far as what happened to them inside another jail, I could debate that. I would think that responsibility kind of ends when you're in someone else's custody.

Q. Am I correct, though, that at least in terms of the pretrial detainees which I think you said were like the vast majority of the people that were moved out of parish, these were individuals who were facing criminal charges in Calcasieu, correct?

A. Correct.

Q. And they were in the custody of the Calcasieu Parish sheriff's office and y'all's detention centers on the legal basis of those pending criminal charges in Calcasieu, correct?

A. Right.

DRAFT COPY

Q. And that legal basis for holding them in custody, those pending charges in Calcasieu remained the same even when you evacuated them to other facilities, correct?
A. Correct.
MS. WASHINGTON:
Okay, I believe that I am done with the questions. I really appreciate your time with me. So we have three other topics. I'm thinking they should be shorter because I've covered so much. We'll start going and see how we do. Jack Stephens is going to question on those other topics. So if you give us one second. I'm not going anywhere. We're just going to switch places and we can go from there.
EXAMINATION BY MS. STEPHENS:
Q. Hey, Commander. My name is Jack Stephens. Let's get right into it, see if we can finish these out.
As Emily mentioned, based on process of elimination we have three topics

DRAFT COPY

left. I'm going to do topics two, four and five. I'm not going to be time posting as discretely as Emily was as I go through and that's because these topics have a lot of overlap, they kind of collapse into one another. If you want to take a second to review in that case you're welcome to, but otherwise I'm going to jump right in.

I'm going to start by sharing my screen. Are you seeing this?

A. Yes.

Q. I have pulled up what has been previously marked as Exhibit 47. This is the old prisoner housing agreements between Catahoula Parish and Calcasieu Parish. On page 3, provision number 5, do you see where my cursor is?

A. Yes.

Q. This says: "Housing agency agrees that any escape, attempted escape, staff assault, serious illness or hospitalization of any prisoner held under the terms of this contract shall be reported to CPSO as soon as reasonably practical."

Can you tell me how this

DRAFT COPY

requirement is carried out?
A. So how it was carried out at the time we were housing is we would get a phone call from usually Warden Stott, Eric Stott, telling us what happened. And then at that point he usually would ask for the person to come back to us as soon as they were able to.
Q. Okay, and the provision says "as soon as reasonably practical." In your experience, how soon after an incident would Assistant Warden Stott contact you?
A. It would be within an hour of that incident happening.
Q. And who would receive that call within Calcasieu Parish?
A. Michael Holland.
Q. And when Mr. Holland received that notification did he write anything down or otherwise document notification?
A. The way we documented that is we would require that facility to send us their reports of the incident and we would write an incident report within the correction division system and scan in the report from the other agency or from Catahoula into our

DRAFT COPY

JMS, which is a jail management system.
Q. And they would be saved within JMS thereafter, correct?
A. Correct.
Q. Are they retrievable from JMS?
A. Yes.
Q. You mentioned that Eric Stott would oftentimes request that y'all take back the detainee that was subject to the notification?
A. Yes. That would happen at every facility.
Q. So to be clear, would you ask to take that detainee back or would in this case Catahoula request that you take them back?
A. Most of the time they would request that we take them back. It was quite regularly that if that person was a problem, if they were a medical problem, had a serious illness or medical emergency or something, or the inmate was just annoying, they would call and ask for us to take him back. And we would accommodate, depending on the situation, we would try to send that inmate to another facility.

DRAFT COPY

Q. Can you tell me more about how you'd go about finding another facility?

A. We just called our list. Once we were established with the twenty-two facilities we knew which ones would accept more, which was usually Tensas, Catahoula, or East Carroll or Rapides Parish.

So we would call those facilities and say, How many beds do you have for us today? And we would send as many as we could to each facility. So most days we had at least two facilities showing up to pick up inmates.

