Transcript of the Testimony of

# ASST WARDEN TYRONE MAYS

January 22, 2024

JAMES MURRAY, ET ALL v. JAMES LEBLANC, ET AL



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES MURRAY; LATAVIUS PASCHAL; ANTONE HENDERSON | CIVIL DOCKET NO. 21-cv-592-SDD-RLB |
| VERSUS | JUDGE: JOHN W. DEGRAVELLES |
| JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, et al | MAGISTRATE: RICHARD L. BOURGEOIS |

VIDEOCONFERENCE DEPOSITION OF ASSISTANT WARDEN TYRONE MAYS, 670 Bell Hill Road, Homer, Louisiana 71040, taken via Zoom, in the above-entitled cause on the 22nd of January, 2024, commencing at 9:50 a.m.

REPORTED BY: CHERIE' E. WHITE
CCR (LA), CSR (TX), CSR (MS), RPR
CERTIFIED COURT REPORTER

APPEARANCES:

ATTORNEYS REPRESENTING THE PLAINTIFFS, JAMES MURRAY, LATAVIUS PASCHAL AND ANTONE HENDERSON:

RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
4400 South Carrollton Avenue
New Orleans, Louisiana 70119
Phone: 504.620.2259 |Fax: 504.208.3133

(BY: Elizabeth Cumming, Esquire)
E-mail: elizabeth.cumming@mcarthurjustice.org

ATTORNEYS REPRESENTING THE DEFENDANTS, LASALLE MANAGEMENT AND MADISON PARISH SHERIFF:

PROVOSTY, SADLER & deLAUNEY
934 Third Street, Suite 800
Alexandria, Louisiana 71315-3530
Phone: 318.767.3133 |Fax: 318.767.9588

(BY: John D. Ryland, Esquire)
E-mail: jryland@provosty.com

APPEARANCES CONTINUED:

ATTORNEYS REPRESENTING THE DEFENDANT, SETH SMITH AND SECRETARY LEBLANC:

HAMMONDS, SILLS, ADKINS, GUICE,
NOAH, & PERKINS, LLP
2431 S. Acadian Thruway, Suite 600
Baton Rouge, Louisiana 70808
Phone: 225.923.3462 |Fax: 923.0315

(BY: Evan M. Alvarez, Esquire)
E-mail: ealvarez@hamsil.com

# I N D E X


| | PAGE |
|---|---|
| STIPULATION................................ | 5 |
| TYRONE MAYS | |
| BY MS. CUMMING.............................. | 6 |
| BY MR. ALVAREZ.............................. | 156 |
| BY MS. CUMMING.............................. | 169 |
| CORRECTION SHEET............................ | 172 |
| WITNESS CERTIFICATE......................... | 173 |
| REPORTER'S CERTIFICATE...................... | 175 |


## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 4/25/19 Basic Jail Guidelines | 23 |
| Exhibit 2 | 7/31/22 Jail Operations, Basic Jail Guidelines | 24 |
| Exhibit 3 | May 2020 MPCC Monthly Activity Report | 40 |
| Exhibit 4 | May 2020 Single Month Activity Report, Northeast Region | 53 |
| Exhibit 5 | BJG Quarterly Summary Report, Q4 (April-June 2020) | 58 |
| Exhibit 6 | 9/12/22 Memo Recertifying MPCC and MPCS Facilities | 97 |
| Exhibit 7 | 2021 Medical Tracking Spreadsheet (Male) | 109 |
| Exhibit 8 | May 2020 1-61 CI Monthly Logs | 110 |
| Exhibit 9 | BJG Classification Checklists | 122 |
| Exhibit 10 | 5/1/14 MCC Classification Policy | 128 |
| Exhibit 11 | Madison Parish CC, DC, & Southern CF - Annual 2019 | 148 |

S T I P U L A T I O N

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Louisiana Code of Civil Procedure, Article 1421, et seq., for all purposes, in accordance with law;

That the formalities of reading and signing are specifically NOT waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

CHERIE E. WHITE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath.

ASSISTANT WARDEN TYRONE MAYS,

670 BELL HILL ROAD, HOMER, LOUISIANA 71040, after having first been duly sworn by the above-mentioned court reporter, did testify as follows:

MS. CUMMING:

So we are taking this deposition pursuant to the rules of -- the Federal Rules of Civil Procedure. There's no objection to the use of Zoom for this deposition or the court reporter being remote.

At the end of the deposition, the court reporter's going to ask you about reading and signing, so you can talk with Mr. Alvarez about, you know, what you want to do with that.

EXAMINATION BY MS. CUMMING:

Q. Can you please introduce yourself for the record?

A. I'm Assistant Warden Mays. I'm the warden at David Wade Correctional Center in Homer, Louisiana.

Q. And can you provide your address and phone number?

A. It's 670 Bell Hill Road, Homer, Louisiana 712 -- 71040 and my phone number to my office is 318-927-0403.

Q. And do you have any previous deposition experience?

A. I have -- I've done about two or three.

Q. Okay. And how long ago was that?

A. About a year or two ago. About two years now.

Q. Okay. And were you like a party in a case where you were a plaintiff or a defendant when you were deposed?

A. No, ma'am. It was as a witness.

Q. And that's exactly the -- the capacity that you are here today, as a witness. You're not named as a -- as a defendant or a party in the case.

So I'm sure when you were deposed previously, the lawyer who took your deposition probably went over a couple of what I like to call ground rules just so that we are all on the same page, so I'm just going to go ahead and refresh your memory on those.

We have got the court reporter here,

so it's really important that you speak up and you answer verbally any questions. I'm -- I'm hearing a little bit of background noise, so I think it -- it will be particularly important for you to -- to speak up when you are answering questions, so -- and I'm going to ask a question. If you can let me sort of get my question out, even if you know exactly where I'm going and then answer it, that just makes for a cleaner transcript. There isn't any kind of question about, you know, what -- what you were answering and, you know, whether or not you understood the question.

You have taken an oath. It's the same oath that you would take as if you were testifying in court, so it's really important that you tell the whole truth, that you don't leave anything out; but at the same time, I'm not asking you to guess, I'm not asking you to sort of make things up. Just tell as much as you know to the best of your ability.

We are interested in finding out everything that you know that's relevant to the case; and so if you need to supplement an answer, if I ask a question and you answer in the middle

of the question that's later, you know, we can go back and say hey, I want to say this other thing and that's completely fine.

I'm going to ask a series of questions. I promise you at some point today, I'm going to ask you a bad question that's either unclear, I'm asking you too much or, you know, there are all sorts of ways to ask a bad question. When that happens, just stop and say, you know, can you clarify that and I don't understand what you're talking about and I'll to try clarify.

You are welcome to take breaks. I -- I try to remember to offer breaks about once an hour. I'm really bad about it, so if at some point you need to take one, just let me know. The only thing I ask is that if I have a question -- if I have a question that you go ahead and you answer that question before -- before we take a break.

MS. CUMMING:

Just on the audio, is there like --

MR. ALVAREZ:

A radio or something?

MS. CUMMING:

Yeah.

THE WITNESS:

Okay. I've got my radio turned off.

MS. CUMMING:

Am I coming through clear?

MR. ALVAREZ:

You are kind of breaking up a little bit.

MS. CUMMING:

I'm coming in choppy on yours too?

MR. ALVAREZ:

Just every now and then. Most of what you are saying is fine, but every now and then, I hear that background or something. It almost sounds like somebody's on the interstate or something.

MS. CUMMING:

Yeah. Okay. That's -- I'm hearing that too. Can I ask if there's a microphone problem?

THE WITNESS:

I have a microphone on my camera.

MS. CUMMING:

Okay. Yeah.

(A short recess was taken.)

BY MS. CUMMING:
Q. All right. So we were talking about breaks, so just answer any questions that I have before we take a break. If at some point you need to speak with your attorney, Mr. Alvarez is here with you, so you -- you are welcome to speak with him. I may ask if -- if you -- if you had any conversation with him during the break when we come back on.
Is anybody else in the room with you right now?
A. No, ma'am.
Q. And is there any medication, sleep deprivation or any other hardship that would interfere with you understanding my questions or providing complete and truthful answers today?
A. No.
Q. Okay. What is your understanding as to why we are here today?
A. I think it's dealing with some pretrial inmates at Madison Parish.
Q. Okay. And what did you do to prepare for today's deposition?
A. I spoke with my attorney.
Q. Did you review any documents?

A. I just went over the documents of the case, I mean, the lawsuit, files or whatever, the paperwork for the lawsuit. That's all.

Q. And do you have anything -- and when you say "the paperwork for" -- you are talking about like the complaint?

A. Yes. The complaints from the -- yeah, the plaintiffs.

Q. And do you have anything with you today?

A. No, ma'am.

Q. Okay. So I want to clarify a little bit some of the facilities we will be talking about today. We are going to be talking about a bunch of things, but a lot will focus on the facilities at Tallulah, Louisiana.

And I understand there are several different buildings, so I'm going to refer to them all as MPCC or Madison Parish Correctional Center. But my understanding is that there is Southern Correctional Center, or SCC, and that's referred to as Building 4; is that right, to your knowledge?

A. Yes, ma'am.

Q. Okay. And then there's Madison

Correctional Center. That's MCC and that's referred to as Building 3; is that right?

A. Correct.

Q. And then there's also Madison Detention Center (sic) or MDC -- MDC; is that correct?

A. It depends on what timeframe you are talking about. That facility is -- is called Bayou Correctional (sic) now, so --

Q. Okay. All right. When did it become Bayou?

A. I'm not very sure on the date and time.

Q. That's fine. And do you know what that facility is used for?

A. DOC offenders.

Q. Okay. Male or female?

A. Male.

Q. Okay. Has there ever been a period when the -- it was not in use at all?

A. Yes.

Q. And when was that period; do you remember?

A. I want to say back in '16, '17 or somewhere in that area.

Q. Okay. But in the timeframe of, you know, like roughly 2019 to -- to now, it's -- it's in use; is that correct?
A. Bayou Corrections, it's a -- purchased it I think back in '20. I'm not certain on the dates, but somewhere along in that area there.
Q. Okay. All right. Great. Thank you.
So I -- I wanted to sort of run through a little bit of background; if you could just let me know what you're -- you're educational background is, so, you know, when did you finish high school and any other schooling you had after that.
A. I finished high school in '92. I graduated from Grambling State University in ninety -- '97, '98, with a bachelor's degree in criminal justice. I started -- that's pretty much it as far as education.
Q. Do you have any like professional licenses or certifications or anything like that?
A. No, ma'am.
Q. And can you run through your employment history? I'm not asking you to dwell

on every single thing, but just kind of a listing of -- of jobs you've held from, you know, let's say, about the age of 20 on?

A. Twenty. Twenty, I think I was -- I was in college and I worked at a -- I was like at a disability facility that dealt with disability people that was wheelchair bound. I did that part-time while I was in college.

After college, I graduated from college, I moved to New Orleans. I worked at Bridge City for about six months to a year and then I transferred here to David Wade, which was in '99; and I've been at David Wade ever since '99 working here at the facility.

Q. That's a long time. You are -- you're a quarter of a century in.

A. Yes, ma'am.

Q. Can you run me through what positions you've -- you've held at David Wade?

A. I've held pretty much every rank that they offer here. I started off as a cadet. Well, when I -- when I transferred here, I was a sergeant; sergeant, master sergeant, lieutenant, captain, and I was promoted from captain, I went to major, did major a little bit, then went from

major to lieutenant colonel and went from lieutenant colonel to colonel, and then I went from colonel to assistant warden, so now I'm -- I'm assistant warden here over security at David Wade.

Q. How long have you been an assistant warden?

A. I've been an assistant warden for three years and -- and a little bit.

Q. Okay. All right. So I'm sorry. I didn't mean to demote you. I should be calling you Warden Mays not Mr. Mays.

A. That's fine. I'm not stuck on titles.

Q. Okay. So you're assistant warden for about three years. Before that -- and I'm -- my -- my rank gets all confused. You were -- you were a major before that; is that correct?

A. No, ma'am. I was a colonel before I became warden, assistant warden.

Q. Okay. How -- how long were you a colonel?

A. I was a colonel for about six or seven months.

Q. And then before you were a colonel,

you were?
A. Lieutenant colonel.
Q. Uh-huh (affirmatively). How long were you a lieutenant colonel?
A. I was lieutenant colonel for about three years, three and a half years, something to that effect.
Q. As you were sort of going through the -- the ranks and getting promoted, were you getting --
Well, let me ask this. How did those promotions happen; did you have to take a test, did you have to ask for them? Yeah. Tell me what happened.
A. Well, you have to take a test for the lieutenant position and you have to take a test for the captain's position. After that, those are the only tests that you have to take and the other -- everything else you apply for the position and you interview and -- and the best applicant is -- is picked from that point from major on up, so --
Q. And when you were working at Bridge City, was that -- was that working for -- for Department of Corrections or was that working for

like the Office of Juvenile Justice or whatever it was back then?

A. It was Department of Corrections.

Q. All right. So your current duties as assistant warden, what do you -- what do you have to do?

A. I'm the warden over security, which anything dealing with security-wise, it -- it comes through me as far as officers or staffing, inmates, whatever dealing with security areas in the facility here.

Q. And that's at David Wade, correct?

A. Correct.

Q. All right. And then when you were colonel and lieutenant colonel, what were your duties then?

A. Colonel, I was over the -- over a particular unit, which is south compound here at David Wade, and it -- it dealt with restrictive housing and that nature. And as lieutenant colonel, I was investigative, which I did investigative internal affairs dealing with anything throughout the institution.

Q. All right. So you were running investigations as lieutenant colonel?

A. Ma'am?
Q. You were running investigations as lieutenant colonel?
A. Well, not running. I mean, it means that I've -- I worked particularly -- I worked specifically for the warden, and any investigation as far as staff or inmate come across my desk, that was my job to investigate it and -- and get an answer for the warden as, you know, whatever needs that arise at that time.
Q. Okay. And so the warden would say I have a question about, you know, something that happened and -- and you -- you would look into it; is that correct?
A. Correct.
Q. Okay. All right. How would you look into things when the warden asked you?
A. It depends on what -- what it is. I mean, if it's dealing with a staff, I would investigate -- I would talk to the staff, interview the staff, or as far as any kind of whatever it is or whatever it may be at the time, you know, whatever the incident requires me to do, I would take that step to get that information. So everything, I mean, it -- it

depends on what the -- whatever occurred at that time.

Q. Uh-huh (affirmatively). Okay. So if it's staff, you would -- you would talk to staff. Would you -- like were there -- would you put in records requests and look at records or documents; would you do stuff like that?

A. It depends. If it requires that, yes.

Q. Okay. And then if it's -- if it's inmates, did your investigation differ?

A. It -- mostly, it was geared toward like PREA or anything of that nature. That -- that's -- basically as far as inmate-wise, I was a PREA or investigative. It mostly dealt with that kind of nature as far as inmates and -- and as far as investigations.

Q. Okay. Did you do -- did you run any investigations outside of David Wade or do any kind of investigation outside of David Wade?

A. No, not that I can recall.

Q. So in your current position, do -- who is your direct supervisor?

A. My direct supervisor is -- right now here at David Wade is Deputy Warden Jake Barrett.

Q. And -- and who -- who is above that for you?
A. Then above that is Warden Dauzat, Michele Dauzat.
Q. Do you have any other supervisors outside of David Wade?
A. No, ma'am.
Q. And then who are your direct reports? Who do you supervise directly?
A. I supervise two assistant wardens over the units here at the facility.
Q. Okay. And do you have anybody outside -- what are their names, those two assistant wardens?
A. Walter Tolivar and Assistant Warden Lennie Nell.
Q. And do you have anybody outside of David Wade that you supervise?
A. No, ma'am.
Q. When you were colonel, who were your -- who were your direct supervisors?
A. Warden Barrett, Jake Barrett is my supervisor.
Q. Okay. And did you have any direct reports when you were colonel?

A. I'm not understanding that question. What do you mean "direct reports"?
Q. Like anybody that you were supervising directly.
A. Oh, yes. The majors of the shifts.
Q. Okay.
A. Shift majors.
Q. So I want to focus on --
Well, let me ask this. Do your job responsibilities also include --
Well, yeah. Let me just -- let me go back to this. Are you familiar with the Basic Jail Guidelines?
A. Yes, ma'am.
Q. Okay. What are the Basic Jail Guidelines?
A. Those are the guidelines of the center place for local jail facilities and they -- that -- basically, they set their policies off of those guidelines, all the local facility jails that house DOC offenders.
Q. All right. Do you have any role in drafting or editing the Basic Jail Guidelines?
A. Do I have any?
Q. Uh-huh (affirmatively).