Q. And in a case where you weren't able to find a bed for the implicated detainee what would happen?

A. They would stay in a holding cell in intake.

Q. Where specifically?

A. In intake at the correctional center.

Q. So backing up a little bit. You said that the reporting facility would send along incident reports or you would request those incident reports. Is there any other

DRAFT COPY

documentation that they would request?
A. Well, if it involved an offense like a criminal matter, we would usually ask for the office report. We would -- basically the way we would say it is: Send me everything you have on the incident. And they would send it and we would scan it into our system.
Q. And that system, the JMS, what JMS specifically do y'all use?
A. New World Corrections.
Q. And you have been using New World Corrections for the last five or six years at least?
A. Fifteen years. We went live with the program in May of 2010.
Q. Earlier I read out all the types of incidents that require notification. Are inmate fights required to be reported?
A. If it involved an injury, yes.
Q. Did that injury have to rise to a certain level of severity?
A. Yes.
Q. When y'all received these notifications who was responsible for writing

DRAFT COPY

the internal incident report that you mentioned earlier?
A. Michael Holland.
Q. Was Michael Holland also responsible for responding?
A. Yes.
Q. Were any other staff members involved in these back and forths?
A. Me. If Michael Holland wasn't at work, he worked directly for me, so if he wasn't there they would contact me. But even when he wasn't at work Michael Holland still answered the phone and he would get what he needed from Stott and forward that to me.
Q. By e-mail?
A. Yes, I would think so. That would be the only way I could get a document out of his -- you know, from him and into our system.
Q. And when Michael Holland received these reports he would save them on JMS and forward them to you; is that correct?
A. No, he wouldn't forward them to you. me. Once it's in the JMS I can look at them myself. He would keep me informed,

DRAFT COPY

especially if it was something major. If one of our inmates was injured the sheriff was going to want to know. So it was very important that he let me know if any of our inmates were seriously injured. Because we also had to call and notify that family of what was going on and the sheriff is going to want to know. He's also going to want to know what we're doing about it, how we're taking care of the situation, have we notified the family, is that person coming back, is that person in the hospital. He wants to know. So I had to keep the sheriff and the command staff informed.

Q. I just want to back up and make sure we're clear. In the case of Catahoula, Stott would call Michael Holland. Can you just walk through the lines of communication thereafter. He would save in JMS, then who all would he talk to?

A. Me directly. If I wasn't there he would let Warden Brandon Strenth know or Commander Daniel Burkarlter know. But he was our contact for all twenty-two facilities. Everyone knew if they needed to contact

DRAFT COPY

Michael Holland about any issues that happened at that facility.

Q. And when he passed the information up the chain he would do so in what form?

A. Personally. He would come see me face-to-face and tell me about it, unless he wasn't at work. If he wasn't at work he may have texted me or called.

Q. And then who would inform the sheriff at that point?

A. Usually Commander Burkarlter. If Commander Burkarlter wasn't there, it could be Commander Jeff Miller or Warden Brandon Strenth. I did not have contact with the sheriff on a daily basis. I mainly let them know and, you know, they had most contact with him.

Q. How would they inform the sheriff?

A. Verbally in person.

Q. So they would walk to his office and tell him?

A. Yes.

Q. Okay, just to close the loop.

DRAFT COPY

Holland received reports from Catahoula by e-mail?

A. Yes.

Q. Was anyone else on those e-mails?

A. I don't think so.

Q. And then he would save them into JMS?

A. Correct.

Q. At which point he would start the verbal notification process that you just outlined?

A. Right. Well, normally we would be notified before that. Sometimes it may have taken Stott a few days to get us the report. But as soon as Michael Holland knew of the situation we were informed.

Q. So there could be scenarios where you knew of the incident via phone call, the report takes a few days, and when you get the notification the information is moving up the chain?