A. I have a -- I have the guidelines locally, I mean, which they issue every year. I mean, when they do revisions, we have a -- we have a copy of it to keep with us when we -- to refresh our memory if we go to a jail and -- and make sure we have those guidelines in place, they have them in place.

MS. CUMMING:

So I want to show you what we will mark as Exhibit 1. Let me share my screen with you.

(Exhibit 1 to be marked.)

BY MS. CUMMING:

Q. Can you see that?

A. I see it.

Q. Okay. I'm going to scroll down. And this one's dated April 2019 and reviewed October 2019. That's what that says, correct?

A. Correct.

Q. All right. Does this look like -- I'm not asking you to read the whole thing. I can scroll through all 61 pages if you want, but does this look like the -- the Basic Jail Guidelines booklet that you were talking about?

A. Yes, ma'am.

Q. Okay. All right. That's the table of contents. All right. Do you know is this the most recent version?

A. It's been revised since 2019.

Q. Okay.

MS. CUMMING:

All right. I'm going to show you what we will mark as Exhibit 2.

(Exhibit 2 to be marked.)

BY MS. CUMMING:

Q. So this first page, this says it's a department regulation. Do you see where I'm looking?

A. I see it.

Q. Like right here (indicated)?

A. Yes.

Q. And it's dated July 2022. Does this look like the department regulation that -- that you are familiar with?

A. Yes, ma'am.

Q. And then down here (indicated), this is another sort of -- we are on page 2 of the exhibit. This is another kind of cover page. It says Basic Jail Guidelines, and this is dated July 31st, 2022. Do you know is this -- does

this look like the Basic Jail Guidelines booklet that -- that you get?
A. Yes.
Q. And is this the most recent version to the best of your knowledge?
A. I think they did some more revisions. They constantly do revisions, revision on that, so I -- I can't say it's the actual latest version.
Q. Okay.
A. Because I think recently they just did some more modifications to it, the -- the Basic Jail Guidelines.
Q. Okay. And when you say they -- they do revisions, do you know who is responsible for doing the revisions?
A. Headquarters.
Q. Okay. Do you know who at headquarters?
A. Usually, the person that I have contact with is Megan Wintz.
Q. Megan?
A. Wintz. She used to be the administrator. So normally, when she does a revision on any policy, she will notify us and

let us know that that policy or -- or whatever guidelines that they did a revision on, she will let us know so we can notify the institutions and make sure they are aware of the revisions.

Q. So Megan. And -- and when you say she will notify you, how does she notify you?

A. It can be through e-mail, whatever.

Q. And when she notifies you of a revision, does she send out like the whole booklet again or does she just say we made a revision to this specific provision and this is the revision?

A. Normally, she will send out the notification and -- and the -- the specific guideline and then later on go back and implement it in the -- in the book. So, I mean, first thing, you'll get a notification of what policy is being revised and she will send that out, and we will have to make sure that the institution is aware of that and then they will go back and modify it in the -- in the guideline book.

Q. Okay. So just roughly, how frequently do you receive notifications that -- that a provision has been revised or updated?

A. It varies. I mean, it -- it can

vary. I -- I can't just put a specific on it.
Q. Uh-huh (affirmatively). Do you know is there like a specific schedule that -- that headquarters follows to -- to update provisions or guidelines?
A. No, I don't.
Q. Okay. And do you know is there any kind of -- like is there anything that will -- will trigger a revision, like if something happens or there's -- there's some problem that's identified?
A. I can't answer. I -- I -- I don't know what -- how they come about arriving to change any policies that -- I mean, that once I get it, I just get it. I don't know the reason or whatever. All I do is, if they send it out, I make sure the institutions that I supervise or oversee make sure they get the information and they are aware of the changes in the policies.
Q. All right. And when you say the -- the institutions that you supervise or oversee, tell me. What do you mean by that?
A. The facilities that are assigned to me in my region, those are the ones that I'm -- I normally get the information to, so those

facilities that I monitor I guess I should say.
Q. Okay.
A. Those are the people that I get that information to.
Q. All right. So the facilities that you monitor, and you are -- you are in the northeast region; is that correct?
A. Correct.
Q. Okay. So your role in monitoring the facilities, what is your -- do you have like a job title that is associated with those responsibilities and duties?
A. I'm the BJG team leader of the northeast region.
Q. How long have you been BJG team leader?
A. Since '17.
Q. Okay.
A. 2017.
Q. Okay. Sorry. Let me go back and ask. I think I asked you who -- who your supervisor was when you were a colonel, but can I ask who your supervisor was when you were a lieutenant colonel?
A. Warden Goodwin, Jerry Goodwin.

Q. And did you have people that you were supervising directly as a -- as a lieutenant colonel?
A. No, ma'am.
Q. Okay. So you've been a BJG team leader since 2017. How -- how did you -- how did you become a BJG team leader?
A. Well, I inherited it actually, but -- but the -- the lady that was doing it before I came, she was retiring and they needed someone to take her place. And I went along with her as -- as she was getting ready to retire and that's how I became the BJG team leader. I took her spot when she retired, so --
Q. Is that something that you asked for, that you applied for?
A. Well, no. It was presented to me, and once I started going with her and -- and kind of monitoring, doing the actual audits with her, and Warden Goodwin at that time, he asked me would I consider doing it and I told him I would. So that's how basically I wound up doing the BJG team leader for the northeast region.
Q. So when did you start doing -- so I know you became the team leader in 2017. When

did you start doing audits?
A. I went along with her in '16.
Q. What was her name, the -- the person who had your position before?
A. She recently passed, so I -- Mrs. -- I -- I can't think of her name right now, but -- but she did it for a long, long time, so --
Q. All right. So you went with her to do her audits in 2016 and then you took over in 2017; is that right?
A. Yes, ma'am.
Q. Okay. Did you get any kind of training or anything like that on how to do these audits?
A. As in -- as going with her, she taught me, she trained me, she was telling me. That's what I was doing, getting training from her because that's what she -- that's what she does. So she was kind of training me and showing me the ropes of how to conduct the audits and what to look for and what to expect at an audit; so yes, I guess you could say she was doing the training --
Q. All right.
A. -- and I was learning from her.

Q. Okay. All right. So that training was you went with her on the audits. Did you -- well, how many facilities did you audit with her in 2016?
A. I can't recall.
Q. So can you run me through what all your responsibilities are as -- as team leader?
A. Basically what I do is we do annual audits, we do recertification every three years. We normally make sure the facility is following the Basic Jail Guidelines and make sure that they are aware of any changes within the guidelines.
We also -- we make sure that any question that they may have, I'm kind of like the go-between person between them and headquarters. If they have an issue or something that they need an answer to, I can go along, I can maybe get the answer for them if they have anything that they need or whatever. Kind of like the liaison for headquarters in -- in -- in the local jail basically.
Q. Got it. And this is on top of your -- your responsibilities at -- at Wade, at that institution, correct?
A. Correct.

Q. Okay. And if -- let's say over the course of a year, what -- what percentage of your time would you say you spend on, you know, being a team leader and those duties, and what percentage of your time would you say you spend on your responsibilities at Wade?

A. I'm at Wade every day, so I'll say as far as the jail, I -- probably 15 percent. I mean, it's not my primary job. My primary job is here making sure the facility is -- and everything and all my staff here at David Wade is doing what they are supposed to do, and the other majority of the time maybe at the jail is in which we only -- we -- we do annual inspections and they are scheduled throughout the year, so -- and if something, a need comes up or they need me to investigate or need me to go to that facility for something, I can make amends to go and -- and -- and whatever that headquarters needs me to do in that area; but the majority of my time is here at Wade Correctional Center.

Q. All right. And so when you --

Well, let me ask it this way, so two -- two questions: One is when you are working -- when you are serving as sort of a --

the liaison between the -- the local jails and headquarters, who are you -- who are your contacts at headquarters who you are dealing with?

A. Megan, Megan Wintz.

Q. Okay. Anybody else?

A. She's the -- she's the go-to person if I have a question or anything. She's the main person that I would call or she can get the message relayed to whoever that's -- you know, that's in position or whatever; but that's -- that's -- that's the main contact person as far as BJG team. We normally contact her and she will get the ball rolling to whoever the question or whatever we may have or need answered, she will get it back to us pretty effective in time.

Q. Okay. All right. And then if -- you were talking about if someone at headquarters reached out for you to -- to look more into something.

Who was the person that -- that worked -- you know, people who -- who would be reaching out for you to look into something?

A. She would normally give me something, give me the e-mail or she will say --

she will say why don't you go check this out or whoever if something arises; and, you know, normally, she will relay that information to me.

Q. All right. So it's -- so it's Megan that is your -- your primary contact for going and coming; is that correct?

A. Correct.

Q. Okay. Great. I'm going to come back.

Well, let me ask this. What -- when -- when you have been asked to sort of go look into something, what -- what sorts of things have you been asked to look into?

A. It can vary. It can vary whatever they may need me to look into; if somebody had a complaint about something, food or -- or medical, any -- any -- any -- anything. It doesn't -- if it's something that warrants some attention and they want me to go check it out, it -- it can be a limit of anything, I mean, nothing just really in particular. They may have a concern about something, like an offender escape or something and they want me to go check it out. I investigate how the offender escaped, what was the reason, you know, anything of that nature.

Q. Uh-huh (affirmatively). Okay. All right. Do you know who decides, you know, what is worth looking into and investigating and, you know, what -- what isn't?

A. Can you repeat that question again?

Q. Yeah. You said -- you said that you'll -- you'll go out and -- and look into -- into things if it's -- if it's worth looking into, I think. Correct me if I -- if I misunderstood that. But do you know, you know, who is it that decides, okay, this is worth looking into, this is worth, you know, trying to find out more about?

A. That would come from headquarters or whatever.

Q. All right. And do you know who at headquarters?

A. Not in particular. I mean, it could -- you know, like I say, I get all my information through her. If she say somebody wants you to go check this out, I'll go do whatever they ask or request me to do. It could -- it could come from the secretary, Chief Smith or whoever. I mean, anybody that gets the information to me and she relay it to me

and she ask me to go do it, I'm going to go -- go check it out, investigate it or whatever.

Q. Okay. And do you know where -- where she sits, like, you know, who are her supervisors?

A. I don't know her direct supervisor. I think Chief Smith, she works under Chief Smith's office.

Q. Okay.

A. I don't know if he's her direct supervisor or not. I don't really know, you know, her structure as far as --

Q. Okay. Yeah. That's -- that's fine. And her last name, I'm -- right now, I'm -- I'm sort of noting it to myself as W-I-N-C-E; is that correct?

A. W-I-N-T-Z.

Q. W-I-N-T-Z. Great. Thank you.

All right. And do you know does she have anybody who is like -- that she supervises or that's under her?

A. I do not know that.

Q. Okay. All right. So if they -- if they ask you to go out and look at something --

MS. CUMMING:

We can actually stop sharing this now.

BY MS. CUMMING:

Q. If they ask you to go out and look at something, what steps -- so let's say it's a -- it's a -- it's an escape. How would you go about looking into that?

A. An escape? Probably get all the documents that they have at the facility. First of all, get the UORs and information that they have gathered at the institution, and I would review it first and see basically if they followed policies and procedure as far as the escape or whatever. Getting all their documentation first and looking at it and observing it and see what areas that they, you know, maybe didn't follow policy or whatever. First thing is getting their documentation, information and looking at it.

Q. All right. So you would first get all of their stuff and then what would be the -- the next step after you get all of their -- their UORs?

A. Probably going to it, interviewing, looking at the area in which the escape occurred,

you know, and -- and just investigating this particular area, talking to the warden and -- and everybody that was involved or -- or who was there at the -- at the time and trying to see and get a clear -- clarification of how and why this happened, so --

Q. All right. Okay. So, and have you ever --

THE WITNESS:

I'm going to have to transfer this phone. This phone is about to die. Let me get this other phone right quick.

MS. CUMMING:

Sure. Actually, why don't we -- we take the opportunity to take a little five-minute break? Mr. Mays, do you want to take a little five-minute break while you get your phone plugged in?

THE WITNESS:

Hello?

MS. CUMMING:

Yeah. Can you hear me?

THE WITNESS:

Yeah.

MS. CUMMING:

All right. Are you good? You are plugged in?

THE WITNESS:

Yeah. I'm good.

MS. CUMMING:

Okay. Great. Never mind. We will go a little longer.

BY MS. CUMMING:

Q. So have you -- have you ever asked for something from a facility, like a document or a record, and -- and not been able to -- to get it, like they refused to give it to you?

A. I don't recall.

Q. Okay. And so pretty much if you -- if it's something that you would like to see that would be helpful for you to look into something and -- and a facility has it, they will -- they'll turn it over to you if you ask for it; is that right?

A. I can't recall not wanting -- not -- a facility not giving me any information or answering any questions at this time. I don't recall any of them not doing it.

Q. Okay. Okay. I want to turn to incident reporting. As -- as part of your work

as the team leader, do you get reports on things like assaults and injuries to -- to people at the local jails?

A. They do a monthly report, and on their monthly report, they -- they -- they report the number of assaults and incidents that occurred.

MS. CUMMING:

Okay. I want to show you what we are going to mark as Exhibit 3.

(Exhibit 3 to be marked.)

BY MS. CUMMING:

Q. All right. Can you see this?

A. Yeah. I see it.

Q. Okay. Good. All right. This is three pages. I'm going to just show you all three pages, but at the -- at the top, it says Louisiana Department of Public Safety & Corrections and then Monthly Activity Report. This one's from Madison Parish Correctional Center. It's got Region: Northeast, month of May, year of 2020 and then it says reviewed and approved by you, correct?

A. Correct.

Q. All right. So I want to show you

all three pages of this. That's the three pages.
Does this look like the monthly report that you get from the facilities?
A. Yes, ma'am.
Q. So how do you receive these reports; is it by e-mail, mail?
A. Through -- they got a -- they got a -- on their -- they have a -- a deal where they report it every month on their computer and they send it through the web base to -- to me on the web base that they have set up in that.
Q. Okay. So it's like a portal kind of thing?
A. Yeah. It's a -- it's a web -- website they go on monthly and they would do a report of their incident every month. They have to report it.
Q. All right. And that's all of the -- all of the facilities in the northeast region, they do this monthly and they send it -- they send it to you; is that correct?
A. Correct.
Q. Okay. Does anybody else receive these monthly reports through that web based thing?

A. Yes. It -- I approve it and it goes to headquarters.
Q. Do you know who it goes to at headquarters?
A. I think Ms. Wintz. She's -- she has that database. I don't know who all in particular. I know she probably reviews it as well once I approve it.
Q. Okay. So let me ask about your approval process. What is that? What does it mean for you to approve something?
A. I go in and I make sure that they have all the correct -- the information inputted in there as far as the numbers, as far as the -- like I say, for instance, they say over capacity. They have to -- I have to -- they have to give me a reason why they are over capacity for that month or whatever. If I see anything that warrants -- you know, like as far as the number of discharges, if they have IDs when they discharged; and if they don't have any IDs, I -- I want to know why they didn't get the ID when they discharged, things to that effect.
Q. Okay.
A. Or I would -- I would compare

numbers, like if their medical number was higher than last month, I ask them why where they had three this month and they had ten last month, you know, kind of that kind of thing, kind of monitor their numbers or stuff like that, make sure that they are accurate on the reports.

Q. Okay. All right. So, and in saying "they are accurate on the reports," is there any other information that you look at to -- to try and confirm the accuracy of the -- of the monthly report?

A. Pretty much everything. If they have an escape, they need to explain, you know, was DOC escaped and apprehended. They have to -- I make sure they have that on there if they have an escape or whatever, just anything in particular that -- that warrants an explanation and they have to explain why this happened or whatever.

Q. Okay. So -- so here, for example, in this May report, they have got Medical 3 and this is transfers to DPS&C custody. What is that referring to?

A. Those are the ones they transferred to -- to Department -- to the Department of

Corrections' facility due to the medical issue that they have, they can't house them if their medical expenses -- or most time if they can't take care of that offender, they will transfer them back to a Department of Corrections.