A. Correct.

Q. And when you get the report, subsequently that receipt is also moving up

DRAFT COPY

the chain?
A. The receipt?
Q. When you receive the incident report that took a few days.
A. Yeah, depending on the situation, depending on the severity, he would put that in the JMS. But if it was very severe, then the sheriff or the commander or the warden is going to want to read it. But if it wasn't severe, then it would just be documented in our JMS. We wanted to make sure we had a record of that incident.
Q. What type of incidents rise to the level of severity where it needs to go to the sheriff?
A. If the person is seriously injured. If someone -- it wouldn't be an everyday injury. If one sprained an ankle, that wouldn't be something we would inform the sheriff about. But if someone got in a fight and had a broken bone or had to spend a few days in the hospital we're going to let the sheriff know. The same thing, what happened in Catahoula or any other jail. If

DRAFT COPY

it were to happen in my jail I would need to tell the sheriff about it, it's the same rules, same kind of guidelines. If it were an everyday thing and it happened in my jail I wouldn't be telling the sheriff about it. But if someone got seriously hurt in my jail, then I would tell the sheriff about it. It was the same rules that we have always lived by.

Q. When a Calcasieu detainee went to the hospital, is that automatically the level of severity that would require notification to the sheriff?

A. No.

Q. What types of hospital stays wouldn't require telling the sheriff?

A. Anything that wasn't a serious injury. On a daily basis we may bring five people to the hospital for various reasons. Most of the time they are minor incidents. It's kind of a judgment call, I mean, on what happens. If the person is able to come back to my jail after being in the hospital for a couple of hours, I'm not going to tell the sheriff about that.

DRAFT COPY

Q. But if the person has to stay overnight you'll tell the sheriff?
A. It depends on the severity of the injury or illness. Someone could be in the hospital for a week and if it's not serious I would not tell the sheriff about that.
Q. Are there any policies or is it written down anywhere the type of severity of injuries requiring movement of the information up the chain?
A. No.
Q. So it's just based on your experience as a corrections professional?
A. Yes. I work for a politician and I know what he wants to know about.
Q. Did Stott or someone in a comparable position have to call any time there was a fight?
A. No. Just a regular fight, no. With no injuries, no.
Q. If there was a fight that led to minor injuries would you have to call?
A. No.
Q. If there was a fight that led to

DRAFT COPY

a hospital route would it be expected that Stott would call?

A. It depends. If that person was not seriously injured, then no. But if the person was seriously injured, yes.

Q. All right, I think I'm going to move on to a few more specifics in this provision, then we can move on.

Since 2021 has Catahoula called to report escapes or attempted escapes?

A. Yes.

Q. How often?

A. I know of one where the inmate hurt his hand on the perimeter fence and was transferred to Jackson, Mississippi.

Q. When was that, do you recall?

A. I do not remember at what point that happened.

Q. And besides that, it sounds like attempted escape, do you recall any other notifications of either escape or attempted escape?

A. That's the only one that I recall.

Q. And those notifications would

DRAFT COPY

come from Stott and be routed through Holland, correct?
A. Correct.
Q. Would those automatically get passed to the sheriff or the higher-ups?
A. Yes. Holland would report directly to me. And like I said, if I wasn't there he would report it to Daniel Strenth or Daniel Burkarlter.
Q. Just to be clear, any attempted escape or escape, that's getting reported up the chain?
A. Oh, yes.
Q. In those cases, other than the incident reporting and protocol you outlined internally in receiving documents from CCC would you conduct any follow-up?
A. The only follow-up -- I mean, we would read the report and if we had any questions we would call Stott about it.
Q. What types of questions?
A. Like how did he get out of your facility, you know. Anything that they didn't answer within the report. If I read the report and I have a question that isn't

DRAFT COPY

answered in that report we would call and ask them. And basically I would say, hey, Holland, call Stott, ask him why. How did he get out, what was the deal. The same thing with a fight. If they got into a fight and the report didn't exactly explain everything to me, I would say call him and ask him why they were fighting, we would like to know.

Q. Okay, and then when you got answers what would you do with the supplemental information?

A. Usually just for our knowledge, depending on the severity of the incident, we may ask them to add that into their report. Or if it was answered to a satisfactory -- if they had a satisfactory answer, then we may not have done anything.