Q. All right. So that's not like hospital routes out of the facility. That's -- that's going back to a main campus?

A. Ma'am?

Q. So that's not like routes for -- for medical care out of the facility. That's people who are going back to a -- a main camp prison for medical reasons?

A. They are transferred back to our facility, a state facility.

Q. And so that's one of the numbers that you pay attention to and you try and -- and make sure that it's accurate; is that correct?

A. Correct.

Q. What are you checking that number against?

A. The last month's number.

Q. Okay. Is there anything else that you are checking that number against to make sure that it's accurate?

A. No, ma'am.
Q. And then down here at assaults, say --
Well, let's -- let's go to escapes. In May, it looks like there were no escapes. What are you checking that number against to make sure that it's accurate?
A. I mean, if it didn't happen, it didn't happen. I mean, you are really just looking to make sure that, you know, if they don't have an escape, that's good. I mean, we -- we wants the -- that number to be zero, you know, every month. I mean, if -- if it's zero, that means that they are doing something right. They are not letting the inmates just -- no escape and no apprehension, that -- that's a good -- good sign. I mean, the inmates are in control, they -- they got them maintained and well and in order, so --
Q. Okay. So, but there's nothing that you are doing to sort of confirm that -- that they are -- that they are being accurate in reporting that there were zero escapes; is that right?
A. That's right.

Q. Okay. And then assaults, we have got a couple different categories: Offender on offender, offender on offender with serious injury, and on staff. Do you see where I'm looking?

A. I see.

Q. Okay. Is there anything that you do to -- to confirm that this number is accurate?

A. Yes. I would probably call -- I would call the institution that actually and -- and probably they have to explain what the assault was or who the assault was on and did they press any charges if it was significant injury or did that inmate have to go to the hospital or anything of that nature. So kind of in that area, if it's an assault, we -- we would look into it and make sure that if that offender did hurt somebody, did -- was there any charges pressed, did they send him out to the hospital or anything of that nature.

Q. Okay. Are you also -- what else are you looking at beyond just charges and hospital care?

A. Was he placed in deseg or whatever. I mean, are -- are you going to -- they request

to be transferred or whatever. Just depends on the gist of the incident just what steps did they take to correct the problem or get that problem resolved.

Q. Are you looking to see if there are any kind of like, you know, policy violations or -- or violations of the Basic Jail Guidelines?

A. Not really. I mean, if they -- if they -- I mean, it could have just been a simple fight and, you know, I mean, you can't control a fight. So, I mean, if they violate a policy, they -- I mean, I -- I don't look for that in that report right there, not in -- not in this report here.

Q. And then are you -- are you looking for -- is there anything that you are -- are kind of checking this number against to -- to confirm that it's accurate?

A. As far as these, no, ma'am.

Q. Okay. And so as you are going through and you are -- you approve the report, roughly how long does it take you to -- to approve a report, a monthly report?

A. Probably as soon as they send it to me, I'm going to look into it. They usually have

to send it in by the 20th of each month. Not a hard process to approve it. I mean, it's just looking at it, verifying the information that's on it, make sure it's accurate and make sure that all -- all the information that they implemented. It -- I might say at the bottom if -- if I look at it and -- and then I get it and I look at it, it takes about a day.

I mean, once I get it, I look at it; and if I see something that I -- raise a red flag or question, I call them about it and check it, make sure that, you know, the information they put on here is accurate so we -- it can take from a day or two or whatever timeframe that I have to check it and make sure that it's -- it's accurate and approved.

Q. Okay. So once you're looking at it, it -- it's about a day process; is that right?

A. Yeah.

Q. And so -- and when you say the 20th of the month, you -- you are talking -- so, for example, for this May monthly report, you would not get that until, you know, like the -- the 20th of the following month, of that June; is that right?

A. Like this -- this one here is for May. I'll probably -- it -- it will come -- it's like a month behind. So say, for instance, this month, this is December. I'll -- I'll get December's, they have to report it in by the 20th. It doesn't have to be exactly on the 20th. Some of them turn it in a little early.

Once they got all the information and put it in the system, they will send it and submit it; and once I look at it and review it, I approve it, so it's like a month behind. Each -- each -- each of those reports are like a -- run like a month behind, so this month it will be December for approval. February will be January for approval, so it kind of run like a month behind.

Q. Okay. All right. And do you know what -- well, so for Madison, do you know who compiles this monthly activity report?

A. Can you repeat that?

Q. Do you know who compiles this monthly activity report for Madison?

A. Usually, it be the major.

Q. Okay. So if you -- if you need to call the facility, who -- to -- to confirm

something, who do you usually call?
A. I usually call the major or the warden, the warden of the facility.
Q. Okay. And at Madison, who is your primary point of contact?
A. If I got a question about something, I'm going to call the warden first and he can decipher who he wants to answer the question or whatever.
Q. Okay. And so which warden would you -- would you call for -- for Madison?
A. Warden Stinson right now. He's the warden over the facility now.
Q. Okay. All right. How frequently -- when you're -- when you're reviewing these monthly activity reports, how frequently do you have to pick up the phone and call the facility?
A. It varies. It depends on what I'm looking for and what I'm asking. I mean, it varies. I can't just -- I mean, it varies. I can't just pinpoint and say I called them every time that they do a report, which I don't.
Q. Okay. I understand it -- it varies. So let's just take, you know, an over -- over six months, any six months, are you calling -- are

you calling facilities, you know, half the time, you know, a quarter of the time? Do you have any sort of rough estimate?

A. Within a six-month timeframe, I maybe call once or twice if I got a question about something on the report. Maybe once or twice in -- in -- like I say, it varies. I mean, if it's something warrants that I -- I think need to be looked into or I see something that's -- that wasn't a little higher this month than last month, I mean, it varies. I mean, I can't just put an actual number on it.

Q. And what sorts of -- what sorts of things -- I just want to make sure I understand.

What sorts of things would make you pick up the phone and call the facility?

A. Like I say, you could go down and look at like the contraband, you know, the amount of contraband that's on there or -- or whatever. I mean, anything that raises my attention, you know, as far as anything that didn't -- you know, that doesn't look like it's a little higher than it normally be, that's what raises my attention. You know, if something like if they -- and -- and if they got something that, a number higher

than -- than it was two months ago, and their numbers usually be about the same and -- and it's a kind of higher, it -- it could have been a typo or anything of that nature, you know. So that kind of -- that -- that's what basically we are talking about as far as that.

Q. Okay. All right. All right. But in terms of like confirming the -- the information, there's nothing -- there's no other reports or records or documents that you request from the facility to -- to make sure that what they are reporting is accurate; is that right?

A. No, ma'am.

Q. Okay. And do you have anybody that assists you in looking at these reports?

A. Like I said, once I approve them, they will go to I think it's Ms. Collett. She will compile all the reports and get the numbers and all that or Ms. Wintz, they check the reports. Other than that, them the only other people that I know of that actually review those reports after me.

Q. So, and Ms. Collett, she's also at headquarters; is that right?

A. Yes, ma'am.

Q. Okay. Do you know her -- her last name?

A. That is her last name. I think Collett is her last name, I want to say.

Q. Oh, got it. Okay. All right. What's her -- do you know her first name?

A. No, ma'am.

Q. Okay. All right. But she -- she works with Ms. Wintz; is that correct?

A. Yes, ma'am.

Q. Okay. And beyond them, do you know who else reviews those monthly activity reports?

A. No, ma'am.

MS. CUMMING:

All right. I want to show you what we are going to mark as Exhibit 4 now.

(Exhibit 4 to be marked.)

BY MS. CUMMING:

Q. Okay. So this is a single month activity report rollup. Do you see this document?

A. Uh-huh (affirmatively).

Q. It's nine pages. Again, this is -- I'm just taking a sample here, but this is for the northeast region, it's for May, it's for

2020, and it's got a bunch of facilities listed here.

Are these all of the facilities that -- that you are -- are responsible for as team leader for the northeast?

A. No. That -- that's been modified. I don't have all those facilities now.

Q. Oh, okay. All right. Do you know which facilities you no longer have?

A. Only facilities I can -- I can tell you which I have and I can tell you which I don't have. I have -- do Madison, Louisiana Transitional Center, I do Madison Parish Correctional Center, I do Madison Parish Jail, I do Madison Parish Southern, and that would be it on that list.

Q. Okay. So you don't have Caldwell, Franklin, Lincoln?

A. No, ma'am.

Q. Ouachita, Richland, River Bend, Tensas, okay, or Union. All right. Do you know who has those now?

A. Arnold Hunt, Dane Hunt.

Q. That's Armor you said?

A. Arnold, Arnold, A-R-N-O-L-D.

Q. Got it. Thank you.
Okay. When did that happen? When did -- when did your list kind of whittle down to that?
A. Last year.
Q. Okay.
A. It may be longer than that now, you know what I mean, probably about a year or two, I -- I guess about a year or two.
Q. So 2023 or 2022 sometime?
A. Yeah.
Q. Okay. Got it. Does this -- I'll scroll through the nine pages of this exhibit, but as -- as you are looking at it, does this document look familiar to you?
A. Yes, I've seen it.
Q. Okay. When have you seen this document?
A. It's on the database. You can go -- you can go and check it. I mean, I don't have any -- I -- I don't actually do the document. I can go back and review the documents, but it's not nothing that I do.
Q. Okay. All right. And the database, that's the same database where local facilities

submit their monthly activity reports; is that right?
A. Yes, ma'am.
Q. Okay. And do you know who does this document?
A. Ms. Collett.
Q. And do you know where -- how -- do you know how this document is -- is compiled?
A. From the monthly reports.
Q. All right. So your understanding is this is the -- a compilation of the monthly activity reports; is that right?
A. Correct.
Q. All right. And do you know were any steps taken to confirm that the reported information is accurate?
A. She compiles it from the report that we send it, so --
Q. Okay. So after you send in the report, no one is taking any extra steps to confirm that the -- the information is accurate; is that right?
A. I can tell you what we do on my part. I don't know what she does to verify it. I -- I can't specify what she does.

Q. Okay. And do you know who else has access to this rollup?
A. All the BJG team leaders.
Q. Okay. Anybody else?
A. Oh, I don't know that.
Q. Do you know does anybody at headquarters have access to it?
A. No, I don't know that either.
Q. All right. All right. I want to go to --
MS. CUMMING:
Well, actually, can we just take a five-minute break before I go into the next section? We will be quick.
(A short recess was taken.)
BY MS. CUMMING:
Q. All right. So I want to turn to -- well, let me ask this. Before Ms. Wintz, who was your primary contact at the Department of Corrections?
A. Ms. Tauzin, Angela Tauzin.
Q. All right. And how long was Angela Tauzin your -- your contact?
A. I really can't recall. I think she did it up until -- I think she did it up until

'18. I -- I'm not sure on the dates. I think it was up until '18. I'm not sure on the dates, though.

Q. And Tauzin is spelled T-A-U-Z-I-N?

A. Yes.

Q. And then do you recall when Ms. -- who was after Ms. Tauzin?

A. I think it was Markisha Stewart, I want to say. She only did it for a little while, then Ms. Wintz took over.

Q. Okay. Do you recall roughly when Ms. Wintz took over?

A. I -- I -- I do not know that exact date.

Q. Okay. Okay. All right. So it was Ms. Tauzin for a long time. Was it Ms. Tauzin when you took over as team leader?

A. Yes.

Q. Okay. So it was Ms. Tauzin, Ms. Stewart and then Ms. Wintz; is that correct?

A. Correct.

MS. CUMMING:

Okay. So I want to move on to Exhibit 5, which is the quarterly report.

(Exhibit 5 to be marked.)

BY MS. CUMMING:
Q. So this is six pages. I'll scroll through all the six pages. Can you see that?
A. Yes, ma'am.
Q. So, and this is the BJG quarterly summary report for Quarter 4, April to June 2020, and then it's for the northeast region. It looks like it's got you listed as the team leader. All right. So that's the six pages of this exhibit.
A. Yes.
Q. Does this document look familiar to you?
A. Yes.
Q. Okay. All right. And then there's a reference to you as team leader, which we have been talking about a bit. Who -- who else is on the team?
A. A member, usually you take a member. Because when we do an audit, it's just always another person that go along with me, which is a member.
Q. Okay. So who -- I'm sorry. Go ahead.
A. No. Go ahead.
Q. So the -- let me ask this. How many

members are there for the northeast region?
A. A member is only -- I mean, I only take one other person, so it will be just me and the other person doing the actual jail audit.
Q. So there's no one -- and that's primarily for just the active audit time --
A. Correct.
Q. -- is that right?
A. Yes.
Q. Okay. So there's --
A. Yes.
Q. There's no one that is sort of like a permanent team member that helps you with reports or anything like that; is that correct?
A. No, ma'am.
Q. Okay. All right. So it's just you.
All right. So this reporting form, it looks like it's got a couple of kind of set categories. Do you know who developed this -- this reporting form?
A. It came out of headquarters.
Q. Okay. Do you know who out of headquarters developed it?
A. No, ma'am. I can't tell you that.
Q. All right. How long has this

reporting form been in place?

A. It was in place when I started doing it, so I -- I guess it was -- it's been in place -- I don't -- I can't tell you the specific time, because when I took over, it was in place, so I don't know the timeframe, so --

Q. Okay. Has it changed since you took over?

A. Yes. We no longer -- at this time, we no longer do a quarterly -- a summary report any more.

Q. Okay. Do you do something instead?

A. I guess they compile it all with the -- with the report that you had previously before this, they do -- actually, they do a -- the monthly report. She does that report that you pulled up earlier, and then they also do a compiled report of all of it actually, all the facility. So we no longer do this report.

Q. All right. So that's the -- the -- the monthly activity report from the facilities, and then that -- the monthly rollup that we were looking at, those are the two reports?

A. Correct.

Q. Okay. And that is -- that's what

they do now, but they -- but no one -- no one is doing this quarterly report; is that right?
A. No, ma'am.
Q. Okay. All right. When did that change?
A. It's been probably about a year or two now, so, I mean, I -- actually, I -- all that information is redundant really. It's only monthly and the quarterly report that she collects; so really that report there really was just a -- just a repetitive of the other reports basically.
Q. And the "she," who -- what -- who is she that you are referring to?
A. That's Ms. -- Ms. Collett who compiles all the reports together.
Q. All right. So in between the time from when you started and when the report was stopped, was discontinued, were there any changes to it?
A. Not that I can recall.
Q. Do you know when you were compiling the quarterly reports, do you know why they were being compiled?
A. I have no idea.

Q. Okay. Tell me. Are -- are you the person that would put this report together, this quarterly report together for the northeast?

A. Yes, ma'am.

Q. Okay. Tell me how you would do that.

A. I would do it through the monthly reports that I receive. I'll take that information from those reports and compile it to one report, to the quarterly report.

Q. All right. And so here where it talks about operational capacity, DOC offenders and non-DOC offenders, this -- this table up at the top, all of this information is coming directly from the -- from the monthly activity reports; is that right?

A. Correct.

Q. Okay. And you would just sort of be adding it all together?

A. Correct.

Q. Okay. And when you were compiling this -- this report, this quarterly report, did you take any steps to confirm that the information was accurate?

A. I did that through the monthly

reports, which I said all that comes from the monthly reports that's been approved.

Q. Okay. All right. So you're not doing anything different for this report than -- than what you had already done for the monthly report; is that right?

A. Correct.

Q. Okay. All right. So down here where it says schedule B reports and then it's got a total number, what is a schedule B report?

A. Those are the audits that they -- that was written up for that quarterly for each of those facilities.

Q. And so that's -- that's part of the disciplinary process; is that right?

A. Correct.

Q. Okay. And my -- my understanding which is very shaky, so tell me if I'm wrong, my understanding is that the local facilities, if they have someone who is DOC sentenced, if they -- if they are going through the disciplinary process, part of that process has to -- has to go through the Department of Corrections; is that right?

A. I'm confused what you are talking

about.

Q. Okay. All right. It's probably because I'm -- I'm still confused about it too.

Well -- well, let me ask this. The schedule B report, is that just -- is that just sort of a tally of who got written up and who went -- went before the disciplinary board or is that -- is that indicating that there is some sort of more serious disciplinary infraction that the Department of Corrections had to get involved in?