Q. In the case of an attempted escape or escape in this particular instance that you mentioned -- scratch that.

Generally throughout this process of notification would folks ever go to Catahoula?

A. Is your question were there more people going to Catahoula?

DRAFT COPY

Q. I'll rephrase. When Stott would call and notify you of an incident listed in this provision, call Michael Holland, would any Calcasieu employees ever travel to Catahoula for some sort of follow-up or investigation?
A. No. We had our own problems at our own jail.
Q. Since 2021 how often would you get calls from Stott about staff assaults?
A. Staff assaults? I don't ever remember getting a call from him about staff assaults.
Q. Since 2021 how often would you get calls about serious illnesses?
A. Not enough for me to remember how many I got a month or a week. We were getting those types of phone calls all the time from all twenty-two facilities, so I wouldn't know how many I got from him.
Q. To be clear, all those calls from all twenty-two facilities were going to Michael Holland?
A. Yes.
Q. How often since 2021 were you

DRAFT COPY

getting calls about hospitalizations?
A. Same answer as before. I don't know.
Q. What about inmate fights?
A. I don't know how often. It was often enough for me to know that I needed someone to take those calls.
Q. Did you get calls on inmate fights?
A. No. The only time I would ever get a call is if they could not get ahold of Michael Holland. But I don't believe I ever spoke to anybody about a fight.
Q. Commander, just as a reminder, your testimony is as a 36(b)(6) witness, so when you say you, that refers to the sheriffs office entirely. I'll be more clear in my questioning, but just to put it out there. So I'm going to double back.
A. Okay.
MS. HEBERT:
Could we just go off the record for a quick second?
MR. STEPHENS:
Yes.

DRAFT COPY

(At this time, a discussion was held off the record.)

MS. HEBERT:

We can go back on the record. Thank you.

MR. STEPHENS CONTINUES EXAMINATION:

Q. I'm going to double back. Did Michael Holland receive calls about inmate on inmate fights from Catahoula Parish?

A. Yes.

Q. But you don't recall how often he was receiving those calls?

A. No, I do not.

Q. But any call that he did receive would be logged in the JMS?

A. Yes. Because we are required to report from the facility that called to inform us. We require a copy of the report.

Q. In the JMS how are things categorized, is it by facility, by detainee?

A. Are we talking about the incident report or their booking file?

Q. When Michael Holland would receive a call and he would receive documents and write a report about the incident he

DRAFT COPY

would then log into the JMS, correct?
A. Yes. The JMS has an incident module. So basically the incident is put into the system under the inmates's name and then he documents it under that incident. So everything is indexed.
Q. And when you go into that incident module can you filter by facility?
A. No, it's by person.
Q. Okay.
A. The location of the incident would be within the body of the report.
Q. But you cannot filter --
A. Our JMS, the New World system, is not very good. So like especially when we're documenting these incidents. We were scanning in a document from another facility. So basically the report, we're not writing the report. The report is scanned in and none of that is searchable.
I mean, we can find a person's incident report but we can't go and find the locations or we can't even find all the fights. We can't even go in and say, hey, I want every fight that happened in my

DRAFT COPY

facility. I can't do that, can't pull it out.

Q. Okay, I think I know the answer, but just to be clear. If you wanted to find all incidents that stem from Catahoula Parish how would you go about doing that?

A. If I had to, I would start with pulling everyone that was at Catahoula. And then I would have to go through every single one of their incidents that happened during that date range that they were there. Because the system puts every report on that person no matter how many times they've been in jail into the same place.

Q. Can you sort by date?

A. Yes.

Q. Again just to close the loop. The process you have outlined for notification that runs through Michael Holland, that is the same for East Carroll and Tensas?

A. Yes.

Q. Do you recall who was making calls from East Carroll?

MS. HEBERT:

DRAFT COPY

I'm going to object to the form. You can answer.