A. Those are the disciplinary reports that they was written up on and they went to a disciplinary hearing for it, so -- and -- and that consists of all these institutions, those -- those reports that are listed there.

Q. Okay. All right. So this is every single facility in the northeast --

A. Correct.

Q. -- region, that's the total for?

A. For those three -- for those three months.

Q. Okay. Got it. Is there any place where -- where the number of disciplinary schedule B reports is broken down by facility?

A. That's broken down on the monthly reports.

Q. Okay. All right. All right. And you don't take any steps to confirm that this number is accurate beyond, you know, what you were talking about doing with the monthly reports; is that right?

A. Those were the facility reports. That's, you know, basically what it is. I mean, if they -- they do the count and put it on the report and I just kind of -- however the last one, I ask them, you know, but they -- that's the report that they report in every month, you know.

Q. Got it. Okay. All right. And then for the assaults down here (indicated), it looks like this is assaults with significant injury, offender on offender, that's -- that's the category; is that right?

A. Correct.

Q. Okay. What is "significant injury," what does that mean?

A. That's somebody that had to be transported to the hospital to get sutures or whatever, anything that requires a hospital trip or whatever is significant.

Q. Okay. Okay. And is that for anybody who is housed at -- at a facility that's -- that's under the Basic Jail Guidelines, so would that include pretrial people and DOC people?

A. Basically, we try to focus on the DOC offenders.

Q. Okay. So the -- so your expectation is the facility is not necessarily going to report when a pretrial person is routed to the hospital with an injury?

A. Repeat the question.

Q. Well, I'm trying to understand what -- what this number -- what these numbers represent. So if -- if someone is pretrial and they -- they are assaulted and they experience a significant injury that requires that they go to the hospital, would that -- would that be reported to the Department of Corrections?

A. I mean, I don't -- I don't know if they report it to the Department of Corrections due to the fact that he's not in Department of Correction custody, but, you know, that's not -- that will be up to that facility. I mean, I -- I can't exactly tell you that. I don't know.

Q. Okay. All right. And then these narratives that are included in the assaults, where do the -- do you see what I'm talking about, like kind of the summaries of what happened?

A. They will send -- I always require them to send the supporting documentation. If it's something significant, I always require that facility to send me some UORs or -- or -- or go into depth as to actually what happened and what was the outcome of each individual fight. So that's -- that's how I got the narrative of those different incidents, so they have to provide me with a little more information as far as how the fight happened and -- and did he require any kind of medical treatment or anything of that nature. So I request a lot of that information along with which they have significant fights or whatever. They have to explain, you know, that situation.

Q. Okay. So if you see -- I want to make sure I understand this, the process. So if you see on the monthly activity report that there was an assault with a significant injury, you -- you ask for the -- any kind of documentation or records related to that incident; is that right?

A. Correct. They -- they will have to explain it in their -- in their report that what all happened, what transpired.

Q. Okay. How do you ask for that report from the facility?

A. I -- I call and -- and -- and talk to the warden or whoever is at hand, so --

Q. And how does that -- how do those documents get to you?

A. They can send it e-mail or -- or whatever.

Q. Okay. And so the narratives that you have here, are these narratives that -- that you are writing based on all of the documents that you get or are they -- are you copying and pasting from something that's --

A. I -- I kind of summarize it up because you can't write all that stuff on there. That just summarizes.

Q. All right. Okay. Does anybody -- when you complete this quarterly report, what do you do with it?

A. Send it to I guess Ms. Wintz or whoever reviews the reports, send it to her office.

Q. How do you send it?
A. Through e-mail.
Q. All right. And do you know what happens next to the report?
A. No, ma'am.
Q. Okay. When you are compiling these quarterly reports, do you look at like hospital routes from the facility?
A. Repeat that, ma'am.
Q. Do you -- do you look at hospital routes from the facility?
A. Do I look at the hospital routes?
Q. Uh-huh (affirmatively).
A. I'm not understanding what you mean by hospital routes. I mean --
Q. Do you look at any kind of list or log of -- of who all from the facility was sent out for -- for medical care at a hospital?
A. I mean, I look at the information on the report. I mean, I don't just keep a list of who all went out on the hospital. I don't do that.
Q. Okay. And then do you -- do you look at any of the disciplinary records, like any of these schedule B reports to see like how or

why people are being disciplined?

A. No, ma'am. I look at -- on the report, I mean, I'm not quite understanding what you are talking about, do I look at the disciplinary reports?

Q. Well, I know that you get the monthly activity reports and it has a number.

A. Right.

Q. And it says that there were -- there were, you know, 15 schedule B reports, right?

A. Yes, ma'am.

Q. Okay. So the question is do you look at the -- at the underlying documents? Do you look at any of those schedule -- 15 schedule B reports?

A. I don't get the reports of the schedule B. They just list them on the -- the monthly report. I -- I don't actually have a report that they send to me. I just look at the numbers. I don't get -- I don't get the actual reports. I just get the number of reports that they normally did and --

Q. Okay. But if you wanted to, if you wanted to look further into something, could -- could you request the schedule B reports?

A. Yeah. I can request it, but that's a lot of -- you -- you got to look at I got a whole primary job, so I really don't have that kind of time to ask for everybody's report, you know, as far as every individual at a facility to give me a report to actually look at it. You know, that -- that -- I wouldn't have that much time to do that with my job duties here.

Q. Yeah. Okay. Okay. Do you know -- do you know where these DOC or these quarterly reports are maintained?

A. No, ma'am, I don't.

Q. All right. And do you know who has access to these reports?

A. I guess if you on the database, I guess you can access it if you on the database system, but I'm not very sure on that. I -- I guess you would -- if you on the database that they put them on, I mean, you can access the database. I'm not very sure on that, so --

Q. Uh-huh (affirmatively). Yeah. And do you know, have you ever gotten any kind of follow-up from the -- from headquarters about anything in these quarterly reports?

A. I may have. I can't recall at this

point in time.

Q. Okay. How would that follow-up have come; as a phone call, an e-mail?

A. I can't recall. I mean, like I say, it's -- it's been a minute since we did these, so I can't really just give you a definite answer on that.

Q. What sort of -- if there had been any sort of follow-up, what -- what sort of follow-up might it have been?

A. I mean, I -- I -- I can't really just say. I mean, if it's something that they saw that maybe needed -- needed to look into a little deeper, I probably would have gave -- gave the institution a call and probably get some clarification on what actually happened if they -- if that was -- if that was the case, you know.

So probably a phone call getting a little more clarification on whatever they was asking about, so probably getting with the warden of that facility and kind of get him to give me some more information onto whatever they were requesting.

Q. All right. But you can't recall

ever having to do that; is that right?

A. Not at this moment, I can't.

Q. Okay. All right. Would there be any kind of documentation anywhere of like if DOC had asked for more information or had responded to one of your quarterly reports and you would have to follow up?

A. Not -- not that I can recall.

Q. Okay. And I see -- so the -- the quarterly reports that are dealing with assault with significant injury, do you know is there any kind of report where you are following up on just assaults that happened without significant injury?

A. If they do a follow-up on assaults without significant injury?

Q. Uh-huh (affirmatively).

A. No, ma'am, not that I can recall.

Q. Okay. Would that be documented anywhere?

A. It would be on the monthly report. If it's offender on offender, that will be documented on that report.

Q. Yeah. Okay.

All right. So I want to turn now to

the auditing itself. So I want to -- you testified about this earlier and I want to make sure I got it right. So there is an annual audit of all of the local facilities that holds Department of Corrections people, right?

A. An annual. Yes, that's an annual audit.

Q. All right. And then every three years there is a recertification; is that right?

A. Correct.

Q. Okay. All right. So I guess let me just start with the audits. What -- what is an audit?

A. An audit is -- basically it's what it is. An audit is scheduling an audit every year, which is an annual. You go in and you make sure that there's specific files that they are supposed to have in an annual audit. Those are the files that we normally go in and we will look at the files. They should have a policy in place as far as the Basic Jail Guidelines, and they should have a policy, a folder that consists of those files that we are looking for in that annual audit. It's specific files that we look for in an annual.

So we will go in and we will do an inspection of the files, and then we will do a tour of the institution and make sure that we look around, make sure that the institution is as clean, food is good, talk to a few inmates and make sure that they are all right and the quality of life is -- is -- is up to par or whatever. If they may have any concerns, we will talk to them and take the concerns down or whatever. Just basically make sure they are following Basic Jail Guidelines. That's what -- that's what it is.

Q. Okay. All right. And the -- the folder of files that -- that you need to see for the annual audits, what all does that include?

A. It's the specific files that they have to have. I can't tell you which all they are. I just know what -- we have a -- some forms that we have to fill out and the individual files that we have to look at. They are on that annual report that we normally do at an annual inspection. So it's a -- it's a list of BJG guidelines that they have to follow for the annual that we have to go in and monitor for that annual report. So they have to have those files in place and have all the documentation

supporting that policy and procedure that they have set in place.

Q. Okay. All right. And the recertification, can you tell me about that?

A. Recertification is -- consists of every single file that they have in the Basic Jail Guidelines. And what that is is we will go in and we will -- just kind of similar to the annual, but it's every single file that they actually have on the Basic Jail Guidelines, mandatory and non-mandatory files, so every file that they have.

Q. Okay. So what's the purpose -- what's the purpose of the annual audit?

A. Just to make sure that they following proper Basic Jail Guidelines procedures, you know, taking in and making sure the facility is doing what they are supposed to be doing with the files that we are looking at and set in place and just checking, make sure they are doing what they are supposed to do.

Q. And what's the purpose of the recertification?

A. To make sure that that facility is adequate to house the -- the offenders; I mean,

making sure that the inmate's quality of life and well-being is taken care of and the policies are being followed and the procedures are being met within the Basic Jail Guidelines.

Q. And so how -- so who is responsible for the -- the annual audits?

A. I mean, as far as who go do the audit, that's what you talking about, who's -- who's doing the audit, conducting the audit?

Q. Yeah. Let's start there.

A. I -- I normally conduct the audit. The team leaders normally set the dates and the times for the audit, so kind of make it consistent with your time; and you go in and every year we set a date or -- or a specific time that we will go in and do the audit as -- as well as the warden of that facility.

Q. Okay. All right. All right. So the team leader is responsible for actually going and physically doing the audit, right?

A. Correct.

Q. Okay. And then do you -- how many people do you have helping you with the audit?

A. Well, in my area, we only have -- I only take myself and the member because we don't

have any -- the -- we very limited in the staff to take with us in -- in my area because most of the people have to be at work. So I don't have the opportunity to take a lot of people with me, but I normally take a colonel with me or a lieutenant colonel. He will go with me, and normally he will be my team member.

Q. Is it -- is it always the same person or do you -- do you change, rotate?

A. I try to take the same person along with me.

Q. Okay. So who's the person that -- that you've taken with you in the last, say, four years?

A. Colonel -- Colonel Malcolm.

Q. All right. And Colonel Malcolm, what is his day job?

A. Right now, he's colonel over the -- over a unit right now in which now he took over team leader for the northwest region. So he and I, we kind of go together now to do the jail audits for both regions. So I help him out in his region and he help me out in my region, so we kind of team up together and do those regions.

Q. Okay. How long has he been team

leader for the northwest?
A. He just acquired that about a year, maybe a year, right at a year, might not have been a year yet, but right at a year, about eight to ten months I guess you can say. But he's been going with me for a little while, so --
Q. All right. And how -- how long does it take you; does it take you like a day, a week? How -- how long do audits usually take?
A. Probably on whole, probably a day. It takes a day pretty much to -- because there's only two of us, so we have to do -- we have to do the documentation, do the tour of the facility, we talk to inmates. It's -- it consists of a lot of things. I mean, it's going -- it's not just a -- we not just going to go in there and -- it takes a whole day probably to actually do an audit.
Q. So you are talking like get there first thing in the morning and --
A. Correct.
Q. -- spend the day until -- do you -- is it like a business day or like a 12-hour day?
A. It varies. It could be like eight hours or better. I mean, it depends on the size

of the facility as well too, so --

Q. Okay. Well, and I'll -- I'll ask some specific questions about Madison, so just know that's -- that's coming. I'll preview that -- preview that for you.

Okay. So, but usually it's about a day. All right. So, and the recertification visit, let me ask. How many people do you take with you on that?

A. The same two.

Q. Okay.

A. Myself and him.

Q. Okay. And how long do those recertification visits take?

A. About the same as an annual because -- and normally what we try to do, I'll -- we will -- we will split up and -- and we'll alternate. One will do the -- I'll do the folders and he will probably do the walk-through or vice versa, you know, so that's kind of how we normally get through the day, so --

Q. All right. And the folders you are talking about, like those are the folders where they are keeping all of the -- the Basic Jail Guideline information; is that right?

A. Correct.
Q. How many -- how many team leaders are there?
A. I don't have a specific number, but it's quite a few in different regions, so I -- I couldn't tell you how many actually it is.
Q. And in those other facilities that have been carved out, like Franklin and Lincoln and Union Parish and West Carroll, do you know who -- are they in a different region now?
A. No. They in the region, but somebody else is -- is the team leader.
Q. Okay. Do you know who that is?
A. Colonel Arnold.
Q. Oh, I'm sorry. That's right. You said that.
All right. You estimated that you spent maybe about 15 percent of your time throughout the year on team leader activities.
Do you have an estimate of how much time Colonel Malcolm was spending before he became a team leader?
A. No, ma'am.
Q. Okay. And who is Colonel Malcolm's supervisor? He's at -- he's at David Wade,

correct?

A. Correct.

Q. Okay. Who is Colonel Malcolm's supervisor at Wade?

A. Assistant Warden Lennie Nell.

Q. Oh. The other name that I saw, and we will get to the -- some of the other reports I saw, so the other name that I saw was Delota Nalitt. Who is that?

A. Delota Nalitt, that's -- he's a colonel now. I think he did go with us on one of -- one audit. I think he went along with us on an audit.

Q. Okay. All right. And -- and he's a colonel at Wade?

A. Yes, ma'am.

Q. All right. Who is Colonel Nalitt's supervisor, direct supervisor?

A. Warden Tolivar.

Q. Okay. And his other job responsibilities are?

A. The unit manager over the compound.

Q. Do you have a rough estimate of how much time Colonel Nalitt spends on monitoring activities as --

A. Well, I mean, he just came along to emphasize on that audit, so --

Q. Okay. Did Colonel Malcolm have any training on auditing or -- or the Basic Jail Guidelines before he started doing audits?

A. He came along with me several years. He's been doing audits with me for several years before he became a team leader, so he and I would -- before he became a team leader, he was going along with me doing audits as well, so --

Q. All right.

A. He's always my member.

Q. Okay. All right. And then for Colonel Nalitt, did Colonel Nalitt receive any kind of training before starting to do audits?

A. I think that was -- he went along with us. We was training him on that day that he went that you seen on that report probably, so --

Q. So when -- when someone is going to do an audit for the first time, what -- what kind of steps do you take to -- to sort of tell them what's going on to train the person?

A. You kind of break down to them to do -- I try to break down to them before they actually go in the audit, tell them what to look

for and basically what -- what -- to what kind of questions we have questions that we want to ask and -- and he's -- he's not always -- he's not going to be by himself. He's always with somebody that's had been with -- with Colonel Malcolm was with him.

When they did -- when you do an audit, it's going to be somebody experienced with you. You're not going to be by yourself, so we always kind of have somebody with you to kind of get you and guide you to what's actually going on, so basically kind of explain to what -- what we have; and then -- and -- and the audit kind of consists like the audit that we have here at the facility, so he's familiar with how to -- how to go about doing audits. He's been with the facility for a long time, so it's pretty much basically the same kind of setup as we have audits here, so he -- he knows -- he should know how to conduct hisself and how to conduct an audit --

Q. Okay.

A. -- for the training here at David Wade, so --

Q. The audits at -- at Wade, who --

who's conducting those?
A. We have annual audits, headquarters conducts audits here; we have ACA audits. So it's all kind of the gist of the same thing, so you -- you all following basic -- you all guidelines and policies and procedures set in place for any institution, so -- and which he's over the whole division, so he ought to know the policies and procedures and -- and making sure that those policies and procedures are being followed, so --
Q. Okay. Okay. So you said that the audits happen annually. Is there anybody who is responsible for kind of making sure that those audits happen every year?
A. Yes. I mean, we have those audits every year. I guess we coordinate through -- with Megan. We set up a schedule anticipating an itinerary of conducting audits so every year, so --
Q. So you are doing that with -- with Ms. Wintz; is that right?
A. That's -- yes, ma'am. We have -- we normally at first of the year, we will give her a schedule of -- of our itinerary for the year.