THE WITNESS:

From East Carroll we would usually talk to Warden Hedgeman or -- and I have forgotten her name. Shameka? I can't remember her name. I think her last name is Martin, but I'm not a hundred percent sure on that. Tensas would have been Warden Smith.

MR. STEPHENS CONTINUES:

Q. We're going to move to a different provision. It's just right below under custody and supervision, number two on page 3. We spoke about this earlier. It says: "The housing agency will utilize their own classification process to determine appropriate custody levels. The CPS will provide any information relative to classification, past disciplinary issues, security threat, and gang affiliation to the housing agency upon request."

Since 2021 has Catahoula Parish requested this information regarding

DRAFT COPY

classification?

A. I do not believe so.

Q. Has East Carroll Parish ever requested this information?

A. No.

Q. How about Tensas Parish?

A. No. It's not standard practice for any place to really request that information. If you are properly classifying someone, you would do all that research yourself. The only reason you would reach out to another facility is if the inmate mentioned anything about PRIA to you or if you had to find a disposition on a charge that was on the criminal history.

Q. Just below, number two, it says: "The housing agency will notify the CPSO of any criminal charges filed against the prisoner or of any activity that would likely result in litigation."

I just want to focus on the first half of this. Since 2021 has Catahoula Parish provided notifications about criminal charges?

A. Yes.

DRAFT COPY

Q. Tell me about that process.

A. We would follow the same process that we would for any other incident. They would call Michael Holland. He was their point of contact for everything.

Q. What types of documentation would they send along with that notification?

A. We would require them to send us a copy of the warrant along with a detainer letter so we could update our system. And we would add that detainer in our system in case he was transferred to another facility or if he came back to us that we knew he had to go back to Catahoula for those criminal charges.

Q. When you say you require those documents, do you mean you requested them?

A. No. We required them. If you want to place a detainer on an inmate that we have custody of we will not do that without a copy of the warrant and a detainer letter.

Q. How did you alert Catahoula Parish of that requirement?

A. I think the first time it happened we told them what we require and they complied. We have never had a problem

DRAFT COPY

with them giving us what we asked for or told them we needed.

Q. And when you told them, did you tell them over the phone?

A. Yes.

Q. And who told Catahoula Parish of this requirement at the time?

A. That would be Michael Holland.

Q. And just to be clear. Once you receive the required documentation what steps would Calcasieu Parish take?

A. We place the retainer in our system to make sure they weren't inadvertently released. And if, depending on what the circumstances were, if it's something that happened in the jail, then we would ask for a copy of the incident report and follow the same procedure we did for any other incident that was reported to us that we just went over.

Q. Can the JMS sort by detainer?

A. I believe so.

Q. Do you recall how often you were getting notifications of criminal charges since 2021?

DRAFT COPY

A. Rarely. That may have happened through the whole -- of all twenty-two facilities it may have happened a half dozen times.

Q. What is Michael Holland's e-mail address?

A. Mhallon at CPSO dot com.

Q. You mentioned you had about a half dozen criminal charge notifications. What type of charges?

A. From murder to auto theft.

Q. Anything else?

A. Battery.

Q. I'm going to scroll down to the next page. In paragraph three of the provision under injury and medical attention, it says: "The housing agency shall notify the CPSO immediately regarding the nature of the illness or injury, type of treatment provided, and current location of the prisoner." Can you walk me through this process?

A. I don't understand. Of them notifying us that --

Q. I'll back up. When there's a

DRAFT COPY

medical emergency this provision requires that Catahoula or any of the other twenty-two facilities notify Calcasieu Parish. When they provide these medical emergency notifications how does that process go?

A. They call us. It's the same process. They would call Michael Holland. And if the person was injured to the severity that we didn't know if they were, you know, their condition, we would require updates every couple of hours or so. A lot of times we would have the nurse's station call the medical facility that they were at. And we would start getting regular updates from the service provider themselves.

Q. And would those subsequent updates be provided via phone?

A. Yes.

Q. And when you would get the initial notification about a medical emergency what records would you require from Catahoula?