Sometimes that changes. It's not necessarily, you know, permanent. We have to change because we have permanent job duties, so it could change at any time, so -- but we normally get an itinerary of when we scheduled to have an audit for each institution.

Q. And then it's -- is it sort of Ms. Wintz's responsibility to followup every so often to find out if the itinerary is changed, if you need to --

A. It depends. We notify her if we have changes on it or whatever.

Q. I'm sorry. Say that again.

A. I say we'll notify her if the dates change or whatever, when we going to reschedule, if we plan to go on this date or whatever. We'll keep her in the loop so the dates that we actually going to go and make sure that the audit's being conducted. It's kind of, you know, on us is when we do the audits, so --

Q. Okay. All right. So it's sort of -- it's kind of -- tell me if this is wrong. What it sounds like is it's kind of on you and I guess maybe also Colonel Malcolm to kind of figure out when -- when to get to each facility?

A. Yes. Because it's -- like I said, we have other job responsibilities, so yes.

Q. Okay. All right. And it's also kind of on you to -- to make sure that you're getting to every facility every year; is that right?

A. That's correct.

Q. Okay. All right. And then for the recertifications that happen every three years, who -- who keeps track of that?

A. Myself, Megan, be all -- if you're -- if you're a team leader, you're going to know; and she keeps a great record of when you go and every three years she'll let us know to re-cert or whatever. So we -- we kind of keep a monitoring of ourselves and along with Ms. Wintz, for whoever.

Q. Okay. How do -- how do you-all keep track of that, you know, okay, recertification is due?

A. We have a database, you know. If you do it annually, you know, it's kind of easy to track. If you know you did it annually two years, you know, the next Thursday is going to be a re-cert, so it -- it's kind of on the database.

You can go back and look at your reports, see the last time you did an annual, all the annuals you did, so -- and Ms. Wintz can keep -- she keep track of it and we keep track of it ourselves, so --

Q. And so on the database, that's the same database where the monthly activity reports go and that monthly activity rollup is; is that right?

A. Correct. Yes.

Q. Okay. All right. All right. So it's kind of -- it's on you to keep track of it, it's on Ms. Wintz. Everybody's just sort of trying to keep an eye on it, but there's no like automatic tickler system or something like that?

A. She has a database, I mean, a system where she jots it down. I can't tell you where it's at, but she has a system in place where she knows when you due an annual. You know, she'll send out the -- a schedule of all the audits that you've done and it compiles of when you did the last annual and did an audit or research, so it has that database somewhere in that system.

Q. Okay. All right. Do you know is that database called something, does it have a

name?
A. BJG database.
Q. Okay. And I know you said it's web-based, but does it -- does it live any particular place, like is there a -- I don't know
A. I cannot -- I -- I got it saved on my computer. I can't -- I mean, I don't -- I don't know this. All I know is BJG database that we go to and we access all that.
Q. Okay. And when you say it's saved on your computer, it's saved just like an app or is it saved as a -- like a tab in your internet browser?
A. It's the system that's in place in my computer.
Q. Okay. All right. So this is going to be sound granular, but it will help me understand what we are talking about.
If you're looking at like your computer desktop, is there like an icon that you press that takes you directly to that database?
A. Yes. I have one for myself, yes.
Q. Got it. Okay. All right. So it's not like you open up an internet browser and you -- and you go to it?

A. No.
Q. Okay. If you happen to be away from your computer, could you -- and you wanted to check something, would you be able to sort of type into an internet browser an -- an address and it would take you to that database?
A. I have no idea. I -- I do not know.
Q. Okay. All right. You -- you don't on do that? You don't access it that way?
A. (Shook head negatively.)
Q. Okay. But as far as you know, it's called the BJG database?
A. Yes.
Q. All right. Thank you. So you -- you think it might be possible that Ms. Wintz has some sort of system in place, maybe some kind of documentation of -- of like when audits and recertifications are due, but you're -- and you sometimes will get notices from her about when things are due; is that right?
A. No. I said we submit the things and we schedule our own audits because she don't know our schedule. So, like I said, we have a primary job, so we schedule it around our schedule. So we'll notify her when we are going; and if the

dates change, we will notify her. So she doesn't set the dates for us, we set the dates.

Q. Yeah. Yeah. I get that, but she knows in the course of a year like, okay, so Madison is up for its three-year re-cert and she --

A. Yeah. She knows -- she would know that, yeah.

Q. Okay. And now you were -- you were talking about sort of -- I understand you're kind of trying to pile this on top of what sounds like a very full-time job. So when you're planning a visit, tell me -- you look at your schedule first. Who else do you -- do you consult with to plan the date of that visit?

A. Colonel Malcolm because he has to have his schedule cleared in order to go with me to conduct this -- this audit, so I make sure his schedule -- there's no conflict with his schedule along with mine, so -- so he can go along with me.

Q. Okay. All right. And then once you-all get your -- your schedules cleared, do you -- do you give notice to the facility that you're coming?

A. Correct. We'll notify the facility and make sure the date doesn't have anything that's present at that time; and once we clear it with the facility, then we'll schedule that date and everything is set to go.

Q. How far in advance do you notify the facility?

A. I usually try to give them at least two weeks before I even, you know, try to go to that facility, at least two weeks or better --

Q. Okay.

A. -- in which, like I say, I send them an itinerary, a schedule; and if that date change, I'll let them know at least a month in advance if something is going to go -- not going to go on that particular date. So I give them a pretty good advance of notice before I actually go to a facility.

Q. Okay. All right. All right. And then do you request any documents prior to -- to going to the facility?

A. No, ma'am. I do -- I do ask -- before I go, I do ask about the fire marshal, health, and the potential incarceration inspection, make sure that they have a current

inspection, you know, make sure the fire marshal and all that stuff has been there before I do that. I make sure they have their documentation available before I get there. I do request that.

Q. But you're not asking that they send it, just that they make sure that they've got it lined up?

A. Correct.

Q. And the documents, do you review documents or records when you are onsite?

A. Yes. The documents that's in the files, in the BJG files.

Q. Do you know are those documents in the BJG files, are they pulled in advance and they are sitting waiting for you?

A. Most -- yes, ma'am. Most of the time, they will have files already pulled and ready and to be reviewed at the time of the audit.

Q. Okay. So you're not necessarily looking at how they are maintaining their filing system because everything is pulled out and kind of waiting for you; is that right?

A. Yes, ma'am.

Q. Okay. And how do you determine

which documents to -- to request?
A. We have a -- we have a -- what we call the annual report. I usually send that to them in advance, and it has a list of all the files that we will -- that we will be reviewing for the annual; and -- and that's how they establish how to pull what files to pull and what files to have ready at that time of that audit, so it's -- it's on the actual report that I submit to them.
Q. Okay. And at Madison, who would you -- when you would reach out to the facility to coordinate a visit, who are you coordinating with?
A. The warden.
Q. Okay. Do you know which warden?
A. Warden Stinson is the warden there, so Warden Stinson.
Q. How long has it been Warden Stinson; do you know?
A. Ma'am?
Q. How long has it been Warden Stinson; do you know?
A. I have no idea. I don't know that.
Q. Okay. All right. Do you recall any

warden prior to Warden Stinson that you would reach out to?

A. I think they had a couple of wardens since I've been team leader, so -- they had quite a few. I can't recall all of them. We have to go back and look at the files and records, but I've dealt with quite a few I think, I know two or three since then, so --

Q. Okay. And is Warden Stinson or, you know, whatever warden you were working with at the time, was he onsite when you came?

A. I required him to be there when we do an audit. I require the warden to be there. That's one of the things when I schedule it, it's around their schedule and make sure they are at the facility when we are conducting an audit; so that's one of my requirements to have the warden there present.

Q. Have you or -- or Colonel Malcolm or anybody that you've been, you know, monitoring with, have you ever asked for something that you couldn't get in terms of like records or documents?

A. Not that I can recall.

Q. Have you ever been denied access to

a log or a record that you've requested to see?

A. Not that I can recall.

MS. CUMMING:

Let me go to exhibit -- I -- I think we are on Exhibit 6 now.

(Exhibit 6 to be marked.)

BY MS. CUMMING:

Q. All right. Can you see that?

A. I see it.

Q. All right. So this is 61 pages. I'm just going to kind of scroll through and let you see the shape of this. This is a letter. It looks like it's to Sheriff Byrd to Secretary LeBlanc, but it's got you copied on it. And then there's a certificate and then here (indicated) it looks like this is a BJG Recertification Report for Madison Parish Correctional Center, Madison Parish Correction Southern Facility, and this is for -- looks like the inspection happened August 17, 2022.

Does this look like the Basic Jail Guidelines recertification report?

A. Yes, ma'am.

Q. Okay. All right. So this is the recertification. This is where you're going in

and you're looking at everything related to the Basic Jail Guidelines?

A. Yes, ma'am.

Q. Okay. All right. So all provisions of the Basic Jail Guidelines are assessed in that three-year recertification; is that right?

A. Our Basic Jail Guidelines, you talking about the files?

Q. Well, I guess, yeah, that's what I'm asking. So the Basic Jail Guidelines have a number of provisions. Are all of those provisions assessed in this recertification?

A. Yes, ma'am. All -- all the files that -- that they have in the Basic Jail Guidelines are -- are reviewed.

Q. Okay. So the files that they have, do they have to have files for every single Basic Jail Guideline provision?

A. Yes, ma'am. If it pertaining to that facility, yes, every file that's -- that's in that guideline.

Q. Okay. So every provision should have a file that's associated with it; is that correct?

A. Yes, ma'am.

Q. Okay. But for the audit, for the annual audit, it's not every single provision, right?

A. Correct.

Q. Okay. Do you know who decides which -- which Basic Jail Guideline provisions are assessed in the annual audit?

A. I don't know who -- who -- I don't know who decides that. I really don't know.

Q. And you don't know who's responsible for -- for figuring that out?

A. No, ma'am.

Q. All right. So I wanted to sort of look at a couple of these areas. Here it says concerns or issues from the previous Basic Jail Guideline monitoring inspection, and then it goes right into the table of capacity.

Does that mean that there were no previous issues from the last inspection?

A. So when -- nothing was put under there, so I guess that can be -- yes, I guess so.

Q. Okay. And let me ask this. Is -- do you complete this form or does someone else complete this form?

A. I put the information in on the

form.

Q. Okay. All right. And so we've got number of DOC offenders, local offenders, out of state, etc. Local offenders, is that referring to pretrial?

A. It could mean pretrial, parish or whatever, I'm assuming.

Q. Okay. So it's not necessarily people who are from Madison Parish. It could be -- you know, if you've got someone from Iberia Parish, if they are pretrial, would that be included in that local offenders number?

A. That's -- that's how they get that number. I'm not certain how they arrive at that number. It could be a different pretrial or parish offenders. I -- it could be I guess that, I guess so.

Q. Okay. So you're not sure how -- well, let me ask this. Where is this information coming from?

A. From -- coming from the institution.

Q. Okay. And you're not sure how they are -- they are compiling this information; is that right?

A. They are basically compiling it from

their count, their daily count of the day of the inspection. That's where they got those numbers from, from their count for the day of the inspection.

Q. Okay. But you don't know how they are counting local offenders; is that right?

A. No. I don't know how they count them, no, ma'am.

Q. Okay. What about DOC offenders, how -- do you know what that means?

A. I'm not understanding what you're saying.

Q. So we have got a couple of different categories of -- of people, so I'm just trying to understand who all is included. So who is included in DOC offenders?

A. They include the DOC offenders, they including the local offenders, those offenders that are listed on -- on this page. They are getting their count from that particular -- for that day.

Q. Okay. How is double bunked, how is that -- like what does that mean? How is that determined?

A. That means that it's in -- in a

dormitory, they have a double bunk, meaning it's two people in each bunk, so that's considered double bunking.

Q. Okay.

A. It's a two-man bed actually.

Q. Okay. All right. So it's stacked one on top of another?

A. Correct.

Q. Okay. And the single bunks, that's just like one bed, right?

A. Correct.

Q. All right. But it's not referring to -- to cell housing. This is referring to dormitory housing; is that right?

A. That's right.

Q. All right. Is there any -- we will get to restrictive housing in a little bit, but is there any -- is there any kind of cell block for, you know, people who are not on PC at, say, disciplinary at any of the Madison facilities?

A. I don't recall.

Q. All right. One question I wanted to ask. It looks like this is -- the facility names listed are Madison Parish Correctional Center, Madison Parish Correctional Southern Facility.

Is Bayou or Madison Parish -- or Madison Detention Center, is that subject to a different recertification report?

A. Yes. That's totally -- it's a totally different facility. Somebody else runs that facility. That has nothing to do with this facility.

Q. Got it. Okay. All right. So when you go out and you do your audit, you are doing Madison Parish Correctional Center and Madison Parish Southern Facility at the same time; is that right?

A. Correct.

Q. Okay. But when you do Bayou, are you doing that on a different day?

A. Correct.

Q. Okay. All right. Okay. So it's got a breakdown of DOC offenders who are in the dormitory and then it's also got people who are in restrictive housing.

How many people -- what does restrictive housing mean at Madison?

A. It means they are in a cell block setting.

Q. Okay. And do you know how many

cells Madison has?

A. No, ma'am, I don't.

Q. I'm going down to page 4 of this exhibit to Assaults. And this says "Please list monthly since the previous Basic Jail Guideline's monitoring visit," and it's got from August 2021 to July of 2022. You see where I'm at?

A. I see it.

Q. Okay. Who's responsible for putting together these numbers?

A. Normally, the facility compiles them once we get there and have them available for us.

Q. Okay. Do you know what the facility looks at to compile these numbers?

A. They usually look at their monthly reports that they submit monthly and get it from that number.

Q. Okay. Do you think -- do you take any steps when you're onsite doing the audit to confirm the accuracy of these numbers?

A. What I do, when I try to come back to the facility, I try to go back and -- I go back and kind of look at those numbers that they are compiling and to kind of get a -- see if they are giving us correct numbers or whatever, going

back and checking the database myself.
Q. So you are only looking at the monthly reports, right?
A. Correct.
Q. All right. Do you look at any records onsite, any logs or anything like that to -- to try and confirm that these numbers are correct?
A. No, ma'am. There's no particular log that they have onsite that I can look at to determine their numbers.
Q. Okay. We will come back to that. I mean, have you ever asked for -- to see if they have any kind of log or anything like that that would indicate the number of assaults?
A. Not to my knowledge, no.
Q. Okay. And up here (indicated) where it says Offender -- Offender -- well, "off/off" is what it says. Does that mean offender-on-offender assaults?
A. Offender on offender, yes.
Q. Okay. And this is -- this is without significant injury by implication, right?
A. Correct.
Q. Okay. Do you know does this number,

the numbers that they are listing here, would this include if there are assaults, you know, between people who are pretrial or non-DOC and DOC?

A. All those would be DOCs, but that's -- all those numbers are focused on DOC offenders.

Q. Okay. But if there --

A. Those are DOC -- those numbers are compiled for DOC offenders.

Q. Okay. So what happens if you've got a fight that happens between a pretrial person and a DOC person; do you know how that gets counted?

A. I don't know how the pretrial gets counted, but all of those numbers consist of DOC.

Q. Okay. But you see my question? If you've got a pretrial person and a DOC person involved in a fight, does that get counted as an assault or because it involves a pretrial person it doesn't get counted?

A. It counts the DOC -- a DOC offender, but not the pretrial because DOC's offender would be counted in there but not the pretrial. We only focusing on DOC offenders.

Q. Got it. Okay. And so if a pretrial person has a significant injury and is routed out because a DOC person attacks them, that's not going to get reported on this?

A. It will get -- it will get reported, but not on this form here it wouldn't. It wouldn't.

Q. All right. How would that get reported?

A. You have to ask the facility. I don't know how they report that, so I couldn't tell you about a pretrial.

Q. Would -- would it get reported to the Department of Corrections?

A. If they have a fight, yes. They'll report a fight with a DOC offender, yes, ma'am.

Q. Okay. But you don't know how they would report that to the department?

A. No, ma'am.

Q. Okay. And here where it says "significant injury," is significant injury the same meaning? Does that -- does that mean someone gets sent to the hospital?