A. If it involved an assault or something like that, something that was done to them by another inmate, we're going to

DRAFT COPY

follow the same process and ask for an incident report. If this was just someone who had a heart attack or our nursing staff -- when I say ours, I mean the police jury's nursing staff -- would keep up with that with the service provider. And any documents they would need they would ask for for their EMR. But I do not know what they would require from that service provider.

Q. Okay.

A. Or if that service provider would even give them anything. Our main purpose was to know the condition of that person. We want to make sure that person was okay. And we also want to make sure that we inform the family of anything serious. So that was our intent of the regular updates.

Q. And whatever documents you did receive either from the initial facility or medical providers, would those be saved on JMS?

A. No medical documents would be saved on the JMS.

Q. Where would they be?

A. They would be on the police

DRAFT COPY

jury's EMR.

Q. Do you have access to the police jury's EMR?

A. I do not.

Q. Do you know what EMR it is?

A. It's been told to me a few times but I cannot remember the name of that EMR.

Q. You mentioned that you would in certain cases require updates every hour or so about the status of a detainee?

A. Yes.

Q. In the case of longer term stays, multiple days or even weeks, how often would you require updates or communications?

A. Once or twice a day.

Q. And who at Calcasieu Parish would receive those notifications?

A. Of course we would have to reach out ourselves every time. The hospitals would not call us every hour. The facilities would not call us every hour. Our nurses would have to call the facility or hospital the inmate was in. And they would basically get with the nurse's station there and form a relationship and call in every couple of

DRAFT COPY

hours or every day or so.
Q. Did anyone other than the nurses ever make those calls for updates?
A. No. With the HIPAA laws the way they are they won't give us any information. That's why we have to get the nurses to do it. And sometimes they won't even give it to the nurse, the information.
Q. Other than the follow-up that you described, these intermittent calls to the hospital in this case, was there any other follow-up that y'all would do in the case of medical emergencies?
A. No.
MR. STEPHENS:
Okay, I'm going to go off for just a couple of minutes. I think we're near the end of our questioning, but I just want to --
MS. HEBERT:
The time, unfortunately, there's one minute left. Do you have an idea about how much longer?
MR. STEPHENS:
Not much longer at all. I

DRAFT COPY

think we can get this done within ten minutes.

MS. HEBERT:

Okay, we can make that work.

MR. STEPHENS:

Thank you.

(Recess)

MR. STEPHENS CONTINUES EXAMINATION:

Q. How was it communicated between the Catahoula Parish sheriff's office and the Calcasieu Parish sheriff's office which incidents, whether they be medical emergencies, fights, et cetera, are required to be reported?

MS. HEBERT:

I'm going to object to the form but you can answer.

THE WITNESS:

Basically we in corrections, I want to say the whole field knows that. They've been dealing with other facilities for years. But they know if something serious happens to one of our inmates they have to call us. Even though it's

DRAFT COPY

in the contract that is a standard deal in our field. I've never dealt with this before 2020 because we never housed anyone in another facility. But we never had a problem with Catahoula informing us of things going on.

MR. STEPHENS CONTINUES:

Q. But in terms of what they were informing you of, you never had conversations explicitly about what qualified as a serious incident?

A. I didn't have to.

Q. Earlier you testified that inmate on inmate fights with injury are required to be reported to Calcasieu Parish. Did you have discussions as to the seriousness of the injury -- let me back up, I apologize.

Did you discuss with Catahoula Parish how severe an injury must be in an inmate fight to require notification?

A. No.

Q. What was Calcasieu's expectation as to the required severity of an injury from

DRAFT COPY

an inmate fight that would require notification?

A. A serious injury from the fight, I expect to be called. You know, fights happen every day in every jail across America. So if it's just a normal fight and they got a black eye, I would not expect to be called.