A. Not -- not particularly. I mean, it's just he could get seen there at the

infirmary and -- and have a cut. That could be -- or they could stitch him there. That could be a significant injury; a cut on a lip, you know, so it can vary.

Q. Okay. All right. So it doesn't -- it doesn't require going to the hospital?

A. No, ma'am.

Q. Okay. All right. So I just want to make sure I understand what significant injury means. Does that mean like, you know if someone needs stitches, if someone needs to go to the infirmary or to go to the nurse; is that right?

A. Yes.

Q. Okay. And then for Offender Staff, does that include uses of force?

A. No. That could be an inmate assaulted a staff or an inmate hit a staff or something or threw something on the staff, so --

Q. Okay. I see. So it's --

A. Or he --

Q. I'm sorry. Go ahead.

A. I'm done.

Q. So I just want to make sure I understand. So this Offender Staff category, that's not if the staff hit an inmate. It's if

an inmate hits staff --
A. Correct.
Q. -- or does something -- got it. Okay. And when you're onsite, do you -- do you look at the number of trips to the hospital that they had to send people out on?
A. No, ma'am.
Q. Okay.
MS. CUMMING:
Just to, you know, dot my Is and cross my Ts, I'm going to show you Exhibit 7.
(Exhibit 7 to be marked.)
BY MS. CUMMING:
Q. This is like a medical tracking document, and I'm going to show you -- if I can get there, this (indicated) is the sort of the top of this spreadsheet; and it's got reason for service, it's got a little bit of a description of the injury, it's got the person's date of birth and the name, their DOC number, notes. Is this document -- does this look familiar to you? Is this anything you've seen before?
A. Well, I don't have -- I don't -- I don't really go to the extent of looking at that

kind of document. That's not in a BJG file, so I don't have any knowledge of that document.

Q. Okay. All right. And have you ever looked at what's called like a critical incident log?

A. I'm not aware of what you're talking about.

MS. CUMMING:

Okay. I'm going to show you what we are going to mark as Exhibit 8 just as an example.

(Exhibit 8 to be marked.)

BY MS. CUMMING:

Q. So you see up here (indicated) at the top, it's got critical incident. It's got report number and date and it's got a little description of, you know, what happened or like, you know, the nature of the thing.

I'll show you the five pages of this. Does this -- is this a document that you have seen before?

A. No, ma'am.

Q. Okay. All right. And then when you go onsite, do you ever ask to look at disciplinary reports like the schedule B and all

of that stuff?
A. They have some in the -- in some of the guidelines, they have reports in the guidelines. I look at those that's in the guidelines.
Q. Okay. Would that -- does that include, you know, like the specific reports that were made during that -- that auditing period that year on specific inmates or is it just sort of like a general form for disciplinary reporting?
A. It's a particular form for that year within the audit.
Q. So it's like a blank form?
A. Oh, it's -- it's actually a report of an incident, but it's not any particular. They just pick one that something -- an incident that coincide with the guidelines. It have to be for that year of 2023 or '24 or '22 or whenever we doing the audit. It have to coincide with that guideline for that year.
Q. Okay. So is it like -- like a sample disciplinary report?
A. Correct.
Q. Okay. How many samples do you -- do

they have to provide you?
A. It has to be -- every three -- every year, they have to have an example of each guideline. They have to have one -- just say, for instance, '22, '20 and '21 have to have a description of those RVRs for those three years.
Q. Okay. So when you say a "description," are you talking like inmate John Doe got written up, had a schedule B report?
A. Correct.
Q. And inmate John Doe, that -- that one goes into their -- their -- their file, Madison's file; is that right?
A. It's going to be the Basic Jail Guidelines files, yes --
Q. Okay.
A. -- for that year.
Q. So what happens if inmate Greg Smith is also written up, has a schedule B, would you also see Greg Smith's write up or are they just picking we are going to use John Doe's as the example write up and that's the one that we are putting in our Basic Jail Guideline?
A. They have to -- they don't have to put every single inmate file in that guideline.

They just put one particular incident that -- that applies to that guideline in the file. It doesn't have to specify every inmate that got wrote up for a Rule 21. You just give an example for a 21 and put it in the file and -- and make sure that they are following the guidelines. It's not putting everybody's file in the guideline.

Q. Okay.

A. Because if you had everybody's file in the guideline, the file would be that thick (indicated) and we'd be there all day. They are just showing that they are actually doing what they are supposed to do within those Basic Jail Guidelines.

Q. Do they only have to put one in example in for each?

A. Yes.

Q. Okay. When you were onsite, do you ever look beyond what they provide you as the example?

A. No, ma'am. I only look at what they have for the Basic Jail Guideline files, whichever -- whatever the Basic Jail Guidelines require, that's what I look for.

Q. Okay. So, but they -- but they pick what they are showing you in the Basic Jail Guideline file, right?
A. If they put it -- they are the ones putting it in the file, yes, ma'am.
Q. Okay. All right. And you don't look beyond what they choose to show you, correct?
A. What's in the file is what I check.
Q. Okay. Is there -- is there anything in the Basic Jail Guideline files for investigations to make sure that there is an adequate investigation when something happens?
A. Not that I can recall.
Q. Okay. I want to go back to I think what we are calling Exhibit 6. That's that 2022 recertification. Let me find it. There we go. All right.
So I'm still on page 4 and we are going down to, you know, general appearance, cleanness comments in the facility where it says "Team member spoke with several offenders in the dorms. Some of the offenders complained about recreation, some had issues with wanted to be transferred," and in the next one, "Team member

spoke with USC offenders who voiced negative comments about being placed in confinement." Let's, I guess, start with the dorms. How were people selected to speak to?

A. Normally the team leader will walk around and they will just randomly pick inmates. I mean, it's no particular way we do it. We just randomly pick guys or whatever. It's no particular order how we do it. We just talk to individuals in the dormitory.

Q. Okay. And that's -- that was my next question. Where do those conversations take place?

A. Wherever; bed area, wherever they want to. You know, a little privacy where they can talk to you and talk about whatever issues that they may have.

Q. Okay. So do you know are they -- is someone like going off the -- the dorm with the -- with the team member or are they staying on the dorm; do you know?

A. It varies. I mean, if one's saying he wants to talk to you in private, sometimes the team member will take him outside the dorm and talk with him or he'll take him to the bathroom

area where there's some privacy if he's got something he wants to address or whatever, you know. But, you know, most of the time we walking -- they are walking through the dormitory talking to individuals and they'll explain their problems or whatever, you know. It varies. I mean, there's no particular way that we do it, but we try to give them a chance to express theirselves or whatever, so, I mean, it varies.

Q. Okay. And then when you're talking to -- to someone, is MPCC staff within earshot?

A. I mean, they be in the dormitory with us at some point, but, like I say, if -- if one say he want to talk to someone in private, he has that opportunity to do so.

Q. And so the issues of wanting to be transferred, is there any documentation of -- of why people were saying they want to be transferred?

A. A lot of them -- no, ma'am, but a lot of them holler geographical, they too far from home, you know, things like that, and -- and they -- a lot of them just want to know how to go about putting in information to get transferred a lot of instances; and we just tell them how to do

it, how to go about doing it. So it's various situations, varying different things, so you just kind of give them insight on how to do that.

Q. What do you tell them about how to go about getting a transfer?

A. Tell them to fill out a geographical transfer, get with the warden and submit a letter to the warden and let him know, you know, the reason of being why you want to be transferred and things of that nature, just try to give them knowledge of how to do it, go about doing it.

Q. Okay. And then for the rec time, how were those -- were those complaints investigated?

A. We have to go back and look at the -- the recreation documentation.

Q. Where is that documentation?

A. They normally log it. I think they -- I'm not quite sure, but I think they log it in on the computer system. We go back and check the database on it, make them print it out or go through the logbook and kind of identify if they have been going out on the yard through the log in and they -- and they identify it through the logbooks or whatever they have in place.

Q. Okay.
A. And also talking to the warden and making sure that, you know, they are getting yard and rec time.
Q. Is that something that -- like that logbook, does that -- is that going into the -- into one of the folders for the Basic Jail Guideline provisions?
A. Yeah. They do have a copy of the -- of documents showing that they do take them out. It's one of the documents that require there to be BJG guidelines showing that they are getting yard and rec, so that document should be in one of those files.
Q. Uh-huh (affirmatively). Okay. And then there's the discussion about the comments when are being placed on confinement for their actions. Is there any documentation of kind of what the specific complaints were?
A. I can't recall that because I didn't do the walkthrough. I can't really comment on that.
Q. Do you know did anybody look into the concerns that were being voiced?
A. As far as the confinement?

Q. Uh-huh (affirmatively).
A. The members that kind of walked around, they kind of question it and refer to it in the closeout. We always talk to the warden about the confinement and the actions or whatever. I think a lot of them complaining basically being locked in confinement, which all of those are DOC offenders; about the food, basically they wasn't getting enough food, and we make sure that that's not going on, so --
Q. How did you make sure that wasn't going on?
A. I'm making sure that they -- the logs of serving food. I mean, they have to have an accurate log of showing when they serving the chow or whatever, and then we stayed there. Some days we have time to monitor the food meal. We try to monitor it on the day we doing auditing, so make sure that they are actually, you know, following the procedure and giving out food. So they have to have documentation showing that they are issuing the food there and what time the meals are being served.
Q. Okay. Then do they talk about like they have been in confinement for a really long

time, that they didn't have any way of getting out, that they didn't have a way to get in front of a disciplinary board, anything like that?

A. Not to my knowledge. I don't recall.

Q. Okay. I want to turn to the classification section, but before I get there, I just want to kind of get some -- some general information.

What is your understanding of what a classification system is?

A. A system set in place when an offender, an inmate is received in a facility, he's classified through by his gender or any kind of enemies or whatever. They look at it and see based off of that, all that, all those criterias and where to place the offender in a particular area.

Q. Okay. And so why -- why is that important?

A. For the inmate safety as well as the stability of the institution.

Q. When you are doing an audit, either a recertification or an annual audit, are you reviewing the classification system?

A. I look at the documents in the file.
Q. Okay. What documents are in the file for classification?
A. The classification documentation, the intake paperwork, what they normally do when they do intake.
Q. Okay. Are you looking at anything else, like, you know, if there's any kind of reclassification that happens after an incident, anything like that?
A. I'm basically just looking at the documentation that the Basic Jail Guidelines request. That's -- that's basically what I look at.
Q. So and do you know what -- what are the criteria for a classification system under the Basic Jail Guidelines?
A. I have to look at the policy itself. I can't tell you right off the top of my head, so -- I don't have it at hand right now, so I can't just tell you what all it requires or required with that facility.
Q. Okay.
MS. CUMMING:
Yeah. Let me show you what will be

Exhibit 9.
(Exhibit 9 to be marked.)
BY MS. CUMMING:
Q. And I can show you the Basic Jail Guidelines classification, but I think this captures it. This is a checklist is my understanding of it. And here I'm looking at this top part where it has Classification System, and it's got "Written policy, procedure and practice provide for a written offender classification plan," etc. Do you see where I'm at?
A. I see.
Q. Okay. Does this look like the Basic Jail Guideline provision on classification?
A. Yes, ma'am.
Q. Okay. All right. And so here (indicated), it's got a couple of things that the offender management and housing assignment must consider, which is age, gender, legal status. "Legal status," what does that mean?
A. That means if he had any kind of law enforcement, I'm assuming, or attorney or anything of that nature, you probably wouldn't want to put him in an environment with people

that's not in that -- in that status.
Q. Okay. Do you know does that also capture, you know, if you are sentenced versus pretrial; would that also be legal status?
A. I have no idea as far as pretrial. I can't tell you that.
Q. Okay. And then "custody needs," what would custody needs be?
A. That means if it somebody handicapped or whatever, they need to be in a handicap accessible setting, something that's -- that's handicap accessible, any -- any kind of need that they may need to accommodate their disability.
Q. And what about "special problems and needs"?
A. That too as well.
Q. Okay. And "behavior," what does that mean?
A. Behavior?
Q. Uh-huh (affirmatively).
A. I'm not understanding what you're saying. What you say?
Q. What does that mean in this context?
A. Behavior?

Q. Uh-huh (affirmatively).
A. I'm not -- I don't know. I don't know.
Q. Okay. And then an "objective classification process," what is your understanding of what an objective classification process is?
A. Objective process, that means that -- objective means that you put them in a place where they are suitable to live, I mean, you know, an environment that -- that accommodates, you know, whatever status that they qualify for in that area.
Q. Okay. And then down here (indicated), it -- and so it looks at you are identifying the appropriate level of custody, housing assignment, eligibility to participate in programs.
What is your understanding of what "level of custody" means?
A. General population or whatever. I mean, that's -- that's basically I think the custody level that they talking about; general pop, medium or max custody, in that line of defense I guess.

Q. All right. And then down here (indicated) where it says "protocol," what is -- what is that -- does protocol mean?

A. It means that you have a policy in place for that particular guideline.

Q. Okay. So is this -- what's listed under protocol, is that what would be in the folders that you are talking about?

A. Correct. They have a policy, written policy and procedure in place.

Q. Okay. So they have got a written policy and procedure, they have got classification forms and formats.

A. Correct.

Q. What -- what's -- what is a format, what does that mean?

A. I guess that's the format of the form. I mean, they have a format of the form set in place for the classification, how to identify that form. That's -- that's basically what it's talking about, the format of the form isolated out, what they expect on the forms.

Q. Okay. And then offender handbook is pretty self explanatory, offender orientation materials, and then "classification plan," what

is classification plan?
A. That consists of a plan of orientation of inmates.
Q. So what does that look like?
A. It reflects the -- the policy.
Q. Okay. So you're sitting there and you have the Basic Jail Guidelines folder in front of you and you've got your policy. We are going to go over that in a second. You've got some classification forms, you have the handbook, you've got some orientation materials, and then you get to a document that is the classification plan. What is on that classification plan?
A. Classification plan is where they plan to -- I guess it identifies where they plan to house the inmate, you know, that -- you know, that particular inmate, where he's going to be housed.
Q. So are you talking about a particular person, but is there a general classification plan that is inside the -- the -- the guideline form or is it only that they pick one specific example and that's what you're looking at?
A. I'm not understand -- I'm not

following what you're saying.
Q. I guess I'm trying to understand is -- is a classification plan, is that a plan for the whole facility? Is that something that they write out and they talk about how they are going to develop and implement the subjective classification process, what that objective classification process looks like?
A. Basically, yes, ma'am.
Q. That's it. Okay. So tell me when you are looking at a classification plan, what is on that?
A. Layout where they are going to house the particular offenders that they identify that within the specific custody level, so that's basically what you are looking at, wherever -- you know, is it general population or is they going to be housed in particular housing, what plan do you have for these particular inmates, where are you going to place them. That's basically what you are looking at, so --
Q. So are you looking at like a full roster of everybody that's in the facility and then --
A. No, ma'am.

Q. Okay.
A. I'm not looking at the full roster.
Q. What are you looking at then?
A. Just looking at the policies and procedures that they have in place for those type behavior offenders that they have in place and how you plan to place those offenders.
Q. Okay. Got it.
MS. CUMMING:
So let me -- this -- this might help. So I want to turn to Exhibit 10, which is the policy.
(Exhibit 10 to be marked.)
BY MS. CUMMING:
Q. This is Exhibit 10. This is -- says Warden, Arthur Anderson; Chris Stinson, Assistant Warden. It's the Madison Correctional, Southern Correctional Center; and this says it's the Offender Classification & Trustee Assignment.
Is this the classification policy that's in the -- that's in the Basic Jail Guideline file that you looked at?
A. It probably have changed. I mean, they got a new warden, so they probably made a change to identify some different stuff. He

might have changed some things up, but at that time, probably so, yes.

Q. Okay. All right. So this is the policy that you looked at at some point when you were doing an audit?

A. Correct.

Q. Okay. All right. And is there a separate document that reflects the classification plan on how they are going to implement this policy or is this also the plan?

A. I guess that's the plan. I'm not sure. I'm not understanding really your question, so I guess that's the plan. That's -- that's dealing with trustee status inmates, geared more towards that I think. I'm basically lost with -- with your question. I'm really confused. You got me confused, so I don't understand what you're asking me.