Q. When we were discussing the process wherein Eric Stott would send an incident report and attached documents to Michael Holland --

A. Yes.

Q. -- was that only Eric Stott that would send reports and documents to Calcasieu Parish?

A. That I know of. I imagine whoever worked for him probably would send us something every once in a while. But we the majority of the time only dealt with Stott?

Q. But you can't recall the identity of any other Calcasieu Parish sheriff office employees that was sending reports or documents?

A. No.

DRAFT COPY

MR. STEPHENS:
I think that's all we have. Now I'm going to tender you to the attorneys for Catahoula Parish sheriff's office. Shane, do you have any questions?
MR. BRYANT:
I have no questions for Chris. Thank you.
MR. STEPHENS:
Suzanne?
MS. RISEY:
No questions.
MS. HEBERT:
I have a couple.
EXAMINATION BY MS. HEBERT:
Q. Commander, when did Calcasieu Parish sheriff's office find out about the incident involving the plaintiff in this case, Mr. Robert Young?
A. When we were served with the lawsuit.
Q. If Warden Stott never called and notified y'all, how would y'all have known, or how would y'all have expected to have

DRAFT COPY

known?

A. We wouldn't have. The only way we would ever have known is if someone in his family would have called us.

Q. Did anyone in Mr. Robert Young's family ever call y'all about this incident?

A. No, they did not.

Q. Regarding the twenty-two facilities, did y'all rely on the DOC's instructions to go to those twenty-two facilities or is there a different reason why y'all didn't do any extra vetting?

A. Those were the facilities the DOC said had beds. In the state of Louisiana it's all hands on deck for emergency disasters and we went where the beds were, these were the people that would take our inmates.

Q. Did y'all ever receive any medical billing or medical records regarding the specific incident on Mr. Young that occurred in August of 2022?

A. We did not.

Q. Do you know anyone at the Calcasieu Parish sheriff's office that was

DRAFT COPY

sent to Catahoula to monitor, supervise, or be involved in the day-to-day operations?

A. No, we did not do that.

Q. What is the reason for this?

A. They are a facility that houses DOC inmates and complies with the basic jail guidelines. And if DOC will keep their inmates in the facility, so will I.

Q. Did Calcasieu Parish have any involvement in any day-to-day operations or anything at Catahoula that you know of?

A. No.

MS. HEBERT:

I think that is it. Thank you.

MR. STEPHENS:

Quick redirect.

FURTHER EXAMINATION BY MR. STEPHENS:

Q. Plaintiff was stabbed, burned, admitted to the hospital for over a week. Is that the type of incident that you would expect Catahoula Parish would notify Calcasieu Parish of?

A. Yes.

Q. Have you looked in the JMS and other records to see if you were notified by

DRAFT COPY

Catahoula Parish about the incident involving Robert Young?

A. I did, I checked. I saw no record of it.

Q. What steps did you take for notification?

A. I pulled his name up in the incarceration system. I went to our incident module and I went through all of his incidents to see if we had been notified.

Q. Did you check e-mail?

A. I don't have that capability. I believe that our in-house counsel may have, but I do not know that for sure.

Q. Did you ask Mr. Holland to check his e-mail?

A. No, I did not.

MR. STEPHENS:

Thank you.

* * * * *

(At this time, the deposition was concluded.)

DRAFT COPY

I, LILLIE R. BURCH, Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this proceeding was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

______________________________
LILLIE R. BURCH, CCR
Certified Court Reporter

DRAFT COPY

REPORTER'S CERTIFICATE

I, LILLIE R. BURCH, Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was administered, do hereby certify that COMMANDER CHRIS DOMINGUE, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing pages;

That this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the foregoing transcript has been prepared in compliance with transcript format guidelines required by statute or by the Rules of the Louisiana Certified Shorthand Reporter Board; and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangement for deposition services;

That I have acted in compliance with the prohibition on contractual relationships, as

DRAFT COPY

defined by the Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter;

That I am not of counsel, not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

___________________________

Lillie R. Burch, CCR
Certification No. 87177

DRAFT COPY