Q. Okay. All right. And I don't want to confuse you, so I want to -- what I'm trying to figure out is we've got -- with protocol, you expect to see everything that is written in this protocol, written out here. You expect to see that in the file that Madison presents you for, you know, compliance with this classification

system; is that right?
A. Correct.
Q. Okay. And so we have got the policy that we were just talking about in Exhibit 10. We have forms and formats, so those are the forms that they are using. We have got the offender handbook. We have got an offender orientation materials. All of those things I think are self explanatory. Did you see all of those things in Madison's file?
A. Yes, ma'am.
Q. Okay. And so the question I have is what is this thing, what is this classification plan?
A. The classification, I think the plan is as far as trustee status, like you showed the offenders that are qualified to be able to qualify for the trustee status like the ones -- the maintenance workers and all that. Those are the type of classification plans I think you are asking about. That's -- that's basically what the plan is, classification plan. They are utilizing those offenders within the institution in those particular areas and making sure that they are qualified for the -- for that particular

job.

Q. Okay. All right. So if you are -- you're looking -- it's a sheet of paper; is that right?

A. Yes, ma'am.

Q. You're looking -- imagine you are looking at that sheet of paper. Tell me what the various fields, how is information organized on that sheet of paper?

A. I have to have the form in front -- in front of me. I can't tell you right off. I have to have the form. I mean, I have to have the actual form, and I don't have that in -- in the documentation within itself. I don't have it at hand, so --

Q. Okay.

A. -- I actually can't tell you right off.

MS. CUMMING:

All right. John, I'm going to direct this at you. I've asked Brad and Eli for the classification plan every single way I know how. I still haven't gotten anything that looks like a classification plan, so please tell them

to give it to me, if it exists.

MR. RYLAND:

I will pass it on.

MS. CUMMING:

So, I mean, and Evan, I think to you, we've asked for sort of the underlying information that was relied on in the Basic Jail Guideline audit, so if the Department of Corrections has custody of the Basic Jail Guideline files that -- that Mr. Mays is referring to, then those would be responsive to our discovery requests and we would ask that you turn those over as well.

BY MS. CUMMING:

Q. Okay. All right. So, but this checklist, just to sort of close our loop on that, this checklist is sort of what you were looking at for the file. Like you are -- you are trying to determine that they have all of these things on this checklist; is that right?

A. Say that again.

Q. I'm just -- this Basic Jail Guidelines checklist, when you go onsite and you are doing an audit, you are trying to make sure

that they have all of the things listed on this checklist; is that right?

A. Yeah, on the Basic Jail Guidelines, yeah --

Q. Okay.

A. -- on the Basic Jail Guidelines.

Q. Got it. Okay. And down here where it talks about documentation, it says offender housing records, offender classification records. Is that information that you are looking at?

A. Yes. I make sure they have those in place, yes --

Q. Okay.

A. -- offender housing records.

Q. Okay. How -- how do you make sure that you -- they have those in place?

A. I basically look at it and make sure they have information as far as each year, documentation showing that the three years of records is there in place of the housing records, and then also the same thing vice versa with the offender classification records.

Q. Okay. So is this -- is this another example of where the -- of Madison will pull an example of a housing record and an example of a

classification record for each year?

A. Correct. Correct. That's right.

Q. How many examples does Madison pull of -- for each year of housing records and classification records?

A. They have to have a demonstration for each year for three years.

Q. For let's say 2020, how many do they have to pull for 2020?

A. They just have to show that they are actually doing it for the year of 2020 and then they'll do it for 2021 and 2022.

Q. Okay. So let's stay focused on 2020. How do they show that they are doing it?

A. By putting it in the file.

Q. What do they put in the file?

A. A copy of the offender housing record.

Q. And how -- so is it a specific person? So it's John Doe's offender housing record; is that right?

A. If they submit -- well, I mean, as long as they got documents showing that they actually putting in the records, doing it, showing that they are -- they don't have to put a

specific inmate, but they have to show that they are -- it could be his, John Doe. If it happened in '21, put it in the file, make sure that they are actually doing what they are supposed to do within the guidelines.

Q. Okay. So my question is how many -- they could -- they could put in the record the offender housing record and the offender classification records for John Doe. They could do everything perfectly for John Doe. They could not do that for, you know, the -- the 700 other people that they have.

Are you looking at the other 700 records or a sample of those other 700 records or are you only looking at the one record that they provide to you?

A. I'm looking at the record that they provide for me.

Q. Okay. How many records do they provide for -- we are just taking one year. For 2020, how many records do they provide to show you that they are doing this?

A. I really don't recall. I'd have to look at the files and actually see. I can't recall that. That happened in 2020 -- 2020. I

can't recall.

Q. Well, okay. For 2022 or 2021 --

A. I can't recall whether they have the form in the record.

Q. Okay. All right. Does anybody -- all right. I'm -- okay. And down here, it's got -- it looks like it's staff's signature, then it's monitor's signature. The staff is doing its own evaluation to say if they are in compliance or not and then the monitors or giving the date of inspection and then listing deficiencies.

Is this -- what happens with this document? Is this like attached to the recertification; is it -- well, yeah. Just tell me what happens with this document.

A. That document is attached to the BJG file and it's -- it's in the file. And once we check the file to make sure all the documentation and supported documentation in there, we -- we check off on the list whether it's compliant or noncompliant or if it had any deficiencies at the time during the actual audit.

Q. Okay. So this goes into what you are calling the BJG file. That's the same file that the facility is putting together with all of

its documentation to show that it's complying with the Basic Jail Guidelines?

A. Correct.

Q. Okay. What happens to that, to those files when you -- when you finish your audit?

A. They turn it back over to the facility and they lock them up or wherever they place them to store them.

Q. Does anybody at the Department of Corrections see this guidelines checklist once you've -- you've completed it and signed off on it?

A. No, ma'am, not -- not this checklist. I mean, if there's a discrepancy in that, I'll make a documentation on the actual -- the -- the BJG guidelines questionnaire paper that I fill out. If there's a discrepancy, I make a notation on the report of that.

Q. All right. Okay. All right. So you filled this checklist out, but this checklist belongs to the facility ultimately; is that right?

A. Correct.

Q. Okay. And so there is a Basic Jail

Guidelines checklist that goes in with all of the Basic Jail Guidelines folders and that stays at the facility. No one at DOC ever gets custody of that or touches it; is that right?

A. They come and review it, they have custody of it. I mean -- they come to the facility and review the files, they have -- they can check it.

Q. Okay. But no one takes it offsite. It always stays at the facility; is that right?

A. Correct. It stays with the file.

Q. Okay. All right. I did want to go back to the -- this 2020 -- well, no. That's the wrong one. Let's -- that will be the next.

This is the 2022 recertification. Just going back up to the top, it looks like the last time that there was an inspection was in 2019 and then this next inspection is 2022. Is that -- were there audits that happened in the meantime between 2019 and 2022?

A. That was kind of the COVID, so we -- we wasn't allowed to go and do audits at that time.

Q. Okay. Was there any effort to try and do like remote audits, to have the facility

send you the files and, you know, look -- look at things like that?

A. At that time, ma'am, we had issues here. We couldn't -- we had -- we were dealing with COVID, so, I mean, it wasn't no -- I'm dealing with my facility and with COVID, so it was kind of a time that we had to just kind of check in, touch basis through phone conversations or whatever, but we didn't do any audits within that timeframe.

Q. Okay. All right. And then here (indicated), it lists -- it says "Please list monthly since the previous monitoring visit," but this only goes back -- I'm sorry. I'm looking on page 4 in the Assaults. This only goes back to August 2021.

Can you tell me which -- is there some place where this information is -- is included? Well, let me ask this. Do you know why this doesn't go back to 2019 when -- which was the date of the last inspection?

A. We -- we went back a year, a year's -- as you notice all the spaces, a year's time on those slots, so we went back to as far as 2021. Now, those monthly reports were still

being submitted, but we just went back to the -- back from the years 2021 to 2022. We looked at those dates.

Q. All right. And I just want to make sure that I understand. Audits, annual audits didn't happen in 2020 and 2021; is that correct?

A. You might be correct.

Q. But you're not sure?

A. I'm not sure, because, like I said, that was the time -- if it was during the time of COVID, you possibly correct.

Q. Okay. And to the best of your knowledge and recollection, audits only started back up in 2022; is that right?

A. To my recollection, I think so, you're right.

Q. Okay. All right. So I want to go down. So there was no effort to sort of attach the other assaults that were being tallied or reported in the time when the audits weren't happening; is that right?

A. It was reported. It was on the monthly report, so you can refer back to those.

Q. Okay. All right. I want to go down -- well, let me -- let me pause here.

So we have gone through that classification checklist. This -- we are on page 5 of Exhibit 6. This says Classification System. It says "Does the facility have any trustees that work outside the secure perimeter. If yes, what is the classification?"

So this is dealing almost entirely with trustees working outside of the perimeter; is that correct?

A. Yes, ma'am.

Q. All right. Is there anything in this audit form that deals with classification for people coming into the facility, making -- making sure that that Basic Jail Guideline is being followed?

A. I'm not understanding. What is your question?

Q. So this Classification System section, it looks like the only question here really is dealing with whether or not the facility has trustees working outside the secure perimeter, correct?

A. That's what it says, yes.

Q. Okay. And so my question is, is there any other place on this form where you as

the monitor, the auditor are looking at and reporting on whether or not the facility is following the Basic Jail Guideline provision on a classification system beyond just the trustees?

A. That's -- whatever's on that form, that's what we look for, nothing else.

Q. That form, this is the -- the checklist, right?

A. That form is the checklist. That's what we basically look at.

Q. Okay. So this is Exhibit 9. So that's what you look at. So this checklist doesn't go back to the Department of Corrections, correct?

A. You talking about this form?

Q. Yeah.

A. No. I already said it doesn't. It stays with the facility.

Q. Okay. And so my followup on that is what -- what gets reported to the Department of Corrections that captures the facility's compliance with -- with this provision II-A-012?

A. The report, the report that I do.

Q. Okay. And the report that you do, is that what we have been looking at in

Exhibit 6? Let me see if I can get there. We are back on Exhibit 6. So the report that you do is -- is this, correct?

A. Correct.

Q. Okay. And so here in the report, the only question that is being asked is -- is what we are seeing here, right, about trustees working outside the secure perimeter?

A. Yes.

Q. Okay. Is there more information that captures the question of whether or not age, gender, behavior, all of the other things that are listed in that -- that provision, is there anything that captures whether or not the facility is complying with that?

A. That's the information within the Basic Jail Guidelines of that guideline.

Q. All right. I'm asking what you report to -- what DOC gets back based on your audit. Is this report, this --

A. Yes, ma'am.

Q. Sorry. Let me finish the question.

Is this monitoring report the only thing that you send back to the Department of Corrections?

A. Yes, ma'am.

Q. Okay. They get nothing else?

A. The report and the -- the other document, the fire marshal, health inspection, other requirements. The other attached documents to that report there, that's what they get.

Q. Okay. All right. And attached to this recertification report, there is, it looks like, kind of a matrix of provisions of Basic Jail Guidelines provisions and then like a section called Your Findings. Let me see if I can reorient this. That's easier to read.

So it's got the provision, it's got the findings, and then it's got a space for a response. Is the response -- who is the response coming from?

A. That would be coming from headquarters maybe, that they have a response to any of the -- anything that I might find, they'll put a response at the ending of it.

Q. Have you ever gotten a response from -- from headquarters?

A. I probably have, but I -- I probably have. I can't recall, though. I mean, I probably have.

Q. How do you receive responses from headquarters to your reports?
A. Through e-mail basically. Probably through e-mail.
Q. Do you recall did you get any responses from headquarters for this 2022 report?
A. I don't recall.
Q. Are you the one that's responsible for putting together the findings column of this matrix?
A. Yes.
Q. I see there are a couple of places where there are, you know, looks like just typing too fast kind of typos that are circled in blue. Do you know who circled those?
A. Probably Ms. Wintz.
Q. Okay. And so would Ms. Wintz go through, check for typos and send stuff back to you?
A. Yes, ma'am.
Q. All right. And after you send this -- when you send this report, do you know who at headquarters reviews it?
A. Ms. Wintz and probably whoever else. After she gets through reviewing it, it probably

whoever next in line to review it after her.
Q. Okay. Do you know who the next in line would be?
A. No, ma'am.
Q. All right. And do you know what they are reviewing the reports for?
A. The findings that I may have found at the facility, any discrepancies or whatever.
Q. Okay. Have you ever found Madison Parish, any of the facilities in Madison Parish not compliant with any of the Basic Jail Guidelines?
A. I probably have over the years. I mean, I probably have. I mean, it's --
Q. Do you recall when that would have been?
A. No, ma'am.
Q. Do you recall which provision you would have found them in noncompliance with?
A. No, ma'am.
Q. Well, you said you "probably have." What do you base that on?
A. I mean, every facility, I probably -- I've had some -- some noncompliance. Maybe they didn't have a document that -- that

was in place or it could be maybe the bathroom wasn't clean enough, mold or something in the bathroom or they had to get it fixed, cleaned. I had to come back and -- maybe it was one of the locker boxes that they not supposed to have or a fire marshal inspection discrepancy, it wasn't up to par. So it can vary from any facility. It -- you know, but, like I say, I can't recall any instances at this time, so --

Q. And when you -- when you found something was in noncompliance, what -- what happened after that?

A. Give them an opportunity to correct it and come back and make sure it's been corrected and -- and addressed.

Q. Okay. Do you complete this matrix for every recertification visit?

A. Yes, ma'am.

Q. Okay. How long has this -- you know, what I'm calling the matrix, how long has that been the format?

A. How long this form takes to fill out?

Q. No. How long has -- like has this always been in place as the form that you use

when you do recertification visits since you became team leader?

A. Yes, ma'am.

Q. Okay. And then for the annual audits, do you complete something like this?

A. Annual is -- it's not as informative as this. It has -- it's through a file and it's not every file, so -- but it does have -- it's a different template then this template.

Q. So it's not kind of like this matrix template, it's different?

A. Yes, ma'am.

Q. What -- what does the annual audit look like?

A. Kind of like the recertification.

MS. CUMMING:

Well, let me show you this, which we will mark as Exhibit 10 or, sorry, 11.

(Exhibit 11 marked and tendered.)

BY MS. CUMMING:

Q. All right. This is from 2019. It looks like there was a previous inspection in 2018, and it looks like it's -- I'll show you the six pages. It looks like it's --

A. That's the annual audit.

Q. This is the annual. Okay. But there is no attached matrix or anything like that like you have with that recertification?

A. No, ma'am.

Q. Okay. Okay. So the annual is just sort of this first part, and is there -- let me ask this. Is there anything attached to the annual audit?

A. Fire marshal health and detention incarceration inspections.

Q. Okay. And so in the annual audits, the only discussion of the classification system is, again, this question about trustees that work outside of the secure perimeter; is that right?

A. Yes.

Q. Okay. So for this -- let's stay on this 2019 audit. Did you -- did you conduct this audit? Look up at the top.

A. Yes, ma'am.

Q. And I want to go down to Assaults. It looks like in February of '19, there were 45 offender-on-offender results it looks like without serious injury. Do you know did anybody look into why this spike?

A. Probably did. Back in '19, probably

so. I mean, I can't recall, but we probably did check into it.

Q. Where would that be documented?

A. Like I say, I don't know. That's been 2019. I couldn't really tell you. We probably did go in and investigate or did something.

Q. Would there -- would there have been any kind of report? Would there have been any kind of record or documentation that you looked at this?

A. Maybe talked to the warden and got classification onto what it is. I mean, that could be just a simple fight, a lot of fighting went on. I mean, it ain't nothing significant. It could have been a lot of fitting going on or it could have been just spitting or anything. It can identify with anything, so it probably was addressed and, you know, at that time. But, like I said, at that time, I think COVID had hit and so it could have been a lot of things that triggered that. I can't recall the exact information on that.

Q. And there is no place that you would have written down what -- what steps you took;

there is no place that you would have written down what your findings were; there is no place that anybody would have documented that you took any steps to look into this?

A. I can't recall.

Q. Okay.

MS. CUMMING:

All right. Can we take -- I think we are pretty close, but can we just take like ten minutes? I want to talk with my co-counsel and make sure we are -- we are cleaning up.

MR. ALVAREZ:

Sure.

(A short recess was taken.)

BY MS. CUMMING:

Q. So just a couple of questions. Are you -- I know that you were doing this work as team leader on top of your regular full-time job. Are you compensated for this work that -- that you take on as a team leader?

A. You said am I compensated for this?

Q. Yes.

A. Yeah. They have a little compensation that they give, a little incentive.

Q. Okay. How much is that?
A. Like 5 percent.
Q. So 5 percent of your usual salary?
A. Yes.
Q. Okay. All right. And then when you were sort of going and doing the audits with the previous team leader, did you receive compensation for that?
A. No, ma'am.
Q. So you only received compensation when you became team leader; is that right?
A. Correct.
Q. Okay. And when you became team leader, did you have to go through some sort of approval process with your warden?
A. Yes, ma'am.
Q. Okay. What was that approval process?
A. He have to -- well, he have to send it to headquarters and he will submit -- submit it to headquarters and they approved for me to become a team leader. So I don't know the gist of what kind of documentation that he sends, but it has to be approved through headquarters in order for me to be a team leader.

Q. Okay. And do you know who at headquarters has to approve you?
A. Not -- not at that particular time. I don't know.
Q. Okay. And do you know what they were looking at to -- to approve you?
A. I guess my experience and -- and the ability to -- since I've been working here for this X amount of years and in -- in -- in my field, so I guess they wanted somebody to know kind of what they are looking at and then what they are going to be doing as far as Basic Jail Guidelines, a qualified applicant, I guess, somebody that knows the ins and outs in how to run the DOC facilities basically.
Q. Okay. Did you go through any kind of interview process with anybody at headquarters?
A. No, ma'am.
Q. Did you go through any kind of interview process with Warden -- I think it was Gruber?
A. Goodwin.
Q. Goodwin.
A. Yeah. He did -- from day one when I

started, he did my interview process.

Q. When you started, okay, but not when you were going through that team leader appointment process?

A. No. He went off of the experience that I had here and -- and the ability to run this facility, so --

Q. Okay. And I'm just confirming. Do the Basic Jail Guidelines apply to Wade?

A. Not just Wade, it's several other people within the institution, Department of Corrections that does this job, so it's not just pertaining to Wade.

Q. Yeah. I'm just asking your -- your experience at Wade, I'm just trying to understand. When you were at Wade, are you -- are you interacting with the Basic Jail Guidelines and having to apply them or do you have other standards that you need to apply?

A. No. We have other standards.

Q. Okay. All right. And then for Colonel Malcolm, when he started going with you to do the audits, was he getting paid?

A. Not as a member.

Q. Okay. Do you know is he getting

paid as a team leader?

A. All team leader -- all team leaders get -- get a percentage.

Q. Okay. Is it the same percentage?

A. Yes, ma'am.

Q. Okay. So all team leaders get 5 percent additional of their salary?

A. Correct.

Q. Okay. All right. And when Colonel Malcolm, when you were getting Colonel Malcolm to be a member -- well, I guess for anybody that was a member when you were going to do audits, did you have to go through any kind of approval process?

A. With Warden Goodwin.

Q. Okay. What was that process with Warden Goodwin?

A. Kind of he will -- I let him know who -- basically who I was going to take as far as -- as a member and he would approve it for them to go along with me; so basically he'll have to approve them and to actually go with us to do the audits.

Q. Okay. And so that was basically like Warden Goodwin had to approve it because

they needed to maybe have -- have some time off to go actually do these audits, right?

A. Correct.

Q. Okay. Did anybody at headquarters have -- have to approve who -- who you brought as a member?

A. No, ma'am.

Q. And then for when Colonel Malcolm became a team leader, do you know how -- how that approval process worked?

A. He probably went through the same process as me. Warden Goodwin talked to him and followed the same process I did as far as becoming a leader.

MS. CUMMING:

Okay. Thank you. Okay. I think that concludes for us. We appreciate your time, Warden Mays. Mr. Alvarez or Mr. Ryland may have some questions for you, so I'll tender.

MR. RYLAND:

I have no questions.

MR. ALVAREZ:

I actually have some.

EXAMINATION BY MR. ALVAREZ:

Q. Warden Mays, earlier we were talking about the monthly reports, which I think were submitted to you by local jail facilities; is that correct?
A. Yes.
Q. Okay. And in those monthly reports, it has numbers in terms of the amount of certain events that may occur at those local jails such as escapes or fights or assaults?
A. Yes.
Q. Okay. And -- and at some points in time, I understand from your testimony that maybe some of these facilities are no longer -- or those reports are no longer coming to you; but how many -- around 2020, 2019, how many facilities were you getting reports from? I guess how many facilities were in the northeast region?
A. As far as probably about '19, I probably had about 18, would have been 18 facilities --
Q. Okay.
A. -- that I was receiving these reports from.
Q. And you're taking those reports and

you are the one that was making quarterly reports based upon those monthly reports?
A. Correct.
Q. Okay. So when you are doing these quarterly reports, you are kind of getting numbers from different facilities, and -- and are you able to compare numbers from different facilities?
A. Yes. If -- if I'm looking at those reports, I can.
Q. Okay.
A. You know, it's a compilation of all the facilities together.
Q. Okay. And I guess how long were you doing this in terms of looking at these reports? How long were you in the position of Basic Jail Guidelines lead?
A. I've been doing it since 2017, so going on about six or seven years, so --
Q. And I guess in terms of you're getting all these different numbers from these different local jails, local jail facilities, at any point in time -- and I'm referring to Madison Parish, Madison Correctional Center -- did the number of assaults being reported at Madison

Parish when compared to other facilities, did anything ever jump off the page to you in terms of the amount of numbers being reported?
A. Not really. Not really.
Q. So -- so when you're getting these reports of, let's say, assaults from -- from different local jail facilities, did you -- am I understanding correctly that basically you found Madison Parish in line with maybe the reports that were coming in from other jail facilities?
A. Yes, sir.
Q. Okay. What would -- would have happened if, let's say, you -- you see a report and just a number looks odd to you, you know, looks like why a number may look exceptionally high; what would you do in that situation?
A. I would notify that institution and kind of see about what's actually going on and kind of -- kind of get an understanding of what they have going on at the facility and -- and -- and just try to correct that and see what we need to do to correct that problem --
Q. Okay.
A. -- at that facility.
Q. And then how would you do that? How

would you contact that local facility?
A. I would -- first, I would call the warden. I would get with the warden at that facility and -- and, if need be, I would go to the facility and -- and kind of talk with them and investigate or whatever. Whatever process that -- that needs to get the situation under control, that's what we would do.
Q. Okay. Is it abnormal for there to be fights or assaults in?
A. No. No, it's not. In this line of business, it's going to happen. It's just how you respond to it, so --
Q. If I recall from your testimony in terms of these annual audits or the -- the recertification inspections that you-all do every three years, do -- do I recall correctly that during those you actually talk to inmates?
A. Yes, sir.
Q. And you do that both for the annual and the three-year?
A. Yes, sir.
Q. And -- and you said that you're the one that randomly picks who to talk to?
A. Well, the team does. We -- we just

-- normally, if -- we don't -- we just -- if an inmate come to us and he want to talk, we talk to them. We make sure that if the inmate -- the information that they want to give us, they give it to us.

We -- we just walk through the dorm, and somebody say I need to holler at you-all. You know, we just randomly pick them, ask you want to talk and let them express what they have to say, so --

Q. So do you know who these people are ahead of time when they come up and talk to you or --

A. No, sir. You -- you don't have an idea because they all pretty much dressed alike, so you really wouldn't have a clue of who you talking to unlessing they tell you; but I mean, a lot of time they just want to talk and they don't really tell you anything but just talk.

Q. So a lot of times you don't know anything about these people when they come up and talk to you?

A. No, sir.

Q. You don't know who they are?

A. No, sir.

Q. You don't know why they are in where they are in?

A. No, sir, unlessing they tell you. That's the only way that we'll know; but most of the time they just come and start talking to you.

Q. And do sentenced individuals come talk to you?

A. Can you repeat that, sir?

Q. Will sentenced -- well, during these audits, will a sentenced individual come talk to you?

A. Yes, sir.

Q. Does -- do -- have you ever had a pretrial detainee come up and talk to you?

A. I probably have. I -- I mean, I've talked to a lot of inmates when I do audits, so I probably have, you know, so --

Q. Okay. So would you -- if a pretrial detainee did come up and talk to you, would you have talked to that individual?

A. Yes, sir. We don't -- we talk to everybody. I mean, if they got a complaint, we going to probably talk to them.

Q. At any point in time during these audits, has anybody, whether a pretrial detainee

or a sentenced individual, have -- have they come up and expressed any concern about compliance with Basic Jail Guidelines?

A. Probably have. Since I've been doing it, yes, sir, probably have.

Q. And in any of those reports, do you recall any individual, whether a pretrial detainee or a sentenced individual, expressing a concern that they are being housed together inappropriately?

A. I don't recall. I really don't recall at this time.

Q. What -- what is your understanding in terms of how housing is supposed to be maintained in terms of a pretrial detainee versus a sentenced individual?

A. Well, when we try -- we recommend that they house them separately within the department. I recommend -- we recommend that they house them separately from any of the other offenders, but sometimes we know that, due to spacing and -- and classification system -- main thing is we want to make sure everybody's safe. That's our main objective, that the offenders are safe; and that's with any offender, so that's our

main whole goal. But we do recommend that they house DOC offenders together by theirselves when we do audits and things.

Q. Okay. And so you just mentioned the audits. At any time when you're doing these audits, whether it's the annual audit or the recertification, is that a question that's asked? Is that something that's reviewed in terms of whether pretrial detainees are being held or separated to the extent possible from sentenced individuals?

A. Yes. Yes, sir. That's -- that's one of the things that we talk -- we stress. If we -- the moment we realize it, we'll always make sure in the audit that we -- we make sure that the warden understands that at no time that those offenders should be -- if he can avoid it. You know, sometimes we understand circumstances do happen and you have to -- you know, you -- but we do recommend that they house those offenders in different areas than DOC offenders.

Q. Do you -- when you're doing these audits, is there any documentation that you are looking for in terms of that particular issue in terms of pretrial detainee versus sentenced

individuals?

A. Yeah. We kind of monitor the -- the BJG files and make sure they are not handling -- in the BJG guideline files that there's a -- there's a listing of offenders on the database, so we make sure that we look at that and make sure that they kind of follow that and just encourage them not to do that.

Q. At any point in time during your audits of Madison Correctional Center, did it ever come to your attention that pretrial detainees are -- were being housed with sentenced individuals?

A. It may have, but I can't recall at this present moment.

Q. If that would have been reported to you or if you would have discovered that, what would -- what would have happened then?

A. We would -- we would have got with Madison, the warden at Madison, and we would have made sure that they are not doing that and make sure that every opportunity that they have to not to do that.

You know, that's one thing that, you know, we will do. We will double check and

recheck to make sure that they are not actually doing -- doing those type of things, that if they can't -- if they can't -- if at all possible reason that they are doing it, they have to give us some kind of reason of why they have that particular offender in that area or whatever.

Q. Okay. Do you ever recall finding any violation on the part of Madison Correctional Center for mixing pretrial detainees with sentenced individuals?

A. There may have been, but at this time, I can't really recall; but it probably has happened. I mean, I can't recall a particular date or whatever. It probably has happened, but I can't really just recall it.

Q. Do you ever recall reporting any such violation to headquarters?

A. Like I say, again, I may have. I just cannot recall at this time.

Q. Okay. How would you have reported it, I guess, if you are saying --

A. Okay. I'm --

Q. -- you're --

A. Normally if an incident like that happens, I would report it to Ms. Wintz and she

would get it to the chief or whoever and -- and we would look at it from that point.

Q. Okay. But to your -- to your knowledge, do you recall that ever occurring?

A. Not at this time, I don't.

Q. Would you have had any conversations with Seth Smith, Mr. Seth Smith; would you have made any direct reports to him for that type of issue or --

A. If an issue like that arise, well, yes, I'll -- through his office, yes. Somebody would have contacted me and I would have -- probably he would have had me do a report or investigate or whatever and submit my response back to him if anything of that nature had come up, whatever.

Q. Okay. Would you have had any direct conversations with Secretary LeBlanc?

A. No, sir. Probably through his secretary or somebody like that through his office, not directly with Secretary LeBlanc.

Q. Okay. And that was my question, though. Any direct communication?

A. Oh, no, sir, not directly. It would be always transferred through a secretary or

something as well as Chief Smith as well, so --

Q. And that was my question. So same thing for Chief Smith?

A. Correct.

Q. You would not have had -- you would not have directly communicated with him if you would have found an issue at a local facility, correct, you would have just made a report?

A. That's correct.

Q. Okay. And the report you would have made, would that have been -- let's say, I guess, Chief Smith's office, would that have been by e-mail; would it have been by telephone?

A. E-mail.

Q. Okay. So is it safe to say that if we don't have any e-mail showing any concern raised in terms of pretrial detainees being mixed with sentenced individuals at Madison Parish, would that be safe to say that you never made a report to them?

A. Yes. Yes, sir. That would be safe to say, yes, sir.

MR. ALVAREZ:

That's all I have for right now.

MS. CUMMING:

All right. I think we have a couple followups.

EXAMINATION BY MS. CUMMING:

Q. I want to go back to Exhibit 5, which is the quarterly May 2020. Let me see if I can find it. All right. So this is May 2020. This is Exhibit 5, and I want to look on page 2.

You had previously testified that these are summaries that you wrote based on information you got back from the facility and you kind of synthesized these summaries that are included.

And in May, the assaults with significant injury, looking at Madison Parish Correctional Center, it looks like offender Michael LeBlanc, who appears to have a DOC number, had a physical altercation with pretrial offender Lamar Green; and it looks like this is being reported as a -- as a fight with a significant injury.

Did you take any action in looking at this report, which indicates that there's certainly -- it's enough contact between a pretrial and a sentenced person for them to get into a pretty serious fight?

A. I spoke with the warden. As I said earlier, we contact the warden and make sure that those inmates are not housed with DOC offenders.
Q. All right. So which -- which warden did you speak to?
A. Whoever the warden was at the facility at that time.
Q. You don't recall who it was at the time?
A. No.
Q. And when you spoke to the warden, did you request any other documentation to confirm that they weren't housing pretrial and sentenced people together?
A. I don't recall at this time.
Q. Did you speak with Ms. Wintz or anybody at headquarters?
A. I don't recall.
Q. Okay. Is there any documentation of any of the steps that you took?
A. I don't recall.
Q. In -- okay. All right. But -- but you are testifying you do recall that you spoke to the warden after this May 2020 incident?
A. If the incident happened, occurred,

I probably did speak with the warden about the incident because I have to get the information from the institution, so I'm quite sure I did, I spoke with the warden or somebody at the institution about this incident.

Q. Okay. And do you recall did any part of that conversation include the discussion about the fact that there was a DOC person and a pretrial person who were close enough together to get into a fight that resulted in a significant injury?

A. No, ma'am, I don't recall that.

MS. CUMMING:

Okay. All right. Okay. I think that wraps up for us, so yes. We appreciate your time, Warden Mays.

THE WITNESS:

All right.

MS. CUMMING:

So yeah, I think we're -- we're done.

MR. ALVAREZ:

All right.

(The deposition was concluded at 1:59 p.m.)

CORRECTION SHEET

PAGE LINE DESCRIPTION

_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________
_____ _____ __________________________________

WITNESS: ASSISTANT WARDEN TYRONE MAYS
TAKEN ON: JANUARY 22, 2024
BY: CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

WITNESS CERTIFICATE

I, ASSISTANT WARDEN TYRONE MAYS, do hereby certify that the foregoing testimony was given by me, and the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

__________________ _____________________________

DATE SIGNED (Witness' Signature)

Signed with corrections as noted.

Signed with no corrections as noted.

DATE TAKEN: January 22, 2024

REPORTER'S PAGE

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for the court reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; also, that any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

CHERIE' E. WHITE, CCR(LA NO. 96002)
CSR (TX NO 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)

REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, CHERIE' E. WHITE, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that Assistant Warden Tyrone Mays, to whom the oath was administered, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 175 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

Cherie' E. White

CHERIE' E. WHITE, CCR (LA NO. 96002)
CSR (TX NO. 10720)
CSR (MS NO. 1514)
RPR (NATIONAL NO. 839452)